**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LORENA MINIX, BRENDA SIMS, and LINDA SIMS,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION NUMBER:** |
| **v.** | ) | **3:05-cv-00685-T** |
| | ) | |
| **JELD-WEN, inc. and RICHARD FETNER,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT JELD-WEN, inc.'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, JELD-WEN, inc.

("JELD-WEN"), one of the Defendants in the above-referenced matter, submits this

Memorandum of Law in Support of its concurrently filed Motion for Summary Judgment

on all of the claims asserted by Plaintiffs.  In support thereof, JELD-WEN shows the

Court as follows:

**INTRODUCTION/SUMMARY OF ARGUMENT**

The three Plaintiffs, all of whom were employed by JELD-WEN at its Roanoke,

Alabama production facility until the plant closed for economic reasons in December

2004, allege that they were sexually harassed by their supervisor, Richard Fetner.  This

is a classic Ellerth/Faragher case in that the three Plaintiffs, along with two employees

who are not parties to this lawsuit, reported the alleged conduct[1] to JELD-WEN for the

first time on October 13, 2004, and Mr. Fetner's JELD-WEN employment ended that

---

[1]    Mr. Fetner denies the Plaintiffs' allegations.  Fetner, 229:9-230:4, 230:21-231:3.
JELD-WEN, inc. takes no position at this stage of the litigation as to the veracity of the
allegations and reserves any and all rights it has regarding same.

morning.  Plaintiffs' dilatory report was inexcusable given that beginning at least early as August 2004, at least three different medical providers, an EEOC investigator <u>and</u> an attorney friend separately instructed the Plaintiffs to report the alleged conduct in the manner prescribed by JELD-WEN's policy, but yet they failed to do so until October 13, 2004.  None of the Plaintiffs was ever demoted, received any decrease in rate of pay or otherwise subjected to any tangible adverse employment action.  Thus, JELD-WEN has established its defense based on its prompt action consistent with its well-disseminated policy and the Plaintiffs' failure to take advantage of the remedial provisions of the policy.

## <u>STATEMENT OF UNDISPUTED FACTS</u>[2]

### *General*

1.    JELD-WEN is head-quartered in Klamath Falls, Oregon, and manufactures building products including windows and doors.  Hees, ¶2.  JELD-WEN acquired a mill-works plant in Roanoke, Alabama ("Roanoke facility") from Millwork Specialties, Inc. and the employees at the facility became JELD-WEN employees in early 2002. Hees, 40:23-41:6, 48:6-11.

2.    The Roanoke facility produced wooden components (exterior jambs and brick mold) used in the construction of door frames.  Fetner, 26:22-27:3.  The components produced at the Roanoke facility – i.e., the door frame pieces - were then shipped to other locations for assembly.  Hees, ¶3.

---

[2]    Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant presents the facts in the light most favorable to Plaintiff.  Defendant adopts this version of the facts for purposes of this Motion for Summary Judgment <u>only</u>, and nothing herein shall in any way be construed as an admission of any fact or allegation.

3.    From 2002 through 2004, JELD-WEN operated three mill-works plants in Eastern North America including plants in Sparta, Tennessee; Quebec, Canada; and the Roanoke facility.   Hees, 11:16-22.   Dan Hees ("Hees") was the Coordinating General Manager of the three plants and was based out of the Sparta, Tennessee facility.   Hees, 10:11; Hees, ¶4.   Pat Galvez ("Galvez") transferred from the Quebec facility to the Roanoke facility in early 2002 to serve as the Acting General (i.e., Plant) Manager for the Roanoke facility.   Galvez, 21:5-9, 22:1-3, 42:6-8, 43:20-21.   Galvez reported to Hees.  Hees, ¶5.   Richard Fetner, ("Fetner") a former Millworks Specialties, Inc., employee, was a Group Manager, i.e., a position akin to a foreman, and reported directly to Galvez.  Fetner, 32:4-8; Hees, 33:21 – 34:6; Galvez, 13:5-7, 43:9-10.[3]

4.    Plaintiffs Lorena Minix ("Minix") and Linda Sims knew that Hees was over Fetner and Galvez and they knew how to reach Hees if they needed him.  Minix, 67:21 - 68:14; L. Sims, 58:23 – 59:7.  Hees visited the Roanoke Plant once or twice a month. Minix, 177:27 - 178:14; L. Sims, 105:14-16; Hees, 47:24-48:1.

5.    Most of the positions in the Roanoke facility, including the positions held by the three Plaintiffs, were general laborer jobs.  Hees, 74:15-75:2.  General laborers were expected to work a variety of jobs in different areas and moved frequently to accommodate production requirements. B. Sims, 46:1-20, 50:1-8; Hees, 72:7-9; Fetner, 73:6-14, 114:14-18, 165:5-10.  All of the work performed by the general laborers was at about the same difficulty level.  Cook, 63:14-18.

---

[3] Joe Mendoza was also transferred to the Roanoke facility and worked as a Group Manager from October 2002 until October 2003, when he transferred to Corsicana, Texas.  Hees, 61:4-5, 61:15–62:1; Hees, ¶6.  Mendoza and Fetner were equal in the plant hierarchy and reported to Galvez.  Hees, ¶6.

*JELD-WEN's Anti-Harassment Policy*

6.      JELD-WEN's Anti-Harassment Procedures and Guidelines ("anti-harassment policy") is provided to all JELD-WEN employees both in the JELD-WEN Employee Handbook and as a separate stand-alone policy. Galvez, 74:9-13; Sturm, 16:21–17:5, 28:9-20; Minix, 190:20-191:10, EX-27.   Plaintiffs received a copy of the handbook and even produced a copy of the handbook during discovery.  Minix, 184:1-18, EX-26; L. Sims, 119:6-19, EX-16, 18, 19 (handbook and policy acknowledgement); B. Sims, 112:8-13, EX-15-17 (handbook and policy acknowledgement); Fetner, 102:14-21.  The anti-harassment policy is also posted at JELD-WEN's facilities.  Sturm, 70:10-11, 130:15-17.

7.      The anti-harassment policy provides in pertinent part:

> JELD-WEN strives to provide a productive and comfortable working environment free from harassment or discrimination including that which may be construed to be offensive sexual conduct.   This policy applies to every aspect of the employment relationship throughout the organization and to the dealings of employees with one another, as well as with vendors and customers.
>
> **Harassment in any form will not be tolerated by the company.**  Any employee who violates this policy is subject to discipline up to and including discharge.
>
> * * *
>
> Employees will be made aware of this policy and are encouraged to not tolerate harassment.  **Any employee who believes that he/she is being subject to objectionable conduct should promptly notify either their immediate Supervisor, their General or Corporate Manager, Vice President or Subsidiary President, or the Legal Department at (541) 882-3451.**  Any Supervisor, General or Corporate Manager, Vice President or Subsidiary President, who has questions concerning harassment complaints shall contact the Legal Department.

* * *

> Every complaint of harassment will be investigated promptly, thoroughly, fairly, and objectively.

* * *

> If the information collected during the investigation establishes that harassment or other objectionable conduct did occur, disciplinary action will be promptly taken against the harasser, up to and including termination if appropriate. Employees will not be discriminated or retaliated against for reporting harassment or participating in an investigation.

Minix, EX-27 (P0007, emphasis added).

8. Each new employee is required to sign an acknowledgement that provides:

> **I have received training/instruction on JELD-WEN's Anti-Harassment Procedures and Guidelines and I understand its contents**. I agree to abide by this policy and I understand that my conduct will be governed by this policy the duration of my employment.

B. Sims, EX-16; L. Sims, 125:6-14, EX-18 (emphasis added).

9. Each Plaintiff testified at deposition that she was aware of and fully understood the anti-harassment policy. Minix, 186:18-21, EX-26, ("I understand all of it"); B. Sims, 113:5-10; L. Sims, 119:14-19, 120:21-23.

10. Employees should follow the guidelines listed in the policy for reporting harassment allegations. Sturm, 26:23–27:16. Employees are encouraged to escalate their complaint to a higher level when they do not feel the initial response was appropriate or acceptable. Sturm, 129:21–130:17. In addition, to the Legal Department, Hees (as the Coordinating General Manager) and Galvez (as the Acting General

Manager) along with an employee's immediate supervisor were appropriate persons to receive reports of harassment under JELD-WEN's policy.  Hees, ¶7.

11.    Minix indicated that Galvez was a "very nice" guy and that she was comfortable approaching him regarding issues related to her employment, including requests for time off to address personal matters.  Minix, 181:5-7, 245:18-246:7.

12.    The manager designated in JELD-WEN's anti-harassment policy is responsible for initiating an investigation of any allegation of harassment.  Sturm, 21:23-22:3.  JELD-WEN's Legal Department serves as a resource for the investigation and to determine whether particular conduct violates JELD-WEN's policy.   Hees, 165:4-7; Sturm, 22:10-13.

13.    Fetner understood that JELD-WEN did not tolerate harassment in any form.  Fetner, 102:22-103:5.

### Plaintiff Lorena Minix

14.    Minix initially worked at the Roanoke facility during the 1990's.   Minix, 216:5-21.  According to Minix, she returned to work at the Roanoke facility in September 2001 while the facility was operated by Millworks Specialties, Inc.   Minix, 70:2-13, 217:19-218:10.

15.    Minix was re-hired by Richard Fetner who was also her immediate supervisor until his JELD-WEN employment terminated.  Minix, 174:19-22, 183:11-17; Fetner, 67:20-68:21.

16.    Minix was a general laborer with JELD-WEN and primarily worked on the dado machine although she also worked on the routers, on the brick mould machine, on

the cut line and she also worked as an inspector.  Minix, 72:13-73:7, 86:22- 87:5; Hees, 74:15-75:2.

17.    As noted in her EEOC charge and the Complaint filed in this action, Minix and Fetner dated and had a consensual sexual relationship during 2001-2002.  Minix, 210:23-214:15, EX-43.  The relationship ended because Fetner quit calling Minix. Minix, 213:3-8.

18.    Minix's hourly pay rate never decreased while she worked at JELD-WEN. Minix, 143:13-19.

### *Minix Complains about a Co-Employee's Conduct*

19.    At the end of her shift on Thursday, June 26, 2003, Minix requested that Fetner move her away from co-employee Ronald Bowen.  Minix, 223:9-224:1; Galvez, 52:6-9, 54:5-8, 83:3-13.  Minix did not tell Fetner why she wanted to be moved, she just told him that she wanted to be moved.  Minix, 223:9-224:1.  Fetner reported Minix's request to Galvez, the Acting General Manager, soon thereafter.  Fetner,94:16-21; Galvez, 40:18-22.  On June 27th, Towanna Zachery ("Zachery") told Pat Galvez that Bowen was masturbating with his hands inside his pants at the Roanoke facility.  Minix, 219:5-11, 225:4-9, Zachery, 34:18-21; Galvez, 58:9-22.  Galvez began an investigation of the allegations.  Galvez, 53:21-24.  Galvez met with Minix on the morning of Friday, June 27th and she relayed the allegations regarding Bowen.  Minix, 223:22- 224:6; Galvez, 53:21-54:18.

20.    Minix reported no additional complaints about Bowen's conduct after she reported the conduct to Fetner on June 26th and Galvez and Fetner watched her work area closely during the investigation.  Galvez, 82:14-24, 112:6-9; Fetner, 221:14-21.

21.    Minix expressed concern for Bowen during the investigation process and told Galvez that she did not want Bowen to lose his job because he was "good for the plant."  Minix, 221:23-223:20; Galvez, 55:17-19.  According to Minix, she and Bowen were not separated for a "couple of weeks" and she had to work with him "about a week".  Minix, 222:18-23; 308:23-309:1.

22.    As part of his investigation, Galvez met with Bowen on Wednesday, July 2nd and Bowen denied the allegation.  Galvez, 65:9-12, 68:12-15.  The plant was shut down for the July 4th holiday on Friday July 4th and Monday July 7th and Minix was on vacation from July 9th until July 11th.  Galvez, 111:16-112:8.  Thereafter, Minix was assigned to work on another machine where she was further separated from Bowen. Galvez, 80:8-17.[4]  Galvez met with Minix again on July 14, 2003 to conduct a follow-up interview. Galvez, 67:6-12, 70:11-17.

23.    Consistent with JELD-WEN's practice, Galvez contacted JELD-WEN's legal department on July 16, 2003, for further assistance with the allegations.  Galvez, 69:6-17.  In July 2003, Rob Sturm, a labor and employment attorney with JELD-WEN's in-house legal department in Oregon, traveled to Roanoke - a distance of some 2,709 miles - to further investigate Minix's allegations.   Sturm, 38:9-12, 39:1-4.  Minix talked to the JELD-WEN lawyer "about a week" after she talked with Galvez about the issue. Minix, 227:15-21.

24.    Minix found Sturm to be attentive and, as she described, "he was right on the point" with his questions.  Minix, 227:22-228:12.  Sturm talked with Minix both before

---

[4]    Minix made no reference to Bowen's conduct in her charge of discrimination and makes no claim about the conduct in this law suit.  Minix, 315:17-316:3 (noting that her claims relate only to Fetner's alleged conduct).

and after he spoke with Bowen and her complaints were limited to Bowen.   Sturm, 175:6-25, 176:18-22.

25.    Sturm decided to conduct anti-harassment training while he was in Roanoke.  Sturm, 38:9-12, 39:1-4.  On July 24, 2003, Sturm interviewed Minix, another witness and Bowen, but did not complete his investigation prior to the time that the anti-harassment training was scheduled to begin. Sturm, 175:11-176:2.

26.    Sturm used an approximately 66-slide Power Point presentation in his anti-harassment training, a copy of which was produced in this litigation.  Sturm, 31:21-32:17, 33:25-34:3 (D00447-D00513).   The anti-harassment training was presented to the entire plant.  Minix, 229:10-16.  Minix and Fetner, as well as third-party witnesses Towanna Zachery, Kathy Thornton and Lisa Cook all attended the training.   Minix, 231:5-13,EX-44 (sign-in sheet); Fetner, 101:19-102:4.

27.    Bowen confronted Sturm and walked off the job immediately after the PowerPoint presentation on July 23rd.  Sturm, 176:11-14; 22-23;  Minix, 234:3-10.

28.    Minix took over Bowen's job after his employment ended and she received an increase in pay related to this move.  Minix, 282:4-6; Fetner, 220:16-23.

29.    Minix agrees that Galvez and Sturm took action once she apprised them of the situation.  Minix, 236:10-13.  She also expressed appreciation to Sturm regarding the manner in which JELD-WEN handled the matter.  Sturm, 110:24-112:2.

30.    Minix told co-Plaintiffs Brenda Sims and Linda Sims about Sturm traveling from Oregon to investigate Bowen and that Bowen left because of Minix's complaint.  B. Sims, 108:6-12, 110:7-12; L. Sims, 114:23-115:14.

### Plaintiff Linda Sims

31.    Plaintiff Linda Sims was assigned to work at JELD-WEN's Roanoke facility on or about April 19, 2004 by Express Personnel, a provider of temporary employees. L. Sims, 66:17-67:2, 94:11-16, EX.14-15.  Linda Sims became a JELD-WEN employee on or about June 8, 2004.  L. Sims, 66:23-67:1. EX-18.

32.    Linda Sims was a general laborer and performed a variety of general laborer positions in the Roanoke facility.  Hees, 74:15-75:2.  Linda Sims worked on the door lock router, the dado machine and in the glue room.  L. Sims, 99:1-101:2.  Sims never had any problem performing any of the work that she was assigned.  L. Sims, 100:5-102:1.  Sims' salary increased but never decreased during the time that she was employed by JELD-WEN.  L. Sims, 102:4-19.

### Plaintiff Brenda Sims

33.    Plaintiff Brenda Sims was assigned to work at JELD-WEN's Roanoke facility on or about May 14, 2004 by Express Personnel.  B. Sims, 88:3-13.  Brenda Sims became a JELD-WEN employee on or about June 1, 2004.  B. Sims, EX-18-19.

34.    Brenda Sims was a general laborer and performed a variety of general laborer positions in the Roanoke facility. B. Sims, 50:1-8; 96:17-97:1-4, 98:11-16, 99:15-19, 100:1-4, 101:1-3, 102:6-8; Hees, 74:15-75:2.  Brenda Sims worked in the cutting area, the dado machine area, on the glue machine and once in the paint room.  B. Sims, 50:1-8.  Brenda Sims had no problems working in the cutting area, on the routers or in the glue room and could not say whether working on a router or working in the cutting area was harder.  B. Sims, 98:7-100:17.  Brenda Sims was able to handle every task that she was assigned to perform.  B. Sims, 102:16-18, 127:17-19.  Sims' salary increased but never decreased during her JELD-WEN employment.  B. Sims, 127:3-13.

***Fetner's Alleged Conduct and Plaintiffs' Failure to Report***

35.    Plaintiffs complain about Fetner's allegedly sexually harassing conduct in this lawsuit.  Minix, 277:10-280:7, 283:21-285:8; L. Sims, 134:9-12, 21-22, 135:10-16, 136:16-21, 140:21-141:2; B. Sims, 149:23-150:8, 151:3, 153:2-22, 154:13-20, 165:1-6. Plaintiffs' complaints in this case are limited to Fetner's conduct and they do not allege inappropriate conduct by any other JELD-WEN employee.  Minix, 315:17-316:3; L. Sims, 132:23-133:21; B. Sims, 204:18-23.

36.    In general, Plaintiffs complain that Fetner directed inappropriate verbal conduct towards them by asking each of them out on dates and, in the case of Linda Sims, commenting on her anatomy.  L. Sims, 132:23-133:21, 134:9-12, 21-22, 135:10-16, 136:16-21, 140:21-141:2; B. Sims, 155:18-21, 158:17-159:5, 165:1-6; L. Minix, 277:10-280:7, 283:21-285:8.  Plaintiffs further complain that Fetner would hug and/or otherwise touch each of them in a manner that they found to be inappropriate by, for example, brushing up against their breasts when training them on a machine.  L. Sims, 134:9; B. Sims, 149:23-150:8, 150:23-151:1-3, 152:22-153:2, 153:16-21, 154:13-20; L. Minix, 278:3-6, 280:5-7.[5]

37.    According to Plaintiffs, Fetner would engage in this inappropriate conduct outside the presence of Galvez and other JELD-WEN managers where there were no witnesses other than possibly other hourly workers.  L. Sims, 145:22-146:9; B. Sims, 152:16-18, 154:2-4, 155:11-12; L. Minix, 280:12-281:19.  Notably, due to the pre-existing design of the facility, Galvez could not even see the areas where Fetner's

---

[5]    The particulars of Plaintiffs' allegations, which Fetner denies, are irrelevant to a determination on JELD-WEN's motion as JELD-WEN does not argue that the conduct was severe and pervasive for summary judgment purposes.  Fetner, 229:9-230:4, 230:21-231:3.

conduct allegedly occurred from his office.    L. Sims, 97:17-23; B. Sims, 49:10-12; L. Minix, 80:3-9, 82:10-22, 288:4-13, 291:12-18, EX-7; Giles, 53:2-54:5.

38.    Fetner denies that he engaged in any of the alleged conduct.  Fetner, 229:9-230:4, 230:21-231:3.

39.    Minix testified that Fetner's alleged conduct was similar to his conduct when they were dating and she would "joke back with him about it" and "just play it off." Minix, 284:19-286:4.

40.    Plaintiffs reacted to Fetner's conduct by, in Minix's case, acting like the conduct did not occur; in Brenda Sims' case, by walking away from Fetner; and in Linda Sims' case, she just froze up.  Minix, 283:2-11; B. Sims, 153:21-154:1, 155:13-17; L. Sims, 147:14-19.

41.    Sometime prior to October 13, 2004, Minix told Fetner that "he should be ashamed of what he's doing."  Minix, 297:2-7.

42.    Brenda Sims contends that Fetner would move her to different jobs that she "didn't like" even though she could perform the work.  B. Sims, 160:16-162:3.

43.    Linda Sims also contends that Fetner moved her to jobs that no one else wanted to do although she was capable of performing each job after she learned how to perform it.  L. Sims, 142:5-143:10.

### *Plaintiffs Fail To Report the Conduct Notwithstanding Advice from the EEOC, Health Care Providers, Attorneys and Others*

44.    According to Kathy Thornton, she, the three Plaintiffs, Lisa Cook and Mary Lou Laws ate lunch together on several occasions during 2004 and discussed Fetner's inappropriate conduct.  Thornton, 89:12-90:23, 123:4-124:10, 144:4-10.  During one of

these lunch meetings that Thornton believes was in early September 2004, the six women decided to report Fetner's conduct. Id.

45.    Plaintiffs Minix and Linda Sims met with an EEOC investigator in August 2004.  L. Sims,158:14-159:6. EX-23.  The EEOC investigator instructed them to report Fetner's alleged conduct to the people over Fetner in JELD-WEN management.  L. Sims, 159:7-11.

46.    Plaintiff Minix told her health care provider, Nurse Practitioner Charlotte Bishop, about Fetner's alleged conduct sometime prior to October 13, 2004.  Minix, 313:4-22.  Ms. Bishop instructed Minix to report Fetner's conduct to JELD-WEN management.  Minix, 313:16-19.

47.    Plaintiff Brenda Sims told her health care provider, Bill Caypless, about Fetner's alleged conduct.  B. Sims, 184:8-14.  Mr. Caypless instructed Sims to report Fetner's conduct to Fetner's boss.  B. Sims, 184:15-21, 191:16-19.

48.    Plaintiff Linda Sims told her health care provider, Dr. Russell Peterson, about Fetner's alleged conduct on August 25, 2004.  L. Sims, 87:14-88:9.  Dr. Peterson instructed Sims to "contact somebody higher up and talk to them about this problem." L. Sims, 88:4-9.

49.    Finally, the three Plaintiffs and three of their co-workers, Kathy Thornton, Mary Lou Laws and Lisa Cook met with attorney Chad Lee at Ms. Cook's babysitter's house sometime prior to August 24, 2004.  L. Sims, 15:5-9, 43:18-46:6;  Cook, 111:15-112:13, 113:7-15.  Mr. Lee instructed the six women to review JELD-WEN's handbook and report Fetner's alleged conduct to the appropriate management official. Cook, 114:14-21; Thornton, 112:2-113:4.

***Plaintiffs Report Fetner's Alleged Conduct in October 2004***

50.    Plaintiff Brenda Sims left a message for Dan Hees on or about October 8, 2004.  B. Sims, 192:9-12; Hees, 69:18-70:12.  Brenda Sims obtained Hees' number by calling JELD-WEN'S corporate headquarters in Oregon.  B. Sims, 192:13-21.   Hees called her back at her house a couple of days later and arranged a meeting in Roanoke. B. Sims, 193:5-7, 193:21-194:10, 195:14-17.

51.    Plaintiff Linda Sims called JELD-WEN's "800" number in October 2004.  L. Sims, 151:10-11, 154:16-155:5.  Someone from JELD-WEN's legal department called her back a few days later and left a message indicating that the legal department was interested in talking to her.  L. Sims, 151:12-14, 155:21-156:20.  The person requested that Sims call her back on the  "800" number but Linda Sims did not call again because she was about to meet with Hees as a result of Brenda Sims' contact.  L. Sims, 151:7-152:4, 156:21-157:5.

52.    Hees traveled from Sparta, Tennessee and was scheduled to meet with Brenda Sims on October 13, 2004, to discuss Fetner assigning her to work different laborer positions at the Roanoke facility.  Hees, 70:3-18.  Instead, Hees met with Minix, Linda Sims, Brenda Sims, Thornton and Lisa Cook about 9:00 AM in the Roanoke facility's paint room.  L. Sims, 160:3-15; Hees, 71:3-16.  The women selected Hees because they "felt like he was the one [they] were supposed to talk to."  Minix, 275:8-13.

53.    The meeting began with Brenda Sims complaining that Fetner was moving her to jobs where she was not comfortable.  Minix, 276:11-14.  Then the five women relayed their allegations regarding Fetner's inappropriate conduct to Hees during this meeting which lasted approximately 30 to 45 minutes.  Hees, 76:4-89:14; L. Sims, 163:22-164:2; B. Sims, 200:22-201:1; Minix, 274:19 – 275:7.

54.     According to Plaintiffs, Hees was "nice", attentive, appeared concerned and took notes during the meeting although it is likely that everyone in the meeting "giggled" when discussing some of the allegations.  Minix, 301:18-22; L. Sims, 163:6-10.  Minix even laughed when discussing some of the allegations during her deposition.  Minix, 286:20-287:7.

55.     The October 13, 2004 meeting with Hees was the first occasion that any Plaintiff reported Fetner's conduct.  Minix, 279:4-20; L. Sims,168:16-21, 170:19-171:2; B. Sims, 199:5-9.  Hees never personally witnessed Fetner engage in any inappropriate conduct of a sexual nature and the October 13, 2004 meeting was the first time he learned of such allegations.  Hees, 89:23-90:1.

56.     Ms. Thornton and Ms. Cook reported the conduct because they did not want to have to work with Fetner any longer and wanted the conduct to halt.  Thornton, 91:1-13; Cook, 21:17-22:4, 23:9-11, 107:8-11.  Cook was satisfied once she no longer had to work for Fetner.  Cook, 21:23-22:4.

### Hees Meets With Fetner

57.     Fetner was at a dentist appointment when Hees met with the five women.  Hees, 90:23-25; Fetner, 113:13-16.  Hees contacted Fetner a short time after the meeting with the five women ended and met him at a local coffee shop to further investigate the allegations.  Hees, 90:23 – 91:5.  According to Hees, Fetner told Hees that he would "make it simple for you" and he resigned during this meeting after Hees informed him that legal would be contacted to investigate the allegations.  Hees, 95:6-96:5.  According to Fetner, he informed Hees by phone on the day prior to the meeting that he intended to resign and would work a two-week notice period.  Fetner, 71:2-7,

184:15-185:1, 224:11-20, 233:17-22.   Nonetheless, Fetner did not return to work at JELD-WEN after his meeting with Hees and he never directed any additional inappropriate conduct towards any of the Plaintiffs.   Minix, 299:1-11; L. Sims, 164:15-17.   According to Fetner, Hees told him "that I could get my stuff, what I had left in the office that evening."   Fetner, 168:1-2.   No further investigation was necessary because Fetner's employment ended.   Hees, 161:21-24.

58.    Hees met with the five women at the plant later on October 13, 2004 and informed them that Fetner no longer worked for JELD-WEN.   Hees, 127:16-128:3; L. Sims, 164:21-165:12.   According to Lisa Cook, either Minix or Linda Sims asked Hees: "[a]re we going to get anything out of this" which Cook interpreted as a request for monetary compensation.   Cook, 23:3-26:8.

59.    Similar to the allegations set forth in the Complaint, the five women confirmed to Hees that none of them were "short paid" or "lost time" or had their pay reduced during the time about which they were complaining.   Hees, 128:17-22.

60.    Plaintiffs do not complain about any sexually inappropriate conduct after Fetner's employment ended.   Minix, 302:21-303:1; L. Sims, 165:16-18; Thornton, 99:8-12, 116:2-16.   However, Linda Sims does not feel that JELD-WEN punished Fetner as severely as they should have.   L. Sims, 171:10-172:4.

### *JELD-WEN Closes the Roanoke Plant*

61.    During the 2004 budgeting process that took place in or about November 2003, JELD-WEN, inc. decided that the millworks facility in Roanoke, Alabama would be closed during 2004.   Homrighaus, ¶ 2; Sturm, 171:15-21.   Barry Homrighaus, JELD-WEN's President-Window Group, made the decision to close the Roanoke facility with input from his subordinate manager, Rick Parker.   Homrighaus, ¶ 2.   Emails produced in

this action confirm that the decision to close the plant had been made prior to March 2004.  Homrighaus, ¶ 4, EX-A & B.

62.    The Roanoke facility was closed because of issues related to economic efficiency in that foreign competition suppressed the price of the door components produced by the plant and because JELD-WEN, inc.'s Sparta, Tennessee plant produced the same door frame components on a larger and more efficient scale. Homrighaus, ¶ 3.

63.    The Plaintiffs had heard rumors that the plant would close at least as early as 2003.  Minix, 204:22 – 205:10, EX-41; B. Sims, 129:8-11.

64.    In September 2004, Hees' boss, Don Schneider, instructed him not to complete a 2005 budget for Roanoke because the plant would close before the new year.  Hees, 106:19-25; Hees, ¶ 9.  Schneider further informed Hees that they would discuss severance packages and plant closure protocol at a meeting in Oregon that would occur in a couple of weeks.  Hees, ¶ 9.  Hees was at this meeting when Brenda Sims attempted to contact him at the Sparta plant with her initial report of Fetner's alleged conduct.  Hees, ¶ 9.  Hees returned her call after he returned to Tennessee from the meeting.  Hees, ¶ 9.

### The Plant Closing Is Announced

65.    On October 21, 2004, Hees met with the Roanoke facility employees and announced that the plant would not operate in 2005.  Hees, 115:5-6 (D00316).

66.    Plaintiff Minix's last day of work at JELD-WEN was November 28, 2004. Minix, 104:11-16.  Minix was asked to work a little longer but she declined because she was ready to "get out of there."  Minix, 252:16-253:14.

67.    Plaintiff Linda Sims' last day of work at JELD-WEN was November 24, 2004. L. Sims, 169:7-9.

68.    Plaintiff Brenda Sims' last day of work at JELD-WEN was also in November 2004. B. Sims, 62:10-12.

69.    The Plaintiffs do not know when the decision was made to shut down the Roanoke facility nor do they know who made the decision. Minix, 303:2-8; L. Sims, 166:19-21, 167:23-168:10; B. Sims, 132:18-134:3.

70.    Plaintiffs had previously worked at other manufacturing plants that shut down. Minix, 48:18-49:1; B. Sims, 56:8-17, 59:11-60:5.

### Plaintiffs File EEOC Charges

71.    Plaintiff Brenda Sims filed an EEOC Charge on November 29, 2004 alleging that Fetner rubbed and touched her legs and breasts and invited her to his house between June 1, 2004 and August 1, 2004. B. Sims, 145:16-146:15, 149:23-150:8, EX-31.

72.    Plaintiff Linda Sims filed an EEOC Charge on November 11, 2004 alleging that Fetner made sexual comments regarding her body, requested that she go out on dates and touched her between April 1, 2004 and August 1, 2004  L. Sims, 130:5 – 132:8, EX-22.

73.    Plaintiff Minix filed an EEOC Charge on December 13, 2004 alleging that she was subjected to unwelcome hugging, rubbing, and touching as well as invitations that she go to Fetner's house. Minix, 206:7-14, EX-43. The charge indicates that the earliest date that the inappropriate conduct occurred was September 1, 2001 and that the latest was July 1, 2004. Id.

74.    Each Plaintiff cooperated fully with the EEOC investigation and provided the EEOC investigator with any and all information that the Plaintiff had to support her claim.  Minix, 306:20-23; L. Sims, 176:16-177:5; B. Sims, 214:3-9.

75.    The EEOC dismissed the Plaintiffs' charges, finding no cause to believe that JELD-WEN had violated Title VII and sent a letter to Plaintiffs' counsel before issuing the determination stating:

> Evidence from the Respondent indicates that the Company took immediate and appropriate action upon receiving the complaint from your client.  Evidence further shows that the Respondent immediately terminated the employment of the alleged harasser, Richard Fetner.  Respondent contends that your client suffered no tangible injury.  In regards to your client being moved from location to another, Respondent concludes that when business is slow, employees might need to move around to get work completed and that certain employees do not have specific work areas.  Finally, Respondent states that no employee would be moved from another job position without proper safety training.
>
> Your client has not provided sufficient evidence to show that the company did not take immediate action to rectify the problem once she complained to management.

B. Sims, EX-44,45 (quote is from letter regarding B. Sims' charge and the letters regarding the other Plaintiffs' charges contain similar but not identical language).

76.    JELD-WEN did not learn that Plaintiffs filed EEOC complaints until at least December 2004.  Hees, 134:15-17.  Even Linda Sims admits that JELD-WEN did not learn about the EEOC charges until after the plant closure was announced.  L. Sims, 175:7-18.

***Plaintiffs' Allegations in this Lawsuit***

77.    Plaintiffs allege that they were subjected to sexually harassing conduct by Fetner in violation of Title VII.  See Complaint.  Plaintiffs sued both JELD-WEN and Fetner but have not served Fetner with process.  Id.

78.    Fetner is the only person about whom Plaintiffs complain in this case. Minix, 315:17-316:3; L. Sims, 108:14-17, 133:9-21, 165:16-22; B.  Sims, 150:6-16.[6]

79.    Plaintiffs further allege that JELD-WEN and Fetner are liable for Outrage. See Complaint.

## ARGUMENT AND AUTHORITIES

**I.    PLAINTIFFS' TITLE VII SEXUAL HARASSMENT CLAIMS FAIL BECAUSE JELD-WEN HAS ESTABLISHED THE FARAGHER/ELLERTH DEFENSE.**

To establish a hostile work environment claim under Title VII, a plaintiff must establish:  (1) that [she] belongs to a protected group;  (2) that [she] has been subjected to unwelcome harassment;   (3) that the harassment must have been based on a protected characteristic of the employee, such as [the employee's sex];   (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). For purposes of summary judgment only, JELD-WEN does not contest the existence of

---

[6]    Linda Sims also suggested during her deposition that she wanted to assert a claim related to Hees' conduct but the conduct she referenced was simply Hees talking with her about non-sexual and non-gender related topics and does not bear further discussion.  See Linda Sims, 108:18 – 112:1, 133:9-17, EX-22.

the first four elements.[7]  JELD-WEN is entitled to summary judgment because Plaintiffs cannot establish that JELD-WEN is liable for Fetner's alleged conduct.

Courts distinguish between sexual harassment cases where there has been a tangible employment action and where there has been no tangible employment action taken against the plaintiff.  See Burlington Indus. v. Ellerth, 524 U.S. 742, 760-65 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Taylor v. CSX, 418 F. Supp. 2d 1284, 1295 (M.D. Ala. 2006).  For sexual harassment cases in which no adverse tangible employment action is taken, the Ellerth defense may be available to an employer.  The Eleventh Circuit summarized the Ellerth and Faragher holdings in Frederick v. Sprint/United Management Co.:

> In Ellerth and Faragher, the Supreme Court indicated that courts should no longer use the labels "quid pro quo" and "hostile environment" to analyze whether an employer should be held liable on an employee's Title VII claim concerning a supervisor's sex-based harassment.  Ellerth, 524 U.S. at 753, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633; Faragher, 524 U.S. at 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (applying new standard).  Instead, when analyzing whether an employer should be held liable for a supervisor's harassment, courts should separate these cases into two groups:  (1) harassment which culminates in a "tangible employment action," such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse "tangible employment action" is taken but which is sufficient to constructively alter an employee's working conditions. Ellerth, 524 U.S. at 761-63, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633;  Faragher, 524 U.S. at 790, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662;  see also Johnson v. Booker T. Washington Broadcasting Serv., Inc., 234 F.3d 501, 508 (11th Cir.2000) (recognizing shift in terminology).    Under this analysis, when a supervisor engages in harassment which results in an adverse "tangible employment action" against the employee, the employer is automatically held

---

[7]    JELD-WEN reserves its right to contest any and all of these elements at any further proceeding in this matter.

> vicariously liable for the harassment.  Ellerth, 524 U.S. at
> 763, 118 S.Ct. 2257, 141 L.Ed.2d 633;  Faragher, 524 U.S.
> at 790, 118 S.Ct. 2275, 141 L.Ed.2d 662.   In contrast, when
> the supervisor's harassment involves no adverse "tangible
> employment action," an employer can avoid vicarious liability
> for the supervisor's conduct by raising and proving the
> affirmative defense described in the Faragher and Ellerth
> cases ("Faragher /Ellerth affirmative defense").  Ellerth, 524
> U.S. at 765, 118 S.Ct. 2257, 141 L.Ed.2d 633;  Faragher,
> 524 U.S. at 807, 118 S.Ct. 2275, 141 L.Ed.2d 662.

Frederick v. Sprint/United Management Co., 246 F.3d 1305, 1311 (11th Cir. 2001); see also Walton v. Johnson & Johnson Serv., Inc., 347 F.3d 1272 (11th Cir. 2003) cert. denied 124 S.Ct. 1714 (2004).   (Faragher/Ellerth affirmative defense established where supervisor allegedly raped plaintiff employee on several occasions).

The Faragher/Ellerth "defense comprises two necessary elements:  (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Walton, 347 F.3d 1272, 1286.   The two elements of the Ellerth/Faragher defense are established in this case.

**A.    JELD-WEN Exercised Reasonable Care to Prevent And Correct Sexually Harassing Behavior.**

**1.    JELD-WEN Exercised Reasonable Care to Prevent Sexually Harassing Behavior.**

An employer satisfies the initial prong of the Faragher analysis through its dissemination and promulgation of an anti-harassment policy.  Walton, 347 F.3d, 1272, 1286.   The policy must adequately address Title VII's deterrent purpose and, at a minimum, "establish a complaint procedure designed to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending

supervisor." <u>Walton</u>, 347 F.3d 1272, 1286 (internal quotations omitted).  JELD-WEN's policy satisfies these requirements.

JELD-WEN's policy is aggressively and thoroughly disseminated.  JELD-WEN's anti-harassment policy is provided to each of its employees - including the three plaintiffs – by, among other measures, including the policy in its Employee Handbook. Galvez, 74:9-13; Sturm, 16:21-17:5,28:9-20; Minix, 190:20-191:10, EX-27.   The anti-harassment policy is also distributed to each new employee as a stand-alone policy and the employee acknowledges receipt of the policy. <u>Id</u>.; L. Sims, 119:6-19, EX-19; B. Sims, 112:8-13, 121:11-19, EX-15-17.   The policy was also posted at the Roanoke facility. Sturm, 70:10-11,130:15-17.   Furthermore, JELD-WEN's in-house labor and employment counsel trained all of the Roanoke facility's employees - including Minix and Fetner - on the sexual harassment policy in July 2003.  Minix, 229:10-16; Fetner, 101:21-102:4.   Even the employee about whom Plaintiffs complain in this matter, Fetner, testified that he was aware that JELD-WEN did not tolerate harassment in any form and that he had a copy of the handbook.  Fetner, 102:14-103:5.  Accordingly, that JELD-WEN aggressively and thoroughly disseminates its policy to its employees is established as a matter of law.

JELD-WEN's anti-harassment policy offered Plaintiffs no less that five avenues in this instance to report Fetner's conduct:   "their General or Corporate Manager, Vice President or Subsidiary President, or the Legal Department at (541) 882-3451".  Minix, EX-27.  Plaintiff Minix had previously reported inappropriate conduct and observed the investigative and remedial measures employed by JELD-WEN, including sending an in-house attorney from JELD-WEN's corporate legal department in Oregon more than

2700 miles from Roanoke to further investigate her allegations.  See supra Statement of

Undisputed Facts, ¶¶19-30.    In fact, Minix testified as follows regarding JELD-WEN's

anti-harassment policy:

> Q    So, if Mr. Fetner bothers you, you've got a lot of
>      opportunities to call somebody else; is that correct?
>
> A    Yes.

Minix, 187:14-17.

> Q    Well, we'll get to that.  But what I want to ask you is,
>      you had no problem understanding this number eight
>      where if a supervisor bothered you, you could go to
>      Pat Galvez or Dan Hees or JELD-WEN's legal
>      department.
>
> A    Right.  I understand that.

Minix, 188:6-12.  Furthermore, Plaintiffs ultimately contacted Hees because they "felt

like he was the one [they] were supposed to talk to."  Minix, 275:8-13.

    In  instances  such  as  the  case  before  this  Court  where  the  employer  has

promulgated a comprehensive and effective harassment policy, employees bear some

responsibility to provide the employer an opportunity to correct the alleged harassment

because illegal harassment cannot be corrected without the employee's cooperation:

> We are not unmindful of the enormous difficulties involved in
> lodging  complaints  about  discrimination  in  the  workplace,
> including  complaints  of  sexual  harassment.  We  also
> recognize  the  great  psychological  burden  it  places  on  one
> who  is  already  the  victim  of  harassment  to  require  that
> person  to  complicate  further  his  or  her  life  with  the
> ramifications,  both  legal  and  otherwise,  of  making  a
> complaint. **Federal law has now attempted to correct the
> problem of workplace discrimination, but it cannot be
> done  without  the  cooperation  of  the  victims**,
> notwithstanding that it may be difficult for them to make such
> efforts. When  an  employer  has  taken  steps,  such  as
> promulgating  a  considered  sexual  harassment  policy,  to
> prevent  sexual  harassment  in  the  workplace, **an employee**

24

**must provide adequate notice that the employer's directives have been breached so that the employer has the opportunity to correct the problem**.

Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1366 (11th Cir. 1999) (emphasis added) (affirming summary judgment for employer where employee failed to effectively avail herself of the employer's sexual harassment policy).

As is evident from JELD-WEN's response in this case, it also takes its anti-harassment policy seriously and promptly investigates complaints of harassment and takes effective remedial measures, including terminating the employment of offending employees, to remedy harassing conduct. Sturm, ¶2; see Watson v. Blue Circle, 324 F.3d 1252, 1260-61 (11th Cir. 2003) (noting that employer must take complaints of sexual harassment seriously and adequately investigate and respond to such allegations in order to have an effective policy). Accordingly, JELD-WEN clearly took appropriate and effective measures to prevent harassment in the workplace.

**2.     JELD-WEN Took Prompt Effective Action to Correct Fetner's Alleged Conduct.**

**a.     JELD-WEN Did Not Have Notice of Fetner's Alleged Conduct Prior to the October 13, 2004 Meeting**.

Plaintiffs admittedly did not report Fetner's conduct prior to the October 13, 2004 meeting with Dan Hees. Minix, 279:4-20; B. Sims, 199:5-9; L. Sims, 168:16-21, 170:19-171:2. Therefore, JELD-WEN was not on notice of Fetner's alleged conduct and the corresponding need to correct the conduct until October 13, 2004. Breda v. Wolf Camera & Video, 222 F.3d 886, 890 (11th Cir. 2000) ("The sole inquiry when the employer has a clear and published policy is whether the complaining employee followed the procedures established in the policy.") An employer who has an adequate sexual harassment policy has "itself answered the question of when it would be deemed

to have notice of the harassment sufficient to obligate it to take prompt and effective remedial measures." Coates, 164 F.3d 1361, 1364 (granting summary judgment where employee failed to report co-worker's offensive conduct in the manner prescribed by the employer's policy and where, after the employee finally did report the conduct to the proper managers, the employer took prompt and effective remedial action).[8]

"[O]nce an employer has promulgated an effective anti-harassment policy and disseminated that policy and associated procedures to its employees, then '**it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances**.'" Madray v. Publix Supermarkets, 208 F.3d 1290, 1300 (11th Cir. 2000) (affirming summary judgment in supervisor harassment case because employer was not on notice of alleged sexual harassment based on employees contacting mid-level managers who were not designated in the sexual harassment policy) (emphasis added) citing Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1553-1554 (11th Cir. 1997) (holding that employers are "entitled to rely on the procedural framework provided in the policy to remain apprized of the conduct of its own staff"). **An employee's failure to utilize the policy's grievance process will prevent constructive knowledge from adhering to the employer**. Miller, 277 F.3d 1269, 1279 (emphasis added). Accordingly, JELD-WEN was not on notice of Fetner's alleged conduct until October 13, 2004.

---

[8] Plaintiffs also testified that Fetner directed the inappropriate conduct towards them in a manner so that JELD-WEN management would not be aware of the conduct. Minix, 280:12-281:10; B. Sims, 152:16-18, 154:2-4, 155:11-12; L. Sims, 97:17-23. And, in fact, JELD-WEN management was not aware of Fetner's alleged conduct until the October 13, 2004 meeting. Hees, 89:23-90:1.

### b.    JELD-WEN Acted Promptly To Correct The Alleged Behavior.

Even "[i]f an employer has actual or constructive notice of harassment" the employer is not liable if it promptly takes appropriate corrective action. <u>Watson</u>, 324 F.3d 1252, 1261 (reversing summary judgment where employer did not adequately investigate the employee's complaints and took no corrective action).  "Whether an employer's response is sufficient depends on, among other things, the effectiveness of the steps taken, that is, whether it was reasonably likely to prevent the conduct from recurring." <u>Williams v. Russell Corp.</u>, 218 F. Supp. 2d 1283, 1294 (M.D. Ala. 2002) (granting summary judgment where employer promptly investigated and warned offending parties not to repeat offensive behavior).  Importantly, "an employer need not act instantaneously, but must act in a reasonably prompt manner to respond to an employee's complaint of harassment."  <u>See</u> <u>Speaks v. City of Lakeland</u>, 315 F. Supp. 2d 1217, 1228 (M.D. Fla. 2004), (finding city employer acted reasonably to correct the harassment of supervisor who required subordinate to have sex with him by allowing the subordinate to remain at home during the investigation and by demoting, suspending and transferring the offending supervisor).   JELD-WEN's response to Plaintiffs' allegations was prompt and effective.

On or about October 8, 2004, Plaintiffs Linda Sims and Brenda Sims contacted JELD-WEN either through an "800" number (Linda Sims) or by contacting corporate and ultimately leaving a message for Coordinating General Manager Dan Hees (Brenda Sims), who was physically located in Tennessee.  B. Sims, 192:9-12, 195:13-20; L. Sims, 154:16-155:5.   Both calls were returned within a couple of days.  B. Sims, 193:5-7, 193:21-194:4; L. Sims, 155:22-156:20.   Hees informed Brenda Sims that he would

travel to Roanoke on Tuesday, October 13, 2004, and Linda Sims elected not to return the call from JELD-WEN's Legal Department based on the upcoming meeting with Hees.  B. Sims, 193:5-7, 193:21-194:10, 195:14-17; L. Sims, 151:7-152:4, 156:21-157:5.  Hees met with the five women about 9:00 AM on October 13, 2004; Hees met with Fetner at a location away from the Roanoke facility shortly thereafter; and Fetner never worked for JELD-WEN again after the meeting.  Minix, 299:1-11; L. Sims, 164:15-17.

The investigation and remedial action taken by JELD-WEN within hours of Plaintiffs' report was prompt and effective.  See Hansen v. Perry Technologies, 206 F. Supp. 2d 1223, 1236-37, (S.D. Fla. 2002) (investigation within one week of plaintiff's complaints sufficient to satisfy first element of Faragher-Ellerth defense); Frederick v. Sprint/United Management Co., 246 F.3d 1305, 1315 (11th Cir. 2001) (noting that an employer's remedial action that occurred two weeks after notice would be timely remedial action), Walton, 347 F.3d 1272, 1288 (suspension of alleged harasser ten days after report and immediately following his interview was timely remedial measure). See also Portera v. Winn Dixie of Montgomery, Inc., 996 F. Supp. 1418, 1426 (M.D. Ala. 1998) (holding that employer's remedial action taken ten days after employee provided notice to employer was prompt action to remedy sexual harassment).

Notably, the termination (voluntary or involuntary) of Fetner's employment was, of course, adequate remedial action and provided the harassment-free work environment that Title VII requires.  See Smith v. Auburn University, 201 F. Supp. 2d 1216, 1226 (M.D. Ala. 2002) (noting that even threat of termination can be adequate remedial action).  JELD-WEN's actions were swift, decisive and effective once Plaintiffs

provided notice of Fetner's alleged conduct and, as the EEOC aptly determined, JELD-WEN thus is not liable for Fetner's alleged conduct.  It is not for the Plaintiffs to quarrel with the manner in which Fetner was removed form the workplace and whether he resigned or was fired or was paid a severance so long as the measure to correct the harassment is sufficient.  <u>See</u> L. Sims, 171:10-172:4 (noting that she believes that Fetner should have been fired). JELD-WEN's obligation is to take prompt and effective remedial action to eliminate the harassment once Plaintiffs reported the conduct.  How that is accomplished is for JELD-WEN to determine.  <u>Walton</u>, 347 F.3d 1272, 1288 ("But where the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow.")  As confirmed by Plaintiff Linda Sims, no further inappropriate conduct of a sexual nature occurred at the Roanoke facility after Fetner's employment ended.  L. Sims, 165:16-18.  There is no question that JELD-WEN took prompt and appropriate remedial action with regard to Plaintiffs' complaints and has established the first prong of the <u>Faragher/Ellerth</u> defense.

## B.    Plaintiffs Unreasonably Failed to Take Advantage of JELD-WEN's Preventive and Corrective Opportunities.

The Eleventh Circuit commented on an employee's obligation to take advantage of the remedial opportunities afforded by the employer in <u>Walton,</u> a case that involved egregious allegations of multiple rapes by Walton's supervisor:

> We are mindful of the fact that severe harassment such as that which is alleged to have occurred here can be particularly traumatic.   As we have pointed out before, however, "the problem of workplace discrimination ... cannot be [corrected] without the cooperation of the victims." <u>Madray</u>, 208 F.3d at 1302 (alteration in original) (<u>quoting</u> <u>Coates v. Sundor Brands, Inc</u>., 164 F.3d 1361, 1366 (11th Cir.1999)).   Thus, the victim of the alleged harassment has

an obligation to use reasonable care to avoid harm where possible.  See Faragher, 524 U.S. at 807, 118 S.Ct. at 2292 **("If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.")**.  As the First Circuit recently noted,

> Reporting sexually offensive conduct by a supervisor would for many or most employees be uncomfortable, scary or both.  But because this will often or ordinarily be true, as the Supreme Court certainly knew, its regime necessarily requires the employee in normal circumstances to make this painful effort if the employee wants to impose vicarious liability on the employer and collect damages under Title VII.

> Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 35 (1st Cir. 2003).   Here, Walton could have avoided most, if not all, of the actionable harassment by reporting Mykytiuk's behavior to Ortho officials.   By failing to do so, Walton did not give Ortho an opportunity to address the situation and prevent further harm from occurring.

Walton, 347 F.3d 1272, 1290 (emphasis added).

The Plaintiffs in this case did not come forward and report Fetner's alleged conduct until October 13, 2004, denying JELD-WEN the opportunity correct the behavior prior to that time.  Minix, 279:4-20; L. Sims,168:16-21, 170:19-171:2; B. Sims, 199:5-9.  There is no reasonable excuse for the Plaintiffs' failure to report, particularly when the report would have allowed Plaintiffs to avoid the harm they now allege.  Plaintiff Minix had witnessed JELD-WEN's enforcement of its sexual harassment policy first-hand in 2003 when both management and the Legal Department investigated her allegations of inappropriate conduct and the situation was resolved.   See supra Statement of Undisputed Facts, ¶¶19-30.  In fact, although Minix met with JELD-WEN's

in-house labor and employment counsel <u>twice</u> during that investigation and although she alleges Fetner's inappropriate conduct began in September 2001, she never mentioned any allegation regarding Fetner to Sturm, the in-house attorney.   Minix, 279:5-16,17-20, EX-43; Sturm, 175:8-10; 176:18-22.   Minix told both Brenda and Linda Sims who had not been working at the Roanoke facility at that time, that JELD-WEN sent an attorney from Oregon - a distance of 2,709 miles - to investigate her allegations. L. Sims, 114:23-115:14;  B. Sims, 108:6-12, 110:7-12, Sturm, 38:9-12, 39:1-4. Furthermore, in August 2004 – more than six weeks prior to the time the conduct was reported – the following persons instructed Plaintiffs to report the conduct to someone above Fetner in JELD-WEN management:

1. An investigator with the Equal Employment Opportunity Commission, L. Sims, 158:14-159:6;

2. An attorney-friend of Lisa Cook, Cook, 111:11-21;

3. Plaintiff Minix's health care provider, Minix, 313:16-19;

4. Plaintiff Linda Sims' health care provider, L. Sims, 87:14-21; and

5. Plaintiff Brenda Sims' health care provider, B. Sims, 184:15-21, 191:16-19.

Hees visited the Roanoke facility several times a month, but none of the Plaintiffs ever reported Fetner's conduct during any of those visits.   Hees, 47:24-48:1.   Each Plaintiff testified at deposition that she was aware of and understood JELD-WEN's anti-harassment policy.   L. Sims, 119:14-19, 120:21-23; B. Sims, 113:5-10; Minix, 186:18-21.   Furthermore, their understanding is demonstrated by their ultimately using the mechanics set forth in the policy to report Fetner's conduct.   Hence, JELD-WEN cannot be liable for Fetner's conduct based on Plaintiffs' failure to report, the second and final

prong of the <u>Faragher/Ellerth</u> defense is established and JELD-WEN is entitled to summary judgment on Plaintiffs' hostile work environment claim.

### C.    No Tangible Employment Action Occurred.

One final issue bears addressing regarding JELD-WEN's <u>Ellerth/Faragher</u> defense.  Although Plaintiffs did not allege in their EEOC charge or in the Complaint that the alleged harassment culminated in a tangible employment action, Plaintiff Linda Sims suggested at deposition that she believes assigning her to different laborer positions in the plant and that the plant closing were retaliation for her refusal to comply with Fetner's advances.  <u>Compare</u> Complaint <u>with</u> L. Sims, 166:10-14, 187:11-18.  As is more particularly discussed in the following pages, neither of these actions is a tangible employment action.

### 1.    General Law Regarding Tangible Employment Actions.

There was initially some confusion about whether a "tangible employment action" and an "adverse employment action" were the same thing, courts in the Eleventh Circuit now use these terms interchangeably.  "The Eleventh Circuit has observed that, although courts use different terminology in requiring that an employee in a discrimination case demonstrate an adverse employment action, the various standards 'are essentially interchangeable.'"  <u>Taylor</u>, 418 F. Supp. 2d at 1297 n.10.  <u>See also</u> <u>Filius v. Potter</u>, No. 05-13771, 2006 WL 679016, at *1 (11th Cir. May 15, 2006) (discussing whether employer's action had a "tangible adverse effect" on the plaintiff); <u>Brown v. Snow</u>, 440 F.3d 1259, 1266 (11th Cir. 2006) ("Under our case law, the definitions of tangible employment actions and adverse employment actions are essentially the same.")

An employment action will not qualify as a "tangible employment action" simply because an employee does not like the action.  There is a threshold requirement that the action must be of a sufficient magnitude to qualify.  "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Ellerth, 524 U.S. at 761.

Additionally, except in instances where the alleged harasser was the decision-maker for the questioned employment action, the employee must also establish a causal relationship between the tangible employment action and the sexual harassment.  Cotton v. Cracker Barrel Old Country Store, 434 F.3d 1227, 1231-32 (11th Cir. 2006) (holding that the plaintiff "had to prove more than the mere reduction of her hours; [she] had to prove that the reduction was causally related to the incident of harassment."); Llampallas v. Mini-Circuits, Lab, 163 F.3d 1236, 1247 (11th Cir. 1998) (noting that inference not applicable where alleged harasser did not make tangible employment action).  See also Arnold v. Tuskegee Univ., Civ. A. No. 3:03cv515-F, 2006 WL 47507, at *9 (M.D. Ala. 2006) ("[I]f the harasser is not the decision maker, then the plaintiff must prove that the tangible employment action was caused by a discriminatory motive."); Spivey v. Akstein, No. 104cv1003WSDCCH, 2005 WL 3592065, *15 (N.D. Ga. Dec. 30, 2005) (finding no liability for a tangible employment action from plaintiff's termination where the decision to terminate was not made by the harasser).

### 2.    Plaintiffs' Assignment to Different Jobs Is Not A Tangible Employment Action.

Plaintiffs Brenda Sims and Linda Sims argue that they were assigned different laborer jobs - jobs they did not "like" - as a result of the harassment.  B. Sims, 160:16-

23, 161:1-18; L. Sims, 161:19-23. "In the vast majority of instances, however, . . . an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress . . . ." Davis v. Town of Lake Park, 245 F.3d 1242, 1245 (11th Cir. 2001). "A contrary view would potentially open the door to a wide variety of unfair work assignment claims that should not be litigated in the federal courts. Title VII is not designed to make federal courts 'sit as a super-personnel department that reexamines an entity's business decisions.'" Davis, 245 F.3d at 1244 (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)). The Eleventh Circuit continued:

> **Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets** in response to shifting and competing market priorities. . . . For these reasons, applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks.

Davis, 245 F.3d at 1244.

In this case, the general laborers were expected to perform a variety of general laborer positions in the facility. Hees, 72:7-9. In fact, nearly every witness who testified on this point agreed that it was quite common for production employees to be moved around in the plant and work a variety of jobs. Hees, 74:15-75:2, Minix, 72:13-73:7, 86:22-87:5; L. Sims, 99:1-101:2; B. Sims, 50:1-8, 98:7-100:17; Thornton, 54:14-16, 58:11-60:2, 62:19-63:1, 65:6-8; Cook, 62:11-13. Furthermore, although there might have been jobs that a particular employee preferred, each plaintiff testified that she was never assigned a task that she could not perform. B. Sims, 102:16-18, 127:17-19; L. Sims, 100:5-102:1; Minix, 101:7-14.

A change in work duties can rarely be a tangible employment action: "Mere reassignment to a more inconvenient position is insufficient." Piquion v. Walgreen Co., 369 F. Supp. 2d 1339, 1345 (S.D. Fla. 2005) (holding that "a plaintiff's subjective view of the seriousness and materiality of the employer's actions is not controlling" and that a mere "bruising of [plaintiff's] ego" would not implicate Title VII liability). "An employment action is not adverse merely because the employee dislikes or disagrees with it." Lawrence v. Wal-Mart Stores, 236 F. Supp. 2d 1314, 1330 (M.D. Fla. 2002) (finding no tangible employment action in spite of additional workload or increased work assignments). See also Lindsay v. Burlington Northern Santa Fe Railway Co., 266 F. Supp. 2d 1338, 1344 (N.D. Ala. 2003) (holding that there was no adverse employment action because plaintiff did not suffer any serious and material change in her employment status). Accordingly, it is clear that the reassignment from one laborer position to another equally paid laborer position, as allegedly occurred in this case, is not a tangible employment action.

### 3.    Closing the Roanoke Facility.

Plaintiffs also appear to argue that the Roanoke facility closed either in retaliation for their making their complaints or that the plant closure might constitute a tangible employment action for purposes of the Ellerth analysis. See L. Sims, 187:11-18. There simply is no evidence that the shutdown of the Roanoke facility was in any way related to the Plaintiffs' allegations. Likewise, to the extent Plaintiffs seek to argue that the closure was a retaliatory act based on their filing EEOC charges, the charges were not filed until at least a year after JELD-WEN decided to close the plant; several weeks after the plant closing was announced to the employees; and JELD-WEN did not receive notice of the charges until after the plant actually closed. Compare Homrighaus, ¶¶ 2, 3

and 5, noting timetable for decisions regarding plant closure with EEOC charges filed in late November and December 2004. B. Sims, EX-31; L. Sims, EX-22; Minix, EX-43.

Barry Homrighaus made the decision to close the Roanoke facility. Homrighaus, ¶2. Richard Fetner played no role in the decision to close the Roanoke facility. Fetner, 193:21-23, 197:6-9; Homrighaus, ¶6. Furthermore, the decision to close the facility in 2004 was actually made in 2003. Homrighaus, ¶5. Emails produced in this action clearly established that the decision to close the plant had been made in or before March 2004. See Sturm, ¶5, EX-A; Homrighaus, ¶4, EX-A&B, (March 24, 2004 email noting that Sturm "was informed this afternoon that we are closing a facility in Alabama…"). Hees was informed sometime during the month *before* the Plaintiffs first reported their allegations that he should not prepare a 2005 budget for the facility because the plant would close by year end. Hees, 106:19-24. Hees was actually at a meeting in Klamath Falls discussing, among other issues, the logistics of closing the Roanoke facility when the first attempt to contact him was made by any of the Plaintiffs. Hees, ¶9. Lastly, the facility was closed for economic efficiency reasons. Homrighaus, ¶3.

"[W]hen the harassing supervisor is not involved in the challenged employment decision, the employer may prevail by presenting evidence that it imposed the tangible employment action for legitimate reasons and not because the employee refused to accede to the sexual advances of her supervisor." Taylor v. CSX, 418 F. Supp. 2d 1284, 1297 (M.D. Ala. 2006). Furthermore, when the tangible employment action was contemplated before notice of the harassment, there can be no causal relation between the two events. See Cotton, 434 F.3d at 1232-33; Mack v. Alabama Dept. of Hum.

Res., 201 F. Supp. 2d 1196, 1205-06 (M.D. Ala. 2002) (finding no causation because the termination recommendation was contemplated well before any protected activity of the employee).   Plaintiffs simply cannot predicate their claims on the plant closure because Fetner was not involved in the decision, the decision was made before Plaintiffs ever reported any alleged unlawful harassment by Fetner and the decision was made for business-related reasons.   Accordingly, the Ellerth defense is available to the claims of all three Plaintiffs.[9]

## II.    JELD-WEN IS NOT LIABLE FOR OUTRAGE.

### A.    Plaintiffs' Allegations Do Not Rise to The Level Required for Outrage.

The Alabama Supreme Court "has consistently held that the tort of outrage is a very limited cause of action that is available only in the most egregious circumstances."

---

[9]    Plaintiff Linda Sims also alleges that she was sent home from work but apparently correctly does not contend that this was a tangible employment action.  L. Sims, 153:8-154:12.  L. Sims does not recall when she was sent home.  L. Sims, 15:5-9, 154:11-15.  Both Plaintiff Brenda Sims and Plaintiff Minix testified that they were sent home *when the work at the plant slowed down* and such action clearly does not meet the threshold requirement for a tangible employment action.  B. Sims, 162:8-163:1; Minix, 204:13-21, EX-41.  According to Linda Sims, she was also informed that she was being sent home because of lack of work.  L. Sims, 149:6-22, 150:17-23.  Courts have recognized that de minimis adverse actions do not rise to the level of a tangible employment action under Title VII.  See Samedi v. Miami-Dade Cty., 206 F. Supp. 2d 1213, 1219 (S.D. Fla. 2002) (finding no tangible employment action when the harassing supervisor required the plaintiff to go home, causing her loss of pay).  See also Stavropoulos v. Firestone, 361 F.3d 610, 616-18 (11th Cir. 2004) (holding that a tangible employment action "must either be an ultimate employment decision or else must 'meet some threshold level of substantiality.'"); Davis v. Town of Lake Park, 245 F.3d 1242, 1238-46 (11th Cir. 2001) ("Congress simply did not intend for Title VII to be implicated where so comparatively little is at stake."); Lawrence v. Wal-Mart Stores, 236 F. Supp. 2d 1314, 1330 (M.D. Fla. 2002) (finding as de minimis a change in a bonus which accounted for less than one percent of an employee's total annual monetary compensation).  In this case, there simply is no evidence that Linda Sims suffered any tangible loss as she unable to identify even a single day on which she was sent home, much less one that satisfies the applicable standard of being more than di minimus.  Furthermore, she cannot identify who sent her home and, thus, cannot establish causation.

Ex parte Mut. Sav. Life Ins. Co., 698 So.2d 772, (Ala. 1997) (citation omitted)(emphasis added).  Accordingly, the plaintiff's burden of proof in an outrage claim "is a heavy one." Ex parte Crawford & Co., 693 So.2d 458, 459 (Ala. 1997).

Courts have a duty to filter out questionable cases in the intentional tort arena, and the Alabama Supreme Court has imposed a higher clear and convincing evidence requirement for a plaintiff to survive summary judgment in Alabama state courts.  See Lowman v. Piedmont Exec. Shirt Mfg. Co., 547 So. 2d 90, 95 (Ala. 1989).  The more stringent "clear and convincing" standard was adopted to "insure against borderline or frivolous claims."  Lowman, 547 So. 2d at 11-12.

Therefore, to establish a claim of outrage and survive summary judgment, Plaintiffs must prove: "(1) that the defendant's conduct was intentional or reckless; (2) that it was extreme and outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it." Id. at 460.  Additionally, "for [an employer] to become liable for [the] intentional torts of its agent, the plaintiff[] must offer evidence that [1] the agent's wrongful acts were in the line and scope of his employment; or [2] that the acts were in furtherance of the business of [the employer]; or [3] that [the employer] participated in, authorized, or ratified the wrongful acts." Joyner v. AAA Cooper Transportation, 477 So. 2d 364, 365 (Ala. 1985).  An "employer is vicariously liable for acts of its employee that were done for the employer's benefit, i.e., acts done in the line and scope of employment or for acts done for the furtherance of the employer's interest. The employer is directly liable for its own conduct if it authorizes or participates in the employee's acts or ratifies the employee's conduct after it learns of the action." Potts v. BE & K Constr. Co., 604 So. 2d 398, 400 (Ala. 1992).

JELD-WEN is entitled to summary judgment on Plaintiff's outrage claim because the alleged conduct is insufficient to establish an outrage cause of action and because there is no basis to hold JELD-WEN liable for the conduct.

**B.    The Conduct Alleged by Plaintiffs Is Not Outrageous.**

The tort of outrageous conduct is a limited remedy to be applied in only the most egregious circumstances.  See  Portera v. Winn-Dixie of Montgomery, Inc., 996 F. Supp. 1418, 1435 (M.D. Ala. 1998) citing Busby v. Truswal Sys. Corp., 551 So. 2d 322, 328 (Ala. 1989).  In Portera, Judge Albritton assessed the plaintiff's allegations that her supervisor hugged her even after she said "that's enough", made offensive comments to her of a sexual nature on a daily basis, touched her buttocks and placed his hand inside her clothing, and determined that these allegations were insufficient as a matter of law to constitute outrage.  Portera, 996 F. Supp. 1418, 1432 (illustrating offensive conduct) and 1434-35 (addressing outrage claim).  In reaching its decision in Portera, the Court relied on Turner v. Hayes, 719 So. 2d 1184 (Ala. Civ. App. 1997) to determine that the conduct was not sufficiently severe to constitute outrage.  In Turner, the Alabama Court of Civil Appeals determined that allegations that the harasser "fondled his genital area in [the plaintiff's] presence, that he poked her and other female employees under their armpits near their breasts, that he put his hands on her waist and rubbed against her as he passed through a doorway, that he touched her leg, that he frequently questioned her about her 'private life' and asked if she was seeing anyone, that he frequently asked her to meet him somewhere after work for 'other than business purposes,'" was insufficient as a matter of law to establish an outrage cause of action.  Turner, 719 So. 2d 1184, 1187.

As alleged by Plaintiffs in this action, the conduct that Fetner directed towards them was similar to, but not nearly as severe as, the conduct at issue in either Portera or Turner, both of which held that the employer was entitled to summary judgment. Turner, 719 So. 2d 1184, 1187 (granting motion for summary judgment on outrage claim) and Portera, 996 F. Supp. 1418, 1435 (granting employer's motion for summary judgment on all of plaintiff's claims against employer including outrage claim); see also K.M. v. Ala. Dept. of Youth Serv., 360 F. Supp. 2d 1253, 1261 (M.D. Ala. 2005) (distinguishing allegations of "groping" and inappropriate comments – i.e., allegations similar to those made by the three plaintiffs in the case – which were not sufficient to sustain an outrage cause of action from an allegation that a child care worker penetrated a minor with his finger which was sufficient). Accordingly, JELD-WEN is entitled to summary judgment as a matter of law because the conduct alleged by Plaintiffs is not so sufficiently severe as to constitute outrage.

### C. Plaintiffs Cannot Establish Respondeat Superior.

Even if the conduct alleged by Plaintiffs was sufficiently severe to survive summary judgment, they cannot establish any basis to hold JELD-WEN liable for the conduct. "The tort of outrage provides a remedy for 'extreme and outrageous conduct,' and so should not be the basis for vicarious or respondeat superior liability except in the most compelling circumstances." Busby, 551 So. 2d 322, 327 quoting American Road Service Co. v. Inmon, 394 So.2d 361, 365 (Ala.1980). This is certainly not such a case.

Fetner's alleged behavior certainly was not part of his job and was not within the course and scope of his employment. No one at JELD-WEN instructed Fetner to engage in the alleged conduct and Fetner had attended a training session regarding JELD-WEN's corporate policies prohibiting the type of conduct alleged in this action.

Minix, 229:21-231:5-13, EX-44. Furthermore, Fetner was aware that JELD-WEN would not tolerate harassment in any form. Fetner, 102:22-103:5. Additionally, JELD-WEN's action upon learning of Fetner's conduct – i.e., immediately meeting with him to investigate the allegations and, thereafter, to turn it over to the Legal Department for further investigation – establishes that JELD-WEN did not ratify his conduct. Therefore, JELD-WEN is not liable for Fetner's conduct and JELD-WEN is entitled to summary judgment on this claim. Joyner, 477 So. 2d 364, 365.

### D. Plaintiffs Cannot Establish That They Suffered Severe Emotional Harm.

Plaintiffs cannot establish that Fetner's alleged conduct caused each of them emotional distress so severe that no reasonable person could be expected to endure it. American Road Serv. Co. v. Inmon, 394 So. 2d 361, 365 (Ala. 1980) (recognizing that outrage claim requires proof that alleged conduct "cause[d] severe emotional distress to another" including that "bodily harm result[ed] from the distress;" and that "the emotional distress thereunder must be so severe that no reasonable person could be expected to endure it.") Plaintiffs can proffer no competent summary judgment evidence of causation or that the emotional distress allegedly suffered by any plaintiff met the severity requirement required by applicable law. See Barnes v. Tuskegee University, 2006 WL 1071870, *12 (M.D. Ala. April 24, 2006) (slip copy) (granting summary judgment on outrage claim in a case involving much more egregious sexual harassment allegations than those alleged in the instant case because "the plaintiff failed to present any evidence that he suffered extreme emotional distress as a result of the alleged sexual harassment sufficient to survive summary judgment.")

III.    **ALTERNATIVE BASES FOR PARTIAL SUMMARY JUDGMENT.**

JELD-WEN requests summary judgment as to all of the claims made by each of the three Plaintiffs.  Notwithstanding that JELD-WEN is entitled to complete summary judgment, JELD-WEN requests, in the alternative, summary judgment as to all of the claims submitted by one or more of the Plaintiffs.  As a further alternative, JELD-WEN requests summary judgment as to any claim related to or damages (including lost wages) premised on the closing of the Roanoke facility for the reasons set forth at pages 35 to 37.

Lastly, as an alternative to complete summary judgment as to one or more Plaintiffs but in addition to summary judgment regarding the plant closure issue, JELD-WEN requests that summary judgment be entered on Plaintiffs' claim for punitive damages because, where the employer had no knowledge (such as this case) or only constructive knowledge of harassment, punitive damages may only be considered in cases where the "discriminating employee was high[ ] up the corporate hierarchy" or where "higher management countenanced or approved [his] behavior."  Dudley v. Wal-Mart Stores, Inc., 166 F.3d 1317, 1323 (11th Cir. 1999); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1280 (11th Cir. 2002) (reversing award of punitive damages in supervisor harassment case because plaintiff did not present evidence of actual malice or reckless indifference to the plaintiff's Title VII rights).  Fetner's Group Manager position – essentially a foreman – wholly fails to satisfy this requirement.

The Supreme Court has held that employers may assert a good faith defense to vicarious liability for punitive damages where the "employment decisions of managerial agents ⋯ are contrary to the employer's 'good-faith efforts to comply with Title VII.' "

See Kolstad v. Am. Dental Ass'n., 527 U.S. 526, 545, 119 S.Ct. 2118, 2129, 144 L.Ed.2d 494 (1999) ("The inquiry does not end with a showing of the requisite 'malice or ⋯ reckless indifference' on the part of certain individuals, however⋯⋯ The plaintiff must impute liability for punitive damages to respondent."); Wilbur v. Correctional Services Corp., 393 F.3d 1192, 1205 (11th Cir. 2004) (noting that punitive damages claims against employer were due to be dismissed because even if the managerial harassers acted with malice or reckless indifference, there was no basis to impute this malice or reckless indifference to the employer).

JELD-WEN clearly has established this defense through its policy adoption, dissemination, education and remedial measures.  See discussion supra at pp. 22-29. Any claim for punitive damages is due to be dismissed.

## CONCLUSION

Defendant JELD-WEN, inc. respectfully requests that the Court enter summary judgment in its favor on all of Plaintiffs' claims for the reasons set forth herein and that the Court award JELD-WEN any further and additional relief to which it is entitled. Alternatively, Defendant JELD-WEN respectfully requests that the Court assess Plaintiffs' contentions on an individual level and enter partial summary judgment as to the claims asserted by one or more of the Plaintiffs and/or enter summary judgment on any portion of the Plaintiffs' claims to narrow the scope of the claims for trial.

Respectfully Submitted,


s/Michael L. Thompson THO152

OF COUNSEL:
LEHR MIDDLEBROOKS & VREELAND, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945
(205) 326-3002

Scott J. Scofield, Esq.
SCOFIELD, GERARD, SINGLETARY & POHORESLSKY
1114 Ryan Street
Lake Charles, Louisiana 70601
(337) 433-9436

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James B. Douglas, Jr., Esq.
McNeal & Douglas, Attorneys at Law, L.L.C.
P.O. Box 1423
Auburn, AL  36831

Matthew W. White, Esq.
Adams, Umbach, Davidson & White, LLP
P.O. Box 2069
Opelika, AL  36803-2069

Respectfully submitted,

s/Michael L. Thompson
Michael L.  Thompson
Lehr Middlebrooks & Vreeland, P.C.
P.O. Box 11945
Birmingham, AL 35202-1945
Phone:  (205) 326-3002
Fax:  (205) 326-3008
E-mail: mthompson@lehrmiddlebrooks.com
Bar No.: ASB-5417-o46m

152761.doc