# EXHIBIT G

## DEPOSITION EXCERPTS OF LORENA MINIX

# FREEDOM COURT REPORTING

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         EASTERN DIVISION
4
5    CIVIL ACTION NO.: 3:05-cv-685-T
6    LORENA MINIX, et al.,
7         Plaintiffs,
8         vs.
9    JELD-WEN, INC., and
10   RICHARD FETNER,
11        Defendants.
12
13      S T I P U L A T I O N
14        IT IS STIPULATED AND AGREED by and
15   between the parties through their respective
16   counsel, that the deposition of Lorena Minix
17   may be taken before Angela Smith, RPR, CRR,
18   at the offices of McNeal & Douglas, at 1710
19   Catherine Court, Ste: B, Auburn, Alabama
20   36831, on the 10th day of April, 2006.
21
22        DEPOSITION OF LORENA MINIX
23

**Page 2**

1        IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is waived,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating to
7    the taking of depositions.
8        IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17       IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21        * * * * * * * * * * * * *
22
23

**Page 3**

1        * * * * * * * * * * * * *
2         I N D E X
3        EXAMINATION
4              PAGE
5    By Mr. Scofield .................... 13
6    By Mr. Thompson ................... 314
7        DEFENDANT'S EXHIBITS
8              PAGE
9    Ex. 1 - Ms. Minix's birth
10        certificate .............. 17
11   Ex. 2 - Ms. Minix's driver's
12        license issued in '01 .... 17
13   Ex. 3 - Records of Ms. Minix's
14        family members ........... 23
15   Ex. 4 - Document regarding
16        Ms. Minix's brother ...... 37
17   Ex. 4-A - Documents regarding
18        power of attorney for
19        mother ................... 38
20   Ex. 5 - Answers to
21        interrogatories .......... 45
22   Ex. 6 - Application for
23        employment ............... 69

**Page 4**

1    Ex. 7 - Magazine with the layout
2        of the plant facility .... 74
3    Ex. 8 - Ms. Minix's unemployment
4        records ................. 103
5    Ex. 9 - Employment document from
6        Roanoke Electronic ...... 108
7    Ex. 10 - Termination documents
8        from Wellborn .......... 129
9    Ex. 11 - 11/8/94 Blue Cross Blue
10        Shield enrollment
11        document ................ 138
12   Ex. 12 - 3/22/95 Court documents
13        regarding assault
14        charge ................. 139
15   Ex. 13 - Excuse from work to see
16        Dr. Peterson ............ 140
17   Ex. 14 - Payroll documents from
18        '96 ..................... 142
19   Ex. 15 - 2/28/97 document
20        regarding working with
21        Mr. Bowen ............... 143
22   Ex. 16 - Employment records ....... 146
23   Ex. 17 - Pharmacy records from

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

1        Emergency Home Care
2            Pharmacy ............... 148
3    Ex. 18 - Wal-Mart Pharmacy
4            records ................ 153
5    Ex. 19 - Medical records from
6            Dr. Shirah's office ..... 158
7    Ex. 20 - 12/1/01 employment
8            documents ............... 170
9    Ex. 21 - 9/12/01 rehire documents . 172
10   Ex. 22 - Document regarding
11           Ms. Conger .............. 173
12   Ex. 23 - Dr. Shirah's return to
13           work document ........... 173
14   Ex. 24 - Document re:
15           probationary period for
16           healthcare .............. 174
17   Ex. 25 - 3/22/02 benefit
18           documents ............... 176
19   Ex. 26 - The Employee Handbook .... 184
20   Ex. 27 - Reiteration of parts of
21           the handbook ............ 190
22   Ex. 28 - 7/02 personal leave
23           documents ............... 192

Page 7

1    Ex. 41 - Employee Change Notice ... 204
2    Ex. 42 - Return back to work
3            documents from layoff ... 205
4    Ex. 43 - 12/13/04 Charge of
5            Discrimination .......... 206
6    Ex. 44 - 7/24/03 Power Point
7            presentation roster  .... 229
8    Ex. 45 - Key points of the Power
9            Point presentation ...... 231
10   Ex. 46 - Excuse for illness ....... 236
11   Ex. 47 - 7/25/03 excuse from work
12           for cough ............... 236
13   Ex. 48 - 10/13/03 excuse from
14           work for sinus problems . 238
15   Ex. 49 - 12/1/03 doctor's excuse
16           with chills and fever ... 238
17   Ex. 50 - Excuse from work for
18           five days ............... 238
19   Ex. 51 - 1/15/04 Employee Change
20           Notice for suspension ... 239
21   Ex. 52 - 1/9/04 excuse from
22           Dr. Bishop ill mother
23           and sister .............. 240

Page 6

1    Ex. 29 - Doctor's excuse for
2            ten-day absconce for
3            stomach ................. 192
4    Ex. 30 - 7/30/02 return to work
5            slip .................... 193
6    Ex. 31 - 7/30/02 return to work
7            slip from doctors ....... 193
8    Ex. 32 - 9/6/02 Family Leave
9            Medical Act request ..... 194
10   Ex. 33 - 10/1/02 return to work
11           from Dr. Irby ........... 194
12   Ex. 34 - 11/11/02 report .......... 195
13   Ex. 35 - Documents requesting
14           leave for CAT scan ...... 199
15   Ex. 36 - CAT scan documents ....... 200
16   Ex. 37 - Employer Notice of
17           Determination ........... 201
18   Ex. 38 - Return to work from the
19           Kirklin Clinic .......... 202
20   Ex. 39 - 1/28/03 test on Employee
21           Handbook ................ 202
22   Ex. 40 - Return date from
23           disability benefits ..... 203

Page 8

1    Ex. 53 - 1/20/04 clinic note from
2            Dr. Meadows  ............ 240
3    Ex. 54 - 1/20/04 excuse from
4            Dr. Meadows, implants ... 241
5    Ex. 55 - Document discussing
6            surgery and unhappiness . 242
7    Ex. 56 - Appointment with
8            Dr. Meadows for implant
9            problems ................ 243
10   Ex. 57 - 3/18/04 refusal of BP .... 243
11   Ex. 58 - Appointment with
12           Dr. Meadows and things
13           going well .............. 244
14   Ex. 59 - Note from Dr. Meadows
15           regarding return to
16           work .................... 245
17   Ex. 60 - 3/16 and 3/7
18           appointments with
19           Dr. Meadows ............. 246
20   Ex. 61 - Appointment re: adult
21           measles and fatigue ..... 246
22   Ex. 62 - 7/15/04 appointment for
23           sore throat and B-12 .... 247

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1  Ex. 63 - 8/12/04 appointment for
2      stomach problems ......... 247
3  Ex. 64 - Lost paycheck ............ 248
4  Ex. 65 - 9/3/04 appointment with
5      Dr. Meadows, unhappy .... 248
6  Ex. 66 - 9/2/04 appointment with
7      Dr. Bishop, sinus
8      problems ................. 249
9  Ex. 67 - 11/19/04 appointment for
10     ears .................... 249
11  Ex. 68 - 11/24/04 leaving because
12     the plant is closing .... 250
13  Ex. 69 - 8/20/04 EE0C
14     questionnaire .......... 259
15  Ex. 70 - Documents re: Ms. Love
16     being hired by
17     Ms. Minix ............... 263
18  Ex. 71 - 8/20/04 EEOC charging
19     documents ............... 270
20  Ex. 72 - The release documents
21     for the severance ....... 303
22  Ex. 73 - 4/19/05 letter from
23     Mr. McGee ............... 305

Page 10

1  Exs. 74, 75, 76, 77, 78, 79 and
2      80 - Medical records .... 310
3  Ex. 81 - 11/14/02 medical record .. 311
4      * * * * * * * * * * * *
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 11

1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3          EASTERN DIVISION
4
5  CIVIL ACTION NO.: 3:05-cv-685-T
6  LORENA MINIX, et al.,
7      Plaintiffs,
8      vs.
9  JELD-WEN, INC., and
10  RICHARD FETNER,
11      Defendants.
12  BEFORE:
13      ANGELA SMITH, Commissioner.
14  APPEARANCES:
15      MATTHEW WHITE, ESQUIRE, of ADAMS,
16  UMBACH, DAVIDSON & WHITE, 205 S. Ninth St.,
17  Opelika, Alabama 36803, appearing on behalf
18  of the Plaintiff.
19      SCOTT J. SCOFIELD, ESQUIRE, of
20  SCOFIELD, GERARD, SINGLETARY & POHORELSKY,
21  1114 Ryan Street, Lake Charles, Louisiana
22  70601, appearing on behalf of the Defendant,
23  JELD-WEN, inc.

Page 12

1  APPEARANCES (continued):
2      MICHAEL THOMPSON, ESQUIRE, of
3  LEHR, MIDDLEBROOKS, PRICE & VREELAND, 2021
4  3rd Avenue N., Birmingham, Alabama 35203,
5  appearing on behalf of the Defendant,
6  JELD-WEN, inc.
7      ALSO PRESENT:  Dan Hees
8          Brenda Sims
9          Linda Sims
10      * * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23

3  (Pages 9 to 12)

# FREEDOM COURT REPORTING

## Page 13

1    I, ANGELA SMITH, RPR, CRR, a Court
2  Reporter of Wetumpka, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Federal Rules of Civil
5  Procedure and the foregoing stipulation of
6  counsel, there came before me at the offices
7  of McNeal & Douglas, 1710 Catherine Court,
8  Ste: B, Auburn, Alabama 36831, beginning at
9  10:06 a.m., Lorena Minix, witness in the
10  above cause, for oral examination, whereupon
11  the following proceedings were had:
12          LORENA MINIX,
13  being first duly sworn, was examined and
14  testified as follows:
15          COURT REPORTER:  Usual
16  stipulations?
17          MR. SCOFIELD:  Yes, ma'am.
18          MR. WHITE:  Yes.
19          EXAMINATION
20  BY MR. SCOFIELD:
21      Q.    For the Record, ma'am, state
22  your full name and current address.
23      A.    Lorena Minix, 119 Lebanon,

## Page 14

1  Roanoke, Alabama.
2      Q.    Okay.  My name is Scott
3  Scofield, and I represent JELD-WEN.  This is
4  Michael Thompson, he's my co-counsel.  And
5  there's Dan Hees, and I think you've met
6  before.
7          My rules are pretty simple.
8  Have you ever given a deposition before?
9      A.    No.
10      Q.    All right.  I'm sure your
11  attorney has told you about it.  What we do
12  here is, I asked this lady to my left, Madam
13  Court Reporter, is going to type down
14  everything I say and everything you say.
15      A.    Uh-huh.
16      Q.    Fortunately, everything I say
17  is not under oath, but everything you say
18  is.
19      A.    Right.
20      Q.    If, for that reason, if you do
21  not understand me, I'm from a different part
22  of the country, so you may or may not, say:
23  I don't understand you.

## Page 15

1      A.    Okay.
2      Q.    And have it repeated.  The
3  second thing is, and I'm not going to be
4  rude doing this, but she cannot pick up a
5  nod or an uh-huh or huh-uh.
6      A.    Okay.
7      Q.    We all do that.  So when you
8  do that, I'll move my hands and say:  You
9  have to verbalize your answer.  So I'm not
10  trying to be rude.  That's just the way it
11  works.
12      A.    All right.
13      Q.    Okay.  If you have any
14  questions, stop, ask your attorney, walk
15  outside, take a break any time you want.
16      A.    Okay.
17      Q.    All right.  Read and sign,
18  that will be up to your counsel at the end
19  of the deposition and tell the court
20  reporter what you want to do on that.
21      A.    Okay.
22      Q.    And what should I call you?
23      A.    Lorena.

## Page 16

1      Q.    Lorena.  Okay.  All right.
2  Are you taking any type of medication right
3  now that may affect your memory or your
4  ability to give a deposition today?
5      A.    I took a nerve pill this
6  morning.
7      Q.    Okay.  Now, I understand you
8  took a nerve pill, but do you think you can
9  still get through this deposition?
10      A.    Sure.
11      Q.    And tell the truth?
12      A.    Oh, sure, yes.
13      Q.    All right.  Go through your
14  basic background.  Your last name -- maiden
15  name is Benefield?
16      A.    Yes, sir.
17      Q.    And are you currently married?
18      A.    No.  I'm divorced.
19      Q.    Now, you were born in February
20  of '51?
21      A.    Yes.
22      Q.    And your Social Security
23  number is 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?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 17

1  A.  Right. Yes.
2      (Defendant's Exhibit 1 was
3      marked for identification
4      purposes.)
5  Q.  All right. I'd like to hand
6  to you Exhibit Number 1. I've got them
7  premarked. This is a birth certificate that
8  we got from some of the records. You can
9  borrow my glasses, but I couldn't see.
10 So --
11 A.  Well, I'll -- I'm sure I put
12 mine in here.
13 Q.  I've got bifocals, so if you
14 really do need to borrow some.
15 A.  I need bifocals. I have some.
16     (Off-the-Record discussion
17     was held.)
18 Q.  Okay. I know it's in poor
19 shape, but does that appear to be your birth
20 certificate?
21 A.  Yes, yes, that's mine.
22     (Defendant's Exhibit 2 was
23     marked for identification

Page 18

1      purposes.)
2  Q.  All right. The second
3  document I'll show you which is Exhibit
4  Number 2, is also received from the records.
5  Is this your driver's license, or at least
6  the one issued in 2001?
7  A.  Yes.
8  Q.  All right. Now, I understand
9  this is -- you've asked for a jury trial; is
10 that correct?
11     MR. WHITE: That's correct.
12 A.  Yes.
13 Q.  So I'm going to ask you
14 questions about your family if they live in
15 the area that we're going to get the jury
16 venire from.
17 A.  Okay.
18 Q.  You have a daughter by the
19 name of Farrah?
20 A.  Yes.
21 Q.  All right. And her last name
22 is?
23 A.  Hale, H-A-L-E.

Page 19

1  Q.  Okay. Now, did she used to go
2  by Farrah Minix?
3  A.  Uh-huh. Yes.
4  Q.  Okay. And how old is
5  Ms. Hale?
6  A.  She's twenty-eight.
7  Q.  Twenty-eight. And where does
8  she live?
9  A.  LaGrange, Georgia.
10 Q.  It's in Georgia?
11 A.  Right.
12 Q.  So she won't be in the jury
13 pool.
14 A.  Right.
15 Q.  Okay. Now, does -- I guess
16 she wouldn't have any children above
17 eighteen, so we won't worry about her. Now,
18 she lives in LaGrange?
19 A.  Right.
20 Q.  Okay. And her husband lives
21 there and works there?
22 A.  Yes, sir.
23 Q.  Are your parents still with

Page 20

1  us?
2  A.  No. Both my parents are dead.
3  Q.  Okay. Now, your mother was
4  named Clemantine Benefield?
5  A.  Uh-huh.
6  Q.  You have to say yes.
7  A.  Yes.
8  Q.  And when did she pass away?
9  A.  She passed away -- This is,
10 what, May? She's been dead about eight
11 months.
12 Q.  Well, I'm sorry to hear that.
13 Okay. All right. And -- And her maiden
14 name was Garrison?
15 A.  Garrison, yes.
16 Q.  Okay. And does she have any
17 family from this -- from the Roanoke area,
18 parish -- I said parish, that's counties.
19 A.  No, she doesn't have any
20 people here.
21 Q.  And your father is --
22     MR. THOMPSON: You need to ask
23 that for greater Montgomery area.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 33

1    Q.    Wedowee, that is the county
2  capital?
3    A.    Yes.
4        MR. WHITE:  County seat.
5    Q.    County seat.  All right.  Now,
6  again, did any of your, I guess, four
7  divorces -- you had three divorces and --
8    A.    I was with him when it --
9    Q.    Okay.  Particularly your last
10  two, did your divorces cause you
11  humiliation, embarrassment or any emotional
12  distress?
13    A.    I'm sure it did, yes.
14    Q.    Okay.  Which one was the
15  worst?
16    A.    The Hull guy, the last one.
17    Q.    Okay.  And did you have to
18  seek any type of medical help to help cope
19  with emotional problems?
20    A.    Yes, yes, I did.
21    Q.    Okay.  Who did you go see?
22    A.    It was Charlotte, Charlotte
23  Bishop.

Page 34

1    Q.    Okay.  And did you have to
2  take any type of counseling or anything like
3  that?
4    A.    No, no.
5    Q.    Okay.  Did you have to start
6  taking any different type of nerve
7  medication?
8    A.    Yeah.  I forgot what I was
9  taking before, but she changed my
10  medication.
11    Q.    Okay.  Do you know what she
12  changed it to?
13    A.    Paxil, CR.
14    Q.    Okay.  And what church do you
15  belong to?
16    A.    Church of God, Henley Avenue
17  Church of God.
18    Q.    Church of God, Henley Avenue?
19    A.    Yes.
20    Q.    All right.  And how big is
21  that congregation, about?
22    A.    It's probably ninety to a
23  hundred.

Page 35

1    Q.    Okay.  And does the minister
2  there, or anybody in that church, offer any
3  type of counseling to any of its
4  congregation?
5    A.    No, no.
6    Q.    All right.  Do you know a
7  lawyer by the name of Alfred Zachary, from
8  LaGrange?
9    A.    No, sir.
10    Q.    John Gunn?
11    A.    Yeah, yeah, I know John Gunn.
12    Q.    And what type of practice does
13  he have?
14    A.    Well, now, he was an attorney
15  in Roanoke.  I don't know where he is at
16  now.  He was an attorney in Roanoke,
17  Alabama.
18    Q.    He's not there now?
19    A.    No.  I think he's moved.  I'm
20  not sure.
21    Q.    Okay.  Oliver Kitchins, do you
22  know him?
23    A.    Yes.

Page 36

1    Q.    And he's an attorney in
2  Roanoke?
3    A.    Yes, sir.
4    Q.    Do you have -- Did you have an
5  attorney for your divorce in '93 or '94, and
6  his name was Mr. Wright?
7    A.    No.  That was Hull, Larry
8  Hull.
9    Q.    Larry Hull.
10    A.    That was my last husband.
11    Q.    Okay.  And your husband -- And
12  the lawyer you had for Mr. Hull was who?
13    A.    Ned Wright.
14    Q.    Ned Wright.  Okay.  I'm sorry.
15  Okay.  And did you attend high school?
16    A.    Yes.
17    Q.    And which one was that?
18    A.    Wedowee, Alabama.  That's
19  called Randolph County High School.
20    Q.    Okay.  And did you graduate?
21    A.    No, sir.
22    Q.    But you got your GED?
23    A.    Yes, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1    Q.    Okay. Does he fly for the
2  airlines?
3    A.    Uh-huh.
4       MR. WHITE: Say yes.
5    A.    Yes.
6    Q.    And which airline does he fly
7  for?
8    A.    Raytheon.
9    Q.    Okay. And your daughter?
10   A.    No. She didn't go to college.
11   Q.    She didn't go to college. Did
12 she graduate from high school?
13   A.    Yes.
14   Q.    Did any of your ex-husbands
15 serve time in jail?
16   A.    Now, one of them, Ricky
17 Scarborough.
18   Q.    Uh-huh.
19   A.    Now, he's been in jail, but he
20 hasn't been to prison or anything like that.
21 But he has been locked up several times.
22   Q.    Okay. Is he still there now?
23   A.    He's in Georgia.

Page 42

1    Q.    Is he in jail in Georgia?
2    A.    No, no.
3    Q.    Oh, okay. I see. All right.
4  Now, was he in jail while y'all were
5  married?
6    A.    The one time, yes.
7    Q.    Okay. And what was he
8  convicted for?
9    A.    Drinking and driving. And I
10 think he had a case against him. I really
11 don't know what for.
12   Q.    And did that cause you
13 emotional distress and things of that
14 nature?
15   A.    Yes. He's an alcoholic.
16   Q.    Okay. Did you have to seek
17 any type of medical help for that?
18   A.    No.
19   Q.    Okay. Except for your current
20 lawsuit against JELD-WEN, have you ever been
21 in a lawsuit, either been the plaintiff or
22 defendant?
23   A.    No.

Page 43

1    Q.    Other than your divorces?
2    A.    Well, yeah. Of course. But
3  that didn't really . . .
4    Q.    Okay. Have you ever been in
5  any type of class action lawsuit?
6    A.    No, sir.
7    Q.    All right.
8    A.    Yes, I was, too. I was --
9  Well, not that. I had to carry my first
10 husband to Court for child support.
11   Q.    Okay. And when was this?
12   A.    Mercy. I divorced him in '80.
13 It was probably in '81, '82, something like
14 that.
15   Q.    Okay. Did you have to hire a
16 lawyer for that, or did you do it yourself?
17   A.    What did I do? Yes, I hired a
18 lawyer.
19   Q.    And who was that lawyer?
20   A.    Sandy Holiday.
21   Q.    Okay. Sandy Holiday is still
22 with us?
23   A.    Yes.

Page 44

1    Q.    Where is he from?
2    A.    Roanoke.
3    Q.    Okay. Now, you received a DUI
4  in Chambers County in '96?
5    A.    Uh-huh.
6       MR. WHITE: Yes.
7    A.    Yes.
8    Q.    And did you hire an attorney
9  then?
10   A.    No.
11   Q.    Did the DUI cause you to have
12 emotional distress and embarrassment and
13 humiliation?
14   A.    Yes.
15   Q.    And things of that nature?
16   A.    Yes.
17   Q.    Did you seek any type of
18 counseling because of that?
19   A.    No.
20   Q.    Did you seek any type of
21 medical help?
22   A.    No.
23   Q.    Did you seek -- I guess you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 45

1 didn't have to take any medication for that?
2    A.    Oh, no.
3            (Defendant's Exhibit 5 was
4            marked for identification
5            purposes.)
6    Q.    Okay. All right. These are
7 the -- These were provided to me by your
8 attorney, and I think you signed on the --
9    A.    Yes, sir.
10    Q.    -- third-to-last page and
11 probably helped fill them out,
12 fourth-to-last page or something?
13    A.    Yes, sir, I did.
14    Q.    Okay. I'll ask you a few
15 questions for this. I'd like to go to
16 number five, first, if you don't mind.
17 These are your employers you had -- I'm
18 sorry, number four. List of employers you
19 had before you worked for JELD-WEN. Are you
20 there yet? I think the first one is Terra
21 Clay.
22    A.    Yes, sir.
23    Q.    All right. And you worked for

## Page 46

1 them from '85 to '92?
2    A.    Yes, sir.
3    Q.    And where were Terra Clay's
4 headquarters?
5    A.    It was in Roanoke.
6    Q.    Roanoke. So, the company
7 owner and everything lived in Roanoke?
8    A.    No, sir. They lived in
9 Florida.
10    Q.    In Juniper, Florida?
11    A.    No.
12    Q.    Jupiter, Florida?
13    A.    No.
14    Q.    Okay. Palm Beach?
15    A.    Palm Beach.
16    Q.    Okay. West Palm Beach?
17    A.    West Palm Beach.
18    Q.    So, it was a pretty good sized
19 company? It had a -- Excuse me. Sorry.
20    A.    I don't know. You know, I
21 know they --
22    Q.    They had a plant in Roanoke?
23    A.    Yes, sir. But it wasn't that

## Page 47

1 big.
2    Q.    Okay. But where the owner
3 was, they was in Florida?
4    A.    Uh-huh. Yes, sir.
5    Q.    And do you know whether or not
6 they had other companies spread out through
7 the South?
8    A.    No. I don't know about that,
9 but I know they had one in Palm Beach.
10    Q.    And where in Roanoke was it?
11    A.    Airport Road.
12    Q.    Okay. That's kind of an
13 industrial area?
14    A.    No. Not really. Close to the
15 airport.
16    Q.    And what did you do for Terra
17 Clay?
18    A.    I sprayed tile, color on tile.
19    Q.    Okay. And so, I assume Terra
20 Clay made tile?
21    A.    Yeah. We made it -- They made
22 it from scratch.
23    Q.    All right. Did you have any

## Page 48

1 other type of jobs, just spray tile? Did
2 you float around or move around any?
3    A.    No, not really. Now, I -- I
4 hand painted.
5    Q.    Oh, you hand painted them?
6    A.    I hand -- Well, no, I did that
7 on the side.
8    Q.    Okay.
9    A.    I hand painted the border
10 tiles.
11    Q.    Okay. For seven years?
12    A.    Yes.
13    Q.    Okay. Did Terra Clay change
14 its name to Floor Tile Manufacturing?
15    A.    No, sir.
16    Q.    Not that you're aware of?
17    A.    Huh-uh.
18    Q.    Okay. And the reason you no
19 longer work there is because the plant
20 shut down?
21    A.    Yes.
22    Q.    Okay. And do you know why it
23 shut down, do you have any idea why?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 49 | Page 51 |
|---|---|
| 1    A.    I have no idea. | 1    A.    Right. |
| 2    Q.    Okay.  They didn't ask you? | 2    Q.    Did you get charged with |
| 3    A.    No.  I just worked there. | 3  assault in LaGrange? |
| 4    Q.    Okay.  And so, everybody in | 4    A.    Yeah. |
| 5  the whole place was laid off? | 5    Q.    In 1988? |
| 6    A.    Yes. | 6    A.    I'm not sure about that. |
| 7    Q.    Okay.  Are there any | 7        MR. WHITE:  You're not sure |
| 8  businesses there now? | 8  about the date? |
| 9    A.    Yeah.  There's something in | 9        THE WITNESS:  Yeah.  I'm not |
| 10  there now.  I'm not sure what it is. | 10  sure about the date. |
| 11    Q.    Okay. | 11    Q.    And why?  What happened?  Tell |
| 12    A.    But the owner, it's not his | 12  me about that. |
| 13  anymore.  He sold it. | 13    A.    My husband was going with a — |
| 14    Q.    Oh, I see.  Did whoever -- Did | 14  with this woman, and I went to the office |
| 15  Terra Clay, did they offer you a job to go | 15  and she was there, and, you know, we just |
| 16  work at any of his other plants? | 16  had words. |
| 17    A.    Yeah.  If we wanted to move | 17    Q.    Well, so is the assault — |
| 18  there. | 18  Which husband was this? |
| 19    Q.    Okay.  Where did they offer | 19    A.    Ricky Scarborough. |
| 20  you to move to? | 20    Q.    Okay.  Were you hurt in any |
| 21    A.    Florida. | 21  way or did you hurt anybody in any way? |
| 22    Q.    Okay.  Once you're in God's | 22    A.    No. |
| 23  country, you can't hardly leave. | 23    Q.    And what happened to the |

| Page 50 | Page 52 |
|---|---|
| 1    A.    No. | 1  assault charges? |
| 2    Q.    Okay.  Did Terra Clay have a | 2    A.    They were dropped. |
| 3  sexual harassment policy? | 3    Q.    Was it her against you? |
| 4    A.    I don't know. | 4    A.    No, she just didn't show up, |
| 5    Q.    You can't recall or -- | 5  you know, and — |
| 6    A.    No, I just -- I don't know. | 6    Q.    At Court? |
| 7    Q.    Okay.  And you worked for -- | 7    A.    Uh-huh.  And they just dropped |
| 8  Let's see.  You worked for Mill Work | 8  her case. |
| 9  Specialties from '92 to '98? | 9    Q.    That will do it.  Did this — |
| 10    A.    Yes, sir. | 10  Being in this fight, did it cause you |
| 11    Q.    Okay.  We'll talk about that | 11  humiliation and emotional distress and |
| 12  in a minute.  Did you work for a company | 12  embarrassment and anxiety and things of that |
| 13  from -- called Southern Ambulance? | 13  nature? |
| 14    A.    Yes. | 14    A.    Not really. |
| 15    Q.    From '98 to 2000? | 15    Q.    Made you feel better? |
| 16    A.    Yes. | 16    A.    Yeah.  I guess. |
| 17    Q.    Southern Ambulance, that's in | 17    Q.    Did you have an attorney for |
| 18  LaGrange? | 18  that? |
| 19    A.    Yes, sir. | 19    A.    No, sir. |
| 20    Q.    Okay.  How far is LaGrange | 20    Q.    The Milliken, let's talk about |
| 21  from Roanoke? | 21  that for a second.  That's also in LaGrange? |
| 22    A.    Maybe thirty miles. | 22    A.    Yes, sir. |
| 23    Q.    Just across the state line? | 23    Q.    And you worked for them — |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1  shut down -- That was -- Let's see. This is
2  '06. That was 2003.
3      Q.    Is when she quit?
4      A.    Yes, sir.
5      Q.    Okay. Mary Lou Laws. Was
6  Stacy -- Did I ask you, is Stacy married?
7      A.    At the time, I don't know.
8      Q.    Okay.
9      A.    You know, I mean, I just knew
10 of her.
11     Q.    Sure. Mary Lou Laws, is she a
12 social friend of yours?
13     A.    Yes, sir.
14     Q.    Hang out?
15     A.    No.
16     Q.    And what does she do at
17 JELD-WEN?
18     A.    She -- Let's see. What does
19 she do. She did several things. I know she
20 run the routers.
21     Q.    Okay. What's a router?
22     A.    It's where we cut the hinges
23 and door latches.

Page 63

1      A.    The back, back there. Over
2  the --
3          THE WITNESS: What is that
4  part called, Dan? The --
5      Q.    We'll get to that. I've got a
6  layout of the place, and we'll get to that.
7      A.    Anyway, it was in the back, it
8  was in the back.
9      Q.    Okay. Was he ever your
10 supervisor?
11     A.    No, sir.
12     Q.    And somebody by the name of
13 Linda Sims, who is that?
14     A.    That's the girl over here.
15     Q.    The one on the left or the
16 right?
17     A.    On the -- The one with the
18 hand up.
19     Q.    Oh, that one. Okay. I assume
20 she's a good friend of yours?
21     A.    Yes, sir.
22     Q.    And worked with you at
23 JELD-WEN?

Page 62

1      Q.    Okay. And what else does she
2  do?
3      A.    I really don't know what else
4  she does.
5      Q.    Okay. And what department
6  does she work in?
7      A.    It was in the back.
8      Q.    In the back. Okay. Jackie
9  Nelson, social friend of yours, good friend?
10     A.    I don't know Jackie Nelson.
11     Q.    Okay. That ends that, doesn't
12 it?
13     A.    Yeah, I guess.
14     Q.    Joe Mendoza. I think you've
15 got his name misspelled on here. It's
16 Mendoza, you don't know him?
17     A.    Joe? Oh, that's --
18     Q.    Actually, it's Jose Mendoza.
19     A.    Oh, okay. That's -- He was --
20 He came -- I don't know where he came from.
21 But he was a supervisor for them.
22     Q.    Okay. And what was he the
23 supervisor over?

Page 64

1      A.    Yes, sir.
2      Q.    And what's her address -- I
3  can find that. Does she live close to you?
4      A.    Not now. She's moved.
5      Q.    Okay. And is Linda married?
6      A.    No.
7      Q.    And where did Linda work?
8      A.    She worked in the back with
9  us.
10     Q.    In the back. Okay. And what
11 did Linda do in the back?
12     A.    She run the routers, too.
13     Q.    Routers. All right. And
14 Brenda is also -- is she a good friend of
15 yours?
16     A.    Yes, sir.
17     Q.    And does she live close to
18 you?
19     A.    No. She lives in Rock Mills.
20     Q.    Say that again.
21     A.    Rock Mills.
22     Q.    Okay.
23     A.    She lives about ten miles, I

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1   guess, from me.
2       Q.    Okay.  Is Brenda married?
3       A.    Yes.
4       Q.    All right.  And where did
5   Brenda work?
6       A.    She worked in the back with
7   us.  She run routers, also.
8       Q.    Routers.  Okay.  And Tawana
9   Zachary, who is that?
10      A.    Tawana?  Oh, okay --
11      Q.    Nickname is Tooty?
12      A.    Yeah, right.
13      Q.    All right.  Is she a good
14  friends of yours?
15      A.    Yes.
16      Q.    Is she trustworthy, to your
17  knowledge?
18      A.    Yes.
19      Q.    Has she ever told you
20  something that later turned out to not to be
21  true, that you can recall?
22      A.    No, sir, not really.
23      Q.    You say not really, I mean --

Page 66

1       A.    Well, now, we joke around or
2   something.
3       Q.    I'm not talking about joking.
4       A.    Oh, no, no, sir.
5       Q.    This is an interesting
6   character.  Goober Bowen?
7       A.    His name is Kenneth.
8       Q.    Kenneth.  Okay.
9       A.    We call him Goob.
10      Q.    Goob?  Named after the
11  Mayberry character?
12      A.    I don't know how he got that
13  name.
14      Q.    With the funny little hat on?
15      A.    Right.
16      Q.    And where did he work?
17      A.    He worked back there with us.
18      Q.    And what type of work did he
19  do?
20      A.    He run the routers, also.
21      Q.    Pat Galvez, who was he?
22      A.    He was our plant manager.
23      Q.    When did -- Do you recall when

Page 67

1   Pat came in?
2       A.    When did he come in?
3       Q.    Yeah.
4       A.    It was -- Okay.  When I first
5   went to work there, Richard was our -- He
6   came in --
7       Q.    I'm talking about the second
8   time.
9       A.    Right.  He came in about 2004.
10      Q.    Okay.  And when did he leave,
11  do you recall?
12      A.    About 2005, or something.
13      Q.    Okay.  That's just a guess?
14      A.    This is a guess.
15      Q.    You're not sure?
16      A.    No.
17      Q.    And the man to my right, do
18  you know him?
19      A.    Yes.
20      Q.    What's his name?
21      A.    Dan Hees.
22      Q.    Okay.  And where did Dan work?
23      A.    Dan -- I don't know exactly

Page 68

1   what he does, but he just come around once
2   in a while, to check things, see if things
3   were going right.
4       Q.    Was he -- To your knowledge,
5   was he above Fetner and Mendoza and Galvez?
6       A.    Yes, yes, yes.
7       Q.    Did you know how to reach him
8   if you wanted to?
9       A.    Well, if I wanted to, I could,
10  I'm sure.
11      Q.    Just go to Roxie, and ask for
12  where he was?
13      A.    Yeah.  Ask for the number or
14  something.
15      Q.    Okay.  Did you find -- Did you
16  ever talk to Dan Hees before October 13,
17  2004, when he came in and walked around the
18  plant?
19      A.    No, I barely -- I barely
20  talked to him.
21      Q.    Okay.  What about Pat Galvez,
22  did you ever talk to him when he was a
23  general manager?

17  (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 69

1    A.    Not really. Not much.
2    Q.    Okay. We'll come back to this
3 in a little bit.
4         (Defendant's Exhibit 6 was
5         marked for identification
6         purposes.)
7    Q.    This is a four-page document
8 labeled Minix Number 6. Is that your
9 signature on the bottom of the third page?
10   A.    My signature is on the second
11 page, and, yes, on the third page and on the
12 fourth.
13   Q.    And the fourth. But not the
14 first. So, they made a mistake of not
15 making you sign the first page?
16   A.    Well, yeah, it was printed,
17 you know.
18   Q.    You know that you were asked
19 to fill this out truthfully?
20   A.    Yes. And the dates may not be
21 exactly right.
22   Q.    I understand that. But you
23 did the best you could?

Page 70

1    A.    Yes.
2    Q.    All right. If you look at the
3 top, left-hand side, it says: CMS Holding
4 Company, not JELD-WEN?
5    A.    I don't know what that is.
6    Q.    Okay. That answers that
7 question, then. You know that when you
8 first applied back in -- This is your second
9 time, and the date is September 12, 2001, to
10 your knowledge, did JELD-WEN own Millwork
11 Specialties?
12   A.    No, I was there when JELD-WEN
13 bought Millwork out.
14   Q.    Okay.
15   A.    I think I was already there.
16 I'm not sure about that either.
17   Q.    Okay. So, you think it was
18 sometime after you applied, then JELD-WEN
19 come in?
20   A.    JELD-WEN come in.
21   Q.    Okay. About the time Pat
22 Galvez came in?
23   A.    Yes.

Page 71

1    Q.    Okay. But you don't know
2 anything about CMS Holding?
3    A.    No, sir.
4    Q.    All right. Now, again, we're
5 talking about dates, I think we're -- go to
6 the second page. You said you worked for --
7 I guess this is your first time you worked
8 for Millwork, it was from '91 to '94. Could
9 that possibly have been '94 to '97?
10   A.    I'm not -- I'm not sure. '91
11 to '94.
12   Q.    Well, we'll get to that. I'll
13 show you some documents. I think you
14 probably made a mistake there.
15   A.    Okay.
16   Q.    It's no big deal, but I just
17 want to make sure we get the right dates.
18   A.    All right.
19   Q.    Now, was the location of
20 Millwork Specialties in -- the first time
21 you worked there, whatever the time period
22 that was, the same location it was the
23 second time you worked there?

Page 72

1    A.    Yes, sir.
2    Q.    All right. Was the layout the
3 same?
4    A.    No.
5    Q.    They had a different --
6    A.    They had added on.
7    Q.    Added on to it. Okay. But
8 it's the same location?
9    A.    Right. Yes.
10   Q.    And you don't know anything
11 about CMS Holding?
12   A.    No, I don't.
13   Q.    You said you had duties as a
14 dado machine. What's that?
15   A.    That's where we cut the door
16 jambs, cut the seals on each end.
17   Q.    Is that different than a
18 router?
19   A.    Yes, sir.
20   Q.    Okay. And what are the other
21 machines you've worked on?
22   A.    I've worked on the routers.
23 I've run the brick mold machine.

18 (Pages 69 to 72)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 73

1    Q.    I'm sorry?
2    A.    Brick mold machine.
3    Q.    Brick?
4    A.    Mold machine.
5    Q.    Mold. Okay. And the dado.
6    Anything else?
7    A.    And inspected.
8    Q.    You were an inspector. Okay.
9    Anything else? And this is just for
10   Millwork Specialties, I'm talking about.
11   A.    Yeah, right.
12   Q.    All right.
13   A.    I've done -- Gosh --
14         MR. WHITE: He's asking you
15   about the first time you worked there, from
16   '91 to '94.
17         THE WITNESS: Right. Yeah, I
18   did it then.
19         MR. WHITE: Both times?
20         THE WITNESS: Both times.
21         MR. SCOFIELD: Yes. Thank
22   you, Counselor.
23   A.    Both times I've worked on the

Page 74

1    routers and my machine, too.
2    Q.    Did you ever work in the paint
3    department?
4    A.    No, sir.
5    Q.    Now, we're going to come back
6    to this.
7    A.    Okay.
8    Q.    But I want to make sure.
9         (Defendant's Exhibit 7 was
10        marked for identification
11        purposes.)
12   Q.    Now, this is a -- JELD-WEN has
13   the Roanoke facility up for sale. And this
14   is the only map I could find of it. It even
15   has a little map of Roanoke and it shows
16   LaGrange on the front page.
17        All right. Now, if you turn
18   to the second page, they have kind of a
19   layout of the buildings. Okay? Does that
20   look familiar?
21   A.    Well, yeah, kind of, you know.
22   Okay. Here's plant number. Yes, sir. I'm
23   getting it now.

Page 75

1    Q.    Take your time.
2    A.    Okay. I've . . .
3    Q.    Okay. Can you tell me which
4    ones were added onto after --
5    A.    Yes, sir. This department
6    here (indicating).
7    Q.    Okay. You're pointing at --
8    A.    2.
9    Q.    The 200 one?
10   A.    Yes.
11   Q.    That was added on?
12   A.    Yes, sir.
13   Q.    All right.
14        MR. WHITE: The one that says:
15   Outside -- What does that say: Unibel
16   Storage or something at the bottom of it?
17        THE WITNESS: No, no. This
18   was still on it right here, this part
19   (indicating).
20        MR. WHITE: Okay.
21        THE WITNESS: They just added
22   this part (indicating).
23   Q.    There's no way in the world

Page 76

1    the court reporter is going to pick this up.
2    So the part that you -- Just add the -- Kind
3    of put your initials around the place that
4    they added on to after you got there.
5    A.    (Witness complies.)
6    Q.    All right. But everything
7    else is pretty much the same?
8    A.    It was already there.
9    Q.    Okay. All right. Now, while
10   we're here, this wasn't there (indicating),
11   but when you came back in September of 2001,
12   where did you work?
13   A.    I worked back here
14   (indicating).
15   Q.    Back here. Okay. Now, the
16   place that you marked with your initials
17   where you worked, is that also the place on
18   the front of the magazine, or was that a
19   different place?
20   A.    No. I assume that's -- That's
21   the new part.
22   Q.    That's where you worked?
23   A.    Yes.

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1    Q.   Okay.  I need you to put your
2  initials next to that, please.
3    A.   (Witness complies.)
4    Q.   Okay.  All right.  Now, let's
5  focus upon the second time you worked there.
6    A.   Oh, no.  The second time I
7  worked there, this wasn't here -- Oh, yeah.
8  I mean, the first time I worked here at
9  JELD-WEN.
10    Q.   Let's talk about the second
11  time you worked at the JELD-WEN place.
12    A.   Okay.  They had that added on.
13    Q.   They had --
14    A.   They added that on after --
15    Q.   After you got there?
16    A.   No.  Not after I got there,
17  they added that on after the first time I
18  quit.
19    Q.   Okay.
20    A.   When I went back, they had it
21  added on.
22    Q.   Okay.  We're talking about
23  when you got, and after September of 2001?

Page 78

1    A.   Uh-huh.
2    Q.   Okay.  And so, this place you
3  have your signature on was already built
4  when you came back the second time?
5    A.   Right.
6    Q.   Okay.  What I'd like to know
7  is, where -- you worked at the same place
8  your initial was, that's where the router
9  machine was?
10    A.   Yes, sir.
11    Q.   All right.  What other
12  machines are in there where you initialed
13  this?
14    A.   Do what, now?
15    Q.   What other machines were in
16  there?
17    A.   Oh, the routers were in there,
18  the dado machine, which I run, was in there.
19  And there was another little machine, I
20  don't know what it was called, but it did
21  the small jambs.
22    Q.   Okay.
23    A.   Then they had where they made

Page 79

1  the columns and all that, that was back in
2  here, too.
3    Q.   Okay.  And, again, you believe
4  -- This is, again, the second time, you
5  believe that on the front page of Exhibit
6  Number 7, you believe that's the new place
7  they added?
8    A.   Yeah, I'm thinking, yeah, it
9  is.
10    Q.   Okay.  So, in this place it's
11  empty, but when it was in there, it was full
12  of machines and stuff?
13    A.   Yes.
14    Q.   Okay.  All right.  Now, Pat
15  Galvez and Roxie Giles had an office where?
16    A.   Now, it was back -- Okay.  It
17  was right in here (indicating).
18    Q.   Okay.  Let me just -- If it's
19  okay with you, I'm putting -- I'm just going
20  to put Pat Galvez, Pat and Roxie had an
21  office right there (indicating).
22    A.   Right.
23    Q.   Where I'm putting there names,

Page 80

1  Pat and Roxie; is correct?
2    A.   Yes.
3    Q.   All right.  Now, could Pat and
4  Roxie, while they were up there in their
5  office -- This is two story?
6    A.   Yes, sir.
7    Q.   All right.  -- could they see
8  into this new area where you worked?
9    A.   No, sir.
10    Q.   Okay.  Now, you had a paint
11  room.  Do you see where it says:  Paint
12  room?
13    A.   Uh-huh.
14    Q.   All right.  And you had next
15  to the paint room, I guess, this -- Was this
16  where they painted stuff, this whole --
17    A.   No, sir.
18    Q.   All right.
19    A.   Just where you see the paint
20  room.
21    Q.   Okay.  All right.  Now, where
22  did Joe Mendoza work when he worked there?
23    A.   Now, I think he --

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 81

1  Q.  Or did he have an office?
2  A.  Did Joe have an office? Yes,
3  yes.
4  Q.  Now, where was his office?
5  A.  His is back in here
6  (indicating). It was just right along in
7  there (indicating).
8  Q.  Okay. So I'm going to write
9  Joe -- Was it inside this building
10  (indicating)?
11  A.  Yes.
12  Q.  Okay. So, I'm going to write
13  Joe right here (indicating).
14  A.  Yes.
15  Q.  About where Joe's office was.
16  A.  Yes.
17  Q.  And Richard Fetner.
18  A.  Uh-huh.
19  Q.  Where did Richard Fetner have
20  an office, now, the second time?
21  A.  His office was right --
22  Q.  Go ahead and write Richard.
23  A.  Okay. His office would be

Page 82

1  right here (indicating).
2  Q.  Okay. So, Richard -- Was
3  Richard's office on the first floor?
4  A.  Yes.
5  Q.  Okay. Now, you had an office
6  on the first floor, Richard's office first
7  floor. Pat and Roxie's office was on the
8  second floor?
9  A.  Right.
10  Q.  Could Pat and Roxie look out
11  their window and see into Richard's office?
12  A.  No.
13  Q.  Now, did Richard -- But they
14  had glass?
15  A.  Yes.
16  Q.  They could see out, but they
17  just couldn't see into Richard's office?
18  A.  Right.
19  Q.  All right. Now, did Richard
20  have glass in front of his office to where
21  he could see out?
22  A.  Yes, yes.
23  Q.  And did Joe have glass where

Page 83

1  he could see out of his office?
2  A.  Yes, sir.
3  Q.  When Joe left --
4  A.  No. His was just a door.
5  Q.  Just a door?
6  A.  I'm thinking.
7  Q.  Okay. What -- So you had Pat
8  and Roxie. What did they do in this area in
9  front of Pat and Roxie?
10  A.  Oh, okay. The stripping
11  machine. I don't know what you call it.
12  Q.  The stripping machine. Again,
13  I'm pointing right in front of Pat and
14  Roxie.
15  A.  Right.
16  Q.  That building there in front
17  of them. Okay? Right in front of Richard's
18  office, Pat and Roxie, there was a stripping
19  machine?
20  A.  A stripping machine.
21  Q.  Okay. Was that a big machine?
22  A.  No, it's a small machine.
23  Q.  Small machine. Okay.

Page 84

1  A.  Then the -- What is it? I
2  can't even think of that machine that was
3  right here (indicating).
4  Q.  I'm going to write a strip
5  machine where you -- I just want you to
6  agree with me, strip machine in here
7  (indicating).
8  A.  And then they had the -- I
9  can't ever think of the name of it, right
10  here (indicating), where they put the blocks
11  together to make jambs.
12  Q.  Hold on a second.
13  (Off-the-Record discussion
14  was held.)
15  Q.  Finger jointer?
16  A.  Finger jointer. Yes.
17  Q.  Okay. Finger jointer right
18  here (indicating)?
19  A.  Yes, sir.
20  Q.  All right. So, you had --
21  Where your initials are -- Now, was this a
22  divided area right here (indicating)?
23  A.  Yes.

21 (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1    Q.    Okay.  Now, just next -- So,
2  the router -- You said router and all those
3  things where you worked where your initials
4  are, and what did they have -- Is this a
5  separate building I'm pointing at right now?
6    A.    It's not a separate building,
7  it's just a separate section.
8    Q.    Section.
9    A.    But there was a wall.
10    Q.    There's a wall right here
11  (indicating).  I'm going to write wall.
12  Could you see over the wall?
13    A.    No, sir.
14    Q.    All right.  And then they had
15  outside, what, storage?
16    A.    Yes, sir.  That's where --
17  That's where the wood first come in right
18  here (indicating).
19    Q.    Okay.
20    A.    And it would go in.
21    Q.    All right.
22    A.    And they would strip it down
23  and take the bad out.

Page 86

1    Q.    Okay.
2    A.    I don't even know what it was
3  called.
4    Q.    And this room right here
5  (indicating), what is that again, this that
6  you were just talking about?
7    A.    Yeah.
8    Q.    What I'm pointing out, did you
9  have --
10       (Off-the-Record discussion
11       was held.)
12    Q.    This was called the cutting
13  area; is that correct?
14    A.    Yeah.
15    Q.    All right.  Okay.  And that's
16  where they would do what, cut wood?
17    A.    Yes.  Where wood first come
18  in.
19    Q.    Okay.
20    A.    Before anything was done to
21  it.
22    Q.    All right.  Did you ever work
23  in the cutting area?

Page 87

1    A.    Maybe once, twice.  No, not
2  really.
3    Q.    Okay.  And did you ever do the
4  strip machine, did you ever work there?
5    A.    Yes.
6    Q.    All right.  Finger jointer,
7  did you ever work there?
8    A.    No.
9    Q.    Okay.  But you did work in the
10  area where your initials are?
11    A.    Yes, sir.
12    Q.    And you never worked in the
13  painting machine area?
14    A.    No, sir.
15    Q.    Okay.  Now, these other
16  buildings, you never went in there
17  (indicating), or did you?
18    A.    No.
19    Q.    Okay.  What are these, just
20  storage and things?
21    A.    Storage.  Right.
22    Q.    Fram -- Was this frame
23  buildings?

Page 88

1    A.    Right.  All of this right here
2  is just storage and some old machines
3  (indicating).
4    Q.    Okay.  You're pointing at
5  where it says:  Frame buildings and old
6  machines, this was storage?
7    A.    Right.
8    Q.    Okay.  All right.  Thank you.
9  All right.  Now, I'm going to keep this out
10  a little bit.  I want this part of the
11  Record.
12       MR. THOMPSON:  Do you want to
13  just substitute yours for hers?
14       MR. SCOFIELD:  Yeah.  When we
15  get a chance.
16    Q.    When you worked for Millwork
17  Specialties the first time.
18    A.    Okay.
19    Q.    You said on your resume it was
20  '91 to '94, I believe it was '94 to '97, but
21  that's -- we'll get to that.
22    A.    I'd just have to think.
23    Q.    I may be wrong, but I think I

22  (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 89

1  have some documents to show that, but I'm —
2  Let's, for right now, talk about the first
3  time.
4      A.    Okay.
5      Q.    I understand it's before the
6  September 2001 time.
7      A.    Right.
8      Q.    Okay.  Did Richard Fetner work
9  there?
10     A.    Yes.
11     Q.    And the first time, where was
12 his office?
13     A.    It was the same.
14     Q.    The same place?
15     A.    No, no.  Richard — No, first
16 time, no, I'm sorry, Richard didn't work
17 there then.
18     Q.    He didn't —
19     A.    It was Jimmy Moore and Doug
20 Moore, the first time I worked there.
21     Q.    Okay.  So, Doug — I mean,
22 Richard didn't even work at the Millwork?
23     A.    No.

Page 90

1      Q.    Okay.
2      A.    No.
3      Q.    Okay.  So, the first time we
4  don't have to worry about Richard?
5      A.    No.
6      Q.    Not there.
7      A.    Right.
8      Q.    All right.  The first time you
9  worked at Millwork facilities, did it have a
10 sexual harassment policy, a written one, to
11 your knowledge?
12     A.    I'm sure they did, you know.
13 I never did pay any attention to it or
14 something, you know.
15     Q.    Did they give it to you, like
16 they gave all the other employees, or do you
17 recall?  Do you recall what it said?  Do you
18 have a copy of it at home?
19     A.    Not the first, no.
20     Q.    Okay.  And did — The first
21 time you worked there, did you make any
22 complaints?
23     A.    Yes, yes, I did.

Page 91

1      Q.    Okay.  Who did you make
2  complaints against?
3      A.    Ronald Bowen.
4      Q.    Okay.  We'll get to that.
5      A.    Okay.
6      Q.    Anybody else?
7      A.    No, sir.
8      Q.    Did anybody else, other than
9  you, make any type of complaints?
10     A.    I don't know.
11     Q.    That you can recall?
12     A.    I don't know.
13     Q.    At any place that you worked
14 at, other than Millwork or JELD-WEN, the
15 place we're talking about right here on
16 Exhibit Number 7, have you seen — Have you
17 ever made a sexual harassment, a complaint?
18     A.    The first time?
19     Q.    No, no.  Any place other than
20 the JELD-WEN or Millwork?
21     A.    Oh, no, no.
22     Q.    Do you know of anybody that
23 has before, during, after?

Page 92

1      MR. WHITE:  Are you asking if
2  she knows of anybody who has ever made a
3  sexual harassment complaint against anybody?
4      MR. SCOFIELD:  Yes.
5      Q.    Other than at JELD-WEN or
6  Millwork facilities?
7      A.    No, sir.
8      Q.    Okay.  All right.  And you
9  can't recall whether or not Southern
10 Ambulance had a sexual harassment policy?
11     A.    No, sir.  I'm not —
12     Q.    Okay.  And what's your
13 definition of "retaliation"?
14     A.    I'm not sure what you mean.
15     Q.    If — Well, do you know what
16 the words "get revenge" means?
17     A.    Yeah.
18     Q.    Okay.  And what does that mean
19 to you?
20     A.    Get revenge?
21     Q.    Uh-huh.  Yes.
22     A.    I don't know.  To stop people
23 from doing whatever they're doing.  To —

23  (Pages 89 to 92)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 93

1    Q.    Get them back? Get even?
2    A.    Well, more or less, you know.
3    Q.    Okay.
4    A.    It's just a -- To stop
5  somebody. To get somebody stopped.
6    Q.    Okay. Well, I have a
7  different definition than you do, then.
8    A.    You know, protect people.
9    Q.    Someone kicked my son, and I
10  went and hit them, to me, that's revenge or
11  retaliation.
12    A.    Okay.
13    Q.    So we'll know we're on the
14  same page.
15    A.    All right.
16    Q.    All right. Unless he was
17  younger than my son, then I'd take my son
18  back and whip him for letting some little
19  kid beat him up. But that's retaliation on
20  my son.
21    A.    If someone kicked my son or
22  daughter, there would be trouble.
23    Q.    Now, when you left Southern

Page 94

1  Ambulance, did you get -- were you offered
2  any type of severance package?
3    A.    We had a -- I don't know what
4  that was. Some kind of an incentive pay.
5    Q.    Yes.
6    A.    That we could sign or not
7  sign.
8    Q.    Okay.
9    A.    You know, if you signed, it
10  would kill all your rights.
11    Q.    Couldn't sue them?
12    A.    Right. But I didn't sign.
13    Q.    Okay. You didn't sign
14  Southern Ambulance?
15    A.    Right.
16    Q.    What about Terra, did you sign
17  one for them when you left?
18    A.    Terra?
19    Q.    Yes.
20    A.    No, we didn't have to.
21    Q.    What about Milliken?
22    A.    No.
23    Q.    Why did you not sign one for

Page 95

1  Southern Ambulance?
2    A.    Because I felt like it would
3  kill all of the rights we had there, because
4  of things that were going on.
5    Q.    Okay. What rights? What
6  things that were going on, I should say?
7    A.    Sex harassment.
8    Q.    At Southern Ambulance?
9    A.    No, no, no. There was no sex
10  harassment there.
11    Q.    I was asking about Southern
12  Ambulance.
13    A.    Oh, I'm sorry. Oh, no. There
14  was no -- nothing there.
15    Q.    All right. After you left
16  Milliken, you applied again for Millwork
17  Specialties?
18    A.    Yes.
19    Q.    And who interviewed you?
20    A.    You mean at Millwork -- I
21  mean, JELD-WEN?
22    Q.    Yes, ma'am. Well, we'll call
23  it Millwork Specialties. At some point in

Page 96

1  time JELD-WEN took over?
2    A.    Yeah. Right.
3    Q.    We'll call it JELD-WEN for
4  right now.
5    A.    Okay. The last time, who
6  interviewed me?
7    Q.    Yes. In your second term of
8  working there.
9    A.    Richard did.
10    Q.    Richard did. Richard Fetner?
11    A.    Richard Fetner.
12    Q.    All right. And what was
13  Mr. Fetner's title at the time?
14    A.    He was the plant manager at
15  the time.
16    Q.    Okay. And had you known
17  Mr. Fetner before then?
18    A.    Yeah. I've known him all my
19  life. Not really personally know him, but I
20  knew him all my life.
21    Q.    And why did you submit your
22  application at Millwork?
23    A.    Why did I?

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1    Q.    Yeah.
2    A.    Why did I what?
3    Q.    Why did you want to go work
4  for JELD-WEN?
5    A.    It was at home, just looking
6  for a job, you know. I mean, it was at home
7  and I liked that.
8    Q.    You liked the fact that it was
9  close to home?
10    A.    Right.
11    Q.    And what had you heard about
12  this plant? Good, bad? You worked there
13  before?
14    A.    Right.
15    Q.    All right. You just knew —
16    A.    I really didn't hear anything,
17  you know.
18    Q.    Okay. How did you hear about
19  the opening?
20    A.    Richard called me.
21    Q.    And other than Richard, who
22  did you know that worked there, the second
23  time?

Page 98

1    A.    Ronald Bowen.
2    Q.    Ronald?
3    A.    Uh-huh.
4    Q.    Okay.
5    A.    Well, I really knew a lot of
6  them.
7    Q.    Okay. And they seemed happy?
8    A.    Well, yeah. Except Ronald is
9  — he's kind of a — he's different.
10    Q.    I think I'll stipulate to
11  that.
12    A.    I don't know if he was happy
13  or if he was sad. You know, everybody else
14  seemed —
15    Q.    What about — Goober Bowen,
16  was he happy there?
17    A.    Yeah. Goob is happy all the
18  time.
19    Q.    What about any of your lady
20  friends that worked there, did they seem
21  pretty happy?
22    A.    Yeah.
23    Q.    Like who?

Page 99

1    A.    Oh, gosh. At the time I went
2  to work, I can't even really explain some
3  people that —
4    Q.    Let me just ask you this.
5  Before you went to apply, or during the time
6  you applied for the second time, did anybody
7  warn you or say anything to you about
8  working at that plant?
9    A.    No.
10    Q.    All right. And was Mr. — At
11  that time, was Mr. Fetner married?
12    A.    Yes.
13    Q.    And what was the name of his
14  wife?
15    A.    Debbie.
16    Q.    Okay. And when did Richard
17  Fetner get a divorce, to your knowledge?
18    A.    It was right after that, I
19  think.
20    Q.    Okay.
21    A.    I'm not sure.
22    Q.    All right. At that time, when
23  you first got there in September of 2001,

Page 100

1  did Millwork Specialties/JELD-WEN have in
2  place a written sexual harassment policy?
3    A.    Yes.
4    Q.    All right. And do you know
5  whether or not it was similar to the ones
6  that you've seen at Milliken or Terra Clay
7  or any of these other companies you've
8  worked for?
9    A.    Well, I don't — I just don't
10  remember seeing any at Terra Clay. I'm sure
11  Milliken had them, I just probably didn't
12  read it or something.
13    Q.    And how many shifts — Again,
14  we're talking about the second time you
15  worked. How many shifts did you work?
16    A.    We just had day shift.
17    Q.    Day shift.
18    A.    Yeah.
19    Q.    Were there ever any rush jobs,
20  that you had to work at night?
21    A.    Yes.
22    Q.    All right. How often did that
23  occur, to your knowledge?

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

## Page 101

1    A.    Well, a lot of times in the
2 summertime we'd have some rush orders and
3 we'd have to work late.
4    Q.    Okay. So, you'd just work
5 overtime?
6    A.    Yes.
7    Q.    When you had rush orders, did
8 people sometimes have to leave what they
9 normally did, let's say at the router and
10 then go work somewhere else?
11    A.    Yeah. Whatever.
12    Q.    Whatever it took to get the
13 job done?
14    A.    Right.
15    Q.    Okay. Was Mr. Fetner --
16 Again, the second time, did he have to --
17 did the job require him to be on the road a
18 lot?
19    A.    No.
20    Q.    Okay. What about Mr. Galvez,
21 make sales calls or go meet the customers?
22    A.    He went some, but very little.
23    Q.    Very little. What about Joe

## Page 102

1 Mendoza?
2    A.    He didn't travel.
3          (Recess taken.)
4    Q.    Couple of things, back to your
5 interrogatories. You mentioned that this
6 first one, Cathy Thornton, Lisa Cook, Stacy
7 Cook, Mary Lou Laws, Jackie Nelson, you
8 didn't know their address. Is that
9 something you could have found out?
10    A.    Well, they -- All of them
11 lives around Roanoke. I mean, but Jackie
12 Nelson, I don't know him.
13    Q.    That's right, you said that.
14    A.    Right.
15    Q.    So that's a trick question.
16    A.    Oh, is that what it was?
17    Q.    Now, the other ones --
18    A.    Now, Cathy, yeah, they --
19    Q.    I mean, that's something you
20 could have found out if you looked in the
21 phone book, or is that something that --
22    A.    Probably.
23    Q.    One other thing --

## Page 103

1    A.    I mean, I can get that -- We
2 can get that, maybe, this evening or
3 something, some of us.
4    Q.    Okay. Tammy's husband, who
5 does he drive for?
6    A.    Tammy's husband?
7    Q.    Yes.
8    A.    Oh, I'm sorry, my niece?
9    Q.    Yes.
10    A.    His daddy.
11    Q.    Okay.
12    A.    And I don't know --
13    Q.    He's got his own company,
14 whatever that is?
15    A.    Yeah.
16    Q.    Okay.
17    A.    I don't know -- I don't know
18 who it would be.
19    Q.    What's the name of his dad?
20    A.    I don't know.
21          (Defendant's Exhibit 8 was
22          marked for identification
23          purposes.)

## Page 104

1    Q.    Let me show you Exhibit Number
2 8. I probably should have gotten it
3 shorter, but I -- it's marked -- Do you see,
4 it's Exhibit Number 8? It's your
5 unemployment records. They're numbered down
6 here at the bottom.
7    A.    Uh-huh.
8    Q.    So I'm going to refer to that
9 real quick.
10    A.    Okay.
11    Q.    It appears that if you go to,
12 like, 255. If you look at the top, your
13 claim date is November 28, 2004. Is that
14 approximately about the time you were laid
15 off at JELD-WEN?
16    A.    Yes, sir.
17    Q.    All right. If you go to 261,
18 the reason it says: Notice your claim
19 request for separation. If you look under
20 this excerpt forty-one, in the middle of the
21 page, it says: Lack of work. And I guess
22 the layoff date was 11/24/04. Does that
23 sound about right?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 105

1    A.    Yes. That was our --
2    Q.    And was it similar to your
3  layoff from Terra, the plant was just shut
4  down?
5    A.    No. I don't think so.
6        MR. WHITE: I'm sorry. Could
7  you repeat that.
8        MR. SCOFIELD: Yeah.
9    Q.    Did the -- The JELD-WEN plant
10  had just shut down in Roanoke?
11    A.    Yeah. It shut down.
12    Q.    Okay. So, your job ended
13  because it shut down?
14    A.    Yes.
15    Q.    Okay. My understanding, there
16  was a couple of people there, maybe a
17  security guard or something like that?
18    A.    Yeah.
19    Q.    Handful of other people, but
20  eventually they all shut down. As we saw
21  this other exhibit, it's for sale now; is
22  that correct?
23    A.    Well, I don't know that.

Page 106

1    Q.    All right. At any time, did
2  Mr. Hees, over here, ask you, say, in
3  November of any time, whether you wanted to
4  work any time after the middle of November,
5  November 24th, for a couple of more months?
6    A.    No, no, he didn't ask me.
7    Q.    Okay. Not another twenty days
8  or a month or anything like that?
9    A.    Huh-uh.
10    Q.    Okay. So, the answer is no?
11    A.    No.
12    Q.    Okay. Let me show you Exhibit
13  Number -- Okay. Excuse me. So if we go to
14  276, down at the bottom, and, again, these
15  are from the Alabama Unemployment Office,
16  lack of work, and then right above that is
17  your name. That's a correct statement, as
18  the reason filed for unemployment?
19    A.    Oh, I see. Right. Yeah.
20    Q.    Okay. And how long were you
21  able to collect unemployment benefits
22  after --
23    A.    Six months.

Page 107

1    Q.    Six months. All right. Until
2  about, what, June of 2005? Does that sound
3  about right?
4    A.    If that was six months.
5    Q.    Okay.
6    A.    November, December -- June.
7    Q.    If you look at 256, it says
8  you stopped -- Well, it's going to be 257.
9  If I read it correctly, it ended about June
10  11, 2005. Excuse me. It's right down here,
11  it's 255.
12    A.    My unemployment?
13        MR. WHITE: Hold on. He's on
14  255. Let's catch up with him. What line
15  are you reading from?
16        MR. SCOFIELD: Yeah. Up here
17  at the top left (indicating).
18    Q.    Is that the last time you --
19  About June 11, around there, is when you
20  stopped receiving unemployment?
21    A.    Yes.
22    Q.    Okay. That would be about six
23  months, then?

Page 108

1    A.    Yeah.
2        (Defendant's Exhibit 9 was
3        marked for identification
4        purposes.)
5    Q.    All right. Exhibit Number 9,
6  please. Now, this is a document we received
7  from a company called Roanoke Electronic
8  Controls, and said that you were employed --
9  you were not employed with Roanoke
10  Electronics, but a Kelly Temp Services?
11    A.    Yeah.
12    Q.    How long did you work for
13  Kelly Temp Services at Roanoke? It says
14  here a couple of weeks.
15    A.    A couple of weeks.
16    Q.    And that was in February of
17  2005?
18    A.    Yes.
19    Q.    Were you still able to collect
20  unemployment --
21    A.    No.
22    Q.    -- even though you worked at
23  -- during this time period?

27 (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1    A.    I just don't hardly ever go to
2  a doctor.  Maybe a couple years, maybe two
3  or three times during that time.
4    Q.    Okay.  Now, you also have your
5  signature down at the bottom of this page;
6  is that correct?
7    A.    Yes, sir.
8    Q.    And that's the third page of
9  your Exhibit Number 6.  And it goes on to
10  your poor or blurred vision, decreased
11  hearing, vericose veins, swelling,
12  allergies, asthma, hay fever.  And at the
13  very bottom it says:  Periods of depression,
14  where you said yes to that; is that correct?
15    A.    Periods of depression, yes.
16    Q.    Now, if you go down even
17  further it says:  Are you presently taking
18  any medications?  And your answer was:  Yes.
19  For depression.  Is that correct?
20    A.    Yes.
21    Q.    All right.  So, as of 9/12/01
22  you were taking what you call nerve pills?
23    A.    No.  Not nerve pills,

Page 134

1  depression pills.
2    Q.    Depression pills?
3    A.    There's a big difference.
4    Q.    Big difference.  Okay.  And
5  so, if you were taking them in September --
6  depression pills in September of 2001 -- Let
7  me strike that.
8        I'm sorry.  To you, what's the
9  difference between a depression pill and a
10  nerve pill?
11    A.    Well, a nerve pill is kind of
12  like a Band-Aid, you know, it helps you
13  quick, it's a quick-fix, like.
14        A depression pill, you have to
15  take them and get them in your system.  You
16  have to take them ten to twelve days for
17  them to start working.  Like, you could take
18  a depression pill right now, one of mine,
19  and it wouldn't do nothing to you.
20        You could take a nerve pill
21  and you would get calm or whatever, however
22  it affected you.
23    Q.    Okay.  But do you know the

Page 135

1  different types of nerve pills you've taken
2  in the past, like a Xanax, is that what
3  you're talking about, or a Valium, when
4  you're talking about a nerve pill?
5    A.    Valium is a depression pill.
6    Q.    Okay.  I just wanted to make
7  sure.  I just want to know if you know any
8  of the types of nerve pills that you're
9  talking about.
10        Okay.  So, you're -- I guess
11  the answer is no, you call them nerve pills,
12  you just can't remember the names of them?
13    A.    No, no.
14    Q.    Okay.  The -- So, you were
15  taking depression pills in September of
16  2001.  When were you first diagnosed as
17  being depressed?
18    A.    Oh, about twenty years ago.
19  I've been taking them about twenty years.
20    Q.    Twenty years.  Okay.  And what
21  doctor was that, can you recall?
22    A.    Well, let's see.  I think the
23  first one was Dr. Chester Primm.

Page 136

1    Q.    What type of doctor is Chester
2  Primm?
3    A.    M.D.
4    Q.    A family practitioner, a
5  psychiatrist?
6    A.    No.  Family.
7    Q.    And where is -- Is he still
8  with us?
9    A.    No.  He died.
10    Q.    And was he with a practice?
11    A.    Yes.
12    Q.    And what practice was he with?
13    A.    No.  I mean, he --
14    Q.    Like some doctors belong to
15  like a Southern Medical Group or a clinic or
16  anything.
17    A.    No.
18    Q.    He was by himself?
19    A.    Yes, he was.
20    Q.    Okay.  Chester Primm.  What
21  other doctors after that?
22    A.    I went to -- Well, I went to
23  Shirah.

34  (Pages 133 to 136)

# FREEDOM COURT REPORTING

Page 141

1  to ask you anything other than -- Russell
2  Peterson, DO, what is he? Is that a
3  dentist?
4      A.    No. He's a family.
5      Q.    He's a family practitioner?
6      A.    Uh-huh.
7      Q.    Okay. Now, this was just an
8  excuse to get out of work to go for a
9  checkup, but was Dr. Russell Peterson ever
10 your doctor?
11     A.    Yeah, I have been to him
12 before.
13     Q.    Okay. And what kind of doctor
14 is Dr. Russell Peterson?
15     A.    What kind of doctor?
16     Q.    Yes, ma'am.
17     A.    Just a family doctor.
18     Q.    Family doctor. Okay. Is
19 Dr. Peterson in the same group as
20 Dr. Shirah?
21     A.    No. They're not in the same
22 building, if that's what you're saying.
23     Q.    That's what I'm saying.

Page 142

1      A.    No. Huh-uh.
2             (Defendant's Exhibit 14
3             was marked for
4             identification purposes.)
5      Q.    Let's see. Number 14. The
6  only thing I wanted to ask you about this
7  is, again, this was during your first
8  tenure, and this is your basic pay back in
9  '96. Was that for a week or, do you know
10 what your hourly rate was back then?
11     A.    It was about six-fifty,
12 seven-fifty. It was probably here
13 somewhere. I don't remember. It was
14 five-fifty, six-fifty, something like that.
15     Q.    Okay. Now, in '91, when you
16 hired on, do you recall your basically
17 hourly rate?
18     A.    When I was hired on?
19     Q.    In the second time, '91 --
20 Excuse me, 2001.
21     A.    It was seven-fifty.
22     Q.    Seven-fifty. And how did you
23 get raises then? Did you get them at

Page 143

1  various times, or per year, how did that
2  work?
3      A.    Every three -- I'm going to
4  say every three months they give me a raise.
5      Q.    Okay. And what was your
6  hourly rate at the time you were laid off in
7  November of 2004, do you recall?
8      A.    Probably six -- I think it was
9  six-twenty-five.
10     Q.    In 2004?
11     A.    Oh, no, no. Oh, it was
12 ten-twenty-eight.
13     Q.    Ten-twenty-eight. So, you
14 started out at about seven-fifty and got up
15 to ten-twenty-eight?
16     A.    Uh-huh. Yes.
17     Q.    At any time, did your hourly
18 rate get decreased?
19     A.    No.
20            (Defendant's Exhibit 15
21            was marked for
22            identification purposes.)
23     Q.    All right. I've been waiting

Page 144

1  to ask you about this one. Exhibit 15.
2  Have you ever seen this document before?
3      A.    No.
4      Q.    All right. It's Exhibit
5  Number 15. And it says: The effective date
6  is 2/28/97. And it looks like, to me, that
7  your supervisor named Ronald Bowen --
8      A.    He wasn't my supervisor.
9      Q.    Okay. That's what I wanted to
10 ask you.
11     A.    No.
12     Q.    All right. This was an old
13 record I found, and I wanted to ask you
14 about it. Did you quit in '97?
15     A.    Yes. And I quit because of
16 this Ronald Bowen.
17     Q.    Because of Ronald Bowen?
18     A.    Yes. We worked on the same
19 machine and he was sex harassing me.
20     Q.    Okay. In '97?
21     A.    Yes. And I just quit.
22     Q.    All right. And he wasn't your
23 supervisor?

36 (Pages 141 to 144)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 145

1    A.    No, he was like a --
2    Q.    Was he a leadman?
3    A.    Yeah.  Kind of like a leadman,
4    yeah.  He's always been like of a leadman.
5    Q.    All right.  So, as far back as
6    '97, Ronald Bowen was sexually harassing
7    you?
8    A.    Uh-huh.  Yes.
9    Q.    In what way?
10    A.    He was always asking me out,
11    always wanting to touch me, you know, which
12    I refused.  He said:  What if I touch you
13    anyway?  I said:  Ronald, don't touch me.
14    Q.    Did he ever touch you?
15    A.    No.  Not then.
16    Q.    Now, did he ever attempt to
17    grab any of your privates?
18    A.    No.
19    Q.    Did he ever -- Again, this is
20    the first time you're employed?
21    A.    Yes.  The first time.
22    Q.    The first time.  Okay.  Did he
23    say anything to you sexually graphic and use

Page 146

1    any kind of vulgar language?
2    A.    No, he would just say:  I just
3    want to be with you.
4    Q.    Okay.  And at that time, it's
5    my understanding that Millworks was owned by
6    a company called CMS, and you may or may not
7    have known that.
8    A.    No, I didn't.
9    Q.    But did they have -- Did you
10    tell on Mr. Bowen or anything like that?
11    A.    No, no, I didn't.
12    Q.    You handled it yourself?
13    A.    Yeah.  I just quit.  You know,
14    I got tired of it and I just quit.  I didn't
15    tell anybody, say anything.  But everybody
16    knew anyway.
17    Q.    So, if this name on here is
18    supervisor, Ronald Bowen, that's just not
19    correct?
20    A.    Huh-uh.  No.  That's not
21    correct.
22          (Defendant's Exhibit 16
23             was marked for

Page 147

1          identification purposes.)
2    Q.    All right.  Let's go to number
3    16.  Again, this is an older record.  And
4    there's a -- If you look in the bottom,
5    right-hand side, in the middle of the page
6    of the writing it says:  LE left early.  Is
7    that something to do with your quitting or
8    do you have any idea what this is?
9    A.    I don't have no idea what this
10    is.
11    Q.    I don't have any idea what
12    that is either.
13    A.    I don't.
14    Q.    Okay.
15    A.    LE, I don't know -- Who is LE?
16    Q.    I think it meant left early,
17    but I don't know what it means, I just
18    don't.
19    A.    Maybe it means left early and
20    then just wrote it out, maybe.
21          MR. WHITE:  I don't know.  If
22    you don't know, you don't know.
23    Q.    If you don't know, you don't

Page 148

1    know.
2    A.    I don't know.
3    Q.    Let's see here.
4          (Off-the-Record discussion
5             was held.)
6          (Defendant's Exhibit 17
7             was marked for
8             identification purposes.)
9    Q.    Okay.  This is Exhibit 17.  We
10    received these pursuant to subpoena.  And
11    they appear to be pharmacy records from a
12    company called Emergency Home Care Pharmacy.
13    And it's between May 8, 2000 and 4/10/02.
14    A.    Uh-huh.  Yeah.  I used them
15    for a while.
16    Q.    And in year 2000, May 8, 2000,
17    you were taking -- I cannot pronounce it,
18    but I'll try to, A-M-I-T-R-I-P-T-Y-L-I-N-E,
19    Amitriptyline.  And it's my understanding,
20    from viewing the Internet, this is a pretty
21    strong antidepressant?
22          MR. WHITE:  Object to the
23    form.

37 (Pages 145 to 148)

Page 149

1    A.    I -- It's according to what
2  kind of -- I mean, what strong -- how strong
3  they give me. I don't know what --
4    Q.    When Dr. Shirah gave it to
5  you, did he describe it in any certain way?
6    A.    No. He just give me
7  something.
8    Q.    Okay. And did he tell you
9  what it was for, other than depression?
10  Anything else?
11    A.    No.
12    Q.    All right. Lamisil, that has
13  nothing to do with your emotional state?
14    A.    No.
15    Q.    All right. And then you take
16  Amitriptyline until, I guess, October 10,
17  2001, then you switch over to Doxepin?
18    A.    Yeah.
19    Q.    Is that also an
20  antidepressant?
21    A.    Yes. All these will be
22  depression pills.
23    Q.    Okay. And then you have

Page 150

1  Ambien, that's a sleeping pill; is that
2  correct?
3    A.    Yeah. Ambien is a sleeping
4  pill.
5    Q.    All right. And then
6  Amoxicillin is a -- I guess that's --
7    A.    That's a depression pill.
8    Q.    It is also? I wouldn't think
9  it would be.
10    MR. WHITE: No. That's an
11  antibiotic for, like, a sore throat or
12  something like that.
13    A.    Oh, okay.
14    Q.    Then you have several
15  antihistamines in here. During this time
16  period between 5/8/2000, and 4/10/2002, do
17  you know why you were being prescribed these
18  depression pills?
19    A.    Well, now, I was diagnosed,
20  you know, with depression back when I was
21  going through my first divorce. And I went
22  to a psychiatrist and he told me that I need
23  to get on a depression pill.

Page 151

1    Q.    Okay. And who was the
2  psychiatrist.
3    A.    I don't even remember. In
4  Wedowee.
5    Q.    In Wedowee?
6    A.    Yeah.
7    Q.    Okay. Do you believe that
8  psychiatrist is still with us, or do you
9  have any idea?
10    A.    No. He's not with us.
11    Q.    Okay.
12    MR. WHITE: Meaning, do you
13  know if he's dead or alive?
14    Q.    Dead or alive, yeah.
15    A.    Oh, I don't know. He was
16  young, so I assume he's still alive. I was
17  going there for -- I was going through a
18  divorce. That's the reason I was seeing
19  him.
20    Q.    Did Dr. Shirah tell you the
21  Amitriptyline was for depressive illness of
22  a psychotic or neurotic nature, or anything
23  like that?

Page 152

1    A.    No.
2    Q.    Okay. And did the doctor tell
3  you why he changed you from Amitriptyline to
4  Doxepin?
5    A.    Well, I asked him to change
6  because the other, I know, wasn't working
7  for me.
8    Q.    And what do you mean, not
9  working for you?
10    A.    Well, different pills, you
11  know, some of them will make you kind of
12  crazy-headed, you know. It's just, I'm one
13  that's always asking for change because some
14  of them will work the opposite for you, you
15  know. Some of them will keep you awake.
16    Q.    Different chemicals affect
17  different people different ways?
18    A.    Right.
19    Q.    So, you thought maybe this one
20  wasn't working so you wanted to try
21  something different?
22    A.    Yeah. I would explain to him
23  how I was feeling and I felt like I needed

38 (Pages 149 to 152)

# FREEDOM COURT REPORTING

Page 169

1  is an allergy medication. Lunesta is a
2  sleeping medication, as far as I understand.
3      MR. SCOFIELD: Well, if you
4  watch TV, you probably know that.
5      MR. WHITE: I don't. I just
6  happen to know it.
7      Q.   Do you recall which one you
8  were --
9      A.   It was probably a sleeping
10  pill.
11      Q.   Okay. You don't know the
12  antianxiety medication you were taking?
13      A.   No. I don't remember.
14      Q.   Okay. Now, in this Minix
15  Number 19, is there -- I didn't see anything
16  about any problems you were having from
17  working at JELD-WEN from sexual harassment
18  or anything like that. Did you see any?
19      A.   Now, go over that again.
20      Q.   Yeah. I didn't see you
21  complain about anything to Dr. Shirah during
22  this time period about any problems you were
23  having because of sexual harassment or

Page 170

1  anything of that nature.
2      A.   No. I never did tell any of
3  my doctors -- Oh, yeah, yeah, I did. I told
4  Charlotte Bishop. I talked to her about it
5  because she was a woman, and I talked to her
6  about it.
7      Q.   But you didn't tell Dr. Shirah
8  about it?
9      A.   Huh-uh.
10      Q.   Say yes or no.
11      MR. WHITE: Is that a yes or
12  no?
13      A.   No.
14      Q.   All right.
15      MR. WHITE: Is this a good
16  time for a break?
17      MR. SCOFIELD: Sure. That
18  would be fine.
19      (Recess taken.)
20      (Defendant's Exhibit 20
21          was marked for
22          identification purposes.)
23      Q.   Exhibit Number 20, it's my

Page 171

1  understanding this is dated 12/1/01, that
2  would have been the time you started the
3  second time around?
4      A.   Huh-uh.
5      Q.   And you -- What's the name of
6  this machine?
7      A.   It's a dado machine.
8      Q.   Okay. That's the same --
9  That's another word for dado machine.
10      A.   I can't -- I can't even read
11  it. It's T-E-W-N --
12      Q.   Tewnun, or something like
13  that.
14      A.   I've never heard it called
15  that.
16      Q.   And whose signature is that
17  down at the bottom?
18      A.   I guess it's Richard's.
19      Q.   Okay. Richard Fetner?
20      A.   Uh-huh.
21      Q.   And that says: Eight dollars
22  an hour. Could that have been the rate you
23  started out at?

Page 172

1      A.   No. I started out at
2  seven-fifty.
3      Q.   Okay. So, this might have
4  been eight dollars?
5      A.   I don't know.
6      Q.   You don't know what it is?
7      A.   No.
8      Q.   All right. And we talked
9  about this earlier. You were -- You worked
10  in there with the dado machine work?
11      A.   Uh-huh.
12      Q.   The whole time -- The whole
13  time you worked there until the plant was
14  laid off?
15      A.   Uh-huh. Yes.
16      (Defendant's Exhibit 21
17          was marked for
18          identification purposes.)
19      Q.   Okay. Exhibit Number 21.
20  This is just a form that people have to fill
21  out when they start working again. The only
22  thing I was going to ask you is, there's a
23  -- Yeah. Your signature is in the middle of

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 173

1  the page, on 9/12/01. And then there's
2  something down at the bottom called -- or
3  some person called Catherine Conger, office
4  manager, secretary. Who is she?
5      A.   Just what you said. She
6  was --
7      Q.   Okay. How long did Ms. Conger
8  work there?
9      A.   I think she worked there after
10  I went back, about two years, then she quit,
11  and this other lady came in.
12      Q.   A Roxie?
13      A.   Uh-huh.
14      Q.   Roxie Clayton replaced Cathy?
15      A.   Uh-huh. Yes.
16          (Defendant's Exhibit 22
17           was marked for
18           identification purposes.)
19      Q.   Okay. That's all I need to
20  know. For continuity's sake, let's mark
21  Exhibit 22. I just needed to know who Cathy
22  Conger was.
23          (Defendant's Exhibit 23

Page 174

1           was marked for
2           identification purposes.)
3      Q.   Now, Exhibit 23 is a doctor --
4  or certificate to return to work from
5  Dr. Shirah, from Physicians Associates. So,
6  I guess, the point is, is that several days
7  after you started you had to take some time
8  off?
9      A.   Well, not -- I can't remember.
10      Q.   Okay. You don't remember what
11  this was for?
12      A.   No.
13      Q.   If you did start on 9/12/01,
14  you would have been -- you missed work,
15  starting two days later, for a period of
16  three days, but you don't remember what this
17  is about?
18      A.   I don't remember this.
19      Q.   Okay. That's fine. And do
20  you recall who hired you, who you
21  interviewed with the second time?
22      A.   Richard.
23          (Defendant's Exhibit 24

Page 175

1           was marked for
2           identification purposes.)
3      Q.   Richard. Okay. Let me show
4  you Exhibit Number 24. Was there a time
5  after you started work, again, this is the
6  second time, before you could be eligible
7  for their healthcare?
8      A.   Was there a certain time?
9      Q.   Yeah. Was there a
10  probationary period?
11      A.   Yeah, yeah.
12      Q.   Okay. What was the
13  probationary period, do you recall?
14      A.   No.
15      Q.   Exhibit Number 24 has your
16  signature on there.
17      A.   I'm sure it was three months.
18      Q.   Three months?
19      A.   Yeah.
20      Q.   Okay. Again, when you first
21  started, we asked this before, but you
22  didn't know who CMS Holding was?
23      A.   No.

Page 176

1      Q.   All right. And when you first
2  started again, I think you said earlier
3  Richard Fetner was the general manager?
4      A.   Uh-huh. Yes.
5          (Off-the-Record discussion
6           was held.)
7      Q.   Do you know who Richard Fetner
8  reported to?
9      A.   Dan, Dan Hees.
10      Q.   No, no. I'm talking about
11  when you first started there, he reported to
12  Dan Hees?
13      A.   Yeah. I suppose so.
14          (Defendant's Exhibit 25
15           was marked for
16           identification purposes.)
17      Q.   All right. I'll show you
18  Exhibit Number 25. And this is the -- Is
19  this your benefits that you got from
20  JELD-WEN, your healthcare plan, when you
21  enrolled in their healthcare plan on
22  3/22/02?
23      A.   Oh, okay.

44  (Pages 173 to 176)

# FREEDOM COURT REPORTING

Page 177

1    MR. WHITE: Is there a
2  question?
3    Q.    Yeah.  Not really, because I
4  was going to ask you, is this about the time
5  CMS changed over to JELD-WEN and JELD-WEN
6  started bringing in more people?
7    A.    Yeah.  JELD-WEN.  We had to
8  get a different insurance with JELD-WEN.
9    Q.    Yeah.  That's what I'm saying.
10  This is about the time more people from
11  JELD-WEN started coming into the plant?
12    A.    Yeah.  Uh-huh.
13    Q.    That was a question.  Does
14  that sound about right?
15    A.    Yeah.
16    Q.    Okay.  Do you recall exactly
17  when Pat Galvez started working for JELD-WEN
18  and occupying that office every day?
19    A.    It was just a few months after
20  I went to work there.
21    Q.    A few months afterwards.
22  Okay.  And when did the man to my right, Dan
23  Hees, start coming by the plant?

Page 178

1    A.    Well, he's always come by, you
2  know, once a month, sometimes twice a month.
3    Q.    Okay.  Did anybody else from
4  JELD-WEN come by on a regular basis, a
5  higher up?
6    A.    No.
7    Q.    Bob Boyce, does that sound
8  familiar?
9    A.    No.
10    Q.    Doesn't sound familiar.  And
11  what would -- When Dan would come in, what
12  would he do?  Would he tour the plant?
13    A.    Yeah.  He just toured the
14  plant.
15    Q.    Did you ever see him talk to
16  anybody, see how things were going?
17    A.    Yeah.  He'd stop and talk to
18  people.
19    Q.    Did he ever stop and talk to
20  you?
21    A.    No.
22    Q.    What about Brenda or Linda
23  Sims?

Page 179

1    A.    Yeah.  He talked to Linda a
2  lot.
3    Q.    He'd talk to Linda a lot?
4    A.    Yeah.
5    Q.    Okay.  And do you know what
6  they talked about?
7    A.    No.
8    Q.    Was Linda ever hurt on the
9  job?
10    A.    Yeah.  She hurt her foot, or
11  sprained her ankle.
12    Q.    Okay.  Did she still -- Was
13  she still able to go to work on light duty?
14    A.    Yeah.  She worked in the
15  office.
16    Q.    How long was she able to work
17  in the office?
18    A.    I don't remember.
19    Q.    So, she worked up there with
20  Pat Galvez and Roxie Giles?
21    A.    Yes.
22    Q.    For about a month?
23    A.    I'm assuming.  I'm not sure.

Page 180

1    Q.    Okay.  And how did she hurt
2  her foot?
3    A.    She tripped over a conveyor.
4    Q.    At the plant?
5    A.    Yes.
6    Q.    Did Linda have problems with
7  her either husband or ex-husband?  Did he
8  beat her?
9    A.    I don't know.  I wouldn't
10  know.  Huh-uh.
11    Q.    Okay.  During this time, did
12  Linda's mother pass away?
13    A.    Yes.
14    Q.    While she worked at JELD-WEN?
15    A.    Yes.
16    Q.    Was it before or after she
17  hurt her foot and was on light duty?
18    A.    I don't know.  I don't know
19  which.
20    Q.    Okay.  And did Richard Fetner
21  hold a fund-raiser for Linda?
22    A.    I don't know.
23    Q.    To raise money for the

45  (Pages 177 to 180)

# FREEDOM COURT REPORTING

Page 181

1  funeral?
2      A.    I don't know.
3      Q.    You don't know?
4      A.    No.
5      Q.    Okay.  Did you feel that Pat
6  Galvez was a pretty nice guy?
7      A.    Very nice.
8      Q.    And I may have asked you this
9  earlier, do you feel like he was
10 trustworthy?
11     A.    Oh, sure.  Yes.
12     Q.    What about Joe Menendez, was
13 he a pretty nice guy?
14         MR. HEES:  Mendoza.
15     Q.    Mendoza?
16     A.    He seemed to be.  But I just
17 never did get to know him that well.
18     Q.    Okay.  Because he worked in
19 other part of the plant?
20     A.    Yeah.  It wasn't not just
21 apart, but I just never talked to him much.
22     Q.    Okay.  How old is Mr. Fetner?
23     A.    I'm not sure.  Fifty -- I

Page 182

1  think I'm about two years older than him.
2  He's fifty-four.
3      Q.    Fifty-four?
4      A.    I'm guessing.
5      Q.    Okay.  And could you describe
6  him to me, how tall he is, physically fit.
7  Is he an imposing man?
8      A.    He's probably five-nine,
9  heavyset.
10     Q.    Heavyset.  Does he appear to
11 be out of shape?
12     A.    Yeah.
13     Q.    Okay.  Now, he's a city
14 councilman at Roanoke?
15     A.    Yes.
16     Q.    And Roanoke has, what, about
17 five thousand people, six thousand,
18 something like that?
19     A.    Yeah.
20     Q.    Is being a city councilman in
21 five-thousand or six-thousand person town a
22 big deal?
23         MR. WHITE:  Object to the

Page 183

1  form.
2      A.    Well --
3      Q.    Do you think so?
4      A.    Yeah.  I think it's a big
5  deal.
6      Q.    And why is that?
7      A.    Well, anything -- Any time
8  you're on a city council or anything like
9  that, I think you should be what you say you
10 are, and he wasn't, he's not.
11     Q.    Okay.  And did you work -- Did
12 you work next to Fetner or did you work for
13 him?
14     A.    I just worked for him.
15     Q.    Okay.  And his title was group
16 leader?
17     A.    No.  He was the supervisor.
18     Q.    And what's Mr. Fetner's
19 educational background, to your knowledge?
20     A.    I know nothing about it.
21     Q.    What's that?
22     A.    I don't know anything about
23 him.

Page 184

1          (Defendant's Exhibit 26
2              was marked for
3              identification purposes.)
4      Q.    You don't know.  I'll show you
5  Exhibit Number 26, that's been produced by
6  the Plaintiffs.  Your attorneys gave this to
7  us.
8          MR. WHITE:  Do you recognize
9  the document?
10     A.    Yeah.  I've seen these papers
11 before.
12     Q.    Ma'am?
13     A.    I've seen these papers before.
14     Q.    Okay.  If you look at the
15 second page, it's number 53 down at the
16 bottom.  It was the JELD-WEN Employee
17 Handbook, Revised January 1, 2002.  Do you
18 see that, at the very top, in small print?
19     A.    I thought you said 53.
20     Q.    Yeah.  It's 53 down here
21 (indicating).  I don't know which one you
22 want to go by.
23     A.    Okay.

46 (Pages 181 to 184)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 185

1       MR. WHITE: He's referring to
2   that language right there (indicating).
3       Q.   Do you see that?
4       A.   Yeah. What, the handbook?
5       Q.   Yes, ma'am. During the whole
6   -- Any time after 2002, are you aware that
7   JELD-WEN changed this handbook to another
8   edition after -- while you were there at
9   JELD-WEN?
10      A.   No, I'm not aware of that.
11      Q.   Okay. Now, let's go to --
12  it's Bates number 60 -- 61 down at the
13  bottom right. And page -- Let's see. Yeah.
14  61 down at the bottom right. Probably
15  number five on your book.
16      A.   Okay.
17      Q.   That's my handwriting on
18  there.
19      A.   Okay.
20      Q.   Okay. I numbered it so we
21  could talk about it, the different
22  paragraphs.
23      MR. WHITE: Okay.

Page 186

1       Q.   All right. Look at number
2   one. Have you read this before?
3       A.   Yeah. I've read all this.
4       Q.   Okay. Do you have any
5   problems understanding it?
6       A.   Well, I don't really remember
7   what's all on here.
8       Q.   Go ahead and read it.
9       MR. WHITE: Do you want us to
10  read it paragraph by paragraph, or do you
11  want us to read the whole thing?
12      MR. SCOFIELD: Go ahead and
13  read the whole thing, and then I'll ask you
14  various questions.
15      MR. WHITE: Okay.
16      A.   Okay. I just read down
17  through twelve.
18      Q.   Okay. Let's go to the first
19  paragraph. Is there anything about that you
20  don't understand?
21      A.   Well, I understand all of it.
22      Q.   Okay. All right. That makes
23  it easy, then. Let's go to -- You

Page 187

1   understand all of this. To start with, I
2   want to ask you some questions about number
3   eight. I have parts underlined there.
4       It says: Any employee that
5   believes he/she is being subject to
6   objectionable conduct should promptly notify
7   either their supervisor, the general or
8   corporate manager, vice president or
9   subsidiary president or legal department at
10  541-882-3451. Do you see that?
11      A.   Yes.
12      Q.   Okay. Do you understand that?
13      A.   Yes.
14      Q.   So, if Mr. Fetner bothers you,
15  you've got a lot of opportunities to call
16  somebody else; is that correct?
17      A.   Yes.
18      Q.   Such as Mr. Hees or Pat Galvez
19  or JELD-WEN's legal department in Klamath
20  Falls, Oregon?
21      A.   Yes.
22      Q.   And did you have any problems
23  finding the telephone number at the plant?

Page 188

1       A.   No. I mean, you'll just find
2   yourself not doing it.
3       Q.   Okay.
4       A.   I mean, I talked to Richard
5   Fetner about it and he --
6       Q.   Well, we'll get to that. But
7   what I want to ask you is, you had no
8   problem understanding this number eight,
9   where if a supervisor bothered you, you
10  could go to Pat Galvez or Dan Hees or
11  JELD-WEN's legal department?
12      A.   Right. I understand that.
13      Q.   Okay. All right. Number nine
14  is underlined: Employees are encouraged to
15  report any conduct they may witness against
16  someone else, whether verbal, visual,
17  physical, sexual or otherwise that they
18  believe constitute harassment. Do you
19  understand that?
20      A.   Uh-huh. Yes.
21      Q.   And did most -- To your
22  knowledge, did Brenda and Linda Sims
23  understand that, to your knowledge?

47  (Pages 185 to 188)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 189

1    MR. WHITE: Object to the
2    form.
3    A.    Yes.
4    Q.    All right. To your knowledge,
5    did Brenda and Linda Sims understand number
6    eight?
7    MR. WHITE: Object to the
8    form.
9    Q.    Did you talk about it with
10   them, that they could contact Dan Hees or
11   Pat Galvez or JELD-WEN's legal department?
12   A.    Yeah. We spoke about it.
13   Q.    Okay. Number ten says: Every
14   complaint of harassment will be investigated
15   promptly, thoroughly, fairly and objectively
16   and a written investigative report will be
17   completed for each complaint. Do you
18   understand that?
19   A.    Yes.
20   Q.    Do you understand number
21   eleven: If information collected during an
22   investigation establishes that harassment or
23   other objectionable conduct did occur,

Page 190

1    disciplinary action will be promptly taken
2    against the harasser up and to including
3    termination, if appropriate. Do you
4    understand that?
5    A.    I understand that.
6    Q.    And perhaps most importantly,
7    number twelve: Employees will not be
8    discriminated or retaliated against for
9    reporting harassment or participating in an
10   investigation. Do you understand that?
11   A.    I understand that.
12   Q.    All right. At any company
13   that you ever worked for, any part of your
14   life, have you ever seen a policy more
15   thorough than that?
16   A.    No, no, no.
17         (Defendant's Exhibit 27
18         was marked for
19         identification purposes.)
20   Q.    Okay. I'll show you JELD-WEN
21   Number 27. Again, this is just a
22   reiteration of what we just went over. Take
23   your time and read it. But I think it --

Page 191

1    you'll -- I'll ask you questions pretty much
2    what we just went over, Exhibit Number 27.
3         MR. WHITE: Are you finished?
4    THE WITNESS: Uh-huh.
5    Q.    Did you ever see this Exhibit
6    Number 27 while you worked at JELD-WEN?
7    A.    Did I ever see this?
8    Q.    Yes. Posted on a wall or
9    given to you.
10   A.    It was given to us.
11   Q.    Okay. And you had no problems
12   understanding it?
13   A.    No.
14   Q.    All right. Did you ever
15   discuss Exhibit Numbers 26 and 27 with
16   Brenda and Linda Sims? Strike that.
17         When you did discuss Exhibits
18   26 and 27 with Brenda and Linda Sims, at any
19   time did you feel like that they didn't
20   understand any part of it?
21         MR. WHITE: Object to the
22   form.
23   A.    Well, we didn't really talk

Page 192

1    that much, I mean, you know, they had the
2    evening. I know they understand.
3    Q.    They're smart enough to
4    understand it?
5    A.    Yes, yes.
6         (Defendant's Exhibit 28
7         was marked for
8         identification purposes.)
9    Q.    Okay. I'll show you Exhibit
10   Number 28. Do you recall having to take off
11   for personal leave for ten days in July of
12   2002?
13   A.    Yeah. I remember taking off,
14   but I can't actually remember what for.
15         (Defendant's Exhibit 29
16         was marked for
17         identification purposes.)
18   Q.    Okay. I'll show you Exhibit
19   Number 29. At the second page, it's a --
20   Well, it's a Drs. Seemon and Flood,
21   Carrollton, Georgia, and this is dated July
22   of 2002. Do you know why you went to see
23   these --

48 (Pages 189 to 192)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 201

1    Q.    Okay. All right. At any
2  time, were they concerned that you were
3  going to have cancer or anything like that?
4    A.    No.
5       (Defendant's Exhibit 37
6       was marked for
7       identification purposes.)
8    Q.    Okay. Number 37. I don't
9  know what this is. Employer Notice of
10  Determination. Did you seek any -- While
11  you were off with your, I guess, your deer
12  accident, did you have any type of -- any
13  type of unemployment insurance or anything?
14    A.    No. I just drawed disability.
15    Q.    Okay. Was this related to
16  disability? Do you have any idea what this
17  is?
18    A.    I'm assuming it would be
19  because of the wreck.
20    Q.    Well, if you don't know,
21  that's fine. It's not that important. I
22  had no idea what that was. I didn't know if
23  you were laid off during that time period?

Page 202

1    A.    No.
2       (Defendant's Exhibit 38
3       was marked for
4       identification purposes.)
5    Q.    Okay. That was just from the
6  wreck with the deer. Exhibit 38. Again,
7  this is -- This is from the Kirklin Clinic,
8  University Hospital, it's a return to work.
9  The Kirklin Clinic is what? Is that --
10  That's in Birmingham?
11    A.    Oh, okay. Yeah. I had to go
12  to Birmingham, also. They ran some lights
13  down me and told me it was still bacterial,
14  my stomach.
15       (Defendant's Exhibit 39
16       was marked for
17       identification purposes.)
18    Q.    Okay. This is 39. It's dated
19  1/28/03. And it was in your file. And I
20  just want to know -- do you recall -- it's
21  my understanding, agree with me, if you
22  agree with me, it's a test on the Employee
23  Handbook, which I think is Exhibit Number

Page 203

1  26. Do you remember, is this your
2  handwriting and signature at the top,
3  left-hand side?
4    A.    Yes, that's mine.
5    Q.    Okay. And on paragraph
6  fifteen, that's the part that deals with
7  harassment?
8    A.    Uh-huh.
9    Q.    And you got them all correct?
10       MR. WHITE: Is that a
11  statement or a question?
12       MR. SCOFIELD: Yes.
13    Q.    Correct, you got all the
14  answers correct?
15    A.    Yes.
16       (Defendant's Exhibit 40
17       was marked for
18       identification purposes.)
19    Q.    Exhibit Number 40. Only
20  question I have about this, I guess, this is
21  your return date from disability benefits?
22    A.    Uh-huh.
23    Q.    And that's from the deer

Page 204

1  wreck?
2    A.    Uh-huh.
3    Q.    Okay. You have to say yes or
4  no.
5    A.    Yes.
6    Q.    All right. So, you were off
7  until sometime in March, from your deer
8  wreck?
9    A.    If that's what it says, yes.
10       (Defendant's Exhibit 41
11       was marked for
12       identification purposes.)
13    Q.    Okay. 41, this was -- Again,
14  this was an Employee Change Notice. This
15  was your -- You got laid off for one week
16  off return. This was, again, related to
17  your --
18    A.    No. This might have been just
19  a layoff.
20    Q.    Okay.
21    A.    Shortage of work.
22    Q.    Okay. At about this time, did
23  you start hearing rumors that this JELD-WEN

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 205

1   plant might be shutting down?
2       A.    Yeah.  I heard rumors.
3       Q.    Okay.  And who -- Who did you
4   hear it from?
5       A.    Gosh, I don't know.
6       Q.    Everybody?
7       A.    I don't remember.
8       Q.    Y'all were laid off for a week
9   because there was just no work?
10      A.    There was no work.
11            (Defendant's Exhibit 42
12            was marked for
13            identification purposes.)
14      Q.    Okay.  All right.  And 42 is,
15  I guess, your return back to work.  I'm
16  sorry.  I'm trying to hurry up a little bit.
17            MR. WHITE:  Is there a
18  question?
19      Q.    Yeah.  Is this when you came
20  back from the layoff?
21      A.    Yes.
22      Q.    And it's signed by Jose
23  Mendoza?

Page 206

1       A.    Joe --
2       Q.    Or Joe Mendoza?
3       A.    Yeah.
4       Q.    All right.  So, you were off
5   for, what, two weeks?
6       A.    Yeah.
7             (Defendant's Exhibit 43
8             was marked for
9             identification purposes.)
10      Q.    All right.  What we're here
11  for.  43, please.  Exhibit Number 43 is a
12  Charge of Discrimination, dated 12/13/04.
13  Is that your signature?
14      A.    Yes.
15      Q.    And right above that you said:
16  Declare under penalty of perjury that the
17  above is true and correct.  Did you read
18  that before you signed your name?
19      A.    Yes, I did, actually.  Yes.
20      Q.    Now, it says that you began
21  your employment on September 10, 2001, as a
22  dado machine operator.  We've already talked
23  about that.  But you're saying here that the

Page 207

1   earliest that the discrimination started was
2   September 1, 2001?
3       A.    Yeah.  Yes.
4       Q.    Okay.  And that it ended on
5   July 1, 2004?
6             MR. WHITE:  I'm sorry.  Are
7   you reading from here somewhere?
8             MR. SCOFIELD:  Yes, sir.
9   Right up here in the corner, it says:  Dates
10  discrimination took place, signed 12/13/04,
11  9/1, 2001 to July 1, 2004.
12            MR. WHITE:  All right.  I'm
13  with you now.  Thank you.
14      Q.    All right.  Is that pretty
15  much your recollection?
16      A.    Yes.
17      Q.    All right.  Now, second
18  sentence, if we go back down into this part
19  right here, it says:  On a couple of
20  occasions I went out with my supervisor and
21  was involved sexually during 2001 and early
22  2002.  Did you see that?
23      A.    Yeah, I see that.

Page 208

1       Q.    Okay.  And I just want to make
2   clear that the supervisor we're talking
3   about is Richard Fetner?
4       A.    Uh-huh.
5       Q.    Say yes or no.
6       A.    Yes.
7       Q.    Not Pat Galvez, not Joe
8   Mendoza, Dan Hees, or anybody else?
9       A.    No.
10      Q.    All right.  Now, this
11  particular Charge of Discrimination, is
12  there any reference in here or intended
13  reference in here to Donald Bowen?
14      A.    To Ronald Bowen?
15      Q.    Ronald Bowen.
16      A.    Okay.  Well, Ronald was sex
17  harassing me the same.
18      Q.    I understand that.  We're
19  going to get to that.  We know about the
20  playing stuff.  Is there any reference in
21  your Charge of Discrimination about
22  Mr. Bowen?
23      A.    Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 209

1     Q.    Where is that?
2     A.    Oh, it's somewhere, because a
3 lawyer come down and took it all down.
4     Q.    Okay. But it's not on this
5 one.
6     A.    Well, it's down.
7     Q.    I saw it on your lawsuit.
8     A.    Oh, okay.
9     Q.    But is it in here?
10    A.    No.
11    Q.    All right. Look down at the
12 bottom, it says: Amended charge, original
13 charge, November 30, 2004. Do you know
14 where the original charge is?
15    A.    No. Is this on Ronald you're
16 talking about, that last where it says:
17 Amended charge, original charge?
18    Q.    No. I'm -- I've seen the
19 original charge, and it's pretty much like
20 this.
21    A.    Uh-huh.
22    Q.    But, I might be able to find
23 it somewhere, but I didn't see his name on

Page 210

1 there. I just want to know -- Well, let me
2 ask you this question. Did you file any
3 other Charge of Discrimination with the EEOC
4 after the one you signed on December 13,
5 2004?
6     A.    No, I didn't.
7     Q.    All right. Can you recall
8 whether or not in your first charge you had
9 a reference to Mr. Bowen?
10    A.    Uh-huh.
11    Q.    You did or did not?
12    A.    Did not.
13    Q.    Okay.
14    A.    I mean, we did not -- It
15 didn't go anywhere on that.
16    Q.    All right. We're going to
17 talk about Mr. Bowen right now, if you don't
18 mind.
19    A.    Mr. Bowen.
20    Q.    Well, let me ask you a few
21 more questions. I thought I was going to
22 ask you about him now.
23        Let's get back to your

Page 211

1 supervisor, Mr. Fetner. You said: On a
2 couple of occasions went out with my
3 supervisor, that's Mr. Fetner, was involved
4 sexually in 2001, early 2002. Let me ask
5 you this. What was it about Mr. Fetner that
6 -- Strike that.
7        Was this relationship
8 consensual?
9     A.    Well, I thought it was.
10    Q.    All right. And why did you
11 think it was consensual?
12    A.    Well, because I thought I was
13 the only one. I thought -- I mean, we were
14 close to the same age, you know -- I just
15 thought he was it.
16    Q.    At this time, was Mr. Fetner
17 married?
18        MR. WHITE: I'm sorry, when
19 you say at this time --
20    Q.    At the time you began your --
21    A.    No, no, I know he wasn't, no,
22 because I wouldn't have went out with him.
23    Q.    Okay. He had already --

Page 212

1 Mr. Fetner had already gotten his divorce at
2 the time you started dating him?
3     A.    Yes.
4     Q.    All right. And what were the
5 qualities about Mr. Fetner that made you
6 want to date him?
7     A.    Well, you know, he was just --
8 The way he was talking to me, and I was the
9 only woman there that understand him and
10 just -- it just led to going out, you know.
11 And we were the same age, almost, and --
12    Q.    Well, did your -- I mean, the
13 issue has been brought up. Did you have
14 strong feelings toward him, positive
15 feelings at the time, enough to --
16    A.    At the time, yes.
17    Q.    Were y'all talking marriage?
18    A.    Oh, no.
19    Q.    Were you -- Did you want to
20 get married?
21    A.    No, no.
22    Q.    And when did your consensual
23 sexual involvement with Mr. Fetner start?

53 (Pages 209 to 212)

# FREEDOM COURT REPORTING

Page 213

1    A.    Well, now, we just went out
2    twice. I just had sex with him once.
3    Q.    Okay. And then you just
4    didn't see him again?
5    A.    I just didn't see him anymore.
6    Q.    And whose decision was that?
7    A.    It was his. I mean, he -- He
8    just quit calling, quit whatever.
9    Q.    Did that make you mad?
10    A.    Well, it didn't make me mad.
11    It kind of bothered me, like, wondered why,
12    you know.
13    Q.    If Mr. Fetner had asked you
14    out again, would you have gone at that time?
15    A.    At that time?
16    Q.    Yes. And the time I'm talking
17    about is the time with reference in your
18    Charge of Discrimination.
19    MR. WHITE: Let me make sure
20    we're talking about the same time. When you
21    say at that time, you're talking about when
22    they first began a relationship in sometime
23    early 2001 and early 2002? I'm sorry.

Page 214

1    A.    Now, I wouldn't have --
2    MR. WHITE: Hold on. Let me
3    clarify what we're talking about.
4    MR. SCOFIELD: I think I --
5    Let me try it this way, Counselor.
6    MR. WHITE: Okay.
7    Q.    You went out twice, then the
8    second date there was consensual sex. If
9    he'd have called you up the next week, would
10    you have gone with him, go out to eat or
11    whatever, dated him?
12    A.    The next week?
13    Q.    Yeah. Or the next night.
14    A.    Yes. I probably would have
15    went out with him.
16    Q.    All right. During the time
17    that you dated Mr. Fetner, did you tell him
18    anything about yourself that you felt like
19    he could later use to blackmail you or make
20    you feel bad?
21    A.    Well, yeah, I talked to him
22    about my brother, you know.
23    Q.    Earl?

Page 215

1    A.    Yes.
2    Q.    All right. And what did you
3    say about your brother, Earl?
4    A.    Well, I was just telling him,
5    you know, how dirty -- dirty things he did.
6    Q.    Earl?
7    A.    Yes.
8    Q.    Okay. Anything else?
9    A.    No.
10    Q.    Okay. Did you date anybody
11    else at the JELD-WEN plant besides Mr. --
12    A.    No.
13    Q.    -- Fetner?
14    A.    No.
15    Q.    Okay. To your knowledge, did
16    Linda Sims or Brenda Sims?
17    A.    No.
18    Q.    I want to get some dates
19    correct. In your petition --
20    MR. SCOFIELD: Counselor, I
21    only have one copy. Do you have extra
22    copies?
23    MR. THOMPSON: I've only got

Page 216

1    one copy. He's probably got a copy.
2    MR. WHITE: The complaint?
3    MR. THOMPSON: Yeah. He's
4    probably got a copy of the complaint.
5    Q.    If you'll look at paragraph
6    eight, you talked about the two times you
7    worked at the Millwork facility, JELD-WEN.
8    Do you think after seeing all the records
9    that you've seen, that the correct date
10    probably would be from, say, '94 to '97, and
11    then September of 2001 to November of 2004?
12    A.    Now, wait a minute. Go over
13    that again.
14    Q.    Yes. In here --
15    A.    From the first time I went to
16    work for JELD-WEN or Millwork?
17    Q.    Right. Would it probably have
18    been 1994 to '97, instead of '96 to '99?
19    A.    It could be. I don't know.
20    Because it's been that long and I don't
21    remember.
22    Q.    All right. You say you worked
23    from September of 2004 to November of 2004.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 217

1 And we already saw papers that you enrolled
2 in 2001. Is that —
3     A.    Yeah. That's the next --
4     Q.    Do you think this number
5 probably should have been 2001 instead of
6 2004?
7     A.    Oh, yes, yes.
8     Q.    Okay. All right. Everybody
9 makes mistakes. I just want to make -- just
10 make it clear.
11     A.    Well, November, we closed down
12 in November.
13     Q.    I understand that. I'm not
14 refuting that time period.
15     A.    Oh, okay.
16     Q.    But this 2004 probably should
17 be 2001?
18     A.    Right.
19     Q.    Okay. We don't know about the
20 first one, but this one was probably
21 September of 2001 to November of 2004?
22     A.    Yeah.
23     Q.    Okay. All right. Now, on

Page 218

1 paragraph ten: During your first tenure at
2 JELD-WEN she was harassed by co-worker,
3 Ronald Bowen. We talked about that;
4 correct?
5     A.    Yes.
6     Q.    And your second tenure, it
7 says: When she was rehired in September of
8 2004, and, actually, it's September of 2001
9 when you were hired?
10     A.    Right.
11     Q.    Okay. On paragraph ten. All
12 right. So, when you came back in September
13 of 2001, Mr. Bowen was still there?
14     A.    Yes.
15     Q.    All right. Now, I get the
16 brothers and nicknames mixed up, but the one
17 that bothered you?
18     A.    Right. That's Ronald.
19     Q.    Ronald. Okay. And in 2001,
20 Mr. Galvez is there; is that correct?
21     A.    Yes.
22     Q.    And Dan Hees comes in
23 periodically; is that correct?

Page 219

1     A.    Yes.
2     Q.    And then Roxie is there, Roxie
3 Giles is there; is that correct?
4     A.    Yes.
5     Q.    All right. Now, paragraph
6 thirteen, that's the next page, for lack of
7 better words, Mr. Bowen hid behind one of
8 the machines in the workplace, and
9 masturbated in your presence; is that
10 correct?
11     A.    Yes.
12     Q.    All right. Now, was this in
13 front of you?
14     A.    It was where he could -- he
15 was hid and he could see me through -- under
16 the blades part.
17     Q.    He could see you?
18     A.    But I could see his head.
19     Q.    You could see his head?
20     A.    So when I walked over there he
21 was masturbating, and I asked him, I said:
22 Are you doing what I think you're doing? He
23 said: Does it bother you? I said: It

Page 220

1 makes me sick.
2     Q.    All right. Did this occur,
3 roughly -- Do you know when this occurred,
4 the date of this occurrence?
5     A.    No.
6     Q.    All right. So, if JELD-WEN's
7 own records say it occurred around in July
8 of 2003, would you have any reason to
9 disagree with that date?
10     A.    No, I wouldn't.
11     Q.    Okay. Now, it's my
12 understanding that that -- that -- How did
13 you react when Mr. Bowen first did this?
14     A.    It just -- It's been going on
15 so long until it just -- it really just made
16 me sick, you know.
17     Q.    Okay. And this occurred --
18     A.    And it bothered me and it hurt
19 me.
20     Q.    Did anybody else see this?
21     A.    Yes.
22     Q.    Who saw it?
23     A.    Tawana.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 221

1    Q.    Tooty?
2    A.    Yes.
3    Q.    She saw it?
4    A.    I told her, you know, I said:
5    I want you -- This is the second time he did
6    it.
7    Q.    Okay.
8    A.    The first time he did it, she
9    didn't see it.
10   Q.    No one saw it but him -- you?
11   A.    Me.
12   Q.    Okay.
13   A.    And the next time it started
14   happening, I knew what he was doing so I
15   just slipped and told Tooty.
16   Q.    Tooty.
17   A.    I said: I want you to go
18   where you can see Ronald and I want you to
19   tell me what he's doing.
20   Q.    Okay.
21   A.    And she walked around there
22   and she just hollered. So . . .
23   Q.    Okay. All right. Now, did

Page 222

1    Tooty or yourself confront Mr. Bowen at this
2    time?
3    A.    Yeah. She went and told
4    somebody.
5    Q.    Mr. Galvez?
6    A.    Yes.
7    Q.    All right. But you didn't?
8    A.    No.
9    Q.    Why didn't you do it?
10   A.    Well, you know, he was a
11   leadman, and he was smart, and I just wanted
12   to be moved.
13   Q.    You what?
14   A.    I just wanted to be moved.
15   Q.    Okay.
16   A.    Because he was good for the
17   company.
18   Q.    But Mr. Galvez, once he found
19   out about it -- Tooty went and told him,
20   Mr. Galvez moved you, is that correct, while
21   he looked into it?
22   A.    No, they didn't move me. I
23   stayed there for a couple of weeks.

Page 223

1    Q.    If the JELD-WEN records
2    indicate that they moved you away from --
3    A.    No, they never moved me.
4    Q.    Okay. If JELD-WEN records
5    indicate that Mr. Galvez then contacted --
6    talked to you, did he talk to you?
7    A.    Yes.
8    Q.    All right.
9    A.    Then I had to tell what
10   happened. I mean, I went to him and told
11   him -- I told Richard Fetner, I said: Look,
12   you know, I've got to be moved.
13   Q.    All right.
14   A.    He said: What did he do? I
15   said: I don't want to tell on him, I just
16   want to be moved. Because he was, he was
17   very smart, very intelligent.
18   Q.    Talking about Mr. Bowen?
19   A.    Yes. You know, he was good
20   for the plant.
21   Q.    All right.
22   A.    So I just told him I wanted to
23   be moved. I wasn't going to tell him why.

Page 224

1    Because I knew they would fire him.
2    Q.    Okay. All right.
3    A.    So then I had to, after.
4    Q.    But at what point -- When
5    Tooty went and told Mr. Galvez?
6    A.    Uh-huh. Yes.
7    Q.    Then Mr. Galvez went and spoke
8    with you?
9    A.    Yes.
10   Q.    All right. And Mr. Galvez
11   went and spoke with Tooty?
12   A.    Yes.
13   Q.    All right. Mr. Galvez then
14   spoke with Mr. Bowen, is that correct, to
15   your knowledge, or do you know?
16   A.    I don't know.
17   Q.    All right. Let me ask you
18   this --
19   A.    I don't think he did.
20   Q.    Okay.
21   A.    I think he called his lawyer,
22   I mean the lawyer.
23   Q.    JELD-WEN lawyer?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 225

1    A.    Yes.

2    Q.    Named Rob Sturm?

3    A.    I believe so.

4    Q.    All right. Did either one of

5  these times that Mr. Bowen was doing this,

6  was it -- How do I ask you this? Was it

7  out?

8    A.    No, I didn't see it out. I

9  saw his hands in his pants.

10    Q.    Oh, okay. All right. That's

11  kind of a hard question to ask, no pun

12  intended.

13    A.    I know, I know. It's hard to

14  answer, too.

15    Q.    Let's go back to the map. I

16  just want to know about where this was.

17  Okay?

18    A.    Okay.

19    Q.    I think that's Exhibit Number

20  7. I don't -- Can you just point out with

21  your finger or pen, back of a pen, where it

22  was?

23    A.    Okay. We were right along

Page 226

1  where my initials are.

2    Q.    All right.

3    A.    This would be the machine

4  (indicating).

5    Q.    You're drawing a machine over

6  your initials.

7    A.    Yeah.

8    Q.    All right.

9    A.    And I worked down here at the

10  loading machine.

11    Q.    Okay.

12    A.    And Ronald took off and

13  inspected. But he would squat down right

14  here (indicating).

15    Q.    Behind the machine?

16    A.    Yeah. And he would look under

17  these wheels that goes around. You know,

18  it's apart about that much (indicating).

19    Q.    Okay.

20    A.    And he could see me. And he

21  would stare at me and then he would do

22  whatever. So . . .

23    Q.    All right. And he did it

Page 227

1  twice?

2    A.    Twice.

3    Q.    All right. Did -- Do you know

4  whether or not Mr. Galvez told -- Did you

5  talk to Dan Hees during this time period?

6    A.    No.

7    Q.    Do you know whether or not

8  Mr. Galvez told Mr. Hees?

9    A.    I don't know.

10    Q.    All right. Now, do you recall

11  a period of time that we talked about a

12  lawyer from JELD-WEN, from Oregon, coming in

13  to talk to you?

14    A.    Yes.

15    Q.    All right. Do you know what

16  the period of time was between you spoke

17  with Mr. Galvez and the time the JELD-WEN

18  lawyer came in to talk to you?

19    A.    It was about a week.

20    Q.    About a week?

21    A.    Yeah.

22    Q.    Do you remember -- Can you

23  recall -- Can you describe the lawyer that

Page 228

1  you met? Was he attentive? Did he ask you

2  a lot of questions?

3    A.    Oh, yes, he asked a lot of

4  questions.

5    Q.    Bad as I am?

6        MR. THOMPSON: Lawyers do

7  that.

8    A.    Worse.

9    Q.    Worse than I am? My God.

10    A.    But he was right on the point,

11  you know.

12    Q.    Okay.

13    A.    All this medical stuff wasn't

14  asked, you know.

15        MR. WHITE: He didn't take

16  three hours to start asking you about all

17  that?

18        THE WITNESS: No. All of that

19  would have been thrown away.

20        MR. SCOFIELD: Off the Record.

21        (Off-the-Record discussion

22        was held.)

23    Q.    Okay. So, Mr. Sturm asked you

57 (Pages 225 to 228)

# FREEDOM COURT REPORTING

Page 229

1  all these relevant, pointed questions, and
2  you felt like he asked the right questions?
3      A.    Yes.
4      Q.    You felt like he interviewed
5  Tooty, also?
6      A.    Yes.
7      Q.    Do you know whether or not he
8  interviewed Mr. Bowen?
9      A.    Yes, he did.
10     Q.    All right. Then Mr. Sturm,
11 the lawyer from Oregon, conducted a Power
12 Point presentation for the whole plant?
13     A.    Yes.
14     Q.    In which he talked about,
15 amongst other things, sexual harassment?
16     A.    Yes.
17           (Defendant's Exhibit 44
18             was marked for
19             identification purposes.)
20     Q.    Okay. Now, it's my
21 understanding that -- I'll show you Exhibit
22 44, please. This is dated July 24, 2003.
23 It's my understanding this is the same day

Page 230

1  that Mr. Sturm spoke with -- interviewed
2  you; is that correct? In other words, he
3  interviewed you, then he left to go give
4  this Power Point presentation about sexual
5  harassment?
6      A.    Yeah. To the whole plant.
7      Q.    And number five is you, is
8  that your signature?
9      A.    Yes.
10     Q.    Number six is Lisa Cook; is
11 that correct?
12     A.    Yes.
13     Q.    And number one is Pat Galvez;
14 is that correct?
15     A.    Right.
16     Q.    Okay. And number thirteen is
17 Roxie Giles?
18     A.    Uh-huh. Yes.
19     Q.    And let's see. Sixteen, Cathy
20 Thornton, she was there?
21     A.    Yes.
22     Q.    Thirty-three, excuse me, is --
23 Turn to the next page. Thirty-three, Ronald

Page 231

1  Bowen?
2      A.    Yes.
3      Q.    That's the guy that did that?
4      A.    Right.
5      Q.    And number thirty-five,
6  Richard Fetner; is that correct?
7      A.    Yes.
8      Q.    Do you remember seeing all of
9  those people there, at least at the start of
10 it?
11     A.    Oh, yes, I did, I made --
12 because I wanted him to -- I wanted Richard
13 to hear that, too.
14           (Defendant's Exhibit 45
15             was marked for
16             identification purposes.)
17     Q.    All right. And it's my
18 understanding that -- Well, let me ask you
19 this. Let's go to the next number, number
20 45. I understand the Power Point was a
21 little bit longer, but these were some of
22 the key points that Mr. Sturm covered with
23 these thirty-five people. Is that -- I'm

Page 232

1  asking you, go through there.
2           MR. WHITE: Go through that
3  and look at it and see if you recognize it.
4      Q.    Yeah. Do you have a general
5  recollection that this is the Power Point
6  presentation that Mr. Sturm gave?
7      A.    Yeah, he did.
8      Q.    Okay. Again, the
9  fourth-to-the-last page, do you recall
10 Mr. Sturm emphasizing that: What can
11 employees expect if they complain? Their
12 complaint will be taken seriously, prompt
13 and appropriate investigation, no
14 retaliation, prompt disciplinary action if
15 policy violated, information about the
16 results of the investigation? Do you
17 remember him asking -- pointing that out to
18 you, or something to that effect?
19     A.    Well, something to that
20 effect.
21     Q.    And was there a
22 question-and-answer session after it was
23 over, in other words, after he was through?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 233

1    A.    I don't remember.
2    Q.    You don't remember. Okay.
3 Now, do you recall Mr. Bowen walking out of
4 the Power Point presentation?
5    A.    Yes, he did.
6    Q.    And then confronting Mr. Sturm
7 afterwards?
8    A.    No, I didn't see or hear.
9    Q.    You didn't hear about that?
10    A.    Someone told me about it.
11    Q.    What did you hear about it?
12    A.    They say he just got in his
13 face. And I don't remember what was said.
14    Q.    You said Ronald Bowen got in
15 Mr. Sturm's face?
16    A.    Yes. That's what I heard.
17    Q.    Mr. Sturm is kind of a small
18 guy, isn't he?
19    A.    Yes.
20    Q.    Is Mr. Bowen a pretty big guy?
21    A.    No. He's not real big.
22    Q.    But Mr. Bowen didn't work for
23 JELD-WEN anymore after that; is that

Page 234

1 correct?
2    A.    No.
3    Q.    After Ronald Bowen confronted
4 Mr. Sturm and walked out of the sexual
5 harassment seminar, Ronald Bowen never
6 worked for JELD-WEN again; is that correct?
7    A.    Yes. That's correct.
8    Q.    All right.
9    A.    But he just walked out, he
10 just left hisself, he and his brother, both.
11    Q.    Is there anything wrong with
12 that?
13    A.    Well, I mean —
14    Q.    Is there anything more else
15 that you think JELD-WEN should have done?
16    A.    I think they should have done
17 something a long time ago. I mean, this
18 mess had been going on awhile.
19    Q.    No. I'm talking about to
20 Mr. Bowen at that particular time, in July
21 of 2003?
22    A.    No. Just fire him, is all.
23    Q.    Well, do you consider that the

Page 235

1 same as firing him? He never bothered you
2 again at the JELD-WEN plant, Mr. Bowen?
3    A.    No.
4    Q.    All right. Okay. Did you
5 file criminal charges against Mr. Bowen?
6    A.    No.
7    Q.    So I just want to make clear,
8 paragraph ten of your complaint is not
9 correct in that when: She, meaning you, was
10 hired September 2004, Mr. Bowen was still
11 working with the company. That's not
12 correct?
13        MR. WHITE: That should have
14 been 2001. I thought we corrected that
15 already.
16    Q.    I just wanted to make sure
17 that he wasn't there then?
18    A.    No, Mr. Bowen was there in
19 2001.
20    Q.    But not 2004.
21    A.    That's when he was --
22    Q.    He was let go in 2003.
23    A.    Oh, okay.

Page 236

1    Q.    All right. In paragraph
2 twelve, you allege that: Plaintiff, Lorena
3 Minix, complained that Defendant Fetner took
4 no action. And the complaint you're
5 referring to is about Donald Bowen; is that
6 correct?
7    A.    Ronald Bowen.
8    Q.    Ronald Bowen.
9    A.    Uh-huh.
10    Q.    You would agree that Pat
11 Galvez and Rob Sturm did take action, once
12 they were apprised of the situation?
13    A.    Well, yes, yes.
14        (Off-the-Record discussion
15        was held.)
16        (Defendant's Exhibit 46
17        was marked for
18        identification purposes.)
19    Q.    Number 46. Do you know why
20 you were sick that day?
21    A.    No.
22        (Defendant's Exhibit 47,
23        was marked for

59 (Pages 233 to 236)

Page 245

1 question. It's Dr. Meadows: Things have
2 gone well with what he did for you. Nothing
3 in here about Mr. Fetner or any emotional
4 problems as a result of him?
5 A. No.
6 (Defendant's Exhibit 59
7 was marked for
8 identification purposes.)
9 Q. All right. 59. It's
10 referencing you down at the bottom. There's
11 a comment, which I'm just going to — It
12 appears to me it says: Lorena returned to
13 work today. She was off work on STD. I
14 don't know what that is. And Family Medical
15 Leave Act for nonwork-related surgery.
16 That's what Dr. Meadows did?
17 A. Yes.
18 Q. Okay. And so JELD-WEN allowed
19 you to take time off to take care of these
20 personal matters; is that correct?
21 A. Yes.
22 Q. Or Mr. Galvez did?
23 A. Yes.

Page 246

1 Q. Did you go to Mr. Galvez and
2 ask him for the time?
3 A. Yes.
4 Q. You felt comfortable asking
5 him?
6 A. Yeah. I was all right with
7 it.
8 (Defendant's Exhibit 60
9 was marked for
10 identification purposes.)
11 Q. All right. Exhibit Number 60.
12 Again, same questions. This is Dr. Meadows.
13 You saw him on the 16th and the 7th. Things
14 are going well. Talking about minor
15 problems, but no complaints about anything
16 to do with Mr. Fetner, sexual harassment, or
17 any problems with that?
18 A. No.
19 (Defendant's Exhibit 61
20 was marked for
21 identification purposes.)
22 Q. Okay. 61. It's talking about
23 adult measles, other few things like that.

Page 247

1 Fatigue, malaise. Is there anything in
2 there about Dr. -- I guess Dr. Bishop. Is
3 there anything in there about sexual
4 harassment, Mr. Fetner, or anything
5 bothering you like that?
6 A. No.
7 (Defendant's Exhibit 62
8 was marked for
9 identification purposes.)
10 Q. All right. Same with number
11 62, July 15, '04, came in for sore throat,
12 B-12, sinus drainage, nothing in there about
13 any problems at work?
14 A. No.
15 Q. Or Mr. Fetner or anything like
16 that; correct?
17 A. No.
18 (Defendant's Exhibit 63
19 was marked for
20 identification purposes.)
21 Q. All right. 63, August 12,
22 2004. Come in -- This is talking about your
23 stomach problems with the Bacteria H.

Page 248

1 Pyloir, I think. B-12 shot. Nothing in
2 there to Charlotte Bishop about work
3 problems or Mr. Fetner's sexual harassment?
4 A. No.
5 (Defendant's Exhibit 64
6 was marked for
7 identification purposes.)
8 Q. Okay. 64. I don't know what
9 this is, other than you lost a paycheck?
10 A. Okay. Yeah. Right.
11 Q. So, you called or wrote to the
12 — or written to by the JELD-WEN, I guess
13 head office or one of their offices?
14 A. Yes.
15 Q. And got that taken care of?
16 A. Well, they never did send me
17 my check. I don't really know what happened
18 there.
19 Q. So it was lost and you
20 couldn't find it.
21 A. I just lost it.
22 (Defendant's Exhibit 65
23 was marked for

62 (Pages 245 to 248)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 249 | Page 251 |
|---|---|
| 1     identification purposes.) | 1     Q.   Let me ask you this. Maybe I |
| 2     Q.   Okay. All right. 65. | 2 misspoke before. But I had a conversation |
| 3 Another one from Dr. Meadows. September 3, | 3 with Mr. Hees, and I just want to know if |
| 4 2004 something 2004. Somewhat unhappy about | 4 you -- maybe this will help you out. At |
| 5 some of the work he did, but, again, nothing | 5 some point in time, in either September or |
| 6 in there about emotional problems from work | 6 October, there were a bunch of people laid |
| 7 or sexual harassment or anything like that; | 7 off; is that correct? |
| 8 is that correct? | 8     A.   Yeah. They laid off some, and |
| 9     A.   No. | 9 then laid off some more. |
| 10     (Defendant's Exhibit 66 | 10     Q.   Kind of ran out of work and |
| 11     was marked for | 11 laid off some? |
| 12     identification purposes.) | 12     A.   Yeah. And then later laid off |
| 13     Q.   66. Coming in to see | 13 more. |
| 14 Dr. Charlotte Bishop, sinus problems, | 14     Q.   You and Ms. Sims -- the Sims |
| 15 nausea, ears, tired all the time, again, | 15 twins stayed on? |
| 16 nothing in there about work or Fetner's | 16     A.   Yes. |
| 17 sexual harassment? | 17     Q.   After an initial round of |
| 18     A.   No. | 18 layoffs; is that correct? |
| 19     (Defendant's Exhibit 67 | 19     A.   Yeah. We stayed on, yeah. |
| 20     was marked for | 20     Q.   All right. Did Mr. Hees ask |
| 21     identification purposes.) | 21 you to stay on for another thirty, |
| 22     Q.   67. November 19, 2004. This | 22 forty-five days, and work with Tooty |
| 23 was about the time you were laid off; is | 23 Zachary? |

| Page 250 | Page 252 |
|---|---|
| 1 that correct? | 1     A.   I think Richard said something |
| 2     A.   Okay. Where's the date at? | 2 about anybody that wanted to stay on for a |
| 3 Okay. 11/19. Well, our last day was the | 3 few more days. |
| 4 24th. | 4     Q.   Okay. |
| 5     Q.   Okay. Came in, ears hurt, | 5     A.   He was just asking a group. |
| 6 sore throat, blah, blah, blah. Nothing in | 6     Q.   Richard Fetner? |
| 7 here about sexual harassment or any problems | 7     A.   Uh-huh. |
| 8 with that; is that correct? | 8     Q.   You don't remember Dan Hees |
| 9     A.   No. | 9 asking you that? |
| 10     Q.   And you know you -- You | 10     A.   No. |
| 11 certainly knew by then you were going to get | 11     Q.   Patrick. Working with |
| 12 laid off; is that correct? | 12 Patrick? |
| 13     A.   Yes. | 13     A.   He was already gone then. |
| 14     (Defendant's Exhibit 68 | 14     Q.   Okay. You never were asked to |
| 15     was marked for | 15 stay on an extra -- |
| 16     identification purposes.) | 16     A.   Yeah, yeah, they was asking us |
| 17     Q.   All right. 68. Is that your | 17 whoever wanted to stay on a few more days, |
| 18 signature on 11/24? | 18 you know, that they could. |
| 19     A.   Yes. | 19     Q.   Yeah. Did they ask you to |
| 20     Q.   The reason you're leaving is | 20 stay on with Patrick, work with Patrick? |
| 21 plant closing. And the manager is Dan Hees; | 21     A.   No. |
| 22 is that correct? | 22     Q.   You don't recall that? |
| 23     A.   Yes. | 23     A.   No. |

63 (Pages 249 to 252)

# FREEDOM COURT REPORTING

Page 253

1    Q.    What about before the last few
2  days, anybody ask you to work with Patrick?
3  Do you recall Dan Hees asking you to work
4  with Patrick or Tooty?
5    A.    Patrick, who is Patrick?
6    Q.    A joint operator.
7    A.    Patrick. Yeah. They did ask
8  us to work a few more days, if we wanted to.
9    Q.    Okay. And you turned that
10  down?
11    A.    Yeah.
12    Q.    And why was that?
13    A.    Just wanting to get out of
14  there.
15    Q.    Okay. Did you -- Do you
16  recall talking with Dan Hees about that
17  particular topic?
18    A.    No. I don't remember that.
19    Q.    Okay. All right. Let's go to
20  69, please. Let me -- Before we get to
21  that, did your -- Your mother did pass away;
22  is that correct?
23    A.    Yes.

Page 254

1    Q.    All right. Did your brother,
2  Earl, want to go to the funeral?
3    A.    Yes.
4    Q.    All right. But he's presently
5  incarcerated in a prison?
6    A.    Yes.
7    Q.    And that's in the Bullock
8  Correctional Facility in Union Springs?
9    A.    Yeah. Union Springs.
10    Q.    And did your brother, Earl,
11  get to go to your mother's funeral?
12    A.    Yes.
13    Q.    And how did that happen?
14    A.    Well, we just made some calls.
15  Richard said he made a call.
16    Q.    Did you go to Mr. Fetner and
17  ask Mr. Fetner: Could you help Earl get out
18  of prison so he could go to your mother's
19  funeral?
20    A.    No, I didn't go to him. He
21  come to me. He said he could make a call
22  and help me to get him out.
23    Q.    Okay.

Page 255

1    A.    Richard couldn't get him out.
2    Q.    Did Richard call a State
3  Representative?
4    A.    He said he did.
5    Q.    Okay. Did you go talk -- Did
6  you talk to anyone else besides Richard
7  about getting your brother out?
8    A.    No, I didn't, I didn't.
9    Q.    All right. But you do know
10  that Richard talked to you about getting
11  your brother, Earl, out of prison?
12    A.    Yeah.
13    Q.    So he could attend your
14  mother's funeral?
15    A.    Yeah. But they come home
16  anyway. They can come home. They have a
17  choice coming home before your mother or dad
18  dies, or either after, to come to the
19  funeral, any prisoner can do that.
20    Q.    How do you know that?
21    A.    Well, it just happens.
22    Q.    You don't think Richard had
23  anything to do with that?

Page 256

1    A.    Well, he couldn't have done
2  it. He, himself, couldn't have got him out.
3    Q.    But did he call the State
4  Representative?
5    A.    He said he did. Richard --
6  His name is Richard Laird.
7    Q.    The State Representative?
8    A.    Yeah.
9    Q.    Again, when did this happen,
10  that Richard came to you and asked about
11  getting Earl out of prison?
12    A.    Well, he come to me, he said
13  that, you know: If you want me to help you,
14  he said: I might can make a call to
15  somebody and help get -- see if I can't help
16  get Earl to come down and see your mother
17  for the funeral.
18    Q.    And Richard is the only person
19  you spoke to about getting Earl out?
20    A.    Yeah. But my other sister, my
21  oldest sister, she's the one that called the
22  prison or wherever.
23    Q.    Okay. Did this occur while

64  (Pages 253 to 256)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 257

1  Fetner was still working for JELD-WEN?
2       A.   Yes.
3       Q.   Did it occur in August or July
4  of 2005?
5       A.   When my mother died?
6       Q.   Yes.
7       A.   Yes.
8       Q.   All right. Did you tell
9  Mr. Fetner thank you?
10      A.   Yes, yes, I did.
11      Q.   Did you write him a little
12  note?
13      A.   No.
14      Q.   All right. So, this occurred
15  after you alleged in your EEOC charge that
16  the harassment had stopped, it happened
17  after July 1st?
18      A.   At one time it stopped, then
19  it started back again.
20      Q.   All right. But based upon
21  your charges, this occurred after your
22  charges?
23      A.   Yes.

Page 258

1       Q.   All right.
2       A.   No.
3       Q.   Huh? Well, let's look.
4       A.   After the charges?
5       Q.   I'm sorry. Your EEOC charge,
6  you had the dates on there.
7       A.   Oh, okay.
8       Q.   Yes. Here it is. You said —
9       A.   Oh, okay.
10      MR. WHITE:  Wait for a
11  question.
12      Q.   September 1, 2001, to July 1,
13  2004. You signed it December 13, 2004.
14  Mr. Fetner helped — or you told —
15  Mr. Fetner —
16      A.   That was after —
17      Q.   Your mother died after July 1,
18  2004?
19      A.   Yeah.
20      Q.   All right. And Mr. Fetner
21  came to you after July 1, 2004, to help get
22  Earl —
23      A.   Yes.

Page 259

1       Q.   — offer his help in getting
2  Earl out of prison to attend your mother's
3  funeral?
4       A.   Uh-huh.
5       Q.   You have to say yes or no.
6       A.   Yes.
7       Q.   And you told him thank you
8  after that?
9       A.   Yes.
10      Q.   All right. Now, let's go to
11  Exhibit 69?
12      MR. WHITE:  Would now be
13  another — a good time for another break?
14      MR. SCOFIELD:  Yes.
15      (Recess taken.)
16      (Defendant's Exhibit 69
17      was marked for
18      identification purposes.)
19      Q.   Ms. Minix, this is a document,
20  Exhibit Number 69, from the EEOC, the Equal
21  Employment Opportunity Commission, the
22  Birmingham office. Did you have to go to
23  Birmingham to fill this out?

Page 260

1       A.   Yes.
2       Q.   And who did you go with?
3       A.   I went with Linda Sims.
4       Q.   Okay. And that's your
5  signature at the last page?
6       A.   Yes.
7       Q.   All right. And it's dated
8  August 20, 2004?
9       A.   Right.
10      Q.   So, this was while you were
11  still working at JELD-WEN; correct?
12      A.   Yes.
13      Q.   Third page, Dan, plus, a
14  question mark, is that in reference to —
15      A.   I just —
16      Q.   Is that Dan Hees?
17      A.   Yes. I just couldn't at the
18  time think of his last name.
19      Q.   You couldn't think whether it
20  was Dan Hess or Dan Hees?
21      A.   Dan Ass.
22      Q.   Now, on top of page two,
23  there's a name — not the — You see you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 261

1  reference your son or your brother named
2  Keith Minix?
3      A.   That's my son.
4      Q.   Okay.  Then right below that
5  there is:  Are you represented by an
6  attorney, if so, provide his or her name,
7  telephone number.  D. Love --
8      A.   D. Leigh --
9      Q.   D. Leigh Love.
10     A.   Yeah.
11     Q.   You have different attorneys
12 now; is that correct?
13     A.   Uh-huh.
14     Q.   You have to say yes or no.
15     A.   Yes.
16     Q.   When did you hire D. Leigh
17 Love?
18     A.   Of course, she was our -- No,
19 she was our second lawyer.  Gosh.  I can't
20 remember.  I cannot remember.
21     Q.   Well, let me just reference --
22 You signed this and drove to Birmingham --
23 How far is Birmingham from here, two hours?

Page 262

1      A.   Two hours.
2      Q.   Two hours from Roanoke?
3      A.   Yes.
4      Q.   So, you drove two hours,
5  signed it on August 20, 2004, and said your
6  attorney was D. Leigh Love.  Did she go with
7  you?
8      A.   Yes.  She come up there.
9      Q.   D. Leigh Love did?
10     A.   Yes.
11     Q.   Okay.  And she's from --
12     A.   No, she just followed us
13 there.  Oh, she carried us there.  Because
14 we went to her office and he went from her
15 office with me to go up there.
16     Q.   And she's in Talladega?
17     A.   No.  Birmingham.
18     Q.   D. Leigh Love is from
19 Birmingham?
20     A.   Uh-huh.
21     Q.   You have to say yes or no.
22     A.   Yes.
23     Q.   All right.  And so, it was

Page 263

1  either that day or sometime before then you
2  hired D. Leigh Love; is that correct?
3      A.   Yes.
4      Q.   Do you know how many weeks,
5  months before you hired her, your attorney?
6      A.   Yeah.
7          MR. WHITE:  He's asking you
8  how long prior to going and filling out this
9  form did you hire that lady.
10     A.   Oh, no, we had already went
11 and talked to her.
12     Q.   I know, but how about how
13 long?  I mean, a week before, two weeks
14 before?  Do you remember that?
15     A.   Yeah.  Something like that.
16 Couple of weeks.
17          (Defendant's Exhibit 70
18             was marked for
19             identification purposes.)
20     Q.   Okay.  I'll show you Exhibit
21 Number 70, please.  Is this the lady you
22 hired?
23     A.   Yes, it is.

Page 264

1      Q.   Now, if you look at her
2  practice area, she's been practicing law
3  since 1988; is that what it says?
4      A.   Yes.
5      Q.   Okay.  So, at the time you
6  spoke with her, she's been practicing law, I
7  guess, what, sixteen years, if my math is
8  correct; is that correct?
9      A.   Yes.
10     Q.   And she specializes in -- Or
11 her practice areas include civil rights,
12 employment claims, and discrimination.  Does
13 that include sexual discrimination?
14     A.   Yes.
15     Q.   All right.  Okay.  So, by
16 August 20, 2004, if not before, you knew
17 that Dan Hees was the JELD-WEN's top dog,
18 the company owner, president, or personnel
19 director?
20          MR. WHITE:  Object to the
21 form.  Is that a question?
22          MR. SCOFIELD:  Yes.
23          MR. WHITE:  What's the

66 (Pages 261 to 264)

# FREEDOM COURT REPORTING

Page 265

1  question?
2  Q.    So, at least by this time,
3  August 20, you knew that Dan was the top
4  person with JELD-WEN?
5  A.    Uh-huh. We had talked to Dan,
6  all six of us girls.
7  Q.    Correct.
8  A.    Yeah.
9  Q.    But not before August 20,
10 2004, or did you?
11 A.    No. Yes. We talked to him
12 before we went to see a lawyer.
13 Q.    Did you see a lawyer before or
14 after Richard Fetner no longer worked at
15 JELD-WEN?
16 A.    Before and after.
17 Q.    Okay. By August 20, 2004, you
18 were fully aware of JELD-WEN's sexual
19 harassment policies, that we talked for a
20 long time about earlier?
21 A.    Do what, now?
22 Q.    You were fully aware of
23 JELD-WEN's sexual harassment policy?

Page 266

1  A.    Yes, yes.
2  Q.    The year before, you had that
3  seminar with Rob Sturm?
4  A.    Yes, yes.
5  Q.    You don't have to answer this,
6  it's up to you, but did you give your sexual
7  harassment lawyer, Ms. Love, JELD-WEN's
8  policies?
9       MR. WHITE: Object to the
10 form. I'm going to instruct her not to
11 answer that question.
12 Q.    All right. Again, you don't
13 have to answer this, but did you talk to
14 Ms. Love about -- Strike that.
15      MR. SCOFIELD: You're going to
16 object.
17 Q.    What was the name -- When you
18 went to Birmingham on August 20th, 2004,
19 what was the name of the EEOC investigator
20 you met with, do you recall?
21 A.    I can't remember.
22 Q.    A man, woman?
23 A.    It was a man.

Page 267

1  Q.    Deverlin McGee?
2  A.    I think his name was Mac.
3  Q.    Mac?
4  A.    Mac, maybe. I'm not sure.
5  Q.    And how long did you spend
6  with this EEOC investigator?
7  A.    Really, I've never talked to
8  him. I talked to a woman in there.
9  Q.    Okay.
10 A.    And I filled out a form. And
11 he was supposed to get back with me.
12 Q.    Okay. Did the -- Did either
13 the man or the woman you talked to work for
14 the EEOC?
15 A.    Yes, yes.
16 Q.    I --
17 A.    Yes, she worked for them.
18 Q.    Okay. And did either the
19 man or woman who worked for the EEOC that
20 you spoke with on August 20, 2004, give you
21 any advice about what to do about
22 Mr. Fetner?
23 A.    Well, no.

Page 268

1  Q.    Did they tell you to tell --
2  make a complaint to JELD-WEN?
3  A.    Well, you know, they -- She
4  asked a few questions about what was going
5  on, and I told her. And she said she'd tell
6  whatever his name is, that he would get in
7  contact with me.
8  Q.    Whatever his name is, that's
9  just another EEOC employee?
10 A.    The EEOC guy, yeah.
11 Q.    The EEOC investigator --
12 A.    No. That's the one that was
13 supposed to talk to me, the --
14 Q.    But did anyone with the EEOC,
15 on August 20, 2004, ever tell you to contact
16 JELD-WEN and complain about Mr. Fetner?
17 A.    No.
18 Q.    Now, your lawyer was there, D.
19 Love. Was Linda Sims or Brenda Sims?
20 A.    Yeah.
21 Q.    Both of them?
22 A.    No. It was just Linda.
23 Q.    What about Ms. Thornton, was

67 (Pages 265 to 268)

# FREEDOM COURT REPORTING

Page 269

1  she there?
2      A.    No.
3      Q.    Okay.  Now, you told the EEOC
4  investigator on August 20, 2004, about your
5  consensual relationship with Mr. Fetner?
6      A.    Uh-huh.
7      Q.    Yes or no?
8      A.    Yes.
9      Q.    You told them that you became
10 upset with Mr. Fetner because he was
11 involved with other employees?
12     A.    Well, that's when I found out
13 -- It was like I was just used.  I was just
14 another one of his women.  And it hurt me
15 deeply, because three of these girls are
16 real young, and he made some awful threats
17 to them.  And that's really what got me --
18 got me started.  I mean, he threatened one
19 girl that she'd lose her kid if she ever
20 told anything, what went on.
21     Q.    Okay.  Did Mr. Fetner threaten
22 you?
23     A.    No, he didn't threaten me.

Page 270

1      Q.    He knew better?
2      A.    I can stand on my own feet.
3      Q.    You say he threatened other
4  girls.  Who did he threaten?
5      A.    Cathy Thornton.
6      Q.    Who else?
7      A.    Lisa Cook.
8      Q.    Okay.  Anybody else?
9      A.    Not as I know of.
10     Q.    Would the right word be, were
11 you mad, were you jealous that he was doing
12 that?
13     A.    No, I wasn't jealous.
14     Q.    Okay.  I just wanted to make
15 sure about that.
16     A.    No.  I just got sick after I
17 started finding all this other out.
18              (Defendant's Exhibit 71
19              was marked for
20              identification purposes.)
21     Q.    The -- Let's go to 71.  These
22 are records I got from the EEOC.  And the
23 charging party is Lorena Minix, and it's

Page 271

1  August 20, 2004.  It says:  Respondent -- I
2  guess that's potential charging party,
3  visited office along with two other female
4  employees that worked at above-referenced
5  employer.  Who were the other two female
6  employees?
7      A.    That went to him?
8      Q.    Yes.
9      A.    To the -- It was Brenda Sims
10 and Linda.
11     Q.    And then go on that:  You had
12 engaged in consensual relationship with
13 respondent and seemed to become upset of
14 alleged harassment upon learning that he was
15 involved with others -- is that employees?
16     A.    Yes.
17     Q.    Okay.
18     A.    There was six of us at the
19 time.
20     Q.    All right.  And then states:
21 She wanted to be left alone and asked him to
22 stop.  And then it says something else.  Do
23 you know what that reference is?

Page 272

1      A.    No.  I can't read that.
2      Q.    Okay.  I mean, you don't have
3  to guess.  If you don't have any independent
4  recollection or can't read it, that's fine.
5  I couldn't read it.
6      A.    I don't remember.
7      Q.    That's your interview with
8  this EEOC person.  And I just want to know
9  what was said, if you recall what was said?
10     A.    Well, I didn't threaten to
11 talk to him, so . . .
12     Q.    Now, it says:  On November 9,
13 2004, you wanted to go ahead and file your
14 claim; is that correct?
15     A.    Yes.
16     Q.    And then on November 18th,
17 they drafted your complaint and mailed it to
18 you?
19     A.    Yes.
20     Q.    Okay.  Then you returned the
21 complaint, and I guess the second page
22 indicates that:  She did not have a
23 consensual relationship.  Investigator

68  (Pages 269 to 272)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 273

1  called you, informed that if charge was not
2  true, she should not have signed. Is that
3  what he was talking about earlier?
4      A.    Well, now, somewhere it was
5  saying that Richard and I was having a
6  relationship. We didn't have no
7  relationship, you know. I mean, I thought
8  we were going to, but then I found out this
9  and found out that. Then everybody got to
10  talking. And then I'm thinking, well, I was
11  a fool.
12      Q.    Okay. Who got to -- I don't
13  understand that. Who got to talking?
14      A.    I was kind of complaining
15  about Richard, and one of the girls said:
16  Well, you don't know nothing. He ain't done
17  nothing to you. Then she started talking
18  about what all he's done to her.
19      Q.    Who was this?
20      A.    Lisa Cook.
21      Q.    Okay.
22      A.    And then Cathy started
23  talking, and Brenda and Linda. You know,

Page 274

1  stuff -- everybody -- He told everybody the
2  same thing, the same way, the same words.
3  So, everybody thought this --
4      Q.    Used the same lines on
5  everybody?
6      A.    Everybody.
7      Q.    All right. Did the EEOC
8  investigator tell you that it was against
9  the law for a company to retaliate against a
10  complainant?
11      A.    Well, I didn't get to talk to
12  him, you know, he never did call me back.
13      Q.    Okay. But the JELD-WEN lawyer
14  did in July of 2003?
15      A.    Yes.
16      Q.    All right. And the JELD-WEN
17  handbook said that; is that correct?
18      A.    Yes.
19      Q.    All right. Now, it's my
20  understanding that on the morning of October
21  13, 2004, that Linda Sims, Lisa Cook, Cathy
22  Thornton, Brenda Sims and yourself, went to
23  go see Dan Hees?

Page 275

1      A.    Yes.
2      Q.    And whose idea was it to go
3  talk to Dan Hees?
4      A.    Well, we just all was talking
5  about it, that we should go tell somebody.
6      Q.    Okay.
7      A.    So it was all of us, really.
8      Q.    Okay. And why did you pick
9  Dan Hees to talk to?
10      A.    Well, he was the -- Pat was
11  gone, so he was the only one, really -- We
12  felt like he was the one we were supposed to
13  talk to.
14      Q.    Okay. And Dan Hees did have a
15  good relationship with Linda Sims?
16      A.    Do, what?
17      Q.    Dan Hees had a pretty good
18  relationship with Linda Sims, to your
19  knowledge?
20      MR. WHITE: Object to the
21  form.
22      A.    Well, they just talked.
23      Q.    Talked a lot?

Page 276

1      A.    Yeah.
2      Q.    Well, that's what I meant to
3  say.
4      A.    Yes.
5      Q.    I guess in these kind of
6  cases, you've got to watch what you say.
7  They talked a lot?
8      A.    Yeah.
9      Q.    All right. Now, my
10  understanding is that the first thing y'all
11  discussed was that Mr. Fetner was moving
12  Brenda Sims to a job that she didn't feel
13  comfortable working at?
14      A.    Yes.
15      Q.    And what did Mr. Hees respond
16  to that statement, to your recollection?
17      A.    I don't know.
18      Q.    Okay. Did Mr. -- Do you
19  recall Mr. Hees asking you and Lisa and
20  Cathy to try to help Linda and Brenda work
21  at different parts of the plant because
22  y'all were more experienced and they were
23  less experienced?

69 (Pages 273 to 276)

# FREEDOM COURT REPORTING

Page 277

1    A.    No. I don't remember him
2  saying that.
3    Q.    You don't remember that. Then
4  after that discussion, do you recall talking
5  about -- about Richard getting too loose
6  with the way he talks to employees?
7    A.    Uh-huh. Yes. That's
8  something I remember us talking to him
9  about, really.
10    Q.    Okay. All right. And what
11  did you tell Mr. Hees about Richard Fetner?
12    A.    I told him he was sexually
13  harassing me, and putting his hands on me,
14  and asking me to go buy some beer and have
15  sex with him, and all that kind of stuff.
16    Q.    Now, you said that he was --
17  Let's talk about -- not the verbal stuff
18  right now, but any of the putting the hands
19  on you. Did he -- Did Mr. Fetner put any of
20  the hands on you on any of your private
21  parts?
22    A.    Well, yes. He would -- He
23  would do it in a way where he thought you

Page 278

1  wouldn't think anything about it.
2    Q.    A sneaky way?
3    A.    Yeah. He'd come behind you
4  and hug you, but he'd put his arms across
5  your boobs, or he'd spank you on your butt.
6  But he was always talking -- talking that
7  stuff, you know, like: Let's go have about
8  four hours of sex. You know, he -- He was
9  just nasty.
10    MR. WHITE: Are you asking her
11  everything that Fetner did to her, or are
12  you just -- I mean --
13    MR. SCOFIELD: Well, what I'd
14  like to break this down to is stuff that he
15  did physically. And then the next question
16  I was going to ask: Where was it and did
17  anybody witness it?
18    A.    Oh, it was -- Yeah, yeah.
19    Q.    Let's talk about --
20    MR. WHITE: Do you understand
21  what he's asking you? He wants you to tell
22  him every time that he touched you
23  physically, take them each one at a time and

Page 279

1  tell him about it and what he did.
2    A.    It just happened -- It would
3  just happen every day or every other day.
4    Q.    Well, let's -- Do you recall
5  -- Let's back up a little bit. Was this the
6  first time you talked to Dan Hees about
7  Richard Fetner?
8    A.    Yes.
9    Q.    All right. And you had not
10  talked to Pat Galvez about it?
11    A.    No, we didn't.
12    Q.    So, this was -- This was the
13  first -- Or Rob Sturm, when you met with Rob
14  Sturm, did you talk to Attorney Rob Sturm
15  about Richard Fetner?
16    A.    Oh, no, no.
17    Q.    Okay. So, this was the first
18  time you went to JELD-WEN management about
19  Mr. Fetner; is that correct?
20    A.    Yes.
21    Q.    Okay. Now, you -- What I'm
22  trying to get at is, you already said that
23  he'd grab you and -- sneakily grab your boob

Page 280

1  and pat you on the butt and stuff, did he do
2  that in front of other people?
3    A.    He would hug me out there in
4  front of everybody, he'd come up behind me
5  and put his arms around me. Or he'd grab
6  you by your arm, but his fingers would be
7  where he could rub your boob.
8    Q.    And was it -- Did you feel
9  that was sexual in nature?
10    A.    No. That was Richard. That
11  was just Richard.
12    Q.    Okay. Now, who saw this? Can
13  you think of anybody who saw it?
14    A.    Probably Brenda --
15    Q.    Okay.
16    A.    -- and Linda, both, probably
17  saw it. Or Tooty saw it. Most of the
18  people back there.
19    Q.    Now, we're talking about in
20  the dado machine area?
21    A.    Right.
22    Q.    Okay. And did he ever do this
23  anywhere else?

70 (Pages 277 to 280)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 281

1    A.    Yeah.  In his office, you
2  know.
3    Q.    In Richard's office?
4    A.    Yes.
5    Q.    Okay.  Did he do it in any
6  other parts of the plant?
7    A.    No.  It was just in his
8  office.
9    Q.    Or the dado area?
10    A.    Yeah.
11    Q.    All right.  And you believe
12  Brenda saw this, and you believe Tooty saw
13  this.  Anybody else?
14    A.    Linda.
15    Q.    Linda.  Anybody else?
16    A.    Oh, yeah.  Mike Weathers.
17  Now, he saw all this.
18    Q.    Mike who?
19    A.    Weathers.
20    Q.    Okay.  Where is he?
21    A.    He's in Rock Mills.
22    Q.    That's in Alabama?
23    A.    Yes.

Page 282

1    Q.    All right.
2    A.    Now, he worked with me.
3    Q.    Okay.
4    A.    After Ronald Owen got fired,
5  then I took over Ronald's part, and then
6  this Mike Weathers starting working with me.
7    Q.    Did you have any problems with
8  Mr. Weathers?
9    A.    No, not at all.
10    Q.    All right.  Now, that's the
11  physical part.  Can you remember anything
12  else Richard did physically that perhaps
13  anybody else saw while you were at
14  JELD-WEN's facility?
15    A.    No, no.
16    Q.    All right.  And when did this
17  occur?
18    A.    Gosh, I don't know.  I think
19  it occurred for months, you know.
20    Q.    Okay.
21    A.    Sometime every day, sometime
22  every other day, once a week, sometimes —
23  But he was also, you know, fiddling with the

Page 283

1  other girls.
2    Q.    Did — When he would come up
3  and hug you and things of that nature, how
4  would you react?
5    A.    I would react like it didn't
6  happen, you know, but then I'd talk to the
7  girls about it.
8    Q.    But you would react to Richard
9  like it didn't happen?
10    A.    Play dumb.  Play like you
11  didn't know what he was doing.
12    Q.    Okay.  I mean, you didn't call
13  your son up and say:  Go over to the
14  Spectrum over there, and whip Richard's ass
15  or anything like that?
16    A.    No, no, no.  But my son did
17  call Richard and talk to him.
18    Q.    When did this happen?
19    A.    This happened when Ronald was
20  doing his stuff.
21    Q.    Okay.  Now, let's talk about
22  verbal stuff.  What would -- What would
23  Richard do that you felt like was

Page 284

1  inappropriate, sexually, verbally?
2    A.    He'd tell me, he'd say:  Why
3  don't you come over to the house.  You know,
4  I'll buy some beer, come over to the house,
5  we'll watch TV.
6        Then sometimes he'd come up to
7  me and he'd say:  We'll go get some beer and
8  we'll go home and have about four hours of
9  sex, you know.  He couldn't, probably.  But
10  anyway, that's the way he'd do it.  And
11  even, you know, he'd come -- One time he
12  wanted me to come on my lunch break, you
13  know, and he said he'd fix my time, you
14  know, my time card.
15    Q.    Now, again, the same kind of
16  questions, did anybody overhear this, these
17  types of comments?
18    A.    No, no.
19    Q.    How did you react?  Did you
20  play dumb or did you say:  Richard —
21    A.    No.  I'd say:  Richard, you
22  know, you can't do all that.  You know, I'd
23  just kind of joke back with him about it.

71 (Pages 281 to 284)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 285

1    Q.    Okay.  So, no witnesses, and
2  you would tell him:  No, and joke back with
3  him about it?
4    A.    Well, you know, just play it
5  off.  There's no time -- You know, like, one
6  time he come up and, you know, and told me,
7  he said:  I'd like to eat you from the top
8  of your head to your toes.
9    Q.    Well, let me ask you this.
10  While, I guess, when y'all went out -- y'all
11  dated a couple of times, but where did y'all
12  go out?  Did y'all go out to eat?
13    A.    Yeah.  We went to the White
14  House.
15    Q.    That's a local restaurant in
16  Roanoke?
17    A.    No, it's in -- It's close to
18  LaGrange.
19    Q.    Ma'am?
20    A.    It's close to LaGrange,
21  Georgia.
22    Q.    Okay.  All right.  Was that --
23  I mean, was he acting then, when y'all were

Page 286

1  dating, pretty much the same way what you're
2  complaining about now, same kind of kidding,
3  joking, grabbing, hugging?
4    A.    Yeah, yeah.
5    Q.    Okay.  Now, again, we'll go
6  back to the meeting with -- I understand --
7  From what our understanding is, you told
8  your story -- story, excuse me, I didn't
9  mean to say that.  You told your -- what you
10  said to Dan Hees?  And then all the other
11  women told what they experienced with
12  Mr. Fetner to Dan Hees?
13    A.    Yes.
14    Q.    All right.  Now, you were in
15  the room and listened to what they said; is
16  that correct?
17    A.    Yes.
18    Q.    What did Linda Sims have to
19  say?
20    A.    She was talking about -- She
21  was telling Dan that Richard said her butt
22  looked like a basketball.
23    Q.    I'm just seeing -- Linda is

Page 287

1  the one on the right?
2    A.    Yeah.
3    Q.    I see you're laughing.  Why
4  are you laughing?
5    A.    Why am I laughing?  Just the
6  sound of it now, and her sitting over there,
7  it's just funny.
8    Q.    Well, did you laugh at all
9  during the meeting?
10    A.    No.
11    Q.    All right.  A little bit?
12    A.    Not at all.
13    Q.    Did anybody laugh?
14    A.    No.  I don't think so.  I
15  don't remember.
16    Q.    Now, what -- Again, something
17  about a basketball, what was --
18    A.    Yeah.  He said that he'd like
19  to dribble her basketball.
20    Q.    Okay.
21    A.    And he come over and told me,
22  he said:  Go over there and tell Linda that
23  one of her basketballs is losing air or

Page 288

1  something.  He said:  I've got something I
2  can pump it up.  I said:  No.  I'm not going
3  to tell her that.
4    Q.    Again, did this happen in your
5  dado work area?
6    A.    Yes, yes.
7    Q.    Anywhere else?
8    A.    No.  I don't remember.
9    Q.    All right.  And, again, where
10  the dado work area is, there's no way that
11  Pat Galvez or Roxie Giles, they couldn't
12  see?
13    A.    No, no.
14    Q.    All right.  Anything else you
15  recall Linda Sims, other than the silly
16  basketball deal -- maybe it's not silly, but
17  the basketball deal?
18    A.    Well, he hugged on her a lot.
19    Q.    Okay.  Did Linda complain
20  about Richard slipping in a feel?
21    A.    Yes, yes.
22    Q.    All right.  Did Linda complain
23  -- Did Linda tell Mr. Hees --

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 289

1      MR. SCOFIELD: You think it's
2  been a long day for you. Sorry.
3      Q.   Did Linda tell Mr. Hees that
4  she rejected.
5      A.   Yes, yes.
6      Q.   What did Linda say about how
7  she rejected Mr. Fetner?
8      A.   She would -- He'd come around
9  and she would draw back, he'd get close to
10  her and she'd back up. You know, he just
11  had to get his arms around her, you know.
12      Q.   But did -- To your knowledge,
13  did Linda yell at Richard, tell him to stop,
14  tell him to quit, anything like that?
15      A.   She told him -- Oh, yeah.
16      MR. WHITE: This is Jim
17  Douglas, if y'all haven't met.
18      MR. SCOFIELD: I'm
19  Mr. Scofield. How are you doing, sir?
20      MR. DOUGLAS: Scott, good to
21  meet you.
22      A.   After he said what he did
23  about pumping her basketball up, she told

Page 290

1  him, she said: No, you won't.
2      Q.   Okay. And the hugging and the
3  basketball, is there anything else that
4  Linda --
5      A.   That's all I can recall.
6      Q.   And this all happened in the
7  dado area?
8      A.   Uh-huh.
9      Q.   All right. Lisa Cook. What
10  was her complaints?
11      A.   Oh, that he was touching her
12  all over, you know.
13      Q.   Something about a bubble bath?
14      A.   Bubble bath. I mean, when she
15  was behind a cart, you know, a cart of wood,
16  he'd get -- you know, she said he'd come
17  back there and touch her.
18      Q.   And Lisa Cook declined any of
19  Mr. Fetner's advances, is that what she
20  said?
21      A.   She said, what?
22      Q.   She said no? That Lisa Cook,
23  in front of Mr. Hees, said that she declined

Page 291

1  Mr. Fetner's advances?
2      A.   Well, yeah, I'm sure she did.
3      Q.   Okay. Any other comments that
4  Lisa Cook made to Dan Hees in front of you?
5      A.   Well, she just said that he's
6  always said the same things to her that he
7  was saying to me, you know, that she was the
8  only one, you're special to me, I'll do
9  anything for you, and what we do, you know,
10  is between us two, which he said that to
11  every one of them.
12      Q.   All right. Cathy Thornton,
13  what were her complaints?
14      A.   Oh, she had some bad ones. He
15  would go in the paint room because she
16  worked alone in there. Well, there was
17  another guy at the end of the room, but he
18  couldn't see what was going on up there.
19  But he would always shake his private parts
20  at her.
21      Q.   Richard Fetner?
22      A.   Yeah. I mean, he'd grab his
23  breeches. He never took it out.

Page 292

1      Q.   Kind of like a guy, a rap
2  star?
3      A.   Yeah. And he'd say: Don't
4  you want some of this? And she said he'd
5  get a broom and stick it up her pants behind
6  her. Then he wanted her to go out to --
7  There's a little old building outside, right
8  beside the plants where they keep the
9  equipment.
10      Q.   Yeah.
11      A.   And he wanted her to give him
12  a blow job.
13      Q.   Okay.
14      A.   But he was always harassing
15  her. And she got to where she was just
16  scared to death.
17      Q.   Okay.
18      A.   She wouldn't -- You know, she
19  wouldn't go in the office by herself. Well,
20  any of us wouldn't go in the office after
21  awhile, alone, we'd always get somebody to
22  go with us, because we knew he was going to
23  touch.

73 (Pages 289 to 292)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 293

1  Q.  To your knowledge, Cathy
2  Thornton rejected all these overtures?
3  A.  Yes.  And he --
4  Q.  Let me ask you this.  Did you
5  ever see any of this happen to Cathy
6  Thornton?
7  A.  No, no, I didn't.
8  Q.  Okay.  Do you know of anybody
9  else that did?
10  A.  I don't think so.
11  Q.  What about Lisa Cook, did
12  anybody see that?  Did you see that?
13  A.  Oh, no.  I saw him hug her.
14  Q.  Yeah.
15  A.  But I didn't see him put his
16  hands on her.
17  Q.  Okay.  Brenda Sims.  What did
18  Brenda Sims complain about?
19  A.  The hugging.
20  Q.  Hugging?
21  A.  The having her by her arm and
22  rubbing her boob at the same time.
23  Q.  Did you ever see that happen?

## Page 294

1  A.  Yeah, I saw him hug her.
2  Q.  With Brenda?
3  A.  Uh-huh.
4  Q.  That all occurred in the dado
5  room?
6  A.  Yeah.  We were all back there,
7  except for Cathy.
8  Q.  Okay.  And to your knowledge,
9  Brenda Sims always rejected?
10  A.  Yes.
11  Q.  All right.  Anything else you
12  recall about Brenda Sims?
13  A.  No.  That's it.
14  Q.  To your knowledge, was this
15  the first time that -- We already talked
16  about you, but was this the first time,
17  Brenda Sims, Linda Sims, Cathy Thornton,
18  Lisa Cook complained to Dan Hees about
19  Richard Fetner, to your knowledge?
20  A.  No.  I heard that Cathy and
21  Lisa reported this back way back, you know,
22  a year or so ago.  And to who --
23  MR. WHITE:  A year or so ago,

## Page 295

1  or a year or so prior to your reporting it
2  to Dan Hees?
3  THE WITNESS:  No, this was
4  before -- This was before we found out about
5  all of us.
6  MR. WHITE:  Okay.  Go ahead.
7  A.  They reported it to somebody.
8  So I don't know who they --
9  Q.  Let's take this two steps at a
10  time, then.  To your knowledge, did Brenda
11  or Linda Sims make any complaints about
12  Richard Fetner to Dan Hees or Pat Galvez
13  before October 13, 2004?
14  A.  No.
15  Q.  To your knowledge, did Cathy
16  Thornton and Lisa Cook make -- complain
17  about Richard Fetner before October 13,
18  2004?
19  A.  Yes, they did.
20  Q.  All right.  And what is the
21  basis of your knowledge about that?
22  A.  Well, I just heard they did.
23  Q.  Okay.  So, this is hearsay?

## Page 296

1  A.  Yeah.
2  Q.  All right.  Who did you hear
3  it from?
4  A.  Cathy.
5  Q.  Okay.  And do you recall what
6  Cathy had said?
7  A.  Yes.
8  Q.  What did Cathy say about who
9  she complained to?
10  A.  I don't remember who she said
11  she complained to and talked to about
12  Richard, the way he was doing.
13  Q.  Okay.
14  A.  I just heard after we all got
15  this lawsuit going, you know, then that's
16  when they told us:  We had reported it way
17  back.
18  Q.  Cathy did?
19  A.  Uh-huh.  Cathy and Lisa did.
20  Q.  Cathy and Lisa did.  But it's
21  fair to say you don't know who they reported
22  to or when?
23  A.  No, I don't.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 297

1    Q.    Okay. All right.
2    A.    But also, Richard told Cathy,
3  because I talked to Richard one day, and I
4  told him he should be ashamed of what he's
5  doing. He said: What do you mean? And I
6  told him about the way he was talking to the
7  girls.
8    Q.    The girls being Cathy and
9  Lisa?
10    A.    Yeah. He said: I don't know
11  what you're talking about.
12    Q.    Did you tell Dan Hees during
13  that meeting that you'd already filed a
14  complaint -- Well, strike that, that you
15  already met with the EEOC and filled out --
16    A.    No.
17    Q.    -- these charges?
18    A.    No.
19    Q.    Did you tell Dan Hees that you
20  already -- I don't know what number it is,
21  but that you filled out this Exhibit Number
22  69, this questionnaire on August 20, 2004?
23    A.    I don't think.

Page 298

1    Q.    Okay.
2    A.    I think we talked to Dan
3  before we even went up there to see this
4  lawyer or the EEOC.
5    Q.    Well --
6    A.    I'm not sure.
7    Q.    You're not sure. Okay. Right
8  after -- How long did this meeting last with
9  Dan Hees?
10    A.    I don't know. Probably about
11  thirty minutes.
12    Q.    Okay. After that meeting, did
13  Dan Hees talk to you again?
14    A.    No.
15    Q.    Did Richard Fetner work at
16  JELD-WEN again after you had that meeting?
17    A.    Yes, yes.
18    Q.    After that meeting?
19    A.    After we talked to Dan?
20    Q.    Yeah.
21    A.    Then Dan, I'm sure, went and
22  talked to someone else or something, I'm
23  sure.

Page 299

1    Q.    And Richard Fetner no longer
2  worked at JELD-WEN after that meeting;
3  correct?
4    A.    Well, true.
5    Q.    You said sure?
6        MR. WHITE: She said true.
7    Q.    True. Okay. So, the day that
8  you five women went to Dan Hees, Richard
9  Fetner, after that, no longer worked for
10  JELD-WEN?
11    A.    Yes.
12        MR. WHITE: Objection. My
13  understanding, it was six woman. I may be
14  mistaken.
15    A.    Yeah. It was six women.
16    Q.    Who was the sixth woman?
17    A.    Her name was --
18    Q.    Mary Lou Laws.
19    A.    -- Mary Lou Laws.
20    Q.    Sorry. All right. What did
21  Mary Lou complain about?
22    A.    The hugging.
23    Q.    All right.

Page 300

1    A.    The asking out.
2    Q.    Okay. Did anybody see that,
3  or did he do it -- Did Mary Lou work with
4  you?
5    A.    Yes.
6    Q.    All right. Did, to your
7  knowledge, Mary Lou complain before, to Dan
8  Hees, about Mr. Fetner, before that meeting?
9    A.    Yes, it was before the
10  meeting. She was one of us when we talked
11  to Dan.
12    Q.    Okay. But did Mary Lou Laws
13  complain to anybody with JELD-WEN?
14    A.    No.
15    Q.    Pat Galvez, Dan Hees or
16  anyone?
17    A.    No.
18    Q.    Okay. So, this was her --
19        MR. WHITE: Before that
20  October meeting?
21    Q.    Before the October 13th
22  meeting, the 2004 meeting with Dan Hees?
23    A.    No.

75  (Pages 297 to 300)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 301

1    MR. WHITE: Are you talking
2  about, does she know whether Mary Lou Laws
3  complained to somebody else?
4    A.    No. I don't think she did.
5    Q.    She didn't tell you that?
6    A.    No, she didn't tell me.
7    Q.    Okay. Now, as a result of
8  your talking to Dan Hees on October 13,
9  2004, did any of the six women get their pay
10  reduced?
11    A.    No, I don't think so.
12    Q.    Okay. Did any of them get
13  demoted, to your knowledge?
14    A.    No.
15    Q.    Did any of them get
16  disciplined, in any way, to your knowledge?
17    A.    No.
18    Q.    Was Dan Hees a -- Describe Dan
19  Hees's attitude during the meeting.
20    A.    He was nice. He was
21  understanding and -- But he was really nice
22  about it.
23    Q.    Was he taking notes and

Page 302

1  things?
2    A.    No.
3    Q.    Okay. Did Dan -- After he --
4  Let me make sure we're clear on this. After
5  your morning meeting with Dan Hees on
6  October 13, 2004, did you then again meet
7  with Dan Hees?
8    A.    No, we didn't meet with him
9  again.
10    Q.    Okay. You didn't talk to him
11  again about whether or not you were
12  satisfied with what happened to Fetner?
13    A.    No.
14    Q.    Okay. Did Mr. Hees ask you if
15  you wanted to make further complaints about
16  Mr. Fetner to JELD-WEN's legal department?
17    A.    Yeah. He -- He asked us did
18  we want it put in the paper or something. I
19  don't know. I can't remember. I just can't
20  remember. You know, I'm not sure.
21    Q.    Okay. And after Mr. Fetner
22  left, did anybody else bother you until you
23  got laid off?

Page 303

1    A.    No, no.
2    Q.    Okay. Do you know who at
3  JELD-WEN made the decision to shut down the
4  Roanoke plant?
5    A.    No.
6    Q.    All right. Do you know when
7  the decision was made?
8    A.    Not really.
9    Q.    Okay. You had heard that it
10  may happen a year before; is that correct?
11    A.    I heard that if we didn't meet
12  our needs or whatever, that they might close
13  down.
14    Q.    Okay. After you were laid off
15  at JELD-WEN, did anybody offer you a job to
16  go work for JELD-WEN at another facility?
17    A.    No, no.
18    Q.    Okay. Were you offered some
19  sort of severance package?
20    A.    No.
21        (Defendant's Exhibit 72
22        was marked for
23        identification purposes.)

Page 304

1    Q.    Let me show you Exhibit 72.
2  This is a --
3    MR. WHITE: Are you talking
4  about the severance package where they read
5  the release?
6    MR. SCOFIELD: Yeah.
7    A.    Oh, yeah. I told you that
8  before.
9    Q.    I didn't -- Yeah.
10    A.    Yeah.
11    Q.    I took the person's name out
12  and it's just the form here.
13    A.    Yeah. It's to --
14    Q.    Okay. But you were offered
15  this?
16    A.    Yes.
17    Q.    Along with everybody else?
18    A.    Yes. But if we signed it, it
19  would take all of our rights away.
20    Q.    That's correct. It was
21  designed to do that.
22    A.    Yeah. So didn't sign it.
23    Q.    To your knowledge, did

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 305

1  everybody -- Did Cathy Thornton and Lisa
2  Cook and Mary Lou Laws sign this, to your
3  knowledge?
4      A.    Yes, I think they did.
5      Q.    Let's go back to this log
6  here.
7          MR. WHITE:  What number?
8          MR. SCOFIELD:  71.
9      Q.    And I may have asked you this.
10  Did you, at any time, tell anyone at the
11  EEOC that -- that Mr. Fetner had -- Well,
12  strike that, that you'd gone to Dan Hees and
13  complained about Mr. Fetner?
14      A.    No, I didn't -- No. They
15  didn't ask me that.  I mean, all we done was
16  write down what Richard had done to us and
17  said to us.
18          (Defendant's Exhibit 73
19              was marked for
20              identification purposes.)
21      Q.    Okay.  All right.  I'll show
22  you Exhibit Number 73.  This is a letter
23  dated -- the date is on the second page,

Page 306

1  it's dated April 19, 2005, by Investigator
2  Deverlin McGee.  Do you see that?
3      A.    Well, you know --
4      Q.    On the second page it's on
5  there.
6          MR. WHITE:  He just asked you
7  who it's from.
8          THE WITNESS:  Oh, okay.
9      Q.    And at that time, Matt White,
10  I guess he's your lawyer?
11          MR. WHITE:  That's me.
12      A.    Yes.
13      Q.    Okay.  Do you remember seeing
14  a copy of this document?
15      A.    No.  I don't remember.  I
16  don't remember seeing this.  I don't know.
17  If I did, I didn't read it.
18      Q.    Okay.  Let me ask you a
19  question.  Before this letter dated April
20  19, 2005, did you, to your knowledge, do
21  everything you were supposed to do, that the
22  EEOC asked you to do?
23      A.    Yes.

Page 307

1      Q.    Gave them all the information
2  they asked you to give?
3      A.    Yes, I did.
4      Q.    All right.  Go down to the
5  fourth paragraph.  It says:  Evidence from
6  respondent, meaning you, indicates that the
7  company took immediate and appropriate
8  action upon receiving the complaint from
9  your client.
10          Evidence further shows that
11  the respondent immediately terminated the
12  employment of the alleged harasser, Richard
13  Fetner.  The filing respondent contends your
14  client suffered no tangible injury.  Do you
15  see that?
16      A.    Yes.
17      Q.    All right.
18          MR. WHITE:  Let me interpose
19  an objection.  You said respondent meaning
20  you, I think respondent is JELD-WEN in this
21  situation.
22          MR. SCOFIELD:  No.  The
23  respondent would be Ms. Minix, we'd be the

Page 308

1  company.
2          MR. THOMPSON:  No.  We'd be
3  the respondent.
4          MR. SCOFIELD:  We'd be the
5  respondent.  Okay.  They screwed that up.
6          (Off-the-Record discussion
7              was held.)
8      Q.    Okay.  Did you feel like that
9  Mr. Hees handled the situation as quickly as
10  he could by terminating Mr. Fetner?
11      A.    He was there after that.  He
12  was there a while.  I'm not even sure how
13  long, but he was still there a while.
14      Q.    Talking about Mr. Fetner?
15      A.    Yes.
16          MR. WHITE:  He was there
17  after.  I'm sorry.  You said after, after
18  what?
19          MR. SCOFIELD:  After the
20  meeting with Dan Hees.
21          MR. WHITE:  Okay.
22      A.    And I still had to work, just
23  like this Ronald deal, I still had to work

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 309

1  with him another week -- about a week.
2      Q.    It's my understanding that on
3  the afternoon that you came in and spoke to
4  Dan Hees on October 13, 2004, and that by
5  that afternoon Mr. Fetner had cleared out
6  his desk and never came back. Do you have
7  anything to disagree with that?
8      A.    No. I don't think that's when
9  he left.
10     Q.    That's correct.
11     A.    It was later on. I'm not
12  sure. I can't remember.
13     Q.    Okay. Did you provide any
14  additional information to the EEOC after
15  this letter dated April 19, 2005?
16     A.    No, I just talked to him the
17  one time and wrote my statement down.
18     Q.    Did you have any -- Did you
19  have any additional information you thought
20  you could have given them?
21     A.    Yeah, yeah.
22     Q.    Like what?
23     A.    Well, I didn't -- You know, it

Page 310

1  just happened so often. I mean, you can
2  just tell them one time: Well, you know, he
3  hugged me, he touched me, but he just -- he
4  just does it every day, you know, or every
5  other day. You know, he just did it for
6  months. It wasn't a one-time thing, you
7  know.
8          (Defendant's Exhibits 74,
9          75, 76, 77, 78, 79 and 80
10         were marked for
11         identification purposes.)
12     Q.    Okay. I'll give you all at
13  the same time 74, 75, 77, 78, 79, and 80.
14  They are -- 74 is a medical record from
15  Charlotte Bishop, dated 2/21/03, 10/13/03,
16  2/23/05, 6/17/05, 7/28/05 and 10/6/05. I'd
17  like you to look through there and see if
18  there's any complaints about any problems
19  associated with the sexual harassment
20  charges against JELD-WEN?
21     A.    No. I mean, I talked to her
22  about him, but it was just a
23  friend-to-friend, like, talk, you know,

Page 311

1  because she become a good friend of mine.
2  And I was just telling her, you know, and
3  she was just responding back: How sick can
4  you get, you know? As far as writing
5  anything down, I don't think she ever did
6  that.
7      Q.    And Dr. Bishop is a female?
8      A.    Yes.
9      Q.    And you felt comfortable
10  talking to her about it?
11     A.    Yeah. We become friends, you
12  know. She gave me her problems and I told
13  her mine, because she was going through a
14  divorce.
15     Q.    Okay. Exhibit Number 80, you
16  talked about your motor vehicle accident on
17  July 28, 2005.
18     A.    Uh-huh. Yes.
19     Q.    That's where you went to sleep
20  behind the wheel?
21     A.    Yeah.
22         (Defendant's Exhibit 81
23         was marked for

Page 312

1          identification purposes.)
2      Q.    On Exhibit Number 81, it's
3  dated November 14, 2002.
4      A.    81?
5      Q.    I'm sorry. Exhibit Number 81,
6  you talk about stomach problems, a motor
7  vehicle accident where you broke your
8  shoulder and broke your wrist; is that
9  correct?
10     A.    Yes.
11     Q.    Again, nothing about sexual
12  harassment with Mr. Fetner or anything like
13  that?
14     A.    No.
15     Q.    All right. And on number
16  eight of your interrogatories: Identify,
17  pursuant to the definitions and instructions
18  provided, name, address and dates of any
19  healthcare provider you saw because of your
20  -- any charge against JELD-WEN and/or
21  because of any other allegations, lawsuits,
22  your only response was Charlotte Bishop; is
23  that correct?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 313

1    A.    Uh-huh.
2    Q.    Say yes or no.
3    A.    Yes.
4    Q.    All right.  Which visit do you
5  believe you talked to Charlotte Bishop about
6  the harassment?
7    A.    I have no clue.  I have no
8  idea.  It's just one day we were talking,
9  and I just told her about it.
10    Q.    Just one time you talked to
11  her about it?
12    A.    Yeah.  Uh-huh.
13    Q.    All right.  And did Ms. Bishop
14  give you advice on what to do?
15    A.    Yeah, she did.
16    Q.    What did she say?
17    A.    She said, well, I needed to
18  talk to -- We needed to all get together and
19  talk to Dan, or the boss.
20    Q.    And that was before you talked
21  to Dan Hees on October 13, 2004?
22    A.    Yes.
23        MR. SCOFIELD:  I'm about

Page 314

1  through.  I need to talk to my co-counsel
2  about two minutes.
3        (Recess taken.)
4        EXAMINATION
5  BY MR. THOMPSON:
6    Q.    All right.  Ms. Minix, we've
7  been here a long time today.  Have you
8  testified truthfully?
9    A.    Yes.  Of my knowledge, you
10  know.
11    Q.    Well, is there anything you
12  need to go back and change or alter or
13  amend?  I mean, you've testified truthfully,
14  haven't you?
15    A.    Yeah.  We were talking, and I
16  think perhaps we did see the EEOC before --
17  before we talked to Dan.
18    Q.    Before the meeting with
19  Mr. Hees; correct?
20    A.    Yeah.  And I was saying it was
21  after.
22    Q.    Okay.  And you were just
23  confused on those dates?

Page 315

1    A.    Yeah, I was, you know.
2    Q.    Okay.  Have -- You're not
3  basing any claim in this lawsuit on any
4  conduct that we haven't discussed today;
5  correct?
6    A.    Do what, now?
7    Q.    I'm just trying to make sure
8  there's nothing else to talk about?
9    A.    Oh.  Right now, I can't think
10  of anything.
11    Q.    Okay.  So, there's nothing
12  else that you know of that you're basing a
13  claim in this lawsuit, other than what
14  you've talked to Mr. Scofield about;
15  correct?
16    A.    Right.
17    Q.    Okay.  And you're not making
18  complaints about anyone in this lawsuit,
19  other than Richard Fetner?
20    A.    Yes.
21    Q.    You are making complaints
22  about someone other than Richard Fetner?
23    A.    Oh, no, no, no.

Page 316

1    Q.    Okay.  So, it's only Fetner's
2  conduct we're worried about; correct?
3    A.    Right.
4    Q.    Okay.
5        MR. THOMPSON:  I think that's
6  all we've got.  We're going to stop for now.
7  We've still got some subpoenas out.  If
8  there's anything new that comes up in the
9  subpoenas, we may want to sit down with her
10  and address that.  For now, that's it.
11        MR. SCOFIELD:  Thank you,
12  again for your hospitality.
13        MR. THOMPSON:  My pleasure.
14        MR. WHITE:  Well, the only
15  condition being is, if you had something you
16  want to ask her about a subpoena, it's going
17  to be limited to the subpoena responses.
18        MR. SCOFIELD:  Well, it
19  depends on what the subpoena exposes.  We'll
20  be reasonable related to the subpoena.  I
21  don't anticipate --
22        MR. WHITE:  We'll discuss that
23  issue when it arises.  How about that?

79  (Pages 313 to 316)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 317

1      MR. SCOFIELD: That's fine.
2  (The deposition was concluded at 5:30 p.m.,
3      April 10, 2006.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 318

1          REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4          I, Angela Smith, Registered
5  Professional Reporter and Commissioner for
6  the State of Alabama at Large, do hereby
7  certify that the above and foregoing
8  proceeding was taken down by me by
9  stenographic means, and that the content
10  herein was produced in transcript form by
11  computer aid under my supervision, and
12  that the foregoing represents, to the best
13  of my ability, a true and correct
14  transcript of the proceedings occurring on
15  said date and at said time.
16          I further certify that I am neither
17  of kin nor of counsel to the parties to the
18  action; nor in any manner interested in the
19  result of said case.
20
21
       _____
22     Angela Smith, RPR, CRR,
       for the State of
23     Alabama at Large.

80 (Pages 317 to 318)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# EXHIBIT 6

Form 2-2F6

CMS HOLDING COMPANY
(FOR OFFICE USE ONLY)

AN EQUAL OPPORTUNITY EMPLOYER

| Last | First | Middle |
|------|-------|--------|

## APPLICATION FOR EMPLOYMENT

### PERSONAL INFORMATION

Date 9-12-01

Social Security Number

Name _Lorena_ _Doris Lee_ _Minix_
　　　　(First)　　　　　(Middle)　　　　(Last)

Present Address _119 Lebanon Roanoke Al. 36274_
　　　　　　　　(Street)　　　(City)　　　(State) (Zip Code)

Permanent Address _____
　　　　　　　　　(Street)　　　(City)　　　(State) (Zip Code)

Phone No. 3

In case of emergency notify: _Farrah Minix Lois Moore_

Address _Lagrange Ga. Roank_ Phone No. _706-84_

### EDUCATION

| SCHOOL | NAME | WHERE LOCATED | FROM | TO | YEARS OF CREDIT | DEGREES |
|--------|------|---------------|------|-----|-----------------|---------|
| Grammar | Wedowee | | | | | |
| High School | R.C.H.S | Wedowee | 1st | 10th | | |
| College | — | | | | | |
| Other | — | | | | | |

### EMPLOYMENT DESIRED

Position _Daydo Machine_ Salary Desired _#6:73_

Have you ever been employed by CMS Holding Company
or any of its subsidiaries or divisions? Yes ☑ No ☐

Are you employed now? Yes ☐ No ☐

If so, may we inquire
of your present employer? Yes ☑ No ☐

(continued on other side)

**Minix - 6**

# EMPLOYMENT RECORD

| | | FROM MO. YR. | TO MO. YR. | DUTIES | RATE OF PAY | REASON FOR LEAVING |
|---|---|---|---|---|---|---|
| Present Employer | Name Milliken Address Lagrange | Feb. 01 | 9 - 01 | Inspecting | $10.25 | Layoff |
| Last Employer | Name Southern Numblance 9 Address Lagrange | 4-98 | 5-00 | upholstery | 8:45 | Closed |
| Next to Last Employer | Name Millwork 91 Address Roanoke | 4-94 | 6-94 | laydo Machine | $6:30 | Moved away |
| One Other Employer | Name Address | | | | | |
| One Other Employer | Name Address | | | | | |

Have you ever been convicted of a felony? Yes ☐ No ☑

If yes, what was the offense?

Date of conviction _____ Place of conviction _____

## U.S. MILITARY SERVICE

From _____ (DATE) To _____ (DATE) Branch _____ Rank _____

Jobs

Present Military Status _____

In making this application for employment it is understood that an investigative consumer report may be prepared whereby information concerning my character, general reputation, personal characteristics and mode of living may be obtained through personal interviews with my neighbors, friends or others with whom I am acquainted. Also an investigation may be requested to be made of my credit standing by a consumer reporting agency. I authorize both or either of such investigations to be made. I further understand that upon written request made within a reasonable period of time, I have the right to obtain additional detailed information about the nature and scope of these investigations, if made.

I authorize CMS Holding Company to investigate all statements contained in this application and hereby release former employers and CMS Holding Company from all liability on account of furnishing such information to CMS Holding Company. It is understood and agreed that any misrepresentation by me in this application will be sufficient cause for cancellation of the application and/or for separation from the company's service if I have been employed. In the event of my employment by CMS Holding Company I agree to abide by all present and subsequently issued rules of CMS Holding Company.

READ ABOVE BEFORE SIGNING

DATE 9-12-01    SIGNATURE Lorena Muniz

### DO NOT WRITE BELOW THIS LINE

Interviewed by _____ Date _____ Start Date _____

Hired by _____ Date _____ Job Title _____

Comments _____

Job Code _____

Rate _____ Per _____

Dept _____ Shift _____

Exempt _____ Non-Exempt _____

Other _____

NAME _Lorena Minnix_          DATE _7-12-01_

Answers to all questions will be treated with strict confidence and will become a part of your permanent record.

HOME ADDRESS _49 Lebanon St_

DATE OF BIRTH _2-1-51_          TELEPHONE NUMBER _334 863-4522_

In case of emergency notify: NAME _Lois Moore_

ADDRESS _Roanoke Al._          TELEPHONE NUMBER _334 863 2104_

PERSONAL PHYSICIAN: NAME _Dnc. Shirah_

## IN THE FOLLOWING LIST CIRCLE "YES" OR "NO", AND IF "YES" UNDERLINE THE CONDITION.

Have you ever had or do you now have:

| Condition | | |
|---|---|---|
| Poor or blurred vision, watering eyes | YES | NO |
| Decreased hearing | YES | NO |
| Earache, running or ringing ears | YES | NO |
| Nose or throat trouble | YES | NO |
| Dermatitis, skin rash, eczema or hives | YES | NO |
| Pleurisy, pneumonia, bronchitis or frequent colds | YES | NO |
| Allergy, asthma or hay fever | YES | NO |
| Tuberculosis or spitting of blood | YES | NO |
| Shortness of breath | YES | NO |
| Palpitation, pounding heart or chest pain | YES | NO |
| Heart trouble or circulatory disorder | YES | NO |
| High or low blood pressure | YES | NO |
| Varicose veins, swelling of ankles or feet | YES | NO |
| Stomach pain, frequent nausea or vomiting | YES | NO |
| Diabetes | YES | NO |
| Thyroid disorder | YES | NO |
| Gall bladder or liver disease | YES | NO |
| Duodenal or gastric ulcer | YES | NO |
| Pain in urination or blood in urine | YES | NO |
| Kidney, bladder or urinary disorder | YES | NO |
| Rheumatism, arthritis, painful joints or neuritis | YES | NO |
| Back injury, back pain or sciatica | YES | NO |
| Convulsions, epilepsy, fainting or dizziness | YES | NO |
| Head injury or frequent headaches | YES | NO |
| Nervous breakdown | YES | NO |
| Numbness, weakness or fatigue | YES | NO |
| Periods of depression or worry | YES | NO |

|  | YES | NO | IF YES, GIVE DETAILS |
|---|---|---|---|
| Have you had any illness or injuries other than those listed above? | | | no |
| Have you ever been a patient in a hospital? | | | Yes having child |
| Have you ever had an injury or illness caused by or related to your job? | | | no |
| Have you lost time from work due to illness or injury during the last two years? | | | no |
| Has your work ever been limited or restricted on account of your health? | | | no |
| Have you any physical complaint, impairment or disability at present? | | | no |
| Are you presently taking any medications? | | | Yes depression |
| Have you consulted with or been treated by physicians, healers or other practitioners within the past five years? | | | |

Would you say your present health is:

Excellent _____   Good _✓_   Fair _____   Poor _____

The preceeding answers are true to the best of my knowledge, and I understand this will become part of my medical record.

SIGNATURE _Lorena Minnix_

## EMPLOYMENT AGREEMENT

1.   I agree to submit a pre-employment physical, drug screening test, and back assessment test at the expense of Millwork Specialties, Inc.

2.   Upon acceptance of employment with Millwork Specialties, Inc., I understand and agree that I will be on a probation period of up to 90 days, and if, during that time, I have not, in the judgement of the company, adapted to the work assigned or proved myself likely to be successful, then my employment may be terminated.   I understand that there is no express or implied contract employment for any particular period of time and that either I or the Company can terminate our relationship with or without cause.

3.   Millwork Specialties, Inc. policy regarding use of illegal drugs, including marijuana, by employee on or after the job, is that such use shall result in the immediate termination of employment.   I agree to submit to periodical random polygraph and/or psychological stress examinations and chemical drug screening tests, urinaysis and/or blood when requested to do so.  I understand the refusal to submit to testing shall result in the termination of my employment.

4.   In the event of an accident at Millwork Specialties, Inc. requiring off premises medical services, I am required to submit to a drug test.

5.   I have read and understand this policy statement.

_Lorena Muniz_
_____
Signature

_____
Witness

# EXHIBIT 7

# Former JELD-WEN Facility
## Roanoke, AL

### For Sale or Lease



### 235 Millwork Industrial Dr.
### Roanoke, AL  36274

- +/- 19.93 acres
- +/- 50,000 SF (expandable)
- +/- 1,500 SF of office
- 2 dock high doors with levelers
- 1 oversized drive-in door
- Heavy 3-phase power, 277/480 Volt
- Additional trailer storage available

**For More Information Please Contact:**

**Chip Watson**
770.290.0714
cwatson@trammellcrow.com

**Wit Truitt**
770.290.0710
wtruitt@trammellcrow.com

**www.trammellcrow.com**

**TrammellCrowCompany**

The information contained herein is believed to be accurate but is not warranted, as the information may change or be updated without notice. Seller or landlord makes no representation as to the environmental condition of the property and recommends purchaser's or tenant's independent investigation.

**Minix - 7**

SEC. 02- TSP. 22-S - RNG. 12-E
ROANOKE, RANDOLPH COUNTY, A

N00° 47'

S21°54'E 238.63'

N71°01'-18"W 337.01'

2" Ø O.T. GALV.

IRON PIN FOUND
COMPUTED POINT
CONCRETE SLAB
POWER POLE LINE

C.S.X. RAILROAD

100' R.O.W. (50' EACH SIDE OF CENTERLINE)

N73°49'-39"W 266.11

¾" Ø NIP

½" Ø O.T.

ABANDONED RAILROAD SPUR NOT
LOCATED ON THIS SURVEY.

N70°04'-35"W 580.26'

FRAME BUILDINGS

TRANSFORMERS

1¼" Ø O.T.

S85°01'-23"E 528.91'

PP

PP

PHONE PED.

PROPANE TANK

2" Ø ROD

S60°57'-00"E 200.04'

GUA

S63°46'-39"E 40.26'

S65°55'-51"E 275

METAL STRUCTURE

Strip machine
Finger Joints

RICHard

cutting Area

Joe

HALL

copper

45'

out line double concrete

200'

80'

150'

COMMENCING AT AN IRON BAR WHICH IS T
THE NORTHEAST ¼ OF THE NORTHWEST ¼ (
SOUTH, RANGE 12 EAST, ROANOKE, RANDO
POINT OF BEGINNING; THENCE RUN NORTH
238.63 FEET TO AN IRON PIPE; THENCE RUN
DISTANCE OF 528.91 FEET TO AN IRON ROD
BOUNDARY OF GUANO STREET; THENCE RU
DISTANCE OF 40.26 FEET TO AN IRON PIN LC
BOUNDARY OF GUANO STREET; THENCE RU

# EXHIBIT 10

04/05/06  14:47 FAX 205 326 3194    LEHR, MIDDLEBROOKS, PRICE,

7.28.05

Visited by a Lorena Minix at 1:45PM today. She was very upset about not being retained as an employee in the Dado Department. She was here for one and a half days only on the floor after orientation. .The lady apparently was very sleepy one day and asked if she could go home early to sleep. The Supervisor and Lead person explained that we needed to report to work and that she could not just leave early. She then asked the Lead man (Mike Cotton) to get her a cup of coffee so she could work and stay awake. Mike actually went and got the lady a cup of coffee while she was on duty and gave it to her. He told her that he would not do that again and that she must stay awake like everybody and do her job.

She was told that they might look at letting her go at twelve noon when part of the second shift was reporting to work. She then went to lunch at 11:30 and without permission clocked out and went home. She had already been told to report to work on Saturday as well, but she failed to report and did not call in to the report line. She did say she called the HR office for Karen but that is not the report line that is clearly given to each new employee. Karen was not here on Saturday. The lady later left early without permission. Before she left, Mike Cotton clearly told her not to leave early. He said that she would have to get permission from her Supervisor, Mattias Wise. She did not do so.

Unfortunately for the lady, she was involved in an accident the next day after she left the plant. She failed to call our report line in the appropriate manner. line only.

This is a moot point however due to the fact that she left early without permission prior to being involved in an accident while away from our plant site.

I tried to explain this to her, but she accused the company of not being a fair place to work, and that this action was "dirty" and "lowdown" and that she would speak to Mr. Wellborn about all this . She also said that her son knew Mr. Wellborn and that would see to it that he got the story. I told her that she had every right to speak with Mr. Wellborn if she felt as if she needed to.

I thanked her for her time, but explained that I had not heard anything that would allow me to overrule the decision that had been made. I further explained that we must have rules for these situations of reporting and leaving early and especially in the first 120 days of employment and that she had only been here for1.5 days on the floor.

She went on the say that we should supply a bed or someplace for people to lie down in cases like this. I attempted to be kind and listen to all she had to say but she became angry and upset and finally left.

Ben Rosser

8.1.05  CALLED 706-845-8608 (ID AS A MS. HILL, DAUGHTER)
SHE DEMANDED TO KNOW WHY MOTHER WAS TERMINATED. (SHE FAIL _____ )  I DID NOT GET INTO MANY DETAILS, BUT TOLD HER
DISPOSITION.) I DID NOT GET INTO MANY _____ .SHE THEN CA_____

**Minix - 10**

ME A LIAR! I HUNG UP T/PHONE AT 1HAT POINT!

# EXHIBIT 25

# JELD-Wen Health Plan Sign-up & Coverage Changes

Instructions & details on back.

Company Code _____ Company Name _____

## Mid-Year Coverage Change Only — 31 Day Time Limit — see back

a. List qualified event below (marriage, divorce, birth etc) & attach proof

MY CURRENT COVERAGE IS:
☐ NO COVERAGE  ☐ EMP ONLY  ☐ EMP + CHILD
☐ EMP + SPOUSE  ☐ EMP + CHILDREN  ☐ FAMILY

I WANT TO **CHANGE** MY COVERAGE TO:
☐ NO COVERAGE  ☐ EMP ONLY  ☐ EMP + CHILD
☐ EMP + SPOUSE  ☐ EMP + CHILDREN  ☐ FAMILY

STATUS EVENT

DATE OF QUALIFIED CHANGE EVENT

DESCRIBE CHANGE (REQUIRED)

b. Use section 2, & list ALL dependents to be covered by the Health Plan.

c. I drop the following because of the above change (if applicable)
☐ SUPPLEMENTAL DISABILITY  ☐ FSA HEALTH CARE  ☐ FSA DEPENDENT CARE

### Sign & Date below

Salary Reduction Payment Agreement: My signature confirms that I have read the information on this form and the Health Benefit Enrollment materials. I certify that the above information is true. I authorize my employer to adjust my salary to pay for the cost of the coverage(s) I have elected. I understand that any payroll changes will be made as soon as administratively possible. My choices on this form are for the Plan Year and ALL subsequent Plan Years until I make a change. If I have not elected coverage, my signature confirms that I decline coverage.

X _Lorena Minix_  X 3-22-02
SIGNATURE                        DATE

### Local Company Please Complete

DATE RECEIVED:                RECEIVED BY:                EFFECTIVE DATE:

FULL-TIME HIRE DATE:
☐ HOURLY  ☐ STAFF  ☐ MANAGEMENT  ☐ OTHER:

### Health Benefits Only — Authorization for coverage category changes
☐ CHANGE APPROVED  EFFECTIVE ON: ___  ☐ NOT APPROVED/NO CHANGES
REASON:

☐ ENTERED IN SYSTEM                                BY/DATE:
☐ OTHER CHANGE APPROVED & EFFECTIVE ON: ___  ☐ NOT APPROVED
REASON:                                              BY/DATE:

---

## 1 Employee Information

LAST NAME: Minix
FIRST NAME & M.I.: Lorena D
BIRTH DATE:

MAILING ADDRESS: 119 Lebanon St.
HOME PHONE: 334-863-4524
SOCIAL SECURITY #:

CITY: Roanoke
ST: AL
ZIP: 36274

GENDER: ☐ MALE  ☑ FEMALE
MARITAL STATUS: ☐ MARRIED  ☑ SINGLE  ☐ WIDOW  ☐ DIVORCED

## 2 List ALL dependents to be covered by the Health Plan

Is your spouse an employee of JELD-WEN?  ☐ YES  ☐ NO

| | BIRTH DATE | SOCIAL SECURITY # | OTHER INSURANCE? |
|---|---|---|---|
| 1) SPOUSE'S FULL NAME | | | ☐ YES  ☐ NO |
| 2) DEPENDENT'S FULL NAME  ☐ MALE  ☐ FEMALE | | | ☐ YES  ☐ NO |
| DEPENDENT'S FULL NAME  ☐ MALE  ☐ FEMALE | | | ☐ YES  ☐ NO |
| DEPENDENT'S FULL NAME  ☐ MALE  ☐ FEMALE | | | ☐ YES  ☐ NO |
| DEPENDENT'S FULL NAME  ☐ MALE  ☐ FEMALE | | | ☐ YES  ☐ NO |
| DEPENDENT'S FULL NAME  ☐ MALE  ☐ FEMALE | | | ☐ YES  ☐ NO |

YOU, OR A COVERED DEPENDENT HAVE OTHER HEALTH INSURANCE, LIST INSURANCE COMPANY & PHONE #

## 3 Check the coverage you want

☐ NO COVERAGE  ☑ EMPLOYEE ONLY  ☐ EMPLOYEE + CHILD
☐ EMPLOYEE + SPOUSE  ☐ EMPLOYEE + CHILDREN  ☐ FAMILY

## 4 Wellness Factor (Premium) Discount

Employee ☑ NO TOBACCO USE IN LAST 12 MONTHS  OR  ☐ USED TOBACCO USE IN LAST 12 MONTHS
Spouse ☐ NO TOBACCO USE IN LAST 12 MONTHS  OR  ☐ USED TOBACCO USE IN LAST 12 MONTHS

## 5 Supplemental (additional) Disability for new enrollees

☑ WANT SUPPLEMENTAL DISABILITY  OR  ☐ DO NOT WANT SUPPLEMENTAL DISABILITY

Minix - 25

# EXHIBIT 27

| **JELD-WEN**<br>CORPORATE POLICIES AND PROCEDURES | PROC. 203: Anti-Harassment<br>PAGE:    1 of 3<br>DATE:    *12/02* |
|---|---|

203.   Anti-Harassment Procedures

**A.**   
<u>General</u>:

JELD-WEN strives to provide a productive working environment free from harassment or discrimination, including that which may be construed to be offensive sexual conduct. This policy applies to every aspect of the employment relationship throughout the organization and to the dealings of employees with one another, as well as with vendors and customers.

Harassment in any form will not be tolerated by the Company. Any employee who violates this policy is subject to discipline up to and including discharge. In addition, any client, customer, or vendor of the Company who engages in such conduct will be informed of our policy and will be dealt with accordingly, with the aim of completely eliminating the harassment.

This Anti-Harassment Policy shall be prominently posted in all of our facilities and reprinted in the You and JELD-WEN company handbook.

**B.**   <u>Definition</u>:

Harassment includes, but is not limited to, the following behaviors, if such behaviors create an intimidating, hostile, or offensive environment:

1.   <u>Verbal Harassment</u>:

Derogatory comments, jokes, slurs, or abusive language.

2.   <u>Physical Harassment</u>:

Unwanted physical contact, or assault.

3.   <u>Visual Harassment</u>:

Leering, making sexual gestures, displaying derogatory or sexually suggestive objects, pictures, posters, cartoons, drawings, or clothing printed with derogatory material.

4.   <u>Sexual Harassment</u>:

**Minix - 27**

| PERSONNEL | PROCEDURES |
|---|---|

JELD-WEN, Inc./Lorena Minix, et al. - Documents Produced by Plaintiffs                P000

| **JELD-WEN**<br>CORPORATE POLICIES AND PROCEDURES | PROC. 203: Anti-Harassment<br>PAGE:    2 of 3<br>DATE:    *12/02* |
|---|---|

Unwelcome sexual advances, request for sexual favors, offering employment benefits in exchange for sexual favors, or any other verbal or physical conduct that is directed toward an individual because of that person's gender.

C.    Procedures:

1.    Employees will be made aware of JELD-WEN's policy and will be encouraged to not tolerate harassment. Any employee who believes that he/she is being subjected to objectionable conduct should promptly notify either their immediate supervisor, their General or Corporate Manager, Vice President, or Subsidiary President or the Legal Department at (541) 882-3451. Any supervisor, General or Corporate Manager, Vice President, or Subsidiary President who has questions concerning harassment complaints shall contact the Legal Department.

2.    Employees are encouraged to report any conduct they may witness against someone else, whether verbal, visual, physical, sexual, or otherwise, that they believe constitutes harassment. They should follow the same steps of contacting their immediate supervisor, their General or Corporate Manager, Vice President, or Subsidiary President, or the Legal Department.

3.    Every complaint of harassment will be investigated promptly, thoroughly, fairly, and objectively. A written investigative report will be completed for each complaint. The investigator should take detailed statements from the person making the complaint, the alleged harasser, the harassee, and witnesses. The complaint will be kept as confidential as possible: information will be disseminated on a "need-to-know" basis, only. Basic results of the investigation will be reported to the individual registering the complaint.

4.    If the information collected during the investigation establishes that harassment or other objectionable conduct did occur, disciplinary action will be promptly taken against the harasser, up to and including termination if appropriate.

5.    Employees will not be discriminated or retaliated against for reporting harassment or participating in an investigation.

D.    Harassment Training for Managers:

| **PERSONNEL** | **PROCEDURES** |
|---|---|

JELD-WEN, Inc./Lorena Minix, et al. - Documents Produced by Plaintiffs

| **JELD-WEN**<br>CORPORATE POLICIES AND PROCEDURES | PROC. 203: Anti-Harassment<br>PAGE:    3 of 3<br>DATE:    *12/02* |
|---|---|

All Managers will be made familiar with the Company Policy regarding harassment and encourage employees to come forward to report any harassment. All Managers will receive a copy of this policy and it will be included in the Company Handbook as well.

| PERSONNEL | PROCEDURES |
|---|---|

JELD-WEN, Inc./Lorena Minix, et al. - Documents Produced by Plaintiffs

# EXHIBIT 41

**EMPLOYEE CHANGE NOTICE**

1. **Effective Date of Change** _3-17-03_   ☒ Hourly  ☐ Salary

2. **EMPLOYEE NAME** _Lorena Minix_

| JELD-WEN COMPANY NAME _Jeld-Wen_ _Roanoke, Al_ | COMPANY CODE & NUMBER _ON_ _6266_ |
|---|---|
| SOCIAL SECURITY NUMBER | TIME CLOCK NUMBER / EMPLOYEE NUMBER _845_ |

3. **Employee Information** (This section to be completed only if changes are made to employee name, address or phone number.)

EMPLOYEE NAME (Name as it appears on Social Security Card. A copy of the Social Security Card is REQUIRED to make a name change.)     PREFERRED FIRST NAME

| ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| COUNTY | COUNTRY | PHONE NUMBER ( ) | |

4. **Martial Status Change**  ☐ Single to Married   ☐ Married to Single

| SPOUSE NAME | PREFERRED FIRST | DATE OF BIRTH |
|---|---|---|
| SPOUSE SOCIAL SECURITY NUMBER | SPOUSE PHONE NUMBER ( ) | IS SPOUSE A JELD-WEN EMPLOYEE? ☐ Yes  ☐ No |

5. **Job Status Change / Company Transfer** (If no change, please indicate "n/c")

| TRANSFER FROM COMPANY | | TRANSFER TO COMPANY | |
|---|---|---|---|
| WORKERS COMP CODE | NEW JOB TITLE | UNION AFFILIATION | DIVISION VP |
| PT NUMBER | CHECK SORT CODE | GL NUMBER | OLD BENEFIT TYPE CODE | NEW BENEFIT TYPE CODE | SCHEDULED # OF HRS/WEEK | VACATION HRS REMAINING |

6. **Salary Compensation Information**

| ANNUAL $ | SEMI MONTHLY $ | PART TIME RATE $ | COLA $ | STAFF LEVEL | OVERTIME ELIGIBILITY ☐ Yes ☐ No | COMMISSION ELIGIBILITY ☐ Yes ☐ No |
|---|---|---|---|---|---|---|

7. **Hourly Compensation Information**

| HOURLY RATE OF PAY $ | SHIFT | LONG HAUL DRIVER ☐ Yes ☐ No | EXPRESS DRIVER ☐ Yes ☐ No |
|---|---|---|---|

8. **Suspend From / Return To Payroll**

FMLA SENT ☐ Yes ☐ No     DATE FMLA SENT

Reason for Suspension:
☐ LO – Layoff
☐ ML – Military Leave
☐ FL – Family Leave
☐ WC – On the Job Injury
☐ PL – Pregnancy Leave

☐ LA – Leave of Absence
☐ DI – Off the Job Illness or Injury
☐ SC – Salary Continuation

☐ RW – Return to Work

9. **Terminate (Remove) From Payroll**

☐ T – Voluntary Term
☐ F – Involuntary Term
☐ W – Workers Comp (over 6 mos.)
☐ I – Disability (over 6 mos.)

☐ M – Military (over 6 mos.)
☐ S – Severance
☐ D – Death
☐ R – Retirement

| LAST DAY WORKED | PAY THROUGH DATE | VACATION HOURS TO PAY |
|---|---|---|
| BONUS TO PAY $ | SEVERANCE TO PAY $ | ELIGIBLE FOR REHIRE ☐ Yes ☐ No | COBRA EVENT ☐ Yes ☐ No |

10. **Comments** (i.e. reason for change)

_1-week off to return 3-24-03_

**Minix - 41**

11. **GM Approval**

| APPROVED BY GENERAL OR CORPORATE MANAGER _Pat A.f_ | DATE _3/12/03_ |
|---|---|

12. **VP Approval**

| APPROVED BY VICE PRESIDENT | DATE |
|---|---|

PRL 21-11A:12/2000

# EXHIBIT 42

# EMPLOYEE CHANGE NOTICE

**JELD-WEN**

**1. Effective Date of Change** 3-31-03    ☑ Hourly    ☐ Salary

**2.**

EMPLOYEE NAME *Lorena Minix*

JELD-WEN COMPANY NAME *Jeld-Wen Roanoke, Al*

COMPANY CODE & NUMBER *ON    026*

SOCIAL SECURITY NUMBER

TIME CLOCK NUMBER / EMPLOYEE NUMBER *848*

**3. Employee Information** (This section to be completed only if changes are made to employee name, address or phone number.)

| EMPLOYEE NAME (Name as it appears on Social Security Card. A copy of the Social Security Card is REQUIRED to make a name change.) | | PREFERRED FIRST NAME |
| --- | --- | --- |
| ADDRESS | CITY | STATE | ZIP CODE |
| COUNTY | COUNTRY | PHONE NUMBER ( ) | |

**4. Martial Status Change**    ☐ Single to Married    ☐ Married to Single

| SPOUSE NAME | PREFERRED FIRST | DATE OF BIRTH |
| --- | --- | --- |
| SPOUSE SOCIAL SECURITY NUMBER | SPOUSE PHONE NUMBER ( ) | IS SPOUSE A JELD-WEN EMPLOYEE? ☐ Yes  ☐ No |

**5. Job Status Change / Company Transfer** (If no change, please indicate "n/c")

| TRANSFER FROM COMPANY | | TRANSFER TO COMPANY | |
| --- | --- | --- | --- |
| WORKERS COMP CODE | NEW JOB TITLE | UNION AFFILIATION | DIVISION VP |
| TY NUMBER | CHECK SORT CODE | GL NUMBER | OLD BENEFIT TYPE CODE | NEW BENEFIT TYPE CODE | SCHEDULED # OF HRS/WEEK | VACATION HRS REMAINING |

**6. Salary Compensation Information**

| ANNUAL $ | SEMI MONTHLY $ | PART TIME RATE $ | COLA $ | STAFF LEVEL | OVERTIME ELIGIBILITY ☐ Yes  ☐ No | COMMISSION ELIGIBILITY ☐ Yes  ☐ No |
| --- | --- | --- | --- | --- | --- | --- |

**7. Hourly Compensation Information**

| HOURLY RATE OF PAY $ | SHIFT | LONG HAUL DRIVER ☐ Yes  ☐ No | EXPRESS DRIVER ☐ Yes  ☐ No |
| --- | --- | --- | --- |

**8. Suspend From / Return To Payroll**

FMLA SENT  ☐ Yes  ☐ No    DATE FMLA SENT

Reason for Suspension:
☐ LO – Layoff
☐ ML – Military Leave
☐ FL – Family Leave
☐ WC – On the Job Injury
☐ PL – Pregnancy Leave
☐ LA – Leave of Absence
☐ DI – Off the Job Illness or Injury
☐ SC – Salary Continuation
☑ RW – Return to Work

**9. Terminate (Remove) From Payroll**

☐ T – Voluntary Term
☐ F – Involuntary Term
☐ W – Workers Comp (over 6 mos.)
☐ I – Disability (over 6 mos.)
☐ M – Military (over 6 mos.)
☐ S – Severance
☐ D – Death
☐ R – Retirement

| LAST DAY WORKED | PAY THROUGH DATE | VACATION HOURS TO PAY |
| --- | --- | --- |
| BONUS TO PAY $ | SEVERANCE TO PAY $ | ELIGIBLE FOR REHIRE ☐ Yes  ☐ No | COBRA EVENT ☐ Yes  ☐ No |

**10. Comments** (i.e. reason for change)

*Return from layoff   3-31-03.*

**Minix - 42**

**11. GM Approval**

APPROVED BY GENERAL OR CORPORATE MANAGER *Jose Mendez Jr*    DATE *3/31/03*

**12. VP Approval**

APPROVED BY VICE PRESIDENT    DATE

PRL 21-11A:12/2000

# EXHIBIT 43

EEOC Form 5 (5/01)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 130-2004-04389 |
| | and EEOC |

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| Lorena Minix | (334) 863-4522 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 119 Lebanon Street Roanoke, AL 36274 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| JELD WEN MILLWORK | 15 - 100 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 235 Millwork Industrial Drive,  Roanoke, AL 36274 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 09-01-2001 | 07-01-2004 |
| ☐ CONTINUING ACTION | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began my employment on September 10, 2001, as a Daydo Machine Operator.  On a couple of occasions, I went out with my supervisor and was involved sexually during 2001 and early 2002.   My supervisor approached me and wanted to renew the personal involvement and I refused.  On a continuous basis and throughout 2004 until approximately August of 2004, I was subjected to unwelcome hugging, rubbing and touching of my body and suggestions that I come to his house for sex.

I believe I have been discriminated against because of my sex, female, and in retaliation for rejecting the continued sexual advances of my supervisor. I believe this to be in violation of Title VII of the Civil Rights Act of 1964, as amended.

Amended charge - original charge filed November 30, 2004

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| X 12-13-04   X _Lorena Minix_  Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year ) |

Minix - 43

# EXHIBIT 44

# JELD-WEN
## Harassment Training
### Attendance Acknowledgement

Facility: Jeld-Wen
Millwork Mfg
Roanoke, Alabama

Date: 7/24/03

| | Name | Signature | Division | |
|---|---|---|---|---|
| 1 | Pat Galvez | Pat Hz | Jeld-Wen Moulding | |
| 2 | Dennis Shelnutt | Dennis Shelnutt | & Millwork Division | |
| 3 | Mike Weathers | Mike Weathers | | |
| 4 | Phillip Smith | Phillip Smith | | |
| 5 | Lorena Minix | Lorena Minix | | |
| 6 | LISA Cook | Lisa Cook | | |
| 7 | Katherine Conger | Katherine Conger | | |
| 8 | Curtis Kendrick | Curtis Kendrick | | |
| 9 | Frank Fetner | Frank Fetner | | |
| 10 | Leigh Williams | Leigh Williams | | |
| 11 | Robert Davis | Robert Davidson | | |
| 12 | Christie Sanders | Christie Sanders | | |
| 13 | Roni S Giles | Roni S Giles | | |
| 14 | TERRY Knight | Jerry Knight | | |
| 15 | Theresa Messer | Theresa Messer | | |
| 16 | Kathy Thornton | Kathy Thornton | | |
| 17 | GARFIELD Clark | Garfield Clark | | |
| 18 | Danny Creathous | Danny Greathouse | | |
| 19 | David Hill | David Hill | | |
| 20 | Luther Phillips | Luther Phillips | | |
| 21 | Rodney Sanders | Rodney Sanders | | |
| 22 | Patrick F Williams | Patrick F Williams | | |
| 23 | Anthony Mendora | Anthony Mendora | | |
| 24 | Luther McCray | Luther McCray | | |
| 25 | Kenneth Bowen | Kenneth Bowen | | |
| 26 | Melissa Brooks | Melissa Brooks | | |
| 28 | Belinda Morgan | Belinda Morgan | | |
| 29 | Towanna Zachery | Towanna Zachery | | |
| 30 | Tammie Wood | Tammie Wood | | |
| 31 | Kim Shelnutt | Kim Shelnutt | | |
| 32 | William R Kellen | | | |
| 33 | Elizabeth Cook | | | |

Three Employees
that complained on
12-13-04.
Took the Seminar!

**Minix - 44**

JELD-WEN

**Harassment Training**

**Attendance Acknowledgement**

Facility: _____     Date: 7/24/03

| | Name | Signature | |
|---|---|---|---|
| 33 | Ronald Bower | Ronald Bower | Jeld-Wen Moulding |
| 34 | Joe Mendoza | Joe Mendoza | & Millwork Division |
| 35 | Richard Fetner | | Millwork |
| 36 | | | |
| 37 | | | |
| 38 | | | |
| 39 | | | |
| 40 | | | |
| 41 | | | |
| 42 | | | |
| 43 | | | |
| 44 | | | |
| 45 | | | |
| 46 | | | |
| 47 | | | |
| 48 | | | |
| 49 | | | |
| 50 | | | |

# EXHIBIT 69

# YOU HAVE A RIGHT TO FILE A CHARGE OF DISCRIMINATION

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## BIRMINGHAM DISTRICT OFFICE

### CHARGE QUESTIONNAIRE

**This Form Is Affected By The Privacy Act Of 1974; Read The Last Page Before Completing This Form.**

**PLEASE READ THE FOLLOWING INFORMATION BEFORE PROCEEDING:**

* A charge must be filed with the EEOC within 180 days after the alleged unlawful practice has occurred (300 days, if the employer is within the jurisdiction of a Fair Employment Practice Agency – If you are a state employee or you worked in Richmond County).
* The employer must have 15 or more employees if the alleged unlawful practice falls under Title VII of the Civil Rights Act and the Americans With Disabilities Act; 20 employees if the alleged unlawful practice falls under the Age Discrimination In Employment Act and 2 employees if the alleged unlawful practice falls under the Equal Pay Act.
* Federal employees should file with their Agency EEO Counselor, unless the unlawful practice falls under the Equal Pay Act.

Please complete this questionnaire and return it to the Receptionist. You will be interviewed by an Investigator to determine if your employment situation falls within the jurisdiction of the EEOC. Be prepared to spend up to approximately three hours here today. Interviews are conducted on a first-come, first-served basis. Thank you for your patience and cooperation.

### PLEASE PRINT

NAME *Lorena Minix*　　　　DATE OF BIRTH _____

ADDRESS *119 Lebanon St.*

CITY *Roanoke*　　STATE *Al*　ZIP *36274*　COUNTY *Randolph*

TELEPHONE *334 863 4522*　CELL/PAGER _____

YOUR RACE *White*　　YOUR SEX : FEMALE ___✓___ MALE _____

SS _____

**PAGE 2**

**WHAT DAY(S) AND TIME(S) ARE YOU AVAILABLE BY TELEPHONE BETWEEN THE HOURS OF 8:30 AM AND 5:00 PM?** 4:30 p.m

**CONTACT PERSON: (SOMEONE AT A DIFFERENT ADDRESS AND TELEPHONE NUMBER WHO KNOWS WHERE YOU CAN BE REACHED)**

NAME Keith Minix          TELEPHONE

ADDRESS Main St.

CITY Roanoke          STATE Al. ZIP 36274

**ARE YOU REPRESENTED BY AN ATTORNEY? IF SO, PROVIDE HIS/HER NAME AND TELEPHONE NUMBER:**

NAME D Leigh Love          TELEPHONE 205 835-1644

## PLEASE ANSWER THE FOLLOWING QUESTIONS

DATE OF YOUR EMPLOYMENT 9-10-2001 JOB AT TIME OF HIRE Daydo Machine *(wood machine)*

Same JOB AT TIME OF DISCRIMINATORY ACTION Daydo Machine

**I BELIEVE I WAS DISCRIMINATED AGAINST BY: (CHECK THOSE THAT APPLY)**

COMPANY_____ UNION (Give Local Number)_____ EMPLOYMENT AGENCY _____

NAME (Richard Fetner) Jeld-Wen millwork

ADDRESS _____ Roanoke al.

CITY, STATE, ZIP _____

TELEPHONE 334 863 7717 APPROXIMATE NO. OF EMPLOYEES 60

NAME _____

ADDRESS _____

CITY, STATE, ZIP _____

TELEPHONE _____ APPROXIMATE NO. OF EMPLOYEES _____

WHAT IS THE BUSINESS OF YOUR EMPLOYER Doors + Brick molde

Page 3

**PROVIDE THE NAME OF THE COMPANY OFFICIAL (OWNER, PRESIDENT OR PERSONNEL DIRECTOR)**

NAME  Dan ?                    TITLE _____

YOUR BEST RECOLLECTION OF THE MOST RECENT DATE OF THE DISCRIMINATORY ACTIONS TAKEN

BY THE EMPLOYER  August 1 2004

DO YOU BELIEVE THE ACTION WAS TAKEN AGAINST YOU BECAUSE OF ANY ONE (OR MORE) OF THE

CATEGORIES LISTED BELOW?  ✓ YES _____ NO   (IF YES, CIRCLE THE ONE(S) THAT APPLY)

RACE, COLOR, (SEX) RELIGION, NATIONAL ORIGIN, AGE, RETALIATION OR DISABILITY (SPECIFY)

_____

**SPECIFIC DISCRIMINATORY ACTION: (CIRCLE THE ONE(S) THAT APPLY)**

DISCHARGE; HIRING; LAYOFF; RECALL; SUSPENSION; PROMOTION; RETIREMENT (INVOLUNTARY);

WAGES; HARASSMENT; (SEXUAL HARASSMENT) OTHER (SPECIFY)_____

PROVIDE A BRIEF EXPLANATION OF THE DISCRIMINATORY ACTION TAKEN AGAINST YOU:

Always asking to go get some Beer
and come to his house an have Sex,
touching, wanting to see my ~~boobs~~ Breast,
If you bend over he alway says how good it loo

WHAT REASON(S) WERE YOU GIVEN FOR THE ACTION TAKEN  None

_____

_____

WHY DO YOU THINK THE ACTION BY THE EMPLOYER WAS DISCRIMINATORY?_____

I feel used, I'm afraid to go to him
for enything afraid of what he may do
to me, such as touching or ask me out for Sex
or some kind of ~~an~~ sexual Comment.
This man is my Supervisor

Page 4

IF YOUR ISSUE OF DISCRIMINATION IS HIRING OR PROMOTION, LIST THE POSITION YOU WERE

SEEKING ___None_____

~~PROVIDE THE NAME & JOB TITLE OF THE PERSON IN THE SAME OR SIMILAR SITUATION WHO WAS~~

~~TREATED MORE FAVORABLE THAN YOU (Identify this person by race, sex, religion, national origin or age)~~

NAME_____ JOB TITLE_____

_____

_____

PROVIDE THE NAME(S) AND TELEPHONE NUMBERS OF THE WITNESS(ES) WHO YOU THINK CAN
PROVIDE EVIDENCE IN SUPPORT OF YOUR ALLEGATIONS OF DISCRIMINATION.

NAME _Lisa Cook_____ TELEPHONE NUMBER_____

_Brenda Sims_____

_Linda Sims_____ 334 863-7336_____

_Mary Lou Laws_____

_Cathy ?_____

PROVIDE A DESCRIPTION OF THE INFORMATION THAT EACH PERSON LISTED ABOVE CAN SUBMIT IN
SUPPORT OF YOUR ALLEGATIONS.

_hugging me, talking Sexual thing_____

_____

_____

_____

WHAT RELIEF ARE YOU SEEKING THROUGH THE EEOC?_____

_____

## YOU HAVE A RIGHT TO FILE A CHARGE OF DISCRIMINATION

I SWEAR OR AFFIRM THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT TO THE BEST OF MY
KNOWLEDGE.

SIGNATURE _Lorena Money_____ DATE _8-20-2004___

# EXHIBIT 71

# CASE LOG

(Continue on Reverse)

Charge No. 302004-04389    Respondent _Old Wm Millwork_    Charging Party _Larena Minix_

| Date | Action | Entered | Reviewed/ |
|------|--------|---------|-----------|
| 082004 | P6 visited office along w/ two other female ees that worked at above referenced employer. P6 had engaged in a Consensual relationship w/ R. P6 seemed to become upset w/ alleged harasser upon learning that he was involved w/ other ees. P6 states that when she wanted to be left alone and asked him to stop. Writer of Cease date. | | |
| 110904 | P6 called wanted to go ahead & file cg | | |
| 111804 | Drafted E mailed cg to P6 | Bne | |
| 13004 | P6 returned cg signed but on a separate | | |

document indicated that she did not
have a consensual relationship
~~she~~ called CP & informed that if
~~charge was not true she should~~
not have signed. She mailed
another 1210 changing the wording
of consensual.

120804 Mailed 131   w/out chg

1216.04  Served of recd

,2.28.04   T M C assessed B to ADR

12.29.04   Mailed 131 chg   ADR

03/02/05 Forwarding file from the mediation unit to
an enforcement unit. Attempts at Informal resolution reached
an impasse.

# EXHIBIT 73



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205
(205) 212-2148
TTY (205) 212-2112
FAX (205) 211-2105

*Mr. Matt White*
*Attorney at Law*
*Adams, Umbach, Davidson & White*
*P. O. Box 2069*
*Opelika, AL 36803-2069*

*Reference:* *Lorena Minix v JELD-WEN, Inc.*
*Charge No. 130 2004 04389*

*Dear Mr. White:*

*The above-referenced charge has been assigned to me for investigation. This correspondence is submitted in reference to your client's charge of employment discrimination filed on the basis of sex, female and retaliation.*

*Based upon my analysis of the material and testimony which your client presented and information obtained from other sources, I have concluded that it is unlikely that further investigation of your client's charge would result in a finding that the law was violated, as alleged.*

*Your client alleged that she was discriminated against because of her sex, female and retaliation, inasmuch as, she was sexually harassed by her supervisor. Your client alleges that she was discriminated against because of her sex, female, and retaliation, which is in violation of Title VII of the Civil Rights Act of 1964, as amended.*

*Evidence from the Respondent indicates that the Company took immediate and appropriate action upon receiving the complaint from your client. Evidence further shows that the Respondent immediately terminated the employment of the alleged harasser, Richard Fetner. Finally, Respondent contends that your client suffered no tangible injury.*

*Your client has not provided sufficient evidence to show that the company did not take immediate action to rectify the problem once she complained to management.*

*If your client has additional information or evidence which was not submitted previously, please provide to me by April 28, 2005. You can send the information to me at the address above, fax (205) 212-2105 or contact me at (205) 212-2070. If you come to the office without making an appointment, I may or may not be able to see you.*

**Minix - 73**




*In the event that I do not hear from you, I will recommend that the charge be dismissed, that your client be issued a Notice of Right to Sue and that the Commission consider this matter closed.*

*Sincerely,*

*April 19, 2005*
*Date*

*Devoralyn J. McGhee*
*Investigator*