# EXHIBIT H

## DEPOSITION EXCERPTS OF BRENDA SIMS

# FREEDOM COURT REPORTING

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3        EASTERN DIVISION
4
5  CIVIL ACTION NO.: 3:05-cv-685-T
6  LORENA MINIX, et al.,
7        Plaintiffs,
8        vs.
9  JELD-WEN, INC., and
10  RICHARD FETNER,
11        Defendants.
12
13        S T I P U L A T I O N
14     IT IS STIPULATED AND AGREED by and
15  between the parties through their respective
16  counsel, that the deposition of Brenda Sims
17  may be taken before Angela Smith, RPR, CRR,
18  at the offices of McNeal & Douglas, at 1710
19  Catherine Court, Ste: B, Auburn, Alabama
20  36831, on the 11th day of April, 2006.
21
22  DEPOSITION OF BRENDA SIMS
23

Page 2

1     IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the reading
3  of the deposition by the witness is waived,
4  the deposition to have the same force and
5  effect as if full compliance had been had
6  with all laws and rules of Court relating to
7  the taking of depositions.
8     IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10  any objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties
13  may make objections and assign grounds at
14  the time of the trial, or at the time said
15  deposition is offered in evidence, or prior
16  thereto.
17     IT IS FURTHER STIPULATED AND
18  AGREED that the notice of filing of the
19  deposition by the Commissioner is waived.
20
21  * * * * * * * * * * * * *
22
23

Page 3

1  * * * * * * * * * * * * *
2        I N D E X
3        EXAMINATION
4                PAGE
5  By Mr. Scofield ..................... 10
6  DEFENDANT'S EXHIBITS
7                PAGE
8  Ex. 1 - Copy of Ms. Sims'
9        driver's license and SS
10        number ................... 13
11  Ex. 2 - Ms. Sims' GED certificate .. 32
12  Ex. 3 - The interrogatories ........ 34
13  Ex. 6 - Map of the layout of the
14        JELD-WEN plant ........... 44
15  Ex. 4 - Medical records from
16        Woodland Clinic .......... 65
17  Ex. 5 - 7/21/98 medical record ..... 71
18  Ex. 7 - 4/19/00 medical records
19        with Woodland Clinic ..... 76
20  Ex. 8 - 8/7/00 medical record
21        from Woodland Clinic ..... 78
22  Ex. 9 - 5/7/01 medical record
23        from Woodland Clinic ..... 78

Page 4

1  Ex. 10 - 3/1/02 medical record
2        from Woodland Clinic ..... 79
3  Ex. 11 - 11/32/03 medical record
4        from Woodland Clinic.  .. 80
5  Ex. 11-A - 4/20/04 medical
6        record.  ................ 85
7  Ex. 12 - 5/14/04 Express
8        documents ................ 87
9  Ex. 13 - 4/28/04 application for
10        employment at JELD-WEN ... 92
11  Ex. 14 - 5/10/04 Employee
12        Orientation ............. 111
13  Ex. 15 - Pages 4 through 8 ........ 112
14  Exs. 16 and 17 - Acknowledgments
15        of receipt of polices ... 121
16  Ex. 18 - 6/1/04 form signed for
17        W-4 Forms ............... 122
18  Ex. 19 - 6/1/04 for for health
19        plan .................... 122
20  Ex. 20 - 5/26/04 medical record ... 123
21  Exs. 21 and 22 - Employee
22        Handbook tests .......... 125
23  Ex. 23 - A document from APS ...... 130

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1  Ex. 24 - Survey taken by APS ...... 134
2  Ex. 25 - 6/27/05 telephone
3      interview ............... 135
4  Ex. 26 - 5/13/05 Propex documents . 139
5  Ex. 27 - Application for
6      employment at Emerson ... 140
7  Ex. 28 - 6/20/05 employment
8      document ............... 142
9  Ex. 29 - 11/7/05 Emerson
10     orientation checklist ... 143
11 Ex. 30 - 11/23/04 Charge of
12     Discrimination .......... 144
13 Ex. 31 - Charge of Discrimination . 157
14 Ex. 32 - The police report ........ 174
15 Ex. 34 - 6/29/04 note to pay five
16     hundred dollars ......... 176
17 Ex. 33 - The complaint filed
18     against Ms. Sims ........ 179
19 Ex. 35 - 8/3/04 order requiring
20     Ms. Sims to appear for
21     trial ................... 180
22 Ex. 36 - Medical record from
23     Woodland Health Clinic .. 182

Page 6

1  Ex. 37 - 8/30/04 medical record ... 183
2  Ex. 38 - 9/1/04 medical record .... 185
3  Ex. 39 - 10/9/04 letter to the
4      EEOC ................... 186
5  Ex. 40 - 10/13/04 EEOC case log ... 190
6  Ex. 41 - 10/22/41 medical record .. 205
7  Ex. 42 - 11/18/04 medical record .. 206
8  Ex. 43 - A medical record ......... 210
9  Ex. 43-A - 2/05 medical record .... 210
10 Ex. 43-B - Medical record for
11     kidney ailment at
12     Wedowee ................. 211
13 Ex. 43-C - 11/3/05 medical record . 211
14 Ex 43-D - 2/21/06 medical record .. 212
15 Ex. 44 - 4/19/05 letter to
16     Mr. White ............... 213
17 Ex. 45 - EEOC Dismissal and
18     Notice of Rights ........ 214
19 Ex. 46 - 11/28/04 letter from
20     Industrial Relations ... 216
21 Ex. 47 - Letter from Industrial
22     Relations Re: Roanoke
23     job ..................... 217

Page 7

1  Ex. 48 - Severance and Release
2      Package ................. 219
3  Ex. 49 - 10/13/04, Mr. Fetner's
4      last day of work
5      document ................ 222
6      * * * * * * * * * * * *

Page 8

1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3          EASTERN DIVISION
4
5  CIVIL ACTION NO.: 3:05-cv-685-T
6  LORENA MINIX, et al.,
7          Plaintiffs,
8          vs.
9  JELD-WEN, INC., and
10 RICHARD FETNER,
11         Defendants.
12 BEFORE:
13     ANGELA SMITH, Commissioner.
14 APPEARANCES:
15     JAMES B. DOUGLAS, JR., ESQUIRE, of
16 MCNEAL & DOUGLAS, 1710 Catherine Court, Ste:
17 B, Auburn, Alabama 36831, appearing on
18 behalf of the Plaintiff.
19     SCOTT J. SCOFIELD, ESQUIRE, of
20 SCOFIELD, GERARD, SINGLETARY & POHORELSKY,
21 1114 Ryan Street, Lake Charles, Louisiana
22 70601, appearing on behalf of the Defendant,
23 JELD-WEN, inc.

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

## Page 9

1  APPEARANCES (continued):
2      MICHAEL THOMPSON, ESQUIRE, of
3  LEHR, MIDDLEBROOKS, PRICE & VREELAND, 2021
4  3rd Avenue N., Birmingham, Alabama 35203,
5  appearing on behalf of the Defendant,
6  JELD-WEN, inc.
7      ALSO PRESENT: Dan Hees
8          Lorena Minix
9          * * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23

## Page 10

1      I, ANGELA SMITH, RPR, CRR, a Court
2  Reporter of Wetumpka, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Federal Rules of Civil
5  Procedure and the foregoing stipulation of
6  counsel, there came before me at the offices
7  of McNeal & Douglas, 1710 Catherine Court,
8  Ste: B, Auburn, Alabama 36831, beginning at
9  10:41 a.m., Brenda Sims, witness in the
10  above cause, for oral examination, whereupon
11  the following proceedings were had:
12      BRENDA SIMS,
13  being first duly sworn, was examined and
14  testified as follows:
15      COURT REPORTER:  Usual
16  stipulations?
17      MR. SCOFIELD:  Yes, ma'am.  If
18  it's okay for opposing counsel.
19      MR. DOUGLAS:  That's fine.
20      EXAMINATION
21  BY MR. SCOFIELD:
22      Q.   Ms. Sims, state your full name
23  and address, please.

## Page 11

1      A.   Brenda Sims, 3552 County Road
2  30, Roanoke, Alabama.
3      Q.   And what's your middle name?
4      A.   Joyce.
5      Q.   Joyce?  So, Brenda Joyce Sims?
6      A.   Uh-huh.
7      Q.   Yes?
8      A.   Yes.
9      Q.   You were here for Lorena's
10  deposition?
11      A.   Yes.
12      Q.   You listened to Lorena's.  You
13  know everybody at the table?  You know Dan
14  Hees?
15      A.   Yes.
16      Q.   Same rules.  I don't mean to
17  be rude.  I'm taking care of her business.
18  If I ask you a question, it's very common
19  for people to say uh-huh, yeah, uh-huh.
20  When I move my hand like that, it means you
21  have to verbalize your answer.  I'm not
22  trying to be rude.  I'm trying to help her
23  out.

## Page 12

1      I'm here to represent -- I
2  represent JELD-WEN.  Mike Thompson and I
3  represent JELD-WEN.  And y'all sued us and
4  are asking them for some money.  And I'm
5  here to ask you questions about it.
6      My rules are pretty simple.
7  I'm sure your attorney knows this, we'll
8  take a break any time you want.  Just say:
9  I want to take a break.
10      If I ask a question that you
11  do not understand because I mumble or got
12  the wrong word in there somewhere, stop me
13  and say:  Sir, you, hey you, whatever, I
14  didn't understand the question.  Otherwise,
15  I'm going to assume you did.  And when you
16  answer the question, it has to be under
17  oath.  Is that okay?
18      A.   Yes.
19      Q.   Okay.  Now, are you presently,
20  today, on any type of medication that would
21  affect your memory?
22      A.   No.
23      Q.   Okay.  Are you on any

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1    A.    Griffin, Georgia.
2    Q.    Is that close to Roanoke?
3    A.    No.
4    Q.    All right. And the church you
5    go to, if you do?
6    A.    I go to the Peyron sometimes.
7    Q.    Can you spell that for me,
8    please?
9    A.    I don't know.
10   Q.    Okay. Is it located in
11   Roanoke?
12   A.    Yes.
13   Q.    And how big is the
14   congregation?
15   A.    Probably twenty-five people.
16   Q.    Okay. And do you have a
17   pastor or anybody within this church that
18   provides any type of counseling to its
19   congregation?
20   A.    Not as I know of.
21   Q.    What's that?
22   A.    Not as I know of.
23   Q.    Okay. Now, you're not related

Page 30

1    to Linda Sims?
2    A.    No.
3    Q.    In any way?
4    A.    No.
5    Q.    Do you spell your names
6    differently, your last names?
7    A.    No.
8    Q.    It just -- It's a common name,
9    and y'all just happen to share a common
10   name?
11   A.    Yeah.
12   Q.    Now, is Linda a good friend of
13   yours?
14   A.    I consider her a friend.
15   Q.    Now, is she the type -- Is
16   Linda the type of friend that you would call
17   after work or go do something with or just
18   call to talk?
19   A.    Yes.
20   Q.    Lorena, is she pretty much the
21   same way?
22   A.    Yes.
23   Q.    Of the people who worked at

Page 31

1    JELD-WEN when you were there, who were your
2    best friends? And I'm not talking about at
3    work, just outside of work, that you would
4    like to hang out with, call or talk or
5    gossip or whatever people do.
6    A.    I don't know.
7    Q.    Don't know?
8    A.    No.
9    Q.    Okay.
10   A.    I mean --
11   Q.    Would Lorena and Linda be up
12   there?
13   A.    Yeah. Lorena, Linda, and I
14   guess that's it.
15   Q.    Okay. All right. Did you
16   attend high school?
17   A.    Yes.
18   Q.    Where did you attend high
19   school?
20   A.    Handley.
21   Q.    Handley. All right. What
22   county is that in?
23   A.    Randolph.

Page 32

1    Q.    Randolph. And did you
2    graduate?
3    A.    No.
4    Q.    But you later did get your
5    GED?
6    A.    Yes.
7          (Defendant's Exhibit 2 was
8          marked for identification
9          purposes.)
10   Q.    All right. Let me show you
11   this. It's marked as Exhibit Number 2. Is
12   this your, I guess, certificate that you got
13   your GED?
14   A.    Yes.
15   Q.    All right. Is the information
16   on there accurate, to your knowledge?
17   A.    Yes.
18   Q.    So, you graduated in 2005?
19   A.    Yes.
20   Q.    In what month, do you recall?
21   A.    Oh, I don't remember.
22   Q.    Okay. And you -- You had a
23   GPA of 3.19, is that on a four-point scale?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 37 |
|---|

1    Q.    Yes, ma'am.  What county or
2  what Federal Court?
3    A.    I really don't.  I don't know.
4    Q.    And you did settle the case?
5    A.    Yes.
6    Q.    Okay.  When did you settle it?
7    A.    I believe I settled in '97,
8  '98.
9    Q.    Okay.  Did that -- At that
10  time, did you have to go through this
11  process like we're going through now?  Did
12  you have to sit down and have a lawyer ask
13  you questions for hours upon end?
14    A.    When we filed the lawsuit?
15    Q.    At any time during that
16  lawsuit.
17    A.    Just -- Just our lawyer, when
18  we went to him.
19    Q.    He just interviewed you?
20    A.    Right.
21    Q.    And then you didn't have to
22  have the other side's lawyer -- Dow-Corning
23  lawyer come in and talk to you?

| Page 38 |
|---|

1    A.    No.
2    Q.    And ask you a bunch of
3  questions about your life?
4    A.    No.
5    Q.    Okay.  Can you tell me how
6  much you got in your settlement?
7    A.    Three thousand.
8    Q.    You should have hired that
9  lawyer from Texas.  Okay.  Now, it also says
10  here you sued a man by the name of Danny
11  Knowles.
12    A.    Yes.
13    Q.    All right.  For what?
14    A.    For messing my trailer up.
15    Q.    Okay.  Now, was he a renter of
16  yours?  You were the landlord and he was the
17  lessee, tenant?
18    A.    He was renting to own.
19    Q.    Okay.  Oh, I see.  You sold
20  him a trailer, one of these rent-to-own
21  deals?
22    A.    Yes.
23    Q.    And then he quit paying?

| Page 39 |
|---|

1    A.    Yes.
2    Q.    And then you sued him for back
3  rent and messing up your trailer?
4    A.    Some stuff that he sold from
5  my trailer.
6    Q.    Stuff he sold from your
7  trailer?
8    A.    Yes.
9    Q.    I'm sorry, did you say sold or
10  stole?
11    A.    Sold.
12    Q.    Okay.  And did you file that
13  lawsuit yourself or did you hire a lawyer?
14    A.    I hired a lawyer.
15    Q.    And who was your lawyer?
16    A.    Y'all called his name
17  yesterday.
18    Q.    You heard his name yesterday?
19    A.    Yeah.
20    Q.    Zachary?
21    A.    No.
22    Q.    Oliver?
23    A.    No.  He was from Roanoke, but

| Page 40 |
|---|

1  he's not there anymore.
2    Q.    Okay.  But you hired a lawyer?
3    A.    Yes.
4    Q.    And when did that lawyer leave
5  Roanoke?
6    A.    When?
7    Q.    Yeah.  Had that lawyer left
8  Roanoke before y'all filed this lawsuit?
9    A.    No.  It was after.
10    Q.    Okay.  And do you know where
11  that lawyer went?
12    A.    No, I don't.
13    Q.    Okay.  All right.  Did you get
14  a judgment against this guy, Mr. Knowles?
15    A.    Judgment?  What do you mean?
16    Q.    I mean, the Judge ordered him
17  to pay some money?
18    A.    Yes.
19    Q.    Okay.  So you won the case?
20    A.    Yes.
21    Q.    All right.  Did you file
22  criminal charges against Danny Knowles?
23    A.    No.

10  (Pages 37 to 40)

# FREEDOM COURT REPORTING

Page 45

1    Now, when you went to work for
2  JELD-WEN, was this pretty much the same
3  set-up? Please look on the second page.
4  I'm sorry.
5    A.    (Witness complies.)
6    Q.    Was this pretty much the same
7  setup it was where you worked?
8    A.    Yes.
9    Q.    Okay. Now, Lorena testified
10 that you worked in this area I'm going to
11 mark X; is that correct?
12   A.    Yes.
13     MR. DOUGLAS: Hold on, Brenda.
14 Can you see where he's marking?
15     THE WITNESS: Yes.
16   Q.    I want to make sure. Please,
17 I mean, we'll do whatever we can. I just
18 want to make sure that you and Lorena are on
19 the same wavelength.
20   A.    Yeah.
21   Q.    Or that I'm on the same
22 wavelength as you and Lorena.
23   A.    Yeah.

Page 46

1    Q.    All right. And that this area
2  under the X was called the cutting area; is
3  that correct?
4    A.    I guess.
5    Q.    Okay. Do you know what they
6  did in this area?
7    A.    They done something to the
8  boards. I don't know.
9    Q.    But you never worked in there?
10   A.    Yes, I did.
11   Q.    Oh, you did work in there?
12   A.    Yes.
13   Q.    All right. Now, what did you
14 do in the cutting area?
15   A.    I cut bad places out of the
16 wood.
17   Q.    All right. And what kind of
18 machinery did they have in the cutting area?
19   A.    They had the saws. And then I
20 worked on the saw. I don't know what you
21 call it.
22   Q.    Now, where I marked an X, they
23 had -- Lorena testified that this is where

Page 47

1  the dado machine was.
2    A.    Yes.
3    Q.    What other machines were in
4  the X part?
5    A.    Routers.
6    Q.    Routers?
7    A.    Yes.
8    Q.    Dado, routers?
9    A.    Yes. And then another little
10 machine, I don't know what you call it,
11 where you cut the ends of the board.
12   Q.    All right. Now, if you go
13 back to the front page of this document,
14 now, if you look at the very top, left-hand
15 side, there's a picture of an empty
16 warehouse. Is that where the dado machines
17 were and where Lorena worked?
18   A.    Yes.
19   Q.    Okay. And then in between
20 where the dado machines were and the cutting
21 area, there was a divider?
22   A.    Yes.
23   Q.    Okay. You couldn't see

Page 48

1  through it?
2    A.    No, you couldn't.
3    Q.    Okay. Now, it's my
4  understanding that there was an office in
5  this building to the left of -- on the page,
6  to the left of where the dado machines were
7  and the cutting area was; is that correct?
8    A.    Yes.
9    Q.    And the time you worked there,
10 Pat Galvez and Roxie Giles worked in a
11 two-story office upstairs?
12   A.    Yes.
13   Q.    Would it be this little thing
14 right here (indicating)?
15   A.    Yes.
16   Q.    All right. So you had Pat and
17 Roxie. I misspelled her name, but it's
18 close enough. Then you had -- On the bottom
19 floor, you had about right here (indicating)
20 was Richard's office; is that correct?
21   A.    Yes.
22   Q.    Richard Fetner?
23   A.    Yes.

12  (Pages 45 to 48)

Page 49

1  Q.  If I drew that line right
2  there and put Richard, that would be
3  accurate?
4  A.  Yes.
5  Q.  All right.  And you had a wall
6  that separated the dado machine so that Pat
7  and Roxie could not see into the dado
8  machine?
9  A.  No.
10  Q.  Could Pat and Roxie, from
11  where they were, see into the cutting area?
12  A.  No.
13  Q.  Okay.  Now, what was in this
14  room that Pat and Roxie were next to?
15  A.  They were saws.  I don't know
16  what you call them.
17  Q.  Did you ever work in there?
18  A.  Yes.
19  Q.  Okay.  Can I just put saws?
20  A.  Uh-huh.
21  Q.  All right.  And anything else
22  in there?  Saws?
23  A.  A glue machine.

Page 50

1  Q.  Glue machine.  All right.  So,
2  am I correct to say that you worked in the
3  cutting area and the dado machine area and
4  where the saws and glue machines are?
5  A.  Yes.
6  Q.  Did you work in the paint
7  room?
8  A.  One time.
9  Q.  Okay.  And that's right here
10  where it says:  Paint room?
11  A.  Yes.
12  Q.  Okay.  Now, did you have to
13  work out here outside any of these three
14  buildings in the storage area?
15  A.  No, I didn't.
16  Q.  Okay.  Now, did you work with
17  Cathy Thornton?
18  A.  No.
19  Q.  Did you work with Lisa Cook?
20  A.  Yes.
21  Q.  Okay.  Where did you work with
22  Lisa Cook?
23  A.  In the — Where you've got the

Page 51

1  X right there.
2  Q.  The X?
3  A.  Right.
4  Q.  I'll just put dado.  Is that
5  okay with you?
6  A.  Fine.
7  Q.  Dado and router?
8  A.  Yes.
9  Q.  And what else did you say?
10  A.  There was another one, but I
11  don't know what it was called.
12  Q.  Okay.  That's fine.  And
13  another machine?
14  A.  Yes.
15  Q.  Okay.  So, you worked with
16  Lisa Cook in there?
17  A.  Yes.
18  Q.  Did you ever witness Richard
19  do anything wrong to Lisa?
20  A.  Yes, I did.
21  Q.  All right.  And what did
22  Richard do, Fetner?
23  A.  He rubbed up the side of her

Page 52

1  breast.
2  Q.  Okay.  Under what context?  He
3  walked up to her and just grabbed it?
4  A.  He was standing there talking
5  to her, and he got close enough to where he
6  could touch her.
7  Q.  He just reached over and
8  touched her side?
9  A.  Yes.
10  Q.  Patting her breast?
11  A.  Rubbed her.
12  Q.  Okay.  And what did Lisa --
13  How did she respond to that?
14  A.  She moved away.
15  Q.  Okay.  Did she yell or scream
16  at him?
17  A.  No.
18  Q.  Okay.  Stacy Cook, where did
19  she -- Let's go back to Cathy Thornton.  Did
20  you ever work with Cathy Thornton?
21  A.  Not work with her, no.
22  Q.  I think I already asked you
23  that.  Lisa Cook did work at JELD-WEN?

# FREEDOM COURT REPORTING

Page 53

1    A.    She was gone when I got there.
2    Q.    Okay. Mary Lou Laws?
3    A.    Yes.
4    Q.    Now, that's the one that got
5  her finger cut off?
6    A.    Right.
7    Q.    Did you work with Mary Lou
8  Laws?
9    A.    Yes, I did.
10    Q.    And where did you work with
11  Mary Lou Laws?
12    A.    In the dado room.
13    Q.    Okay. And that's the only
14  place you worked with her?
15    A.    With her, yeah.
16    Q.    Okay. Now, did Mary Lou Laws
17  -- Did you witness anything Richard Fetner
18  did to her?
19    A.    No.
20    Q.    All right. Jackie Nelson, did
21  she work at JELD-WEN?
22    A.    No. I don't know.
23    Q.    Joe Mendoza?

Page 54

1    A.    He was gone when I got there.
2    Q.    Okay. Do you know where Lisa
3  Cook lives?
4    A.    No, I don't.
5    Q.    When is the last time you
6  spoke with her?
7    A.    Probably about two months ago.
8    Q.    Okay. And what was it about?
9    A.    Just see her in Wal-Mart.
10  Just casual talk.
11    Q.    Did you talk to her about this
12  lawsuit?
13    A.    No, I didn't.
14    Q.    Mary Lou Laws, when is the
15  last time you spoke with her?
16    A.    It's probably been seven or
17  eight months ago.
18    Q.    Okay. And did you talk to her
19  about how her finger is doing?
20    A.    Yes.
21    Q.    Okay. Did you talk to her
22  about this lawsuit?
23    A.    No, I don't -- I don't think I

Page 55

1  did.
2    Q.    Cathy Thornton, when was the
3  last time you spoke with her?
4    A.    A few weeks ago.
5    Q.    Did you talk to her about this
6  lawsuit?
7    A.    Yes, I did.
8    Q.    And what did y'all talk about?
9    A.    She asked me how it was going.
10    Q.    And what did you tell her?
11    A.    I just told her we had got the
12  letter to come down here.
13    Q.    All right. If you don't mind,
14  let's go back to interrogatory number four.
15  And these are the names of the companies
16  that you worked for before you started
17  working for JELD-WEN.
18         I'm not going to talk about
19  the first two. That's too long ago. First
20  three, really. But let's start at the
21  fourth one down, Candlewick Yarns.
22    A.    Yes.
23    Q.    You worked there from '73 to

Page 56

1  '75 the first time?
2    A.    Yes.
3    Q.    And then you quit to have
4  children?
5    A.    To stay at home with my son.
6    Q.    Okay. Which son?
7    A.    My oldest one.
8    Q.    Okay. And then you went to go
9  work for Handley Mills from '76 to '77, and
10  the mill closed?
11    A.    Yes.
12    Q.    So everybody was laid off?
13    A.    Yes.
14    Q.    All right. And do you know
15  why it was laid off -- Excuse me, I mean,
16  why the mill was closed?
17    A.    No.
18    Q.    You weren't a part of that
19  decision-making process?
20    A.    No.
21    Q.    All right. Then you go back
22  to work for Candlewick Yarns in '79 to '82?
23    A.    Yes.

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1    Q.    And, again, you left to stay
2    at home with, I guess, your second son?
3    A.    Yes.
4    Q.    All right. Then you went to
5    go work for Stephanie Fashions?
6    A.    Yes.
7    Q.    And you worked there for five
8    years?
9    A.    Yes.
10   Q.    And what did you do there?
11   A.    I pressed. And then I was a
12   service girl.
13   Q.    Okay. I'm sorry, what is a
14   service girl?
15   A.    You give work to the other
16   women.
17   Q.    Okay. So, you were kind of a
18   leader, or foreman or something?
19   A.    No. I just gave them their
20   work.
21   Q.    All right. And you left there
22   to go back to -- Well, you left there to go
23   back to Candlewick; is that correct?

Page 58

1    A.    Yes.
2    Q.    And you worked at Candlewick
3    from '89 to '90?
4    A.    Yes.
5    Q.    And then it shut down?
6    A.    No.
7    Q.    Or you were terminated?
8    A.    Yes.
9    Q.    Terminated for lack of
10   production. Was it -- What does that mean?
11   A.    I wasn't making production. I
12   wasn't getting as much out as they thought I
13   should.
14   Q.    Okay. Was that a type of
15   place where you had to get certain numbers
16   of things down -- out per hour?
17   A.    Yes.
18   Q.    Or per time increment?
19   A.    Per eight hours.
20   Q.    Per eight hours. And they
21   didn't feel like you were meeting your
22   quota?
23   A.    Right.

Page 59

1    Q.    And you were let go?
2    A.    Right.
3    Q.    Did you think that they were
4    wrong? Or was there something going on that
5    you --
6    A.    Yes. I had went through my
7    first divorce.
8    Q.    Oh, so your divorce interfered
9    with your work here?
10   A.    Yes.
11   Q.    Okay. I understand that.
12   Then you got a job working for Wehadkee
13   Yarns?
14   A.    Wehadkee.
15         (Off-the-Record discussion
16         was held.)
17   Q.    Wehadkee Yarns. And you
18   worked there from June 1992 to May of 2004,
19   that's twelve years?
20   A.    Yes. Almost thirteen.
21   Q.    And the plant closed?
22   A.    Yes.
23   Q.    And everybody was laid off?

Page 60

1    A.    Yes.
2    Q.    And do you know why the plant
3    closed? Did you have any part in that
4    decision-making process?
5    A.    No.
6    Q.    All right. Now, was either
7    Candlewick Yarns or Wehadkee Yarns, are they
8    pretty good-sized companies, had their
9    corporate offices elsewhere?
10   A.    Yes. Now, Candlewick, I can't
11   remember where their office was. But it was
12   a big corporation.
13   Q.    Okay.
14   A.    And Wehadkee was in -- I
15   believe it was West Point, Georgia.
16   Q.    Okay. Did either one of those
17   have a sexual harassment policy?
18   A.    Yes.
19   Q.    Okay. Pretty much the same
20   thing you had at JELD-WEN?
21   A.    Yes.
22   Q.    All right. Did you have any
23   problems understanding the sexual harassment

15  (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 61

1 policies Candlewick and Wehadkee had?
2     A.    No.
3     Q.    All right. While you were
4 working at either one of these places,
5 Candlewick or Wehadkee, did you ever make a
6 charge of sexual discrimination?
7     A.    No.
8     Q.    Did you see anybody or hear of
9 anybody make a charge?
10     A.    No.
11     Q.    Okay. Did they assure you at
12 both places that if you do make a charge,
13 that you would not be retaliated against?
14     A.    I don't never — I don't
15 remember ever hearing anything like that.
16     Q.    Okay. Do you know what
17 retaliation means?
18     A.    To get back at someone.
19     Q.    Okay. All right. Can you go
20 to number five? It says that — Strike
21 that.
22           While you worked for
23 Candlewick Yarns and Wehadkee, did you ever

Page 62

1 witness anyone that you believed was either
2 racially discriminated against or sexually
3 discriminated against?
4     A.    No.
5     Q.    While you were there, did
6 anybody make any racial discrimination
7 claims?
8     A.    Not to my knowledge.
9     Q.    Not to your knowledge. Okay.
10 Now, last date you worked at JELD-WEN was in
11 November of 2004?
12     A.    Yes.
13     Q.    This was after the plant was
14 shut down?
15     A.    They were just — just
16 starting to lay people off.
17     Q.    Okay. Now, I understand they
18 laid people off in October, about half the
19 plant in October of 2004, and the remainder
20 of the plant in, what, end of November 2004,
21 does that sound about right to you?
22     A.    I don't know.
23     Q.    Okay. They laid everybody

Page 63

1 off?
2     A.    Yes. Sooner or later.
3     Q.    Yeah. Okay. You then went to
4 go work for some company called Amoco
5 Fabrics?
6     A.    Yes.
7     Q.    Where is that? That's in
8 Roanoke?
9     A.    In Roanoke.
10     Q.    All right. And you were
11 getting paid nine bucks an hour there?
12     A.    Yes.
13     Q.    And you quit?
14     A.    Yes.
15     Q.    Why is that?
16     A.    I was having to work from four
17 to twelve. And I had asked for the swing
18 shift and they wouldn't let me have it.
19     Q.    Okay. Then you went to go
20 work for Emerson Company?
21     A.    Yes.
22     Q.    And that's in LaGrange?
23     A.    Yes.

Page 64

1     Q.    Is that -- That's where you
2 work now?
3     A.    Yes.
4     Q.    And how much do you make there
5 now?
6     A.    Nine-seventy-one.
7     Q.    Okay. At JELD-WEN, what did
8 you start off making, do you recall?
9     A.    I really — It was seven
10 something. I don't know if it was just
11 seven dollars or a little bit more.
12     Q.    Does seven-forty-nine an hour
13 sound about right?
14     A.    Yeah. About right.
15     Q.    At any time, did your pay get
16 reduced at JELD-WEN?
17     A.    No.
18     Q.    Okay. Have you gotten any
19 raises at either Emerson -- at Emerson,
20 since you started there?
21     A.    Yes.
22     Q.    Is it a cost-of-living raise
23 or a merit raise?

16  (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 69

1    A.    In '70. 1970.
2    Q.    1970. Okay. And had you been
3  taking -- Who was the doctor that gave you
4  nerve pills?
5    A.    I believe his name was
6  Dr. Lewis. That's all I can remember.
7    Q.    Okay. And where was he from?
8    A.    LaGrange. Clark-Holder
9  Clinic.
10   Q.    Excuse me?
11   A.    Clark-Holder Clinic.
12   Q.    And do you know what kind of
13  -- What is your -- Strike that.
14         What is your definition of
15  nerve pills?
16   A.    Something to calm you.
17   Q.    Okay. And do you, like
18  Lorena, see a distinction between nerve
19  pills and antidepressants?
20   A.    There's a little difference.
21   Q.    Okay. And what is the
22  difference, to you?
23         MR. DOUGLAS: Object to the

Page 70

1  form of the question, to the extent it calls
2  for knowledge that's beyond her knowledge
3  base, but you can answer.
4    Q.    Certainly. Just tell me what
5  you know, if you don't know, say I don't
6  know.
7    A.    I don't know.
8    Q.    All right. Has anyone ever
9  explained to you the difference between the
10  two?
11   A.    No. Not that I can remember.
12   Q.    Okay. And do you know the
13  names or the types of nerve pills you were
14  taking?
15   A.    No.
16   Q.    Valium, Xanax, anything like
17  that?
18   A.    No.
19   Q.    And did you take -- From 1970
20  to 1998, did you take nerve pills off and on
21  or on a regular basis?
22   A.    No. I had to take them for
23  about a year.

Page 71

1    Q.    Okay.
2    A.    It was more or less for
3  thyroid problems.
4    Q.    Thyroid. Okay. Okay. So you
5  took them one time in 1970. Then the next
6  time you took any type of pills for any type
7  of emotional difficulties was when you were
8  going through a divorce, and that was with
9  Dr. Caypless?
10   A.    The best I can remember.
11   Q.    The best you can remember?
12   A.    Yes.
13         (Defendant's Exhibit 5 was
14          marked for identification
15          purposes.)
16   Q.    Okay. Let's talk about Number
17  5. On 7/21/98, again you come in with some
18  sort of nasal, respiratory problem. And
19  then the doctor says -- And I'm not --
20  spontaneous epistasis of uncertain
21  causation. Do you know what that is?
22   A.    No, I don't.
23   Q.    All right. But he does

Page 72

1  diagnose you as depression.
2         MR. DOUGLAS: Is that a
3  question?
4    Q.    Yeah. Does he diagnose you as
5  depression?
6    A.    Yes.
7    Q.    Okay. And, again, this
8  episode in '98, do you have a -- was it
9  traced to the divorce?
10   A.    Yes.
11   Q.    All right. Were you
12  complaining about the Paxil not working?
13   A.    Yes. I didn't like the way it
14  made me feel.
15   Q.    Okay. And what about it that
16  you didn't like?
17   A.    It just made me feel doped up.
18   Q.    Okay. And then the
19  Dr. Caypless was going to give you some
20  Xanax, what -- that's for your anxiety or
21  tension? Again, this was on July 21, 1998.
22   A.    Yes.
23   Q.    He also says on there -- And

18  (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 77

1  Wellbutrin helped in the past. Did he —
2  Did the doctor refill your prescription for
3  Wellbutrin at this time?
4              MR. DOUGLAS: It's Wellbutrin,
5  I believe.
6      Q.    Wellbutrin.
7      A.    I really don't know.
8      Q.    If you look down at the
9  bottom, it looks like the word "Prozac", is
10 that something you may have been taking at
11 that time?
12     A.    I took it one time.
13     Q.    Okay. And didn't like it?
14     A.    I didn't like it.
15     Q.    And the doctor's impression of
16 you, you were still depressed; is that
17 correct? Is that depression down at the
18 bottom?
19     A.    I guess.
20     Q.    All right. Did — And
21 assuming this was 4/19/2000, what did you
22 have to be depressed over? Can you trace it
23 to anything?

Page 78

1      A.    I don't know.
2              (Defendant's Exhibit 8 was
3              marked for identification
4              purposes.)
5      Q.    Number 8. This is a medical
6  record from Woodland Clinic dated August 7,
7  2000. At this time, you're still being
8  diagnosed as depressed, and you have
9  problems with the stuffy nose, drainage from
10 the sinus and things of that nature?
11     A.    Yes.
12             (Defendant's Exhibit 9 was
13             marked for identification
14             purposes.)
15     Q.    Okay. Number 9. This is
16 dated, from Woodland Clinic, May 7, 2001.
17 It says: Intermittent — Do you know if
18 this is talking about your complaints, your
19 intermittent, recurrent something something
20 pain radiating to back? Do you recall what
21 that was about?
22     A.    No, I don't.
23     Q.    Nausea, complaining about

Page 79

1  nausea and a fever?
2      A.    Probably gallbladder.
3      Q.    Gallbladder. Okay. And it's
4  impression that you had a leaking silicon
5  breast implant. Is that something, again,
6  you were concerned about?
7      A.    Yes.
8      Q.    And this was Dr. Stewart this
9  time; is that correct?
10     A.    No.
11     Q.    It's not?
12     A.    Yeah, I guess it was. It's
13 got Stewart on there. I seen him one time,
14 but that was the only time I remember.
15             (Defendant's Exhibit 10
16                 was marked for
17                 identification purposes.)
18     Q.    Okay. Number 10, please.
19 Again, it's Woodland Clinic, 3/1/02. Again,
20 you're complaining about sinus problems,
21 stuffy head, and you need prescription
22 refills. This time he put you on Zoloft, if
23 you look down at the bottom.

Page 80

1      A.    Yes.
2      Q.    And Zoloft is an
3  antidepressant?
4      A.    Yes.
5      Q.    And do you have any reason or
6  cause to know why you're still depressed?
7      A.    No. It's a chemical
8  imbalance.
9      Q.    That's fine. Is that what the
10 doctor told you, or that's what you read
11 about or believe?
12     A.    Well, it's a known fact,
13 depression is caused from a chemical
14 imbalance.
15     Q.    Okay. And that's what you
16 believe is your problem, you have a chemical
17 imbalance?
18     A.    Yes.
19     Q.    Okay. The Zoloft, did that
20 help you better than the other depression
21 pills you had taken before?
22     A.    I really don't remember.
23             (Defendant's Exhibit 11

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1     A.   In '99.
2     Q.   '99. Okay. Still fish, read,
3  have hobbies?
4     A.   Yes.
5         (Defendant's Exhibit 11-A
6            was marked for
7            identification purposes.)
8     Q.   Okay. Now, I don't -- I don't
9  recall this Exhibit Number 11-A, I'll show
10 it to Counsel. And I probably need to -- I
11 think they go together. I must have missed
12 this one. This is dated 4/20. We'll call
13 it 11-A.
14        If you don't mind, I don't
15 have an extra copy so I'll just have to ask
16 questions on that. And I put 11.5 which is
17 kind of stupid, but I'll put: Change to
18 11-A. This is dated 4/20/04, Wedowee
19 Hospital Clinic. Now, is this a different
20 set of doctors than you had been going to?
21    A.   It's a different set of
22 doctors, but they're all in together.
23    Q.   Okay. Is it a different

Page 86

1  location?
2     A.   Yes.
3     Q.   All right. They're just
4  associated with each other?
5     A.   Yes.
6     Q.   All right. Now, you had to
7  fill out a form on this clinic on the second
8  page, on Exhibit 11-A, as of 4/20/04, again,
9  thyroid disease, depression, family history,
10 and you circled it; correct?
11    A.   Yes.
12    Q.   And it showed the other pills
13 you were taking, the aspirin for the heart
14 and the vitamin E and things of that nature;
15 correct?
16    A.   Yes.
17    Q.   Okay. Thank you. And the
18 location of this hospital clinic is
19 different than the other one, Woodland
20 Clinic?
21    A.   Yes.
22    Q.   Okay. But they're connected?
23    A.   Yes.

Page 87

1     Q.   And how are they connected, to
2  your knowledge?
3     A.   Well, I don't know how you
4  would -- how you would call it. I think one
5  or two of the doctors may go to the
6  Woodland.
7     Q.   I see. So, it's a satellite
8  office? One is the satellite office of the
9  other?
10    A.   I really don't know how they
11 do that, but they're connected.
12    Q.   But is there any reason why
13 you went to this different hospital?
14    A.   I couldn't get an appointment
15 with my regular doctor.
16        (Defendant's Exhibit 12
17           was marked for
18           identification purposes.)
19    Q.   Good deal. Let's go to 12.
20 Now, this is my understanding that you
21 worked for a temp agency called Express?
22    A.   Yes.
23    Q.   And the temp agency assigned

Page 88

1  you to JELD-WEN; is that correct?
2     A.   Yes.
3     Q.   And that -- Can you recognize
4  the signature? Is that your signature:
5  Associate's Signature on 5/14/04?
6     A.   Yes.
7     Q.   Is that about the time you
8  started working at JELD-WEN, through
9  Express, or roughly?
10    A.   Yeah. Close to it.
11    Q.   I mean, one or two months off,
12 one way or the other?
13    A.   A couple of days.
14    Q.   Okay. A couple of days. All
15 right. Now, authorized signature, do you
16 know who that is? It appears to me it's Pat
17 Galvez, but I don't know if you recognize it
18 one way or the other?
19    A.   I don't know.
20    Q.   Do you know who the manager
21 was at that time?
22    A.   I thought it was Richard.
23    Q.   Okay. Do you know who Richard

22  (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 89

1  reported to?
2      A.    Not right then, I didn't.
3      Q.    Okay.  But at some point in
4  time, you found out that -- or did you find
5  out that Pat Galvez was ahead of -- above
6  Richard?
7      A.    No.  Pat didn't stay but about
8  a week after I went to work.
9      Q.    Mr. Hees, do you know him?
10      A.    Yes.
11      Q.    All right.  Did he come by the
12  plant on an occasional basis?
13      A.    Yes.
14      Q.    About how often?
15      A.    I seen him about once a month.
16      Q.    Okay.  And what would he do?
17      A.    Just walk through.
18      Q.    Would he talk to employees?
19      A.    I didn't see him talk to any.
20      Q.    Okay.  You didn't see him talk
21  to Linda?
22      A.    Not at first.
23      Q.    Or at any time?

Page 90

1      A.    Later on.
2      Q.    Later on.  Okay.  Did you know
3  where Dan Hees worked?
4      A.    Not really.
5      Q.    Okay.  If the records show
6  that Pat Galvez worked until the middle or
7  toward the latter part of July of 2005,
8  would you have any reason to disagree with
9  that?
10      A.    No.  2005?
11      Q.    I'm sorry.  2004.  You're
12  right.  July of 2004.
13      A.    Yeah.
14      Q.    Do you think he worked until
15  then, Pat Galvez?
16      A.    He probably worked there until
17  then, but he wasn't there the whole time.
18      Q.    Okay.  Where would he go, to
19  your knowledge?
20      A.    When I first went to work, he
21  worked there a week, then he took vacation.
22      Q.    Okay.  For how long?
23      A.    I'm not sure.

Page 91

1      Q.    Okay.
2          MR. DOUGLAS:  I'm sorry,
3  Scott, can you give me two minutes?
4          MR. SCOFIELD:  Sure.
5          (Recess taken.)
6      Q.    How long had you worked for
7  Express?
8      A.    How long?
9      Q.    Uh-huh.  And let me just ask
10  you this.  How does this work?  You work for
11  Express, and then they assign you various
12  places to work on a temporary basis?
13      A.    The company, JELD-WEN, went
14  through Express to hire people.
15      Q.    Oh, I see.  So, when you
16  worked for Express, the only company you
17  ever worked for, for Express, was JELD-WEN?
18      A.    No.
19      Q.    Okay.  Can you tell me some
20  other companies?
21      A.    Emerson.
22      Q.    Emerson.  That's where you
23  work now?

Page 92

1      A.    Yes.
2      Q.    I see.  You work for Emerson
3  now?
4      A.    Yes.
5          (Defendant's Exhibit 13
6          was marked for
7          identification purposes.)
8      Q.    Okay.  Now, this is dated, I
9  believe, April 28, '04.  And the previous
10  document was dated in May of '04.  This is
11  an application for employment for JELD-WEN
12  at -- I guess at some point in time, you
13  wanted to go from working for Express to
14  JELD-WEN full time, like you did Emerson?
15      A.    Well, you had to put in an
16  application at JELD-WEN.
17      Q.    Just to work for JELD-WEN,
18  through Express?
19      A.    Yes.
20      Q.    Okay.  So, this would have
21  been probably about the time you started
22  working for JELD-WEN, or a little after
23  this, through Express?

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1    A.    I guess.
2    Q.    Let me ask you, this might
3 make it a little easier. When you worked
4 for Express, did you get paychecks from
5 Express or JELD-WEN?
6    A.    Express.
7    Q.    Okay. And at some point in
8 time, you started getting a paycheck from
9 JELD-WEN?
10    A.    Yes.
11    Q.    Okay. Do you know about when
12 that was, when you started getting your
13 paycheck from JELD-WEN?
14    A.    I don't remember.
15    Q.    Now, this application for
16 employment you filled out and signed on
17 April 28, 2004?
18    A.    Yes.
19    Q.    All right. And you mentioned
20 that you have names on the front page, it
21 says: Names of friends or relatives at this
22 company. You said: Lorena Minix; is that
23 correct?

Page 94

1    A.    Yes.
2    Q.    And a Cathy — I think that's
3 Cathy. Is that Cathy?
4    A.    That's not my handwriting.
5    Q.    That's not your handwriting.
6 Okay. And you got your high school, Handley
7 and your GED; is that correct?
8    A.    Yes.
9    Q.    Okay. And you had a GED as of
10 — in 2004?
11    A.    I was studying for it.
12    Q.    Studying for it. Okay. And
13 return to the second page. You have Lorena
14 Minix as a reference?
15    A.    Yes.
16    Q.    And why would you have Lorena
17 Minix as a reference to work for — on your
18 application to try to work for JELD-WEN?
19    A.    She was a friend.
20    Q.    Okay. And did — What did
21 Lorena say about JELD-WEN to you to get you
22 to try to apply for it?
23    A.    I don't remember.

Page 95

1    Q.    Did you talk -- Did you talk
2 to Lorena, your friend, and ask her
3 permission to put her name down as a
4 reference?
5    A.    I don't remember that.
6    Q.    Okay. Did you ask Lorena how
7 she liked working at JELD-WEN?
8    A.    I don't remember that.
9    Q.    Do you recall her saying
10 anything negative about JELD-WEN, or Richard
11 Fetner, at this time?
12    A.    No.
13    Q.    Do you believe, the way your
14 mind works, that if Lorena, as of April 28,
15 2004, had told you that Richard Fetner was
16 sexually harassing her, that that's
17 something you would have remembered?
18    A.    Yes.
19    Q.    All right. And to this day,
20 you don't remember whether or not Lorena
21 told you that she had been sexually harassed
22 by Richard Fetner as of April 28, 2004?
23    A.    No, she didn't.

Page 96

1    Q.    She didn't tell you that?
2    A.    No.
3    Q.    Okay. And you believe that if
4 Lorena did tell you that, that Richard
5 Fetner was sexually harassing her as of
6 April 28, 2004, would you have not worked
7 for JELD-WEN?
8    A.    No, I wouldn't have.
9    Q.    Okay. I'd like to go quickly
10 back to Exhibit Number 6, which is the
11 outline of the places you worked. And what
12 I'd — Do you have any independent
13 recollection as to where you worked at any
14 time period, given time period, when you
15 first started working for JELD-WEN/Express,
16 where you worked?
17    A.    Yes. I worked here
18 (indicating).
19    Q.    Okay. That would be the —
20 what we called the saws and the glue
21 machine?
22    A.    No, that — No.
23    Q.    That would be what?

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1    A.    No, it was here (indicating).
2  In the cutting area.
3    Q.    The cutting area?
4    A.    Yeah.
5    Q.    All right.  And who worked in
6  the cutting area, then?
7    A.    Tooty.
8    Q.    Tooty Zachary?
9    A.    I don't know.
10   Q.    Whatever Tooty's last name is?
11   A.    Yeah.
12   Q.    Okay.
13   A.    And then there were some guys.
14  I don't know their names.
15   Q.    Okay.  Can you describe them?
16   A.    They were black guys.
17   Q.    Black guys?
18   A.    Yeah.
19   Q.    Did you get along with them
20  very well?
21   A.    Yeah.  No problem.
22   Q.    Okay.  And who was the leadman
23  or lead person in the cutting area?

Page 98

1    A.    As far as I know, we didn't
2  have one.
3    Q.    Okay.  And who -- Who was the
4  group leader who supervised that area?  Was
5  that Mr. Fetner?
6    A.    Yes.
7    Q.    All right.  Now, where did you
8  work after the cutting -- Did you have any
9  problems doing the work in the cutting area?
10   A.    No.
11   Q.    All right.  Where else did you
12  work after that?
13   A.    I went to the dado room.
14   Q.    Okay.  And which machines did
15  you work on there?
16   A.    The router.
17   Q.    Router.  And did you have any
18  problems working on the router machine?
19   A.    No.
20   Q.    All right.  And who did you
21  work with?
22   A.    Lorena, Mary Lou, Lisa, Linda,
23  and --

Page 99

1    Q.    Linda Sims?
2    A.    Sims.
3    Q.    Your first cousin or sister?
4    A.    Yeah.  And Mike Weathers.
5    Q.    Mike?
6    A.    Weathers.
7    Q.    Weathers.  Okay.  And who was
8  your supervisor there?
9    A.    Richard.
10   Q.    Okay.  Who was the lead
11  person, leadman?
12   A.    Phil Shepherd.
13   Q.    Phil Shepherd?
14   A.    Yeah.  He set our machines up.
15   Q.    All right.  And how long did
16  you work at the dado, at the router machine?
17   A.    I don't -- Off and on.
18   Q.    Off and on?
19   A.    Yeah.
20   Q.    Okay.  Which one was harder,
21  you thought, the routing machine or the
22  cutting area?
23   A.    I don't know.  Both of them.

Page 100

1    Q.    All right.  Now, did you work
2  in this area where the saws and glue
3  machine?
4    A.    Sometimes.
5    Q.    Okay.  Who worked in there
6  with you, that you can recall?
7    A.    Most of the time, me and Linda
8  was put out there.
9    Q.    Linda?
10   A.    Sims.
11   Q.    Okay.  You did what out there?
12  You said you put out there.
13   A.    Linda usually run the machine
14  and I would stack the wood.
15   Q.    Okay.  And did you have any
16  problems doing that work?
17   A.    No.
18   Q.    And who was the lead person or
19  leadman in there?
20   A.    I don't know.
21   Q.    Who was the foreman or
22  supervisor?
23   A.    Richard.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 101

1    Q.    All right. Now, any other
2  place you worked?
3    A.    I worked in the paint room for
4  a day.
5    Q.    Okay. Now, how long did you
6  work in the paint room?
7    A.    Just about a half a day.
8    Q.    Did you have any problems
9  doing the work there?
10    A.    No.
11    Q.    All right. And no problems
12  doing the work on the saws or the glue
13  machine?
14    A.    No.
15    Q.    And who did you work with in
16  the paint room?
17    A.    Danny Greathouse.
18    Q.    Danny who?
19    A.    Greathouse.
20    Q.    Let's see. Do you know how to
21  spell his last name?
22    A.    I don't. I'm sorry.
23    Q.    Oh, Danny Greathouse. And no

Page 102

1  problems there?
2    A.    No.
3    Q.    And who was your supervisor
4  when you were working in there?
5    A.    Richard.
6    Q.    All right. Any other places
7  you recall working?
8    A.    I worked on the glue machine.
9    Q.    Okay. All right. Who did you
10  work with on the glue machine?
11    A.    I don't know who all those
12  people were.
13    Q.    Okay. Any problems working on
14  the glue machine?
15    A.    No.
16    Q.    Okay. Could you handle every
17  task that was given to you?
18    A.    Yes.
19    Q.    All right. Did you ever get a
20  chance to talk to Pat Galvez at all, during
21  safety meetings or anything like that?
22    A.    No.
23    Q.    Did you -- Did you have an

Page 103

1  opinion of him, what kind of man he was,
2  nice, mean?
3    A.    He seemed nice.
4    Q.    Seemed nice. Okay. Did
5  anybody at the -- while you worked there and
6  while Mr. Galvez worked there, say anything
7  good or bad about him that you can recall?
8    A.    About who?
9    Q.    Pat Galvez?
10    A.    Anybody say anything bad about
11  Pat?
12    Q.    Yeah.
13    A.    I didn't hear anybody say
14  anything bad about him.
15    Q.    Did anybody say anything good
16  about him, nice guy, anything like that?
17    A.    Yeah. Everybody said he was
18  nice.
19    Q.    Okay. Now, Roxie Giles, do
20  you know Roxie?
21    A.    Yes.
22    Q.    Did you get along with her
23  fairly well?

Page 104

1    A.    Yes.
2    Q.    What did she do?
3    A.    She was a secretary.
4    Q.    Do you consider her a friend
5  of yours?
6    A.    Yeah. A coworker friend.
7    Q.    Coworker friend?
8    A.    Yeah.
9    Q.    But you don't hang out with
10  her?
11    A.    No.
12    Q.    Or go to the same church with
13  her?
14    A.    No.
15    Q.    Let me ask you, is there
16  anybody in your congregation that you know
17  that used to work with JELD-WEN?
18    A.    Not that I know of.
19    Q.    All right. So if you felt
20  like you needed an explanation about your
21  paycheck or your insurance or anything like
22  that, time you have to work, you felt like
23  you could go talk to Roxie about that?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 105

1    A.    Yes.
2    Q.    Okay.  Tooty Zachary, same
3    thing, you liked her?
4    A.    Yeah.
5    Q.    Did you find her to be a
6    trustworthy person?
7    A.    Well, I didn't know her that
8    good.
9    Q.    Okay.  Patrick Williams, did
10   you know him?  Do you remember him at all?
11   A.    No.
12   Q.    At any time, did -- When you
13   worked there, did Mr. Fetner yell at any
14   employees for just kind of standing around,
15   not working?
16   A.    Yes.
17   Q.    Okay.  At one time or a lot of
18   times?
19   A.    A few times.
20   Q.    Okay.  When was the first
21   time?
22   A.    I don't really remember.
23   Q.    Do you know what part of the

Page 106

1    plant you were working in when that
2    happened?
3    A.    I don't remember.
4    Q.    Were you working with Lorena
5    when that happened?
6    A.    I don't think so.
7    Q.    Okay.  At any time, were you
8    -- that Fetner, I guess, got on to people
9    for not working, were you working with
10   Lorena or Linda Sims?
11   A.    Not that I can remember.
12   Q.    Not that you can remember.
13   Okay.  Who at JELD-WEN did you interview
14   with?
15   A.    Richard.
16   Q.    Anybody else?
17   A.    No.
18   Q.    Okay.  Was Richard nice to you
19   at the time?
20   A.    Yes.
21   Q.    During the interview process,
22   did he give you any indication that he --
23   that he wanted to have sex with you or any

Page 107

1    type of sexual, derogatory remark or
2    anything like that?
3    A.    Not at that time.
4    Q.    At that time, when you
5    interviewed for JELD-WEN, did Lorena -- had
6    you known about Lorena had previously dated
7    Mr. Fetner?
8    A.    No.
9    Q.    Had Lorena, at the time you
10   were interviewing for JELD-WEN, told you
11   about Donald Bowen?
12   A.    No.
13   Q.    Had Lorena ever told you about
14   Donald Bowen while you were working for
15   JELD-WEN?
16   A.    Yes.
17   Q.    Okay.  At what stage did she
18   -- did Lorena tell you about Donald Bowen?
19   A.    I can't remember.
20   Q.    Okay.  Was it before you spoke
21   with Dan Hees on October 13, 2004?
22   A.    I really don't remember.
23   Q.    Okay.  And what did Lorena say

Page 108

1    about Donald Bowen?
2    A.    Told me what he would do.
3    Q.    Pretty much what Lorena said
4    yesterday in her deposition?
5    A.    Yes.
6    Q.    All right.  Did Lorena tell
7    you, while you were working for JELD-WEN,
8    that JELD-WEN had sent a lawyer in from
9    Oregon to investigate Donald?
10   A.    Yes.
11   Q.    She told you that?
12   A.    Yes.
13   Q.    And you don't recall when she
14   told you that?
15   A.    No.
16   Q.    Did Lorena tell you that
17   Donald Bowen quit before he was fired?
18   A.    I don't -- You know, I don't
19   remember.
20   Q.    Okay.  Donald Bowen wasn't
21   working there when you were working there?
22   A.    No.
23   Q.    All right.  Did Lorena tell

27 (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1  you about a sexual harassment seminar that
2  was put on by a lawyer from Oregon because
3  of Donald Bowen?
4         MR. DOUGLAS: Object to the
5  form of that question, but go ahead, you can
6  answer.
7      Q.    Excuse me. It's Ronald Bowen.
8  What I'm talking about is Ronald Bowen. The
9  guy that Lorena was talking about. If I
10  said Donald I meant Ronald.
11     A.    The one that was --
12     Q.    The one that played with
13  himself. Okay. that's the one we're
14  talking about.
15     A.    Did she tell me the day after
16  that --
17     Q.    Let me start this over again,
18  because I'm bad with names, obviously. Did
19  Lorena tell you about Ronald Bowen and the
20  problems that he caused her by masturbating
21  in front of her?
22     A.    Yes.
23     Q.    All right. And do you recall

Page 110

1  when Lorena told you about Ronald Bowen?
2      A.    No.
3      Q.    All right. Did Lorena tell
4  you that Ronald Bowen had quit at JELD-WEN
5  after Lorena had complained about him?
6      A.    No.
7      Q.    But Lorena did tell you that
8  because of Ronald -- a complaint about
9  Ronald Bowen's activities, a lawyer from
10  Oregon came in to investigate; is that
11  correct?
12     A.    Yes.
13     Q.    All right. And did Lorena --
14  Lorena seem satisfied with the extent of the
15  investigation about the lawyer from Oregon?
16         MR. DOUGLAS: Object to the
17  form. You can answer.
18     Q.    Go ahead.
19     A.    Did she seem satisfied?
20     Q.    Yes. That JELD-WEN would
21  bring in a lawyer from Oregon to investigate
22  a complaint about Ronald Bowen.
23     A.    I don't know.

Page 111

1      Q.    Okay. That's a fair answer.
2  Now, Lorena did tell you about the sexual
3  harassment seminar, the slide show and Power
4  Point presentation?
5      A.    Yes.
6             (Defendant's Exhibit 14
7              was marked for
8              identification purposes.)
9      Q.    I'll show you Exhibit Number
10  14. This document numbered 14, and
11  entitled: New Employee Orientation, May 10,
12  '04, is that your signature down at the
13  bottom?
14     A.    Yes, it is.
15     Q.    Is that your initials to the
16  right?
17     A.    Yes, it is.
18     Q.    All right. Now, if you'll
19  look down at the bottom of the general
20  information, it says: Handbook Standards of
21  Conduct, pages four and five, and Your
22  Responsibilities, four and eight. Do you
23  see that?

Page 112

1      A.    Yes.
2      Q.    And then you got a -- Your
3  initials out next to the side of it?
4      A.    Yes.
5             (Defendant's Exhibit 15
6              was marked for
7              identification purposes.)
8      Q.    All right. I'll show you
9  Exhibit Number 15. Now, if you'll turn --
10  Is this what we're talking about, pages four
11  through eight that you got?
12     A.    I remember getting one of
13  these.
14     Q.    Okay. Now, if you go to the
15  third page, it's numbered number five, it's
16  the third page in front of you, do you see
17  that, where it says: Harassment Policy?
18     A.    Uh-huh.
19     Q.    All right. Now, if you would
20  like to read it again, that's fine. But I'd
21  like you to read it right now, not out loud,
22  but to yourself.
23         MR. DOUGLAS: How much do you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 113

1  want her to read, to the next section?
2       MR. SCOFIELD: Yeah. To the
3  section where it says: Wage and Assignments
4  and Garnishments.
5       Q.  Okay. Did you just read that
6  section entitled: Harassment Policy?
7       A.  Yes.
8       Q.  All right. Is there any part
9  about that you don't understand?
10      A.  No.
11      Q.  At the time you got this, back
12 in May 10, 2004, was there any part that you
13 didn't understand?
14      A.  No.
15      Q.  All right. Let's go to -- On
16 the second paragraph, under harassment
17 policy, it says: Harassment of any form
18 will not be tolerated by the company. Any
19 employee who violates this policy is subject
20 to discipline, up to and including
21 discharge. Do you see that?
22      A.  Yes, I do.
23      Q.  All right. Now, if you go to

Page 114

1  the top, right-hand side, over here
2  (indicating), it says: Employees will be
3  made aware of this policy and are encouraged
4  not to tolerate harassment.
5       Any employee who believes that
6  he/she is being subject to objectionable
7  conduct should promptly notify either their
8  immediate supervisor, their general or
9  corporate manager, vice president,
10 subsidiary president, or the legal
11 department; is that correct?
12      A.  Yes.
13      Q.  All right. Now, it's your
14 understanding that Mr. Fetner was your
15 supervisor, your immediate supervisor?
16      A.  Yes.
17      Q.  Above him was Pat Galvez,
18 until he left, to your knowledge?
19      A.  To my knowledge.
20      Q.  Okay. Then the man to my
21 right, Dan Hees, was above Mr. Fetner, is
22 that correct, and Mr. Galvez?
23      A.  Right.

Page 115

1       MR. DOUGLAS: Are you asking
2  does she know that now or did she know that
3  then?
4       Q.  Did you know that then?
5       A.  That Pat was over Richard?
6       Q.  Yes.
7       A.  Yes.
8       Q.  Okay. And did you know that
9  then?
10      A.  Yes.
11      Q.  Did you know that Dan Hees was
12 over Richard?
13      A.  I don't think I did at first.
14      Q.  Okay. But you knew he was
15 somebody -- What did you believe Dan did
16 when he came into the plant?
17      A.  I thought he was just somebody
18 to come in and look around, make sure
19 everything was good.
20      Q.  Okay. You didn't know Dan
21 Hees's title?
22      A.  Not at first.
23      Q.  All right. Now, you had the

Page 116

1  legal department telephone number; is that
2  correct?
3       A.  Yes.
4       Q.  And nothing could stop you
5  from calling that number; is that correct?
6       A.  Right.
7       Q.  All right. In fact, Lorena
8  had told you about a lawyer coming in from
9  Oregon to investigate Ronald Bowen's playing
10 with himself in front of Lorena; is that
11 correct?
12      A.  She told me later.
13      Q.  Okay. Well, while you worked
14 there?
15      A.  Right.
16      Q.  At what time did she tell you
17 -- Lorena tell you that?
18      A.  I really don't remember when
19 she told me.
20      Q.  Okay. All right. But, again,
21 is there anything -- any part about this --
22 Do you think if you wanted to find out who
23 Dan Hees was, you could go up and ask Roxie;

29  (Pages 113 to 116)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1 is that correct?
2     A.   Well, I asked somebody who he
3 was.
4     Q.   You did?
5     A.   Yeah.
6     Q.   Who did you ask?
7     A.   I don't remember.
8     Q.   And what did they tell you?
9     A.   That he was over Richard.
10     Q.   Okay. All right. And when
11 did this — When did you ask that?
12     A.   I don't know. After I had
13 seen him come in a couple of times.
14     Q.   All right. And he came in,
15 what, once every two weeks or so?
16     A.   About once a month, I believe.
17     Q.   All right. And you believe
18 you could ask Roxie Giles, who was the
19 corporate manager, or the vice president, or
20 the president of the company?
21     A.   I could have.
22     Q.   Okay. Or who to contact in
23 the legal department; correct?

Page 118

1     A.   I could have.
2     Q.   The paragraph below that says:
3 Every complaint of harassment will be
4 investigated promptly, thoroughly, fairly,
5 objectively. A written investigative report
6 will be completed for each complaint. And
7 the investigator will take detailed
8 statements from the person making the
9 complaint, the alleged harasser, the
10 harassee and the witnesses. Do you see
11 that?
12     A.   Yes, I do.
13     Q.   Did you understand that?
14     A.   Yes, I did.
15     Q.   All right. If you go to the
16 last sentence it says — Well, the last
17 paragraph says: If the information
18 collected during the investigation
19 establishes that harassment or other
20 objectional conduct did occur, disciplinary
21 action will be promptly taken against the
22 harasser. Do you understand that?
23     A.   Yes, I do.

Page 119

1     Q.   Okay. The last sentence says:
2 Employees will not be discriminated or
3 retaliated against for reporting harassment
4 or participating in an investigation. Do
5 you understand that?
6     A.   Yes, I do.
7     Q.   Okay. And what does that mean
8 to you?
9     A.   That there would be nothing
10 done to me.
11     Q.   That's correct. Okay. Did
12 you understand that when you worked for
13 JELD-WEN?
14     A.   Yes.
15     Q.   The whole time?
16     A.   Yes.
17     Q.   All right. Couple of
18 documents to go a little quicker. 16 and
19 17. Oh, I'm sorry. Won't go a little
20 quicker. Will you turn the page?
21     MR. DOUGLAS: What page?
22     MR. SCOFIELD: From the
23 Exhibit Number 15, on the bottom.

Page 120

1     MR. DOUGLAS: Page six?
2     MR. SCOFIELD: Page six.
3     Q.   It says: Keep the Company
4 Informed. And there's a list of seven
5 things that you're supposed to keep the
6 company informed on.
7     A.   Yes.
8     Q.   Okay. Do you understand all
9 that?
10     A.   Yes.
11     Q.   All right. And then there's a
12 safety section; is that correct?
13     A.   Uh-huh.
14     Q.   And there's, what, fifteen
15 things about safety you need to know; is
16 that correct?
17     A.   Yes.
18     Q.   And then there's cleanliness
19 and dos and don'ts; is that correct?
20     A.   Yes.
21     Q.   And then there's something up
22 here about substance abuse; is that correct?
23     A.   Yes.

## FREEDOM COURT REPORTING

Page 121

1    Q.    All right. And then there's a
2    Standards of Conduct on the first page; is
3    that correct?
4         MR. DOUGLAS:  Talking about on
5    page four?
6         MR. SCOFIELD:  Yes, sir.
7    A.    Yes.
8         (Defendant's Exhibits 16
9         and 17 were marked for
10        identification purposes.)
11   Q.    Okay. I'll show you 16 and 17
12   at the same time. 16 is your signature
13   dated May 28, 2004. And in it you say that
14   you have received the JELD-WEN's
15   Antiharassment Procedures and Guidelines to
16   understand its contents. And that's your
17   signature saying that you understand that;
18   correct?
19   A.    Yes.
20   Q.    All right. Same with Sims
21   Number 17, it's your acknowledgement and
22   agreements that you received a copy of the
23   JELD-WEN Employee Handbook and you

Page 122

1    understand it, it sets forth the terms and
2    conditions of your employment. That's your
3    signature indicating you understand that?
4    A.    Yes.
5         (Defendant's Exhibit 18
6         was marked for
7         identification purposes.)
8    Q.    Okay. Number 18. This is
9    your W — This is your signature dated June
10   1, 2004. It's your W-4 Form for JELD-WEN;
11   is that correct?
12   A.    Yes.
13   Q.    Would that have been — And,
14   again, I just don't know this, but would
15   this have been about the time you
16   technically started receiving a paycheck
17   from JELD-WEN, under JELD-WEN's name?
18   A.    I really don't know.
19   Q.    Roughly, around in there?
20   Could have been? I don't know.
21   A.    I really don't know.
22        (Defendant's Exhibit 19
23        was marked for

Page 123

1         identification purposes.)
2    Q.    Okay. That's good. Okay.
3    Number 19. Is your -- That's your signature
4    toward the middle -- on paragraph four,
5    dated June 1, 2004; is that correct?
6    A.    Yes.
7    Q.    And your husband's signature
8    dated June 4, 2004; is that correct?
9    A.    Yes.
10   Q.    Did your husband ever go by
11   JELD-WEN?
12   A.    Sometimes.
13   Q.    When was that?
14   A.    I don't remember. He went to
15   pick my check up.
16   Q.    Okay. And at this time, did
17   you get on JELD-WEN's, I guess, healthcare
18   plan?
19   A.    Yes.
20        (Defendant's Exhibit 20
21        was marked for
22        identification purposes.)
23   Q.    All right. Let's go to

Page 124

1    Exhibit Number 20. This is a — Let me ask
2    you something. This is a medical record
3    dated May 26, 2004. Is Dr. Bill, or
4    Dr. Caypless, is he an actual medical doctor
5    or is he a kind of --
6    A.    No. He's a —
7    Q.    Kind of like a Charlotte
8    Bishop?
9    A.    Yeah.
10   Q.    He's not an actual medical
11   doctor, he's kind of a nurse doctor type,
12   you know, the nurse practitioner?
13   A.    I think. I'm not sure,
14   really.
15   Q.    Came in on May 26, 2004,
16   nausea, stomach problems, lower back pain,
17   something else we're not going to talk
18   about, and they had same kind of bacterial
19   test on you, that H. Pylori?
20   A.    Yes.
21   Q.    Okay. And that's the same
22   thing that Lorena had, wasn't it?
23   A.    Yes.

31 (Pages 121 to 124)

# FREEDOM COURT REPORTING

Page 125

1  Q.  At this time, were you taking
2  any type of antidepressants still?
3  A.  I don't think so.
4      (Defendant's Exhibits 21
5      and 22 were marked for
6      identification purposes.)
7  Q.  Okay.  I'll show you 21 and
8  22.  21, it's my understanding, that you
9  took a test on the employee handbook, I
10  guess, Exhibit Number 16 or 15, that we
11  talked about?
12  A.  Yes.
13  Q.  Okay.  And the first time you
14  took the test you made a 52?
15  A.  Yes.
16  Q.  So, you missed 48?
17  A.  Yes.
18  Q.  But on paragraph fifteen, is
19  when they talk about the sexual harassment,
20  down at the bottom, you got them all
21  correct?
22  A.  Yes.
23  Q.  All right.  Now, this test is

Page 126

1  kind of designed to take tests on specific
2  parts of the book?
3      MR. DOUGLAS:  Object to the
4  form of that question.  You can answer.
5  Q.  Like, the book is set up,
6  like:  Signal System, Standards of Conduct
7  and Harassment Policy, Wage and Assignment,
8  Keep the Company Informed, Safety, it's
9  designed to make sure you answer questions
10  about each one of these sections?
11      MR. DOUGLAS:  Object to the
12  form.
13  Q.  To your knowledge?
14  A.  I really don't know.
15  Q.  Okay.  Would you go back to
16  Exhibit Number 22.  This time it's an August
17  18, 2004, you made an 85 on it; is that
18  correct?
19  A.  Yes.
20  Q.  And again you got paragraph
21  fifteen all correct; is that correct?
22  A.  Yes.
23  Q.  All right.  And how long did

Page 127

1  you study for these tests?
2  A.  I don't remember.
3  Q.  Okay.  What was your pay when
4  you got at JELD-WEN, when you became full
5  time?
6  A.  I believe it was -- I'm really
7  not sure.
8  Q.  Okay.  At any time, did it go
9  down?
10  A.  No.
11  Q.  In fact, did it go up while
12  you were there?
13  A.  Yes.
14  Q.  All right.  At the time you
15  left, was it about seven-fifty an hour?
16  A.  That sounds right.
17  Q.  Okay.  And were you ever given
18  a job that you couldn't handle?
19  A.  No.
20  Q.  Were you ever hurt on the job?
21  A.  One time.
22  Q.  How were you hurt?
23  A.  I messed my back up.

Page 128

1  Q.  Okay.  And when was that?
2  A.  I don't recall.
3  Q.  All right.  And how many days
4  did you miss?
5  A.  It seems like about three.
6  Q.  Three days.  Okay.  And did
7  you have a title or just a laborer, or does
8  that -- did they give you --
9  A.  I was supposed to been running
10  a router.
11  Q.  Running a router.  Okay.  All
12  right.  You were here yesterday for Lorena's
13  deposition?
14  A.  Yes.
15  Q.  Did you hear Lorena say that
16  she had heard rumors that the JELD-WEN plant
17  may close sometime in the year 2000?  That's
18  when she first heard the rumors?
19  A.  I heard her say that.
20  Q.  Okay.  When did -- Did you
21  ever hear those rumors?
22  A.  No.
23  Q.  Okay.  So, Lorena -- You don't

32  (Pages 125 to 128)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 129

1  recall you and Lorena talking about that?
2      A.    That was in 2000?
3      Q.    2003.
4          MR. THOMPSON:  You said 2000
5  the first time you said it.
6          MR. SCOFIELD:  I did.
7          MR. THOMPSON:  Yeah.
8      Q.    Do you recall Lorena saying
9  that she heard the plant was going to close
10 in the year 2003?
11     A.    We heard rumors.
12     Q.    Okay.  When you were working
13 at JELD-WEN, did you hear the same rumors?
14     A.    Right at the end.
15     Q.    Right at the end.  Okay.  Do
16 you know how much before the end that you
17 heard the rumors?
18     A.    I don't remember.
19     Q.    Okay.  Now, I think we talked
20 about this a little earlier.  Do you recall,
21 like, a month before you were laid off, the
22 number of people JELD-WEN laid off before
23 you got -- you left work?  Do you remember

Page 130

1  anything about that?
2      A.    There was just a few.  I don't
3  know how many.
4      Q.    Okay.  Did Dan Hees talk to
5  you about staying on for a period of time
6  after October or November, to work?
7      A.    No.
8      Q.    At all?  You don't remember
9  that?
10     A.    He didn't.
11         (Defendant's Exhibit 23
12          was marked for
13          identification purposes.)
14     Q.    Okay.  I'm showing you Exhibit
15 Number 23.  This was given to us by a
16 company called APS.  Do you know what that
17 stands for?
18     A.    No.
19     Q.    Is that your signature on the
20 third page of Exhibit Number 23?
21     A.    Oh, APS?
22     Q.    Yeah.  What did I say?
23     A.    I thought you said EPS.

Page 131

1      Q.    I may have.
2      A.    Yes.
3      Q.    What is APS?
4      A.    It's a staffing company.
5      Q.    It's kind of like an Express
6  that you worked for before?
7      A.    Kind of.
8      Q.    Okay.  All right.  Now, do you
9  see above your signature it asks you to:
10 Declare that all statements that you make
11 are true and correct, and understand that
12 false or inaccurate information on an
13 application will be grounds for termination?
14 Do you see that?
15     A.    Yes.
16     Q.    So, did you try to do your
17 best to make this information in here
18 correct and true?
19     A.    Yes, I did.
20     Q.    All right.  Now, let's go to
21 the second page.  It says, with reference to
22 JELD-WEN, that your position was woodwork;
23 is that correct?

Page 132

1      A.    Yes.
2      Q.    All right.  And that the name
3  of your supervisor was Phil Smith?
4      A.    Yes.
5      Q.    Okay.  Who is he?
6      A.    He was the one that set our
7  machines up.
8      Q.    All right.
9      A.    And this right here is for the
10 woodwork is not -- I didn't write that down.
11     Q.    Oh, okay.  But you did write
12 down the words:  Phil Smith was your
13 supervisor?
14     A.    Yes, I did.
15     Q.    Okay.  And that the reason for
16 leaving was that the plant closed?
17     A.    Yes.
18     Q.    All right.  Did you have --
19 And I'm not asking you about these other
20 companies, but do you know who made the
21 decision to close the JELD-WEN plant in
22 Roanoke?
23     A.    No.

33 (Pages 129 to 132)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1    Q.    Do you know when the decision
2  was made?
3    A.    I'm not sure.  It was after
4  Richard left.
5    Q.    Okay.  But do you know -- You
6  don't know who made it?
7    A.    No.
8    Q.    Or where that person is who
9  made it?
10    A.    No.
11    Q.    All right.  But you were told
12  after Richard left?
13    A.    Yes.
14    Q.    All right.  And you had no
15  part in that decision-making process?
16    A.    For them to close?
17    Q.    Yeah.
18    A.    No.
19    Q.    Kind of like these other
20  plants that closed on you?
21    A.    Right.
22    Q.    And, obviously, Richard Fetner
23  didn't have any decision-making process in

Page 134

1  that?
2    A.    No.
3    Q.    Okay.  You laugh, but I've got
4  to ask these questions.  I'm sorry.  All
5  right.  Do you know who Phil Shepherd is?
6    A.    Yes, I do.
7    Q.    Who was he?
8    A.    He was the one that set our
9  machines up.
10    Q.    That's not the same guy as
11  Phil Smith?
12    A.    Oh, Phil Shepherd.
13    Q.    Yeah.  Phil Shepherd.  Do you
14  know who he is?
15    A.    No.  Not right offhand.
16    Q.    Phil Smith is a pretty good
17  guy?
18    A.    As far as I know.
19    Q.    And how old was he?
20    A.    I have no idea.
21          (Defendant's Exhibit 24
22          was marked for
23          identification purposes.)

Page 135

1    Q.    Let me show you Exhibit Number
2  24, please.  This is a document we got from
3  APS.  Is this something that you filled out
4  with -- It doesn't have your name or
5  signature or anything, but --
6    A.    This is not my writing.
7    Q.    This is not your writing?
8    A.    No.
9    Q.    Do you remember someone from
10  APS asking you these questions?
11    A.    No, no.
12    Q.    So, you can't add -- You don't
13  know anything about this document?
14    A.    No.
15          (Defendant's Exhibit 25
16          was marked for
17          identification purposes.)
18    Q.    Okay.  Exhibit 25.  Now, you
19  worked for APS, you started working there
20  May 13, 2005, it appears there on the top,
21  left-hand side?
22    A.    Yes.
23    Q.    And this is a telephone --

Page 136

1  This says:  Telephone interview, 6/27/05.
2  Is that when you quit working for APS?
3    A.    I guess.
4    Q.    Is this your handwriting on
5  Exhibit 25?
6    A.    No.
7    Q.    Could you read Exhibit Number
8  25, and -- I take that back.  Do you
9  remember giving a telephone interview?
10    A.    Yes, I did.
11    Q.    Could you read this and see if
12  the lady accurately put down what you told
13  her?
14          MR. DOUGLAS:  Just, for the
15  Record, the top part of this copy is cut
16  off.
17          MR. SCOFIELD:  So is mine.
18          MR. DOUGLAS:  Okay.
19          MR. SCOFIELD:  Just do the
20  best you can.
21          MR. DOUGLAS:  All right.  So,
22  we'll be skipping the first line of that
23  second page?

34  (Pages 133 to 136)

# FREEDOM COURT REPORTING

## Page 145

1 APS and Propex.
2     Q.  All right. And this is their
3 sexual harassment policy that you knew and
4 understood; is that correct?
5     A.  I have no idea.
6     Q.  Okay. Well, you're welcome to
7 read it, if you want.
8     A.  Well, they might have gave me
9 one when I went to work. I don't -- I don't
10 remember.
11     Q.  Okay.
12     MR. SCOFIELD: Do y'all want
13 to take a break right now?
14     MR. DOUGLAS: Sure.
15     (Recess taken.)
16     Q.  Okay. Ms. Sims, Brenda, this
17 is the Charge of Discrimination that you
18 filled out, is that correct, or that you
19 signed your name on?
20     A.  Yes.
21     Q.  And you signed it on November
22 23, 2004, under penalty of perjury?
23     A.  Yes.

## Page 146

1     Q.  Did you do the best you can to
2 fill this out and tell the truth?
3     A.  Yes.
4     Q.  And the discrimination that
5 you had an X on was based upon sex; is that
6 correct?
7     A.  Yes.
8     Q.  There's no X next to
9 retaliation; is that correct?
10     A.  Right.
11     Q.  And your earliest
12 discrimination that you believed took place
13 was June 1, 2004, and the latest August 1,
14 2004; is that correct?
15     A.  Yes.
16     Q.  All right. Now, did someone
17 from the EEOC help you fill this out?
18     A.  No.
19     Q.  Okay. Did you meet with the
20 EEOC? Did you go up and drive to Birmingham
21 with Lorena and Linda Sims?
22     A.  Yes.
23     MR. DOUGLAS: Hold on. When?

## Page 147

1 When are you talking about? Before she did
2 this, before she filled this out?
3     MR. SCOFIELD: Yes.
4     MR. DOUGLAS: Did you
5 understand that to be his question?
6     THE WITNESS: No, I didn't
7 understand that.
8     Q.  Before you filled this out,
9 did you drive to Birmingham, Alabama, and
10 meet with someone from the EEOC?
11     A.  No.
12     Q.  You did not?
13     A.  No.
14     Q.  Okay. Are you tired? Are you
15 okay right now?
16     A.  I'm fine.
17     Q.  Okay. Now, you were here
18 yesterday when Lorena said that she drove up
19 to Birmingham to meet with the EEOC and her
20 lawyer, Ms. Love, followed her; is that
21 correct?
22     A.  Right.
23     Q.  Did you go with Lorena at that

## Page 148

1 time?
2     A.  No.
3     Q.  All right. But Linda did?
4     A.  Right.
5     Q.  Okay. You did not go?
6     A.  No.
7     Q.  All right. Why not?
8     A.  I don't remember.
9     Q.  Were you asked to go?
10     A.  Yes.
11     Q.  All right. But you don't
12 recall why you didn't go?
13     A.  No.
14     Q.  All right. At any time before
15 you signed this Charge of Discrimination on
16 November 23, 2004, did you go and meet with
17 the EEOC in Birmingham?
18     A.  I don't remember when we went.
19     Q.  You say we, who did you go
20 with?
21     A.  Lorena and Linda.
22     Q.  Okay. Had they -- Lorena and
23 Linda, had they already gone?

37 (Pages 145 to 148)

# FREEDOM COURT REPORTING

Page 149

1   A.   Yes.
2   Q.   All right. But you just don't
3   recall when?
4   A.   No, I don't.
5   Q.   Was it while you were still
6   working for JELD-WEN?
7   A.   I'm not sure.
8   Q.   Okay. As of November 23,
9   2004, had you retained a lawyer?
10  A.   No.
11  Q.   You did not hire Ms. Love?
12  A.   No.
13  Q.   All right. Had you consulted
14  an attorney before November 23, 2004?
15  A.   No.
16  Q.   Not your family attorney, not
17  any of the attorneys we talked about earlier
18  in your deposition?
19  A.   No.
20  Q.   All right. You say the
21  particulars of your discrimination, sexual
22  discrimination, is that starting the first
23  sentence: I believe I have been subjected

Page 150

1   to sexual harassment from my supervisor,
2   which consisted of the rubbing and touching
3   of my body, to include my legs and breast;
4   is that correct?
5   A.   Yes.
6   Q.   Who is the supervisor you're
7   referring to?
8   A.   Richard Fetner.
9   Q.   Nobody else?
10  A.   Nobody else.
11  Q.   Not Mr. Smith?
12  A.   No.
13  Q.   Not Dan Hees?
14  A.   No.
15  Q.   Not Pat Galvez?
16  A.   No.
17  Q.   Where -- Well, could you
18  describe the -- Without getting too graphic,
19  could you describe the rubbing and touching
20  of your legs and breasts by Mr. Fetner. How
21  would it occur?
22  A.   I was in the office one day.
23  Q.   Mr. Fetner's office?

Page 151

1   A.   Right. And I don't remember
2   why I was in there or what we were talking
3   about, and he started rubbing my leg.
4   Q.   Closer to your knee or closer
5   to somewhere else?
6   A.   Close to my knee.
7   Q.   Okay.
8   A.   And then the other time I went
9   in there to use the phone, and instead of
10  him putting it over here for me to use it,
11  he had me go behind him.
12  Q.   And when you're talking about
13  him, being Mr. Fetner?
14  A.   Richard Fetner.
15  Q.   All right.
16  A.   And when I went behind to use
17  the phone, he started rubbing my upper
18  thigh, and I hung the phone up and walked
19  out of the office.
20  Q.   Did you tell Mr. Fetner at
21  either one of those times that was
22  inappropriate and to stop doing that?
23  A.   The first time I did.

Page 152

1   Q.   Okay. And how did Mr. Fetner
2   respond?
3   A.   He just laughed.
4   Q.   Okay. Did you laugh, also?
5   A.   No.
6   Q.   The second time, when he went
7   into the office and rearranged the phone so
8   he could grab your thigh?
9   A.   Rub my -- Rub my upper thigh.
10  Q.   Rub your upper thigh, and you
11  left, did you say anything to him?
12  A.   No. I just walked out.
13  Q.   And do you recall when this
14  happened?
15  A.   No.
16  Q.   Did anybody witness -- To your
17  knowledge, did anybody witness this happen?
18  A.   No.
19  Q.   You say: This conduct was
20  continuous during the period June 2004 and
21  August of 2004. Is there any -- Can you
22  think of any other instances where
23  Mr. Fetner did anything sexually

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

|  | Page 153 |
|---|---|
| 1 | inappropriate to you? |
| 2 | A.    He touched my breasts. |
| 3 | Q.    Okay.  How did that come |
| 4 | about? |
| 5 | A.    I had to work over a few |
| 6 | minutes, me and Mike Weathers, one |
| 7 | afternoon, and Richard wanted us to finish |
| 8 | the pallet.  So we got through with the |
| 9 | pallet.  Everybody else was gone.  We |
| 10 | started cleaning up.  He come and told me, |
| 11 | he said:  Clean that up tomorrow.  Just go |
| 12 | on, go on, go on.  And he was trying to get |
| 13 | me out ahead of Mike.  And I started walking |
| 14 | on out, and he come up beside me, put his |
| 15 | arm around me and touched my breast. |
| 16 | Q.    Arm around your back? |
| 17 | A.    Around my back and under my – |
| 18 | Q.    Underneath your underarms? |
| 19 | A.    Right. |
| 20 | Q.    And then grabbed your breast? |
| 21 | A.    Right.  And I pulled away from |
| 22 | him. |
| 23 | Q.    Did you say anything to him? |

|  | Page 154 |
|---|---|
| 1 | A.    No. |
| 2 | Q.    Did Mr. Weathers or anyone |
| 3 | else see this? |
| 4 | A.    No. |
| 5 | Q.    Did you say anything to |
| 6 | Mr. Fetner about that? |
| 7 | A.    No. |
| 8 | Q.    And do you recall when this |
| 9 | was? |
| 10 | A.    No. |
| 11 | Q.    And, again, anytime you want |
| 12 | to take a break, you may.  Anything else? |
| 13 | A.    Yes.  The other time he |
| 14 | touched my breast, he called me in the break |
| 15 | room, he wanted to talk to me.  And he was |
| 16 | standing right in front of me and he just |
| 17 | reached up and grabbed my breast. |
| 18 | Q.    Straightforward and just |
| 19 | grabbed your breast? |
| 20 | A.    Yes. |
| 21 | Q.    Now, what room was this in? |
| 22 | A.    The break room. |
| 23 | Q.    On Exhibit Number 6, could you |

|  | Page 155 |
|---|---|
| 1 | tell me where that is, the break room. |
| 2 | A.    It was probably up under |
| 3 | Roxie's and them's office, I think. |
| 4 | Q.    Right under here (indicating)? |
| 5 | A.    Right in there somewhere |
| 6 | (indicating). |
| 7 | Q.    Okay.  So what I wrote down: |
| 8 | Saws and glue machine, it would be right |
| 9 | under Pat or Roxie's thing? |
| 10 | A.    Right in there somewhere, yes. |
| 11 | Q.    Okay.  And no one saw that? |
| 12 | A.    No. |
| 13 | Q.    And what did you tell |
| 14 | Mr. Fetner? |
| 15 | A.    Nothing.  I just turned around |
| 16 | and walked out.  It made me sick to my |
| 17 | stomach. |
| 18 | Q.    Anything else physical?  You |
| 19 | have the statement in here about that he |
| 20 | asked you – |
| 21 | A.    Well, he would ask me to go to |
| 22 | his house. |
| 23 | Q.    Before we get to that, I want |

|  | Page 156 |
|---|---|
| 1 | to make sure I get all the physical. |
| 2 | A.    Well, that's – |
| 3 | Q.    That was it? |
| 4 | A.    As far as I can remember, |
| 5 | that's the only times he touched me. |
| 6 | Q.    Did you keep a diary of this? |
| 7 | A.    I wrote it down, yes. |
| 8 | Q.    Okay.  Where is that? |
| 9 | A.    It's at home somewhere. |
| 10 | Q.    Does it have the dates on |
| 11 | there? |
| 12 | A.    I'm not really sure. |
| 13 | Q.    When did you make this diary? |
| 14 | A.    When I – I sit down, when I |
| 15 | was going to fill out the papers for the |
| 16 | EEOC. |
| 17 | Q.    So, it was done after the – |
| 18 | A.    After the – |
| 19 | Q.    In other words, it wasn't done |
| 20 | – Say, if it happened on Monday, June the |
| 21 | 1, you didn't go home that night and write |
| 22 | it down, it was later on? |
| 23 | A.    Right. |

39 (Pages 153 to 156)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 157

1    Q.    Okay.  And did you make this
2  diary before you hired a lawyer?
3    A.    Yes.
4    Q.    Okay.
5    A.    It's not really a diary.  I
6  just wrote it down on paper, on a sheet of
7  paper.
8    Q.    To help you fill out -- make
9  up the Charge of Discrimination?
10        MR. DOUGLAS:  Object to the
11  form of the question.  But go ahead.
12    A.    Yes.
13    Q.    To help you fill out --
14    A.    To help me remember what
15  happened.
16        (Defendant's Exhibit 31
17         was marked for
18         identification purposes.)
19    Q.    What happened.  Did you also
20  use that diary to help you draft this Charge
21  of Discrimination marked as Exhibit Number
22  31?
23        MR. DOUGLAS:  Object to the

Page 158

1  form.
2    A.    I don't understand what you're
3  talking about.
4    Q.    Well, when you filled out this
5  Charge of Discrimination marked as Exhibit
6  Number 31, signed by you on November 23,
7  2004, did you refer to that diary in helping
8  you write these charges?
9        MR. DOUGLAS:  Object to the
10  form.
11    A.    Yes.
12        MR. DOUGLAS:  That's fine.
13  You answered.
14    Q.    Subject to your attorney's
15  objection, your answer was yes?
16    A.    Yes.
17    Q.    Okay.  All right.  Now, let's
18  talk about the verbal things that Mr. Fetner
19  said or -- to you, that you found
20  objectionable.  On here it says:  My
21  supervisor, meaning Mr. Fetner, suggested
22  that I come to his house.  And he also
23  stated that should I come, I would have no

Page 159

1  worry about my work time.  When did this
2  happen?
3    A.    Over the period of time, June
4  through August.  I don't know the exact
5  dates.
6    Q.    Would your diary have the
7  exact date?
8        MR. DOUGLAS:  Object to the
9  form.  I'm just objecting to the use of the
10  term "diary", because she hasn't adopted it.
11    Q.    Well, that piece of paper that
12  you wrote stuff on, what do you want to call
13  that?
14    A.    It was just a piece of paper,
15  so I could remember what was done.
16    Q.    So I'm just going to call it
17  the piece of paper.
18    A.    Okay.
19    Q.    All right.  The piece of
20  paper, did it have dates on there?
21    A.    I -- I don't remember.
22    Q.    All right.  Is there any
23  particular reason why that was not produced

Page 160

1  to us earlier, to your knowledge?
2    A.    No.
3    Q.    Okay.
4    A.    I mean, it was just something
5  I scribbled out, you know, to help me fill
6  out the papers for the EEOC.
7    Q.    Okay.  Now, would you have an
8  objection of giving it to your lawyer, and
9  having your lawyer decide whether or not he
10  can give that to us?
11    A.    If I can find it.
12    Q.    Okay.  How many times did
13  Mr. Fetner ask you to come, to you?
14    A.    Quite a few.  I don't remember
15  exactly how many, but quite a few.
16    Q.    You said:  In retaliation for
17  my rejection of sexual harassment, I am
18  moved from my normal work assignment and
19  placed on other jobs.  What do you mean by
20  that?
21    A.    He would pull me off of my
22  regular job, even if I had work, and put me
23  on different jobs.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1    Q.    Could you give me an example.
2    A.    He would take me off my
3    regular job and put me --
4    Q.    Such as a router?
5    A.    The router.  And put me out on
6    the saws out there.
7    Q.    Okay.  And what's wrong with
8    that?
9    A.    I didn't like the job.
10    Q.    But you could do it?
11    A.    Yes.
12    Q.    Any other time he moved you?
13    A.    Quite a few times.
14    Q.    Okay.  Could you give me other
15    examples.
16    A.    I really don't know the days
17    when he done it, but he put me on the glue
18    machine.
19    Q.    And you didn't like working on
20    the glue machine?
21    A.    No.
22    Q.    Is it because of the people
23    that worked there?

Page 162

1    A.    No.
2    Q.    Or the work was different?
3    A.    I just didn't like the work.
4    Q.    Okay.  But you could do it?
5    A.    Yes.
6    Q.    And your pay never decreased?
7    A.    No.
8    Q.    All right.  Did your hours
9    ever change?
10    A.    He sent me home a time or two.
11    Q.    When was this?
12    A.    I have no idea.
13    Q.    For what?
14    A.    He said: No work.
15    Q.    For no work?
16    A.    Uh-huh.
17    Q.    Yes or no.
18    A.    That's right.
19    Q.    You have to say yes or no.
20    A.    Yes, for no work.
21    Q.    Okay.  All right.  Now, you
22    heard Lorena got sent home several times for
23    no work, was that the same kind of deal?

Page 163

1    A.    Yes.
2    Q.    All right.  Did -- Can you
3    think of anything else?  I mean, we talked
4    about the instances where he grabbed your
5    thighs, your breasts, the wanting you to
6    come home with him, anything else?
7    A.    When he'd ask me to go over to
8    his house, and I'd tell him no.
9    Q.    Okay.  Did you tell your
10    husband about this?
11    A.    No.
12    Q.    Why not?
13    A.    He would have made me quit.
14    Q.    All right.  Were you worried
15    about your husband going over there and
16    beating him up or something like that?
17    A.    Well, not really.
18    Q.    Okay.  Was your -- I don't
19    know how to ask this, but the way Lorena
20    described Mr. Fetner, he was a short, fat
21    man in his fifties, and your husband is
22    thirty-nine?
23    A.    Right.

Page 164

1    Q.    In your opinion, would there
2    have been any problem with your husband
3    taking care of Mr. Fetner?
4    MR. DOUGLAS:  Object to the
5    form of the question, but please answer it.
6    A.    There wouldn't have been a
7    problem at all.
8    Q.    So, I wonder why you didn't
9    tell your husband?
10    A.    That would have just caused
11    trouble.
12    Q.    All right.  And what kind of
13    trouble would that have caused?
14    A.    Robert would have probably got
15    locked up.
16    Q.    Okay.  All right.  Did you get
17    the feeling that Mr. Fetner was trying to
18    hurt you when he was doing this, or just
19    flirting with you very clumsily --
20    A.    I don't -- What do you mean,
21    hurt me?
22    Q.    Well, I mean, he wasn't -- You
23    felt like he was --

41 (Pages 161 to 164)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

1    A.    He was wanting to have sex
2  with me.
3    Q.    Yeah. I understand that. But
4  was he trying to do this to upset you, do
5  you believe, or just to have sex with you?
6    A.    To have sex with me.
7    Q.    Okay. All right. And I may
8  have asked you this, any witnesses to any of
9  this, to any of your complaints?
10    A.    Not as I know of.
11    Q.    Okay. Did you -- When
12  Mr. Fetner was doing this, did you go see
13  any type of doctor and seek medication for
14  anything as a result of what Mr. Fetner did
15  or did not do?
16    A.    I went to the doctor one time,
17  but I don't remember if it was for that.
18    Q.    Okay. You can't recall one
19  way or the other whether or not you went to
20  go see a doctor to seek any type of
21  medication or counseling because of
22  Mr. Fetner's sexual advances towards you?
23    A.    No.

Page 166

1    Q.    Okay.
2        (Off-the-Record discussion
3        was held.)
4        MR. DOUGLAS: Just answer his
5  questions. I can't help you.
6        THE WITNESS: Okay.
7    Q.    How did this make you feel
8  about Mr. Fetner?
9    A.    It made me dislike him.
10    Q.    Now, earlier you told me about
11  you had a daughter-in-law by the name of
12  what Miller?
13    A.    Jennifer.
14    Q.    Little smile on your face.
15  Who did Jennifer Miller common-law, was it
16  Jamie?
17    A.    Jason.
18    Q.    Jason. All right. I'm told
19  by my co-counsel to ask you another question
20  about going back before. When did you start
21  disliking Mr. Fetner?
22    A.    When he started putting his
23  hands on me.

Page 167

1    Q.    As soon as -- It was June 1,
2  2004?
3    A.    Yes.
4    Q.    Okay. Now, is there a place
5  called the Spectrum in Roanoke?
6    A.    Yes, there are.
7    Q.    And that's a gas station,
8  convenience store kind of place?
9    A.    Yes, it is.
10    Q.    I think I like you. Is there
11  a Dollar General store next to the spectrum?
12    A.    Close to it.
13    Q.    All right. On June 28, 2004,
14  did you see Jennifer Miller with someone
15  besides your son, Jason?
16    A.    Did I see her with someone
17  besides my son?
18    Q.    Yes.
19    A.    No.
20    Q.    Well, did you see her?
21    A.    Yes.
22    Q.    All right. And this was after
23  work, about six-thirty p.m.?

Page 168

1    A.    Yes. Around six o'clock.
2    Q.    All right. And did you go
3  over there and have a discussion with
4  Ms. Miller?
5    A.    Yes, I did.
6    Q.    Did you get in a fight with
7  Ms. Miller?
8    A.    Yes, I did.
9    Q.    Did you choke Ms. Miller?
10    A.    Yes, I did.
11    Q.    Did you pull Ms. Miller's
12  hair?
13    A.    Yes, I did.
14    Q.    Did Ms. Miller pull your hair?
15    A.    Yes, she did.
16    Q.    Why did you go over and choke
17  Ms. Miller?
18    A.    Because she had been abusing
19  my grandchild.
20    Q.    How had she been abusing your
21  grandchild?
22    A.    She would jerk him around,
23  holler at him, not give him a bath, not feed

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1  him.
2      Q.    Did you also accuse Ms. Miller
3  of cheating on your son?
4      A.    Yes, I did.
5      Q.    And had she been?
6      A.    Yes, she had.
7      Q.    Did someone call the police?
8      A.    Yes, they did.
9      Q.    And while you were choking
10 Ms. Miller, was she holding your grandson?
11     A.    I was.
12     Q.    Oh, you were holding him.
13 Okay. Did Ms. Miller punch you in the face?
14     A.    She hit me up the side of the
15 head.
16     Q.    Okay. Did you hit her back?
17     A.    No.
18     Q.    Or just choked?
19     A.    Just choked her.
20     Q.    And grabbed her hair. All
21 right. Now, you were arrested for domestic
22 violence, third degree?
23     A.    Yes, I was.

Page 170

1      Q.    You were the primary
2  aggressor?
3      MR. DOUGLAS:  Object to the
4  form of that question.
5      Q.    Were you arrested for domestic
6  violence, third degree, because you were the
7  primary aggressor?
8      MR. DOUGLAS:  Objection.
9      A.    What is the aggressor?
10     Q.    Is that what the police report
11 said, or do you know?
12     A.    I don't know. I'd have to
13 look at it.
14     Q.    Okay. I'll show it to you in
15 a minute. Who were the witnesses to this
16 incident?
17     A.    The lady in Spectrum, she seen
18 it going on. And then there was some guy, I
19 don't know who he was.
20     Q.    Was it Caldwell?
21     A.    No. He was the one that
22 arrested me.
23     Q.    Okay. Brooks?

Page 171

1      A.    He's the one that arrested
2  Jennifer.
3      Q.    Okay. Now, you were put in
4  jail?
5      A.    Yes, I was.
6      Q.    Roanoke?
7      A.    Yes.
8      Q.    And how long did you stay in
9  jail?
10     A.    Ten hours.
11     Q.    Ten hours. Okay. From about
12 six-thirty to about, what, four in the
13 morning?
14     A.    About four o'clock.
15     Q.    And who got you out of jail?
16     A.    Who got me out?
17     Q.    Yes.
18     A.    My husband come and got me.
19     Q.    All right. Who bonded you
20 out?
21     A.    Richard.
22     Q.    Richard who?
23     A.    Fetner.

Page 172

1      Q.    And how much money did
2  Mr. Fetner have to put up to bond you out?
3      A.    None, I don't guess. I don't
4  know.
5      Q.    You don't know?
6      A.    All I know is that he signed
7  my bond.
8      Q.    Okay. In the middle of the
9  night?
10     A.    That afternoon.
11     Q.    That afternoon. Who called
12 Mr. Fetner?
13     A.    I did.
14     Q.    And why did you call
15 Mr. Fetner?
16     A.    He was going to have to know
17 that I wasn't going to be at work the next
18 day.
19     Q.    Okay. So, how did it come
20 about — You called Mr. Fetner, and tell him
21 you weren't coming to work. Why couldn't
22 you go to work?
23     A.    I was in jail.

43  (Pages 169 to 172)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 173

1    Q.    And what happened next,
2 Mr. Fetner offered to bond you out?
3    A.    I asked him if he would sign
4 my bond.
5    Q.    Why did you ask him?
6    A.    I just did.
7    Q.    Okay. You don't know why you
8 asked Mr. Fetner and not your husband?
9    A.    My husband couldn't sign my
10 bond. My husband couldn't sign my bond.
11    Q.    Why is that?
12    A.    Because he didn't own any
13 land.
14    Q.    What about any of your sons?
15    A.    My oldest son don't live in
16 Randolph County, and my other son was
17 signing Jennifer's bond.
18    Q.    So, he couldn't sign two
19 bonds?
20    A.    I didn't ask.
21    Q.    You didn't ask your son to
22 sign your bond out?
23    A.    No. He wasn't talking to me.

Page 174

1    Q.    Okay. So, you felt like
2 Richard was the only person you could go to
3 to sign you out, bond you out? I mean,
4 nobody else in Roanoke could do it?
5    A.    Well, really, I didn't think
6 of nobody else.
7    Q.    Okay. At that time, did you
8 consider Richard a friend?
9    A.    He was my boss.
10    Q.    Did you tell -- You told
11 Richard Fetner thank you?
12    A.    Yes.
13    Q.    Did you write him a little
14 note?
15    A.    No.
16        (Defendant's Exhibit 32
17            was marked for
18            identification purposes.)
19    Q.    I'll show you Exhibit Number
20 32. Why don't you go ahead and read the
21 first and second pages. Take your time.
22 I'll ask some questions from it.
23    A.    Okay.

Page 175

1    Q.    Is there anything in that
2 Exhibit 32 that you find to be incorrect?
3    A.    Yes.
4    Q.    Okay. Would you point that
5 out to me, please. The second page.
6    A.    Yes. Second page. Jennifer
7 didn't grab me around the throat.
8    Q.    You're talking about
9 Mrs. Miller?
10    A.    Mrs. Miller didn't grab me
11 around the throat. And she didn't punch me
12 in the face with her fist.
13    Q.    Okay. Everything else is
14 accurate, to the best of your recollection?
15    A.    Yes.
16    Q.    Now, go back to the front
17 page, and look down here on the bottom,
18 bottom, middle, and it says: Released to
19 Richard Fetner; is that correct?
20    A.    Yes.
21    Q.    Now, again, I'm very
22 unfamiliar with criminal law, in general,
23 and particularly Alabama criminal law, but

Page 176

1 there's no way your husband could come up
2 with five hundred dollars to get you out of
3 jail?
4        MR. DOUGLAS: Object to the
5 form of that question. I don't know where
6 the five hundred dollars comes from. And
7 it's been asked and answered.
8    Q.    Were you told how much the
9 bond was going to be?
10    A.    I don't remember.
11        (Defendant's Exhibit 34
12            was marked for
13            identification purposes.)
14    Q.    Look at Exhibit 34. Those are
15 out of order. Have you ever seen this
16 document before?
17    A.    Yes. Yes, I have.
18    Q.    That's the one you signed your
19 name to on June 29, 2004?
20    A.    Yes, I did.
21    Q.    And it says: I, Brenda Sims,
22 and Richard Fetner, agree to pay the
23 municipality of Roanoke, Alabama, the sum of

44 (Pages 173 to 176)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 177 |
| --- |

1 five hundred dollars, and all costs and
2 appear in Court. So you were to appear in
3 Court on August 3, 2004; is that correct?
4    A.    They've got the dates wrong.
5    MR. DOUGLAS: Well, just
6 answer his questions. He's asking you is
7 that what that said.
8    A.    Yes.
9    Q.    And you said the dates are
10 wrong, what dates are wrong?
11    A.    On this one --
12    Q.    On exhibit number what, ma'am?
13    MR. DOUGLAS: 32 is what she's
14 pointing to.
15    A.    Yeah. The date of the arrest,
16 they've got 6/28/04. On the date of the
17 bond they've got 8/3/04.
18    Q.    That's the date you're
19 supposed to appear before the Court?
20    A.    For the Court?
21    Q.    Yeah.
22    A.    Oh, okay.
23    Q.    All right. So, that may very

| Page 178 |
| --- |

1 well be the correct date?
2    A.    Yeah.
3    Q.    All right. Did you call and
4 ask your husband if he could raise the five
5 hundred dollars?
6    A.    My husband came up to the
7 police station. And when you're arrested
8 for domestic violence, you have to stay in
9 jail, you can't bond out, you have to stay
10 so many hours.
11    Q.    Okay. But eventually you did
12 get bonded out, or is this an appearance
13 bond?
14    A.    When Richard signed this and
15 my time was up, they let me go.
16    Q.    Okay. Now, the explanation,
17 and your counsel is correct, I did ask you
18 this before, but I've got a follow-up to it.
19 You said your husband didn't have any
20 property to put up; is that correct?
21    A.    Right.
22    Q.    If your husband could have
23 asked his parents or used cash or asked

| Page 179 |
| --- |

1 friends, there's no way your husband could
2 have done that?
3    MR. DOUGLAS: I object to the
4 form of that question. You can answer it if
5 you know what your husband could have done
6 to bond you out.
7    A.    He probably could have got it.
8    Q.    Okay. Why didn't he do it,
9 then?
10    A.    It was never thought about.
11    Q.    Because Richard Fetner would
12 do it?
13    A.    I -- I don't -- I mean -- I
14 didn't know you could put up five hundred
15 dollars and get out of jail. Because I knew
16 they told me I had to stay for so long. And
17 told me that if I get somebody to come sign
18 my bond. There was never nothing mentioned
19 about getting up five hundred dollars.
20    (Defendant's Exhibit 33
21    was marked for
22    identification purposes.)
23    Q.    All right. Let me show you

| Page 180 |
| --- |

1 Exhibit 33. Is this the complaint that your
2 daughter-in-law filled out against you?
3    A.    I guess. I've never seen this
4 before.
5    Q.    Is that your daughter-in-law's
6 handwriting; to your knowledge?
7    A.    I have no idea.
8    Q.    Is it your daughter-in-law's
9 signature under complainant, to your
10 knowledge?
11    A.    I have no idea.
12    Q.    Can you even read that
13 complaint?
14    MR. DOUGLAS: Hold on. Answer
15 his question.
16    A.    It looks like Moore.
17    Q.    That's what I was going to
18 ask. Who -- 138 Chestnut Street, is that
19 where your daughter-in-law lived at that
20 time?
21    A.    No.
22    (Defendant's Exhibit 35
23    was marked for

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 181

1        identification purposes.)
2        Q.    Okay.  Exhibit 35, please.
3  This is an order requiring you to appear, is
4  it for a trial on August 3, 2004?
5        MR. DOUGLAS:  I object.  I
6  don't think that's what it says.
7        Q.    Well, if I'm wrong, I'm wrong.
8  But, I mean, is it -- The word "other" --
9  Can you read that?
10       A.    I can't.
11       Q.    Okay.  Do you have any idea
12  what this document is?  Okay.  Did you
13  appear in Court on this day, August 3, 2004?
14       A.    No.
15       Q.    You didn't?
16       A.    No.
17       Q.    Did you have a lawyer at this
18  time?
19       A.    No.
20       Q.    Were you placed on the
21  administrative docket, to your knowledge?
22       A.    Yes.
23       Q.    Okay.  What does that mean to

Page 182

1  you?
2        A.    I had to stay out of trouble
3  for a year.
4        Q.    Okay.  Did you stay out of
5  trouble for a year?
6        A.    Yes, I did.
7              (Defendant's Exhibit 36
8              was marked for
9              identification purposes.)
10       Q.    Okay.  Let's go to Exhibit
11  Number 36.  This is a medical report where
12  you went to Woodland Rural Health Clinic,
13  and it was signed by Dr. Ahmed.  It's for
14  back pain:  Thinks she twisted it yesterday.
15  Did that occur at work?
16       A.    I don't think so.
17       Q.    All right.  You were given
18  Flexeril.  Do you know what that is, down at
19  the bottom?
20       A.    Flexeril -- I don't know what
21  Flexeril is.
22       Q.    Is that a muscle relaxer, to
23  your knowledge?

Page 183

1        A.    I don't know.
2        Q.    Okay.  Is there anything in
3  here about -- Of course, you've heard me ask
4  this question a hundred times before, is
5  there anything in here about your problems
6  with Mr. Fetner, sexual harassment, any
7  emotional problems from that?
8        A.    No.
9              (Defendant's Exhibit 37
10             was marked for
11             identification purposes.)
12       Q.    All right.  Go to Exhibit
13  Number 37.  August 27, 2004.  You go in for
14  a sore throat, complaining about, I guess,
15  some sort of pain of some sort in your
16  breast.  Was there any complaint in here
17  about anything related to work, such as
18  Mr. Fetner, or sexual harassment, or any
19  emotional problems from that?
20             MR. DOUGLAS:  Just answer his
21  question, yes, no, or you don't know.
22       Q.    Yeah.  I can't read a lot of
23  it, but that's fine.

Page 184

1        A.    I can't read this down here,
2  (indicating), but it looks like it's got
3  Fetner on it.
4        Q.    Do you recall talking to
5  Dr. -- Would this have been talking to Bill
6  Caypless or would it have been talking to --
7        A.    Bill Caypless.
8        Q.    Okay.  Did you ever talk to
9  Bill Caypless about Mr. Fetner?
10       A.    Yes, I did.
11       Q.    When did you talk to him about
12  it?
13       A.    One day when I went to the
14  doctor.
15       Q.    Okay.  And what did
16  Mr. Caypless advise you to do about
17  Mr. Fetner?
18       A.    That I needed to talk to
19  Richard's boss.
20       Q.    Okay.  And that's Dan Hees?
21       A.    Yes.
22       Q.    Okay.  And do you recall when
23  that happened, when you talked to

46  (Pages 181 to 184)

# FREEDOM COURT REPORTING

Page 185

1  Mr. Caypless?
2      A.    I don't remember if it was on
3  this date or — because I can't read this
4  down here.
5          (Defendant's Exhibit 38
6              was marked for
7              identification purposes.)
8      Q.    I can't either. All I see
9  Fetner on it and I see an F-E-N, something,
10  T, something. All right. Let's go to 38.
11  Now, this is a different medical people.
12  That's your signature on the front page,
13  dated September 1, 2004?
14      A.    Yes, it is.
15      Q.    All right. And East Alabama
16  Medical Center. I think these three go
17  together. I'm not sure. But there's a
18  discussion in the back about your
19  gallbladder and surgery?
20      A.    Yes.
21      Q.    When did the surgery have to
22  take place?
23      A.    I really don't remember.

Page 186

1      Q.    But everything turned out
2  okay?
3      A.    Yeah.
4      Q.    All right. And surgery
5  happened about this time?
6      A.    When I was working, I had it,
7  so . . .
8          (Defendant's Exhibit 39
9              was marked for
10              identification purposes.)
11      Q.    Okay. I'll show you 39. All
12  right. We've already been through this.
13  This is an October 9, 2004, letter by you to
14  the EEOC?
15      A.    Yes.
16      Q.    All right. One thing I did
17  want to ask you, if you look in the middle,
18  it says: I think — And I'll show you right
19  here. It says: I think because I won't
20  have sex with him, he's making it hard on me
21  at work. Now, did Mr. Fetner tell you he
22  was going to make it harder on you if you
23  don't have sex with him?

Page 187

1      A.    Not in those words.
2      Q.    Okay. What words did he use?
3  What made you think that?
4      A.    He said something to the thing
5  about he could make it harder on me, so I
6  would quit.
7      Q.    And when did he say this?
8      A.    I don't remember.
9      Q.    That piece of paper you have
10  at home, would that have the date on it?
11      A.    It's — I think the piece of
12  paper is more or less like this right here.
13      Q.    Okay.
14      A.    Because I wrote it out so I
15  could fill out my paper.
16      Q.    And who typed this document?
17      A.    The EEOC, I guess. I don't
18  know.
19      Q.    And you don't recall —
20      A.    No, no, no, no. I done this
21  on my computer.
22      Q.    Okay. Let me show you Exhibit
23  Number 40. Let me back up before we start

Page 188

1  talking about 40. Do you recall — You
2  testified earlier that you're good friends
3  with Lorena. Do you recall Lorena's mother
4  dying and Lorena wanting her brother, Earl,
5  to be able to go to the funeral, or that
6  Earl wants to go to Lorena's mother's
7  funeral?
8      A.    I remember her mother dying,
9  yes.
10      Q.    Okay. Did you go to the
11  funeral?
12      A.    Yes, I did.
13      Q.    Was Lorena's brother, Earl,
14  there?
15      A.    Yes, he was.
16      Q.    Okay. Do you know how Earl
17  got to the funeral — how he got out of
18  prison to go to the funeral?
19      A.    To my knowledge, a police
20  officer went and got him and brought him.
21      Q.    Okay. You don't know anything
22  about the involvement of Mr. Fetner?
23      A.    Richard said that he made

47 (Pages 185 to 188)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 189

1  calls, that's --
2      Q.    He told you that?
3      A.    He told me that.
4      Q.    All right.  Do you trust what
5  Mr. Fetner said?
6      A.    No.
7      Q.    Why not?
8      A.    I just don't.
9      Q.    You don't believe he's the one
10  responsible?
11      A.    No.
12      Q.    Who do you believe is?
13      A.    I believe Richard Laird was.
14      Q.    Okay.  And who is Richard
15  Laird?
16      A.    Our State representative.
17      Q.    Okay.  Do you know who called
18  Richard Laird?
19      A.    Not really.
20      Q.    Could it have been Mr. Fetner?
21          MR. DOUGLAS:  Objection.  She
22  said she doesn't know.  It could have been
23  anybody.

Page 190

1          MR. SCOFIELD:  Yeah.  That's
2  true.
3          MR. DOUGLAS:  If Mr. Fetner
4  told you he did, then --
5      Q.    Did Mr. Fetner tell you he
6  did?
7      A.    Not to my knowledge.
8      Q.    Okay.  Now, this letter is
9  dated October 9, 2004.  This is on Sims
10  Number 39.  Do you see that?
11      A.    Where?
12      Q.    Up at the top.
13      A.    Okay.
14      Q.    Is that your handwriting?
15      A.    Yes, it is.
16          (Defendant's Exhibit 40
17          was marked for
18          identification purposes.)
19      Q.    Okay.  All right.  Now let's
20  go to Exhibit Number 40.  It says -- This is
21  your EEOC case log on October 13, 2004:  The
22  afore response was received by the EEOC.  Do
23  you see that?

Page 191

1      A.    Uh-huh.
2      Q.    All right.  And it says:  On
3  November 18th they called you and mailed
4  drafted charge from the four respondents?
5  It's the second one.
6      A.    Yes.
7      Q.    Do you recall someone from the
8  EEOC talking to you?
9      A.    Yes, I do.
10      Q.    Okay.  Do you recall who it
11  was?
12      A.    No, I don't.
13      Q.    How long did you talk to that
14  person?
15      A.    I don't remember.
16      Q.    Now, you testified that Bill
17  Caypless told you to talk to Dan Hees?
18      A.    He told me to talk to
19  Richard's supervisor.
20      Q.    All right.  Now, it's my
21  understanding that you -- Did you know where
22  Dan Hees worked, where his normal office
23  was?

Page 192

1      A.    No.
2      Q.    Do you recall?
3          MR. DOUGLAS:  Can I get a time
4  frame for the question?
5          MR. SCOFIELD:  Yeah.
6          MR. DOUGLAS:  Are you talking
7  about when Caypless told her that or when
8  she first started working?
9      Q.    Do you recall, say, in the
10  first part of October of 2004, calling and
11  leaving a message for Dan Hees?
12      A.    Yes, I do.
13      Q.    All right.  How did you get
14  Dan Hees's telephone number?
15      A.    I think I called the office,
16  main office.
17      Q.    In Klamath Falls, Oregon?
18      A.    Right.
19      Q.    All right.
20      A.    And they gave me his number, I
21  believe.
22      Q.    All right.  And do you recall
23  -- Do you normally work on Sundays?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 193

1    A.    No.
2    Q.    Do you recall Dan Hees calling
3  your house on a Sunday?
4    A.    No, not on a Sunday.
5    Q.    Do you recall Dan Hees calling
6  you back at your house?
7    A.    Yes.
8    Q.    All right. And what did you
9  tell -- What did you and Dan Hees talk about
10  when Dan Hees called you back?
11    A.    I just started telling him the
12  things that Richard was doing to me.
13    Q.    Okay. And do you have any
14  idea when this, date-wise, in relation to
15  your letter to the EEOC, when this occurred?
16    A.    No, I don't.
17    Q.    Or in relation to when Dr. --
18  or Bill told you to call a supervisor?
19    A.    Well, it was after Bill told
20  me that, and before I done that.
21    Q.    Okay. Did -- When Dan Hees
22  called you back at your house, was it -- can
23  you guesstimate how much time went by from

Page 194

1  the time you left a message for Dan to call
2  you?
3    A.    It seems like a couple of
4  days.
5    Q.    Couple of days. All right.
6  Now, did Dan Hees, then, when you got back
7  to work, ask you to meet, or did you go to
8  Dan Hees and ask to meet? Did you meet with
9  Dan Hees in the JELD-WEN facility?
10    A.    Yes, I did.
11    Q.    All right. Was that in the
12  paint room?
13    A.    Yes, it was.
14    Q.    And at that time, nobody was
15  working in the paint room; is that correct?
16    A.    Well, it was lunchtime.
17    Q.    Lunchtime. So, there was
18  nobody in there?
19    A.    Right.
20    Q.    All right. Who all went in to
21  meet with Dan Hees?
22    A.    Myself, Lorena, Linda, Cathy,
23  Mary Lou and Lisa.

Page 195

1    Q.    Are you sure Mary Lou went?
2    A.    No. Mary Lou was out that
3  day.
4    Q.    Because I think Lorena was
5  wrong, because she had hurt her finger,
6  right, Mary Lou had hurt her finger and she
7  was out that day?
8    A.    No.
9    Q.    But she didn't go in that
10  first meeting?
11    A.    I don't think Mary Lou was
12  there for the first meeting.
13    Q.    All right. So, we tripped up
14  Lorena, then, huh? All right. But this
15  meeting was a couple of days after Dan
16  Hees's phone call to you?
17    A.    Right.
18    Q.    Next day, two days, three days
19  later?
20    A.    About three days, I believe.
21    Q.    Three days later. And at the
22  start of the meeting, it's my understanding
23  that you led off and started complaining

Page 196

1  about being moved around the --
2    A.    I'm not sure who started. I
3  don't know.
4    Q.    Okay. Well, do you recall --
5  Did you -- Did you get the impression that
6  -- Did Dan Hees have a white pad, writing
7  down what y'all were saying?
8    A.    I don't remember.
9    Q.    Okay. Do you recall what you
10  told Dan Hees?
11    A.    I think so.
12    Q.    Okay. Could you tell me now
13  what you told Dan Hees.
14    A.    Told him that day or on the
15  phone?
16    Q.    Well, let's start with the
17  phone, and then we'll start with the
18  meeting. First to the phone.
19    A.    I know I told him that he was
20  touching my breasts, some of the things he
21  was saying to me. And at the meeting, I
22  believe it was the same thing.
23    Q.    Okay. What did Linda Sims say

49  (Pages 193 to 196)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 197

1  during this meeting?
2      A.     About what he said about her
3  butt, about the basketballs.
4      Q.     I'm sorry. I don't mean to
5  interrupt you, but please try to use names
6  instead of pronouns. He meaning --
7      A.     Richard.
8      Q.     Richard was saying?
9      A.     What Richard Fetner said about
10  her --
11     Q.     Her, being Linda?
12     A.     Linda Sims.
13     Q.     Okay. About the basketball
14  stuff?
15     A.     Yes.
16     Q.     Anything else?
17     A.     I don't remember what all was
18  said.
19     Q.     What did Cathy Thornton say
20  that you can recall?
21     A.     About him grabbing hisself and
22  shaking hisself at her.
23     Q.     You're talking about Richard

Page 198

1  Fetner grabbing himself?
2      A.     About Richard Fetner grabbing
3  himself and shaking it at Cathy. About
4  Richard Fetner trying to get Cathy to go out
5  and give him a blow job.
6      Q.     Anything else?
7      A.     I don't remember.
8      Q.     All right. Did I say Lisa
9  Cook? What did Lisa Cook complain about?
10     A.     I don't remember what Lisa
11  said.
12     Q.     What about Lorena, what did
13  she complain about?
14     A.     I really can't remember.
15     Q.     Did Lorena say anything about
16  her previously having dated Richard at that
17  time?
18     A.     I don't remember.
19     Q.     Okay. Did anyone start
20  laughing about Richard Fetner and some of
21  the comments he had made to some of the
22  women?
23     A.     Dan laughed.

Page 199

1      Q.     Did any of the women laugh?
2      A.     I don't remember.
3      Q.     Okay. Did you laugh?
4      A.     I don't remember.
5      Q.     Was this the first time, to
6  your knowledge, that you'd ever complained
7  about Richard to Dan Hees or Pat Galvez, or
8  anyone else with JELD-WEN?
9      A.     Yes.
10     Q.     Or Phil Smith?
11     A.     What do you mean by
12  complaining?
13     Q.     Like, going to an office and
14  say: Richard Fetner grabbed my boobs?
15     A.     Like, going to a supervisor?
16     Q.     Yes.
17     A.     Yes, that's the first time I
18  had talked to a supervisor.
19     Q.     That's correct. Okay. All
20  right. To your knowledge, and based upon
21  your conversation with Lorena, was that
22  Lorena's first time to complain to a
23  supervisor, about Richard Fetner?

Page 200

1      A.     As far as I know.
2      Q.     Same with Linda Sims?
3      A.     As far as I know.
4      Q.     What about Lisa Cook?
5      A.     As far as I know.
6      Q.     Cathy Thornton?
7      A.     I really don't know about
8  Cathy.
9      Q.     Just based upon your
10  conversations with Cathy and Lisa, did they
11  tell you they had complained about Richard
12  Fetner to Dan Hees or any other supervisor
13  before?
14     A.     I don't remember about Cathy.
15     Q.     Okay. And all the conduct
16  that you complained about occurred before
17  your conversation with Dan Hees?
18     A.     Yes, it did.
19     Q.     Before your telephone
20  conversation with Dan Hees?
21     A.     Yes, it did.
22     Q.     All right. And how long did
23  this meeting with Dan Hees last?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 201

1    A.    Probably about thirty minutes.
2    Q.    Okay.  Now, after you had a
3  meeting with Dan Hees, at whatever time you
4  had that day, did you have a second one with
5  Dan Hees, wherein, Dan Hees told you that
6  Richard Fetner was no longer working at --
7    A.    I don't believe it was a
8  meeting.  We asked.
9    Q.    Say it again.
10    A.    It wasn't a meeting.  We asked
11  Dan what happened.
12    Q.    Oh, okay.  When did you find
13  out that Richard Fetner was no longer
14  working at JELD-WEN?
15    A.    The day that Dan let him
16  resign.
17    Q.    Okay.  And that was the same
18  day that you had the meeting with Dan Hees?
19    A.    I don't remember.
20    Q.    Okay.  If JELD-WEN's records
21  show that you met with Dan Hees on the
22  morning of October 13, 2004, and that
23  Richard Fetner was allowed to resign on the

Page 202

1  afternoon of October 13, 2004, do you have
2  any information to refute that?
3    A.    No.
4    Q.    Okay.  And after Richard
5  Fetner was allowed to resign, did he ever
6  come back on the premises of JELD-WEN?
7    A.    Not while I was there.
8    Q.    All right.  Has Mr. Fetner
9  ever bothered you, said anything to you,
10  made any additional passes at you, after
11  Mr. Fetner was allowed to resign from
12  JELD-WEN?
13    A.    No.
14    Q.    Have you seen him in town?
15    A.    Yes.
16    Q.    Okay.  How is his reaction
17  towards you?
18    A.    He gives me a go-to-hell look.
19    Q.    Let me ask you this, and,
20  again, it's my ignorance, but did him
21  bonding you out of jail actually cost him
22  any money or did he get his money back?
23    A.    No.  It didn't cost him

Page 203

1  anything.
2    Q.    Okay.  I just don't know.  To
3  your knowledge, if you had not appeared in
4  Court in August of 2004, would Mr. Fetner
5  have had to have forfeited his bond, to your
6  knowledge?
7         MR. DOUGLAS:  I object to the
8  form of that question.  She's testified she
9  didn't appear in Court, was my recollection
10  of the testimony.
11         MR. SCOFIELD:  I think he's
12  got us there.  Objection sustained,
13  Counselor.
14    Q.    Okay.  Let's go back to this
15  EEOC log.  At any time when you spoke to the
16  EEOC, did you tell the EEOC that you
17  complained to Dan Hees about Mr. Fetner?
18    A.    As far as I can remember.
19    Q.    You did?
20    A.    I did.
21    Q.    You did tell the EEOC?
22    A.    Yes.
23    Q.    Did you tell the EEOC all the

Page 204

1  information that you had, truthfully and
2  honestly?
3    A.    Yes.
4    Q.    Okay.  Did you tell the EEOC,
5  to your knowledge, or to your recollection,
6  that Mr. Fetner was allowed to resign after
7  -- the day of -- same day that you spoke
8  with Dan Hees, and you and Linda, and all
9  the rest of the women?
10    A.    I don't remember that.
11    Q.    Okay.  Did Mr. Hees ask you
12  during his meeting with you, whether or not
13  you want to make further complaints with
14  JELD-WEN's in-house lawyers?
15    A.    Not that I know of.
16    Q.    Okay.  You don't recall that?
17    A.    I don't recall.
18    Q.    All right.  After Mr. Fetner
19  was allowed to resign on October 13, 2004,
20  did anyone else bother you sexually at the
21  JELD-WEN plant for the remainder of your
22  month and a half tenure there?
23    A.    No.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 205

1    Q.    Did you file any criminal
2  charges against Mr. Fetner?
3    A.    No.
4    Q.    And to your knowledge, did the
5  other Ms. Sims or Lorena?
6    A.    Not as I know of.
7    Q.    Why not? To you, why didn't
8  you do it?
9    A.    I don't know.
10    Q.    Did your husband ever suggest
11  that you do?
12    A.    No.
13         (Defendant's Exhibit 41
14          was marked for
15          identification purposes.)
16    Q.    Sorry. Things kind of run
17  together. Now, when you -- Go to 41. This
18  is dated 10/22/04. You're complaining about
19  blood work, arthritic pain in feet and
20  wrist. And down at the bottom it says:
21  Restart -- Is that Axtra?
22    A.    I don't know.
23    Q.    Do you recall starting any

Page 206

1  type of medication at this time?
2    A.    I think it's Bextra.
3    Q.    Or Bextra. What is that?
4    A.    I think it's for arthritis.
5    Q.    Okay. Is there anything in
6  here about Mr. Fetner or the sexual
7  harassment or anything of that nature?
8    A.    Not that I see.
9         (Defendant's Exhibit 42
10          was marked for
11          identification purposes.)
12    Q.    All right. Let's go to
13  Exhibit 42. This is dated November 18,
14  2004. And you went to go see, again, was it
15  Bill Caypless, or is it Dr. Syed Ahmed?
16    A.    I can't tell.
17    Q.    Now, you came in here with a
18  headache for three days, right side pain,
19  depressed, stayed in bed, cries easily, very
20  depressed, because your son is getting a
21  divorce and cannot see grandchild.
22    A.    Oh, that -- I think the date
23  is wrong on this, if this is what it's

Page 207

1  about. That's when Jennifer took off with
2  my grandson.
3    Q.    Okay. But the November 18,
4  2004, date is wrong?
5    A.    Yes.
6    Q.    And what leads you to believe
7  that the medical records would be wrong?
8    A.    Well, because Jennifer left
9  November the 30th.
10    Q.    Okay.
11    A.    October the 30th.
12    Q.    Oh, October 30th.
13    A.    Oh, no, no, no. I'm wrong.
14    Q.    Okay.
15    A.    This is when she refused to
16  let me see him.
17    Q.    Your grandson?
18    A.    Right.
19    Q.    What's your grandson's name?
20    A.    Luke.
21    Q.    Luke. All right. And your
22  son and Ms. Miller had already started
23  divorce proceedings?

Page 208

1    A.    No.
2    Q.    They were separated?
3    A.    No.
4    Q.    She just took off?
5    A.    Right.
6    Q.    To some -- To Georgia?
7    A.    To her mother's.
8    Q.    In Georgia. And did you try
9  to call her and couldn't see Luke, and so
10  you started feeling bad?
11    A.    Well, now, she was still at
12  home -- She was still with Jason at this
13  time right here, on the 11th and 18th.
14    Q.    Okay. But she still wouldn't
15  let you see Luke?
16    A.    No, she wouldn't let me see
17  him.
18    Q.    So, the doctor prescribed you
19  an antidepressant, Zoloft; is that correct?
20    A.    Yes.
21    Q.    And what's that medication?
22    A.    I think that's nerve pills.
23    Q.    Okay. The one that starts

52  (Pages 205 to 208)

# FREEDOM COURT REPORTING

Page 213

1   the question?
2       Q.   Yeah. I mean, do you recall
3   going to the doctor on February 6th at that
4   clinic, and what did you go in for, and what
5   did the doctor give you?
6       A.   Yes, I remember going. I had
7   the flu. And I had to have a thyroid test
8   done. What he gave me, I have no idea.
9       Q.   Okay. Nothing in there about
10  -- Last few -- Nothing in there about
11  Richard Fetner, sexual harassment, or
12  JELD-WEN?
13      A.   No.
14      Q.   I'm not even going to give you
15  this. You had a liver biopsy, everything
16  turn out okay?
17      A.   Yes.
18           (Defendant's Exhibit 44
19           was marked for
20           identification purposes.)
21      Q.   All right. Exhibit 44. Do
22  you recall seeing this letter that was sent
23  to your attorney, Matt White, dated April

Page 214

1   19, 2005? The date is on the back part.
2       A.   Yes.
3       Q.   The only question I have to
4   ask you is, before that date, April 19,
5   2005, did you give all the information that
6   you had concerning the sexual harassment
7   allegations against Richard Fetner and
8   JELD-WEN to the EEOC, as best you could?
9       A.   Yes.
10      Q.   And to your knowledge, you
11  told them the truth?
12      A.   Yes.
13      Q.   Is there any additional
14  information you feel like you should have
15  given to them?
16      A.   I really don't know.
17           (Defendant's Exhibit 45
18           was marked for
19           identification purposes.)
20      Q.   Okay. 45, please. Do you
21  recall seeing this document? It's an EEOC
22  Dismissal, Notice of Rights.
23      A.   I don't understand this.

Page 215

1       Q.   Okay. The one that has
2   checkmarks is --
3           MR. DOUGLAS: His question is,
4   do you recall seeing that document?
5       Q.   Yes. Dated 4/29/05.
6       A.   I got some papers from the
7   EEOC, but I don't remember what they were.
8       Q.   Okay. That is your correct
9   address at the top, left-hand side?
10      A.   Yes, it is.
11      Q.   And there's an X right in the
12  middle?
13      A.   Yes.
14      Q.   Okay. And the statement to
15  the right of that, you do not understand, or
16  do you understand it?
17      A.   I really don't understand it.
18  I don't know what that means.
19      Q.   Okay.
20      A.   I mean, not giving them enough
21  information, or, you know --
22      Q.   Let me ask you this. Do you
23  not -- Do you disagree with the statement or

Page 216

1   don't understand it?
2       A.   I don't understand it, you
3   know.
4           (Defendant's Exhibit 46
5           was marked for
6           identification purposes.)
7       Q.   All right. Go to 46, then. I
8   got this from the Alabama Department of
9   Industrial Relations, and I think it refers
10  to you, Brenda Sims; is that correct?
11      A.   Yes.
12      Q.   And it was dated November 28,
13  2004, which is right after you left
14  JELD-WEN; is that correct?
15      A.   It's dated when?
16      Q.   Look at the top right. I'm
17  Sorry. Excuse me. November 28, 2004.
18      A.   Yes.
19      Q.   All right. And is that about
20  when you applied for unemployment benefits?
21  I'm not going to tie you down. Just,
22  roughly.
23      A.   I don't remember.

54  (Pages 213 to 216)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 221

1  offered originally?
2      A.    I really don't know.
3          MR. SCOFIELD: Okay. I'm
4  basically through. Can I talk to my
5  cocounsel about five minutes?
6          MR. DOUGLAS: Sure.
7          (Recess taken.)
8      Q.    When is the last time you've
9  taken any type of antidepressants or nerve
10  pills?
11      A.    I'm on antidepressants now.
12      Q.    Ma'am?
13      A.    I'm on depression pills now.
14      Q.    Are you still having concerns
15  and worries about the silicon in your body?
16      A.    Of course, I worry about it.
17      Q.    Is things with Luke, is that
18  better now?
19      A.    Oh, yes, that's fine.
20      Q.    Okay. When you went to --
21  came up here yesterday and went home, can
22  y'all remember what y'all talked about?
23      A.    Going home?

Page 222

1      Q.    Yeah. Did you talk about the
2  case?
3      A.    I don't think so.
4      Q.    Okay. What about on the way
5  up here?
6      A.    We went shopping.
7          (Defendant's Exhibit 49
8          was marked for
9          identification purposes.)
10      Q.    Okay. Let me mark this
11  Exhibit Number 49. This is a document that
12  says that the last day at work for Richard
13  Fetner was October 13, 2004. And I want --
14  I know you've never seen this before, but I
15  want to know if you have any evidence or
16  memory that may contradict that date that
17  that was his last day?
18      A.    I don't remember what his last
19  day was.
20      Q.    Okay. Have you left anything
21  out -- We've had a few breaks today, and
22  just got off one, can you think of anything
23  you left out of your deposition that you'd

Page 223

1  like to add or take away? Any changes you'd
2  like to make, without looking at your
3  attorney?
4      A.    Well, now, Phil Smith, when
5  Richard left, he was over that department.
6      Q.    Okay. But only when
7  Mr. Fetner left?
8      A.    Only when Mr. Fetner left.
9      Q.    And you did the best you could
10  to tell the truth?
11      A.    Yes, I did.
12          MR. SCOFIELD: At this time,
13  I'd like to -- without any seeking of
14  stipulation from Counsel, I'd like to leave
15  the Record open in the event that we may
16  need to do this again, to talk about any new
17  additional documents that have come in and
18  limited to that. You don't have to make any
19  agreement. I'd just like to make that on
20  the Record that we still have not received
21  all of our subpoenas back yet. If something
22  comes up that we'd like to --
23          MR. THOMPSON: She's got some

Page 224

1  documents right here.
2          MR. SCOFIELD: And she's got a
3  document, too. If, in fact, we need to talk
4  about that, we'd like to reserve the right
5  to the extent allowed by law to ask
6  questions on those new documents.
7          MR. DOUGLAS: All I can say is
8  that we'll talk about them. And he's got to
9  get new information.
10          MR. SCOFIELD: That's all I
11  want to do. I just want to know -- I just
12  don't want to foreclose the right to ask you
13  that, or the Court.
14          MR. DOUGLAS: And I believe
15  she stated she didn't know if she had that
16  paper or not. She stated she was going to
17  try to find that paper, not that she still
18  had it.
19          MR. SCOFIELD: Okay.
20          THE WITNESS: Because I might
21  have throwed it away.
22          MR. SCOFIELD: The deposition
23  is now concluded, unless you have questions.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 225

1         MR. DOUGLAS:  I don't.
2         MR. SCOFIELD:  Ms. Brenda,
3    thank you so very much.
4    (The deposition was concluded at 4:06 p.m.,
5     April 11, 2006.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 226

1         REPORTER'S CERTIFICATE
2    STATE OF ALABAMA,
3    ELMORE COUNTY,
4         I, Angela Smith, Registered
5    Professional Reporter and Commissioner for
6    the State of Alabama at Large, do hereby
7    certify that the above and foregoing
8    proceeding was taken down by me by
9    stenographic means, and that the content
10   herein was produced in transcript form by
11   computer aid under my supervision, and
12   that the foregoing represents, to the best
13   of my ability, a true and correct
14   transcript of the proceedings occurring on
15   said date and at said time.
16       I further certify that I am neither
17   of kin nor of counsel to the parties to the
18   action; nor in any manner interested in the
19   result of said case.
20
21
                    _____
22              Angela Smith, RPR, CRR,
                for the State of
23              Alabama at Large.

57 (Pages 225 to 226)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# EXHIBIT 6

# Former JELD-WEN Facility
## Roanoke, AL



### For Sale or Lease



**235 Millwork Industrial Dr.
Roanoke, AL  36274**

- +/- 19.93 acres
- +/- 50,000 SF (expandable)
- +/- 1,500 SF of office
- 2 dock high doors with levelers
- 1 oversized drive-in door
- Heavy 3-phase power, 277/480 Volt
- Additional trailer storage available

For More Information Please
Contact:
**Chip Watson**
770.290.0714
cwatson@trammellcrow.com
**Wit Truitt**
770.290.0710
wtruitt@trammellcrow.com
www.trammellcrow.com

**Trammell Crow Company**

The information contained herein is believed to be accurate but is not warranted, as the information may change or be updated without notice. Seller or landlord makes no representation as to the environmental condition of the property and recommends purchaser's or tenant's independent investigation.

**B. Sims - 6**

COMMENCING AT AN IRON BAR WHICH IS T
THE NORTHEAST ¼ OF THE NORTHWEST ¼
SOUTH, RANGE 12 EAST, ROANOKE, RANDO
POINT OF BEGINNING; THENCE RUN NORTH
238.63 FEET TO AN IRON PIPE, THENCE RUN
DISTANCE OF 528.91 FEET TO AN IRON ROD
BOUNDARY OF GUANO STREET, THENCE RI
DISTANCE OF 40.26 FEET TO AN IRON PIN LO
BOUNDARY OF GUANO STREET, THENCE RI

IRON PIN FOUND

COMPUTED POINT

CONCRETE SLAB

POWER POLE LINE

ABANDONED RAILROAD SPUR NOT
LOCATED ON THIS SURVEY.

C.S.X. RAILROAD

100' R.O.W (50' EACH SIDE OF CENTERLINE)

SEC. 02 - TSP. 22 - S - RNG. 12 - E
ROANOKE, RANDOLPH COUNTY, A

# EXHIBIT 13

APPLICATION FOR EMPLOYMENT     40min   4-28-04

Please answer all questions. If one does not apply, insert N/A (not applicable)

**PERSONAL**

Name  Sims Brenda H.                    Social Security Number:
(Please print)  Last        First        Middle Initial

Home Phone: (334) 885-6612          Message Phone: (        )

Address  3552 Co Rd 30 Roanoke, Al.        36274
         Street              City          State        Zip

Position desired: _____

Type of employment desired:
☑ FULL-TIME ☐ PART-TIME ☐ SUMMER

Shifts you can work:
☑ DAY ☐ SWING ☐ GRAVEYARD

Do you have restrictions that would prevent you from working overtime?
☐ YES  ☑ NO

REASON: _____

Date Available: 5-10-04

Have you the legal right to work in the U.S.?
☑ YES  ☐ NO

Are you at least 18 years of age?
☑ YES  ☐ NO

Hire is subject to verification that applicant is at least 18 years old and is eligible to work in the United States.

Have you, since the age of 18 or within the last 7 years (whichever is most recent), ever been convicted of a felony?
☐ YES  ☑ NO

If yes, describe briefly: _____

I have previously:      ☐ Applied for employment with JELD-WEN or one of its divisions.
                        ☐ Been employed by JELD-WEN or one of its divisions.

Names of friends or relatives at this company:
Lorisa Minnix
Kelly

Position: _____  Date: _____

Location: _____

List any "sideline" business interests. _____

| EDUCATION | Name | City | State | No. of Years | Major Subject | Degree/Diploma (if degree, identify type) |
|---|---|---|---|---|---|---|
| High School | Handley | Roanoke, Al. | | 5 | | GED |
| College | | | | | | |
| College | | | | | | |
| Graduate School | | | | | | |
| Business, Trade, or Other | | | | | | |

Are you presently enrolled as a student?  ☐ YES  ☑ NO      Do you expect to be?  ☐ YES  ☑ NO      When?

Where? _____

**SKILLS**

Please list any other special training, skills, and experience that will assist you in the job for which you are applying. List all factory and/or office equipment you can operate.

Typing ☐

WPM _____

Shorthand ☐

WPM _____

Are you taking any vocational or technical courses at present?  ☐ YES  ☑ NO

If yes, what and where? _____

**U.S. MILITARY**

Branch of Service _____      From: _____      To: _____
(Army, Navy, Air Force, USMC, Etc.)          Month/Day/Year          Month/Day/Year

Rank: _____

Kinds of training and duty while in service: _____

(Please complete reverse side)

Page 1101.1

B. Sims - 13

**EMPLOYMENT RECORD**  Beginning with your present or last employer, list the last four jobs you have held.

| NAME OF EMPLOYER (PRESENT OR LAST) | JOB TITLE | BASE RATE OF PAY (HOUR/WEEK/MONTH) |
| | | START _9.58_  END |
| _Alabaskee Mills_ | _Twister_ | AREA CODE  PHONE |
| ADDRESS | (CITY)        (STATE) | _334  885 - 6622_ |
| _Hwy 22_ | _Rock Mills   Al._ | REASON FOR LEAVING |
| YRS EMPLOYED | NAME & TITLE OF SUPERVISOR | _Closeing Down_ |
| FROM: _6 - 1991_ TO: _7th May 2004_ | _Ray Jones_ | |

BRIEF DESCRIPTION OF DUTIES

_Puts Twist In Yard_

If still employed, may we contact this employer?    ☑ YES    ☐ NO

| NAME OF EMPLOYER | JOB TITLE | BASE RATE OF PAY (HOUR/WEEK/MONTH) |
| | | START    END |
| _Screen Prints_ | | AREA CODE  PHONE |
| ADDRESS | (CITY)        (STATE) | |
| | _Roanoke , Al_ | REASON FOR LEAVING |
| DATES EMPLOYED | NAME & TITLE OF SUPERVISOR | _Layed off_ |
| FROM: _1990_ TO: _1991_ | _Page Enloe_ | |

BRIEF DESCRIPTION OF DUTIES

_Printed Thing's On Shirts_

| NAME OF EMPLOYER | JOB TITLE | BASE RATE OF PAY (HOUR/WEEK/MONTH) |
| | _Winder_ | START    END |
| _Chadwick Yarns_ | | AREA CODE  PHONE |
| ADDRESS | (CITY)        (STATE) | _334   863 - 2191_ |
| | _Roanoke     Al._ | REASON FOR LEAVING |
| DATES EMPLOYED | NAME & TITLE OF SUPERVISOR | _Could Not Work_ |
| FROM: _1989_ TO: _1990_ | _Tommy Yaus_ | _Nights_ |

BRIEF DESCRIPTION OF DUTIES

| NAME OF EMPLOYER | JOB TITLE | BASE RATE OF PAY (HOUR/WEEK/MONTH) |
| | _Presser_ | START    END |
| _Stephini Fashions_ | | AREA CODE  PHONE |
| ADDRESS | (CITY)        (STATE) | |
| | _Roanoke     Al._ | REASON FOR LEAVING |
| YRS EMPLOYED | NAME & TITLE OF SUPERVISOR | |
| FROM: _1984_ TO: _1989_ | _Shirl Clack_ | |

BRIEF DESCRIPTION OF DUTIES

✱ _Pressd Shirts_

REFERENCES _Non-relative ; A person with a position of being a good Judge of Character._

List people in addition to your prior employers we may contact for additional information regarding your capabilities and work habits.

| NAME | ADDRESS | CITY | STATE  ZIP | AREA CODE  PHONE |
| _O'Day Wilson_ | | _Roanoke , Al. 36274_ | |
| _Lorine Minaix_ | | _Roanoke , Al. 36274_ | |
| _Sara Sales_ | | _Roanoke, Al. 36274_ | |

**CERTIFICATION & AGREEMENT** — Read Carefully and Sign

Please read the following statements carefully before signing this application.

Only those applications that are signed and dated are considered valid.

I certify that all answers or statements I have made in this application or other supplementary material are true and correct without omissions. I acknowledge that any false statement, misrepresentation or material omission on this application or supplementary materials may result in a refusal to hire or an immediate dismissal if I am hired. I authorize you to contact any of my past employers, schools and personal references concerning my previous employment, education and personal history. I release this company and all persons and organizations so contacted from all claims and liabilities of any nature arising from such investigations or supplying of such information. I understand that I will be required, and hereby agree; to submit to a drug and alcohol screening and to undergo a fitness for duty exam as part of the hiring process. If hired, I agree to comply with all rules and policies established from time to time by the company. I understand that if hired my employment is for no definite period of time and may be terminated at any time by the company or by me, with or without cause. I have read and understand the foregoing statements and accept the same as conditions of employment.

Signature of Applicant  _Brenda H. Sims_        Date _4 - 28 - 04_

(REF #241)

# EXHIBIT 16

# JELD-WEN®

## Employee Acknowledgement of Anti-Harassment Procedures and Guidelines

I have received training/instruction on JELD-WEN's Anti-Harassment Procedures and Guidelines and I understand its contents. I agree to abide by this policy and I understand that my conduct will be governed by this policy the duration of my employment.

*Brenda H. Sims*
Employee Name (print)

_____
Manager Signature

*Brenda H. Sims*
Employee Signature

Date: 5-28-04

**[To be placed in the employees personnel file]**

**B. Sims - 16**

# EXHIBIT 17

# JELD-WEN®

## Handbook Acknowledgement and Agreement

I acknowledge that I have received and reviewed a copy of the JELD-WEN Employee Handbook and understand that it sets forth the terms and conditions as well as the duties, responsibilities and obligations of my employment with JELD-WEN. I understand and agree to be knowledgeable about and to abide and be bound by the rules, policies and standards set fourth in the Employee Handbook.

I also acknowledge that my employment with JELD-WEN is at-will, which means it is not for a specified period of time and can be terminated at any time with or without cause or notice, by me or by JELD-WEN. I acknowledge that no statements or representations regarding my employment can alter the foregoing. I acknowledge that, except for the policy of at-will employment, JELD-WEN reserves the right to revise, delete, and add to the provisions of this Employee Handbook at its sole discretion.

I understand and accept the foregoing statements regarding my employment with JELD-WEN.

*Brenda H. Sims* 

Employee Name (Print)                           Manager Signature

*Brenda H. Sims*

Employee Signature

Date: _5 - 28 - 04_

**[Maintained in the employees' personnel file]**

**B. Sims - 17**

# EXHIBIT 18

# Form W-4 (2004)

**Purpose.** Complete Form W-4 so that your employer can withhold the correct Federal income tax from your pay. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption from withholding.** If you are exempt, complete only lines 1, 2, 3, 4, and 7 and sign the form to validate it. Your exemption for 2004 expires February 16, 2005. See Pub. 505, Tax Withholding and Estimated Tax.

**Note:** You cannot claim exemption from withholding if: (a) your income exceeds $800 and includes more than $250 of unearned income (e.g., interest and dividends) and (b) another person can claim you as a dependent on their tax return.

**Basic instructions.** If you are not exempt, complete the **Personal Allowances Worksheet** below. The worksheets on page 2 adjust your withholding allowances based on itemized deductions, certain credits, adjustments to income, or two-earner/two-job situations. Complete all worksheets that apply. However, you may claim fewer (or zero) allowances.

**Head of household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals. See line E below.

**Tax credits.** You can take projected tax credits into account in figuring your allowable number of withholding allowances. Credits for child or dependent care expenses and the child tax credit may be claimed using the **Personal Allowances Worksheet** below. See Pub. 919, How Do I Adjust My Tax Withholding? for information on converting your other credits into withholding allowances.

**Nonwage income.** If you have a large amount of nonwage income, such as interest or dividends, consider making estimated tax payments using Form 1040-ES, Estimated Tax for Individuals. Otherwise, you may owe additional tax.

**Two earners/two jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one Form W-4. Your withholding usually will be most accurate when all allowances are claimed on the Form W-4 for the highest paying job and zero allowances are claimed on the others.

**Nonresident alien.** If you are a nonresident alien, see the Instructions for Form 8233 before completing this Form W-4.

**Check your withholding.** After your Form W-4 takes effect, use Pub. 919 to see how the dollar amount you are having withheld compares to your projected total tax for 2004. See Pub. 919, especially if your earnings exceed $125,000 (Single) or $175,000 (Married).

**Recent name change?** If your name on line 1 differs from that shown on your social security card, call 1-800-772-1213 to initiate a name change and obtain a social security card showing your correct name.

---

### Personal Allowances Worksheet (Keep for your records.)

**A** Enter "1" for yourself if no one else can claim you as a dependent . . . . . . . . . . . **A** _____

**B** Enter "1" if:
- You are single and have only one job; or
- You are married, have only one job, and your spouse does not work; or
- Your wages from a second job or your spouse's wages (or the total of both) are $1,000 or less.

. . **B** _____

**C** Enter "1" for your **spouse**. But, you may choose to enter "-0-" if you are married and have either a working spouse or more than one job. (Entering "-0-" may help you avoid having too little tax withheld.) . . . . . . . . . **C** _____

**D** Enter "1" for each dependent (other than your spouse or yourself) you will claim on your tax return . . . . . . **D** _____

**E** Enter "1" if you will file as head of household on your tax return (see conditions under Head of household above) . . . **E** _____

**F** Enter "1" if you have at least $1,500 of child or dependent care expenses for which you plan to claim a credit . . **F** _____
(**Note:** Do not include child support payments. See Pub. 503, Child and Dependent Care Expenses, for details.)

**G** **Child Tax Credit** (including additional child tax credit):
- If your total income will be less than $52,000 ($77,000 if married), enter "2" for each eligible child.
- If your total income will be between $52,000 and $84,000 ($77,000 and $119,000 if married), enter "1" for each eligible child plus "1" additional if you have four or more eligible children. . . . . . . . . . . . . **G** _____

**H** Add lines A through G and enter total here. **Note:** This may be different from the number of exemptions you claim on your tax return. ▶ **H** _____

For accuracy, complete all worksheets that apply.
- If you plan to **itemize or claim adjustments to income** and want to reduce your withholding, see the **Deductions and Adjustments Worksheet** on page 2.
- If you have **more than one job or are married and you and your spouse both work** and the combined earnings from all jobs exceed $35,000 ($25,000 if married) see the **Two-Earner/Two-Job Worksheet** on page 2 to avoid having too little tax withheld.
- If **neither** of the above situations applies, **stop here** and enter the number from line H on line 5 of Form W-4 below.

- - - - - - - - - Cut here and give Form W-4 to your employer. Keep the top part for your records. - - - - - - - - -

---

## Form W-4
Department of the Treasury
Internal Revenue Service

## Employee's Withholding Allowance Certificate

▶ Your employer must send a copy of this form to the IRS if: (a) you claim more than 10 allowances or (b) you claim "Exempt" and your wages are normally more than $200 per week.

OMB No. 1545-0010

## 2004

| 1  Type or print your first name and middle initial | Last name | 2  Your social security number |
|---|---|---|
| Brenda H. | Sims | |

| Home address (number and street or rural route) | 3  ☐ Single ☑ Married ☐ Married, but withhold at higher Single rate. |
|---|---|
| 3552 Co Rd 30 | Note: If married, but legally separated, or spouse is a nonresident alien, check the "Single" box. |

| City or town, state, and ZIP code | 4  If your last name differs from that shown on your social security card, check here. You must call 1-800-772-1213 for a new card. ▶ ☐ |
|---|---|
| Roanoke, Al. 36274 | |

**5** Total number of allowances you are claiming (from line H above or from the applicable worksheet on page 2)  **5** _____

**6** Additional amount, if any, you want withheld from each paycheck . . . . . . . . . . . **6** $ _____

**7** I claim exemption from withholding for 2004, and I certify that I meet **both** of the following conditions for exemption:
- Last year I had a right to a refund of all Federal income tax withheld because I had no tax liability and
- This year I expect a refund of all Federal income tax withheld because I expect to have no tax liability.
If you meet both conditions, write "Exempt" here . . . . . . . ▶ **7** _____

Under penalties of perjury, I certify that I am entitled to the number of withholding allowances claimed on this certificate, or I am entitled to claim exempt status.

Employee's signature
(Form is not valid unless you sign it.) ▶ *Brenda H. Sims*     Date ▶ 6-1-04

| 8  Employer's name and address (Employer: Complete lines 8 and 10 only if sending to the IRS.) | 9  Office code (optional) | 10  Employer identification number (EIN) |
|---|---|---|
| | | |

For Privacy Act and Paperwork Reduction Act Notice, see page 2.    Cat.

**B. Sims - 18**

Form **W-4** (2004)

# EXHIBIT 19





**Employee Stock Ownership and Retirement Plan (ESOP)**
**DESIGNATION OF BENEFICIARY**

---

**PLEASE TYPE OR PRINT WITH BLACK PEN.  ORIGINAL MUST BE RETURNED TO BE VALID.  SEE INSTRUCTIONS.**

---

**1** | **Participant Information**

Social Security Number _____   Company _Jeld - Wen_____

Last Name _Sims_____   First Name _Brenda  H._____

---

**2** | **Marital Status**

I certify that I am:

☑ Married *(If you are married and you do not designate your spouse as the only primary beneficiary, your spouse must sign the "Spousal Consent" section below in the presence of a notary public and receive the Notice of Spouse's Rights to Death Benefits.)*

☐ Single *(If you later marry, your new spouse will automatically become the only primary beneficiary.)*

☐ Divorced

☐ Legally Separated *(You must attach a copy of the signed Court Order if you are Legally Separated.)*

---

**3** | **Beneficiary Designation**

I hereby designate the following as my PRIMARY beneficiary(ies) under the Company's ESOP:

NAME                    RELATIONSHIP    FULL ADDRESS                    % SHARE

_____

    SOCIAL SECURITY _____

2) _____ %

    SOCIAL SECURITY # _____

I also name the following as my SECONDARY beneficiary(ies) to receive benefits if I am not survived by any primary beneficiary:

1 _____ %

    SOCIAL SECURITY # _____

    SOCIAL SECURITY _____

---

**4** | **Participant Signature**

I name the beneficiary(ies) indicated above and hereby revoke any prior designation of beneficiary.

_Brenda H. Sims_____   Date _6 - 1 - 04_____
SIGNATURE of Participant

---

**5** | **Spousal Consent to Benefit Election**

I, the undersigned, being the spouse of the above-named Plan participant hereby acknowledge that I have received the Notice of Spouse's Rights to Death Benefits and voluntarily consent to the election made by my spouse.  I acknowledge that my spouse has elected not to name me as sole primary beneficiary.  I further acknowledge that by consenting to this election, I will not receive full benefits and, if not a primary beneficiary, may not receive any benefits from this Plan if I survive my spouse.

Spouse's Name (Please PRINT)          SIGNATURE of Spouse          Date

Must be notarized below:

STATE of _____ )
COUNTY of _____ ):SS
The foregoing instrument was acknowledged before me this _____ Day of _____ 20_____.

Notary Signature _____

My Commission Expires: _____

---

**B. Sims - 19**

10/17/02

# EXHIBIT 22

NAME: _Brenda Sims_    DATE _8/8/___    /15

# TEST ON EMPLOYEE HANDBOOK

85

1. The normal customer is interested in three things when they buy a product. What are they?

   1. _Quality_
   2. _____
   3. _Prompness_

2. A new or rehired full-time employee will be considered probationary and will be evaluated for a period of _3_ months before acquiring seniority status.

   A new regular full-time employee becomes eligible for the JELD-WEN Health Benefit Plan on the _15th_ of the month following three months of active service.

   Our company has an educational program for all regular full-time employees with seniority status which provides _100_ percent of tuition cost of any "pre-approved" course upon satisfactory completion of the course.

5. In order to qualify for any "Holiday Pay", an employee must have worked at least _3_ months as a regular full-time employee prior to the holiday and must have worked the scheduled work day for the plant preceding and following the holiday.

6. Three minutes prior to the end of each shift, a warning signal will sound. Which of the following should be done during the three-minute period? Please check all proper activities.

   _____ Chat with your buddy
   _✓_ Make out production tickets
   _____ Go to the restroom
   _✓_ Put tools away
   _✓_ Shut down machines
   _____ Have coffee
   _✓_ Clean area

7. Absence of _3_ days without notifying either your group manager or general manager may be considered a voluntary quit.

8. When considering an employee for promotion, there are nine factors equally considered. Please name at least six (6) of these.

   1. _Quiltey Of Work_
   2. _Be At Work On Time_
   3. _Netnes Of Person_
   4. _Attidue Of Person_
   5. _____
   6. _____

9. Employees called to work in an emergency will receive a minimum of _2_ hours pay at the applicable rate.

1

B. Sims - 22

10. It is recognized that an "at will" employment relationship exists between the employee and the company, and both have reserved the right to _Terminat_ the employment relationship.

11. To help guide you or your family members to professional help for substance abuse and to give you assistance in working out solutions to any number of personal problems, the company has formally adopted an _Substance Abuse_ Program.

12. Which of the following acts of misconduct are subject to disciplinary action, including dismissal at the discretion of management?

_✓_ Stealing—Including possession of company property without permission.

_✓_ Coming to work under the influence of alcohol or any illegal drug, bringing alcoholic beverages or illegal drugs onto company property, or drinking and using illegal drugs on Company property.

_✓_ Stopping work without permission before quitting time.

_✓_ Violation of company rules or policies and/or violation of safety or health regulations, or failure to use safety devices.

_✓_ Use of improper or abusive language.

_✓_ Abuse of property, or any attempt to interfere with or obstruct production.

_✓_ Failure to carry out any reasonable instructions of a group manager.

13. In the employee booklet there are 15 responsibilities of each employee in regard to safety. Please name at least six (6), but all 15 if possible.

1. _Ear Plugs_  9. _____
2. _Gloves_  10. _____
3. _Eye Glases_  11. _____
4. _Keeping Work Area Clean_
5. _Watch Where You Put Your Hands around a Saw_
6. _Put Lock Out On Job When It Has To Be Worked On_
7. _____  15. _____
8. _____

14. The "_Health_ Incentive Program" is designed to give you and your spouse an incentive to lead healthier lives.

15. Harassment in any form will not be tolerated by the company. Place an "x" by each of the following that would be considered harassment.

_X_ Derogatory comments.

_X_ Unwanted physical contact.

_X_ Making sexual gestures.

_____ Greeting a coworker with "Good Morning".

_X_ Offering employment benefits in exchange for sexual favors.

_X_ Wearing a shirt printed with derogatory material.

_X_ Physical conduct of a sexual nature that is directed toward an individual because of their gender.

16. In the employee booklet, there are seven occurrences listed when you should keep the company informed. Please name at least four (4) of these.

1. *Call In When You Are Going To Be Out*

2. *Harassment*

3. *Fix Unsafe Things*

4. _____

17. Cleanliness is a part of everybody's job and a neat facility will add *Time* to our products, *Saftey* to our jobs, and *Quitey* in our work.

18. Please place either "DO" or "DON'T" in the blank for each of the following statements regarding cleanliness.

*Don't* Throw packaging material or trash on the floor

*Don't* Allow defective products past your workstation – no matter where the defect was created

*Do* Sweep and clean during any idle time

*Do* Pick up spilled items at once

*Do* Remember that we are in business to satisfy customers

*Don't* Throw paper or cups on the ground outside

*Do* Pick up any wood or debris seen on the floor

JELD-WEN possesses certain _____ and trade secret information relating to many of its operations, including but not limited to, manufacturing processes and techniques, particular technologies or equipment, cost information, customer information and pricing and financial data. This information must not be disclosed or used in any manner except as is necessary to your work at JELD-WEN.

20. (You make this question)

# EXHIBIT 25



*Telephone interview*
*6-27-05   1:25 PM*

# Exit Interview Questionnaire

Employee Name *Sims, Brenda*          SS# *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*

Employment Start Date *5-13-05*          Termination Date _____

Position *OES Operator*          Supervisor *Charlotte Overton*

1. What prompted you to look for other work? *Did not like 4 to 12 shift.*

2. How did you feel about the employee benefits package offered? *Good*

3. Are there any other benefits you feel we should have offered? *Would have liked to have had full benefits before 1 year*

4. How frequently did you received feedback on performance? *Some, was told she was doing a good job.*

5. What did you like most about your job with the company? *Good company to work for.*

6. What did you like least about your job with the company? *Having to work full year without benefits*

7. Do you feel you could have been given more responsibility? *Was given too much too fast*

8. Did you have enough opportunity for advancement? _____

9. Were you satisfied with your working conditions? *NO*

10. Was too much work expected of you? *Yes*

11. How would rate this company as a place to work? ☐ Excellent ☑ Good ☐ Fair ☐ Poor

12. How do you feel your APS coordinator treated you? *Very nice*

13. How do you feel you were treated by your immediate supervisor? *Very nice*

14. As of your termination date, or at any time, were you ever injured on the job? *NO*

15. If yes, what was the extent of your injury? _____

16. Any further suggestions or comments: *Had problems with trainer, Anita... She was not knowledgeable about the job (see back)*

Print Name: _____          Date: _____

B. Sims - 25

she _____ _____ _____ _____ ___ __ _____
time as soon as the 2nd night she worked. (She states
they had heated words about it.) She was not explaining
the job to her. She wanted to talk to Shawn about it
but was not able to speak to him privately. She states
I was also upset about my pay. I knew my instructor was
making much more money than I was. I did not feel it
was fair to have to work a year before I would be
making more money. (She states she discussed this with
her instructor.)

# EXHIBIT 31

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 130-2005-00512 |
| | and EEOC |

| | State or local Agency, if any |
|---|---|

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| **Brenda Sims** | **(334) 885-6612** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **3552 County Road 30 Roanoke, AL 36274** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe
Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **JELD WEN MILLWORK MANUFACTURING** | **15 - 100** | **(334) 863-7717** |

| Street Address | City, State and ZIP Code |
|---|---|
| **235 Millwork Ind,  Roanoke, AL 36274** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **06-01-2004** | **08-01-2004** |
| ☐ CONTINUING ACTION | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

believe I have been subjected  sexual harassment from my supervisor which consisted of the rubbing and touching of my body to include my legs and breasts.  This conduct was continuous during the period of June of 2004 through August of 2004.  My supervisor suggested that I come to his house and he also stated that should I come, I would have no worry about my work time.  In retaliation for my rejection of the sexual harassment, I am moved from my normal work assignment and placed on other jobs.

I believe I have been discriminated against because of my sex, female in violation of Title VII of the Civil Rights Act of 1964, as amended.

*NOV 29*

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| *11-23-04*   *Brenda H. Sims* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date          Charging Party Signature | |

B. Sims - 31

# EXHIBIT 32

03/13/2006  11:21  3348637780                    ROANOKE POLICE DEPT                    PAGE  02

## ALABAMA UNIFORM ARREST REPORT
### OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| Fingerprinted | R84 Completed |
|---|---|
| ☐ Yes ☒ No | ☐ Yes ☒ No |

| 1 ORI # | 2 AGENCY NAME | 3 CASE # | 4 SFX |
|---|---|---|---|
| AL0560100 | Roanoke Police Department | 04062801A | 2 |

**IDENTIFICATION**

| 5 LAST, FIRST, MIDDLE NAME |
|---|
| SIMS, BRENDA H |

| 7 SEX | 8 RACE | 9 HGT | 10 WGT. | 11 EYE | 12 HAIR | 13 SKIN | SCARS, MARKS, TATOOS, AMPUTATIONS |
|---|---|---|---|---|---|---|---|
| ☐ M ☒ F | ☐ B ☒ W ☐ A | 5'07" | 110 | GRN | BRO | | |

| 15 PLACE OF BIRTH (CITY, COUNTY, STATE) | 16 SSN | 17 DATE OF BIRTH | 18 AGE | 19 MISCELLANEOUS ID # |
|---|---|---|---|---|
| ROANOKE, RANDOLPH, AL | 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 | 09/12/1952 | 51 | |

| 20 SID # | 21 FINGERPRINT CLASS | | | | | | | 22 MNU # | 23 ST |
|---|---|---|---|---|---|---|---|---|---|
| | | KEY | MAJOR | PRIMARY | SCDV | SUB-SECONDARY | FINAL | 3106986 | AL |
| | HENRY CLASS | | | | | | | | |
| 24 FBI # | NCIC CLASS | | | 25 IDENTIFICATION COMMENTS | | | | | |

| 26 ☐ RESIDENT ☒ NON-RESIDENT | 27 HOME ADDRESS (STREET, CITY, STATE, ZIP) | 28 RESIDENCE PHONE | 29 OCCUPATION (BE SPECIFIC) |
|---|---|---|---|
| | 3552 COUNTY RD 30, ROANOKE, AL 36274 | (334) 885-6612 | ROUTER |

| 30 EMPLOYER (NAME OF COMPANY/SCHOOL) | 31 BUSINESS ADDRESS (STREET, CITY, STATE, | 32 BUSINESS PHONE |
|---|---|---|
| JELDWEN | ROANOKE, AL 36274 | |

**ARREST**

| 33 LOCATION OF ARREST (STREET, CITY, STATE, ZIP) | 34 SECTOR # | 35 ARRESTED FOR YOUR JURISDICTION | |
|---|---|---|---|
| SPECTRUM, ROANOKE, AL 36274 | | ☐ IN STATE | ☒ YES ☐ NO |
| | | ☒ OUT STATE AGENCY | ROANOKE POLICE DEPT |

| 36 CONDITION OF ARRESTEE | 37 RESIST ARREST? | 38 INJURED? | 39 DESCRIPTION OF WEAPON |
|---|---|---|---|
| ☐ DRUNK ☐ SOBER | ☐ YES ☒ NO | ☐ OFFICER ☒ NONE ☐ ARRESTEE | ☐ HANDGUN ☐ OTHER FIREARM |
| ☒ DRINKING ☐ DRUGS | | | ☐ RIFLE ☐ OTHER WEAPON |
| | | | ☐ SHOTGUN |

| 41 DATE OF ARREST M D Y | 42 TIME OF ARREST | 43 DAY OF ARREST | 44 TYPE ARREST | 45 ARRESTED BEFORE? |
|---|---|---|---|---|
| 06/28/2004 | 18:23 ☐ AM ☒ PM | M T W T F S S | ☒ ON VIEW ☐ WARRANT | ☐ YES ☒ NO |

| 46 CHARGE - 1 | 47 UCR CODE | 48 CHARGE - 2 | 49 UCR CODE |
|---|---|---|---|
| ☐ FEL ☒ MISD  Simple Assault - Domestic Violence | 132401 | ☐ FEL ☐ MISD | |

| 50 STATE CODE/LOCAL ORDINANCE | 51 WARRANT # | 52 DATE ISSUED M D Y | 53 STATE CODE/LOCAL ORDINANCE | 54 WARRANT # | 55 DATE ISSUED M D Y |
|---|---|---|---|---|---|
| 13A-6-132 | | | | | |

| 56 CHARGE - 3 | 57 UCR CODE | 58 CHARGE - 4 | 59 UCR CODE |
|---|---|---|---|
| ☐ FEL ☐ MISD | | ☐ FEL ☐ MISD | |

| 60 STATE CODE/LOCAL ORDINANCE | 61 WARRANT # | 62 DATE ISSUED M D Y | 63 STATE CODE/LOCAL ORDINANCE | 64 WARRANT # | 65 DATE ISSUED M D Y |
|---|---|---|---|---|---|
| | | | | | |

| 66 ARREST DISPOSITION | 67 IF OUT ON RELEASE WHAT TYPE? | 68 ARRESTED WITH (1) ACCOMPLICE (FULL NAME) |
|---|---|---|
| ☐ HELD ☐ TO PJE | bond posted | |
| ☐ BAIL ☐ OTHER | | 69 ARRESTED WITH (2) ACCOMPLICE (FULL NAME) |
| ☒ RELEASED | | |

**VEHICLE**

| 70 VYN | 71 VMA | 72 VMO | 73 VST | 74 VCO  TOP  BOTTOM | 75 TAG # | 76 LIS | 77 LIY |
|---|---|---|---|---|---|---|---|
| 78 VIN | | | | 79 IMPOUNDED? ☐ YES ☒ NO | 80 STORAGE LOCATION/IMPOUND # | | |

| 81 OTHER EVIDENCE SEIZED/PROPERTY SEIZED |
|---|
| |

**JUVENILE**

| 82 JUVENILE DISPOSITION | ☐ HANDLED AND RELEASED | ☐ REF. TO WELFARE AGENCY | ☐ REF. TO ADULT COURT | 83 RELEASED TO |
|---|---|---|---|---|
| | ☐ REF. TO JUVENILE COURT | ☐ REF. TO OTHER POLICE AGENCY | | |

| 84 PARENT OR GUARDIAN (LAST, FIRST, MIDDLE, NAME) | 85 ADDRESS (STREET, CITY, STATE, ZIP) | 86 PHONE |
|---|---|---|
| | | |

| 87 PARENTS EMPLOYER | 88 OCCUPATION | 89 ADDRESS (STREET, CITY, STATE, ZIP) | 90 PHONE |
|---|---|---|---|
| | | | |

**RELEASE**

| 91 DATE AND TIME OF RELEASE | 92 RELEASING OFFICER NAME | 93 AGENCY/DIVISION | 94 ID# |
|---|---|---|---|
| 06/29/2004  4:00 ☐ AM ☒ PM | Randy Moore | Roanoke Police Department | 4988 |

| 95 RELEASED TO | 96 AGENCY/DIVISION | 97 AGENCY ADDRESS |
|---|---|---|
| Richard Petner | | Roanoke, AL 36274 |

| 98 PERSONAL PROPERTY RELEASED TO ARRESTEE | 99 PROPERTY NOT RELEASED/HELD AT: | 100 PROPERTY # |
|---|---|---|
| ☐ YES ☒ NO ☐ PARTIAL | | |

| 101 REMARKS (NOTE ANY INJURIES AT TIME OF RELEASE) |
|---|
| Released with no injuries. Court set for 8-3-04 @ 6PM |

| 102 SIGNATURE OF RECEIVING OFFICER | 103 SIGNATURE OF RELEASING OFFICER | LOCAL USE | STATE USE |
|---|---|---|---|
| | | | |

| MULTIPLE CASES CLOSED | 104 CASE # | 105 SFX | 106 CASE # | 107 SFX | 108 CASE # | 109 SFX |
|---|---|---|---|---|---|---|
| | | | | | | |

| 111 ARRESTING OFFICER (LAST, FIRST, M.I.) | 112 ID # | 113 ARRESTING OFFICER (LAST, FIRST, M.I.) | 114 ID # | 118 SUPERVISOR | | 119 WATCH CMDR |
|---|---|---|---|---|---|---|
| Randy Moore | 4955 | Jonathan Caldwell | 5246 | Stacey Brooks | ID # 1428 | ID # |

### TYPE OR PRINT IN BLACK INK ONLY

ACJIC-32 REV. 10-90

03/13/06  MON 10:36  [TX/RX

**B. Sims - 32**

JELD-WEN/Minix, et al. - Police Arrest Report on B. Sims Produced by Def. JELD-WEN

T00001

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| ADDITIONAL ARREST NARRATIVE CONTINUED | DATE AND TIME OF ARREST 08/28/2004  18:23 | AM / PM | CASE # 04062801A | RX |
|---|---|---|---|---|

PAGE # 2

On this date officers received called to spectrum for a 10-97D in progress. Upon arrival I saw both subjects in a verbal confrontation in the alley way at the gas pump of spectrum. Both were loud and arguing with each other and several spectators were present. While I was trying to get information form both parties, Mrs. Miller became more aggravated with her boyfriends mother over things she was blaming her for. Mrs Miller started cursing loudly in public toward her boyfriends mother. Mrs. Miller was placed under aresst for Disorderly Conduct. Both had marks about them. Mrs. Miller had claw marks to her left side neck area from were her boyfriends mother had her by the neck choking her. Upon talking to both subjects and a witness, conclusion was that Mrs. Miller and boyfriend were at spectrum, The boyfriends mother came over from dollar general and confronted them. She was blaming Mrs Miller for jerking her grandson up by the arm on previous occasions, and threatened to call DBR. She also blamed Miller for messing around on her son. The boyfriends mother grabbed Mrs Miller around the throat area with her hand and started choking her the whole time the Mother-in-law had her grandson in her arms. Mrs Miller grabbed the mother-in-law back by the throat in defense to get her off her. She could not get her off so she grabbed the mother-in-laws hair. In turn the mother-in-law grabbed her hair. B. Miller could not get her off of her so Mrs Miller punched the mother-in-law in the face with her fist.

Mrs. Miller was aressted for Disorderly Conduct and Mrs. Sims was aresssted for Domestic Violence 3rd degree being that she was found to be the primary aggressor.

TYPE OR PRINT IN BLACK INK ONLY

03/13/06  MON 10:36  [TX/RX NO 9905]

JELD-WEN/Minix, et al. - Police Arrest Report on B. Sims Produced by Def. JELD-WEN          T00002

# EXHIBIT 33

| State of Alabama Unified Judicial System<br>Form CR-6    Rev. 2/95 | **Complaint**<br>(Felonies, Misdemeanors, or Violations -<br>District Court or Municipal Court) | Warrant Number<br><br>Case Number<br>104-62851A-02 |

IN THE _Municipal_
(Circuit, District, or Municipal)    COURT OF _Roanoke_  MC04-342, ALABAMA
Name of Municipality or County

☐ STATE OF ALABAMA    ☒ MUNICIPALITY OF _Roanoke_

v. _Brenda Sims_ , Defendant

Before me, the undersigned authority, personally appeared this day the undersigned complainant who, upon first being duly sworn, states on oath that he/she has probable cause for believing, and does believe, that _Brenda Sims_ , Defendant, whose name is otherwise unknown to the complainant, did, prior to the commencement of this action, on or about _6-28-04_ (date of Occurrence) commit the offense of _Domestic Violence 3_ within the

☐ County of _____
☒ City/Town of _Roanoke_ or in the police jurisdiction thereof, in that he/she did:

(State specific facts here. Continue on a separate sheet of paper if needed.) _Commit the Crime of Assault in the 3rd degree pursuant to Section 13A-6-132 by grabbing the victim by the throat with intent to cause Physical Injury, she did cause Physical injury to the victims throat. And the victim being a domestic-in-law under common law marriage._

in violation of
☒ Section _13A-6-132_ , Code of Alabama 1975,
☐ Ordinance Number _____, which embraces Section _____
Code of Alabama 1975, previously adopted, effective and in force at the time the offense was committed.
☐ Other _____

Sworn to and Subscribed before me this _28th_ day of _June_ 20_04_

_____
Judge/Magistrate/Warrant Clerk

_____
Complainant
_138 chestnut St, Roanoke_
Address
_863-2121_
Telephone Number

| WITNESSES | | |
| NAME | ADDRESS | TELEPHONE NUMBER |
| J Caldwell | RPD | 863-2121 |
| S Brooks | RPD | 863-2121 |

Additional Witnesses on Reverse Side.

B. Sims - 33

JELD-WEN/Minix, et al. - Roanoke Municipal Court Records of B. Sims Produced by Def. JELD-WEN    T0000

## ALABAMA UNIFORM ARREST REPORT

| Fingerprinted | R84 Completed |
|---|---|
| ■ Yes | ■ Yes |
| 2 No | 2 No |

**OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION**

| 1 ORI# | 0 5 6 0 1 0 0 | 2 AGENCY NAME Roanoke Police Department | 3 CASE # 0 4 0 6 2 8 0 1 A | 4 SFX D 2 |

| 5 LAST, FIRST, MIDDLE NAME SIMS, BRENDA H | 6 ALIAS AKA |

| 7 SEX ■1 M ■2 F | 8 RACE W ■3 A | 9 HGT. 5'07" | 10 WGT. 110 | 11 EYE GRN | 12 HAIR BRO | 13 SKIN | SCARS | MARKS | TATOOS | AMPUTATIONS |

| 15 PLACE OF BIRTH (CITY, COUNTY, STATE) ROANOKE, RANDOLPH AL | 16 SSN 4 2 0 – 7 2 – 5 6 2 9 | 17 DATE OF BIRTH 0 9 1 2 51 | 18 AGE 51 | 19 MISCELLANEOUS ID # |

| 20 RCF# | 21 FINGERPRINT CLASS  HENRY CLASS  NCIC CLASS | KEY MAJOR PRIMARY SCDV SUB-SECONDARY FINAL | 22 DL# 3105986 | 23 ST AL |
| 24 FBI# | | | 25 IDENTIFICATION COMMENTS |

| 26 ■ RESIDENT  ■ NON RESIDENT | 27 HOME ADDRESS (STREET, CITY, STATE, ZIP) 3552 COUNTY RD 30 ROANOKE, AL 36274 | 28 RESIDENCE PHONE (334) 885-6612 | 29 OCCUPATION (BE SPECIFIC) ROUTER |

| 30 EMPLOYER (NAME OF COMPANY/SCHOOL) JELDWEN | 31 BUSINESS ADDRESS (STREET, CITY, STATE, ZIP) ROANOKE, AL 36274 | 32 BUSINESS PHONE |

| 33 LOCATION OF ARREST (STREET, CITY, STATE, ZIP) SPECTRUM ROANOKE, AL 36274 | 34 SECTOR | 35 ■ IN STATE  □ OUT | ROANOKE POLICE DEPT |

| 36 CONDITION OF ARRESTEE: | 1 DRUNK  3 DRINKING | 2 SOBER  4 DRUGS | 37 RESIST ARREST? 1 YES ■2 NO | 38 INJURIES? 1 YES ■2 NO | 39 HOW  OFFICER  ARRESTEE | 40 ■1 Y ■N | HANDGUN | OTHER FIREARM |

| 41 DATE OF ARREST | 42 TIME OF ARREST  □ AM  □ PM  □ MIL | 43 DAY OF ARREST 1 2 3 4 5 6 7 | 44 TYPE ARREST  1 ON VIEW  2 CALL  WARRANT | 1 YES ■ NO 2 UNKNOWN | 2 SHOTGUN |

| 46 Charge-1  1 FEL ■ MISD  Simple Assault - Domestic Violence | 47 UCR CODE 1324 | 48 |

| 50 STATE CODE/LOCAL ORDINANCE | 51 WARRANT # | 52 DATE ISSUED  M D Y | 53 STATE CODE/LOCAL ORDINANCE | 52 WARRANT # | 55 DATE ISSUED  M D Y |

| 56 Charge-2  1 FEL ■ MISD | 57 UCR CODE | 58 | 58 1 FEL 2 MISD | 59 UCR CODE |

| 15 STATE CODE/LOCAL ORDINANCE | 61 WARRANT # | 62 DATE ISSUED  M D Y | 63 STATE CODE/LOCAL ORDINANCE | 64 WARRANT # | 65 DATE ISSUED  M D Y |

| 67 ON RELEASE WHAT TYPE?  1 HELD  4 TOT-LE  2 BAIL  5 OTHER  3 RELEASED | 68 ARRESTED WITH (1) ACCOMPLICE (FULL NAME)  69 ARRESTED WITH (2) ACCOMPLICE (FULL NAME) |

### VEHICLE

| 70 VYR | 71 VMA | 72 VMO | 73 VST | 74 VCO  TOP  BOTTOM | 75 TAG # | 76 LIS | 77 LIY |
| 78 VIN | | | | 79 IMPOUNDED?  1 YES ■2 NO | 80 STORAGE LOCATION/IMPOUND # | | |
| 81 OTHER EVIDENCE SEIZED/PROPERTY SEIZED | | | | | | | |

### JUVENILE

| 82 JUVENILE DISPOSITION | 1 HANDLED AND RELEASED  2 REF. TO JUVENILE COURT | 3 REF. TO WELFARE AGENCY  4 REF. TO OTHER POLICE AGENCY | 5 REF. TO ADULT COURT | 83 FILE # |
| 84 PARENT OR GUARDIAN (LAST, FIRST, MIDDLE NAME) | | 85 ADDRESS (STREET, CITY, STATE, ZIP) | | |
| 87 PARENTS EMPLOYER | 88 OCCUPATION | 89 ADDRESS (STREET, CITY, STATE, ZIP) | | 90 PHONE |

### RELEASE

| 91 DATE AND TIME OF RELEASE  M D Y  □ AM □ PM □ MIL | 92 RELEASING OFFICER | 93 AGENCY/DIVISION | 94 SFX |
| 95 RELEASED TO: | 96 AGENCY/DIVISION | 97 AGENCY ADDRESS |
| 98 PERSONAL PROPERTY RELEASED TO ARRESTEE  1 YES  2 NO  3 PARTIAL | 99 PROPERTY NOT RELEASED/HELD AT: | 100 PROPERTY # |
| 101 REMARKS (NOTE ANY INJURIES AT TIME OF RELEASE) | LOCAL USE |
| 102 SIGNATURE OF RECEIVING OFFICER | 103 SIGNATURE OF RELEASING OFFICER  Ken J Moore | STATE USE |

| MULTIPLE CASES CLOSED | 104 CASE # | 105 SFX | 106 CASE # | 107 SFX | 108 CASE # |

| 111 ARRESTING OFFICER (LAST, FIRST, M.) Randy Moore | 112 ID# 4955 | 113 ARRESTING OFFICER (LAST, FIRST, M.) Jonathan Caldwell | 114 ID# 5246 | 115 SUPERVISOR Stacey Bro | ID# 1426 | ID# |

**TYPE OR PRINT IN BLACK INK ONLY**

ACJIC-32 REV. 10-90

# EXHIBIT 34

| State of Alabama<br>Unified Jusdicial System<br>Form MC-11B    Rev. 8/92 | **APPEARANCE BOND** | Case Number<br>D4062801A-02 |
|---|---|---|

**STATE OF ALABAMA**

THE MUNICIPALITY OF _Roanoke_    ☐ IN THE DISTRICT COURT OF _____, COUNTY

_Brenda Sims_    v.    ☒ IN THE MUNICIPAL COURT OF _Roanoke_, ALABAMA

**DEFENDANT**

I, _Brenda Sims_ (Defendant), as principal, and I(we), (please print)
X _Richard Fettner_, as surety(ies), agree to pay the Municipality of
_Roanoke_, Alabama, the sum of $ _500.00_, (not to exceed $1,000) AND ALL COSTS INCURRED
IN THIS COURT unless the above named Defendant appears before the above court on _08-03-04_ (date) at
_6:00_ _p_. m. (time) (if date and time are unknown, the words "the scheduled" may be placed in the date blank and a line may
be placed in the space for time.) and from time to time thereafter until discharged by law to answer the charge of _Domestic_
_Violence 3_, or any other charge as authorized by law.

We hereby severally certify that we have property valued over and above all debts and liabilities that have a fair market value equal to or greater than the amount of the above bond and we, and each of us, waive the benefits of all laws exempting property from levy and sale under execution or other process for the collection of debt by the Constitution and laws of the State of Alabama, and we especially waive our rights to claim exempt our wages or salary, that we have under the laws of Alabama and our rights to homestead exemptions that we have under the Constitution of Alabama and the laws of the State of Alabama, as set out in a separate writing.

It is further agreed and understood that this is a continuing bond which shall remain in full force and effect until such time as the undersigned are duly exonerated.

Signed and sealed this date with notice that false statements are punishable as perjury.

_6-29-04_    _Brenda H. Sims_ (L.S.)
Date    Signature of Defendant

_35 52 Co Rd 30_    _Roanoke Al. 36274_    _885-6612_
Address    City    State    Zip Code    Telephone Number

**AFFIDAVIT OF SURETY(IES)**

In addition to the statements made above, I(we), the undersigned Surety(ies), hereby certify [that I(we) are not (an) attorney(s), (a) judicial official(s), or (a) person(s) authorized to take bail and]* that I(we) own property in this state that has a fair market value equal to or greater than the amount of the appearance bond in this cause, exclusive of property exempt from execution and above and over all liabilities, including the amount of all other outstanding appearance bonds entered into by me(us). [If the surety's(ies) property is valued at less than the amount of the bond and is to be aggregated with the property of other sureties, state the value of the surety's(ies) property exclusive of liabilities and exemptions.]

**SURETY NUMBER 1: Property**\*\* _____

Exemptions and Liabilities\*\* _____

Other Outstanding Surety Bonds: Number _____    Aggregate Amount $ _____

X _Richard Fettner_    X _(signature)_ (L.S.)
Surety's Name (Print)    Social Security Number    Signature of Surety

_____
Surety's Address    City    State    Zip Code    Telephone Number

\*Does not apply: Immediate Family Member Specify Relationship _____
\*\*Attach a separate sheet if necessary

**SURETY NUMBER 2: Property**\*\* _____

Exemptions and Liabilities\*\* _____

Other Outstanding Surety Bonds: Number _____    Aggregate Amount: $ _____

_____ (L.S.)
Surety's Name (Print)    Social Security Number    Signature of Surety

_____
Surety's Address    City    State    Zip Code    Telephone Number

\*Does not apply: Immediate Family Member Specify Relationship _____
\*\*Attach a separate sheet if necessary

Bond ☐ APPROVED  ☐ WAIVED
this the _6-29-04_ day of _____, 20_04_    _(signature)_
Signature

Title: _JTC_

COURT RECORD: Original    DEFENDANT: Copy    SURETY: Copy

**B. Sims - 34**

# EXHIBIT 39

## Untitled

TO:EEOC
I BRENDA H. SIMS FELL I HAVE BEEN SEXAUL HARASSED
ON MY JOB.FROM JUNE 2004 TO AUG 2004 THIS IS FROM
MY BOSS RICHARD FETNER.THE FRIST TIME HE PUT HIS
HAND ON MY LEG AND RUBBED IT.I MOVED BACK.THE NEXT
TIME HE PUT HIS ARM AROUND ME AND PUT HIS FINGERS
ON MY BREST.I MOVED AWAY.THE NEXT TIME HE WAS STAND-
ING IN FRONT OF ME HE PUT HIS HAND ON MY WAST CAME
UP MY SIDE TO MY RIGHT BREST AND SQUEEZED MY BREST
I WENT OUT AS FAST AS I COULD.RICHARD WOULD TELL
ME,WE ARE GOING TO GET TOGETHER OR LETS RUN AWAY
TOGETHER.I WOULD LAUGH AT HIM.I WAS HAVEING SOME
FAMILY TROUBLE ABOUT MY GRANDSON AND RICHARD WOULD
TELL ME TO COME OVER TO HIS HOUSE TO TALK.RICHARD
WOULD TELL ME NOT TO WEARY ABOUT MY TIME AT WORK
HE WOULD TAKE CARE OF IT.I TOLD HIM I HAD TO MUCH
GOING ON IN MY LIFE FOR THAT.I THINK BECOUSE I WONT
HAVE SEX WITH HIM HE IS MAKEING IT HARD ON ME AT
WORK.HE WONT LET ME WORK ON MY JOB HE WILL PUT ME
ON ANOTHER JOB.THEN PUT SOME ONE ON MY JOB.THAT
WILL MAKE ME SO MAD AND HE KNOWS IT.OR HE WILL
SEND ME OUT FOR NO WORK THEN LET SOMEONE WORK ON
MY JOB.RICHARD HAS TOLD ME A LOT IF I GET TO WHERE
I DONT LIKE YOU I WILL MAKE IT HARD ON YOU AT WORK.
AND THAT IS WHAT HE IS DOING TO ME NOW.

                              THANK YOU
                              BRENDA H. SIMS

BRENDA H.SIMS
3552 CO.RD.30
ROANOKE,AL.36274
PHONE 334-885-6612
SS 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

THE PLACE I WORK
JELD-WEN MILLWORK MFG.
235MILLWORK IND.
ROANOKE,AL.36274
PHONE 334-863-7717

B. Sims - 39

# EXHIBIT 40

CASE LOG

(Continue on Reverse)

| Charge No. | Respondent | Charging Party |
|---|---|---|
| 130 2005 00512 | Jeld Wen Millwork | Brenda Sims |

| Date | Action | Entered | Reviewed/ |
|---|---|---|---|
| 10.13.04 | Correspondence recd in the office | onl | |
| 11.18.04 | Called CP Mailed drafted Charge from Correspondence | anl | |
| 11.29.04 | Ch recd back in the office | anl | |
| 12.07.04 | CMC accessed A-2 | anl | |
| 12.09.04 | Mailed 131, Cp ADR | anl | |
| 03/02/05 | Forwarding charge file from mediation unit to an enforcement Unit. Attempts at informal resolution reached an impasse. | jml | |
| 8 Mar 05 | Inv. recd newly assigned charge from supr. | DJM | |
| 29 Mar 05 | Rl requests extension per telephone NLT 5 Apr 05 | DJM | |
| 15 Apr 05 | Inv. organized, tabbed + analyzed file | DJM | |
| 9 Apr 05 | Inv. completed PDI Ltr- mailed + faxed to CP's attorney | DJM | |

EEOC Form 159 (Test 10/94)

**B. Sims - 40**

CASE LOG

(Continue on Reverse)

| Charge No. | Respondent | Charging Party |
|---|---|---|
| 130 2005 00512 | Jill Wright Milbank | Brenda Sims |

| Date | Action | Entered | Reviewed/ |
|---|---|---|---|
| | Settlement | | |
| 03/02/05 | Informal settlement negotiations reached an impasse. The charge file is being transferred from mediation to an enforcement unit. | Jml | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EEOC Form 159 (Test 10/94)

(Continue on Reverse)

| Charge No. 130 2005 00512 | Respondent JELD-Wen, Inc. | Charging Party Brenda Sims | | |
|---|---|---|---|---|
| Date | Action | | Entered By | Reviewed/ Approved |
| 20 Apr 05 | Inv. rec'd fax from R ref termination of alleged harasser | | DJM | |
| 28 Apr 05 | Inv. submits file to supr for approval | | DJM | |
| 04/27/2005 | To S D concurring w/recommendation. SD | | | |

EEOC Form 159 (Test 10/94)

# EXHIBIT 44

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205
(205) 212-2148
TTY (205) 212-2112
FAX (205) 211-2105

*Mr. Matt White*
*Attorney at Law*
*Adams, Umbach, Davidson & White*
*P. O. Box 2069*
*Opelika, AL 36803-2069*

*Reference:  Brenda Sims v JELD-WEN, Inc.*
*Charge No. 130 2004 00512*

*Dear Mr. White:*

*The above-referenced charge has been assigned to me for investigation. This correspondence is submitted in reference to your client's charge of employment discrimination filed on the basis of sex, female.*

*Based upon my analysis of the material and testimony which your client presented and information obtained from other sources, I have concluded that it is unlikely that further investigation of your client's charge would result in a finding that the law was violated, as alleged.*

*Your client alleged that she was discriminated against because of her sex, female, and was sexually harassed by her supervisor, and in retaliation for rejecting the sexual harassment, she was moved from her normal work assignment and placed on other jobs. Your client alleges that she was discriminated against because of her sex, female, which is in violation of Title VII of the Civil Rights Act of 1964, as amended.*

*Evidence from the Respondent indicates that the Company took immediate and appropriate action upon receiving the complaint from your client. Evidence further shows that the Respondent immediately terminated the employment of the alleged harasser, Richard Fetner. Respondent contends that your client suffered no tangible injury. In regards to your client being moved from one location to another, Respondent concludes that when business is slow, employees might need to move around to get work completed and that certain employees do not have specific work areas. Finally, Respondent states that no employee would be moved from another job position without proper safety training.*

*Your client has not provided sufficient evidence to show that the company did not take immediate action to rectify the problem once she complained to management.*

**B. Sims - 44**

*If your client has additional information or evidence which was not submitted previously, please provide to me by April 28, 2005. You can send the information to me at the address above, fax (205) 212-2105 or contact me at (205) 212-2070. If you come to the office without making an appointment, I may or may not be able to see you.*

*In the event that I do not hear from you, I will recommend that the charge be dismissed, that your client be issued a Notice of Right to Sue and that the Commission consider this matter closed.*

*Sincerely,*

*April 19, 2005*
*Date*

*Devoralyn J. McGhee*
*Investigator*

# EXHIBIT 45

## DISMISSAL AND NOTICE OF RIGHTS

To:  Brenda H. Sims
     3552 County Road 30
     Roanoke, AL  36274

From:  Birmingham District Office
       Ridge Park Place
       1130 22nd Street, South
       Birmingham, AL 35205

**RECEIVED**

MAY - 3 2005

JELD—WEN
LEGAL DEPARTMENT

| [ ] | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 130-2005-00512 | Devoralyn J. McGhee, Investigator | (205) 212-2070 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ]  Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ]  While reasonable efforts were made to locate you, we were not able to do so.

[ ]  You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[X]  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice;** or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Bernice W. Kimbrough*                                04-29-05

Enclosure(s)

**Bernice Williams-Kimbrough**
**District Director**

*(Date Mailed)*

cc:  C. Robert Sturm, Senior Corporate Counsel, JELD-WEN, INC.
     Matt White, ADAMS, UMBACH, DAVIDSON & WHITE

B. Sims - 45