# EXHIBIT I

## DEPOSITION EXCERPTS OF LINDA SIMS

# FREEDOM COURT REPORTING

Page 1

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE MIDDLE DISTRICT OF ALABAMA

3  EASTERN DIVISION

4

5  CIVIL ACTION NO.: 3:05-cv-685-T

6  LORENA MINIX, et al.,

7      Plaintiffs,

8      vs.

9  JELD-WEN, INC., and

10  RICHARD FETNER,

11      Defendants.

12

13      S T I P U L A T I O N

14      IT IS STIPULATED AND AGREED by and

15  between the parties through their respective

16  counsel, that the deposition of Linda Sims

17  may be taken before Angela Smith, RPR, CRR,

18  at the offices of McNeal & Douglas, at 1710

19  Catherine Court, Ste: B, Auburn, Alabama

20  36831, on the 12th day of April, 2006.

21

22  DEPOSITION OF LINDA SIMS

23

Page 2

1      IT IS FURTHER STIPULATED AND

2  AGREED that the signature to and the reading

3  of the deposition by the witness is waived,

4  the deposition to have the same force and

5  effect as if full compliance had been had

6  with all laws and rules of Court relating to

7  the taking of depositions.

8      IT IS FURTHER STIPULATED AND

9  AGREED that it shall not be necessary for

10  any objections to be made by counsel to any

11  questions except as to form or leading

12  questions, and that counsel for the parties

13  may make objections and assign grounds at

14  the time of the trial, or at the time said

15  deposition is offered in evidence, or prior

16  thereto.

17      IT IS FURTHER STIPULATED AND

18  AGREED that the notice of filing of the

19  deposition by the Commissioner is waived.

20

21      * * * * * * * * * * * * *

22

23

Page 3

1      * * * * * * * * * * * * *

2          I N D E X

3      EXAMINATION

4                      PAGE

5  By Mr. Scofield .................... 9

6      DEFENDANT'S EXHIBITS

7                      PAGE

8  Ex. 1 - Copy of Ms. Sims'

9      driver's license and SS

10      number ................... 12

11  Ex. 3 - 9/21/04 JELD-WEN health

12      plan ..................... 19

13  Ex. 2 - Interrogatories ............ 24

14  Ex. 16 - The Employee Handbook ..... 48

15  Ex. 11 - A prescription summary

16      from Emerging Home Care .. 75

17  Ex. 11-A - Medical records ......... 78

18  Ex. 11-B - 11/10/98 medical

19      record for Dr. Peterson .. 80

20  Ex. 11-C - Randolph Medical

21      Associates medical

22      records .................. 82

23  Ex. 11-D - 2/4/04 medical record

Page 4

1      for Dr. Peterson ......... 82

2  Ex. 11-E - 5/8/97 medical record

3      from Russell Patterson ... 84

4  Ex. 11-F - Medical record from

5      Dr. Peterson ............. 85

6  Ex. 11-G - 8/25/04 medical record

7      from Dr. Peterson ........ 86

8  Ex. 11-H - 9/10/04 medical record .. 88

9  Ex. 11-I - 9/20/04 medical record

10      for Dr. Peterson ......... 89

11  Ex. 11-J - 10/29/04 medical

12      record ................... 91

13  Ex. 12 - 4/24/04 hire-in

14      documents at JELD-WEN .... 93

15  Ex. 13 - The layout of the plant

16      facility ................. 94

17  Ex. 14 - 3/25/04 - Job

18      application ............. 112

19  Ex. 15 - 4/19/04 New Employee

20      Orientation ............. 117

21  Ex. 17 - 4/19/04 personnel

22      information form ........ 124

23  Exs. 18 and 19 - Acknowledgments

**367 VALLEY AVENUE**

**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

1          of receipt of documents . 125
2   Ex 20 - 8/8/04 test taken on the
3          Employee Handbook ....... 126
4   Ex. 21 - Verification of
5          employment sent to
6          landlord ................. 126
7   Ex. 22 - 10/26/04 Charge of
8          Discrimination .......... 130
9   Ex. 23 - Notification of right to
10         file charge ............. 157
11  Ex. 24 - EEOC forms ............... 158
12  Ex. 25 - 8/20/04 EEOC case log .... 169
13  Ex. 26 - 9/23/04 letter from the
14         EEOC ................... 176
15  Ex. 27 - 11/24/04 final check.  .. 177
16  Ex. 28 - Severance and release
17         agreement ............... 177
18  Ex. 29 - 4/19/05 document from
19         the EEOC ............... 179
20  Ex. 30 - The Dismissal Notice of
21         Rights ................. 180
22  Ex. 31 - 1/22/05 application to
23         work for IHOP ........... 180

Page 7

1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3            EASTERN DIVISION
4
5   CIVIL ACTION NO.: 3:05-cv-685-T
6   LORENA MINIX, et al.,
7        Plaintiffs,
8        vs.
9   JELD-WEN, INC., and
10  RICHARD FETNER,
11       Defendants.
12  BEFORE:
13       ANGELA SMITH, Commissioner.
14  APPEARANCES:
15       JAMES B. DOUGLAS, JR., ESQUIRE, of
16  MCNEAL & DOUGLAS, 1710 Catherine Court, Ste:
17  B, Auburn, Alabama 36831, appearing on
18  behalf of the Plaintiff.
19       SCOTT J. SCOFIELD, ESQUIRE, of
20  SCOFIELD, GERARD, SINGLETARY & POHORELSKY,
21  1114 Ryan Street, Lake Charles, Louisiana
22  70601, appearing on behalf of the Defendant,
23  JELD-WEN, inc.

Page 6

1   Ex. 34 - Application to work for
2          Movie Gallery ........... 182
3   Ex. 35 - The Movie Gallery sexual
4          harassment policy ....... 183
5   Ex. 36 - Unemployment documents ... 183
6          * * * * * * * * * * * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 8

1   APPEARANCES (continued):
2       MICHAEL THOMPSON, ESQUIRE, of
3   LEHR, MIDDLEBROOKS, PRICE & VREELAND, 2021
4   3rd Avenue N., Birmingham, Alabama 35203,
5   appearing on behalf of the Defendant,
6   JELD-WEN, inc.
7       ALSO PRESENT:  Lorena Minix
8            Brenda Sims
9            * * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1    I, ANGELA SMITH, RPR, CRR, a Court
2  Reporter of Wetumpka, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Federal Rules of Civil
5  Procedure and the foregoing stipulation of
6  counsel, there came before me at the offices
7  of McNeal & Douglas, 1710 Catherine Court,
8  Ste: B, Auburn, Alabama 36831, beginning at
9  9:03 a.m., LINDA SIMS, witness in the above
10  cause, for oral examination, whereupon the
11  following proceedings were had:
12        LINDA SIMS,
13  being first duly sworn, was examined and
14  testified as follows:
15        COURT REPORTER:  Usual
16  stipulations?
17        MR. DOUGLAS:  That will be
18  fine.
19        MR. SCOFIELD:  Yes, ma'am.
20        EXAMINATION
21  BY MR. SCOFIELD:
22    Q.    All right.  Ms. Sims, you were
23  here for the first deposition of Lorena

Page 10

1  Minix?
2    A.    Yes.
3    Q.    So, you know what's going to
4  happen?
5    A.    Yes.
6    Q.    It's going to last a long
7  time.  My name is Scott Scofield.  I
8  represent JELD-WEN.  Michael Thompson is my
9  cocounsel.  This lady here to my left is
10  going to type out everything we say and
11  you're going to say it under oath.
12    A.    Okay.
13    Q.    If you need a break at any
14  time, say:  I need a break.  If you don't
15  understand me, say:  Sir, I don't understand
16  you.  Please repeat the question or
17  whatever.
18    A.    Okay.
19    Q.    If your lawyer objects, stop
20  until he tells you to go forward.  Could you
21  state your full name for the Record, please.
22    A.    Linda Diane Sims.
23    Q.    And how do you spell Sims?

Page 11

1    A.    S-I-M-S.
2    Q.    And you're not related to --
3    A.    No, sir.
4    Q.    -- to Brenda.  All right.
5  Now, are you on any type of medication
6  today?
7    A.    No.  Allergy pills.
8    Q.    Allergy pills.  Okay.  What is
9  your current address?
10    A.    551 Filng Road.
11    Q.    Filng Road?
12    A.    Uh-huh.
13    Q.    Okay.  Oh, that's another
14  rule --
15    A.    I moved.
16    Q.    Okay.  Is that F-L-I-N-G?
17    A.    F-I-L-N-G.
18    Q.    Okay.
19    A.    LaGrange, Georgia.
20    Q.    Now, does that mean you no
21  longer support Alabama, and go for Georgia
22  now?
23    A.    Right.  Oh, no, no, no.  I'm

Page 12

1  an Alabama fan.
2    Q.    All right.  One other thing,
3  that just happened, and I don't mean to be
4  rude, but sometimes when we're talking
5  you'll say uh-huh and huh-uh.  The lady to
6  my left cannot get that down on her
7  computer.  So what I'll stop you and say:
8  Yes or no, instead of uh-huh or huh-uh, that
9  type of deal.  Okay?
10    A.    Yes.
11    Q.    I'm not trying to be rude, I'm
12  just trying to help the lady to my left.
13    A.    Yes.
14    Q.    Otherwise, it just doesn't
15  come out.  Is there a -- We talked about
16  Brenda, but is there another Sims in the
17  Roanoke area named Linda A. Sims?
18    A.    I have no idea.
19        (Defendant's Exhibit 1 was
20        marked for identification
21        purposes.)
22    Q.    No idea.  Okay.  All right.
23  I'll show you Exhibit Number 1.  Is this

3  (Pages 9 to 12)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 13

1  your driver's license and Social Security
2  number?
3      A.    Yes.
4      Q.    All right.  On Exhibit Number
5  1.  All right.  Middle name Bowen?
6      A.    Yes.
7      Q.    Is that related to Donald or
8  Ronald?
9      A.    There may be some somewhere
10  distant.  I don't know them.  I've never
11  known them.  I just know of their name.
12      Q.    Okay.  But you never talked to
13  them?
14      A.    No.
15      Q.    Okay.  Not about anything
16  involved in this lawsuit?
17      A.    No, no, no.
18          MR. DOUGLAS:  Be sure and let
19  him finish his question before you answer.
20  Okay?
21          THE WITNESS:  Okay.
22      Q.    Not anything about this
23  lawsuit?

## Page 14

1      A.    No.
2      Q.    You're forty-eight years old?
3      A.    Yes.
4      Q.    And your maiden name?
5      A.    Bowen.
6      Q.    And how many times have you
7  been married?
8      A.    One.
9      Q.    Okay.  Are you currently
10  married?
11      A.    No.
12      Q.    Okay.  What is the name of
13  your first husband, your only husband?
14      A.    Richard Sims.
15      Q.    Okay.  And when did you marry
16  Richard Sims?
17      A.    In '74.
18      Q.    Okay.  And when did you get a
19  divorce?
20      A.    '94.
21      Q.    '94.  Okay.  Are your parents
22  still with us?
23      A.    No, sir.

## Page 15

1      Q.    Okay.  And when did they pass
2  away?
3      A.    My dad died when I was ten.
4      Q.    Okay.
5      A.    And my mother died in August
6  of 24 -- Excuse me, August 24th of '04.
7      Q.    While you were working at
8  JELD-WEN?
9      A.    Yes.
10      Q.    Okay.  And how old was your
11  mother when she passed away?
12      A.    Seventy-five.
13      Q.    Did your mother have an
14  occupation?
15      A.    Yes.
16      Q.    Where did she work?
17      A.    She worked with Home
18  Healthcare.
19      Q.    Where is that based?
20      A.    Well, the corporate office, I
21  think, is in Anniston.
22      Q.    Okay.  Did they have a
23  facility in the Roanoke area?

## Page 16

1      A.    They had a facility.  It's in
2  Roanoke area.  I don't know the street
3  address.
4      Q.    Okay.  Home Healthcare, what
5  does that do, takes care of people?
6      A.    Yes.  She went to people that
7  was disabled to, like -- like, she went and
8  cleaned their houses and went grocery
9  shopping for them if they needed.
10      Q.    Okay.
11      A.    Or to take them places if they
12  needed to go.
13      Q.    Brothers, sisters?
14      A.    I have one sister.
15      Q.    What's her name?
16      A.    Marsha Bowen.
17      Q.    She's not married?
18      A.    No, sir.
19      Q.    And where does Marsha live?
20      A.    She's in Roanoke, Alabama.
21      Q.    And where does she work?
22      A.    She's disabled.
23      Q.    Is it physically disabled?

4  (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 29

1    A.    She's handicapped. She's
2  mentally handicapped.
3    Q.    Okay. Buck Kelly?
4    A.    That's just a distant cousin.
5    Q.    What does Buck do?
6    A.    I have no idea.
7    Q.    That distant?
8    A.    That distant.
9    Q.    All right. We talked about
10  Jeff Ruffner. Sandra Maulden?
11    A.    Yes, sir.
12    Q.    Who is that?
13    A.    She's my cousin.
14    Q.    Okay. What's her age and what
15  does she do?
16    A.    She's probably fifty, and she
17  works for the Wal-Mart Distribution Center
18  in Georgia, LaGrange.
19    Q.    Okay. Tabatha Maulden?
20    A.    That's Sandra's daughter, and
21  she lives in Roanoke.
22    Q.    And what's her age, you think?
23    A.    I think she's probably

Page 30

1  twenty-five.
2    Q.    And what does she do?
3    A.    She's some kind of a nurse
4  prac -- I don't know if she's a nurse
5  practitioner. She does something with
6  nursing.
7    Q.    And who does she work for?
8    A.    I have no idea.
9    Q.    Anell Gosdin?
10    A.    Yes, sir. She's a distant
11  cousin, too.
12    Q.    How old is she?
13    A.    I don't know. Older than us.
14  She's probably, I'd say, in between
15  fifty-five and sixty.
16    Q.    Do you know where she works?
17    A.    No, sir, I don't.
18    Q.    Chris Maulden, who is that?
19    A.    That's Sandra's other --
20  That's her son.
21    Q.    And is he a distant cousin,
22  also?
23    A.    He's also distant.

Page 31

1    Q.    Do you know his age or where
2  he works?
3    A.    I don't know. Well, he's
4  about the same age as my son.
5    Q.    Which son?
6    A.    My oldest son, Richie. So I
7  guess he's about thirty-two, and I have no
8  idea where he works.
9    Q.    All right. Who is your best
10  friend now? Who is your best friend?
11    A.    Lorena.
12    Q.    Lorena?
13    A.    Uh-huh.
14    Q.    Yes or no.
15    A.    I'm sorry. Yes.
16    Q.    Don't apologize to me. I'm
17  just trying to help this lady to my left.
18  And how long have you been friends with
19  Lorena?
20    A.    Probably about ten years.
21  Something like that. I've known her all my
22  life.
23    Q.    So, y'all hang out after work

Page 32

1  and talk on the phone and socialize?
2    A.    Yes, sir.
3    Q.    Okay. Brenda Sims, your
4  nonrelative.
5    A.    Right.
6    Q.    Is she also a good friend of
7  yours?
8    A.    She's a friend of mine, yes.
9    Q.    Hang out after work?
10    A.    No.
11    Q.    Talk on the phone?
12    A.    We talk sometimes on the
13  phone, but we don't hang out or anything.
14    Q.    Did you have any other friends
15  that worked at JELD-WEN?
16    A.    Close friends?
17    Q.    Yes.
18    A.    No, sir.
19    Q.    Okay. You attended high
20  school at Woodland High?
21    A.    Yes, sir.
22    Q.    And where is that?
23    A.    Woodland, Alabama.

8  (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 41

1  yet?
2      A.   No, sir.
3      Q.   Let's go back to your
4  interrogatories. Just have that right in
5  front of you.
6      A.   Okay.
7      Q.   The first one, Cathy Thornton,
8  tell me what you know about her.
9          MR. DOUGLAS: What number are
10 we on?
11         MR. SCOFIELD: I'm sorry,
12 Exhibit Number 2, number one interrogatory.
13         MR. DOUGLAS: You're on number
14 one?
15         MR. SCOFIELD: Yeah. I'm
16 sorry. I apologize.
17     A.   Tell you what I know about
18 her?
19     Q.   Yeah.
20     A.   I just know that she was
21 sexually harassed by Richard Fetner.
22     Q.   All right.
23     A.   He did some pretty horrible

Page 42

1  things.
2      Q.   Did you see that?
3      A.   No, sir, I didn't see that.
4      Q.   This is what Cathy told you?
5      A.   Yes, sir.
6      Q.   All right. Where is — Do you
7  know — Is Cathy a friend of yours?
8      A.   I mean, just a friend.
9      Q.   You don't hang out?
10     A.   No, sir.
11     Q.   Okay. Do you know where she
12 lives?
13     A.   To my knowledge, she lives in
14 Roanoke, Alabama.
15     Q.   Okay. Do you know where her
16 house is, or her apartment is, or mobile
17 home?
18     A.   If she still lives there.
19     Q.   Okay. Lisa Cook, do you know
20 where she lives?
21     A.   No, sir, I don't.
22     Q.   Did she work at JELD-WEN?
23     A.   Yes, sir.

Page 43

1      Q.   Okay. When is the last time
2  you spoke with Cathy Thornton?
3      A.   It's probably been about six
4  months ago, maybe.
5      Q.   Was it about this lawsuit?
6      A.   Yes, sir.
7      Q.   All right. And what did y'all
8  talk about?
9      A.   She just went with us to the
10 lawyer's office and told her side of the
11 story.
12     Q.   Lawyer's office, are you
13 talking about --
14     A.   Matt White.
15     Q.   Okay. Did you ever hire D.
16 Love?
17     A.   Yes, sir.
18     Q.   Okay. Lisa Cook, did you ever
19 go with her to any lawyer's office?
20     A.   We went to talk with Chad Lee.
21 We didn't know what to do.
22     Q.   Chad Lee?
23     A.   Uh-huh.

Page 44

1      Q.   Who is that?
2      A.   He's just a lawyer that Lisa
3  knew, baby-sitted for and knew her.
4      Q.   And where is Chad Lee from?
5      A.   He's from Wedowee.
6      Q.   And how do you spell his last
7  name?
8      A.   L-E-E.
9      Q.   And when did Lisa Cook go
10 visit Chad Lee?
11     A.   I don't remember the date.
12     Q.   While you were still working
13 at JELD-WEN?
14     A.   Yes, sir.
15     Q.   Okay. And was it before
16 Mr. Fetner had — was allowed to resign?
17     A.   Yes, sir.
18     Q.   All right. Close period of
19 time, long period of time, do you have any
20 idea, maybe, in relation to your mother's
21 death, before or after?
22     A.   Of what?
23     Q.   I'm trying to figure out the

11 (Pages 41 to 44)

Page 45

1  time period when you went to go see Mr. Lee.
2      A.    Oh, it was before.
3      Q.    Before your mother's death?
4      A.    Uh-huh.
5      Q.    Say yes.
6      A.    Yes, sir.
7      Q.    You don't have to say yes,
8  sir.
9      A.    I'm sorry.
10     Q.    You can call me sir, I don't
11 mind, but you just don't have to.
12     A.    It was just the way my
13 mother --
14     Q.    It's the way you were raised?
15     A.    Way my mother brought me up.
16     Q.    Okay.  Stacy Cook?
17     A.    I do not know her.
18     Q.    Mary Lou Laws?
19     A.    I know her, yes.
20     Q.    Okay.  Did you ever go to a
21 lawyer with Mary Lou Laws?
22     A.    No, sir.  Well, yes, sir, we
23 all went to see Chad Lee.

Page 46

1      Q.    And, again, I don't mean to
2  bring this up, but your mother passed away
3  when?
4      A.    August the 25th.
5      Q.    So, y'all all went to go see
6  Chad Lee before August 25?
7      A.    Yes, sir.
8      Q.    And you don't know how many
9  days or weeks or a month before?
10     A.    No, sir.
11     Q.    Okay.  Did you bring to -- I'm
12 not going to ask you what you talked about
13 with Mr. Lee -- Well, did you hire Mr. Lee?
14     A.    Ms. Leigh.
15     Q.    Ms. Leigh?
16     A.    We went to talk to her.
17     Q.    Did you hire her as your
18 attorney?
19     A.    No.
20     Q.    And why not?
21     A.    Well, we just -- When we went
22 to see her and just talk to her, and to see
23 what we should do or what should happen.

Page 47

1  And she told us --
2          MR. DOUGLAS: Hold on.  Do not
3  say anything that you were told or told a
4  lawyer.
5          THE WITNESS: Okay.
6          MR. DOUGLAS: That's
7  privileged.
8          MR. SCOFIELD: Well, I
9  disagree, but are you instructing her not to
10 answer?
11         MR. DOUGLAS: Well, I think
12 she's answered -- Your question was: Why
13 didn't you hire the person?
14         MR. SCOFIELD: That's correct.
15 Okay.
16         MR. DOUGLAS: So, I'm not sure
17 she was giving a responsive reply, anyway.
18 But I'm instructing her not to say what she
19 said to the lawyer or what the lawyer said
20 to her.
21     Q.    Okay.  Did you speak with
22 Ms. Leigh about your complaints about
23 Mr. Fetner sexually harassing you?

Page 48

1          MR. DOUGLAS: Okay.  Don't
2  answer that.
3      Q.    Did you bring to Ms. Leigh,
4  JELD-WEN's employment or sexual harassment
5  policy?
6      A.    We had some papers.  I'm sure
7  we had all the papers.
8          (Defendant's Exhibit 16
9              was marked for
10             identification purposes.)
11     Q.    Let me show you Exhibit Number
12 16.
13         MR. DOUGLAS: Is the question,
14 did she take that to the lawyer's office?
15         MR. SCOFIELD: Yes.
16         MR. DOUGLAS: Okay.
17     A.    No, sir.  I don't think I did.
18     Q.    All right.  And that's Exhibit
19 Number 16, the Employee Handbook?
20     A.    Yes, sir.
21     Q.    All right.  Do you know what
22 documents you did bring to Ms. Leigh?
23     A.    I don't remember.

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

Page 49

1    Q.    Did it have anything to do
2  with sexual harassment regarding Mr. Fetner,
3  while you worked at JELD-WEN?
4    A.    I'm not for sure. I don't
5  remember exactly what.
6    Q.    Did Ms. Leigh send you a bill?
7    A.    No, sir.
8    Q.    And you never hired Ms. Leigh?
9    A.    We were going to, but . . .
10   Q.    What about Chad Lee?
11   A.    No, sir. We just talked to
12  him. I guess we just talked to Ms. Leigh,
13  too. We didn't really hire anybody.
14   Q.    Okay. So, there's two
15  lawyers, there's Leigh Love and then there's
16  Chad Lee?
17   A.    Yes.
18   Q.    Chad Lee is from Roanoke?
19   A.    Wedowee.
20   Q.    Wedowee?
21   A.    Yes, sir.
22   Q.    And did you talk to Chad Lee
23  about any sexual harassment problems

Page 50

1  regarding Mr. Fetner?
2    A.    Yes, sir.
3    Q.    Okay. Did you bring Mr. Chad
4  Lee the Employee Handbook regarding
5  JELD-WEN's sexual harassment policy?
6    A.    No, sir.
7    Q.    Did you ever hire Chad Lee?
8    A.    No, sir.
9    Q.    And did you see Chad Lee
10  before your mother passed away?
11   A.    Yes, sir.
12   Q.    All right. And you saw D.
13  Love before your mother passed away?
14   A.    Yes, sir. Five days.
15   Q.    Ma'am?
16   A.    Five days before my mother
17  passed away.
18   Q.    And did you see Chad Lee
19  before you saw Ms. Love?
20   A.    Yes, sir.
21   Q.    Okay. Do you know how much
22  time before?
23   A.    I have no idea.

Page 51

1    Q.    Okay. And did Lorena and
2  Brenda Sims go with you just to go see Chad
3  Lee?
4    A.    Yes, sir.
5    Q.    Did Lorena and Brenda Sims go
6  with you to see Leigh Love?
7    A.    Lorena did.
8    Q.    Did you and Lorena and Brenda
9  talk about the lawyers -- what Chad Lee had
10  advised you?
11   A.    No, sir. Not that I can
12  recall.
13   Q.    Okay. Same question, only
14  about what Ms. Leigh Love advised you?
15   A.    Yes, sir.
16   Q.    Y'all talked about what she
17  advised you to do?
18   A.    Yes, sir.
19   Q.    Okay. And did you sign a
20  contract or enter in -- hire Ms. Love?
21   A.    No, sir.
22   Q.    And why not?
23       THE WITNESS: Should I answer

Page 52

1  this?
2       MR. DOUGLAS: You can answer
3  the question of why you didn't hire the
4  attorney, unless your answer is going to
5  call for you to reveal what you were told,
6  then you can't -- then you shouldn't.
7    A.    I guess my -- Five days later
8  my mother was killed in an accident, and a
9  few months later Lorena's mother had died.
10  So we had just decided not to do anything.
11  It would just be too much stress to continue
12  with anything. So . . .
13   Q.    All right.
14   A.    So we just let everything go.
15   Q.    Is that the same reason you
16  didn't hire Chad Lee?
17   A.    We just didn't hire him. We
18  just didn't talk to him after that.
19   Q.    Okay. Do you -- Who is Jackie
20  Nelson?
21   A.    She's my cousin's husband.
22   Q.    And why -- Did she work at
23  JELD-WEN?

13  (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1    A.    No, sir.  She worked at
2  Wellborn Cabinets.
3    Q.    She never worked at JELD-WEN?
4    A.    No, sir, not to my knowledge.
5    Q.    So, she worked with Fetner at
6  Wellborn?
7    A.    Yes, sir.
8    Q.    And what's the significance of
9  that?  Why would --
10    A.    They just -- They went out.
11    Q.    Oh, Mr. Fetner and Jackie
12  Nelson went out?
13    A.    Yes, sir.
14    Q.    Was Mr. Fetner married at the
15  time?
16    A.    I don't think he was.
17    Q.    Okay.  How would Ms. Nelson
18  have knowledge about what Mr. Fetner did at
19  JELD-WEN?
20    A.    I just called her and asked
21  her what went on there.
22    Q.    There, meaning --
23    A.    At Wellborn.

Page 54

1    Q.    -- Wellborn?  Okay.  What had
2  gone on at Wellborn?
3    A.    We just heard rumors that
4  things had been happening there, too, that
5  was the reason he was fired.  Wasn't no
6  documents, but that was the reason he was.
7    Q.    So, Jackie had told you that
8  there were rumors that Mr. Fetner had been
9  fired for sexual harassment problems at
10  Wellborn?
11    A.    Yes, sir.
12    Q.    All right.  Did you know
13  anybody that worked at Wellborn, other than
14  Jackie?
15    A.    Not -- I probably know some
16  people, but I don't know who at that time.
17    Q.    Do you know -- Did this occur
18  -- Strike that.
19          When did Jackie call and tell
20  you this?
21    A.    I called her.
22    Q.    All right.
23    A.    Because I talked to her

Page 55

1  husband.
2    Q.    Was this before or after your
3  mother's passing away?
4    A.    It was after.
5    Q.    After.  All right.  Was this
6  before or after --
7    A.    I'm sorry.  It was before.
8    Q.    Before.  All right.  And then
9  who at -- Strike that.
10          Did Jackie tell you who
11  complained about Mr. Fetner at Wellborn?
12    A.    No, sir.  She just heard
13  rumors, too.
14    Q.    Okay.  Did Jackie tell you
15  what happened to the person who complained
16  about -- or persons who complained about
17  Mr. Fetner at Wellborn?
18    A.    No, sir.
19    Q.    Okay.  Did she say whether or
20  not they were fired or retaliated against at
21  Wellborn?
22    A.    She just heard that Mr. Fetner
23  was let go because of that, but it was done

Page 56

1  secretly.
2    Q.    Okay.  But Jackie didn't say
3  that the person who was the target of
4  Mr. Fetner was also demoted or fired or had
5  their pay reduced or anything like that?
6    A.    No names were mentioned.
7    Q.    Do you know what the word
8  "retaliation" means?
9    A.    Sure.
10    Q.    What is your definition of it?
11    A.    When someone does something
12  bad, you try to protect yourself.  You try
13  to make a right wrong -- I mean, make a
14  wrong right.
15    Q.    Get even?
16    A.    Not necessarily.
17    Q.    All right.  Do you know a
18  person by the name of Roxie Giles?
19    A.    I do, yes.
20    Q.    And where does she live?
21    A.    I have no idea.
22    Q.    Okay.  I take it she's not a
23  social friend of yours?

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 61

1     A.     Yes, sir.
2     Q.     Did Lamar have a sexual
3   harassment policy?
4     A.     I'm sure they did.
5     Q.     Okay. You don't recall it?
6     A.     I don't recall it.
7     Q.     At any time while you were
8   there, did you have to complain about
9   anyone?
10    A.     No, sir.
11    Q.     Did you have any friends or
12  know of anybody that complained about anyone
13  at Lamar?
14    A.     No, sir.
15    Q.     What about for racial
16  problems, was there any person that —
17    A.     No, sir.
18    Q.     — complained about racial
19  discrimination or anything of that nature?
20    A.     No, sir.
21    Q.     Now, you left Lamar, were you
22  — You were not fired?
23    A.     No, sir.

Page 62

1     Q.     You just quit?
2     A.     Quit. Yes, sir.
3     Q.     All right. And you took a job
4   at Wal-Mart?
5     A.     Yes, sir.
6     Q.     And you worked there from '95
7   to 2002?
8     A.     Yes, sir.
9     Q.     And what did you do for them?
10    A.     I run a cash register for
11  about two years. And then I worked in
12  electronics until the day I quit.
13    Q.     Electronics?
14    A.     Uh-huh.
15    Q.     You sold electronics?
16    A.     I worked in the electronic
17  department.
18    Q.     Did Wal-Mart, to your
19  knowledge, have a written sexual harassment
20  policy?
21    A.     Yes, sir.
22    Q.     They did?
23    A.     Yes, sir.

Page 63

1     Q.     All right. Was it similar to
2   the one that you had at JELD-WEN?
3     A.     Yes, sir.
4     Q.     All right. Did you have any
5   problems understanding the one that you had
6   at Wal-Mart?
7     A.     No, sir.
8     Q.     All right. Including the part
9   about who to call and that if you make a
10  complaint you won't be retaliated against?
11    A.     Yes.
12    Q.     All right. Now, at Wal-Mart,
13  did you see anybody or — Strike that.
14            Did you ever make a complaint
15  against anyone about sexually harassing you
16  at Wal-Mart?
17    A.     No, sir.
18    Q.     Did you have any friends or
19  know of anybody that made a complaint?
20    A.     No, sir.
21    Q.     Did you have — Were there any
22  complaints such as racial discrimination
23  made?

Page 64

1     A.     No, sir.
2     Q.     Okay. We touched on this
3   briefly. You had a fiance — You left
4   Wal-Mart in 2002 to go work with your
5   fiance, Jeff Ruffner?
6     A.     Yes, sir.
7     Q.     Okay. And were y'all living
8   together?
9     A.     No, sir.
10    Q.     All right. And what did you
11  do with — or for Mr. Ruffner?
12    A.     We delivered Old Navy trucks
13  to stores that were opening.
14    Q.     And what exactly did you do?
15    A.     I drove.
16    Q.     You drove a truck?
17    A.     It was like a one-ton dually
18  truck.
19    Q.     All right. And then, y'all
20  broke up, so the job broke up?
21    A.     Yes, sir.
22    Q.     All right. Then you went to
23  go work for a temp service called Kelly

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 57

1    A.    No, sir.
2    Q.    Did you work with her while
3  you worked at JELD-WEN?
4    A.    Yes, sir.
5    Q.    Did you find her to be a
6  trustworthy person?
7    A.    I really didn't know her that
8  well.
9    Q.    Did you ever tell her -- Did
10  she ever tell you something that later you
11  found out not to be true?
12    A.    I very seldom talked to her.
13    Q.    Okay. Pat Galvez, do you know
14  him?
15    A.    Yes, sir.
16    Q.    Could you describe him?
17    A.    Just a man that seemed to work
18  hard.
19    Q.    Did he appear to be a nice
20  man?
21    A.    Yes, sir.
22    Q.    Approachable?
23        MR. DOUGLAS: I object to the

Page 58

1  form of that question. You can answer.
2    A.    He would just -- I don't know
3  that you could -- He just was -- He just
4  worked. I don't know if he was approachable
5  or not, because I really didn't see him that
6  often to know that.
7    Q.    Did you ever talk to him?
8    A.    No, sir. Just when I got
9  hired.
10    Q.    Just when you got hired?
11    A.    Yes.
12    Q.    Was he very nice to you when
13  you got hired?
14    A.    Yes, sir.
15    Q.    Dan Hees, do you know him?
16    A.    Yes, sir.
17    Q.    He was here the first day --
18  He was here during Lorena's deposition?
19    A.    Yes, sir.
20    Q.    Did you have any problems
21  recognizing him?
22    A.    No, sir.
23    Q.    Where did Dan Hees work, to

Page 59

1  your knowledge?
2    A.    I don't know exactly what he
3  was, I just know he was over Richard --
4    Q.    I'm sorry?
5    A.    I don't know exactly what he
6  was. He was just over Richard, and he came
7  in the plant periodically.
8    Q.    Did he make rounds and walk
9  around?
10    A.    And tour, yes.
11    Q.    All right. Now, let's go to
12  interrogatory, Exhibit Number 2. And we'll
13  go to number four, the answers to number
14  four. And this is -- The answer is
15  basically the people you worked for before
16  you worked for JELD-WEN?
17    A.    Yes, sir.
18    Q.    Okay. Now, this company
19  called -- You worked for Lamar Manufacturing
20  in Woodland, Alabama from 1982 to 1995?
21    A.    Yes, sir.
22    Q.    Now, where was Lamar
23  Manufacturing based in, where was the

Page 60

1  headquarters?
2    A.    Bowden, Georgia.
3    Q.    Georgia. Is this Lamar
4  Manufacturing now called Bowden
5  Manufacturing?
6    A.    Yes, sir.
7    Q.    All right. But you worked at
8  its Woodland plant?
9    A.    Yes, sir.
10    Q.    And what did you do?
11    A.    I was a machine operator. I
12  pressed.
13    Q.    But what did you press? Wood
14  products?
15    A.    Vests.
16    Q.    That's right. They made
17  military uniforms?
18    A.    No, sir, they make -- I don't
19  know if they do now or not, but at the time
20  we made gentlemen's uniforms -- I mean,
21  gentlemen's suits.
22    Q.    All right. And you worked
23  thirteen years there?

15  (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 65

1  Services?
2      A.  Yes, sir.
3      Q.  And for Kelly Services, who
4  did you work for?
5      A.  Jan.
6      Q.  What's Jan?
7      A.  Just the people that works
8  there and tries to get you jobs, find you
9  jobs.
10     Q.  So you were -- So you temped
11  around for 2003, 2004?
12     A.  Yes, sir.
13     Q.  All right.  You can't recall
14  any of the people you temped for?
15     A.  I worked for Mead, I worked
16  for Duracell.
17     Q.  You said Mead?
18     A.  Mead, M-E-A-D.
19     Q.  And Duracell is the battery
20  people?
21     A.  Yes, sir.
22     Q.  All right.  Who else?
23     A.  Those are the only two I can

Page 66

1  remember.
2      Q.  Okay.  Did Mead or Duracell,
3  did they have, to your knowledge, a sexual
4  harassment policy?
5      A.  I didn't see it if they did.
6      Q.  Okay.  And any time while you
7  worked for Mead or Duracell, or a third
8  company while you were working for Kelly,
9  did anyone, to your knowledge -- Did you
10  make a complaint about sexual harassment?
11     A.  No, sir.
12     Q.  Did anybody -- Did anybody
13  there, to your knowledge, make one?
14     A.  Not that I know of.
15     Q.  What about racial?
16     A.  No, sir.
17     Q.  Okay.  Then you worked for a
18  company called Express Personal Services?
19     A.  Yes, sir.
20     Q.  Okay.  Then from there you
21  temped for JELD-WEN?
22     A.  Yes, sir.
23     Q.  And then you got a full-time

Page 67

1  job at JELD-WEN?
2      A.  Yes, sir.
3      Q.  Anybody else you temped for
4  while you worked for Express?
5      A.  No, sir.
6      Q.  All right.  Let's go to --
7  Interrogatory number five is -- these are
8  the people you worked for after the JELD-WEN
9  plant shut down.
10         If you look down at the
11  bottom, it says:  Unemployment dates
12  beginning November/December of 2004.  You
13  only drew unemployment for one month?
14     A.  That's about one month, yes,
15  sir.
16     Q.  Then you worked for a company
17  called Kelly Services again?
18     A.  Right.
19     Q.  And how long did that last?
20     A.  Three weeks to a month.
21     Q.  Three weeks to a month.  And
22  how much were you getting paid there?
23     A.  Nine dollars an hour.

Page 68

1      Q.  That was more than you were
2  getting paid at JELD-WEN?
3      A.  Yes, sir.
4      Q.  All right.  Then in -- I'm
5  trying to figure this out.  How long did you
6  work for Kelly Services?
7      A.  Off and on.
8      Q.  I guess you worked from
9  January 2005 until present, you started
10  working for IHOP?
11     A.  Yes, sir.
12     Q.  As a waitress?
13     A.  As the hostess.
14     Q.  The hostess with the mostest?
15     A.  Uh-huh.
16     Q.  Sorry.  I'm getting kind of
17  giddy.  All right.  Now, your pay at IHOP
18  was eight dollars an hour, plus, tips, or is
19  it just eight dollars an hour?
20     A.  It's eight dollars an hour.
21     Q.  And that's more than what you
22  made at JELD-WEN?
23     A.  Yes, sir.

17  (Pages 65 to 68)

# FREEDOM COURT REPORTING

| Page 85 | Page 87 |
|---|---|
| 1 there. I cannot read it. | 1 muscle spasms, headaches, and you said you |
| 2     A.   I don't think so. I think I | 2 were employed at JELD-WEN. Is there |
| 3 was upset, but I don't remember if he -- He | 3 anything in here -- Well, strike that. |
| 4 may have gave me something, but I couldn't | 4     Do you know what the cause of |
| 5 remember what it was. It's been awhile | 5 the muscle spasms and headaches were? |
| 6 back. | 6     A.   No, sir. |
| 7     Q.   Did you complain about having | 7     Q.   Is there anything in here |
| 8 insomnia? | 8 emotional? |
| 9     A.   Yes, sir. | 9     A.   Work problems. |
| 10     Q.   And what are these two words, | 10     Q.   Where does it say that? |
| 11 if you know, in front of insomnia? | 11     A.   Where you've got it circled. |
| 12     A.   I can't -- I don't know what | 12     Q.   Okay. And what does it say |
| 13 it says. | 13 about work problems? |
| 14     Q.   Okay. The -- Is this -- Do | 14     A.   I can't read the underneath |
| 15 you know what this word is? Is it Elavil? | 15 there. It just says: Work problems. |
| 16 Is that any type of antidepressant or | 16 Because that was the day I talked to him. |
| 17 anything? | 17 It was the same day my mother got killed, |
| 18     A.   Elavil? | 18 but I had talked to him earlier that day. |
| 19     Q.   You just don't know? | 19     Q.   It's the same day that you |
| 20     A.   No. | 20 believe you talked to Russell Peterson about |
| 21     (Defendant's Exhibit 11-F | 21 Fetner? |
| 22     was marked for | 22     A.   Yes, sir. |
| 23     identification purposes.) | 23     Q.   And what -- Down at the bottom |

| Page 86 | Page 88 |
|---|---|
| 1     Q.   Okay. Here's what's marked | 1 right, did he give you any type of |
| 2 11-F. It's a Linda Sims that's described as | 2 medication? |
| 3 being born on 2/26/57 and divorced, so I | 3     A.   He gave me some Lexapro. |
| 4 assume it's you. Again, it's Dr. Peterson. | 4     Q.   Okay. Did Dr. Peterson give |
| 5 And you went to the office for what, now? | 5 you any advice about what to do about |
| 6 Do you recall this visit? | 6 Mr. Fetner? |
| 7     A.   Those are all medications for | 7     A.   He told me I should probably |
| 8 my sinuses. Claritin, that's an inhaler for | 8 contact somebody higher up and talk to them |
| 9 my asthma. | 9 about this problem. |
| 10     Q.   There's nothing in here about | 10     (Defendant's Exhibit 11-H |
| 11 sexual harassment or any type of -- | 11     was marked for |
| 12     A.   Not on that one. | 12     identification purposes.) |
| 13     Q.   -- problems associated with | 13     Q.   Okay. Now, this is a -- Again |
| 14 Mr. Fetner? | 14 it's marked as exhibit -- What do I have up |
| 15     A.   No, sir. | 15 there, ma'am? |
| 16     Q.   Or medication? | 16     A.   11. |
| 17     A.   No. | 17     Q.   11-J? |
| 18     (Defendant's Exhibit 11-G | 18     A.   It's H. |
| 19     was marked for | 19     Q.   11-H. And that's dated either |
| 20     identification purposes.) | 20 9/10 or -- 9/10/04? |
| 21     Q.   Let me show you 11-G. Appears | 21     A.   Yes, sir. |
| 22 to be dated August 25, 2004, from Russell | 22     Q.   And this is you? This is the |
| 23 Peterson, where you visited him for neck | 23 correct Linda Sims? |

22 (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 93

1    A.    Oh. Not that I've saw yet.
2    Q.    Okay. This is where you
3  worked for a temp agency called Express.
4  And that's when they lent you over to
5  JELD-WEN?
6    A.    Yes.
7    Q.    Or you worked at JELD-WEN but
8  Express actually paid you?
9    A.    Yes, sir.
10        (Defendant's Exhibit 12
11        was marked for
12        identification purposes.)
13    Q.    All right. Exhibit 12. Well,
14  is this April 24th, roughly, the time period
15  that you started working at JELD-WEN?
16    A.    Yes, sir.
17    Q.    All right. And the signature
18  is Pat Galvez, the manager; is that correct?
19    A.    Yes, sir.
20    Q.    Now, when did he interview
21  you? Did he interview you while you were
22  working for Express? Or did he interview
23  you after you filled out an application to

Page 94

1  work for JELD-WEN?
2    A.    No. It was after Express sent
3  me there.
4        (Defendant's Exhibit 13
5        was marked for
6        identification purposes.)
7    Q.    I'll show you 13, please.
8  We've done this with Lorena and your cousin,
9  Brenda. And so what I'd like to do is go
10  ahead and do it with you. The time that you
11  worked -- I'm talking about the whole time
12  you worked at JELD-WEN, the period,
13  including with Express, was from, roughly,
14  what, April until you got laid off in
15  November of 2004?
16    A.    Right.
17    Q.    All right. And was this the
18  kind of layout that you had when you worked
19  there?
20    A.    It looks familiar.
21    Q.    Does it look familiar?
22    A.    Yes.
23    Q.    Now, from what Lorena and

Page 95

1  Brenda said, that if you -- where I'm
2  marking an X, is where a big warehouse where
3  the dado machines and the routers were?
4    A.    Yes, sir.
5    Q.    All right. Dado and router
6  were. And that would be -- Was there any
7  other type of machines that you can recall
8  being there?
9    A.    No. Just those.
10    Q.    Now, then there was a wall
11  that you couldn't see through. But on the
12  other side of the wall was, what, is that
13  the cutting area?
14    A.    Cutting, yes, sir.
15    Q.    And was there anything else
16  that you can recall that was in the cutting
17  area?
18    A.    No, sir.
19    Q.    All right. Now, there's a
20  passage way through from the cutting area
21  into another warehouse?
22    A.    Right.
23    Q.    And what did they do in this

Page 96

1  warehouse?
2    A.    They did different things. I
3  think they put pieces of wood together with
4  glue.
5    Q.    Called the glue room?
6    A.    Yes.
7    Q.    All right. Now, it's my
8  understanding that on the second floor there
9  was an office up there that overlooked the
10  glue room.
11    A.    Yes, sir.
12    Q.    And in there was Pat Galvez?
13    A.    Yes, sir.
14    Q.    All right. And Roxie?
15    A.    Yes, sir.
16    Q.    Anybody else?
17    A.    That's it.
18    Q.    Okay.
19    A.    Well, Cathy was there for
20  awhile.
21    Q.    Cathy Conger?
22    A.    Cathy Conger.
23    Q.    All right. So, there's three

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 97

1  people up there?
2      A.   Right.
3      Q.   All right.  And Richard
4  Fetner's office was on the first floor.
5  I'll draw it and I'll put Richard right
6  there; is that correct?
7      A.   Yes, sir.
8      Q.   All right.  Now, Richard had
9  an office that had a glass partition so he
10 could see out and people could see in?
11     A.   Yes, sir.
12     Q.   All right.  And Pat and Roxie
13 had -- on the second floor, they could see
14 out, they had a glass partition where they
15 could see out and see in?
16     A.   Yes, sir.
17     Q.   All right.  But could Pat and
18 Roxie see inside Richard's office?
19     A.   No, sir.
20     Q.   All right.  Could Pat and
21 Roxie see in this warehouse where the dado
22 and router and cutting area?
23     A.   No, sir.

Page 98

1      Q.   All right.  Paint room, did
2  you have -- Was that correct -- It's called
3  paint room on there.
4      A.   Yes, sir.
5      Q.   Did you ever work in the paint
6  room?
7      A.   I've got paint room on mine,
8  but, yes, sir.
9      Q.   You did work in there?
10     A.   No, sir, I didn't.
11     Q.   Okay.  Now, where did you
12 work?
13     A.   When I first started to work,
14 I worked about middle ways.
15     Q.   Okay.  Where the X is?
16     A.   Yes.
17     Q.   Could you mark on mine,
18 please, where you worked.  Just put L-S,
19 where you worked.
20     A.   (Witness complies.)
21     Q.   All right.  And you worked on
22 -- with Lorena?
23     A.   No, sir.

Page 99

1      Q.   Who did you work with?
2      A.   I worked by myself on a --
3  it's called a door hinge.
4      Q.   Okay.
5      A.   I mean, excuse me, door lock.
6      Q.   Should I put door lock up
7  here, too?
8      A.   Yes.  It was a router, but you
9  cut holes to make a door lock.
10     Q.   Okay.  So, we had door lock,
11 router, dado, and up here where the X is,
12 where you put your L-S is?
13     A.   Right.
14     Q.   All right.  Now, who did you
15 work with?
16     A.   I worked with Phil --
17     Q.   Smith?
18     A.   -- Smith.
19     Q.   All right.
20     A.   I worked with Lorena.  Brenda
21 worked in there, Mary Lou worked in there,
22 Lisa Cook worked in there.  And I can't
23 think of the guy that worked on the machine

Page 100

1  -- Mike Weathers, he worked in there.
2      Q.   All right.  Did you ever work
3  on the dado machine?
4      A.   No.  I -- Yes, sir, I did.
5      Q.   Okay.  Did you have any
6  problems working on the dado machines?
7      A.   No, sir.  It was heavy, but --
8      Q.   But you could handle it?
9      A.   Yes, sir.
10     Q.   Did you ever work on the
11 router?
12     A.   Yes, sir.
13     Q.   Did you have any problems with
14 that?
15     A.   No, sir.
16     Q.   All right.  The door lock
17 machine, did you ever have any problems
18 working on that?
19     A.   No, sir.
20     Q.   Did you ever work in the
21 cutting area?
22     A.   No, sir.
23     Q.   All right.  Did you ever work

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1 in the glue room?
2    A.    Yes, sir.
3    Q.    All right. Who worked in
4 there with you, in the glue room?
5    A.    Just some guy named Pat. I
6 can't think of his last name. He was kind
7 of a big guy, big black guy.
8    Q.    Okay. Big black guy. Let's
9 see. Williams?
10    A.    I don't know his last name.
11    Q.    You don't know his last name.
12 Okay. So, anybody else that you can recall?
13    A.    There was a lady, I can't -- I
14 can't think of her name. I can't recall her
15 name.
16    Q.    Okay. Did you have any
17 problems handling the work in the glue room?
18    A.    No, sir.
19    Q.    Did you have any problems
20 handling any of the work that you did in
21 here?
22    A.    Doing the work?
23    Q.    Yeah.

Page 102

1    A.    No, sir.
2    Q.    Okay. Now, the whole time
3 that you were at JELD-WEN -- Strike that.
4         What was your starting salary
5 at JELD-WEN?
6    A.    With Express?
7    Q.    Yes.
8    A.    Six-fifty.
9    Q.    And when you started with
10 JELD-WEN -- After you started working full
11 time for JELD-WEN, what was your salary?
12    A.    Seven dollars.
13    Q.    Seven?
14    A.    Seven.
15    Q.    And what was it at the end?
16    A.    Seven-seventy-five.
17    Q.    Okay. At any time, did your
18 salary get cut?
19    A.    No, sir.
20    Q.    At any time -- What was it --
21 Did you have a title for what you did?
22    A.    I just --
23    Q.    Hourly worker?

Page 103

1    A.    Yeah. Just an employee.
2    Q.    Okay. Did you ever lose any
3 hours? Did someone say: I'm not going to
4 let you work today because I don't like you
5 or something?
6    A.    No, no one ever said that, but
7 I felt differently about it.
8    Q.    Okay. Now, you did get hurt
9 on the job?
10    A.    Yes, sir.
11    Q.    Where did you get hurt?
12    A.    I got hurt right behind the
13 dado machine.
14    Q.    Okay. You're pointing to the
15 dado machine right under your L-S?
16    A.    In between these two things
17 (indicating).
18    Q.    Okay. How did you get hurt?
19    A.    I was stepping over a piece of
20 wood and my foot -- I just didn't step far
21 enough and I caught the edge of it.
22    Q.    And did JELD-WEN pay all your
23 medical bills?

Page 104

1    A.    As far as I know, yes.
2    Q.    All right. Did you miss any
3 work because -- Were you put on light duty?
4    A.    Yes, sir.
5    Q.    Okay. So, you didn't miss any
6 work?
7    A.    No, sir.
8    Q.    All right. Now, when you were
9 on light duty, where were you stationed?
10    A.    I was stationed up in the
11 office.
12    Q.    With Pat and Roxie?
13    A.    With Roxie. Pat had already
14 left.
15    Q.    I see. Okay. Now, did you
16 and Roxie become friends while you worked in
17 the office?
18    A.    No, sir.
19    Q.    Did you ever talk to her much?
20    A.    No, sir.
21    Q.    All right. And Joe Mendoza,
22 he was gone by the time you were there?
23    A.    Yes, sir.

26 (Pages 101 to 104)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 105

1    Q.    All right. In relation -- Do
2  you know when Pat Galvez left, do you recall
3  the date?
4    A.    I think it was, like, in June.
5    Q.    June. Okay. Do you know
6  Tooty Zachary?
7    A.    I know her, yes.
8    Q.    Okay. Did you ever work with
9  her?
10   A.    No, sir.
11   Q.    Dan Hees, the man that was
12 here Monday, you know him?
13   A.    Yes, sir.
14   Q.    All right. Now, did Dan Hees
15 visit the plant very often?
16   A.    Maybe once or twice a month.
17   Q.    Okay. After Pat left, did it
18 increase?
19   A.    Maybe a little.
20   Q.    Okay. And you knew Dan was
21 above Richard Fetner?
22   A.    Exactly.
23   Q.    All right. In fact, your

Page 106

1  doctor, Dr. Peterson, told you to tell Dan
2  Hees about Richard Fetner?
3    MR. DOUGLAS: Object to the
4  form of that question. You can answer it,
5  if your doctor told you to report to Dan
6  Hees.
7    A.    Oh, yes.
8    Q.    He did?
9    A.    Well, he didn't say --
10   Q.    No. He didn't know Dan Hees.
11 He just said whoever was above Richard to
12 report to him, someone like Dan Hees?
13   A.    Yes. Exactly.
14   Q.    Okay. Now, was there ever a
15 time when Dan visited the plant, what would
16 he do, walk around the production floor?
17   A.    Yes, sir.
18   Q.    Check and make sure everything
19 was okay?
20   A.    Yes, sir.
21   Q.    Talk to people?
22   A.    I didn't see him talk to many
23 people.

Page 107

1    Q.    Did you find Dan to be a
2  friendly person?
3    A.    To start with, he just kind of
4  walked around, no expression.
5    Q.    Okay. At some point, did you
6  -- while you were on light duty, sit down
7  and talk to Dan at any length of time?
8    A.    I spoke to him over the phone
9  a couple of times.
10   Q.    He called you or you called
11 him?
12   A.    He called there, looking for
13 Richard or whomever.
14   Q.    Okay. Oh, I see. You
15 answered the phone while you were in the
16 office?
17   A.    Exactly.
18   Q.    Okay. Did you ever talk to
19 Dan about your personal life?
20   A.    No, sir. Well, no, sir.
21   Q.    You never talked to Dan about
22 your husband?
23   A.    No, sir.

Page 108

1    Q.    Did you ever tell Dan that
2  your husband was a drunk?
3    A.    Not Dan, no.
4    Q.    Did you tell anybody that at
5  JELD-WEN, besides Lorena, or anyone like
6  that?
7    A.    I think pretty much everybody
8  knew who my husband was.
9    Q.    Okay. Did you tell Dan that
10 you feared for your life because of your
11 ex-husband?
12   A.    Not Dan.
13   Q.    Okay. Did Pat Galvez -- The
14 only -- It may be easier. The person you're
15 complaining about at JELD-WEN is Richard
16 Fetner; is that correct?
17   A.    Yes.
18   Q.    Not Pat Galvez, not Dan Hees,
19 not anybody else?
20   A.    Dan Hees, too.
21   Q.    Did Dan Hees make -- What are
22 you complaining about Dan Hees for?
23   A.    Well, first of all, he used to

27  (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1  come and talk to me, and all the girls,
2  after he came and talked to me, would say:
3  He didn't come over and talk to anybody else
4  like he's talking to you. I was like: I
5  don't know.
6          He would tell me: What are
7  you doing here? You don't belong in a place
8  like this. You should be doing something
9  like with make-up or something.
10         At one point he said -- He was
11  talking to me and Mary Lou, and he said that
12  one of the guys come to get him and he said:
13  I'm talking to the girls.
14         And then at another point, he
15  -- he was in -- we was in the office, and he
16  said: He would know more about me, but he
17  would probably want to know more about me
18  than he should.
19  Q.    That's it?
20  A.    Pretty much it. And then he
21  would just come around and talk to me.
22  Q.    Okay.
23  A.    Ask me how was things going.

Page 110

1  Q.    Okay. Did he ever say -- make
2  any sexual advances towards you?
3  A.    No, sir. No sexual advances.
4  Q.    He never -- Did he ever grab
5  you or --
6  A.    Oh, no. He never touched me.
7  Q.    Never touched you. He just --
8  A.    It was just an insinuation
9  that I felt.
10  Q.    Did he talk about sex at all
11  with you?
12  A.    No, not about sex, no.
13  Q.    Anything sexual in nature?
14  A.    No, sir.
15  Q.    And no sneaky touches like
16  Lorena described about Mr. Fetner?
17  A.    No, sir.
18  Q.    Didn't hug you?
19  A.    No, sir. Shook my hand.
20  Q.    That's it?
21  A.    Uh-huh.
22  Q.    That's the only contact -- You
23  have to say yes or no.

Page 111

1  A.    Yes.
2  Q.    That's the only contact you
3  ever had with Dan Hees, was a handshake?
4  A.    Yes, sir. He would come up
5  behind me sometimes when I'm on my router
6  and talk to me, kind of stand behind me.
7  Q.    Okay. That's it?
8  A.    Yeah.
9  Q.    You can't think of anything
10  else?
11  A.    Oh, he said something about --
12  We were talking one day, and he had been on
13  a flight to somewhere, and he said he needed
14  a secretary to go with him.
15  Q.    Did he ask you to go with him?
16  A.    No.
17  Q.    Did this make you feel
18  uncomfortable?
19  A.    It made me feel somewhat
20  uncomfortable, I guess, but, I mean, I just
21  kind of ignored it and just kind of went on
22  and just didn't say anything else.
23  Q.    Okay.

Page 112

1  A.    Because he said something
2  about getting me a job or something.
3  Q.    Speaking of that, did you hear
4  that the JELD-WEN plant was going to close?
5  When did you hear that?
6  A.    I heard that a week after we
7  filed the complaint.
8  Q.    Okay. You didn't hear it
9  beforehand?
10  A.    Huh-uh.
11         MR. DOUGLAS: You need to
12  answer yes or no.
13  A.    Yes -- No.
14  Q.    You didn't hear any rumors or
15  anything of that nature?
16  A.    No, sir.
17         (Defendant's Exhibit 14
18             was marked for
19             identification purposes.)
20  Q.    Okay. I'll show you 14. This
21  two-page document we've marked as Exhibit
22  14, is that your signature on the bottom of
23  the second page, dated March 25, 2004?

28 (Pages 109 to 112)

# FREEDOM COURT REPORTING

Page 113

1    A.    Yes, sir.
2    Q.    And you use as a reference
3  Lorena Minix?
4    A.    Yes, sir.
5    Q.    Who is Pam Bonner?
6    A.    That's just a good friend of
7  mine.
8    Q.    And where did she work?
9    A.    She worked at the Utility
10  Board in Roanoke.
11    Q.    Kathleen Spears, who is that?
12  Have we talked --
13    A.    That's my cousin.
14    Q.    Okay.  Now, Lorena, as you
15  said earlier, is one of your best friends?
16    A.    Yes, sir.
17    Q.    All right.  What did Lorena
18  say about JELD-WEN before you made the
19  application on March 25, 2004, that you can
20  recall?
21    A.    I don't -- I think she may
22  have mentioned something about Ronald to me.
23    Q.    Did she say anything about

Page 114

1  Richard Fetner?
2    A.    Not too much, no.
3    Q.    You say not too much.  Did she
4  say anything about Richard Fetner?
5    A.    No, sir.
6    Q.    Okay.
7    A.    Not that I can recall.
8    Q.    Okay.  Did -- Before March 25,
9  2004, before making this application, did
10  Lorena ever tell you that Richard Fetner had
11  been bothering her or sexually harassing her
12  at JELD-WEN?
13    A.    I think she told me that when
14  she went out with him, but that's it.
15    Q.    That's it.  Okay.  Now, what
16  did Lorena say about -- I think I got the
17  right name, Ronald Bowen?
18    A.    Right.
19    Q.    What did Lorena say about
20  Ronald Bowen?
21    A.    He was just doing some
22  horrible stuff.
23    Q.    Okay.  Well, we know what the

Page 115

1  horrible stuff is, did Lorena tell you that
2  -- what happened to Mr. Bowen?
3    A.    Yes, sir.
4    Q.    What did she tell you?
5    A.    She said that they had a
6  meeting -- that a lawyer came down and they
7  had a meeting and that he left.
8    Q.    That Ronald Bowen left?
9    A.    Uh-huh.
10    Q.    Yes or no?
11    A.    Yes, sir.
12    Q.    Because of Lorena's complaint
13  about Ronald Bowen?
14    A.    Yes, sir.
15    Q.    And nothing happened to
16  Lorena, even though she made the complaint
17  about Ronald Bowen?
18    A.    No, sir.  She just -- The only
19  thing she's told me that she's been asked to
20  be moved before that and they didn't move
21  her.
22    Q.    And how long did she have --
23  did that period last, between the time she

Page 116

1  asked to be moved and Ronald Bowen quit?
2    A.    I couldn't tell you that.  I
3  don't know.
4    Q.    Okay.  Did Lorena tell you
5  that she was happy with the way JELD-WEN
6  reacted when she complained about Ronald
7  Bowen?
8    A.    No, sir.  I don't think she
9  was real happy.
10    Q.    What was she unhappy about,
11  Lorena?
12    A.    I think probably --
13        MR. DOUGLAS:  Object to the
14  form of the question, but you can answer.
15    Q.    What did Lorena tell you that
16  she was unhappy about?
17    A.    That they should have moved
18  her, that she asked to be moved.
19    Q.    Well, she -- Was she happy
20  about the fact that JELD-WEN -- Did she tell
21  you she was happy about the fact that
22  JELD-WEN sent in a lawyer to investigate her
23  allegations against Donald -- Ronald Bowen?

29 (Pages 113 to 116)

# FREEDOM COURT REPORTING

### Page 117

1    A.    She -- Not that I can recall.
2    Q.    Okay. All right. And Ronald
3  Bowen, do you know him?
4    A.    I know of him.
5    Q.    That's right. He's related to
6  you?
7    A.    Distantly.
8    Q.    Not distant enough?
9    A.    No.
10         (Defendant's Exhibit 15
11         was marked for
12         identification purposes.)
13   Q.    Exhibit 15, please. Do you
14  recall receiving -- Strike that. This is a
15  document numbered Linda Sims Number 15,
16  entitled: New Employee Orientation, dated
17  4/19/04. Is that your signature next to the
18  date?
19   A.    Yes, sir.
20   Q.    And the L-S, is that your
21  initials?
22   A.    Those -- Yes.
23   Q.    Okay. And do you recall

### Page 118

1  receiving Handbook Standards of Conduct,
2  pages four and five, and Your
3  Responsibilities, pages four and eight?
4    A.    I'm sorry, repeat that again.
5    Q.    Yes. If you look under
6  general information, do you recall seeing
7  Handbook Standards of Conduct, pages four
8  and five, and Your Responsibilities, pages
9  four and eight?
10   A.    Yes, I do.
11   Q.    Okay. And your initials are
12  next to that?
13   A.    Yes.
14   Q.    Okay. And then your signature
15  is at the bottom. And above your signature:
16  The above was explained to me and I accept
17  the above responsibilities. Do you see
18  that?
19   A.    Yes, sir.
20   Q.    All right. Was the above
21  explained to you?
22   A.    Yes, sir.
23   Q.    Okay. Who helped you -- Who

### Page 119

1  did you talk to while you were filling this
2  out, Exhibit Number 15?
3    A.    Roxie.
4    Q.    Roxie?
5    A.    Uh-huh.
6    Q.    Okay. I'll show you Exhibit
7  Number 16. You already have that. That's
8  already been marked.
9          MR. DOUGLAS: Just give us the
10  page at the bottom.
11   Q.    All right. Five. Do you see
12  the part called: Harassment Policy?
13   A.    Yes, sir.
14   Q.    All right. Have you read that
15  harassment policy?
16   A.    Yes, sir.
17   Q.    All right. Do you understand
18  it?
19   A.    Yes, sir.
20   Q.    All right. Did you understand
21  that JELD-WEN would not tolerate -- this
22  part right here it says: Harassment in any
23  form will not be tolerated by the company.

### Page 120

1  Any employee who violates this policy is
2  subject to discipline, up to and including
3  discharge?
4    A.    Yes.
5    Q.    All right. Up at the top,
6  right-hand corner, it says: Employees will
7  be made aware of this policy, and we
8  encourage -- and are encouraged not to
9  tolerate harassment.
10         Any employee who believes that
11  he/she is being subject to objectionable
12  conduct should promptly notify either their
13  immediate supervisor, their general
14  corporate manager, vice president,
15  subsidiary parent or the legal department,
16  and it provides the number. Do you see
17  that?
18   A.    Yes, sir.
19   Q.    You understand that?
20   A.    Yes, sir.
21   Q.    You understood it then, when
22  you received this policy?
23   A.    Yes, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 121

1    Q.    All right. And when you
2  worked with Roxie, do you feel like you had
3  any problems going to her asking her for any
4  telephone numbers for anybody that you would
5  want to report any type of sexual harassment
6  problems?
7    A.    Actually, I felt very
8  uncomfortable up there.
9    Q.    With Roxie?
10   A.    Uh-huh.
11       MR. DOUGLAS:  You need to
12  answer yes.
13   A.    Yes.
14   Q.    And why is that?
15   A.    I just felt like she usually
16  talked to everybody but she never hardly
17  spoke a word to me the whole time I was up
18  there. I would try to make conversation
19  with her and she just wouldn't answer yes,
20  no.
21   Q.    She wasn't bothering you, was
22  she?
23   A.    No, no.

Page 122

1    Q.    Okay. You don't feel like if
2  you had asked her for a telephone number,
3  she wouldn't give it to you?
4    A.    Oh, I'm sure if I would have
5  asked, she would have.
6    Q.    So, like, if your Dr. Russell
7  advised you to call someone above Richard
8  Fetner, you wouldn't have any problem going
9  to Roxie and saying: Can you give me a
10  number to call?
11   A.    Yes, sir.
12   Q.    You would not have any
13  problem?
14   A.    I would not have a problem.
15   Q.    Okay. Do you understand the
16  part about the bottom part on this last part
17  that says: Employees will not be
18  discriminated against -- discriminated or
19  retaliated against for reporting harassment
20  or participating in investigation. Do you
21  understand that?
22   A.    I understand that.
23   Q.    Okay. And what does that mean

Page 123

1  to you?
2    A.    I mean --
3    Q.    Just what it says?
4    A.    Yes.
5    Q.    Look up here, again, on the
6  right-hand side, it says: Additionally. Do
7  you see the word "additionally"?
8    A.    Yes, sir.
9    Q.    Employees are encouraged to
10  report any conduct they may witness against
11  someone else, whether verbal, visual,
12  physical, sexual or otherwise, that they
13  believe constitutes harassment?
14   A.    Yes, sir.
15   Q.    You understand that?
16   A.    Yes, sir.
17   Q.    That you're supposed to report
18  it?
19   A.    Yes, sir.
20   Q.    Either if it happens to you or
21  somebody else, you're supposed to report it?
22   A.    Yes, sir.
23   Q.    Okay. Also, this booklet has

Page 124

1  different areas other than sexual harassment
2  in it; is that correct?
3    A.    Yes, sir.
4    Q.    Keep the Company Informed.
5  There's seven things that you should keep
6  the company informed on. Safety, substance
7  abuse and things of that nature?
8    A.    Yes, sir.
9    Q.    And you understood all of
10  those?
11   A.    Yes, sir.
12       (Defendant's Exhibit 17
13       was marked for
14       identification purposes.)
15   Q.    Okay. All right. This is
16  dated 4/19. Has this been filled out by
17  you? Is that your handwriting?
18   A.    Yes, sir, that's my
19  handwriting.
20   Q.    Okay. Just basic information.
21  Brandy New, your daughter, in case of
22  accident, and Russell Peterson is your
23  person to call in case of emergency; is that

31 (Pages 121 to 124)

# FREEDOM COURT REPORTING

Page 125

1  correct?
2      A.    Yes, sir.
3          (Defendant's Exhibits 18
4          and 19 were marked for
5          identification purposes.)
6      Q.    All right.  18 and 19.  Number
7  18 is your signature, dated June 8, 2004?
8      A.    Yes.
9      Q.    And it says that:  You
10  received training and instruction on
11  JELD-WEN's anti-harassment procedures and
12  guidelines and you understand its contents.
13  Is that a correct statement?
14      A.    Yes, sir.
15      Q.    All right.  On 19, you
16  acknowledge receiving a copy of the JELD-WEN
17  Employee Handbook, and, again, you
18  understand the terms and conditions and
19  duties set forth therein, and you signed
20  your name, dated June 8, 2004; is that
21  correct?
22      A.    Yes, sir.
23      Q.    All right.  So you did

Page 126

1      understand the Employee Handbook?
2      A.    Yes, sir.
3          (Defendant's Exhibit 20
4          was marked for
5          identification purposes.)
6      Q.    All right.  Is this Exhibit 20
7  dated, I think, August 8, 2004, a test that
8  you took on the Employee Handbook?
9      A.    Yes, sir.
10      Q.    And you scored an 84; is that
11  correct?
12      A.    Yes, sir.
13      Q.    And on paragraph fifteen,
14  dealt with the harassment; is that correct?
15      A.    Yes, sir.
16      Q.    And you got all those correct?
17      A.    Yes, sir.
18      Q.    And you got a much better
19  score than Brenda Sims; is that correct?
20      A.    A little.
21          (Defendant's Exhibit 21
22          was marked for
23          identification purposes.)

Page 127

1      Q.    Okay.  Exhibit 21, is this a
2  document that you needed to be sent by
3  JELD-WEN to your landlord so that they would
4  rent an apartment to you?
5      A.    Yes, sir.
6      Q.    And on the third page, it was
7  signed by Roxie Giles?
8      A.    I suppose.
9      Q.    Okay.  You don't know whether
10  or not she did this or not?
11      A.    I have no idea.
12      Q.    Okay.  You don't remember
13  talking to Roxie about this?
14      A.    No.
15      Q.    At this time, on August 10,
16  2004, were you injured and on light duty?
17      A.    No, sir.
18      Q.    When did that happen?
19      A.    It happened, like, about two
20  weeks after my mother's death.
21      Q.    Okay.
22          MR. THOMPSON:  Let's go off
23  the Record.

Page 128

1          (Recess taken.)
2      Q.    Ms. Sims, are you currently
3  living with anybody?
4      A.    No, sir.
5      Q.    Okay.  When you were with --
6  working for JELD-WEN, were you living with
7  anybody?
8      A.    No, sir.
9      Q.    And that lawsuit in which
10  Mr. Tinney is representing you, have you
11  given a deposition, like we're doing today?
12      A.    No, sir.
13      Q.    Okay.  And, again, I hate to
14  bring this up, but I want to make sure.  You
15  testified -- Or did you testify that you saw
16  Dr. Peterson on August 25th, before your
17  mother was killed in a car accident?
18      A.    Right.  It was that morning.
19      Q.    And she was killed in the
20  afternoon?
21      A.    Afternoon.
22      Q.    Okay.  And Ms. Zachary, do you
23  know her nickname?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 129

1    A.    Who?
2    Q.    Tooty Zachary.
3    A.    I just don't know her last
4    name. I know the name Tooty.
5    Q.    Tooty. Okay. And how long
6    have you known Tooty?
7    A.    Just when I started to work at
8    JELD-WEN.
9    Q.    Okay. You didn't know her
10   beforehand?
11   A.    Huh-uh.
12   Q.    And had no interaction with
13   her?
14   A.    No, sir.
15   Q.    We talked about this a little
16   earlier. Did you tell anyone at -- While
17   you worked at JELD-WEN, did you tell anyone
18   there about that you feared for your life
19   because of your ex-husband or ex-boyfriend?
20   A.    My ex-boyfriend? No. My
21   husband, that was when we were married. I
22   might have talked to Lorena about it.
23   Q.    No one else?

Page 130

1    A.    Huh-uh.
2          (Defendant's Exhibit 22
3          was marked for
4          identification purposes.)
5    Q.    Okay. I'm showing you Exhibit
6    Number 22, please. Take your time and look
7    at that for a second, please. Ms. Sims, do
8    you recognize Exhibit Number 22?
9    A.    Yes, sir.
10   Q.    Is that your signature dated
11   10/26/04?
12   A.    Yes, sir.
13   Q.    Okay. Above that it says: I
14   declare under penalty of perjury that the
15   above is true and correct?
16   A.    Yes, sir.
17   Q.    And you're -- As we sit here
18   today -- When you signed that, did you
19   believe everything you wrote in here was
20   true and correct?
21   A.    Yes, sir.
22   Q.    And do you believe that as of
23   today?

Page 131

1    A.    Yes, sir.
2    Q.    Now, you have base of
3    description -- Charge of Discrimination
4    based upon sex?
5    A.    Yes, sir.
6          (Off-the-Record discussion
7          was held.)
8    Q.    Now, you did not put an X for
9    retaliation; is that correct?
10   A.    No, sir.
11   Q.    And why is that?
12   A.    I really just -- Well, at that
13   point in time, this was going on, but I felt
14   like the retaliation came later.
15   Q.    Okay. Now, you signed this on
16   October 26, 2004?
17   A.    Uh-huh.
18   Q.    Say yes or no.
19   A.    26th. No, sir.
20   Q.    October 26, 2004?
21   A.    Yes, sir.
22   Q.    Okay. And if you go up to the
23   dates that the discrimination took place,

Page 132

1    you say: From April 1, 2004, to -- and the
2    latest is August 1, 2004?
3    A.    During April of 2004.
4    Q.    That's right?
5    A.    Uh-huh.
6    Q.    To, and the latest is August 1
7    of 2004; is that correct?
8    A.    Yes, sir.
9    Q.    All right. Now, let's start
10   with the particulars. You began your
11   employment during April of 2004 as a router.
12   We go back to -- Let's look at this
13   together. Exhibit Number 13, which we
14   talked about, if you don't mind leave it
15   like that, if it's possible.
16   A.    Okay.
17   Q.    And you started working as a
18   router, so you were working right next to
19   where your initials are; is that correct?
20   A.    Uh-huh.
21   Q.    Yes or no.
22   A.    Yes, sir.
23   Q.    You said: Almost from the

33 (Pages 129 to 132)

# FREEDOM COURT REPORTING

Page 133

1 beginning of my employment, I have been
2 subjected to sexual harassment from the
3 plant manager, consisting of sexual comments
4 regarding my body parts, request to go out
5 on dates, touching my body around the waist,
6 placing his arms around me and pulling me
7 close to his body; is that correct?
8     A.    Yes, sir.
9     Q.    Now, the plant manager you're
10 referring to is Mr. Fetner?
11    A.    Yes, sir.
12    Q.    Nobody else?
13    A.    Yes, sir.
14    Q.    You're not -- Who else are you
15 referring to?
16        MR. DOUGLAS: That's it. She
17 said nobody else, yes, sir.
18    Q.    I see. Nobody else? Yes,
19 sir. Not Dan Hees or Pat Galvez or anyone
20 else?
21    A.    No, sir.
22    Q.    Okay. Now, I'd like to do
23 this, if it's okay with you, you felt like

Page 134

1 Richard Fetner verbally harassed you?
2     A.    Yes, sir.
3     Q.    All right. Can you give me
4 particular instances where that happened and
5 what he said, and who the witnesses are?
6     A.    I would be on my router, and
7 the whole -- this whole area --
8     Q.    The area with the X in it.
9     A.    He would come up and hug me.
10 And when he pulled me up to him, and just,
11 like, look at everybody and just start
12 laughing and grinning.
13    Q.    Again, this is where the
14 router is?
15    A.    Yes. It's right there
16 (indicating), yes.
17    Q.    That's what you're pointing
18 at?
19    A.    Uh-huh.
20    Q.    Okay.
21    A.    And he came up to me and told
22 me my butt looked like two basketballs.
23    Q.    Okay.

Page 135

1     A.    And he wanted to go dribbling.
2     Q.    Okay.
3     A.    And this was here
4 (indicating).
5     Q.    At the X?
6     A.    Uh-huh.
7     Q.    You have to say yes.
8     A.    Yes, sir.
9     Q.    All right.
10    A.    And then he would come around
11 this way (indicating), and come like this
12 (indicating) and act like he was dribbling a
13 basketball.
14    Q.    Okay. Referring to your
15 buttocks?
16    A.    Look at me and laughing, yes.
17    Q.    All right.
18    A.    Then at one point, we were
19 going to the break room around in this way
20 (indicating) --
21    Q.    Now, wait. The what room?
22    A.    The break room.
23    Q.    Now, where's the break room?

Page 136

1 Could you write on there where the break
2 room is. Just write break room.
3     A.    Well, it would --
4     Q.    Put an X where the break room
5 is.
6     A.    It should be right here
7 (indicating).
8     Q.    And that's right below -- Is
9 it on the first floor?
10    A.    It's on the bottom floor.
11    Q.    Bottom floor, but underneath
12 Pat and Roxie's office?
13    A.    Uh-huh. Yes.
14    Q.    Okay. Where you put the X.
15 Okay.
16    A.    And we were going to the break
17 room, and he came up behind me, and he told
18 me that my -- one of my basketballs looked
19 deflated, and that he had a needle that he
20 could pump me up. And I just looked at him
21 and kind of went -- and just walked off.
22    Q.    Okay.
23    A.    And at one point, we were here

34  (Pages 133 to 136)

## FREEDOM COURT REPORTING

Page 137

1  in his office, which we had got to a point
2  to where nobody wanted to go in his office
3  alone, but he kept his shades closed. And
4  the door was open and there was nobody in
5  there.
6          And I went in there to get
7  some gloves. I saw he wasn't in there, so
8  I'm thinking okay, I'm going to go in here
9  because the gloves were in this little
10 cabinet.
11         I walked in there, and he
12 shuts -- comes in behind me and he shuts the
13 door, and he starts -- he didn't really say
14 anything to me at that point, but I'm like
15 really nervous.
16         So I'm trying to get out the
17 door. And I'm over here trying to get out
18 the door, and he was just right up almost
19 against me, and I almost felt like he was
20 fixing to bump me.
21    Q.    Bump you?
22    A.    Bump me.
23    Q.    Okay.

Page 138

1     A.    And I was trying to get out
2  the door. And I was over here (indicating),
3  at one point --
4     Q.    Okay. This is a -- You're
5  pointing to a different place now.
6     A.    Different place.
7     Q.    Right next to your initials?
8     A.    Right. I was sweeping the
9  floor, and I had kind of bent over to sweep
10 up the trash, and he -- I didn't even
11 realize he was behind me, and he walked up
12 behind me and he said: I know a person your
13 age can't be your age that moves like that.
14        Shortly after that -- I just
15 walked off. And shortly after that, Brenda
16 came over there and asked me if he pinched
17 me because she said he looked like he was
18 like doing that (indicating), to me. I told
19 her no.
20        MR. DOUGLAS: You need to say
21 what doing that is.
22    Q.    Cupping your hands underneath
23 your butt?

Page 139

1     A.    Like pinch me. She said it
2  looked like he had his hand like he was
3  going to reach out and pinch me.
4     Q.    All right.
5     A.    And I said: No. And she
6  said: It looked like he had his hand in
7  like he was fixing to pinch you.
8     Q.    But he didn't?
9     A.    No.
10    Q.    All right.
11    A.    And he would come up behind
12 me. A lot of times he would just come up
13 and stand right in behind me at my machine
14 where I worked here at the door lock.
15        And then there were times that
16 he was coming -- he was coming this way
17 (indicating), and he asked me where I was
18 going, and I said I was going to the little
19 girl's room.
20    Q.    Where is the restroom?
21    A.    The restrooms are right
22 underneath Roxie.
23    Q.    Okay. Right underneath Roxie,

Page 140

1  on the first floor?
2     A.    Yes.
3     Q.    Okay.
4     A.    And he asked me if I needed
5  any help or something, and I'm, like: No.
6  So anyway, then he -- I'm trying to remember
7  everything he said to me, because he said so
8  much.
9          But we was working -- I was
10 working on the dado machine when Mike was
11 here (indicating).
12    Q.    Mike?
13    A.    Mike Weathers.
14    Q.    Mike Weathers.
15    A.    And everybody else had -- was
16 doing something else. I don't know if
17 Lorena was out that day or what, but I was
18 doing this. And he came over here behind
19 me.
20    Q.    He, being Mr. Fetner?
21    A.    Mr. Fetner came over behind me
22 and told me that he would play with my
23 basketballs if nobody was there. I told

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 141

1 him, I said: No, you wouldn't, because I
2 wouldn't let you.
3         And a different -- I remember
4 screaming at him right here at one point
5 (indicating), and told him --
6         MR. DOUGLAS: Where is right
7 here?
8     A.    Right here at the door --
9         MR. DOUGLAS: No, no, say it.
10     A.    Okay. As we was going out the
11 door --
12     Q.    Why don't you put a Y where
13 you were -- where this happened.
14     A.    A Y?
15     Q.    Yeah. Just a Y.
16     A.    Like this (indicating)?
17     Q.    Yeah. This is where you were
18 standing when you screamed at him?
19     A.    Yeah. I yelled at him. I had
20 tried my best to -- I remember yelling at
21 him and telling him that he was crazy.
22         And every time after that, I
23 would just, like, back up. If he even got

Page 142

1 near me, you know, just back up.
2         And I never spoke to him
3 unless it was anything to do with work or
4 unless I had to answer him.
5         And I felt like that he at
6 that point started, like, moving me off my
7 job and putting me on different jobs that,
8 you know, no one else would do. And then he
9 would let Lisa Cook do my job while I'm out
10 here doing some other job.
11     Q.    Like the glue room job?
12     A.    Yeah. Somewhere in -- It
13 wasn't a glue room job, but it was some part
14 over here.
15     Q.    A job near -- in the glue
16 room, in the place where the glue room is?
17     A.    Right.
18     Q.    Okay. Was that a job you were
19 capable of doing?
20     A.    Well, I had to learn how to do
21 it.
22     Q.    Were you able to learn how to
23 do it?

Page 143

1     A.    I did it.
2     Q.    Yeah.
3     A.    Well, you just had to pick up
4 wood and push it through this other machine.
5     Q.    Okay. So, you were capable of
6 doing that?
7     A.    Oh, yeah.
8     Q.    Was it harder than the router
9 job?
10     A.    Oh, yes, sir.
11     Q.    Okay. Were there any other
12 women doing that job?
13     A.    Me and Brenda.
14     Q.    Okay. Anybody else?
15     A.    He would send Brenda out there
16 to do it, too. Mary Lou, I think, done it
17 sometimes, too.
18     Q.    Okay.
19     A.    And I don't know, I think Lisa
20 may have done it a few times, too.
21     Q.    You're talking about this
22 job --
23     A.    This job.

Page 144

1     Q.    What do we call this job?
2     A.    I don't know what the name of
3 it is.
4     Q.    It's a job in the glue room?
5     A.    Yeah. I don't know what the
6 name of it was.
7     Q.    And you would be sticking wood
8 through something?
9     A.    It was like it was trimming
10 the woods off the edges of the wood, making
11 it smooth.
12     Q.    All right. Now, anything else
13 that you can think of?
14     A.    Not right at this present
15 moment.
16     Q.    Okay.
17     A.    No. There was more said and
18 done, I just can't think of more.
19     Q.    Did anybody -- To your
20 knowledge, did anybody -- did Mr. Fetner
21 ever grab you, grab your breasts, grab your
22 crotch or any other private area?
23     A.    No, he didn't. He would just

36 (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 145

1  pull me into him and would pull me like this
2  (indicating).
3      Q.  Okay.  When he did that, did
4  he grab at any of your private parts?
5      A.  No.
6      Q.  All right.  Did Mr. Fetner --
7  When he was saying the dribbling basketball
8  thing, did he say that in front of anybody
9  else?
10     A.  He told that to Lorena.
11     Q.  Lorena?
12     A.  Yes, sir.
13     Q.  Anybody besides Lorena?
14     A.  Not to my knowledge.
15     Q.  Okay.  Now, you talked about
16  Brenda saying he walked -- When you bent
17  over and he put his hand near you, but he
18  didn't touch you; is that correct?
19     A.  No.
20     Q.  Okay.
21     A.  If he did, I didn't feel it.
22     Q.  All right.  Other than Brenda,
23  did anybody see it?

Page 146

1      A.  I don't think so, no.
2      Q.  Okay.  Do you know of anybody
3  that witnessed, other than Lorena and
4  Brenda, anything Mr. Fetner did to you?
5      A.  Well, Lisa, Mary Lou, all of
6  them saw him hugging me.
7      Q.  Hugging you?
8      A.  Yes.  And the people over --
9  They didn't -- I don't guess they saw
10  anything, but I think everybody -- When I
11  would come out here to work, they would say:
12  Well, what did you do?  Why did Richard send
13  you out here?
14     Q.  Who would say this?
15     A.  Anybody that -- Everybody that
16  worked in this part (indicating).
17     Q.  Okay.  And you're circling the
18  glue room?
19     A.  Right.  And I would say: It's
20  just because I won't play his games.  They
21  were like: Yeah, that figures.
22     Q.  When you were hurt and on
23  light duty, did you tell Roxie any of this?

Page 147

1      A.  No.
2      Q.  Did you tell Pat Galvez any of
3  this?
4      A.  No.  Because he had already
5  left.
6      Q.  Okay.
7      A.  He also asked me out the first
8  day that -- the first week or so that I was
9  there, he started asking me to go out with
10  him.
11     Q.  All right.
12     A.  And he asked me to come
13  decorate his bedroom.
14     Q.  What were your reactions to
15  Mr. Fetner's hugs?
16     A.  I just kind of like did this
17  (indicating).
18     Q.  You froze up?
19     A.  Yes, sir.
20     Q.  Did you say:  Don't do that
21  again, to him?
22     A.  I didn't really know what to
23  say.

Page 148

1      MR. DOUGLAS:  Answer his
2  question.  He asked you if you said:  Don't
3  do this again?
4      A.  No, sir.
5      Q.  Now, let's go back to this
6  time where you said you marked the Y.  When
7  did -- You yelled at him?
8      A.  Yes, sir.
9      Q.  What time of day was this?
10     A.  It was probably about the
11  middle of the day.
12     Q.  And did anybody see you do
13  that, or hear you do that?
14     A.  Probably nobody could hear it
15  because it's a really loud place.
16     Q.  Did anybody see you yelling at
17  him, to your knowledge?
18     A.  I would think anybody in this
19  way could have saw me and him talking.  And
20  anybody working this way (indicating),
21  because we were kind of like out in the
22  open.
23     Q.  Okay.  But they couldn't hear

37 (Pages 145 to 148)

# FREEDOM COURT REPORTING

Page 149

1  you yelling because of the noise?
2      A.   Right.
3      Q.   But they could see you
4  talking?
5      A.   Oh, yeah.  Uh-huh.
6      Q.   All right.  Did you ever lose
7  any hours because there was a lack of work?
8  In other words, did -- several people were
9  laid off because of lack of work in one
10  department or another?
11      A.   There was one time we may have
12  had to stay home for a day or two.  But I
13  think it was after one of these incidents
14  that I was -- like, told to -- I was told to
15  go home for the rest of the day.
16      Q.   Who told you to go home?
17      A.   Well, Richard had told Phil to
18  come tell me.
19      Q.   Okay.  Were you the only one
20  that he'd ask to go home?
21      A.   No.  Brenda was.  Me and
22  Brenda was.
23      Q.   You were the only two?

Page 150

1      A.   Uh-huh.
2      Q.   In the whole plant?
3      A.   Uh-huh.
4      Q.   Yes or no.
5      A.   Yes.
6      Q.   Were you asked to ever go home
7  because Mr. Fetner — you refused
8  Mr. Fetner's advances?
9      A.   I felt like that was why.
10      Q.   Okay.  You felt like it, did
11  anybody ever tell you that?
12      A.   No.
13      Q.   Would Phil Smith, did he tell
14  you that, that you were being sent home for
15  any particular reason?  Strike that.  That's
16  not a good question.
17           Did Phil Smith give you a
18  reason why you were being sent home?
19      A.   I'm not for sure if he did or
20  not.  I think he just come told us that we
21  could go home, which I don't think either
22  one of us wanted to go home, but — I'm not
23  for sure.  I'm not for sure.

Page 151

1      Q.   Okay.
2      A.   But I just remember Phil
3  coming and telling us that we had to go
4  home.  And there was work on my job, and I
5  think that was when I got so mad.
6      Q.   They would work on your job?
7      A.   There was work on my job.  And
8  he would tell us to go home.  And I think me
9  and Brenda, both -- At that point I got fed
10  up with it, and I called the 1-800 number to
11  JELD-WEN and I got the answering machine.
12           And I think, like, a couple of
13  days later, they would call me back and I
14  wasn't at home and they left me a message.
15  So I called them back.  And then I told them
16  that there was some things going on that
17  they probably should know about.  And so
18  they told me that the legal manager would
19  call me.
20           And then, at the same day, I
21  found out that Brenda had called Mr. Hees.
22  And so I just kind of didn't do anymore
23  about it because she called Mr. Hees.  But I

Page 152

1  think me and her called the same day.
2      Q.   Okay.
3      A.   But I think she had got a hold
4  of Mr. Hees before I did.
5      Q.   Okay.  So, you called the
6  legal?
7      A.   Uh-huh.
8      Q.   If JELD-WEN's records indicate
9  that you met with Mr. Hees on October 13,
10  2004, would you have any reason to agree or
11  disagree with that?
12      A.   No, sir.
13      Q.   All right.  If Mr. Hees's
14  memory is such that he called, I think,
15  Brenda at her house on a Sunday before
16  October 13th, would you have any records to
17  agree or disagree?
18      A.   No, sir.
19      Q.   Do you have any -- apparently
20  the word "diary" is the wrong word, but
21  pieces of paper at home where you wrote out
22  the dates all of this happened?
23      A.   I may have some at home where

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 153

1 I was trying to remember everything.
2    Q.    Okay. Did you write out on
3 this piece of paper as it happened or at
4 some point later in time?
5    A.    It was later in time, I'm
6 sure.
7    Q.    And are you -- Do you feel
8 like -- Well, strike that. Do you recall
9 having Phil Smith tell you to go home early
10 one time?
11    A.    Yes, sir.
12    Q.    Okay. Did you actually lose
13 any wages?
14    A.    I lost that rest of the day's
15 pay.
16    Q.    Okay. How many hours was
17 that?
18    A.    Actually, I don't know if it
19 was -- He sent us home for the whole
20 weekend. For the rest of the week. I can't
21 remember. I know I'm not supposed to ask
22 her. But I'm not for sure about that, but I
23 just know he sent us home and we were gone

## Page 154

1 over several days. I missed several days
2 after that.
3    Q.    Okay. And you don't know --
4    A.    I can't remember a certain
5 date.
6    Q.    You don't remember -- have any
7 idea when that was?
8    A.    I can't remember just exactly
9 when.
10    Q.    Was it before --
11    A.    It was before we talked to
12 Mr. Hees.
13    Q.    Before you talked to Mr. Hees.
14 Was it before or after your mother's death?
15    A.    It was after.
16    Q.    After your mother's death.
17 Okay. So, at some point before the time you
18 spoke with Dan Hees, you did call JELD-WEN's
19 800 number?
20    A.    Yes, sir.
21    Q.    And they did call you back?
22    A.    Yes, sir.
23    Q.    Within how much time?

## Page 155

1    A.    I think it was a day or two
2 later.
3    Q.    Okay. And this was probably
4 in October sometime, or do you know?
5    A.    Yes, sir.
6    Q.    Well, you think it was in
7 October sometime?
8    A.    I'm not for sure, but --
9    Q.    Okay. And who did you speak
10 with?
11    A.    I spoke with their -- I think
12 it was a secretary. I don't know what her
13 name was.
14    Q.    Do you have -- You don't know
15 what her name was?
16    A.    Huh-uh.
17    Q.    Did she identify herself as a
18 secretary?
19    A.    She identified herself, but I
20 don't remember who she was.
21    Q.    Okay.
22    A.    She just told me I needed to
23 speak with the legal department, and that

## Page 156

1 they were gone for the day, and that she
2 would have them call me back.
3    Q.    And did they call you back?
4    A.    Yes. It was several days
5 later, but, yes, they called me back.
6    Q.    Who called you back?
7    A.    It was a lady. I don't
8 remember her name.
9    Q.    Julie?
10    A.    Could have been. I'm not for
11 sure.
12    Q.    Okay.
13    A.    But I wasn't at home, so she
14 just left a message on my machine.
15    Q.    I see. What did the message
16 say?
17    A.    We wanted -- Was calling you
18 back in regards to the complaint that you
19 was making and that we would be interested
20 in talking to you.
21    Q.    Okay. Did she give you a
22 telephone number?
23    A.    The 800 number. She repeated

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 157

1    that 800 number.
2        Q.    Okay. Did you call that 800
3    number back?
4        A.    Not at that point, because we
5    were fixing to talk to Mr. Hees.
6            (Defendant's Exhibit 23
7                was marked for
8                identification purposes.)
9        Q.    Okay. I'll show you Exhibit
10   Number 23. Just take your time and look at
11   it. Exhibit Number 23, is this a document
12   you filled out regarding you have a right to
13   file a Charge of Discrimination?
14       A.    Yes.
15       Q.    The information in here, this
16   second page, D. Love, by that time you had
17   hired D. Love?
18       A.    We did not hire her.
19       Q.    Okay. It says: Are you
20   represented by an attorney?
21       A.    At that point, we had talked
22   to her and she told us to go there and to
23   file a complaint.

Page 158

1        Q.    Okay. But you never hired D.
2    Love?
3        A.    No, sir.
4        Q.    All right. Did D. Love go
5    with you?
6        A.    She showed us where the
7    building was. She did not go inside with
8    us.
9        Q.    Okay. All right. Now, if we
10   go to the go -- We don't need to go over
11   these again. These are pretty much what you
12   talked about today, the complaints?
13       A.    Yes, sir.
14       Q.    All right. And that is your
15   signature dated August 20, 2004?
16       A.    Yes, sir.
17           (Defendant's Exhibit 24
18                was marked for
19                identification purposes.)
20       Q.    Okay. Exhibit Number 24, is
21   this the D. Love that you referenced on
22   the --
23       A.    Yes, sir.

Page 159

1        Q.    When you talked -- When you
2    went to go fill this out, did you meet with
3    anybody from the EEOC, speak with them?
4        A.    Yes, sir.
5        Q.    Who was that, do you recall?
6        A.    It was a lady.
7        Q.    Okay. Did she give you any
8    type of advice or tell you what to do?
9        A.    She told us that we needed to
10   call the -- over the -- the people over
11   Mr. Fetner.
12       Q.    Okay. Did you ask any of your
13   -- And, again, I'm sorry if I get this mixed
14   up. You have two sons?
15       A.    Yes, sir.
16       Q.    Did you ask them for any help
17   in trying to go intervene and talk to
18   Mr. Fetner?
19       A.    No, sir. I really didn't want
20   to get my kids involved.
21       Q.    Okay. Let's talk about the
22   time you went to -- you went to Dan Hees.
23   How did that come about?

Page 160

1            MR. DOUGLAS: I object to the
2    form of that question.
3        Q.    Did you go talk to Dan Hees on
4    October 13, 2004?
5        A.    Are you talking about, like,
6    when we all went and talked to him?
7        Q.    Yes.
8        A.    Yes.
9        Q.    Okay. And what time of day
10   was that?
11       A.    It was in the morning time,
12   about nine o'clock.
13       Q.    Okay. Who all went?
14       A.    It was me, Lorena, Brenda,
15   Lisa and Cathy.
16       Q.    Not Mary Lou?
17       A.    No, sir. She wasn't there
18   that day.
19       Q.    Did -- What was said? Who
20   started off?
21       A.    I think it started off with
22   Lisa.
23       Q.    Cook?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1    A.    Uh-huh.
2    Q.    And what did she have to say?
3    A.    She just told him about what
4  he was doing to her and how he touched her
5  in places and he tried to kiss her at one
6  point and . . .
7    Q.    And what did you say, pretty
8  much what you just told me?
9    A.    Yes, sir.
10    Q.    And what did Lorena say?
11    A.    Pretty much what she --
12    Q.    Pretty much what you heard her
13  say the other day?
14    A.    Yes, sir.
15    Q.    What did Brenda say?
16    A.    That he had been squeezing her
17  and touching her and she was -- he rubbed
18  her leg.
19    Q.    Did Brenda Sims complain about
20  being moved around?
21    A.    Yes, sir.
22    Q.    Did you?
23    A.    Yes, sir.

Page 162

1    Q.    And what did Dan Hees say to
2  that?
3    A.    I think he just -- I don't
4  remember exactly what he said. I can't -- I
5  can't remember.
6    Q.    Did Mr. Hees ask Lorena to try
7  to help you and Brenda -- if you are moved
8  around, for Lorena -- for the more
9  experienced women to help you learn how to
10  do the jobs?
11    A.    No, sir.
12    Q.    You don't recall that?
13    A.    No, sir.
14    Q.    All right. Did Mr. Hees take
15  any notes?
16    A.    Yes, sir.
17    Q.    Did he have a note pad?
18    A.    Yes, sir.
19    Q.    Did he seem to be taking you
20  seriously?
21       MR. DOUGLAS: Object to the
22  form. You can answer.
23    A.    Okay. He would kind of --

Page 163

1  Every time we'd say what he did, he would
2  kind of make a joke about it. Like, when I
3  was telling him about mine, he would say:
4  Been playing basketball lately? And he'd
5  just kind of laugh about it.
6    Q.    Well, did any of the women
7  laugh?
8    A.    Well, you know, it's just like
9  -- There might have been some of them that
10  laughed. I didn't think it was funny.
11    Q.    Okay.
12    A.    I didn't laugh.
13    Q.    Well, did any other women
14  laugh?
15    A.    Maybe Lisa, but maybe just as
16  a nervously laugh, like a nervous laugh.
17    Q.    But you don't know that it was
18  -- Did she tell you that was a nervous laugh
19  after it was over?
20    A.    No, sir. But I can -- You can
21  tell when it's a laugh for real.
22    Q.    Okay. And how long did this
23  meeting last?

Page 164

1    A.    About thirty-five, forty
2  minutes.
3    Q.    Okay. What happened after
4  that?
5    A.    We went back to work. And
6  Mr. Fetner had left while we had our
7  meeting. And then we went back to work. He
8  came in in about --
9    Q.    He who?
10    A.    Mr. Fetner. We had been to
11  work for a little while and then we saw
12  Mr. Fetner leave.
13    Q.    The plant?
14    A.    Yes, sir.
15    Q.    And that was the last time he
16  ever worked there?
17    A.    Yes, sir.
18    Q.    He never bothered you again at
19  that plant?
20    A.    No, sir.
21    Q.    All right. And you talked to
22  Dan Hees again?
23    A.    Yes, sir.

41 (Pages 161 to 164)

# FREEDOM COURT REPORTING

Page 165

1    Q.    And what did he say? Or what
2  did y'all say? Just you personally talked
3  to him or a group?
4    A.    No, sir. It was just in a
5  group.
6    Q.    Who all was in the group?
7    A.    Me, Lisa, Lorena, Brenda. I'm
8  not sure if Mary Lou was there at that point
9  or not, and Cathy Thornton, she was there.
10  And he just wanted to let us know that, you
11  know, he had fired Richard, and he wouldn't
12  be back.
13    Q.    Okay. And Richard never did
14  go back; is that correct?
15    A.    No, sir.
16    Q.    And did anyone at the JELD-WEN
17  plant bother you sexually again?
18    A.    No, sir.
19    Q.    And the whole time you were
20  there, the only one that ever bothered you
21  was Mr. Fetner?
22    A.    Yes, sir. But I felt like
23  Mr. Hees was, like, indicating some

Page 166

1  different things, but . . .
2    Q.    Not the -- Not anywhere near
3  the level of Mr. Fetner?
4    A.    No, no. Well --
5        MR. DOUGLAS: Wait for a
6  question.
7    Q.    What did you want to say?
8        MR. DOUGLAS: Answer his
9  question.
10    A.    I just felt like Mr. Hees and
11  them -- it was a week later they told us the
12  plant was closing, after we made our
13  complaint. I just felt like the plant was
14  closing because of the complaints we made.
15    Q.    Okay. You feel that way?
16    A.    Uh-huh.
17    Q.    Is that a yes or no?
18    A.    Yes.
19    Q.    Okay. Now, do you know who
20  made the decision to close the plant?
21    A.    No.
22    Q.    Do you have any knowledge
23  whether or not Richard Fetner had played a

Page 167

1  part in making the decision for the plant to
2  close?
3    A.    I do not know.
4    Q.    You would --
5    A.    I wouldn't know.
6    Q.    You would suspect he would not
7  because he had been fired?
8    A.    I would think not, yes.
9    Q.    Do you know whether or not Dan
10  Hees had any part in making the decision of
11  whether or not that plant would close?
12    A.    Yes.
13    Q.    And how do you know that?
14    A.    Because he was the one that
15  came and -- toured the plant. I never saw
16  anyone else. He was the highest one up that
17  I know of.
18    Q.    Okay. Listen to my question.
19  Did Mr. Hees ever tell you that he played a
20  part in making the decision to close the
21  plant?
22    A.    No, sir.
23    Q.    All right. Did anyone from

Page 168

1  JELD-WEN ever tell you they played a part in
2  making a decision to close the plant?
3    A.    No, sir.
4    Q.    Do you have any idea when the
5  decision was made to close the plant?
6    A.    I think it was after we made
7  our complaint.
8    Q.    I know you think it was, but
9  do you know when the decision was made?
10    A.    No, sir.
11    Q.    Okay. There's a difference in
12  being announced and when the decision was
13  made; right?
14    A.    Right.
15    Q.    Did Mr. Hees ever tell you
16  that -- Strike that. Had you -- Before you
17  went to -- you made your telephone call to
18  JELD-WEN legal department and met with Dan
19  Hees on October 13, 2004, had you ever
20  complained to Mr. Hees about Mr. Fetner?
21    A.    No, sir.
22    Q.    Did you complain to Roxie?
23    A.    No, sir.

42 (Pages 165 to 168)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1    Q.    All right. Did Mr. Hees tell
2  you that he had heard others make complaints
3  about Mr. Fetner on October 13, 2004?
4    A.    No, sir.
5    Q.    Okay.
6    A.    Not that I can remember.
7    Q.    Okay. You were laid off on
8  November 24, 2004?
9    A.    Yes, sir.
10   Q.    And you were offered a
11  severance package?
12   A.    Yes, sir.
13   Q.    And you turned it down?
14   A.    Yes, sir.
15   Q.    Did you get the money anyway?
16   A.    No, sir.
17   Q.    Brenda did.
18        MR. DOUGLAS: That's not a
19  question. Just wait for a question.
20        (Defendant's Exhibit 25
21        was marked for
22        identification purposes.)
23   Q.    All right. Let me show you

Page 170

1  Exhibit 25. This is an EEOC case log for
2  Linda Sims, that we got from the EEOC. And
3  the top, left-hand side there's a date on
4  there of August 20, 2004. You came in with
5  a fellow employee, that was Lorena?
6    A.    Lorena, yes.
7    Q.    All right. Okay. And on
8  September 22, 2004, an investigator called
9  you again?
10   A.    No. I think I called her.
11   Q.    You called her. And told her
12  you had too much what, now?
13   A.    My mother had passed away, and
14  it was too much to deal with at the point in
15  time.
16   Q.    In other words, you didn't
17  want to go through the lawsuit?
18   A.    I had -- Yes, sir.
19   Q.    All right. Now, your
20  telephone call to the JELD-WEN legal
21  department, and your October 13th
22  conversation with Dan Hees, was this the
23  first time you ever made a complaint of

Page 171

1  sexual harassment about Mr. Fetner?
2    A.    Yes, sir.
3    Q.    Go to the third page.
4    A.    (Witness complies.)
5    Q.    Is this your handwriting?
6    A.    Yes, sir.
7    Q.    Do you know the date of this
8  letter?
9    A.    No, sir.
10   Q.    Okay. Now, if you read the
11  second paragraph, it says: I feel that
12  JELD-WEN did not punish him to the extent
13  that they should have. The him you're
14  referring to is Mr. Fetner?
15   A.    Yes, sir.
16   Q.    And they, JELD-WEN, let him
17  resign. He has the opportunity to go back
18  and start this problem that he clearly has
19  over again.
20   A.    Yes, sir.
21   Q.    All right. And why do you say
22  that?
23   A.    I just feel like they slapped

Page 172

1  him on the hands and told him he had to go,
2  and he could just go back and do this all
3  over again because he had done it elsewhere,
4  come there and done it.
5    Q.    To your knowledge, has
6  Mr. Fetner ever worked for JELD-WEN again?
7    A.    Not to my knowledge.
8    Q.    All right. Did you file any
9  criminal charges against Mr. Fetner?
10   A.    No, sir.
11   Q.    Do you know of anybody that
12  did?
13   A.    Not that I know of.
14   Q.    And why did you not?
15   A.    I don't know. Just --
16   Q.    But while you were on the
17  JELD-WEN premises until the plant was shut
18  down, Mr. Fetner didn't bother you again; is
19  that correct?
20   A.    No, sir.
21   Q.    At your workplace?
22   A.    No, sir.
23        MR. DOUGLAS: Are you talking

43 (Pages 169 to 172)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 173

1  about after he left?

2          MR. SCOFIELD: After he left.

3          MR. DOUGLAS: Okay.

4          Q.    Because this was written with

5  the knowledge of him having been -- having

6  resigned, I assume this was after October

7  13, 2004, this letter you wrote?

8          A.    Yes, sir.

9          Q.    Okay. Was there another page

10  to this letter that perhaps the EEOC didn't

11  give to me?

12          A.    I wouldn't think so. Don't

13  know. I don't know how to answer that one.

14          Q.    Well, I mean, do you recall

15  writing a two-page letter?

16          A.    Yes, sir.

17          Q.    Your first sentence, you start

18  out saying: Mr. Fetner also said --

19          A.    Oh, yeah. I'm sure it

20  probably was more than one page.

21          Q.    Because this is all I got from

22  the EEOC. Did you keep a copy of what else

23  you wrote?

Page 174

1          A.    I've got it, but it's at home.

2          Q.    Okay. Would you have a

3  problem giving that to your attorney so that

4  he can give that to me.

5          A.    Well, my lawyer and them has

6  it. Matt has it. They have a copy of it.

7          Q.    Okay. When you went to the

8  EEOC the first time, in August of 2004, did

9  you tell anyone, such as -- with JELD-WEN,

10  such as Dan Hees or Roxie Giles or anyone

11  else that you had gone there?

12          A.    No, sir.

13          Q.    And, to your knowledge, did

14  you -- Well, strike that. When you met with

15  Dan Hees in October 13 -- on October 13,

16  2004, did you tell Dan Hees that you'd

17  already been to the EEOC?

18          A.    I don't remember.

19          Q.    Okay. Do you know when

20  JELD-WEN found out that you had gone to the

21  EEOC and filed a charge?

22          MR. DOUGLAS: Object to the

23  form of that question.

Page 175

1          A.    I don't know. Ask me the

2  question again.

3          Q.    Yeah.

4          MR. DOUGLAS: He wants to know

5  if you somehow know how JELD-WEN found out

6  when you went to the EEOC.

7          Q.    No. Do you know when JELD-WEN

8  found out you had gone to the EEOC?

9          MR. DOUGLAS: Same objection.

10          A.    Whenever we decided we wanted

11  to pick this back up.

12          Q.    Which was when?

13          A.    It was after they told us they

14  were closing the plant.

15          Q.    Okay. So, you believe that

16  was the first time JELD-WEN found out that

17  you had gone to the EEOC?

18          A.    Yes, sir.

19          Q.    Okay. Now, there was a -- I

20  asked you about this. Again, I hate to

21  belabor this, but after your mother passed

22  away in the car accident, did Mr. Fetner

23  hold a fundraiser to raise money for the

Page 176

1  funeral expenses?

2          A.    Not to my knowledge.

3          Q.    For anything associated with

4  your mother's passing away?

5          A.    They -- I think, the plant

6  gave me two hundred dollars.

7          Q.    The plant did? Okay. And you

8  don't know what Mr. Fetner's involvement on

9  that was?

10          A.    I have no idea.

11          (Defendant's Exhibit 26

12          was marked for

13          identification purposes.)

14          Q.    Okay. I'm showing you Exhibit

15  Number 26. This is a letter dated September

16  23, 2004, to you by a man -- an EEOC

17  employee by the name of Aaron Hallaway, an

18  investigator. Do you see that?

19          A.    Yes, sir.

20          Q.    Did Mr. Hallaway ever call you

21  and talk to you in person?

22          A.    He did at one point, but I

23  don't remember just exactly when.

44  (Pages 173 to 176)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1    Q.    Okay. But you spoke with
2  him —
3    A.    Over the phone.
4    Q.    -- at length?
5    A.    Yes.
6         (Defendant's Exhibit 27
7          was marked for
8          identification purposes.)
9    Q.    Okay. I'm showing you Exhibit
10 27. Exhibit 27, is this your signature that
11 you had read the above information?
12   A.    Yes.
13   Q.    All right. And this was your
14 final check dated November 24, 2004?
15   A.    Yes, sir.
16   Q.    All right. And after that,
17 the plant did close, to your knowledge?
18   A.    To my knowledge, yes, sir.
19        (Defendant's Exhibit 28
20         was marked for
21         identification purposes.)
22   Q.    And 28. Were you — Exhibit
23 Number 28 is titled: Severance and Release

Page 178

1  Agreement. Did JELD-WEN offer to give you
2  something like this?
3    A.    It wasn't no eighteen hundred
4  dollars.
5    Q.    Well, not the dollar amount,
6  but the rest of the amount?
7         MR. DOUGLAS: I object to the
8  form of that.
9    Q.    Not the dollar amount. Did
10 they offer to give you a lesser amount in
11 exchange for you signing this severance
12 agreement?
13   A.    Yes, sir.
14   Q.    They did?
15   A.    They give me something that
16 was called severance — It wasn't nothing
17 like this. It wasn't this paper.
18   Q.    I know it wasn't this paper.
19 But did they give you something different?
20   A.    They just said in the
21 agreement that no one would prosecute.
22   Q.    Do you still have the paper
23 they gave you?

Page 179

1    A.    I do. At home.
2    Q.    Could you give that to your
3  lawyer?
4    A.    They already have it.
5         (Defendant's Exhibit 29
6          was marked for
7          identification purposes.)
8    Q.    All right. Exhibit Number 29
9  is from the EEOC office. And the second
10 page is dated April 19, 2005.
11   A.    Uh-huh.
12   Q.    Do you recall receiving this
13 document?
14   A.    I didn't.
15   Q.    You did not receive this?
16   A.    I didn't receive this.
17 Huh-uh.
18   Q.    Okay. Is Matt White one of
19 your attorneys?
20   A.    Uh-huh. Yes, sir.
21   Q.    All right. Let me ask you
22 this. Before April 19, 2005, did you give
23 all the information that you felt you had

Page 180

1  regarding the sexual harassment by Richard
2  Fetner at JELD-WEN to the EEOC?
3    A.    When?
4    Q.    Before April —
5         MR. DOUGLAS: The date of this
6  letter?
7         MR. SCOFIELD: The date of the
8  letter.
9         MR. DOUGLAS: He's asking if
10 you gave them everything you had before
11 that.
12   A.    Yes, sir.
13        (Defendant's Exhibit 30
14         was marked for
15         identification purposes.)
16   Q.    Exhibit Number 30. Do you
17 recall receiving Exhibit Number 30, the
18 Dismissal Notice of Rights?
19   A.    Yes, sir.
20        (Defendant's Exhibit 31
21         was marked for
22         identification purposes.)
23   Q.    Okay. I'll show you Exhibit

45 (Pages 177 to 180)

**FREEDOM COURT REPORTING**

Page 181

1  Number 31, please.  Is this your application
2  to work for IHOP?
3     A.    Yes, sir.
4     Q.    It's dated January 22, 2005?
5     A.    Yes, sir.
6     Q.    And how often — How quick
7  after this application were you able to go
8  to work for IHOP?
9     A.    I went to work with Kelly's
10 first.
11    Q.    Oh, I'm sorry, Kelly's.
12    A.    I went to work pretty quick
13 because I needed a job.  I needed to make a
14 living.
15    Q.    Did you think you worked
16 pretty well at Meads, you thought you did a
17 good job when you worked there?
18    A.    Yes, sir, I did.
19    Q.    And do you think you're doing
20 real well as a hostess for IHOP?
21    A.    Yes, sir.
22    Q.    All right.  Do you have any
23 reason to believe that the EEOC did not

Page 182

1  conduct a full and thorough investigation of
2  your claims?
3         MR. DOUGLAS:  Object to the
4  form of that question.  You can answer.
5     A.    I don't know.
6     Q.    That's good enough.
7         (Off-the-Record discussion
8         was held.)
9         (Defendant's Exhibit 34
10        was marked for
11        identification purposes.)
12    Q.    All right.  Let's skip 32 and
13 33.  Let's look at 34 and 35 together.  34
14 is your application for Movie Gallery?
15    A.    Yes, sir.
16    Q.    All right.  On the second
17 page, that's your signature and the date,
18 5/18/05; is that correct?  The second page
19 of that.
20    A.    Yes, sir.
21    Q.    And, again, you put Lorena
22 Minix as a reference?
23    A.    Yes, sir.

Page 183

1         (Defendant's Exhibit 35
2         was marked for
3         identification purposes.)
4     Q.    You hadn't learned?  I'm just
5  kidding.  All right.  On Number 35, this is
6  the Movie Gallery Sexual Harassment Policy?
7     A.    Yes, sir.
8     Q.    Pretty much the same as what
9  they had at JELD-WEN?
10    A.    Uh-huh.
11    Q.    That's a yes or no?
12    A.    Yes.
13    Q.    And have you had any problems
14 there?
15    A.    No, sir.
16        (Defendant's Exhibit 36
17        was marked for
18        identification purposes.)
19    Q.    All right.  One other
20 document, Number 36.  That's just your
21 unemployment documents I got.  If you look
22 at the third page, the reason that was put
23 in for leaving JELD-WEN is lack of work, is

Page 184

1  that correct, or was it that the plant was
2  shut down?
3     A.    Yeah.
4     Q.    Either way?
5     A.    The plant.  Yeah.
6         MR. SCOFIELD:  Let's take a
7  five-minute break and talk to my cocounsel.
8         (Off-the-Record discussion
9         was held.)
10        MR. DOUGLAS:  To the extent
11 that Ms. Sims has indicated that she may
12 have documents at her home, I'll instruct
13 her to bring them to me and I will forward
14 them to you, unless there's some privileged
15 objection.
16        MR. SCOFIELD:  There's no
17 problem with that.
18        MR. THOMPSON:  That's fine.
19 If there is, you'll let us know by law as to
20 what they are.
21        MR. DOUGLAS:  I will.
22        MR. THOMPSON:  And then can we
23 also check with Matt White and make sure he

46  (Pages 181 to 184)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 185

1 doesn't have any just tucked away in a
2 corner that he's forgotten about?
3          MR. DOUGLAS: I will call Matt
4 and ask him to make sure that he has
5 produced all the records that he has.
6          (Off-the-Record discussion
7              was held.)
8          (Recess taken.)
9     Q.    Ms. Sims, Ms. Linda Sims, were
10 you and Brenda the last two people hired at
11 JELD-WEN?
12    A.    No, sir.
13    Q.    Who had hired on after you?
14    A.    There were several people that
15 come through Express.
16    Q.    Okay. That's what I wanted to
17 ask you. How many people came through
18 Express?
19    A.    I couldn't tell you the
20 number.
21    Q.    Do you know their names?
22    A.    Jeff something or other. And
23 some girl. I can see her face. I can't

Page 186

1 think -- I cannot think of their names right
2 now. But there were several.
3     Q.    Okay. Did -- Now, both you
4 and Brenda stayed until the plant was
5 closed; is that correct?
6     A.    Yes, sir.
7     Q.    Did Jeff stay until the plant
8 was closed?
9     A.    No, sir.
10    Q.    Okay. Do you know when he
11 left?
12    A.    He left probably about a month
13 or so prior. So . . .
14    Q.    It's my understanding there
15 was a layoff in October. So about half the
16 plant left, or half the people left?
17    A.    No, sir.
18    Q.    You don't remember that?
19    A.    No, sir.
20    Q.    But Jeff wasn't there when you
21 -- until then; is that correct?
22    A.    Right.
23    Q.    What about the other people

Page 187

1 from Express?
2     A.    I think they may have -- I
3 can't think of her name. It might have been
4 one or two others that left.
5     Q.    Okay. Well, did -- Were you
6 and Brenda the only two that came from
7 Express that were there until the end of the
8 -- when the plant was closed in November of
9 2004?
10    A.    I don't know.
11    Q.    Okay. Was the change in job
12 assignments the only part that you
13 considered that JELD-WEN retaliated against
14 you on?
15    A.    No, sir.
16    Q.    What else?
17    A.    I felt like they closed the
18 plant.
19    Q.    Okay. That, and closing the
20 plant?
21    A.    Uh-huh.
22    Q.    You need to say yes.
23    A.    Yes.

Page 188

1     Q.    And in your -- Did you ride up
2 here with Lorena and Brenda on Monday?
3     A.    No, sir.
4     Q.    Okay. You went in your own
5 car?
6     A.    Yes, sir.
7     Q.    Okay. And you felt like that
8 you did your best to tell the truth today?
9     A.    Yes.
10    Q.    Okay.
11          (Off-the-Record discussion
12              was held.)
13    Q.    Okay. Exhibit 25, when we
14 asked whether or not there is another page.
15    A.    Uh-huh.
16    Q.    Could this have been an added
17 page to 23? I'm just asking maybe if it was
18 or wasn't? If you don't know, that's fine.
19    A.    I wouldn't think so.
20    Q.    You don't think so?
21    A.    I don't know.
22          MR. SCOFIELD: Thank you.
23          MR. THOMPSON: Let's leave it

47 (Pages 185 to 188)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 189

1  open until we get the rest of the records.
2        MR. SCOFIELD:  Yeah.  We
3  reserve the right to leave it open to talk
4  about anything else that hasn't been
5  produced yet, subject to your negotiations
6  and objections.
7        MR. DOUGLAS:  Thank you.  I
8  don't have any questions.
9  (The deposition was concluded at 2:58 p.m.,
10  April 12, 2006.)
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 190

1        REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4        I, Angela Smith, Registered
5  Professional Reporter and Commissioner for
6  the State of Alabama at Large, do hereby
7  certify that the above and foregoing
8  proceeding was taken down by me by
9  stenographic means, and that the content
10  herein was produced in transcript form by
11  computer aid under my supervision, and
12  that the foregoing represents, to the best
13  of my ability, a true and correct
14  transcript of the proceedings occurring on
15  said date and at said time.
16        I further certify that I am not neither
17  of kin nor of counsel to the parties to the
18  action; nor in any manner interested in the
19  result of said case.
20
21

22        _____
          Angela Smith, RPR, CRR,
          for the State of
23        Alabama at Large.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# EXHIBIT 3

# JELD-WEN, INC. HEALTH PLAN

☐ New Enrollee    ☐ Change (Qualifying Event Required)

**1) NAME & ADDRESS—ALL FIELDS REQUIRED**

LAST NAME: Sims    FIRST NAME: Linda    M.I.

MAILING ADDRESS: 241 CDRd. 79 Apt. 24 Roanoke

CITY: Roanoke    STATE & ZIP: AL 36274

SOCIAL SECURITY NUMBER: ___    DATE OF BIRTH: ___    GENDER: ☐M ☑F

☑ SINGLE  ☐ MARRIED
☐ WIDOWED  ☐ DIVORCED

ARE YOU ACTIVELY AT WORK? (SEE BACK)  ☐ YES  ☐ NO

**ALL DEPENDENTS FOR MEDICAL, DENTAL, RX, VISION**

List EVERY person you want covered in 2004
☐ CHECK IF MORE LISTED ON OTHER SIDE    MORE ROOM ON BACK ☞

1) SPOUSE'S LAST NAME / FIRST NAME:

BIRTH DATE:    SOCIAL SECURITY NUMBER:    GENDER:    OTHER INSURANCE? ☐ YES* ☐ NO

Is Your Spouse a JELD-WEN Employee? ☐ YES ☐ NO

2) DEPENDENT'S LAST NAME / FIRST NAME:

BIRTH DATE:    SOCIAL SECURITY NUMBER:    RELATIONSHIP:    GENDER:    OTHER INSURANCE? ☐ YES* ☐ NO

3) DEPENDENT'S LAST NAME / FIRST NAME:

BIRTH DATE:    SOCIAL SECURITY NUMBER:    RELATIONSHIP:    GENDER:    OTHER INSURANCE? ☐ YES* ☐ NO

*IF YOU OR DEPENDENTS HAVE OTHER HEALTH COVERAGE, LIST BELOW.
CARRIER NAME, PHONE, ADDRESS & NAME OF PERSON COVERED

**8) SIGN & DATE**

Salary Reduction Payment Agreement: I certify the information I have provided is true. I understand I may be required to provide evidence of insurability to qualify for life coverage elections. I have read the JELD-WEN Enrollment materials, including the General Coverage Conditions (reverse), coverage and cost information. I authorize my employer to deduct from each paycheck, the amount required to pay for the cost of the elected benefits. My signature below confirms I have either elected or declined coverage under the JELD-WEN Health Benefit Program.

SIGN: Linda Sims    DATE: 9-21-04

---

**Company Code**    **Company Name**

**3a) LIFE INSURANCE**
Employee Additional Life
Elect, Change or Cancel Coverage:
☐ $10,000  ☐ $60,000  ☐ $110,000
☐ 20,000  ☐ 70,000  ☐ 120,000
☐ 30,000  ☐ 80,000  ☐ 130,000
☐ 40,000  ☐ 90,000  ☐ 140,000
☐ 50,000  ☐ 100,000
☐ Cancel (see section 7)

Dependent Additional Life
(Employee must also elect Additional Life)
Spouse Additional Life:
☐ $5,000  ☐ $30,000  ☐ $60,000
☐ 10,000  ☐ 40,000  ☐ 70,000
☐ 20,000  ☐ 50,000
☐ Cancel (see section 7)
Child(ren) Additional Life:
☐ $5,000  ☐ $10,000  ☐ Cancel

**4) MEDICAL, DENTAL, RX**
☐ No Coverage
☐ Employee
☐ Employee + Child
☐ Employee + Spouse
☐ Employee + Children
☐ Employee + Family

**VISION**
☑ Employee!
☑ Covered Dependents!

**5) WELLNESS FACTORS**
Tobacco-free for last 12 Months
☐ Yes—Employee  ☐ No—Employee
☐ Yes—Spouse  ☐ No—Spouse
OR
☐ Employee currently enrolled in
tobacco cessation program
☐ Spouse currently enrolled in
tobacco cessation program

**6) DISABILITY**
Short-Term Disability (STD)!
☑ Employee

Long-Term Disability (LTD)!
☐ Elect  ☐ Cancel Coverage

(Attach proof of program participation)

---

**3b) EMPLOYEE LIFE INSU**

Primary & Alternate Beneficiaries

1) PRIMARY:    RELATIONSHIP:    SOCIAL SECURITY NUMBER:    PERCENT:

2) PRIMARY (OPTIONAL):    RELATIONSHIP:    SOCIAL SECURITY NUMBER:    PERCENT:

1) ALTERNATE (OPTIONAL):    RELATIONSHIP:    SOCIAL SECURITY NUMBER:    PERCENT:

2) ALTERNATE (OPTIONAL):    RELATIONSHIP:    SOCIAL SECURITY NUMBER:    PERCENT:

**7) MID-YEAR COVERAGE CHANGES—QUALIFYING EVENTS**
You can change coverage during the Plan Year if you have a qualifying event (Qualified Status Change event) such as a marriage, divorce, birth or adoption of a child. You must submit your change within 31 days of the event. See reverse side for details, or call Customer Service at (800) 441-4518.

DATE OF EVENT:    DESCRIBE QUALIFYING EVENT IN DETAIL (ATTACH PROOF—REQUIRED):

**MAKE OTHER COVERAGE CHANGES IN APPROPRIATE SECTIONS**
OTHER COVERAGE CHANGE REQUESTS
CURRENT COVERAGE CATEGORY
☐ No Coverage
☐ Employee Only
☐ Employee + Child
☐ Employee + Spouse
☐ Employee + Children
☐ Employee + Family

REQUESTED COVERAGE CATEGORY
☐ No Coverage
☐ Employee Only
☐ Employee + Child
☐ Employee + Spouse
☐ Employee + Children
☐ Employee + Family

**Local Company**    **HEALTH BENEFITS ONLY!**

FSA AMOUNT CHANGE
$___ .00 (Annual)
☐ DROP FSA

---

**L. Sims - 3**

BENEFICIARY
Check if this is a change
SOCIAL SECURITY NUMBER: ___  Must equal 100%

2004/HEALTH/...  ...ROLLFORM (OCT 03)

# EXHIBIT 12

**EXPRESS**  |  **Press hard and print clearly**

Name: Linda Sims
Social Security Number:

Client Company Name: Wld-Wen

Week Ending Date (Sunday): 4-24-04
Job Number:

☑ Assignment Completed
☐ Returning Next Week

| DAY/DATE | TIME IN | Lunch Out | Lunch In | TIME OUT | Regular Time | Overtime | Double Time |
|---|---|---|---|---|---|---|---|
| MON 4/19 | 7:15 | 11:30 | 12:00 | 4:00 | 8¼ | Starting Day | |
| TUE 4/20 | 6:30 | 11:30 | 12:00 | 4:00 | 9 | | |
| WED 4/21 | 6:30 | 11:30 | 12:00 | 4:00 | 9 | | |
| THU 4/22 | 6:30 | 11:30 | 12:00 | 4:00 | 9 | | |
| FRI 4/23 | 6:30 | 10:30 | — | — | 4 | | |
| SAT | | | | | 0 | | |
| SUN | | | | | 0 | | |
| ENTER WEEKLY TOTALS (Round to nearest quarter hour) | | | | Regular Time 39¼ | Overtime 0 | Double Time 0 | |

**ASSOCIATE NOTICE:** Please fill in this time card completely. Leave the appropriate copy with your supervisor who signs to verify hours. The Express copies of the time card must be received in our office by 8:00 a.m. Monday. Failure to turn in your time card by the deadline may delay your check by one week. Failure to notify your Express Personnel Supervisor of the completion of any assignment will be considered job abandonment, and unemployment benefits may be denied in some states.

I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME CARD, WHILE ON THIS ASSIGNMENT, I HAVE NOT HAD ANY WORK-RELATED INJURIES OR ILLNESSES THAT I HAVE NOT REPORTED TO EXPRESS.

Associate Signature: Linda Sims    Date 4-23-04

Yes! As an Express Associate, I want to help the Children's Miracle Network.
Please deduct:
☐ $ _____ This paycheck  ☐ $ _____ Every paycheck  ☐ $ _____ Other

**CLIENT NOTICE AND VERIFICATION:** The undersigned, as agent for the client company, certifies that this Express temporary associate named herein worked acceptably during the period noted on this card. The undersigned also acknowledges and accepts the terms and conditions listed on the reverse side of this time card whereby this temporary associate has been supplied by Express. Please read the terms and conditions and retain the client copy.

Authorized Signature: Pat Haley

Title: Manager    Date: 4/23/04
Department or special billing instructions:

QUALITY OF WORK: ☑ EXCELLENT  ☐ SATISFACTORY  ☐ UNSATISFACTORY

CLIENT COPY

**EXPRESS**  |  **Press hard and print clearly**

Name: Linda Sims
Week Ending Date (Sunday): 4-24-04

| MON 4/19 | 7:15 | 11:30 | 12:00 | 4:00 | 8¼ | Starting Day |
| 4/20 | 6:30 | 11:30 | 12:00 | 4:00 | 9 |
| 4/21 | 6:30 | 11:30 | 12:00 | 4:00 | 9 |
| 4/22 | 6:30 | 11:30 | 12:00 | 4:00 | 9 |
| 4/23 | 6:30 | 10:30 | | | 4 |
| | | | | 0 |
| | | | | 0 |

ENTER WEEKLY TOTALS (Round to nearest quarter hour)   Regular Time 39¼   Overtime 0   Double Time 0

L. Sims - 12

# EXHIBIT 13

*so in great detail, when work, who*

*work with, able to do job*

# Former JELD-WEN Facility
## Roanoke, AL

## For Sale or Lease



### 235 Millwork Industrial Dr.
### Roanoke, AL  36274

- +/- 19.93 acres
- +/- 50,000 SF (expandable)
- +/- 1,500 SF of office
- 2 dock high doors with levelers
- 1 oversized drive-in door
- Heavy 3-phase power, 277/480 Volt
- Additional trailer storage available

**TrammellCrowCompany**

The information contained herein is believed to be accurate but is not warranted, as the information may change or be updated without notice. Seller or landlord makes no representation as to the environmental condition of the property and recommends purchaser's or tenant's independent investigation.

For More Information Please Contact:

**Chip Watson**
770.290.0714
cwatson@trammellcrow.com

**Wit Truitt**
770.290.0710
wtruitt@trammellcrow.com

www.trammellcrow.com

L. Sims - 13



# EXHIBIT 14

APPLICATION FOR EMPLOYMENT

924

Please answer all questions. If one does not apply, insert N/A (not applicable)

**PERSONAL**

Name: Sims  Linda  D
(Please print)   Last      First      Middle Initial

Social Security Number:

Home Phone: (334) 863-7336   Message Phone: (256) 750-0224

Address: 241 Co.Rd. 79  Apt 24  Roanoke  AL  36274
Street                City        State        Zip

Position desired: _____

Date Available: ____

Type of employment desired:
☑ FULL-TIME ☐ PART-TIME ☐ SUMMER

Shifts you can work:
☐ DAY ☐ SWING ☐ GRAVEYARD

Do you have restrictions that would prevent you from working overtime?
☐ YES ☑ NO

REASON: _____

Have you the legal right to work in the U.S.?
☑ YES ☐ NO

Are you at least 18 years of age?
☑ YES ☐ NO

Hire is subject to verification that applicant is at least 18 years old and is eligible to work in the United States.

Have you, since the age of 18 or within the last 7 years (whichever is most recent), ever been convicted of a felony?
☐ YES ☑ NO

If yes, describe briefly: _____

I have previously:
☐ Applied for employment with JELD-WEN or one of its divisions.
☐ Been employed by JELD-WEN or one of its divisions.

Names of friends or relatives at this company:

Position: _____   Date: _____

Location: _____

List any "sideline" business interests: _____

**EDUCATION**

| | Name | City | State | No. of Years | Major Subject | Degree/Diploma (If degree, identify type) |
|---|---|---|---|---|---|---|
| High School | Woodland High | Woodland | Al | 11 | | |
| College | Southern Union | | | | GED | |
| College | | | | | | |
| Graduate School | | | | | | |
| Business, Trade, or Other | | | | | | |

Are you presently enrolled as a student? ☐ YES ☑ NO   Do you expect to be? ☑ YES ☐ NO

Where? _____   When? Fall

**SKILLS**

Typing ☐
WPM 35

Shorthand ☐
WPM

Please list any other special training, skills, and experience that will assist you in the job for which you are applying. List all factory and/or office equipment you can operate.

Are you taking any vocational or technical courses at present? ☐ YES ☑ NO

If yes, what and where? _____

**U.S. MILITARY**

Branch of Service _____
(Army, Navy, Air Force, USMC, Etc.)

From: _____   To: _____
Month/Day/Year        Month/Day/Year

Rank: _____

Kinds of training and duty while in service: _____

(Please complete reverse side)

Page 1101-1

4/98

L. Sims - 14

**EMPLOYMENT RECORD** — Beginning with your present or last employer, list the last four jobs you have held.

| | | |
|---|---|---|
| NAME OF EMPLOYER (PRESENT OR LAST) *Kelly Services* | JOB TITLE *Temp* | BASE RATE OF PAY (HOUR/WEEK/MONTH) START *11-03* END |
| (ADDRESS) *Durrell Marconi Mead* | (CITY) *LaGrange* (STATE) *GA* | AREA CODE *800* PHONE *829-2175* |
| DATES EMPLOYED FROM: TO: | NAME & TITLE OF SUPERVISOR | REASON FOR LEAVING *Tempe* |

BRIEF DESCRIPTION OF DUTIES

If still employed, may we contact this employer?          ☐ YES   ☐ NO

| | | |
|---|---|---|
| NAME OF EMPLOYER *Ruff Cowboy Interprizes* | JOB TITLE *Tranportation Coorindtaor* | BASE RATE OF PAY (HOUR/WEEK/MONTH) START END |
| (ADDRESS) | (CITY) | AREA CODE PHONE |
| DATES EMPLOYED FROM: *3-2001* TO: *10-2002* | NAME & TITLE OF SUPERVISOR *self* | REASON FOR LEAVING *partner Slit split* |

BRIEF DESCRIPTION OF DUTIES

| | | |
|---|---|---|
| NAME OF EMPLOYER *Walmart* | JOB TITLE *Customer Speailist* | BASE RATE OF PAY (HOUR/WEEK/MONTH)) START *6-95* END *3-2001* |
| (ADDRESS) *Roanoke* (STATE) *Al.* | | AREA CODE *334* PHONE *863-2147* |
| DATES EMPLOYED FROM: TO: | NAME & TITLE OF SUPERVISOR *Kathleen Spears* | REASON FOR LEAVING *self employed* |

BRIEF DESCRIPTION OF DUTIES *driver, deliver person, Finican,*

| | | |
|---|---|---|
| NAME OF EMPLOYER *G-Co* | JOB TITLE *machine Opertor* | BASE RATE OF PAY (HOUR/WEEK/MONTH) START *3-81* END *9-95* |
| (ADDRESS) *Woodland* (CITY) *Al.* (STATE) | | AREA CODE *out of buniness* |
| DATES EMPLOYED FROM: TO: | NAME & TITLE OF SUPERVISOR | REASON FOR LEAVING |

BRIEF DESCRIPTION OF DUTIES *Cashier, Elec. department*

**REFERENCES** *Non-relative; A person with a position of being a good Judge of Character*

List people in addition to your prior employers we may contact for additional information regarding your capabilities and work habits.

| NAME | ADDRESS | CITY | STATE | ZIP | AREA CODE | PHONE |
|---|---|---|---|---|---|---|
| *Lorcana minix* | | *Roanoke* | *Al.* | *36274* | | |
| *Pam Bonner* | | *Roanoke* | *Al.* | *36274* | | |
| *Kathleen Spears* | | *Roanoke* | *Al.* | *36274* | | |

**CERTIFICATION & AGREEMENT — Read Carefully and Sign**

Please read the following statements carefully before signing this application.

Only those applications that are signed and dated are considered valid.

I certify that all answers or statements I have made in this application or other supplementary material are true and correct without omissions. I acknowledge that any false statement, misrepresentation or material omission on this application or supplementary materials may result in a refusal to hire or an immediate dismissal if I am hired. I authorize you to contact any of my past employers, schools and personal references concerning my previous employment, education and personal history. I release this company and all persons and organizations so contacted from all claims and liabilities of any nature arising from such investigations or supplying of such information. I understand that I will be required, and hereby agree, to submit to a drug and alcohol screening and to undergo a fitness for duty exam as part of the hiring process. If hired, I agree to comply with all rules and policies established from time to time by the company. I understand that if hired my employment is for no definite period of time and may be terminated at any time by the company or by me, with or without cause. I have read and understand the foregoing statements and accept the same as conditions of employment.

Signature of Applicant *Linda Sims*          Date *3-25-04*

# EXHIBIT 15

## NEW EMPLOYEE ORIENTATION

NAME: *Linda Sims*          DATE: 4-19-04

**GENERAL INFORMATION:**

| | |
|---|---|
| Normal Shift Hours: | Mon-Thurs 6:30 am - 4:00 pm / Fri-6:30 am to 10:30 am |
| 1st 10 minute break begins at: | 9:00 AM |
| Lunch (1/2 hour not paid): | 11:30 am to Noon |
| 2nd 10 minute break begins at: | 2:00 PM |
| Breakroom/restroom location: | LS |
| Water fountain location: | LS |
| Parking location: | LS |
| Supervisor name & office location: | *Richard Fitner* LS |
| Smoking policy/designated smoking area: | LS |
| Signal/buzzer system: | LS |
| Handbook 'standards of conduct' (Pgs 4 & 5) and 'Your Responsiblities' (Pgs 4 - 8) | LS |
| Office & Supervisor phone: (334) 863-7717 | LS |

**ABSENCES:**

More than 24 hours of absences during first
   3 months of work is grounds for termination:

**GENERAL SAFETY:**

Ear plug availability:
Work gloves, optional:
Forklift - buffer zone;
   - right of way, aisle use:
Stacked lumber/cut stock, be aware:
"Pinch Points" - belts & rollers:
   -chains & sprockets:
Saw blades, knives, infeed rollers:
   - keep hands away:
   - put hands only where you can see (high noise levels
     may "hide" a moving blade):
Fire extinguishers, location near work areas:
Floors, keeping debris/material out of work area & aisles:
Watch footing - carts, pile blocks(runners),
underground chains/belts w/covers:
Clean up spilled water, beverages, oils, diesel at once:
First Aid box location:
Yellow railings / lines on floor/aisle way:
Fire Exits:

LS

**THE ABOVE WAS EXPLAINED TO ME AND I ACCEPT THE ABOVE RESPONSIBILITIES:**

*Linda Sims*
EMPLOYEE SIGNATURE

6/30/2003

L. Sims - 15

# EXHIBIT 18

# JELD-WEN®

## Employee Acknowledgement of Anti-Harassment Procedures and Guidelines

I have received training/instruction on JELD-WEN's Anti-Harassment Procedures and Guidelines and I understand its contents. I agree to abide by this policy and I understand that my conduct will be governed by this policy the duration of my employment.

_Linda Sims_
Employee Name (print)

                                           
Manager Signature

_Linda Sims_
Employee Signature

Date: _6-8-04_

**[To be placed in the employees personnel file]**

**L. Sims - 18**

# EXHIBIT 19

# JELD-WEN®

## Handbook Acknowledgement and Agreement

I acknowledge that I have received and reviewed a copy of the JELD-WEN Employee Handbook and understand that it sets forth the terms and conditions as well as the duties, responsibilities and obligations of my employment with JELD-WEN. I understand and agree to be knowledgeable about and to abide and be bound by the rules, policies and standards set fourth in the Employee Handbook.

I also acknowledge that my employment with JELD-WEN is at-will, which means it is not for a specified period of time and can be terminated at any time with or without cause or notice, by me or by JELD-WEN. I acknowledge that no statements or representations regarding my employment can alter the foregoing. I acknowledge that, except for the policy of at-will employment, JELD-WEN reserves the right to revise, delete, and add to the provisions of this Employee Handbook at its sole discretion.

I understand and accept the foregoing statements regarding my employment with JELD-WEN.

Linda Sims
Employee Name (Print)

Manager Signature

Linda Sims
Employee Signature

Date: 6-8-04

**[Maintained in the employees' personnel file]**

L. Sims - 19

# EXHIBIT 22

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 130-2004-04335 |
| | | and EEOC |

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| **Linda  Sims** | **(334) 863-7336** | |

Street Address                          City, State and ZIP Code

**241 Co Rd 79 Apt 24,  Roanoke, AL 36274**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **JELD-WEN MILL WORK** | **Over 15** | **(334) 863-7717** |

Street Address                    City, State and ZIP Code

**235 Millwork Industrial Dr     Roanoke, AL    36274**

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address                    City, State and ZIP Code

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN  ☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.) | Earliest **04/01/2004**  Latest **08/01/2004**  ☒ CONTINUING ACTION |

PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began my employment during April of 2004 as a Router.   Almost from the beginning of my employment I have been subjected to sexual harassment from the plant manager consisting of sexual comments regarding my body parts, requests to go out on dates, touching my body around the waist, placing his arms around me and pulling me close to his body.  He often referred to my buttocks as basketballs and he would say he wanted to go dribbling.   I rejected the harassment but it continues.

I believe I am being discriminated against because of my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

NOV 10 2004

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.  SIGNATURE OF COMPLAINANT |
| X 10-26-04  X _Linda Sims_  Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

L. Sims - 22

# EXHIBIT 23

# YOU HAVE A RIGHT TO FILE A CHARGE OF DISCRIMINATION

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## BIRMINGHAM DISTRICT OFFICE

### CHARGE QUESTIONNAIRE

**This Form Is Affected By The Privacy Act Of 1974; Read The Last Page Before Completing This Form.**

**PLEASE READ THE FOLLOWING INFORMATION BEFORE PROCEEDING:**

* <u>A charge must be filed with the EEOC within 180 days</u> after the alleged unlawful practice has occurred (300 days, if the employer is within the jurisdiction of a Fair Employment Practice Agency - If you are a state employee or you worked in Richmond County).
* <u>The employer must have</u> 15 or more employees if the alleged unlawful practice falls under Title VII of the Civil Rights Act and the Americans With Disabilities Act; 20 employees if the alleged unlawful practice falls under the Age Discrimination In Employment Act and 2 employees if the alleged unlawful practice falls under the Equal Pay Act.
* <u>Federal employees</u> should file with their Agency EEO Counselor, unless the unlawful practice falls under the Equal Pay Act.

**Please complete this questionnaire and return it to the Receptionist. You will be interviewed by an Investigator to determine if your employment situation falls within the jurisdiction of the EEOC. Be prepared to spend up to approximately three hours here today. Interviews are conducted on a first-come, first-served basis. Thank you for your patience and cooperation.**

### PLEASE PRINT

NAME _Linda Sims_                                DATE OF BIRTH

ADDRESS _241 co.Rd 79 Apt. 24_

CITY _Roanoke_      STATE _Al_   ZIP _36274_ COUNTY _Randolph_

TELEPHONE _334-863-7336_   CELL/PAGER

YOUR RACE _White_      YOUR SEX : FEMALE _✓_    MALE

SS#

**PAGE 2**

**WHAT DAY(S) AND TIME(S) ARE YOU AVAILABLE BY TELEPHONE BETWEEN THE HOURS OF 8:30 AM AND 5:00 PM?** _4:30 pm,_

**CONTACT PERSON: (SOMEONE AT A DIFFERENT ADDRESS AND TELEPHONE NUMBER WHO KNOWS WHERE YOU CAN BE REACHED)**

**NAME** _Brandy (Sims) New_ **TELEPHONE**

**ADDRESS**

**CITY** _Roanoke_ **STATE** _Al._ **ZIP** _36274_

**ARE YOU REPRESENTED BY AN ATTORNEY?  IF SO, PROVIDE HIS/HER NAME AND TELEPHONE NUMBER:**

**NAME** _D. Leigh Love_ **TELEPHONE** _205-835-1644_

## PLEASE ANSWER THE FOLLOWING QUESTIONS

**DATE OF YOUR EMPLOYMENT** _4-2004_ **JOB AT TIME OF HIRE** _Rounter_ _Same_ **JOB AT TIME OF DISCRIMINATORY ACTION** _Same Rounter_

**I BELIEVE I WAS DISCRIMINATED AGAINST BY: (CHECK THOSE THAT APPLY)**

**COMPANY** _✓_ **UNION (Give Local Number)**_____ **EMPLOYMENT AGENCY**_____

**NAME** _(Richard Fetner) Teld-Wen_

**ADDRESS**_____

**CITY, STATE, ZIP** _Roanoke Al. 36274_

**TELEPHONE** _334-863-7717_ **APPROXIMATE NO. OF EMPLOYEES** _60_

**NAME**_____

**ADDRESS**_____

**CITY, STATE, ZIP**_____

**TELEPHONE**_____ **APPROXIMATE NO. OF EMPLOYEES**_____

**WHAT IS THE BUSINESS OF YOUR EMPLOYER** _door and window frames_

Page 3

**PROVIDE THE NAME OF THE COMPANY OFFICIAL (OWNER, PRESIDENT OR PERSONNEL DIRECTOR)**

NAME _____ TITLE_____

---

YOUR BEST RECOLLECTION OF THE MOST RECENT DATE OF THE DISCRIMINATORY ACTIONS TAKEN

BY THE EMPLOYER _8-2004_

**DO YOU BELIEVE THE ACTION WAS TAKEN AGAINST YOU BECAUSE OF ANY ONE (OR MORE) OF THE**

**CATEGORIES LISTED BELOW?** ✓ YES _____ NO  ( IF YES, CIRCLE THE ONE(S) THAT APPLY)

RACE, COLOR, SEX, RELIGION, NATIONAL ORIGIN, AGE, RETALIATION OR DISABILITY (SPECIFY)

_Sex harassment_

**SPECIFIC DISCRIMINATORY ACTION: (CIRCLE THE ONE(S) THAT APPLY)**

DISCHARGE; HIRING; LAYOFF; RECALL; SUSPENSION; PROMOTION; RETIREMENT (INVOLUNTARY);

WAGES; HARASSMENT; SEXUAL HARASSMENT; OTHER (SPECIFY)_____

**PROVIDE A BRIEF EXPLANATION OF THE DISCRIMINATORY ACTION TAKEN AGAINST YOU:**

_touching, hugging - Commients, saying my butt_
_blooks like basketballs and needs to dribble, goes by walks_
_my machine like he is dribbling a basketball, he one or_
_my basketball is smaller and he has a needle to pump it up._
_Grabbing me around the wasit and pulling me close to him from be_

WHAT REASON(S) WERE YOU GIVEN FOR THE ACTION TAKEN _NONe_

_____

_____

WHY DO YOU THINK THE ACTION BY THE EMPLOYER WAS DISCRIMINATORY? _he made_
_me feel uncomfortable, embrassed, and I felt like_
_I would lose my job. He made me feel sick inside_
_unwanted sexual advances. He is my_
_Supervisor_

Page 4

IF YOUR ISSUE OF DISCRIMINATION IS HIRING OR PROMOTION, LIST THE POSITION YOU WERE

SEEKING_____

PROVIDE THE NAME & JOB TITLE OF THE PERSON IN THE SAME OR SIMILAR SITUATION WHO WAS

TREATED MORE FAVORABLE THAN YOU (Identify this person by race, sex, religion, national origin or age)

NAME_____ JOB TITLE_____

_____

PROVIDE THE NAME(S) AND TELEPHONE NUMBERS OF THE WITNESS(ES) WHO YOU THINK CAN
PROVIDE EVIDENCE IN SUPPORT OF YOUR ALLEGATIONS OF DISCRIMINATION.

NAME Lisa Cook _____ TELEPHONE NUMBER_____
Brenda Sims
Mary Lou Laws
Lorena Minix
Kathy

PROVIDE A DESCRIPTION OF THE INFORMATION THAT EACH PERSON LISTED ABOVE CAN SUBMIT IN
SUPPORT OF YOUR ALLEGATIONS.

him hugging me, dribbling like he was dribbling a basketball saying my basketball need pumping up. he had a needle to pump it up with.

WHAT RELIEF ARE YOU SEEKING THROUGH THE EEOC?_____

## YOU HAVE A RIGHT TO FILE A CHARGE OF DISCRIMINATION

I SWEAR OR AFFIRM THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT TO THE BEST OF MY
KNOWLEDGE.

SIGNATURE Linda Sims       DATE 8-20-04



**PRIVACY ACT STATEMENT:** This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:

1. **FORM TITLE:** EEOC Charge Questionnaire.

2. **AUTHORITY:** 42 U.S.C. sec. 2000e-5(b), 29 U.S.C. sec. 211, 29 U.S.C. sec 626, 42 U.S.C. sec. 12117(a).

3. **PRINCIPAL PURPOSE:** The purpose of this questionnaire is to solicit information in an acceptable form consistent with statutory requirements to enable the Commission to act on matters within its jurisdiction. When this form constitutes the only timely written statement of allegations of employment discrimination, the Commission will, consistent with 29 CFR 16091.12(b) and 29 CFR 1626.8(b), consider it to be a sufficient charge of discrimination under the relevant statute(s).

4. **ROUTINE USES:** Information provided on this form will be used by Commission employees to determine the existence of facts relevant to a decision as to whether the Commission has jurisdiction over allegations of employment discrimination and to provide such charge filing counselling as appropriate. Information provided on this form may be disclosed to other state, legal and federal agencies as may be appropriate or necessary to carrying out the Commission's functions. Information may also be disclosed to charging parties in consideration of or in connection with litigation.

i. **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION:** The providing of this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge of discrimination. It is not mandatory that this form be used to provide the requested information.

---

**FOR EEOC INVESTIGATOR USE ONLY.**
**SIXTY-DAY INFORMATION. BRIEFLY STATE WHY NO CHARGE WAS TAKEN.**

_____

_____

_____

_____

Investigator's Initials _____

# EXHIBIT 25

## CASE LOG

(Continue on Reverse)

| Charge No. | Respondent | | Charging Party | |
|---|---|---|---|---|
| 1302004<del>0</del>4335 | Old Win Mill | | Linda Sims | |

| Date | Action | Entered | Reviewed/ |
|---|---|---|---|
| 082004 | P/p assigned. Rev article chg processing procedures. P/p accompanied by a fellow employee alleging sexual harassment. P/p had little info. P/p seeking info & will get back w/ Inv. | Out | |
| 092204 | Inv spoke to P/p about the filing of the chg. P/p states that Mom had passed away and she now has responsibility for sister and has so much on her mind to file a chg. Inv explained the 180 day time filing requirements and advised that chg will be mailed to her but it will be up to her to file a chg | | |

L. Sims - 25

has not been filed and if it
is your desire to file it must
be returned w/i 180 days of
gets.

02704    Recd call from Pg on machine

02904    recd call
        tno spoke to Pg - them that
        Chg again must be file w/i time
        limits

11004    Chg recd back in office

11604    TMC assessed B

111904   Mailed 131 Chg ADR

03/02/05  Forwarding charge file to an enforcement Unit.
          Attempts at informal resolution in mediation reached
          an impasse.

 

Mrs Fetter also said one of my basketballs looked deflicted and he had a needle to pump it up. When I rejected his sexual comminents and touching, he "Mr. Fetner" would take me off my job and put me a job nobody else wanted to do. I would have work on my job, but he would not let me do the work. He would put other people on my job. He made the statement Commintment to my friend he would put me out there we he got ready for me to come back "on my job".

I feel that Jeld-Wen did not punish him to the extent that they should have. They "Jeld-Wen" let him resign. He has the opportunity to go back and start this problem that he clearly has, over again.

235 Millwork Industrial Dr.
Roanoke, Al. 36274

Jeld-Wen Corporate Office
Administration
P.O. Box 1329
Klamath Falls Or
                97601-0268

**CASE LOG**

(Continue on Reverse)

| arge No. | Respondent | Charging Party | | |
|---|---|---|---|---|
| 130 2004 04335 | Jldwin Hall | Linda Sim | | |
| **Date** | **Action** | | **Entered** | **Reviewed/** |
| | _Settlement_ | | | |
| 03/02/05 | Informal settlement negotiations reached an impasse. Therefore, the case file will be transferred from mediation to an enforcement unit. | | Jil | |
| 8 Mar 05 | Inv. rec'd newly assigned charges | | DM | |
| 29 Mar 05 | Inv. rec'd call from R requesting extension ref P.I. until 5 Apr 05 | | DM | |
| 15 Apr 05 | Inv. organized, tabbed and analyzed file. | | DM | |
| 19 Apr 05 | Inv. mails PDI Ltr - S: 25 Apr 05 Faxed copy - p.m. | | DM | |
| 20 Apr 05 | Inv. rec'd termination docs from R's atty. | | DM | |
| 28 Apr 05 | Inv. submits file to supr for approval. | | DM | |
| 04/27/2005 | To DD concurring w/inv's Recommendation. sd | | | |

EEOC Form 159 (Test 10/94)

# EXHIBIT 29

 

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205
(205) 212-2148
TTY (205) 212-2112
FAX (205) 211-2105

*Mr. Matt White*
*Attorney at Law*
*Adams, Umbach, Davidson & White*
*P. O. Box 2069*
*Opelika, AL 36803-2069*

*Reference: Linda Sims v JELD-WEN, Inc.*
*Charge No. 130 2004 04335*

*Dear Mr. White:*

*The above-referenced charge has been assigned to me for investigation. This correspondence is submitted in reference to your client's charge of employment discrimination filed on the basis of sex, female.*

*Based upon my analysis of the material and testimony which your client presented and information obtained from other sources, I have concluded that it is unlikely that further investigation of your client's charge would result in a finding that the law was violated, as alleged.*

*Your client alleged that she was discriminated against because of her sex, female, and was sexually harassed by the plant manager. Your client alleges that she was discriminated against because of her sex, female, which is in violation of Title VII of the Civil Rights Act of 1964, as amended.*

*Evidence from the Respondent indicates that the Company took immediate and appropriate action upon receiving the complaint from your client. Evidence further shows that the Respondent immediately terminated the employment of the alleged harasser, Richard Fetner. Finally, Respondent contends that your client suffered no tangible injury.*

*Your client has not provided sufficient evidence to show that the company did not take immediate action to rectify the problem once she complained to management.*

*If your client has additional information or evidence which was not submitted previously, please provide to me by April 28, 2005. You can send the information to me at the address above, fax (205) 212-2105 or contact me at (205) 212-2070. If you come to the office without making an appointment, I may or may not be able to see you.*

L. Sims - 29




*In the event that I do not hear from you, I will recommend that the charge be dismissed, that your client be issued a Notice of Right to Sue and that the Commission consider this matter closed.*

*Sincerely,*

April 19, 2005
Date

Devoralyn J. McGhee
Investigator

# EXHIBIT 30

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To:  **Linda Sims**
    **241 County Road 79, Apt. 24**
    **Roanoke, AL 36274**

From:  **Birmingham District Office**
    **Ridge Park Place**
    **1130 22nd Street, South**
    **Birmingham, AL 35205**

[ ]  *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **130-2004-04335** | **Devoralyn J. McGhee, Investigator** | **(205) 212-2070** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ]  Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ]  While reasonable efforts were made to locate you, we were not able to do so.

[ ]  You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[X]  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Bernice W. Kimbrough*                    04-29-05

Enclosure(s)

**Bernice  Williams-Kimbrough**
**District Director**

*(Date Mailed)*

cc:  C. Robert Sturm, Senior Corporate Counsel, JELD-WEN, INC.
    Matt White, ADAMS, UMBACH, DAVIDSON & WHITE

L. Sims - 30