# EXHIBIT K

**DEPOSITION EXCERPTS OF DAN HEES**

3

```
                                                      1
            IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF ALABAMA
                     EASTERN DIVISION

   LORENA MINIX, et al.,              )
                                      )
          Plaintiffs,                 )
                                      )
     vs-                              ) Civil Action No.
                                      ) 3:05CV685-T
   JELD-WEN, INC. and RICHARD         )
   FETNER,                            )
                                      )
          Defendants.                 )

   - - - - - - - - - - - - - - - - - - -

              Deposition of:

                   DAN HEES

               April 28, 2006

   - - - - - - - - - - - - - - - - - - -

   APPEARANCES:
       Hon. James B. Douglas, Jr.
       MCNEAL & DOUGLAS
       1710 Catherine Court, Suite B
       Auburn, Alabama

          Appearing on behalf of the Plaintiffs.

       Hon. Michael L. Thompson
       LEHR, MIDDLEBROOKS & VREELAND
       2021 Third Avenue North
       Birmingham, Alabama

       Hon. Scott Scofield
       SCOFIELD, GERARD, SINGLETARY & POHORELSKY
       1114 Ryan Street
       Lake Charles, Louisiana

          Appearing on behalf of the Defendants.

   Reported by: Robin Avery
   - - - - - - - - - - - - - - - - - - -
                ACCREDITED COURT REPORTING
                   608 North Walnut Street
                Murfreesboro, Tennessee  37130
                      (615) 890-5993
```

---

2

**INDEX**
**PAGE NO.**

**EXAMINATION OF DAN HEES:**

Direct by Mr. Douglas . . . . . . . . . . . 3

Cross by Mr. Thompson . . . . . . . . . . .164

Redirect by Mr. Douglas . . . . . . . . . .166

Recross by Mr. Thompson . . . . . . . . . .166

Further Redirect by Mr. Douglas . . . . . .168

**EXHIBITS**

None

**STIPULATION**
       It was stipulated and agreed by and between the respective parties of the herein-entitled cause of action that the deposition herein was taken by notice and/or agreement pursuant to the Alabama Rules of Civil Procedure and/or Federal Rules of Civil Procedure, whichever is applicable, before Robin Avery of Accredited Court Reporting, Court Reporter and Notary Public at Large in the State of Tennessee;
       That all testimony and proceedings be written down in shorthand by her and thereafter transcribed by her or under her direction, and that said deposition may be read and used in evidence in said cause of action in any trial thereon or any proceeding therein;
       That all objections, except as to the form of the questions, are reserved to on or before the hearing, and it is further agreed that all formalities as to caption, certificate, transmission, filing, etc., excluding the reading and signing of the completed deposition by the witness, are expressly waived.

* Note: All proper names, unless provided by Counsel to the reporter, represent the best phonetic approximation of the name.

---

1                                    DAN HEES,

2   having first been duly sworn or affirmed, was deposed

3   and examined as follows:

4

5                       DIRECT EXAMINATION

6

7   QUESTIONS BY MR. DOUGLAS:

8

9        Q.    BY MR. DOUGLAS:  All right.  Would you state

08:12:12  10   your name, please, sir?

11        A.    Dan Hees.

12        Q.    And, Mr. Hees, my name is Jim Douglas.  I

13   represent both Ms. Sims and Ms. Minix in this lawsuit.

14   We have met before, correct?

15        A.    Correct.

16        Q.    I am going to be taking your deposition this

17   morning.  Have you ever given a deposition before?

18        A.    Yes.

19        Q.    Okay.  We'll get to that in a minute.  My

08:12:32  20   ground rules are real simple.  If I ask a question that

21   doesn't make sense to you or is poorly worded, if you

22   would ask me to rephrase that question, I'll be happy to

23   do that as many times as it takes for me to ask a good

24   question that you understand.  Okay?

25        A.    Okay.

---

4

1        Q.    If I ask a question and you offer an answer,

2   I'll assume that you understood my question.  Is that

3   fair?

4        A.    That's fair.

5        Q.    Okay.  If at any time you need to take a break

6   for any reason, just let me know.  And it's not an

7   endurance test.  And we'll take a break whenever you

8   need to.  Okay?

9        A.    Okay.

08:13:10  10        Q.    All right.  How many times other than today

11   have you given your deposition?

12        A.    Any deposition?

13        Q.    Yes.

14        A.    Once.

15        Q.    When was that?

16        A.    A couple of years ago.

17        Q.    What was it about?

18        A.    It was a workman's comp case.

19        Q.    Why were you giving your deposition in that

08:13:34  20   case?

21        A.    I was the manager of this plant.  And it had to

22   do with us contesting it.  We protested.

23        Q.    So, there was an employee who claimed to have

24   been hurt on the job, is that correct?

25        A.    Correct.

9

1   A.   I don't think so.

2   Q.   So, all the people you know in Randolph County

3   would be people that either worked for your company or

4   are still working for your company, is that correct?

5        MR. THOMPSON: Object to form.

6        THE WITNESS: Or may be associated with them.

7   Truck lines. We did business with some truck lines

8   there that I know of the company and people that may

9   work with them. Suppliers. The people that supplied

10  the gas. Stuff like that. Not specifically employees.

11  Q.   BY MR. DOUGLAS: Can you tell me the names of

12  the people you know in Jeld-Wen who are not current or former

13  employees of Jeld-Wen?

14  A.   I know of a Moore.

15  Q.   Last name Moore?

16  A.   Moore. M-O-O-R-E. I think her name is Betty

17  Moore.

18  Q.   How do you know her?

19  A.   They were associated with the original

20  manufacturing plant in Roanoke.

21  Q.   And what capacity was she in?

22  A.   They ended up having the lease on the building.

23  So, Jeld-Wen was paying them some kind of rent in 2002

24  and 2003.

25  Q.   Okay. Who else do you know other than

10

1   employees or former employees of Jeld-Wen?

2   A.   I can't really recall any names. Just

3   companies.

4   Q.   Okay. If you recall any names of people you

5   know, would you get those names to your lawyer for me?

6   A.   Okay.

7   Q.   Now, your current occupation with Jeld-Wen is

8   what?

9   A.   You mean my position?

10  Q.   Yes.

11  A.   I'm known as a Coordinating General Manager.

12  Q.   What does a Coordinating General Manager do?

13  A.   Involved with the manufacturing plants to help

14  keep them successful, profitable. Work with sales,

15  purchasing, collecting money. The growth of the plants

16  as far as any requests for assets. I work with the

17  budgets, work with the reviews.

18  Q.   Do you have a specific area that you are in

19  charge of?

20       MR. THOMPSON: You mean geographically.

21  Q.   Geographic area?

22  A.   Basically Jeld-Wen at that time had three wood

23  manufacturing plants.

24  Q.   Hold on. At what time?

25  A.   Pardon me?

11

1   Q.   At what time?

2   A.   During 2002, 2003, 2004.

3        MR. THOMPSON: I think he's asking currently.

4   Q.   BY MR. DOUGLAS: I'm asking currently right

5   now.

6   A.   Currently there's two plants. This plant here,

7   and the one up in Quebec, Canada.

8   Q.   And by here, you mean here in Sparta,

9   Tennessee?

10  A.   Sparta, Tennessee.

11  Q.   So, those are the only plants in existence

12  right now?

13  A.   Those are the plants that I work with --

14  Q.   Got you.

15  A.   -- as the Coordinating Manager.

16  Q.   Okay. Back in 2004 what was your job?

17  A.   Same title.

18  Q.   Okay. What plants did you work with then?

19  A.   At that time it was Sparta, Tennessee; Quebec,

20  Canada; and Roanoke, Alabama. Three millwork plants.

21  Q.   What's a millwork plant?

22  A.   Wood as opposed to doors, windows.

23  Q.   So, do I understand your testimony to be that

24  Jeld-Wen only has two plants in operation, period, right

25  now?

12

1   A.   That's not correct.

2   Q.   It's just the two that you associate with and

3   that you perform your duties with regard to?

4   A.   That's correct. It's the two that I

5   coordinate. There are other millwork plants in the West

6   Coast.

7   Q.   Okay. Are there any plants in operation in

8   Alabama right now?

9        MR. THOMPSON: Just millwork plants or any

10  plants, period?

11  Q.   BY MR. DOUGLAS: Any plants, period?

12  A.   There is. They have a door plant in Hartselle,

13  Alabama. And I think that's it. Just the one.

14  Q.   Okay.

15  A.   No. There is a distribution up in Wedowee,

16  which is 15 miles north of Roanoke.

17  Q.   What is a distribution?

18  A.   They take steel doors, flush doors, the

19  millwork and prehang doors. Then they'll sell it to a

20  contractor to put in the job site.

21  Q.   How long have you been employed with Jeld-Wen?

22  A.   Since August of 1993.

23  Q.   When you were first hired in August of 1993,

24  what was your position with the company?

25  A.   Say that one more time.

13

1    Q.    When you were hired in August of '93, what was
2    your position with the company?
3    A.    I was a General Manager for Jeld-Wen.
4    Q.    And what did those duties entail?
5    A.    Pretty much the same thing I'm doing now.
6    Involved with the purchasing, the sales, collecting
7    money, overseeing the plant.
8    Q.    What does it mean to oversee the plant?
9    A.    To take care of any items, issues that involve
08:25:08 10    manufacturing.  Safety issues, quality issues,
11    environmental, legal.
12    Q.    Okay.  Human resources?
13    A.    It's part of it.  But it's not -- I mean,
14    there's several different categories to operate a plant.
15    I don't get involved with the day-to-day scheduling of
16    production and everything.  But I oversee the overview.
17    Q.    How long did you have your job of General
18    Manager?
19    A.    How long did I have it?
08:25:48 20    Q.    Yes.
21    A.    From August, 1993 until the start of 1998.
22    Then I was promoted to Coordinating General Manager.
23    Q.    What's the difference between a general manager
24    and a coordinating general manager?
25    A.    Besides -- a general manager is involved with

14

1    one plant.  A coordinating general manager is two or
2    more.
3    Q.    And you still hold that Coordinating General
4    Manager's position today?
5    A.    Correct.
6    Q.    Since you have been at Jeld-Wen, have you ever
7    been demoted?
8    A.    Demoted?
9    Q.    Demoted, yes.
08:26:40 10    A.    Not that I know.
11    Q.    Okay.  Have you ever had responsibilities taken
12    away from you as a result of performance?
13    A.    (Nods head up and down).
14    MR. THOMPSON:  You have got to answer out loud.
15    THE WITNESS:  Not that I know of.
16    Q.    BY MR. DOUGLAS:  Okay.  Well, who would know if
17    you didn't know?
18    A.    My boss.
19    Q.    Who is your boss?
08:27:02 20    A.    Currently it's Don Schneider, Vice President.
21    Q.    Where is his office?
22    A.    In Klamath Falls, Oregon.
23    Q.    You report directly to him?
24    A.    Correct.
25    Q.    Do you know who he reports to?

15

1    A.    He reports to the -- to Barry Homrighaus who is
2    the President in charge of the Window Division.
3    Q.    Do you know who Mr. Homrighaus reports to?
4    A.    Barry is one of seven directors.  So, he
5    reports to the shareholders.
6    Q.    By directors you mean Board of Directors?
7    A.    Board of Directors, that's correct.
8    Q.    All right.  Prior to working at Jeld-Wen, where
9    did you work?
08:28:14 10    A.    In what order would you like?
11    Q.    Well, your first job prior to Jeld-Wen?
12    A.    The first job prior was Down River Forest
13    Products.
14    Q.    How long did you work there?
15    A.    Approximately six years.
16    Q.    So, that would have been approximately '87 to
17    '93?
18    A.    That was from 1976 to 1982.
19    Q.    Okay.  What did you do, if anything, between
08:28:50 20    1982 and 1993?
21    A.    That was the second job, which was Custom
22    Forest Products from 1982 to 1993.  And then Jeld-Wen
23    from 1993 to current.
24    Q.    Okay.  What did you do with Down River Forest
25    Products?

16

1    A.    I was a General Manager.
2    Q.    And what duties went along with that job?
3    A.    Manage the plant, take care of sales,
4    purchasing, collecting money, safety, quality.
5    Q.    What type of plant was it?
6    A.    It was a paper and a millwork plant.
7    Q.    Where was it located?
8    A.    In Macon, Georgia.
9    Q.    Did you work as a General Manager the entire
08:30:10 10    time there?
11    A.    Not the first year.  From 1976 to 1978 it was
12    Down River Forest Products on the West Coast Oroville,
13    California and Sacramento, California.  1978 to 1982 was
14    the General Manager of Macon, Georgia.
15    Q.    But you were a General Manager the entire time?
16    A.    Yes.
17    Q.    Just at different facilities?
18    A.    Right.
19    Q.    Why did you leave that job?
08:30:46 20    A.    I left that job to start Custom Forest
21    Products, 1982.
22    Q.    More money?
23    A.    Yeah.
24    Q.    What were your duties at Custom Forest
25    Products?

17

1    A.    What was the job title?

2    Q.    What was the title, and what were your duties?

3    A.    I was the President. Duties were keep up with

4    sales, purchasing, get loans, try and make money, keep

5    the shareholders happy.

6    Q.    Where was Custom Forest Products? Where were

7    they located?

8    A.    Up in -- this plant was up in Grayling,

9    Michigan.

08:31:40  10    MR. THOMPSON: Spell that for her.

11    THE WITNESS: G-R-A-Y-L-I-N-G.

12    Q.    BY MR. DOUGLAS: Did you live in Michigan when

13    you worked there?

14    A.    Yeah.

15    Q.    How big a company was it?

16    A.    Employee wise, sales wise?

17    Q.    Well, how many plants did it have?

18    A.    When we started, it had one.

19    Q.    When you left?

08:32:04  20    A.    Four.

21    Q.    What other states were they in, if any?

22    A.    They were all up in Michigan.

23    Q.    All in Michigan. Okay. And why did you leave

24    that job?

25    A.    Why did I leave the job?

18

1    Q.    Yes, sir.

2    A.    Custom Forest Products. Because Jeld-Wen

3    bought the plant down here in Sparta, Tennessee. This

4    is a Custom Forest Products plant.

5    Q.    Okay. I thought you said a minute ago all the

6    plants were in Michigan?

7    A.    All the ones that are still there. When we

8    sold the company up there -- when we sold the plant down

9    here, there were three or four plants still there when I

08:32:46  10    left there.

11    Q.    Okay. Let me try to ask a better question

12    then. At any time during your tenure with Custom Forest

13    Products from 1982 to 1993, how many states had plants?

14    A.    Two.

15    Q.    Michigan --

16    A.    Two. Tennessee and Michigan.

17    Q.    Okay. So, Jeld-Wen bought the plants in

18    Tennessee or just this one plant here in Sparta?

19    A.    Just this one plant here.

08:33:24  20    Q.    So, you wanted to come to work with Jeld-Wen

21    rather than stay with Custom Forest Products?

22    A.    I was already living down here in 1985.

23    Q.    Okay.

24    A.    So, I only stayed in Michigan for the three

25    years. And we got this plant started, which was Custom

19

1    Forest Products. So, I was starting this plant here in

2    1985, and stayed down here. In 1993 Jeld-Wen made an

3    offer to buy it. And when they did, I stayed with it.

4    Q.    Did you have to take a pay cut to stay here?

5    A.    No.

6    Q.    Okay. How far did you go in school?

7    A.    Four years of college.

8    Q.    And where was that?

9    A.    Adrian College in Adrian, Michigan.

08:34:28  10    Q.    Did you get a degree?

11    A.    Yes.

12    Q.    What type of degree?

13    A.    A B.S., business.

14    Q.    And when did you obtain that degree?

15    A.    In -- the year?

16    Q.    Yes, sir.

17    A.    1976.

18    Q.    Where did you graduate from high school?

19    A.    Plymouth High School in Plymouth, Michigan.

08:35:06  20    Q.    What year?

21    A.    1972.

22    Q.    Did you work between 1976 and 1978?

23    A.    Yes. For Down River Forest Products.

24    Q.    Okay. That's right. You told me that. I

25    apologize. So, you have had three jobs since you have

20

1    gotten out of college?

2    A.    Correct.

3    Q.    When did you first -- well, before I ask you

4    that, have you ever written or published anything?

5    A.    Written or published anything?

6    Q.    Have you ever published any writings?

7    A.    Writings, no.

8    Q.    When you first came to work with Jeld-Wen in

9    1993, did the company have a sexual harassment policy?

08:36:22  10    A.    1993. I'm not sure.

11    Q.    Would it be fair to say if they had one, you

12    don't remember it?

13    A.    Yeah, that would be fair.

14    Q.    All right. What year was it that you first

15    remember the company having a sexual harassment policy?

16    A.    Probably in the mid '90's. 1995, 1996.

17    Q.    Do you have any knowledge of what prompted the

18    adoption of the policy?

19    A.    I think it's all the -- the news and all the

08:37:06  20    things going on with harassment, it became a hot topic.

21    MR. THOMPSON: He asked you if you had any

22    knowledge. You just need to answer his question.

23    THE WITNESS: Okay. Say that again.

24    MR. DOUGLAS: Can you read back my question?

25

21

1  (Court Reporter Reads Back Requested Portion of

2  Transcript)

3

4       THE WITNESS:  Do I have any knowledge of what

5  prompted -- I don't.  I don't.

6  Q.  BY MR. DOUGLAS:  You just have your opinion

7  that you just gave us?

8  A.  Yes.

9  Q.  All right.  Has anybody in the company -- did

08:37:36 10  anybody in the company tell you the reason why they were

11  adopting the policy?

12  A.  No.

13  Q.  Okay.  How did you find out about it?

14  A.  At our plant manager meetings when we would

15  talk about environmental issues, workman's comp issues,

16  it was a topic that we all had to go through.

17  Q.  How often back then when the policy was first

18  adopted did you have plant manager meetings?

19       MR. THOMPSON:  Object to the form.  You can go

08:38:10 20  ahead and answer.

21       THE WITNESS:  Say it again, please.

22  Q.  BY MR. DOUGLAS:  Back when you believe the

23  policy was first adopted in the mid '90's --

24  A.  Okay.

25  Q.  -- how often were you having plant manager

22

1  meetings?

2       MR. THOMPSON:  Same objection.

3  Q.  BY MR. DOUGLAS:  You can answer.

4  A.  We had at least two a year.

5  Q.  Do you have more or less than that now?

6  A.  I would say we have less than that now.

7  Q.  Once a year?

8  A.  Yeah.

9  Q.  Sometimes none a year?

08:38:46 10  A.  We'll meet at least once a year.

11  Q.  Okay.  Do you have any idea for the reduction

12  in those meetings?  Any idea why that's so?

13  A.  Basically in our group it's because of the

14  reduction of the millwork plants.  There was 13 or 14

15  when I joined Jeld-Wen in 1993.  And now we have five.

16  Q.  Okay.  At the plant manager meeting when you

17  believe you may have first heard of the sexual

18  harassment policy, who brought it up, if you remember?

19  A.  Well, at that time our Vice President was Rick

08:39:32 20  Parker.  When he sends out the itineraries of the

21  information that we talk about, it was one of the

22  topics.  So, that's -- it would be Rick Parker.

23  Q.  Did you receive written information at that

24  meeting?

25  A.  Yeah.  Yes.

23

1  Q.  Do you still have it?

2  A.  Probably.

3  Q.  Can you get it to your lawyer?

4  A.  Okay.

5  Q.  Do you recall what, if anything, Mr. Parker

6  said about sexual harassment at that time?

7  A.  We -- when this topic was brought up, Rick had

8  some legal people come in and talk to us for an hour or

9  so about the updated policies, the new things that we're

08:40:32 10  adding that were -- we went through a harassment

11  training session, which the legal people presented to

12  the Jeld-Wen managers.

13  Q.  Were there videos at the session?

14  A.  I don't know if it was video.  But there were

15  power-point presentations.  It was a regular seminar.

16  Q.  What documentation, if any, would you have with

17  regard to that?

18  A.  Well, it would be pretty much the same thing

19  that Rob Sturm went through.  And he may have been the

08:41:06 20  one to present it to us.

21  Q.  Okay.

22  A.  That we did in Alabama.

23       MR. THOMPSON:  Get him to give you a time frame

24  on that.  I think he's confused time frame wise.

25  Q.  BY MR. DOUGLAS:  Oh, okay.  Right now I was

24

1  simply asking about when you first -- when the policy

2  was first put into effect.  Okay?

3  A.  Okay.

4       MR. THOMPSON:  Or when he first recalls.

5  Q.  BY MR. DOUGLAS:  Right.  When you first recall

6  that the policy was put into effect.  Okay.  That's what

7  I'm talking about right this second.

8  A.  Okay.

9  Q.  Can you identify the gentleman whose name you

08:41:42 10  just mentioned, Mr. Sturm?

11  A.  Rob Sturm?

12  Q.  Yeah.  Who is he?

13  A.  He's part of Jeld-Wen legal.  He works at

14  Klamath Falls.

15  Q.  What does part of Jeld-Wen legal mean?  Is he a

16  lawyer?

17  A.  He's one of our Jeld-Wen lawyers.

18  Q.  Okay.  All right.  After you initially recall

19  being told about a sexual harassment policy, did you

08:42:08 20  have follow-up seminars regarding sexual harassment in

21  the years that followed?

22  A.  Not specifically.  I mean, again, the manager

23  meetings we talked about lots of different topics.  If

24  there's anything new that had to be updated with legal

25  issues, harassment, environmental, those are the times

25

1   we talked about them.
2   Q.   Okay.  Now, when you mentioned Mr. Sturm, you
3   were talking about -- you mentioned the Alabama plant?
4   A.   Correct.
5   Q.   Are you talking about the plant in Roanoke?
6   A.   Correct.
7   Q.   Okay.  Tell me about that meeting that you were
8   referring to.
9   A.   **That was when Rob Sturm came down in July of**
08:42:52 10   **2003 to give a presentation of an anti-harassment**
11   **program.**
12   Q.   You were present for that?
13   A.   **I was there, but I didn't go through the**
14   **training.**
15   Q.   How come?
16   A.   **I already went through it.**
17   Q.   In the mid '90's?
18   A.   **Mid to late '90's.**
19   Q.   Okay.
08:43:14 20   A.   **At least the late '90's.**
21   Q.   Okay.  If you don't remember the date, that's
22   fine to tell me you don't remember the date.  Earlier
23   you were saying '95, '96.  Do you think it might have
24   been later than that?
25   A.   **In the mid '90's the topic was brought up.**

26

1   Q.   Okay.
2   A.   **More than it was in 1993 when I joined**
3   **Jeld-Wen.  So, it was late '90's.**
4   Q.   Okay.  Late '90's you specifically recall going
5   through a training of some sort?
6   A.   **We -- all the managers had to go through the**
7   **harassment training program.**
8   Q.   Who was in charge of teaching or who was
9   running the program?
08:44:10 10   A.   **At that time there was a Julie Gilman who was**
11   **part of Jeld-Wen legal.  Sam Porter.**
12   Q.   Are they still with the company?
13   A.   **Yes.**
14   Q.   Where do they work?
15   A.   **At Klamath Falls, Oregon.**
16   Q.   What's Julie's last name?
17   A.   **Gilman.**
18   Q.   And when you went through the harassment
19   program, those were the two people that were in charge
08:44:44 20   of it?
21   A.   **Yes.  I'm pretty sure.**
22   Q.   Tell me about the program, at least what you
23   can remember.
24   A.   **Well, basically that harassment of any kind is**
25   **a serious issue.  Any time it's brought up that we**

27

1   document everything.  And the main thing is that once
2   it's documented that we report these issues to Jeld-Wen
3   legal so we can get the right people involved with the
4   situation.
5   Q.   Has there been any change in the harassment
6   program since the late 90's when you went through the
7   training?
8   A.   **Any changes in the policies or --**
9   Q.   Yes.  I was trying to use your words.  You
08:45:36 10   called it the anti-harassment program.  So, I was trying
11   to be consistent with you.
12   A.   **Right.  I think in the last five, six years**
13   **it's been pretty much the same.**
14   Q.   Okay.  Did you receive any documentation from
15   the program that you went through in the late '90's?
16   A.   **I don't recall.  I assume I did.  Again, copies**
17   **of power-point presentations.**
18   Q.   Do you still have those documents?
19   A.   **If I do -- I don't know.**
08:46:10 20   Q.   Okay.  Will you look for them, and give them to
21   your lawyers if you do?
22   A.   **Okay.**
23   Q.   Did you receive any video tapes from that
24   program in the late '90's?
25   A.   **I can't recall.**

28

1   Q.   Again, would you look?  And if you uncover any,
2   would you give them to your lawyers, please?
3   A.   **All right.**
4   Q.   The program that you went through, I take it
5   announced the -- or told you what the company's policy
6   with regard to sexual harassment was, correct?
7   A.   **Correct.**
8   Q.   All right.  And are you familiar with the
9   employee handbooks that my clients received?
08:46:58 10   A.   **Yes.**
11   Q.   Is there any difference in the policy as stated
12   to you in the policy as outlined in the handbooks to the
13   employees?
14   A.   **Is there any difference?**
15   Q.   Yes, sir.
16   A.   **I don't think there's any difference.**
17   Q.   Okay.  So, the employees would have been given
18   the full policy just as you were given it at the program
19   in the late '90's?
08:47:20 20   A.   **Yes.**
21   Q.   Other than the situation regarding Mr. Fetner,
22   have you personally ever dealt with any other
23   allegations of sexual harassment within the company?
24   A.   **Anywhere?  Are you talking about Alabama?**
25   Q.   Anywhere?

**33**

1    Q.   Tell me about that.

2    A.   That had to deal with Lorena Minix and a Ronald

3    Bowen.

4    Q.   How did that come to your attention?

5    A.   The plant manager, Pat Galvez, called me and

6    told me that he had a harassment issue.

7    Q.   Did he tell you what the harassment issue was?

8    A.   Yeah.  He said that Lorena Minix was

9    complaining that Ronald Bowen was doing some gestures,

08:53:10 10 masturbating behind the machine.

11   Q.   Certainly that would be a violation of the

12   company's anti-harassment policy, correct?

13   A.   Correct.

14   Q.   Did you know Mr. Bowen at the time?

15   A.   Just knew of him as an employee.

16   Q.   Did you know Ms. Minix at the time?

17   A.   Just that she was an employee of Roanoke.

18   Q.   And Pat Galvez was the Manager there at the

19   time?

08:53:44 20 A.   He was the General Manager.

21   Q.   Was Mr. Fetner employed by the company at that

22   time?

23   A.   Yes.

24   Q.   Was he at the Roanoke plant?

25   A.   Yes.

**34**

1    Q.   What was his position?

2    A.   He was a Group Manager.

3    Q.   Okay.  What's a group manager?

4    A.   Similar to a foreman.

5    Q.   So, he would have reported to Mr. Galvez?

6    A.   Correct.

7    Q.   During 2003, 2004, did the company provide cell

8    phones to any of its employees?

9    A.   Provide cell phones, no.  But we -- I'm an

08:54:34 10 employee, and I have my own cell phone.  Pat Galvez had

11   his own cell phone, but it wasn't provided.  The company

12   doesn't have cell phones.

13   Q.   Okay.

14   A.   But you can -- the expense, you can put it on

15   an expense report.

16   Q.   I understand.  During 2003, 2004, did the

17   company, if you know, in Alabama have Southern Link

18   walkie-talkies or anything like that?

19   A.   Yes, they did.  They had a form of

08:55:06 20 communication with Pat Galvez, the Group Manager on the

21   floor, and even the secretary.

22   Q.   So, they all had like hand radios?

23   A.   Yeah.  For phone calls, things like that.

24   Q.   Was it through Southern Link?

25   A.   I don't know.  I don't know.  Southern Link.  I

**35**

1    don't.

2    Q.   Do you know if those calls were recorded?

3    A.   On a walkie-talkie?  These are walkie-talkies.

4    Q.   Okay.  So, to your knowledge there would be no

5    recording of those conversations that the company has?

6    A.   I don't think so, no.

7    Q.   Okay.  All right.  Now, what, if anything, did

8    you do when you received the report from Mr. Galvez

9    regarding Mr. Bowen?

08:55:52 10 A.   I told Pat that I thought this was pretty

11   serious.  That he needs to immediately contact Jeld-Wen

12   legal department.  At that time Rob Sturm was the legal

13   person involved with that.  And I think he did.  He

14   either talked to Rob or talked to somebody in legal so

15   that he can get direction of what he has to do and what

16   he has to proceed with.  So, it went from there.

17   Q.   If you know, why would Mr. Galvez call you?

18   A.   Why would I know?

19   Q.   Why would he call you?

08:56:28 20 A.   I'm his boss.

21   Q.   Okay.  So, that would be proper procedure?

22   A.   Yeah, chain of command.

23   Q.   Okay.  Would it have been wrong for him to call

24   legal directly?

25   A.   No.  It would have been --

**36**

1    Q.   That would have been okay with you?

2    A.   That would have been okay.  I would have been

3    copied on it in some form or other with his e-mails or

4    communication.

5    Q.   What happened next with regard to this

6    incident, if you know?

7    A.   From what I know, legal told Pat to document

8    the situation, everybody involved.  And that at some

9    time, some point that someone from Klamath Falls would

08:57:14 10 come out and investigate soon.  It wouldn't drag on for

11   months.  It would be relatively soon.

12   Q.   Okay.  Would it be typical for investigations

13   like that to drag on months?

14   A.   No.

15   Q.   In July of 2003, had the harassment program

16   already been given in Alabama or do you know?

17   A.   The harassment program?

18   Q.   By Mr. Sturm that you testified about earlier?

19   A.   No.

08:57:46 20 Q.   So, it was after this?

21   A.   It was during that time, yeah.  It was reported

22   sometime at the end of June of 2003.  And by the time

23   all the documents and everything was done, Rob came out

24   there, I think, middle to late July.  So, it was three,

25   four weeks.  And that's when he presented the

37

1    anti-harassment training for all the employees that were
2    there.
3       Q.    Okay.  Was it as a result of this complaint
4    that the training was done, if you know?
5             MR. THOMPSON:  Object to form.
6       Q.    BY MR. DOUGLAS:  You can answer.
7       A.    I think since Rob was there to do the
8    investigation, he found it fit to do the training at the
9    same time.
10      Q.    Okay.  When did the Roanoke plant open, if you
11   know?
12      A.    When did it open?  The Roanoke plant was a part
13   of CMS.  And CMS Company was a customer of Jeld-Wen.
14   Jeld-Wen sold them doors and windows and millwork.  They
15   have been around there for a long time.
16      Q.    Okay.  When did Jeld-Wen buy the facility, if
17   you know?
18      A.    Exact date, I don't know.  But Jeld-Wen took
19   over the CMS operation with the bank because they
20   weren't paying their bills.
21      Q.    Got you.
22      A.    So, we had legal -- I guess the legal okay to
23   take over.  So, we were taking over at the end of 2001,
24   but 2002.  Whether it was purchased, I don't know.  I
25   don't have that --

38

1             MR. THOMPSON:  If you don't know, you don't
2    know.
3             THE WITNESS:  Don't know, yeah.
4       Q.    BY MR. DOUGLAS:  The time frame you believe
5    would have been in the early part of the 2000's -- the
6    early part of this decade we're in right now?
7       A.    Yeah.
8       Q.    When did you first meet Pat Galvez?
9       A.    I met Pat Galvez in 1993 at one of our manager
10   meetings.  He was a Manager or an Assistant General
11   Manager for a West Coast millwork plant.
12      Q.    Okay.  And do you know when he came to the
13   Roanoke facility?
14      A.    Yeah.
15      Q.    When was that?
16      A.    That was early of 2002.
17      Q.    Between 1993 and when you first met him in 2002
18   when he came to the plant in Roanoke, how often did you
19   see him?
20      A.    Maybe once or twice a year.
21      Q.    All right.  How about when he took over the
22   Roanoke -- or became General Manager of the Roanoke
23   plant, how often would you see him then?
24      A.    At least once a month.
25      Q.    And when did he leave that position, if you

39

1    know?
2       A.    Leave the position as Manager at Roanoke?
3       Q.    Yes.
4       A.    It was in the summer of 2004.
5       Q.    So, between '02 and the summer of 2004, you saw
6    him at least once a month?
7       A.    Say that again.
8       Q.    Between the period in 2002 when Mr. Galvez came
9    to the Roanoke facility --
10      A.    Okay.
11      Q.    -- and he left in 2004, you saw him once a
12   month?
13      A.    Saw him at least.
14      A.    At least once a month.
15      A.    Sometimes two or three times a month.  I
16   thought your question was before.
17      Q.    It was.  And I moved on to -- you answered all
18   of my questions as I asked them.
19      A.    Okay.
20      Q.    And he's in Oregon now is my understanding, is
21   that correct?
22      A.    He's in Klamath Falls, Oregon.
23      Q.    Okay.  Do you know what his position now with
24   the company?
25      A.    I think he's Production Manager.

40

1       Q.    Did he go straight from Klamath -- I mean from
2    Roanoke, Alabama to Klamath Falls, Oregon?
3       A.    Yes.
4       Q.    Have you seen him since he left in 2004?
5       A.    Yes.
6       Q.    How many times would you say?
7       A.    Maybe once a year.
8       Q.    Do you consider him a friend of yours?
9       A.    A friend meaning -- a friend.  I'd say he's a
10   friend.
11      Q.    Okay.  Did you all become closer friend wise
12   between 2002 and 2004 when you saw him more regularly?
13      A.    I got to know him better.
14      Q.    Okay.  Did you all ever socialize outside of
15   business?
16      A.    Such as dinners?
17      Q.    Dinners, drinks, whatever?
18      A.    I've taken Pat and his wife out for dinner down
19   at Roanoke.
20      Q.    Okay.  When did you first meet Richard Fetner?
21      A.    Richard Fetner, in the mid to late 2001.
22      Q.    How did that come about?
23      A.    When Jeld-Wen was starting to take over the CMS
24   operations, my boss, Rick Parker, wanted me to go to the
25   plant.  And we wanted to see if he wanted to operate it.

43

1    So, I went down there to see all the players.  At that
2    time, John Lindsey was the CMS General Manager.  He was
3    going to retire in the summer of 2001.  So, if Jeld-Wen
4    was going to take over the operation, somebody needed to
5    come down and help run it.  Richard was one of the — at
6    that time I think they called them former of CMS.
7        MR. THOMPSON:  Jim, whenever you get to a
8    transition point, if we can just take a quick break.
9        MR. DOUGLAS:  Sure.  We can do that right now.
10       MR. THOMPSON:  Good time?
11       MR. DOUGLAS:  Sure.
12
13               (Break)
14
15   Q.   BY MR. DOUGLAS:  All right.  Before we continue
16   with Mr. Fetner, what happened to Mr. Bowen, if you
17   know?
18   A.   What happened to him?
19   Q.   Yes, as a result of the allegations by Ms.
09:10:38 20   Minix?
21   A.   From July of 2003?
22   Q.   Correct.
23   A.   Ronald ended up leaving.  He quit.
24   Q.   How long after the allegations were forwarded
25   to you by Mr. Galvez until Mr. Bowen quit?

42

1    A.   Again, it was brought up to me in late June.  I
2    don't know if I had any documentation.  But I knew that
3    Pat was preparing things.  He was working -- Pat Galvez
4    was working more with the legal.
5    Q.   Okay.  Do you know when Bowen quit?
6    A.   I think it was that day.  It was July 23rd.  It
7    was the day that Rob came down.  2003.
8    Q.   Did you or anybody else to your knowledge tell
9    Mr. Bowen that he was in trouble?
09:11:38 10   A.   I don't think so.
11   Q.   Do you know if his quitting had anything to do
12   with the allegations made by Ms. Minix?
13       MR. THOMPSON:  Object to form.
14       THE WITNESS:  I don't know.  I don't.
15   Q.   BY MR. DOUGLAS:  Did Pat Galvez or anybody ever
16   tell you that they told Mr. Bowen about these
17   allegations by Ms. Minix?
18   A.   I think when Pat was doing the interviews he
19   was asking Lorena and several of the people over there
09:12:10 20   about the incident.  But I don't know if Pat
21   specifically told him what was going on.
22   Q.   Did you have any conversations with Mr. Bowen
23   regarding the allegations?
24   A.   No.
25   Q.   Because you had referred it to legal, correct?

1    A.   Correct.
2    Q.   Okay.  Did anybody at legal or Mr. Galvez
3    report to you that they reported the allegations to Mr.
4    Bowen?
5    A.   Say that one more time.
6    Q.   Did Pat Galvez tell you that he told Bowen
7    about the allegations?
8    A.   I don't know.  I'm not sure.
9    Q.   He may or may not have.  You just don't
09:12:48 10   remember?
11   A.   No.  Don't recall.
12   Q.   Did anyone from Oregon tell you that they had
13   told Mr. Bowen about the allegations?
14   A.   I don't think that happened.
15   Q.   Okay.  They didn't tell you that anyway?
16   A.   No, they didn't tell it to me.
17   Q.   Okay.  Is there any part about the Minix
18   complaint regarding Mr. Bowen that you wish you had
19   handled differently?
09:13:32 20       MR. THOMPSON:  Object to form.
21       MR. DOUGLAS:  You can answer.
22       MR. THOMPSON:  You can go ahead and answer.
23       THE WITNESS:  I don't think I would have done
24   any different.  It was reported.  It was followed up on.
25   Wouldn't have done any different.  I don't think so.

44

1    Q.   BY MR. DOUGLAS:  Okay.  Do you know if Mr.
2    Bowen and Ms. Minix were separated in the workplace
3    after the allegations were made?
4    A.   I don't know.
5    Q.   Don't know either way?
6    A.   No.
7    Q.   Would you agree with me that the better
8    practice would have been to make sure that they were
9    separated after the allegation was made?
09:14:22 10       MR. THOMPSON:  Object to form.
11       THE WITNESS:  Again, not being directly
12   involved, I don't know.
13   Q.   BY MR. DOUGLAS:  Well, would you agree -- it's
14   fine if you disagree with me.  But I'm asking would you
15   agree with me in a situation like that, the best policy
16   is to separate the employees immediately?
17       MR. THOMPSON:  Object to form.
18       THE WITNESS:  Again, that's a -- I can say I
19   don't know if I agree with it.  I just have to know the
09:15:04 20   situation and dig into it and see what the right thing
21   to do is.
22   Q.   BY MR. DOUGLAS:  So, situations might be
23   different?  Is that what you're saying?  So, you
24   disagree with me?
25       MR. THOMPSON:  Object to form.

45

1    Q.   BY MR. DOUGLAS: You don't think what I said is
2    the best practice necessarily?
3         MR. THOMPSON: Same objection.
4         THE WITNESS: I agree with that. I disagree
5    with what you said.
6    Q.   BY MR. DOUGLAS: Okay. Does Jeld-Wen have any
7    policy that says the complaining party and the alleged
8    wrongdoer be separated in the workplace after a
9    complaint is lodged?
09:15:44 10  A.   I don't think so. As far as I know, I don't
11   think so.
12   Q.   Well, to your knowledge, if -- you received
13   information about the complaint in late June of 2003,
14   correct?
15   A.   Correct.
16   Q.   And sometime in July is when Mr. Bowen quit,
17   correct?
18   A.   Correct.
19   Q.   And sometime in July -- the investigation was
09:16:22 20  going on during July, correct?
21   A.   Correct.
22   Q.   Well, don't you think that it was unreasonable
23   to Ms. Minix to have her working with Mr. Bowen in the
24   workplace for this period of time after the allegation
25   was made?

46

1         MR. THOMPSON: Object to form.
2         THE WITNESS: I don't think it was
3    unreasonable.
4    Q.   BY MR. DOUGLAS: Okay. All right. Are you
5    aware of any other examples of sexual harassment
6    complaints within the company other than the ones you
7    have testified about and other than this one that's the
8    subject of this lawsuit?
9         MR. THOMPSON: Object to form.
09:17:24 10       THE WITNESS: I don't think there are. Not
11   that I can remember.
12   Q.   BY MR. DOUGLAS: None that you had to deal
13   with?
14   A.   Correct.
15   Q.   Okay. Are you aware of any complaints of
16   sexual harassment within the company in which the person
17   alleged to have done something wrong was cleared by an
18   investigation?
19   A.   Have I heard of any situation?
09:17:58 20  Q.   Right. Because you have told me about all the
21   ones you have dealt with, correct?
22   A.   Ask that one more time or read that back.
23   Q.   Have you heard -- first of all, all of the
24   times that you have been with the company that you have
25   dealt with allegations of sexual harassment you have

47

1    told me about?
2    A.   Correct.
3    Q.   Other than this case?
4    A.   Right.
5    Q.   All right. So, have you ever heard of any
6    sexual harassment complaints where the party accused of
7    doing something wrong was cleared by the investigation?
8    A.   I don't -- haven't heard anything.
9    Q.   Okay. All right. You met Mr. Fetner sometime
09:18:44 10  in 2001 while he was with CMS, correct?
11   A.   Correct.
12   Q.   And CMS stands for what?
13   A.   I think it's Chuck -- the owner was Chuck
14   Sutherland. So, it must be Chuck, his middle initial,
15   and Sutherland.
16   Q.   All right. And what did that company do?
17   A.   They bought windows, doors. They were in
18   distribution. And they sold product to contractors.
19   Q.   What was your impression of Mr. Fetner when you
09:19:20 20  met him, if you remember?
21   A.   It was a good impression.
22   Q.   You all got along okay?
23   A.   Yeah.
24   Q.   After the plant was acquired or Jeld-Wen
25   started running it, how often were you going down there?

48

1    A.   I would be down there at least twice a month.
2    Q.   And Mr. Fetner was an employee of Jeld-Wen by
3    that time, is that correct?
4         MR. THOMPSON: In 2002?
5    Q.   BY MR. DOUGLAS: Yes. Well, the time frame I
6    had was when Jeld-Wen started running the plant at CMS
7    or started running the CMS plant. Was Fetner an
8    employee of Jeld-Wen at that point?
9    A.   As far as I know, at the end of 2001, all the
09:20:14 10  of the CMS employees were still CMS employees. And they
11   were not employees of Jeld-Wen. Not until early 2002.
12   Q.   Did Jeld-Wen take them all or did they let some
13   go?
14   A.   They let some go, shut some plants down, sold
15   some of the assets.
16   Q.   Okay.
17   A.   Decided to run some of them.
18   Q.   Mr. Fetner was retained by Jeld-Wen in 2002,
19   though, correct? He was hired?
09:20:40 20  A.   Yes.
21   Q.   Who made that decision?
22   A.   To hire him?
23   Q.   Yes.
24   A.   Probably Pat Galvez and myself.
25   Q.   Did you interview Mr. Fetner prior to hiring

53

1    Q.   Are they standard?

2    A.   **Pretty standard.**

3    Q.   Okay.  Do they call for the prospective

4    employee to disclose their previous places of

5    employment?

6    A.   **Yes.**

7    Q.   Is it customary and do you call those previous

8    places for reference information regarding the

9    prospective employee?

09:26:10 10        MR. THOMPSON:  Object to form.

11        THE WITNESS:  When we do formal hiring, it's a

12   procedure.

13   Q.   BY MR. DOUGLAS:  What do you mean it's a

14   procedure?  You do call?

15   A.   **We follow up references.**

16   Q.   Including previous employers?

17   A.   **Yeah, if it's on his application.**

18   Q.   A minute ago you said formal hiring.  Is there

19   such a thing as informal hiring?  And, if so, what's the

09:26:34 20  difference?

21   A.   **Well, maybe the word is wrong.  But if I know**

22   **that I'm going to hire a supervisor that comes out of**

23   **college, there is this formal process that we go**

24   **through.  This was not like that.  This was Jeld-Wen**

25   **took over, acquired CMS.**

54

1    Q.   All right.  Fair enough.  Does Jeld-Wen have

2    the old CMS personnel files?

3    A.   **Does Jeld-Wen have them?  I believe they do.**

4    Q.   Where would those be kept, if you know?

5    A.   **In Klamath Falls, Oregon.**

6    Q.   Do you have any knowledge as to whether

7    Wellborn was contacted regarding Mr. Fetner?

8    A.   **Contacted by Jeld-Wen?**

9    Q.   Yes.  Any representative of Jeld-Wen?

09:27:30 10   A.   **I don't know.**

11   Q.   You didn't though?

12   A.   **I didn't call.**

13   Q.   Okay.  At any time have you ever heard that Mr.

14   Fetner had complaints lodged against him at Wellborn for

15   sexual harassment?

16   A.   **Have I ever known?**

17   Q.   Have you ever heard, first of all?

18   A.   **Never.  I didn't hear it.**

19   Q.   Ever?  Through today you've never heard that?

09:28:00 20   A.   **No.**

21   Q.   Did Mr. Fetner have a computer in his office at

22   the Roanoke plant?

23   A.   **Computer.  I don't think so.**

24   Q.   Was there a computer on-site at the Roanoke

25   plant?

55

1    A.   **Anywhere?**

2    Q.   Anywhere?

3    A.   **Yes.**

4    Q.   How many computers?

5    A.   **Two or three.**

6    Q.   Where were they located?

7    A.   **Pat Galvez, General Manager.  Roxi Giles, she**

8    **had one.  At one time in the sales office they had one.**

9    **So, that's at least three.**

09:28:54 10   Q.   After Mr. Galvez went to Klamath Falls, who

11   became the General Manager?

12   A.   **I was the acting G.M.**

13   Q.   What was Mr. Fetner's title?  Did it stay the

14   same?

15   A.   **Yeah, he was still Group Manager.**

16   Q.   So, his title didn't change?

17   A.   **Right.**

18   Q.   Would it be fair to say that he became

19   responsible for the day-to-day operation of the

09:29:16 20  facility?

21   A.   **It would be fair to say.**

22   Q.   Did he move into Mr. Galvez' office, if you

23   know?

24   A.   **I know that he did not.**

25   Q.   Was anybody in Mr. Galvez' office?

56

1    A.   **Other than me when I went down there, nobody**

2    **was.**

3    Q.   And you were down there at least twice a month?

4    A.   **At least, yeah.**

5    Q.   On a busy month, how often were you down there?

6    A.   **Sometimes three.  Three out of the four weeks.**

7    Q.   Okay.  All right.  So, when you would come

8    down, you would stay for a week at a time?

9    A.   **I would stay for two to three days.**

00:29:52 10   Q.   Okay.  So, you were there at least four to six

11   days out of the month?

12   A.   **Correct.**

13   Q.   And sometimes you were there two or three more

14   times if you stayed the third week?

15   A.   **Right.**

16   Q.   So, it would be fair to say there were a lot of

17   times that you weren't there also?

18   A.   **Correct.**

19   Q.   Who, if anybody, would have had access to Mr.

09:30:16 20  Galvez' office after he left when you weren't there?

21   A.   **Roxi.**

22   Q.   Could Mr. Fetner have gotten into that office?

23        MR. THOMPSON:  Object to form.

24   Q.   BY MR. DOUGLAS:  If you know?

25   A.   **If he had to get in there, he could get in**

61

```
 1    A.   Do I know him?
 2    Q.   Yes.
 3    A.   Yes, I do.
 4    Q.   Who is he?
 5    A.   Joe Mendoza is a Group Manager for Jeld-Wen.
 6    Q.   Where does he work?
 7    A.   Today?
 8    Q.   Today?
 9    A.   He works at Corsicana, Texas.
10    Q.   At a plant in Corsicana?
11    A.   It's a window plant.
12    Q.   To your knowledge was he ever at the Roanoke
13  facility?
14    A.   Yes, he was.
15    Q.   When was he at the Roanoke facility?
16    A.   He was there from the end of 2002 to the end of
17  2003.
18    Q.   Did he have any involvement with regard to the
19  Minix and Bowen incident to your knowledge?
20    A.   I don't -- yeah, I don't think so.
21    Q.   What was his capacity at the Roanoke facility?
22    A.   He was a Group Manager.
23    Q.   Would he have been Ms. Minix' supervisor in
24  2003?
25    A.   I don't believe so.  Joe Mendoza ran the column
```

62

```
 1  and the porch post department.
 2    Q.   Did you ever become friends with Mr. Fetner?
 3    A.   Just business.
 4    Q.   You all never socialized outside of work?
 5    A.   No.
 6    Q.   Did you ever go on any out of town trips with
 7  Mr. Fetner?
 8    A.   No.
 9    Q.   Did you ever have dinner with Mr. Fetner?
10    A.   Had lunch a couple of times.
11    Q.   But never supper, as we would say here in the
12  South?
13    A.   Supper, no.  Lunch with Pat.
14    Q.   Just the midday meal with Mr. Fetner, is that
15  correct?
16    A.   Yeah.  At Gedneys.
17    Q.   Did Mr. Fetner tell you about his personal life
18  at any point in time?
19    A.   I have heard things.
20    Q.   From Mr. Fetner?
21    A.   A little bit.
22    Q.   Okay.  Tell me what Mr. Fetner told you about
23  his personal life.
24    A.   That he was trying to get one of his sons out
25  of rehab.  He had an issue with one of his kids.  That
```

63

```
 1  it was time consuming, and it was costly to get him in
 2  and get him out of the rehab center.  So, I know he had
 3  an issue there.  A couple times Rich would talk to me
 4  about his health, his -- he had to go to the doctor a
 5  couple of times.  High blood pressure.  Things like
 6  that.
 7    Q.   Did you ever have any conversations with Mr.
 8  Fetner about women?
 9    A.   No.
10    Q.   Did Mr. Fetner ever tell you that he had ever
11  been involved with anybody that he worked with --
12  sexually I mean?
13    A.   He did on October 13th.
14    Q.   In connection to this incident?
15    A.   To the incident, yeah.
16    Q.   Okay.  Other than that?
17    A.   No.
18    Q.   Prior to that, any indication by Mr. Fetner he
19  had ever been involved with anybody that he worked with?
20    A.   No.
21    Q.   Did Mr. Fetner have a cell phone?
22    A.   Yes.
23    Q.   Do you know the number?
24    A.   I could get it.  I don't know it off the top of
25  my head.
```

64

```
 1    Q.   In 2003, 2004 did you have a cell phone?
 2    A.   Yes.
 3    Q.   Do you have the same cell phone now?
 4    A.   Same number.  Not the same cell phone.
 5    Q.   Right.  Not the same device.  But it's with the
 6  same company?
 7    A.   Unless they were bought out.
 8    Q.   Who is it with?  Who is your company?
 9    A.   Cingular.
10    Q.   And they were AT&T?
11    A.   Yeah, I think it was AT&T.
12    Q.   Okay.  Do you maintain records of your cell
13  phone records?
14    A.   Not other than a year.  After a year, toss
15  them.
16    Q.   Okay.  How can you get Mr. Fetner's cell phone
17  number?  Do you still have it in your phone?
18    A.   I can get it.  I have got it somewhere.
19    Q.   Do you have it in your phone?
20    A.   In my phone?
21    Q.   Yeah.  Do you have it stored as one of the
22  numbers in your phone?
23    A.   No.
24    Q.   You just have it written down somewhere you
25  think?
```

65

1    A.    Right.

2    Q.    Have you spoken to Mr. Fetner since he left the

3    company?

4    A.    Yes.

5    Q.    On how many occasions?

6    A.    Probably two.  A couple.

7    Q.    When was the -- about when were those

8    occasions?

9    A.    About -- well, one definitely was the week

09:43:08 10    after.  I talked to him in October to give him his

11    severance package after leaving the company.  Another

12    one was in May, June of 2005 when we were liquidating

13    the assets.

14    Q.    And your testimony is that you have not spoken

15    to him since May, June, 2005 or whenever it was in 2005?

16    A.    May, June, 2005.  I don't think so.

17    Q.    Okay.  Tell me everything you can remember

18    about the October of 2004 conversation after he left the

19    company.

09:44:00 20    A.    The conversation between --

21    Q.    You and Mr. Fetner?

22    A.    Me and Fetner.

23    Q.    You said it was about a severance package?

24    A.    Yeah.

25    Q.    What all was said that you recall?

66

1    A.    When we had our conversation on the 13th, I

2    told him that I would get back to him with the severance

3    package of what Jeld-Wen is going to do for him for all

4    the vacation.  I told him I would get that information

5    within a week, and I would get back to him.  That their

6    policy is that he has to take and sign whatever the

7    dollar amount is.  And it's based on a formula.  It's

8    unused vacation, vacation earned going into the next

9    year, any kind of 401-K contribution.  That's put into

09:44:54 10    them.  And he signed it.  I met him the next week.  He

11    signed off on it.  Jeld-Wen sent him a check.

12    Q.    Anything else that was discussed during that

13    conversation other than the severance package?

14    A.    At that conversation?

15    Q.    Right.

16    A.    Yeah.  That I announced that we're shutting the

17    plant down.

18    Q.    You told Mr. Fetner that?

19    A.    Well, he heard about it.

09:45:20 20    Q.    Okay.

21    A.    This was all at the same time.

22    Q.    What did he say with regard to the plant

23    closing?

24    A.    He wasn't that surprised.

25    Q.    Would you characterize the conversation as

67

1    friendly?

2    A.    Yeah.  He wasn't angry.  It was good

3    conversation.

4    Q.    All right.  Tell me what you recall about the

5    May, June, 2005 conversation with Mr. Fetner.

6    A.    He got wind that we were auctioning some assets

7    off.  And he was working at a facility that was in

8    Roanoke.  And he was wanting to know about a forklift

9    and some other stuff.

09:46:30 10    Q.    Did he call you?

11    A.    He either -- he got ahold of me somehow.  He

12    either left a message over here.  And when I went down

13    there, I talked to him about what we had to sell, and

14    that everything is being sold through the internet.

15    That he has to put his bid in like everybody else.

16    Q.    What else was said?

17    A.    Maybe some conversation about how his health

18    is, how the job is over there.  The company he was

19    working for was pretty slow.  He was concerned about his

09:47:06 20    long-term employment with that company.

21    Q.    Did he say anything about his leaving Jeld-Wen

22    the year before?

23    A.    I don't think so.

24    Q.    All right.  I need you to get Mr. Fetner's

25    phone number to your lawyers.

68

1    A.    Okay.

2    Q.    Or to me.  I mean, give them to your lawyers if

3    you can find them.

4    A.    Well, at least the last number that I knew.

5    Q.    Right.  Did you only have one cell phone?

6    A.    Did I?  Yes.

7    Q.    In 2004?

8    A.    Correct.

9    Q.    Okay.  And this was Cingular?

09:48:18 10    A.    Correct.

11    Q.    Do you know if Mr. Fetner was married at the

12    time that you knew him?

13    A.    I don't think he was.  I have heard word of

14    mouth that he was married and divorced.  But I never

15    talked to him about it.

16    Q.    He never mentioned a wife or ex-wife?

17    A.    No.

18    Q.    He just mentioned one child that was in rehab?

19    A.    I think he had -- well, I know he had two sons,

09:48:58 20    because one of them we bought wood from.  But the one

21    was the problem.

22    Q.    Who was the son that you bought wood from?

23    A.    I forget his name.  I'm not sure.  He worked

24    for a company out of Virginia.

25    Q.    Did he live in Virginia to your knowledge?

69

1  A.  I don't know.

2  Q.  Did Mr. Fetner put you in touch with him to buy

3  wood from him?

4  A.  No. I've heard of that company. When I called

5  it, he called and said he was related to Richard. And I

6  don't know if he lived down there or not. But that was

7  one son. And then the other one that he had some issues

8  with.

9  Q.  So, you called the company in Virginia and just

09:49:36 10  happened to get Mr. Fetner's son, and he connected the

11  dots for you?

12  A.  Well, I buy lumber. That's what I do. I knew

13  this company. And I was calling several companies to

14  get lumber.

15  Q.  I understand. But Mr. Fetner didn't tell you

16  he had a son in the lumber business?

17  A.  I don't know. I don't think so.

18  Q.  When did you first receive any information

19  regarding complaints of sexual harassment against Mr.

09:50:32 20  Fetner by either Linda Sims, Brenda Sims, or Lorena

21  Minix?

22  MR. THOMPSON: Object to form.

23  THE WITNESS: About a week before October 13th.

24  Q.  BY MR. DOUGLAS: Tell me what happened.

25  A.  Brenda Sims called this office and left a

70

1  message for me to contact her.

2  Q.  This office being Sparta, Tennessee?

3  A.  Sparta, Tennessee. I was at a meeting in

4  Klamath Falls. When I got back, I called her. I think

5  it was on a Sunday. She told me that she had wanted to

6  talk to me because she had an issue with Richard,

7  because Richard was moving her around to some different

8  locations in the plant. That she thought she was hired

9  to do one specific job. And she didn't think it was

09:51:32 10  right moving her around. So, I told her I would be at

11  the plant within a couple of days. And when I get down

12  there, we'll talk about it. She said it would be good.

13  Q.  That's Brenda Sims?

14  A.  That's Brenda Sims.

15  Q.  And that was the only thing she spoke to you

16  about was being moved around to different jobs at the

17  plant?

18  A.  Right.

19  Q.  Okay. Tell me about your next conversation

09:52:00 20  with -- either with or about any of those three ladies.

21  A.  I don't know exactly what day I got to the

22  plant. But I had talked to her when I traveled down to

23  Roanoke, Alabama, told her I wanted to follow up on her

24  phone call from a couple of days ago. And we can talk

25  about that this morning. And I believe that was on the

71

1  13th.

2  Q.  Of October?

3  A.  Of October, I believe. She wanted to know if

4  somebody else could join us. I'm not sure who. But

5  there would be more than her talking about it. So, I

6  told her I would meet her in the paint room, because

7  it's a good place to talk. We weren't running the paint

8  room that day. And meet her up there to talk about it

9  at 9:00.

09:52:52 10  Q.  Okay. And did anybody else come to the

11  meeting?

12  A.  Yes.

13  Q.  Who all was in the meeting in the paint room on

14  October 13, 2004?

15  A.  October 13th. There was Brenda Sims, Linda

16  Sims, Kathy Thornton, Lisa Cook, and Lorena Minix.

17  Q.  Mary Lou Laws was not there, is that correct?

18  A.  Was not there.

19  Q.  And this meeting on October 13th was the first

09:53:28 20  meeting you had had regarding Mr. Fetner and these

21  complaints, is that correct?

22  A.  Correct.

23  Q.  All right. So, when the meeting began, who

24  started talking first?

25  A.  I did.

72

1  Q.  What did you say?

2  A.  I was directing my conversation to Brenda,

3  because she voiced a complaint about having to be moved

4  around. And I explained that the plant is small. That

5  some departments don't run. Sometimes they do.

6  Sometimes they don't. And we would never have them do

7  anything that they weren't capable of doing. But there

8  are several different areas that general laborer can

9  work. And they have to work in different areas.

09:54:18 10  And the reason I met in the paint room, I said,

11  today we are not even running the paint room. So, the

12  paint crew in here is working somewhere else in the

13  plant. That's just the general practice. So, we talked

14  about that for about five minutes.

15  Q.  What did any of the ladies say, if anything?

16  A.  That they understood that.

17  Q.  Who told you that?

18  A.  All of them did. But, again, I was directing

19  Brenda, because she's the one that specifically asked

09:54:44 20  me. Because she thought she was hired just to do the

21  one job there.

22  Q.  Did she tell you who told her she was hired

23  just to do one job there?

24  MR. THOMPSON: Object to form.

25  THE WITNESS: No.

73

1    Q.    BY MR. DOUGLAS: Did you ask her who told you
2    that nonsense or anything along those lines?
3    A.    Well, no.
4    Q.    I mean, did you think that she was lying that
5    somebody had told her that or did you believe her?
6    A.    **Well, I didn't ask her. I didn't say who -- I**
7    **didn't ask her who told you. She just said that she was**
8    **told that when she was hired to take the job that the**
9    **only thing she had to do was to work the one job.**
09:55:26 10   Q.    You didn't believe that to be -- you certainly
11   didn't believe that that was the way it was supposed to
12   be, right?
13   A.    **That's correct.**
14   Q.    Okay. So, did you wonder who may have told her
15   that at all?
16   A.    **Well, she was saying that Richard --**
17   Q.    Had told her that?
18   A.    **-- had told her when she was hired that she was**
19   **going to do the one job.**
09:55:46 20   Q.    Did you find that odd?
21   A.    **Yeah.**
22   Q.    Did you talk to Richard about that?
23   A.    **Well, this was on the 13th. I hadn't had a**
24   **chance to talk to Richard yet. But I told her I would**
25   **dig into it. And I would also bring in examples of the**

74

1    **other hourly employees that were there referring to --**
2    **that they had been there for two or three years, and**
3    **they know that sometimes they get moved around to the**
4    **paint line, to the dado areas, some of the lighter,**
5    **light duty jobs.**
6    Q.    After Mr. Galvez left and you were not at the
7    facility on those days, who would give people their
8    assignments of where they were working on those days?
9    A.    **Basically Richard.**
09:56:38 10   Q.    That was part of his job responsibilities?
11   A.    **Right.**
12   Q.    Would it be fair to say that he could pretty
13   much put people wherever he wanted them to work?
14   A.    **Yes. That's fair to say.**
15   Q.    Is it fair to say that some jobs are more
16   laborious than other jobs at the plant? Some jobs are
17   harder to do than others physically?
18   A.    **There's some easier. There's some harder. But**
19   **some of the jobs have the same category where it doesn't**
09:57:14 20   **require a lot of training. Operating forklifts,**
21   **machines. We wouldn't have them do that.**
22   Q.    Them, you mean the general laborers?
23   A.    **Yes.**
24   Q.    Okay. And both Ms. Brenda Sims and Ms. Linda
25   Sims and Ms. Minix were general laborers, is that

75

1    correct?
2    A.    **Correct.**
3    Q.    Did you ever speak to Mr. Fetner about him
4    telling Brenda Sims that she only had to work one job?
5    Did that ever come up?
6    A.    **It came up when I talked to Richard that**
7    **morning.**
8    Q.    Okay.
9    A.    **I told him I had the conversation with the five**
09:57:50 10   **hourly employees.**
11   Q.    All right. Tell me what was said only about
12   the contention that he had told Ms. Sims she would only
13   do one job?
14   A.    **Tell you about what I told Richard?**
15   Q.    And what he told you, if anything?
16   A.    **I told Richard that the conversation started**
17   **out where an employee had an issue with working**
18   **different areas. And he said that that was silly. And**
19   **I said, but that was the start of it. And then it led**
09:58:24 20   **into --**
21   Q.    The other stuff?
22   A.    **Yeah.**
23   Q.    Okay. Is that all that was said about Ms.
24   Sims' contention about she was hired to do one job?
25   A.    **Yes.**

76

1    Q.    All right. Now, back to the paint room. Tell
2    me what was said after you all concluded your
3    conversation regarding job responsibilities.
4    A.    **After we wound that conversation down, then**
5    **Lorena said that we need to talk about some other issues**
6    **or some other things going on. And I said, okay, what**
7    **do we need to talk about. She said that we need to talk**
8    **about Richard and some of the things he's saying and**
9    **some of the things he's been doing.**
09:59:08 10   Q.    And what did you say?
11   A.    **I said, is this something that needs to be**
12   **dealt with as a group or does this need to be an**
13   **isolated situation. She said that she -- she was**
14   **speaking on behalf of the group of hourly employees.**
15   **I said, this is something that we can talk about right**
16   **here with everybody here. I said, if you're comfortable**
17   **doing that, let me know what you want -- or what you**
18   **want to talk about.**
19   **So, Lorena said -- she started out. She said**
09:59:36 20   **that Richard is harassing her. That Richard and her had**
21   **a relationship. That she and Richard had the**
22   **relationship where it was sexual. That she said, quote,**
23   **we had sex. And that she still works there. And**
24   **Richard is still trying to ask her out, and their**
25   **relationship was all over with.**

85

1    Q.    So, in your opinion was that conduct, if true,
2  a violation of Jeld-Wen harassment policy?
3          MR. THOMPSON:  Object to form.
4          THE WITNESS:  If it's true, it's odd.
5    Q.    BY MR. DOUGLAS:  It's what?
6    A.    It's odd.
7    Q.    Odd?
8    A.    For someone to train and do that.  If that's
9  what happened.
10:17:42 10   Q.    Okay.  But is it a violation of Jeld-Wen policy
11  in your opinion?
12          MR. THOMPSON:  Object to form.
13          THE WITNESS:  Well, I'm taking notes.  And I'll
14  have the legal people hash it over and go through it.
15    Q.    BY MR. DOUGLAS:  Okay.  I understand that.  But
16  you are bound to follow the policy as well, correct?
17    A.    That's correct.
18    Q.    Okay.  You don't just investigate?  You have to
19  follow the policy as well, correct?
10:18:06 20   A.    I do.
21    Q.    Okay.  So, in your opinion would that violate
22  the policy?
23          MR. THOMPSON:  Object to form.
24          THE WITNESS:  I think that there is an issue
25  there if that's what's happening.

86

1    Q.    BY MR. DOUGLAS:  Is that a yes?
2    A.    That's a yes.
3    Q.    All right.  Who is left?
4    A.    Then you have got Kathy Thornton.
5    Q.    Okay.
6    A.    Okay.  Kathy said that she had a conversation
7  with Richard where Richard implied that if she was
8  willing to go in the back of the plant to give him a
9  blow job, if she would go.  I said, what exactly did
10:18:52 10  Richard say.  She said she couldn't remember the words.
11  But the conversation implied that if she was willing to
12  go in the back of the plant, Richard would meet her back
13  there for a blow job.  I asked if anybody else heard
14  that -- heard that conversation.  She said no.  I asked
15  if she obliged to the request.  She said no.  She said,
16  are you kidding.  I said, how many times did
17  Richard imply this.  She said, the one time.  And one
18  time was enough.
19          The next thing she said was that some time ago
10:19:34 20  when it was cold out that her nipples were erect.  She
21  walked past Richard, and Richard did a mmm, mmm gesture.
22  And she just kind of looked at him and kept on going.  I
23  asked her how many times that happened.  She said it was
24  just the one time.  But she didn't think it was right.
25    Q.    Okay.  Certainly any proposition to do anything

87

1  on premises would be a violation of the policy?
2    A.    Absolutely.
3    Q.    Okay.  If true?
4    A.    Right.
5    Q.    How about the remark regarding, you know, her
6  nipples?  Would that be a violation of Jeld-Wen sexual
7  harassment policy?
8    A.    A violation of policy?  No.  I would say no.
9    Q.    Did she tell you about any other incidents?
10:20:28 10   A.    No.  That was her two.
11    Q.    Okay.  So, what was said next at the meeting,
12  if anything?
13    A.    We had already been there for about half an
14  hour.  Spent maybe 10 minutes talking about the issue of
15  moving people around and that that's not just Richard
16  picking on Brenda.  They all concurred that that's what
17  happens, and that's not a problem.  20 minutes on this
18  topic right here.
19          I summarized everything by saying that I
10:21:00 20  thought that this is a little unusual that this is all
21  going on.  I asked how long has Richard been making
22  these gestures or doing these things that you are saying
23  are inappropriate.  And they all said it's been going on
24  forever.  That's just the way Richard is.  I said, this
25  has been going on forever.

88

1          I told them I have been coming down to the
2  plant for two and a half, three years.  I pointed out
3  Lorena and Kathy Thornton and Lisa Cook, that they had
4  been there for at least since the end of 2001.  That
5  they know what the Jeld-Wen policies are, the harassment
6  policies.
7          Lorena, of all people, in July of 2003, you had
8  an issue with an hourly employee of harassment.  You
9  went through the right procedures.  You seem to think
10:21:56 10  that what we -- how we acted on that, that we did what
11  we are supposed to do.  You two or you three went
12  through the harassment training.  You all signed off on
13  it.  The two new hourly employees, Linda and Brenda, you
14  have signed the book.  I said, why is this brought up
15  right now.  And then they said, well, really -- Lorena
16  said I've had issues with Richard all along.  But ever
17  since Pat left it's -- for the last month or two Richard
18  is getting to be real bossy.  So, I said, so, it hasn't
19  gone on forever.  And they all said, no, it's just in
10:22:38 20  the last month or so.  And that's why we want to bring
21  it to your attention right now.
22          So, I told them that we take this serious.  You
23  all know what our policy is.  That we don't tolerate it.
24  It's zero tolerance.  I do have to listen to the other
25  side.  You are all talking about one person, and it was

89

1    Richard. And it's not anybody else at the plant. And
2    they said that's true, it's Richard. I said, I will
3    talk to Richard right now. I told them that I believed
4    that Richard was at a doctor's appointment. I want to
5    get with Richard, and I want to talk to him about this.
6    And I will be getting back to you five hourly employees
7    before the end of the day.
8            And then I said, what would you like me to do
9    as we stand right here. They said, we just want the
10   dialog and the conversation stopped. We just want to
11   work here, do our thing, and not be harassed by Richard.
12   Q.    And what did you say?
13   A.    And I said, that's fair enough. That's great.
14   I will get back to you by the end of the day.
15   Q.    Okay. So, none of them asked that Richard be
16   fired. Is that the point that you're making?
17   A.    No. That's right.
18   Q.    Okay. So, was that all that you can remember
19   about the conversations with the five hourly employees?
20   A.    At that --
21   Q.    At that time?
22   A.    Between 9:00 and 9:30 that morning.
23   Q.    Okay. So, what did you do -- before I ask you
24   that, had you ever observed any of this behavior in Mr.
25   Fetner prior to this date?

90

1    A.    No.
2    Q.    Since you have been at Jeld-Wen, have you ever
3    observed that type of behavior?
4    A.    With Richard?
5    Q.    With anybody?
6    A.    No.
7    Q.    So, the whole time you have been with the
8    company, you have never heard a supervisor making any
9    type of innuendo to an hourly employee?
10          MR. THOMPSON: Sexual innuendo.
11   Q.    BY MR. DOUGLAS: Sexual innuendo?
12   A.    Not that I recall, no.
13   Q.    Okay. Well, is that something you would
14   forget?
15   A.    I --
16          MR. THOMPSON: Object to form.
17          THE WITNESS: I don't believe that I have heard
18   of any.
19   Q.    BY MR. DOUGLAS: Okay.
20   A.    This is the first.
21   Q.    All right. So, tell me what happens at 9:30 or
22   thereabouts on the 13th of 2004?
23   A.    I went up to Pat's office, called Richard, I
24   believe on his cell phone. He was either at a dentist
25   or a doctor's office. I got ahold of him, told him I

91

1    had a situation I wanted to talk to him about. That
2    when he gets done call me, and I will meet him somewhere
3    where we can sit and talk and have coffee, but somewhere
4    that's kind of private. I think he suggested to meet at
5    the Huddle House, which is right there in Roanoke.
6    Q.    Right.
7    A.    Great place to eat, good coffee. About 20
8    minutes later -- maybe it's about 10:00 or 10:30 he
9    called. He said, I'm done, I'll meet you over there.
10   So, I met him over there.
11   Q.    So, then what happened?
12   A.    That's when I told him that I had an
13   interesting conversation with five hourly employees just
14   about an hour ago.
15   Q.    What did he say?
16   A.    He said, well, like what. I said, well, it has
17   to do with -- it borders harassment, and it all involves
18   with you. And he was surprised. He wanted to know who
19   the employees were. I told him I'm not going to say any
20   names, and he didn't think that was fair. He said,
21   well, what are they saying. I said, well, I'm not going
22   to get into anything specific just in case it relates to
23   something you can remember for retaliation. And he
24   said, okay, fair enough. What's the general tone. I
25   said, it's harassment. I said, some things that I think

92

1    I can pinpoint that has been going on for the last month
2    or two even though some people think it's longer.
3            He said, I know who you're talking about.
4    You're talking about Lorena. I said, well, there's
5    several that are telling me about this, and it's a
6    little disturbing. Plus, it's disturbing that this is
7    coming up right now.
8            He said, well, I know who you are talking
9    about. It's Lorena. We did have a thing going. I
10   said, I understand that from this morning. He said, but
11   that was years ago. And he volunteered to talk about
12   his situation, that he had sex with her. And I said, I
13   understand that, because she told me that point blank.
14   And he said that -- I said, I'm surprised to hear this,
15   because I haven't heard any of this. I haven't heard
16   any animosity between you and any employee, and this is
17   coming up right now. He said, well, there is this thing
18   going on, and she wants to hurt me. She doesn't want to
19   see me succeed. And she wants to put me in my place.
20   Q.    What's the thing going on that he was referring
21   to?
22   A.    Their relationship.
23   Q.    Their relationship?
24   A.    Yeah. That they had a thing. A sexual
25   relationship.

**93**

1    Q.    The previous relationship?

2    A.    Yeah.

3    Q.    What did you -- when you told him that it was

4    disturbing that it was coming up right now, what did you

5    mean by that?

6    A.    Because I hadn't heard anything of all the --

7    from Pat, from word of mouth.

8    Q.    You just meant it was out of the blue type

9    thing?

10   A.    Just, yeah, boom. Five hourly employees. He

11   said, well, I understand Lorena. Because she's going to

12   try and get two or three other people to side with her

13   and talk to her about that. I said, is this something

14   that you are concerned about or that I should be

15   concerned about. He said, I don't think so. I don't

16   think there was anything I did that was inappropriate,

17   that was illegal.

18         I said, well, you know everything there is to

19   know about the Jeld-Wen policies and the harassment

20   thing and you went through the training, which several

21   other people went through. Was there something you

22   don't understand about it. He said, again, there isn't

23   anything that I have done to bring this up.

24         I said, well -- I said, do you -- since you

25   brought up Lorena, do you treat her different than

**94**

1    anybody else. He said, I think so. He said, since we

2    had a little thing going, there's times that I'll pat

3    her on the butt or she'll take and slap me back with a

4    stick or something like that. But he said it's all fun.

5    He said, sometimes he'll take and come up behind her and

6    do a little bear hug. I said, okay, I have heard that,

7    the bear hug. I said, but you're not meaning to hurt

8    her. He said, it's just a thing we did. I said, would

9    you do that with any other employee. He said, no, not

10   really. He said, but it's a small plant, and we're all

11   family there. And if anything, I take care of a lot of

12   people.

13         I said, I'm concerned about the fair treatment

14   that you have with one hourly employee than the other.

15   And you are telling me that with Lorena you can probably

16   say or do things. He said, well, she dishes out the

17   same thing that I would do. But it isn't -- I mean, we

18   don't hurt each other. We have a -- it's a great

19   working relationship.

20   Q.    Did he give you examples of when she dished it

21   back?

22   A.    No. But the thing about -- he brought up the

23   bear hug. So, evidently he must have known that that

24   was a problem with her.

25   Q.    Okay.

**95**

1    A.    And I said, do you do that out in the open

2    floor or is it when you are away from the premises. He

3    said, it's there at the plant, but it's not sexual in

4    nature, and I'm not -- in my view he said, I'm not doing

5    anything illegal.

6          I said, well, that's why I am talking to you

7    right now. Because I had a conversation with employees

8    this morning. I want to talk to you about it. I'm

9    going to have to dig further into this thing because

10   it's not -- there's something that's not right. So, I'm

11   going to document this. I'm going to do what we

12   normally do is report it to legal.

13         And he said, you know, this isn't right. He

14   said, this isn't -- he said, I can't be accused of

15   something like this and have this happen to me. He

16   said, I'm going to make life easy for you. I'm not

17   going to get involved with this thing. I'm not saying

18   that I'm admitting guilt. But just like last year when

19   we talked, 2003, I have an opportunity to go somewhere

20   else. And I feel very uncomfortable about the plant

21   going to be open and closed and everything else.

22         He says, what are my options. I said, well,

23   you can stay here. But I'm going to -- if you stay with

24   the company, we're going to be dealing with the legal

25   department because they're going to sort the thing out

**96**

1    just like they did in July of 2003. He said, well, I'll

2    make it simple for you. I'm going to resign. I said,

3    are you resigning right now. He said, yes, I am. He

4    said, I'm not going to deal with it. I said, if that's

5    what you want to do, I'll accept that.

6          And I had him write down right there on a piece

7    of paper right there, I, Richard Fetner resign any

8    position of General Manager of Jeld-Wen Roanoke, Alabama

9    as of whatever that date was, 10-13. I told him if

10   that's what he wanted to do, I'm not going to fight it.

11   I would prefer that he come to the plant after everybody

12   leaves so it's not uncomfortable for him and some other

13   people, and he can pick up his things. And he did.

14         And he asked that I treat him fair with the

15   severance package. I told him that that will be -- it's

16   a standard thing. It's whatever hours you have worked,

17   and it will be a format. I'll get that to him. I'll

18   have him look at it. He'll sign off on it. And I did.

19   That's when I met him the week after that.

20   Q.    All right. So, is it fair to say that you made

21   no attempt to talk him out of resigning?

22   A.    Yes. That's fair to say.

23   Q.    You were satisfied that he do that?

24   A.    Right.

25   Q.    At that point in time when you were having that

97

1    conversation with Mr. Fetner after you had heard the
2    five hourly employees stories and you had heard a part
3    of what Mr. Fetner would say, did you believe or
4    disbelieve either one of the sides?
5         MR. THOMPSON:  Everything or about --
6    Q.   BY MR. DOUGLAS:  I'm sorry.  That was a bad
7    question.  I guess you would say that Mr. Fetner and
8    Lorena Minix pretty much agreed on what had happened?
9    A.   Yes.
10:33:28 10   Q.   Their stories were the same, right?
11   A.   Yeah.
12   Q.   Actually identical?
13   A.   Yeah.  They both admitted a relationship, sex.
14   Q.   And then the incident --
15   A.   They broke it off.
16   Q.   -- the bear hugging?
17   A.   Yeah.
18   Q.   But with regard to the other employees, did you
19   -- at that time did you believe what they were saying?
10:33:46 20   A.   My tendency was not to or that it was
21   embellished.  It was brought up.
22   Q.   So, you thought they were setting him up?
23   A.   Yes.
24   Q.   Okay.  I'm going to show you a document which
25   was produced to me by your lawyers or Jeld-Wen's lawyers

98

1    I should say.  It's, for the record, marked Bates Number
2    00121.  Do you recognize that document?
3    A.   Yes.
4    Q.   Okay.  What is it?
5    A.   That's the employee signing off on the Rob
6    Sturm anti-harassment training.
7    Q.   Okay.  Is there a date on it?
8    A.   7-24-03.
9         MR. THOMPSON:  For the record, it's actually a
10:34:42 10   two page document.  You have only handed him one page of
11   it.  Do you want me to elaborate?
12        MR. DOUGLAS:  Yeah.
13        MR. THOMPSON:  There is a second page with
14   three or four names on it.  And the copy you have got is
15   probably out of a personnel file where the person who is
16   listed on that particular page and the page was put in
17   their personnel file.
18        MR. DOUGLAS:  Is Mr. Fetner's name on the other
19   page?
10:35:12 20        MR. THOMPSON:  It is.
21        MR. DOUGLAS:  Okay.
22        MR. THOMPSON:  And it's in his personnel file
23   that was produced to you.
24   Q.   BY MR. DOUGLAS:  Got you.  Okay.  Is this the
25   -- the only reason I gave it to you is you referenced

99

1    with Mr. Fetner that he had gone through the training?
2    A.   Yes.
3    Q.   Is this the training you were referring to?
4    A.   Right.
5    Q.   Okay.  That's all I wanted to know.  Had Mr.
6    Fetner not resigned, what would you have done next?
7    A.   Contacted legal.  I would have told Richard
8    just to sit tight, don't go to the plant that day.  I'm
9    going to go back and talk to legal.  Of course, they are
10:35:54 10   two hours behind us.  And that I would get back to him
11   at the end of the day and find out what steps we need to
12   take to proceed with the issue at hand.
13   Q.   Okay.  And would you have talked to the hourly
14   employees after you spoke to legal?
15   A.   Yes.
16   Q.   And at that point I guess it would have been
17   legal's call on what to do --
18   A.   Right.
19   Q.   -- with regard to the workplace?
10:36:16 20   A.   Correct.
21   Q.   Is there such a thing at Jeld-Wen as suspension
22   without pay?
23        MR. THOMPSON:  Object to form.
24        THE WITNESS:  Suspension without pay.
25   Probably.  There is.

100

1    Q.   BY MR. DOUGLAS:  There is?
2    A.   Yeah.
3    Q.   Okay.  Who is authorized to suspend an employee
4    without pay?
5    A.   I would.
6    Q.   So, you could do that?
7    A.   Yeah.
8    Q.   Okay.  Not talking about this situation.  Can
9    you envision a situation regarding sexual harassment
10:36:52 10   where you would do that with a supervisor?
11   A.   Where I would envision suspension without
12   pay —
13   Q.   Yes.
14   A.   -- with a supervisor?
15        MR. THOMPSON:  Object to form.
16        THE WITNESS:  Possibly.
17   Q.   BY MR. DOUGLAS:  Okay.  Let me ask it this way.
18   If Mr. Fetner had admitted to propositioning Kathy
19   Thornton on the job site --
10:37:18 20   A.   Yes.
21   Q.   If he admitted to that, what action would you
22   have taken?
23        MR. THOMPSON:  Object to form.
24   Q.   BY MR. DOUGLAS:  You can answer.
25   A.   I would have talked to both of them.  If that's

101

1    what the case was, I would have let him go, termination.

2        Q.    You would have fired him right then?

3        A.    Yeah.

4        Q.    Okay.  So, after you had conducted your

5    investigation, had Mr. Fetner not resigned, you were

6    just going to proceed down the investigative path with

7    legal?

8        A.    Correct.

9        Q.    Okay.  But we never got to that because he

10   quit?

11       A.    Right.

12       Q.    Why is it your opinion that the hourly

13   employees were trying to set Mr. Fetner up?

14       A.    Only based on what Richard said.  That Lorena

15   is behind this.  She's the ringmaster.  And she's trying

16   to get other people to come up with stuff against him to

17   make him look bad.  Plus, it's just a shock to me that

18   have heard or seen anything.  And on that day five people

19   that day have an issue with Richard.  Not two weeks

20   before that.  Not a year before that.  Right then.  It

21   was odd.

22       Q.    So, it was a combination of Mr. Fetner being

23   believable to you and the situation of everybody

24   happening to converge all at one time?

25       A.    Right.

102

1            MR. THOMPSON:  Object to form.

2        Q.    BY MR. DOUGLAS:  Why was Mr. Fetner paid a

3    severance package?  Was that standard?

4        A.    Policy.

5        Q.    Okay.  So, that would have been the case if

6    anybody had resigned that day?

7            MR. THOMPSON:  Object to form.

8        Q.    BY MR. DOUGLAS:  Or not?

9        A.    That's a policy with management.

10       Q.    Okay.  Because he was a group manager?

11       A.    Because he -- right.

12       Q.    Okay.  And what was the severance package, if

13   you recall?

14       A.    The dollar amount?

15       Q.    Yeah.

16       A.    Around $4,000, $5,000.

17       Q.    Okay.  What did that include?

18       A.    Unused vacation, vacation earned in 2004 for

19   2005.  That was part of his contribution to the 401-K

20   put in.  Plus, the managers have a bonus program that

21   they get put in.  And that's all accumulated for the

22   years of service.  So, I think there's four categories

23   that totaled the bonus up.

24       Q.    All right.  So, the amount that he did receive

25   was part of a company formula?

103

1        A.    Yes.

2        Q.    Is that fair to say?

3        A.    Right.

4        Q.    He wasn't treated any differently than any

5    other person in management that would have resigned?

6        A.    That's correct.

7        Q.    I'm not saying he would have gotten the same

8    amount of money.  But everybody would have been subject

9    to the same format?

10       A.    It's the same format, right.

11       Q.    Okay.  If a management employee like Mr. Fetner

12   is terminated, do they receive a severance package?

13           MR. THOMPSON:  Object to form.

14           THE WITNESS:  If he's terminated?

15       Q.    BY MR. DOUGLAS:  Fired?

16       A.    Just for what reason?

17       Q.    For cause.  Let's say it's for stealing?

18       A.    No.

19       Q.    No severance package?

20       A.    No.

21       Q.    How about if they were fired for sexual

22   harassment?

23       A.    I don't think so.

24       Q.    Who would know for certain?

25       A.    Legal.

104

1        Q.    Okay.  Mr. Sturm?

2        A.    Yeah.

3        Q.    Was Mr. Fetner asked to sign any sort of

4    release releasing Jeld-Wen from liability when he got

5    his severance package?

6        A.    On the standard severance package form when it

7    spells out the dollar amounts you get, there's three or

8    four pages that explain things.  And there is a release

9    statement.  And they sign that.

10       Q.    Releasing the company from all liability?

11       A.    Right.

12       Q.    You were at the depositions of Ms. Minix and

13   Ms. Brenda Sims?

14       A.    No -- well, yeah.  Not -- Brenda Sims and --

15   right, not Linda.

16       Q.    I'm correct, aren't I?

17       A.    Say that again.

18       Q.    You were at the depositions of Ms. Minix and

19   Ms. Brenda Sims?

20       A.    Correct.

21       Q.    You saw the releases that they were given or

22   the severance agreements or whatever you want to call

23   them?

24       A.    Yes.

25       Q.    Actually, it's not the ones they were given.

105

1    It was just a standard -- it was just a --
2    A.    Right.
3    Q.    A copied one?
4    A.    Right.
5          MR. THOMPSON:  Exemplar?
6    Q.    BY MR. DOUGLAS:  Right.  Thank you.  Exemplar.
7    If you know, why were they given those documents?
8    A.    Just those two or all employees?
9    Q.    If the answer is different, then tell me what
10   the difference is.
11   A.    All of the hourly employees were given the
12   severance package.  All different rates, different
13   things.  But it all had the same formula.
14   Q.    And what formula was that?
15   A.    It's the Jeld-Wen formula for the vacations and
16   the vacations earned, 401-K money put in there.
17   Q.    What's the difference in the hourly employees
18   and the management severance package just in categories?
19         MR. THOMPSON:  Object to form.
20         THE WITNESS:  The management has a different
21   bonus program.
22   Q.    BY MR. DOUGLAS:  Okay.
23   A.    Different vacation.
24   Q.    Okay.  So, why were the hourly employees given
25   the severance package, because the plant was closing?

106

1    A.    Yeah.
2    Q.    Why was it closed, if you know?
3    A.    Why was it closed?
4    Q.    Uh-huh (Affirmative).
5    A.    It was financial.  Not doing well.
6    Q.    Do you know when the decision was made to close
7    the plant?
8    A.    Early -- or the budget of 2003.  It was put on
9    the fix, close, sell mode which means it's in trouble.
10   Q.    Okay.  So, in early 2003?
11   A.    Not early.  Just the budget of 2003, which is
12   October.
13   Q.    And, so, it stayed open another year?
14   A.    It was to stay open at least the first quarter
15   of 2004.  And then see what happens after that.  Then it
16   was on a month-to-month.
17   Q.    Do you know when the final decision was made to
18   close it?
19   A.    Sometime the end of September of 2004 my boss,
20   Don Schneider, called me.  We were about ready to do
21   budgets in early October.  And, he said, don't do the
22   budget for Roanoke.  When we get here, we are going to
23   talk about the closure procedures and severance
24   packages.  And just do the budget for Sparta and Quebec,
25   not Roanoke.

107

1    Q.    Did you tell Mr. Fetner about this
2    conversation?
3    A.    I did when I gave him his severance package.
4    Q.    In October of 2004?
5    A.    Right.
6    Q.    So, between September and October, did you tell
7    anybody at the Roanoke facility?
8    A.    Yes.
9    Q.    Who did you tell?
10   A.    Pat Galvez and Richard.  This is October of
11   2003.
12   Q.    Oh, you told them that the plant was in
13   trouble?
14   A.    Yes.
15   Q.    That it was on a fix, close?
16   A.    Fix, close, sell mode.
17   Q.    Sell mode.  Okay.
18   A.    And we shipped Joe Mendoza.  He was transferred
19   back to Corsicana, Texas.
20   Q.    Were any of the employees offered positions at
21   Jeld-Wen plants anywhere else?
22   A.    Well, we made the announcement -- or I made the
23   announcement on October, I think, 21st, I gave everybody
24   their letter.  Basically, our 30 day notice that we were
25   shutting the plant down.  And that if anybody wanted to

108

1    work at other Jeld-Wen facilities to let us know.  And I
2    listed where the closest plants were.
3    Q.    Did you make any direct solicitation of any
4    employees to work at another Jeld-Wen plant?
5    A.    Do you mean --
6    Q.    At the Roanoke facility?
7    A.    Did I make any direct -- for any one person to
8    work somewhere?
9    Q.    Any -- yes.
10   A.    I don't think so.
11   Q.    Okay.  So, you didn't offer any employees the
12   opportunity to work at another Jeld-Wen facility
13   individually?
14   A.    No.
15   Q.    Okay.
16   A.    It was I had a meeting at the end of the day,
17   whatever that day was, on the 21st.  3:30 when I passed
18   out the 30 days notice and told them that this is what's
19   going on, and that we have other plants in Wedowee and
20   Hartselle, Alabama, and Austell, Georgia.  The closest
21   one is Sparta, Tennessee.  And if the opportunity
22   presents itself and if they are willing to move, we can
23   all talk about it.
24   Q.    Okay.
25   A.    So, you have got at least 30 days to think

113

1  before we leave that, on the 13th of October.  Does
2  Jeld-Wen have a policy about interviewing complaining
3  employees privately?
4     A.  **Complaining to employees privately?**
5     Q.  No.  Complaining employees privately,
6  interviewing them in a private place, one-on-one?
7     A.  **I don't know.  I don't think so.**
8     Q.  Okay.  Would you agree with me that the better
9  practice for the October 13th meeting between you and
10  the employees would have been for you to have met with
11  each one of them individually?
12     MR. THOMPSON:  Object to form.
13     THE WITNESS:  To me that was up to them.  They
14  felt relaxed.  And they are the ones that -- I even
15  offered.  Especially after Lorena mentioned that she was
16  -- had a sexual involvement with Richard -- if they all
17  wanted to do this one-on-one.  And they said, we are
18  okay with this.
19     Q.  BY MR. DOUGLAS:  Well, I believe you testified
20  earlier that Lorena said they we're okay with this?
21     A.  **Yeah.  Well, they acknowledged.  They were all**
22  **-- whatever she said, they all followed.  They were all**
23  **--**
24     Q.  They all shook their heads, is that correct?
25     A.  **Yeah.  They all said yes.  They all were happy**

114

1  with all talking about it in an open environment.
2     Q.  Okay.  So, you would disagree with me that the
3  better practice would have been to interview each of
4  them privately?
5     MR. THOMPSON:  Object to form.
6     THE WITNESS:  I think that the interview that I
7  had with the five employees was good.  It was okay.
8  They were comfortable with it.  I was comfortable with
9  it.
10     Q.  BY MR. DOUGLAS:  Okay.
11     A.  **If they weren't, I would have set up a time,**
12  **and we would have talked individually.**
13     Q.  Would you agree with me that sometimes it's
14  easier for people to divulge things one-on-one than in
15  front of people, particularly if the things being
16  disclosed are embarrassing?
17     MR. THOMPSON:  Object to form.
18     THE WITNESS:  I don't agree with that.
19     Q.  BY MR. DOUGLAS:  Okay.  All right.  I'm going
20  to show you a document produced in discovery by
21  Jeld-Wen's attorneys to me Bates stamped 00316.
22     MR. THOMPSON:  Go ahead and read the letter, D.
23  We have third-party documents.  So, it would be "T" as
24  in Tom.
25     MR. DOUGLAS:  "D" as in?

115

1     MR. THOMPSON:  Dog.
2     Q.  BY MR. DOUGLAS:  00316.  Do you recognize that
3  document?
4     A.  **I do.**
5     Q.  Did you write that letter?
6     A.  **I did.**
7     Q.  When was it dated?
8     A.  **October 21st, 2004.**
9     Q.  All right.  Would you please read it,
10     A.  **Dear, then we put the employee's name in.  It**
11  **is with deep regrets that Jeld-Wen has decided not to**
12  **operate the Jeld-Wen Millwork Manufacturing, in**
13  **parentheses, Roanoke, Alabama plant in 2005.  The**
14  **purpose of this letter is to confirm that notice is**
15  **being given to you on this date, October 21st, 2004,**
16  **that your employment will be terminated in 30 days.**
17        **Next paragraph, all regular full-time employees**
18  **who stay for the 30 days will receive benefits in**
19  **accordance with the Jeld-Wen's severance policy.**
20  **Severance benefits include, prorated five year bonus,**
21  **severance pay, and current accrued vacation pay.**
22        **Last sentence, I want to personally thank all**
23  **employees that have given your dedicated service to our**
24  **company, and wish each and every one of you the very**
25  **best of success in the future.  Very truly, Jeld-Wen,**

116

1  Daniel A. Hees.
2     Q.  Did you draft that letter?
3     A.  **Yes.  But it was a standard wording where I put**
4  **the Roanoke, Alabama and the dates.**
5     Q.  Okay.  Were the word choices in here yours?
6     MR. THOMPSON:  Object to form.
7     Q.  BY MR. DOUGLAS:  Let me ask you a more specific
8  question.  The sentence which said -- the second
9  paragraph.  All regular full-time employees who stay for
10  the 30 days will receive benefits in accordance with
11  Jeld-Wen's severance policy, severance benefits include
12  prorated five year bonus, severance pay, and current and
13  accrued vacation pay?
14     A.  **That's Jeld-Wen.  That was not my wording.**
15     Q.  You didn't choose those words?
16     A.  **No.**
17     Q.  Who chose those words, if you know?
18     A.  **I don't know who chose them.  But the person**
19  **that I talked to about the draft was Lisa Bode.**
20     Q.  In Klamath Falls?
21     A.  **In Klamath Falls.**
22     Q.  All right.  I'm going to show you a document
23  which was marked Exhibit 72 to the deposition of Lorena
24  Minix.  Do you recognize that document?
25     A.  **Yes.**

121

1    Q.    Did -- tell me what else was said during that
2    conversation about the instigation of legal proceedings.
3    A.    **That was basically it. He said he had heard**
4    **rumblings, that there were some issues filed. And,**
5    **again, at that time when I talked, there was no decision**
6    **with the E.E.O.C.**
7    Q.    Did he say that it was all not true?
8    A.    No.
9    Q.    Did he express any sort of concern or dismay
11:09:00 10    that there were legal proceedings going on about the
11    incidents?
12    A.    No.
13    Q.    Have you told me everything that you and Mr.
14    Fetner discussed regarding the litigation of the
15    incidences at that meeting?
16    A.    I believe so.
17    Q.    Okay. If a supervisor hugs an employee and the
18    employee asks the supervisor to stop and not to do it
19    anymore, is there any scenario in which the supervisor
11:09:52 20    should do it again?
21    A.    Is there any scenario?
22    Q.    Yeah.
23    MR. THOMPSON: Object to form.
24    THE WITNESS: I think if the supervisor is
25    asked to not do it, then they should not do it.

122

1    Q.    BY MR DOUGLAS: And if the supervisor asks an
2    employee out for dates and the employee declines and
3    asks that the invitations cease, should the invitations
4    cease?
5    MR. THOMPSON: Object to form.
6    THE WITNESS: I think that a supervisor or the
7    employee should respect the word of the other employee.
8    Q.    BY MR. DOUGLAS: I asked you earlier about an
9    alleged remark that Ms. Linda Sims testified about.
11:10:50 10    Now, you were not at her deposition, correct?
11    A.    No.
12    Q.    One of her allegations was that Mr. Fetner said
13    that one of your basketballs looks deflated, I have a
14    needle and will pump it up. And you said she didn't
15    tell you that, is that correct?
16    A.    **No. That's correct. She didn't tell me that.**
17    Q.    Would that remark, if made, be a violation of
18    Jeld-Wen sexual harassment policy?
19    MR. THOMPSON: Object to form.
11:11:18 20    THE WITNESS: Again, I don't know if it's a
21    violation. But it's something that needs to be brought
22    up.
23    Q.    BY MR. DOUGLAS: It's certainly an
24    inappropriate remark at a workplace?
25    A.    Yeah. It's not appropriate.

123

1    Q.    What about remarks like I could eat you from
2    head to toe? Would you consider those a violation of
3    Jeld-Wen sexual harassment policy?
4    MR. THOMPSON: Object to form.
5    THE WITNESS: Again, it has a connotation
6    that's a little sexual that I would be concerned about.
7    It needs to be dealt with.
8    Q.    BY MR. DOUGLAS: What about a remark like I
9    need four or five hours for sex directed to an employee?
11:11:56 10    Would you consider that a violation of the sexual
11    harassment policy of Jeld-Wen?
12    A.    Yes, if that was said.
13    Q.    Do you know anything about Kathy Thornton other
14    than she was an employee for Jeld-Wen?
15    A.    Such as?
16    Q.    Do you know anything about her personally,
17    anything about her personal life?
18    A.    **I had heard that she was separated or divorced**
19    **during the last year.**
11:12:40 20    Q.    In 2004?
21    A.    2004, yeah. I know that she had two kids.
22    **Because she worked in the paint line, and I saw the**
23    **pictures there.**
24    Q.    Okay. Did you know or did you hear that she
25    was in a custody situation with her to be ex-husband?

124

1    A.    No.
2    Q.    Regarding the children. You never heard
3    anything about that?
4    A.    No.
5    Q.    Would you consider unwanted touching of breasts
6    of a female employee a violation of Jeld-Wen's sexual
7    harassment policy?
8    A.    Yes.
9    Q.    Okay. I'm going to show you a document
11:13:50 10    produced in discovery, Bates stamped D00317, 318, and
11    319. And ask you if you recognize that document?
12    A.    I do.
13    Q.    What is it?
14    A.    **It's my notes on the meeting that myself and**
15    **the five hourly employees and I had on 10-13-04.**
16    Q.    Were these notes -- this is a typed document,
17    correct?
18    A.    Yes.
19    Q.    Okay. Who is it to? Who is it listed as to?
11:14:42 20    A.    To Jeld-Wen.
21    Q.    And it's from you?
22    A.    Right.
23    Q.    Did you have handwritten notes before you had
24    these typed notes?
25    A.    Yes.

125

1    Q.    Where are they?

2    A.    I don't have them.

3    Q.    Did you destroy them?

4    A.    I think so.

5    Q.    Would that be your policy to handwrite some

6    notes and then type it and then destroy your handwritten

7    notes?

8          MR. THOMPSON:  Object to form.

9          THE WITNESS:  I can't say it's a policy.  But

11:15:06 10    the notes that I had talking with the five employees, I

11    transferred them here so it made sense, so we could

12    document the --

13    Q.    BY MR. DOUGLAS:  The allegations?

14    A.    The conversation we had.

15    Q.    Okay.  Was there anything in your handwritten

16    notes that you intentionally did not put in the typed

17    version?

18    A.    No.

19    Q.    Okay.  There is nothing that you kept out, in

11:15:28 20    other words?

21    A.    No.

22    Q.    And who was the recipient of those notes?

23    A.    The Jeld-Wen legal.

24    Q.    Did you send these notes under cover of a

25    letter to anybody?

126

1    A.    No.  They were sent -- when I sent them out, it

2    was through e-mail.

3    Q.    Who did you e-mail them to?

4    A.    I think it was Rob and even Jennifer Johns --

5    or Jennifer Palmer now.  At that time it was Jennifer

6    Johns.

7    Q.    What is her position with the company?

8    A.    I think it's Jeld-Wen Legal Assistant.

9    Q.    Were these notes requested by anybody or did

11:16:22 10    you do this on your own.

11    A.    I did this on my own.

12    Q.    Did you ever e-mail Mr. Fetner at the Roanoke

13    plant while he worked there?

14    A.    No.  I don't think he had a computer.

15    Q.    Did you ever e-mail Roxi Giles?

16    A.    Ever e-mail her anything or e-mail this?

17    Q.    Well, did you ever e-mail her anything in 2004?

18    A.    2004, yeah.

19    Q.    Did you ever e-mail her anything regarding this

11:17:00 20    alleged -- these complaints --

21    A.    No.

22    Q.    -- by these workers?

23    A.    No.

24    Q.    Did you ever e-mail anything regarding these

25    complaints by the hourly workers to anybody other than

127

1    document 317 through 319?

2    A.    I don't think so.  I sent the -- some

3    information to the E.E.O.C.  But I think that was a

4    typed letter.  It wasn't an e-mail.

5    Q.    You didn't e-mail anything to the E.E.O.C.  I'm

6    pretty sure?

7    A.    They don't have computers?

8          MR. THOMPSON:  I'm not making a comment on the

9    record.

11:17:42 10    Q.    BY MR. DOUGLAS:  Okay.  Did you ever interview

11    or speak to Mary Lou Laws about any allegations of

12    harassment?

13    A.    No.

14    Q.    Do you know if anybody did?

15    A.    I don't know.

16    Q.    When you -- after Mr. Fetner resigned, that day

17    you had a meeting with the employees that you had talked

18    to earlier?

19    A.    With the five hourly employees I met at 9:00.

11:18:44 20    Q.    Okay.  And tell me about that conversation.

21    A.    This time we were meeting at the loading dock.

22    And I told them that I would -- was going to get back to

23    them, after I heard their conversation in the morning.

24    That I have talked to Richard.  And instead of going

25    into all the details, Richard no longer works at the

128

1    Jeld-Wen facility.  And he'll be coming back to pick his

2    stuff up.  He'll be coming back at the end of the day.

3    You won't have to see him, won't have to face him.

4          So, you complained to me this morning.  You had

5    some issues with Richard.  I told them that I did not

6    bring up their names or the incident.  Richard does know

7    that -- he seems to think that it's spearheaded by

8    Lorena.  And I was looking at Lorena when I said that.

9    And he doesn't -- that right now -- as of right now, he

11:19:52 10    no longer works at the plant.

11          So, you had an issue with me today.  I talked

12    to both sides about it.  Richard doesn't work here.

13    Your request was for it to stop, which I think it will.

14    I'll have to bring some management down from the Sparta

15    plant to fill in the gap.

16          I asked if their needs were taken care of, and

17    they said it was.  I asked them that during this time

18    whatever it was -- if it was a month or a week, did any

19    of them get short paid or did they lose time or did

11:20:26 20    their pay go down.  They said, no, absolutely not.  At

21    the end of the conversation, which was maybe 10 minutes,

22    they were all satisfied with it.

23          I asked them if they wanted me to bring in

24    Jeld-Wen legal, because we can still do that to document

25    everything.  They said, no, we're okay.  Thank you very

129

1  much. And that was around 12:00 or 1:00. So, they
2  worked the rest of the day, and everything was over
3  with.
4  Q.  Who did you bring down to work on an interim
5  basis?
6  A.  It was a guy — supervisor named Bob Boyse.
7  Q.  Can you spell his last name?
8  A.  B-O-Y-S-E.
9  Q.  Is he still with the company?
10 A.  He left the company in February of 2005.
11 Q.  Do you know why?
12 A.  Yeah.
13 Q.  Why?
14 A.  I let him go.
15 Q.  You fired him?
16 A.  Yeah.
17 Q.  What for?
18 A.  For not doing his job.
19 Q.  What does that mean?
20 A.  He wasn't performing.
21 Q.  Poor performance?
22 A.  Poor performance.
23 Q.  Okay. No allegations of sexual harassment
24 against him made by anybody?
25 A.  No.

130

1  Q.  All right. I'm going to show you a document
2  Bates stamped D00320 and ask you if you recognize it?
3  MR. THOMPSON: You have handed him D320 through
4  321?
5  MR. DOUGLAS: 321, yes.
6  THE WITNESS: I do recognize it.
7  Q.  BY MR. DOUGLAS: Can you tell me what it is?
8  A.  It's my recap of the meeting that I had with
9  Richard Fetner.
10 Q.  Who is it to?
11 A.  Jeld-Wen.
12 Q.  And it's from you?
13 A.  Right.
14 Q.  And what date was the memo generated?
15 A.  10-13-04.
16 Q.  That's the date it was generated?
17 A.  Well, it may have been a day or two days after
18 that.
19 Q.  Okay.
20 A.  This date right here is when I pulled this up
21 in Word. Whatever day it is, it will put this date on
22 there.
23 MR. THOMPSON: Tell him what date it is.
24 THE WITNESS: This date says 1-30-05.
25 Q.  BY MR. DOUGLAS: That would just be the day

131

1  that you pull it up on your computer to print it off?
2  A.  Yeah.
3  Q.  Do you know why you printed it off on 1-30-05?
4  A.  I think I was asked to send some documents to
5  Rob Sturm.
6  Q.  Okay. All right. The last paragraph on 320,
7  it says, I told Richard that I have heard enough from
8  our conversation this morning. It is my determination
9  that Richard cannot treat some employees differently
10 than others when it comes to this topic. He is backing
11 himself into a corner, and Jeld-Wen will not endorse his
12 actions. Did you tell him all of that?
13 A.  After he told me that he treated Lorena a
14 little different than he would with the bear hugs and
15 all that.
16 Q.  Was that a terminable offense?
17 A.  It was terminable?
18 Q.  Would you have fired him if he hadn't quit?
19 MR. THOMPSON: Object to form.
20 THE WITNESS: No. But I would have brought
21 Jeld-Wen legal in to sort it all out.
22 Q.  BY MR. DOUGLAS: The next sentence says, even
23 though this appears to be the early stage of an issue,
24 Jeld-Wen does not want to get involved in any further.
25 That as of today, Richard Fetner will no longer be

132

1  employed by Jeld-Wen. Did you write that?
2  A.  Right.
3  Q.  Then the next sentence says, I told Richard he
4  could pick up his things at the plant at 7:00 p.m. when
5  no employees are present. The next sentence, I would
6  like a letter of resignation tonight, and will work up a
7  severance package. You wrote all of that, correct?
8  A.  I believe.
9  Q.  Did you ever tell Richard that if he didn't
10 resign he would be terminated?
11 A.  No.
12 Q.  When you drafted this memo -- I'll withdraw
13 that. Do you know if Pat Galvez and Richard Fetner were
14 friends?
15 A.  I think just business.
16 Q.  Do you know if any complaints were made to Pat
17 Galvez regarding Mr. Fetner at any time?
18 MR. THOMPSON: Object to form.
19 THE WITNESS: As far as I know there was none.
20 Q.  BY MR. DOUGLAS: None ever came to your
21 attention?
22 A.  None. Right.
23 Q.  Had you ever heard that Lisa Cook complained to
24 Mr. Galvez regarding Fetner prior to the complaints you
25 received?

133

```
1    A.   Lisa Cook?
2    Q.   Yeah.
3    A.   No.
4         MR. THOMPSON:  I am sorry.  Was the question
5    Lisa Cook complained to Pat Galvez?
6         MR. DOUGLAS:  Yeah.
7    Q.   BY MR. DOUGLAS:  Lisa Cook's complaint to you
8    on the 13th of October, 2004, was that Richard had made
9    some invitation for a hot tub or shower at his house?
10   A.   Right.
11   Q.   Is that correct?
12   A.   Yeah.
13   Q.   Had Lisa Cook lodged that complaint to Pat
14   Galvez, what would Mr. Galvez' responsibilities have
15   been?
16        MR. THOMPSON:  Object to form.
17        THE WITNESS:  He would have gone through the
18   same process as he went through from July of the year
19   before that.
20   Q.   BY MR. DOUGLAS:  The Bowen incident?
21   A.   He would have taken the incident and talked to
22   everybody about it, report it to me.  If need be, get
23   legal involved.
24   Q.   Did Mr. Mendoza -- did you ever hear that Mr.
25   Mendoza received a complaint regarding Mr. Fetner at any
```

134

```
1    time?
2    A.   No.
3    Q.   Mr. Mendoza never told you if he did?
4    A.   From anybody or from Lisa?
5    Q.   From Kathy Thornton?
6    A.   No.
7    Q.   Do you know when Kathy Thornton began working
8    for Jeld-Wen?
9    A.   She was there at the end of 2001.  I believe
10   she had worked for that operation for over seven years.
11   Q.   Did Mr. Mendoza ever tell you of any complaints
12   by anyone regarding Fetner prior to your hearing from
13   Brenda Sims?
14   A.   No.
15   Q.   When was your first knowledge of an E.E.O.C.
16   complaint?
17   A.   Sometime around December of 2004.
18   Q.   How did you receive that communication?
19   A.   I think it came to me from legal, from Rob or
20   Jennifer Palmer.
21   Q.   What were you told?
22        MR. THOMPSON:  Object if you were told
23   something by legal in response to the charge.  I don't
24   want him going into what he was talking to his lawyers
25   about and stuff like that.
```

135

```
1         THE WITNESS:  So, what was the question again?
2         MR. DOUGLAS:  My question is, what did they
3    tell you about the complaint?  Are you telling him not
4    to answer?
5         MR. THOMPSON:  If the legal department is
6    telling him, it's going to be a privileged communication
7    in response to the charge.  So, don't answer that.
8    Q.   BY MR. DOUGLAS:  Okay.  After your conversation
9    with legal, what did you do?
10   A.   I think they wanted all the documents sent to
11   them, which they already had, because we already shipped
12   everything out there to them.
13   Q.   So, did you send them again?
14   A.   No.  But they didn't know they were sent.
15   Q.   Got you.
16   A.   And that once they get it sorted out, just kept
17   me posted on it.  And I was --
18        MR. THOMPSON:  Any kind of talking back and
19   forth you did, those conversations are privileged.
20        THE WITNESS:  Okay.
21        MR. THOMPSON:  And I'm telling you, don't tell
22   him what was said during those conferences back and
23   forth.  Okay?
24        THE WITNESS:  Okay.
25        MR. THOMPSON:  Do you understand that?
```

136

```
1         THE WITNESS:  I do now.
2         MR. THOMPSON:  Okay.
3    Q.   BY MR. DOUGLAS:  All right.  Now, at some point
4    were you involved in formulating a response to the
5    charge?
6    A.   Yes.
7    Q.   Okay.  Then at some point did you go to
8    Birmingham?
9    A.   Yes.
10   Q.   Okay.  Why did you go to Birmingham?
11   A.   To follow up on it.
12   Q.   Were you interviewed by the E.E.O.C.?
13   A.   Yes.
14   Q.   Did you tell the E.E.O.C. anything differently
15   than your testimony here today with regard to what you
16   did related to the incidences?
17   A.   That's pretty much the same.
18   Q.   Did you receive a copy of the charge made by
19   the -- my three clients?
20   A.   I believe so.
21   Q.   Okay.  Did you read what their allegations were
22   with regard to the harassment?
23   A.   Yes.
24   Q.   On the part of the Linda Sims charge dated
25   August 20th, 2004, provide a brief explanation of the
```

137

1  discriminatory action taken against you.  She put
2  touching, hugging, comments misspelled, saying my butt
3  looks like basketballs, and he needs to dribble.  Walks
4  by my machine like he is dribbling a basketball.  One of
5  my basketballs is smaller, and he has a needle to pump
6  it up.  Did you read that?
7       MR. THOMPSON:  Object to form.  You want me to
8  tell you why I'm objecting?
9       Q.   BY MR. DOUGLAS:  No.  That's fine.  Did you
11:33:10 10  read that?
11       A.   I didn't see that until the last couple of
12  months.
13       Q.   Okay.  So, you didn't see that in connection
14  with the E.E.O.C. charge?
15       A.   No.
16       Q.   Okay.  When you saw it in the last couple of
17  months, did it surprise you?
18       A.   It was pretty much the same that she had talked
19  about before, other than the needle and the pumping up.
11:33:32 20       Q.   Okay.  Did you give any thought to the fact
21  that she hadn't told you about that at the time?
22       A.   Yeah.
23       Q.   What did you --
24       A.   She could have told me about all of these
25  things.

138

1       Q.   Okay.  So, what, if anything, did you make of
2  her not telling you about that one thing -- that one
3  incident about the needle?
4       A.   If she was open enough to tell me about the
5  other issues she had, she could have bought that up.
6       Q.   One other thing.  I want to be sure I'm clear.
7  The two memos that you looked at earlier, your testimony
8  is they were created in October of 2004?
9       A.   They were created, yeah, within a week.
11:34:34 10       Q.   So, in October of 2004?
11       A.   Yes.
12       Q.   And the explanation for the date being January
13  30th is that's when you printed them off?
14       A.   Correct, yeah.
15       Q.   You were not told by anybody to create the
16  memos?
17       A.   No.
18       Q.   Do you have any other documents or do you know
19  of any other documents that relate to this matter, these
11:35:04 20  allegations by the five employees?
21       MR. THOMPSON:  Documents other than what?
22       THE WITNESS:  My notes or any document?
23       Q.   BY MR. DOUGLAS:  Do you know of any documents
24  that relate to these incidences?
25       MR. THOMPSON:  Object to form.

139

1       MR. DOUGLAS:  Did you answer that question?
2       THE WITNESS:  No, I thought --
3       MR. THOMPSON:  No, no.  You can answer.  I'm
4  only objecting to it.
5       THE WITNESS:  What was the question again?  Any
6  other documents?  Yes.  There is another document.
7       Q.   BY MR. DOUGLAS:  Okay.  What is that?
8       A.   The E.E.O.C. copies that I have that I had
9  received, when I read the comments on it, that didn't
11:36:10 10  spell out who the three employees were filing a
11  complaint against.  I think two of the three said that
12  they have a problem with the plant manager.  And the
13  plat manager is Pat Galvez.
14       And I wanted to clarify with either our legal
15  or E.E.O.C., if that's what they are talking about.  So,
16  I sent a letter to someone at the E.E.O.C. to clarify
17  that to make sure that Pat wasn't the target for this.
18       Q.   And you were satisfied that he was not?
19       A.   Yeah.
11:36:46 20       Q.   Did you offer future employment after the plant
21  closed to Ms. Minix specifically?
22       A.   Future employment after she was about to leave?
23       Q.   Yeah.
24       A.   She was one of the original --
25       MR. THOMPSON:  Just answer his question.

140

1       THE WITNESS:  Just like anybody else.  Not
2  individually.
3       Q.   BY MR. DOUGLAS:  Okay.  She was one of the
4  original ones.  What were you about to say?
5       A.   For the first 30 days she was one of the first
6  15 or 16 people to be separated.
7       Q.   What does that mean?
8       A.   That their jobs were over.  From the letter
9  that was the 21st of October to right before
11:37:32 10  Thanksgiving, 15, 16 employees there was no more work
11  left.
12       Q.   Why was she in that top group?
13       A.   Because she was doing the machining.  And all
14  the orders were shipped out.
15       Q.   Didn't have anything to do with her making a
16  complaint about Fetner?
17       A.   No.
18       Q.   How about either Ms. Sims?
19       A.   No.  After the work was done, they were --
11:38:08 20       Q.   Were they in the top group or were they in one
21  of the lower groups?
22       A.   They were in the lower group.
23       Q.   Did you ask Ms. Minix to stay on for another 30
24  days and work with Tooty Zachary?
25       A.   The original 15, 16 employees that worked at

141

1    point, molders, dado, whose those jobs were to end, I
2    asked -- asked her since she had higher seniority, if
3    she wanted to continue to work for another two, three,
4    four weeks.
5        Q.    What did she say?
6        A.    She asked where she would have to work. I
7    said, it's going to be by the finger joint crew or the
8    rough mill cutting wood.
9        Q.    Is that close to where Mr. Fetner is?
10       A.    Richard worked the whole plant.
11       Q.    Okay. But I guess he was gone by then?
12       A.    Yeah.
13       Q.    Have you read the deposition of Linda Sims?
14       A.    Have I?
15       Q.    Yes.
16       A.    No.
17       Q.    Have you read the deposition of any of the
18   three Plaintiffs?
19       A.    No.
20       Q.    Okay. Do you recall ever making any remarks to
21   Linda Sims along the lines of you needed somebody to
22   travel with you?
23       MR. THOMPSON: I --
24       MR. DOUGLAS: Go ahead.
25       MR. THOMPSON: I just think the question is not

142

1    clear. Object to form.
2        Q.    BY MR. DOUGLAS: Go ahead.
3        A.    I remember a conversation.
4        Q.    Can you tell me about that?
5        A.    I asked her where she had worked before in
6    Roanoke. Because I congratulated her on being a
7    full-time employee. And she said she worked at a couple
8    of manufacturing plants. And one of her favorite jobs
9    was working for an executive for two or three years that
10   traveled around the country-side. And she was his
11   personal secretary.
12       Q.    Did she tell you what company it was with?
13       A.    No, or who it was.
14       Q.    Did you ask?
15       A.    No.
16       Q.    Okay. Tell me what else was said.
17       A.    That was basically it. I shook her hand and
18   congratulated her.
19       Q.    On what?
20       A.    Going from -- working from a part-time company
21   to a full-time employee.
22       Q.    At Jeld-Wen?
23       A.    At Jeld-Wen.
24       Q.    How often do you see or talk to Pat Galvez
25   nowadays?

143

1        A.    Pat Galvez now?
2        Q.    Uh-huh (Affirmative).
3        A.    Once, twice a year I'll see him.
4        Q.    How often do you speak with him?
5        A.    Just a couple of times a year.
6        Q.    Have you spoken to anybody other than your
7    lawyers about this case? Your lawyers and your wife,
8    anybody other than those people?
9        A.    Yeah, Roxi.
10       Q.    When have --
11       MR. THOMPSON: With or without lawyers present?
12       THE WITNESS: Oh, say it again.
13       Q.    BY MR. DOUGLAS: Well, he answered my question
14   correctly. Did you and Roxi talk together in front of
15   lawyers?
16       A.    No, no.
17       Q.    Okay. Tell me about the conversation.
18       A.    She has heard in the last couple of weeks that
19   she is going to be deposed, and that was it.
20       Q.    And what did you say to her?
21       A.    I said that's correct. That I was down at
22   Auburn, Alabama. We went through deposition. And as
23   far as I know, there's going to be three or four
24   Jeld-Wen employees deposed in the next couple of weeks.
25       Q.    And what did she say?

144

1        A.    Nothing.
2        Q.    Not a word?
3        A.    I mean, she just said okay.
4        Q.    Just okay?
5        A.    Yeah.
6        Q.    She didn't express dismay that she was going to
7    have to come to Auburn and give a deposition?
8        A.    No.
9        Q.    Did you all talk about the specifics of the
10   case at all?
11       A.    No.
12       Q.    Have you ever spoken to Ms. Giles regarding any
13   of the allegations made by any of the hourly employees?
14       MR. THOMPSON: Outside the presence of Counsel?
15       Q.    BY MR. DOUGLAS: Yeah.
16       A.    Outside the presence of Counsel. There has
17   been some conversation about that.
18       Q.    Okay. Tell me about that.
19       A.    Sometime in the last year or so, she's heard
20   about -- that two or three employees are going to be
21   pressing on for a legal matter.
22       Q.    Okay. And what did you say?
23       A.    I said, well, maybe that's happening. We
24   didn't -- that was basic conversation.
25       Q.    And what did she say after you said maybe

145

```
 1   that's happening?
 2       A.   Nothing.
 3       Q.   Not a word?
 4       A.   (Nods head left to right).
 5       Q.   She didn't ask what the allegations were?
 6       A.   She knows.  She knows that there's some
 7   harassment involved with Richard.
 8       Q.   Well, who told her that, if you know?
 9       A.   Don't know.
10       Q.   You didn't tell her that?
11       A.   No.
12       Q.   What has she told you that she's heard about
13   the harassment regarding Richard?
14       A.   That a couple of employees in Roanoke want to
15   file a lawsuit against Richard or Jeld-Wen for
16   harassment.
17       Q.   She told you that?
18       A.   (Nods head up and down).
19       Q.   And what did you say when she told you that?
20       A.   I said, that's possible.
21       Q.   Had the E.E.O.C. complaints been filed at this
22   point?
23       A.   Yeah.  This was probably last year, 2005.
24       Q.   Had this lawsuit been filed at this point?
25       A.   Had this lawsuit been filed?
```

146

```
 1       Q.   Yes, sir.
 2       A.   I don't know.
 3       Q.   I'm sorry.  I don't remember the date the
 4   lawsuit was filed.  All right.  So, you told her it was
 5   possible.  And what did she say?
 6       A.   Nothing.
 7       Q.   That was just it?
 8       A.   She said me -- she said that she's heard.
 9   She's heard rumor, because she lives in Roanoke.
10       Q.   Right.  And you said that's possible?
11       A.   That's possible.
12       Q.   And that was it?
13       A.   Yeah.
14       Q.   Okay.  Well, what did she tell you with regard
15   to the allegations being made?
16       A.   Other than the fact that there's a couple of
17   employees that wants to file a harassment --
18       Q.   She told you that?
19       A.   -- against Richard.
20       Q.   In any of these conversations did you ask her
21   what her source was for the information?
22       A.   No.  Because, again, she lives there.  She was
23   at the plant.  She was our office staff.
24       Q.   Did you get the impression that she was trying
25   to give you a heads-up that something was about to
```

147

```
 1   happen?
 2       A.   No, because I knew.
 3       Q.   When you were having the meeting on the 13th of
 4   2004, at any time when any of the employees were telling
 5   you what their complaints were --
 6       A.   Any one of the five?
 7       Q.   Yes, hourly employees?
 8       A.   Female employees.  Okay.
 9       Q.   Did you ever laugh at anything that they said?
10       A.   It wasn't that I laughed.  But the whole
11   conversation, everybody was kind of laughing and
12   giggling about it.  It was a real open environment.
13   Nobody was crying.  Nobody was jumping up and down that
14   there were some serious things.  They were all pretty
15   light-hearted about it.
16       Q.   Okay.  So, would you say that everybody was
17   laughing about it?
18       A.   Everybody was laughing, joking, kind of
19   carrying on.  It wasn't a crying -- it wasn't a funeral
20   environment.
21       Q.   I understand.  Were you one of the ones that
22   was laughing though?
23       A.   I can't say I was laughing.  I don't know --
24       Q.   How about snickering?
25       A.   We were all carrying on the same way.  It was
```

148

```
 1   not a serious, crying atmosphere.
 2       Q.   Okay.  But there was laughing going on?
 3       A.   Yeah.
 4       Q.   While the allegations were being told to you?
 5       A.   By everybody.
 6       Q.   Okay.  Everybody was laughing?
 7       A.   Right.
 8       Q.   Including you?
 9       A.   Including me?
10       Q.   Yes.
11       A.   I was fitting in with the conversation.
12       Q.   Okay.  So, what is the answer to my question?
13   Were you laughing or not?
14       A.   I wasn't laughing.
15       Q.   Okay.  You weren't laughing at them laughing?
16   I mean, sometimes that can happen.
17       A.   It was -- I wasn't laughing.
18       Q.   Okay.  What were you doing?
19       A.   Creating a comfortable environment.  So, if
20   they wanted to talk about this issue, that they can talk
21   about it.  And it was a good environment.
22       Q.   Okay.  Do you agree with me that none of these
23   allegations that were being made are funny?
24       A.   Absolutely.
25       Q.   You agree with me on that?
```

149

1     A.    Yeah.

2     Q.    Did you get the impression that the female

3    employees were joking about what they were telling you?

4     A.    Joking like it didn't happen?

5     Q.    Yes.

6           MR. THOMPSON:  Object to form.

7           THE WITNESS:  Not joking like it didn't happen.

8    But kind of carrying on about it that it was a

9    light-hearted situation?

11:49:20 10     Q.    BY MR. DOUGLAS:  Not a big deal in other words?

11     A.    Yeah.

12     Q.    Okay.  Then why did you go talk to Mr. Fetner?

13     A.    Because they brought it to me.  And we take

14    everything serious.  It's topics that border harassment.

15     Q.    Even if the employees don't take it serious,

16    you take it serious?

17     A.    Yes.

18     Q.    Okay.  All right.  Have you had any other

19    conversations with Ms. Giles regarding this matter

11:49:56 20    outside the presence of Counsel?

21     A.    Yes.

22     Q.    Okay.  Tell me about that conversation.

23     A.    You mean the last week or two?

24     Q.    Sure.

25     A.    Just the fact that this deposition is coming

150

1    up.  That I think she's going to end up being deposed.

2    That's what I understood from two weeks ago.

3     Q.    Okay.  Was that all -- you have already told me

4    about that conversation, correct?

5     A.    Yeah.

6     Q.    Any other conversations that you haven't

7    already testified to?

8     A.    I don't think so.

9     Q.    Have you had any conversations with Ms.

11:50:30 10    Zachary, Twana Zachary regarding this matter?

11     A.    No.

12     Q.    Never?

13     A.    No.

14     Q.    Do you know who she is?

15     A.    She was an hourly employee in the cut line.

16     Q.    During the time period?

17     A.    Yes.

18     Q.    Did you ever get around to interviewing her

19    about these incidences?

11:50:50 20     A.    No.  I never knew she was involved.

21     Q.    Okay.  Have you had any conversations with Mr.

22    Galvez regarding this matter?

23     A.    Yes.

24     Q.    Outside the presence of Counsel?

25     A.    Right.

151

1     Q.    Tell me about those.

2     A.    Conversations as far as even e-mail.  That same

3    thing, in the next couple of weeks I understand he's

4    going to be deposed.

5     Q.    Did he e-mail you back?

6     A.    Well, we had a conversation.  We had a

7    conference call.

8     Q.    Who was on the conference call?

9           MR. THOMPSON:  Was Counsel on the conference

11:51:40 10    call?

11           THE WITNESS:  Yeah.

12     Q.    BY MR. DOUGLAS:  Don't tell me about that then.

13     A.    Okay.

14     Q.    Did Mr. Galvez ever e-mail you about this

15    matter at any time?

16     A.    No, not other than the conference call.

17     Q.    Okay.  How is that an e-mail?

18     A.    I sent him an e-mail in the last couple of days

19    that I think that this thing is still on, he'll be doing

11:52:08 20    a deposition.

21     Q.    Do you still have that e-mail?

22     A.    Probably.

23     Q.    Okay.  Will you print it off and give it to

24    your lawyer, please?

25     A.    Okay.

152

1     Q.    Other than in the last couple of weeks, did you

2    ever have any conversations with Mr. Galvez regarding

3    this matter?

4     A.    No.

5           MR. THOMPSON:  During the course of litigation?

6    Is that what you're asking?

7           MR. DOUGLAS:  No, I'm talking about from 2004

8    to today, have you had any conversations with Mr. Galvez

9    outside the presence of Counsel regarding this matter?

11:52:42 10           MR. THOMPSON:  Okay.

11           THE WITNESS:  I don't think so.

12     Q.    BY MR. DOUGLAS:  Has either one of you sent

13    e-mails to the other one regarding this matter?

14     A.    No.

15     Q.    Okay.  Did you ever tell Linda Sims that it

16    would be nice if you had somebody to travel with when

17    she told you that she used to work for an executive?

18     A.    No.  That I would?

19     Q.    Yes.

11:53:12 20     A.    No.

21     Q.    You never said anything like that?

22     A.    (Nods head left to right).

23     Q.    During that conversation you have told me

24    about?

25     A.    That -- no.

153

1    Q.    Okay. Did you ever hear anything regarding any
2    complaints of a Mary Lou Laws at any time?
3    A.    Not other than the last couple of weeks seeing
4    her name on some of these documents.
5    Q.    Have you heard anything with regard to the
6    complaints she had regarding Fetner?
7    A.    No.
8          MR. THOMPSON: Object to form.
9    Q.    BY MR. DOUGLAS: Did you ever receive any type
11:54:14 10    of written complaint regarding Mr. Fetner?
11    A.    No.
12    Q.    When an employee was hired at the Roanoke
13    plant, what documents were they to receive from
14    Jeld-Wen?
15          MR. THOMPSON: Object to form. Withdraw the
16    objection. Sorry.
17          THE WITNESS: Just standard application. W-2
18    to fill out. I-9. They have -- once they go full-time,
19    they read the Jeld-Wen rules and regulations that they
11:55:20 20    sign.
21    Q.    BY MR. DOUGLAS: The handbook?
22    A.    The handbook, yeah.
23    Q.    Okay.
24    A.    There is a -- each plant is different. But
25    they have a test, a handbook test. Things like that.

154

1    Drug test, they have to do a drug test.
2    Q.    That's a condition of employment?
3    A.    Right.
4    Q.    How about video tapes? Are newly hired
5    employees shown video tapes?
6    A.    Sometimes. We have video tapes of the safety
7    training.
8    Q.    Anything with regard to sexual harassment?
9    A.    Yes. There should be a harassment training.
11:56:02 10    Q.    Would the employees of the Roanoke plant have
11    been shown that video, if you know?
12    A.    They should have. Even in 2004.
13    Q.    Okay. Do you have a copy of the video?
14    A.    I can get one.
15    Q.    Will you give it to your lawyer for me?
16    A.    All right.
17    Q.    Were the complaints filed by my three clients
18    the only E.E.O.C. complaints against Fetner that you are
19    aware of?
11:58:36 20    A.    Yes.
21    Q.    How many times have you dealt with E.E.O.C.
22    complaints in your job here at Jeld-Wen?
23    A.    That's the first one.
24          MR. DOUGLAS: Let's take about a five minute
25    break. I'm about done.

155

1
2                (Break)
3
4    Q.    BY MR. DOUGLAS: Okay. Mr. Hees, I'm going to
5    show you a few documents, and then we'll wrap up here.
6    I'm going to show you some documents which are Bates
7    stamped D447 through D513 and ask you if you recognize
8    the documents.
9    A.    Okay.
12:13:14 10    Q.    Do you recognize those documents?
11    A.    I can't say I have them all memorized. But it
12    looks like a Rob Sturm presentation for harassment.
13    Q.    So, if that's what it is, you believe you have
14    seen that presentation before?
15    A.    Or some form of it.
16    Q.    I'm sorry. Did you want to add
17    something?
18    A.    Something could have been updated here in the
19    last couple months or years. But that's --
12:13:40 20    Q.    Okay. After your original orientation with the
21    policy, have you received any updates?
22    A.    We have on the policy and procedure manual. We
23    received some about a year or two ago --
24    Q.    Okay.
25    A.    -- from the original one that we had back in

156

1    the mid to late '90's.
2    Q.    What were the changes, if you remember?
3    A.    Specifically don't have no idea.
4    Q.    Other than that one change, have you had any
5    other classes that you have had to take on harassment?
6    A.    I don't know if I would call them classes. But
7    in management meetings we'll bring up any new changes.
8    Q.    Well, how many times has that occurred, if you
9    know?
12:14:30 10    A.    Maybe once in the last two years.
11    Q.    Well, how about since the late '90's when you
12    first saw the class or first took the class?
13    A.    There has been a lot that's been updated since
14    it was first brought in, in the last eight years.
15    Q.    Okay. How many hourly employees were at the
16    Jeld-Wen facility in the summer and fall of 2004?
17    A.    Summer and Fall? Hourly employees, about 33 to
18    35 roughly.
19    Q.    What were the other employees that were there?
12:15:08 20    A.    There were probably five, six temporary
21    employees from that agency.
22    Q.    Okay. How many of the 30 to 35 were female?
23    A.    A guess?
24    Q.    Yeah.
25    A.    50/50. Just a guess.

157

1    Q.   So, between 15 and 20 you think?

2    A.   Yeah.

3    Q.   Were female?

4    A.   Correct.

5    Q.   So, if there were six of them who were having

6    problems with the group manager, would you call that a

7    systemic problem?

8         MR. THOMPSON:  Object to form.

9         THE WITNESS:  What is the word again?

12:15:56 10    MR. DOUGLAS:  Systemic.

11        MR. THOMPSON:  Same objection.

12        THE WITNESS:  Can you use a different word?

13   Q.   BY MR. DOUGLAS:  Sure.  Pervasive?

14        MR. THOMPSON:  Object to form.

15   Q.   BY MR. DOUGLAS:  Widespread.  Would you

16   consider that widespread if 6 of the 15 to 20 female

17   employees were having the problems with the same group

18   manager?

19        MR. THOMPSON:  Object to form.

12:16:18 20    THE WITNESS:  Widespread?  If it's proven that

21   it's true, that's an issue.  But you said six.  All I

22   knew was five.

23   Q.   BY MR. DOUGLAS:  Okay.  I'm just asking.  For

24   purposes of my question, I'm asking you to assume that

25   there is six and that it is true.  That would be

158

1    alarming to you, wouldn't it?

2         MR. THOMPSON:  Object to form.

3         THE WITNESS:  Again, if it's proven that that's

4    the case, that's -- I would be -- that's something to

5    take action about.

6    Q.   BY MR. DOUGLAS:  Okay.  I'm going to show you

7    just a few documents of the ones that you have

8    identified.  Bates stamped page D00462, Anti-harassment

9    Procedures and Guidelines.  It says under A, Jeld-Wen

12:17:20 10   strives to provide a productive and comfortable working

11   environment free from harassment or discrimination,

12   including that which may be construed to be offensive

13   sexual conduct.  Did I read that correctly?

14   A.   I believe so.

15   Q.   Okay.  And you understood that to be Jeld-Wen

16   policy?

17   A.   Yeah.

18   Q.   In 2004?

19   A.   Not sure.  Again, it could have been an update

12:17:50 20   in the last year or two years.

21   Q.   Okay.  So, you're not sure if that was the

22   Jeld-Wen policy in 2004?

23   A.   Not sure.

24   Q.   Is it their policy today?  Is that Jeld-Wen

25   policy today?

159

1    A.   I believe so.

2    Q.   Page D00464.  The second paragraph says,

3    harassment in any form will not be tolerated by the

4    company, is that correct?

5    A.   That's correct.

6    Q.   The next sentence says, any employee who

7    violates this policy is subject to discipline up to and

8    including discharge, is that correct?

9    A.   That's correct.

12:18:42 10   Q.   Was that the policy in 2004?

11   A.   I believe so.

12   Q.   And that's the policy today?

13   A.   I believe so.

14   Q.   Page D00465, the top says, policy against

15   harassment.  And then number 4 says, sexual harassment.

16   Unwelcome sexual advances, requests for sexual favors,

17   or any other verbal or physical conduct that is directed

18   toward an individual because of that person's gender.

19   Did I read that correctly?

12:19:26 20   A.   You did.

21   Q.   Was that the policy in 2004?

22   A.   I believe so.

23   Q.   And is it the policy today?

24   A.   I believe so.

25   Q.   Okay.  In view of what we have just read, do

160

1    you stand by your earlier testimony regarding whether

2    the allegations made against Fetner violated Jeld-Wen

3    sexual harassment policy?

4         MR. THOMPSON:  Object to form.

5         THE WITNESS:  Do I answer that?

6         MR. THOMPSON:  Yes.

7         THE WITNESS:  Again, there are some topics in

8    our meeting that I felt that were border harassment that

9    need to be dealt with, need to be talked about.

12:20:14 10   Q.   BY MR. DOUGLAS:  My question was simply this.

11   That given what we have just read here in the last

12   couple of minutes, do you stand by your earlier

13   testimony regarding the allegations against Fetner with

14   regard to whether it violated Jeld-Wen's sexual

15   harassment policy?

16        MR. THOMPSON:  Object to form.

17        THE WITNESS:  I believe so.

18   Q.   BY MR. DOUGLAS:  Okay.  Page D00494 is talking

19   about the conduct.  The top says, the conduct is severe

12:20:54 20   or pervasive.  And then it says, what is severe enough.

21   Do you see that?

22   A.   I do.

23   Q.   Okay.  And it lists several things, including

24   grabbing and fondling.  Is that correct?

25   A.   That's correct.

161

1    Q.   And that was Jeld-Wen policy in 2004?

2    A.   I believe so.

3    Q.   And that's still the policy today, correct?

4    A.   I, again, believe so.

5    Q.   All right. I'm going to show you page D00510.

6    It says, what can employees expect if they complain.

7    And it lists five bullet points, correct?

8    A.   That's correct.

9    Q.   The first one is that their complaint will be

12:21:52 10    taken seriously. Do you believe you did that in this

11    case?

12    A.   I do.

13    Q.   Okay. Do you believe that your meeting with

14    all five ladies at the same time complies with that?

15    A.   Yes.

16    Q.   Okay. And certainly a prompt and appropriate

17    investigation you think was met?

18    A.   Yes.

19    Q.   No retaliation?

12:22:16 20    A.   Correct.

21    Q.   How about prompt disciplinary action, if policy

22    violated? Did that not just come up because Fetner

23    resigned?

24    A.   He resigned, and it was taken care of.

25    Q.   Yeah. But Fetner took care of it by resigning,

162

1    right?

2    A.   Yes.

3    Q.   Have you ever had a situation where an employee

4    was -- that you personally accused an employee of doing

5    something wrong and the employee quit?

6    A.   Not that I --

7    Q.   In your experience, do you consider that action

8    to be somewhat of an admission of guilt?

9    MR. THOMPSON: I'll object to form.

12:23:00 10    THE WITNESS: If an employee -- say that again.

11    Q.   BY MR. DOUGLAS: Sure. If you accuse an

12    employee or make known allegations to an employee that

13    they have done something wrong --

14    A.   Right.

15    Q.   -- and they quit, do you personally consider

16    that somewhat of an admission of guilt?

17    MR. THOMPSON: Object to form.

18    THE WITNESS: Not necessarily.

19    Q.   BY MR. DOUGLAS: Okay. The last bullet point

12:23:30 20    was information about the results of the investigation.

21    I take it you did give that to the hourly employees,

22    correct?

23    A.   I believe so, yeah.

24    Q.   Well, let me ask you. If someone made an

25    allegation against you that was not true -- an employee

163

1    and, it wasn't true, you wouldn't quit, would you?

2    A.   No.

3    Q.   Under no circumstances would you quit, would

4    you?

5    MR. THOMPSON: Object to form.

6    THE WITNESS: If it's just generally speaking,

7    I wouldn't just pack up and leave.

8    Q.   BY MR. DOUGLAS: I mean, you would want your

9    name cleared if somebody told you something about you

12:24:10 10    that was false, wouldn't you?

11    A.   I think so.

12    Q.   So, why is it that after Fetner quit you told

13    me that you kind of believed his side of the story?

14    Why?

15    MR. THOMPSON: Object to form.

16    THE WITNESS: Why did I believe his side of the

17    story?

18    Q.   BY MR. DOUGLAS: Yeah. If he was innocent,

19    don't you think he would have said, no, this isn't true,

12:24:40 20    I want the investigation done, I want my name cleared?

21    MR. THOMPSON: Object to form.

22    THE WITNESS: That's his option. He didn't

23    want to go through all the stuff. I think he saw the

24    writing on the wall with the plant shutting down. I

25    think he had another job offer, and it was time for him

164

1    to leave.

2    MR. DOUGLAS: Okay. That's all. I don't have

3    any further questions.

4

5    CROSS EXAMINATION

6

7    QUESTIONS BY MR. THOMPSON:

8

9    Q.   BY MR. THOMPSON: I have just got a couple of

12:25:22 10    clarifications. What I'm going to try to do is sort of

11    take you back in your deposition. You testified that

12    Jeld-Wen does not have a policy that prohibits employees

13    dating other employees. Do you remember that testimony?

14    A.   Yes. I don't think we do.

15    Q.   Okay. And is there a situation where one

16    employee asking another employee out would be

17    inappropriate?

18    A.   I don't think it would be inappropriate.

19    Q.   Okay. What if the employee says I don't want

12:26:00 20    to go out and it happens on multiple occasions?

21    A.   If it's multiple occasions, I think that it's

22    bothering the employee. That it borders harassment.

23    And if it bothers them enough to feel uncomfortable,

24    then they have a right to talk to management about it,

25    and we'll deal with it.

165

1    Q.    So, if it becomes unwelcome, then it could
2  violate Jeld-Wen's policy in your opinion?
3    A.    Absolutely.
4    Q.    Okay.  And who makes the decision within
5  Jeld-Wen whether conduct rises to the level such that it
6  violates Jeld-Wen's sexual harassment policy?
7    A.    That would be our legal department.
8    Q.    You testified just before we took our last
9  break about a video that is shown to new employees.  Do
10 you remember that testimony?
11   A.    Yes.
12   Q.    Okay.  Is that a video that is currently shown
13 to new employees?
14   A.    Yes.
15   Q.    Okay.  Do you know how long it has been
16 available and shown to new employees?
17   A.    Not exactly.  But it seems like the last --
18 within the last year or last two years.
19   Q.    Okay.  And you don't know if that video was
20 ever shown to any new employees at the Roanoke facility?
21   A.    No.  I wasn't there.  I don't --
22   Q.    My other clarification.  You testified about
23 one employee who was -- one Jeld-Wen employee who was
24 employed at the Roanoke facility and then moved on and
25 continued to work for Jeld-Wen somewhere else?

166

1    A.    Bill Keller.
2    Q.    Okay.  Was there another one?
3    A.    Of management or total?
4    Q.    Just any employee?
5    A.    Yeah, Roxi.  She went to the Austell branch.
6          MR. THOMPSON:  That's all.
7
8                REDIRECT EXAMINATION
9
10 QUESTIONS BY MR. DOUGLAS:
11
12   Q.    BY MR. DOUGLAS:  What is the Austell branch?
13   A.    That's a Jeld-Wen distribution in Georgia.
14 Near Atlanta.  Austell, Georgia.
15   Q.    It's in Austell.  What job does she have there?
16   A.    She works with the education, training, working
17 with doors and window.
18   Q.    And what was her job at the Roanoke facility?
19   A.    She was the staff person.  And she now is staff
20 over at Austell, Georgia.
21   Q.    Is that a promotion for her?
22   A.    I think it was a lateral move.
23          MR. DOUGLAS:  Okay.
24
25                RECROSS EXAMINATION

167

1
2  QUESTIONS BY MR. THOMPSON:
3
4    Q.    BY MR. THOMPSON:  I do have one other question.
5  You testified that you were interviewed by the E.E.O.C.
6  Do you remember that testimony?
7    A.    Yes.
8    Q.    Did you actually just attend a mediation?
9    A.    It was a mediation.  Mediation was the word.
10   Q.    So, you were never interviewed by the E.E.O.C.?
11   A.    No.
12   Q.    Okay.  Let me just flip through here to make
13 sure.
14          MR. DOUGLAS:  Off the record.
15
16          (Off the Record Discussion)
17
18   Q.    BY MR. THOMPSON:  Mr. Hees, one other thing.
19 You also testified that you are not aware that Jeld-Wen
20 has a policy that the complainer in a harassment
21 situation be separated from the person about which he or
22 she is complaining.  Do you recall that testimony?
23   A.    Yes.
24   Q.    Okay.  Are you aware of instances where you
25 have separated the complaining party from the person

168

1  about whom the complaint is made?
2    A.    Am I aware of any?
3    Q.    Yes.
4    A.    That I was involved in?
5    Q.    Yes.
6    A.    Yes.
7          MR. THOMPSON:  Okay.  That's it.
8
9                FURTHER REDIRECT EXAMINATION
10
11 QUESTIONS BY MR. DOUGLAS:
12
13   Q.    BY MR. DOUGLAS:  Who was that?
14   A.    That was the issue that we had here that
15 happened in the last two or three months.
16   Q.    I thought that that guy was out on workers'
17 comp?
18   A.    Same person.  He was on workman's comp.  But
19 while he was here, I separated them to sort out the
20 issue.
21          MR. DOUGLAS:  Okay.  Mr. -- never mind.  That's
22 all.
23                FURTHER DEPONENT SAITH NOT
24
25

169

```
1    STATE OF TENNESSEE        )

2

3    COUNTY OF RUTHERFORD      )

4

5         I, ROBIN AVERY, a Notary Public at Large for

6    the State of Tennessee, do hereby certify:

7         THAT, prior to being examined, the witness

8    named in the foregoing deposition, DAN HEES, was by me

9    duly sworn to testify the truth, the whole truth, and

10   nothing but the truth;

11        THAT, the said deposition was taken down by me

12   at the time and place therein named and thereafter

13   reduced to typewriting by me or under my direction.

14        I further certify that I am not interested in

15   the events of the action.

16        WITNESS my hand and seal this 1st day of May,

17   2006.

18

19                    _____

20             ROBIN AVERY

21             Notary Public at Large

               State of Tennessee

22

     My Commission Expires:  12/15/07

23

24

25
```

171

```
1                    CERTIFICATE
2
3         I, _____, declare under
     penalty of perjury, that the foregoing is true and
     correct, including such changes as I have made on the
     Errata Sheet annexed hereto.
5
6    Date              Signature

7

8                    ACKNOWLEDGEMENT

9    STATE OF TENNESSEE        )
     COUNTY OF _____ )
10
          I, _____, A Notary Public
11   Within and for the State of Tennessee, do hereby
     certify:
12        THAT on the _____ day of _____, 20____,
     before me personally appeared_____
13   the witness whose deposition appears herein;
          THAT the said witness stated to me that the
14   said deposition was read to or by said witness, who
     having made such changes and corrections as desired,
15   thereupon subscribed and swore to the said deposition in
     my presence.
16        IN WITNESS HEREON, I have hereunto subscribed
     my name and affixed my official seal, the day herein
17   above written.

18

19                    _____
                         Notary Public

20   My Commission Expires: _____

21

22
23
24
25
```

170

```
1                    ERRATA SHEET

2         Please, read your deposition and on this Errata
     Sheet make any changes or corrections in form or
3    substance to your deposition that you feel should be
     made.  You may add additional sheets, if necessary.
4
          You are to identify these changes/corrections
5    by page and line number, give the correction or change
     desired, and state the reason therefor.  After
6    completing this, sign at the conclusion of such
     changes/corrections, if any.  Do not make any
7    corrections on the transcript itself.

8

9    Page/Line  Correction/Change      Reason
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21
22   Signature: _____
23   Date: _____
24
25
```

LETTER DATED OCTOBER 31, 2004

FROM DAN HEES

RE PLANT CLOSING

D00316

155404.doc



**JELD-WEN.**
*Millwork Manufacturing*

130 Sunset Drive
P.O. BOX 688
Sparta, TN
38583 USA

931 738-2515 Tel
931 738-2560 Fax
www.jeld-wen.com
Windows / Doors / Millwork

October 21, 2004

JELD-WEN Millwork Manufacturing
235 Millwork Industrial Drive
Roanoke, AL 36274

Dear

It is with deep regrets that JELD-WEN has decided not to operate the JELD-WEN Millwork Manufacturing (Roanoke, AL) plant in 2005. The purpose of this letter is to confirm that notice is being given to you this date, October 21, 2004, that your employment will be terminated in thirty days.

All regular, full-time employees who stay for the thirty days will receive benefits in accordance with JELD-WEN's severance policy. Severance benefits include: pro-rated five year bonus, severance pay, and current and accrued vacation pay.

I want to personally thank all employees that have given your dedicated service to our company, and to wish each and every one of you the very best of success in the future.

Very truly,
JELD-WEN

Daniel A. Hees

**JELD-WEN/Minix, et al. - Documents Produced by Defendant JELD-WEN, inc.**

D00316