# EXHIBIT L

## DEPOSITION EXCERPTS OF PAT GALVEZ

Pat Galvez

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION


LORENA MINIX, et al.,

                    Plaintiffs,

          vs.                         CASE NO. 3:05CV685-T

JELD-WEN, INC., and
RICHARD FETNER,

                    Defendants.
_____/


DEPOSITION OF PAT GALVEZ


          BE IT REMEMBERED THAT, pursuant to Notice

of Taking Deposition, the deposition of PAT GALVEZ

was taken on behalf of the Plaintiffs, before

Melanie J. Savord, Certified Shorthand Reporter,

State of Oregon, on Wednesday, May 3, 2006,

beginning at the hour of 12:14 p.m., at the offices

of Jeld-Wen Administration, 3250 Lakeport Boulevard,

in the City of Klamath Falls, County of Klamath,

State of Oregon.

## Pat Galvez

STIPULATION          iii

PURSUANT TO NOTICE OF TAKE DEPOSITION, the deposition
of PAT GALVEZ was taken on behalf of the Plaintiffs,
before Melanie J. Savord, Certified Shorthand Reporter,
State of Oregon, at this time and place, on oral
interrogatories to be propounded to said witness pursuant
to Federal Rules of Civil Procedure.

IT IS STIPULATED AND AGREED that all irregularities
as to notice of time and place and manner of taking said
deposition are hereby waived, each party reserving the
right to object at the time of trial to any question or
answer as to the competency, relevancy or materiality
thereof, but that objections as to the form of the
question or responsiveness of the answers must be made at
the time of taking said deposition or shall be deemed to
be waived.

## Pat Galvez

Page 5

```
 1              PAT GALVEZ,
 2       called as a witness on behalf of the
 3       Plaintiffs, being first duly sworn to testify
 4       the truth, the whole truth, and nothing but
 5       the truth, was examined and testified as follows:
 6  ///
 7              EXAMINATION
 8  BY MR. DOUGLAS:
 9       Q   Could you state your full name, please, sir.
10       A   My name is Pat Galvez.
11       Q   Okay. Mr. Galvez, my name is Jim Douglas. We
12  met just a few minutes ago. I'm going to be taking your
13  deposition today. Have you ever given a deposition
14  before?
15       A   Once.
16       Q   Okay. We will talk about that in a few minutes.
17  My rules for deposition taking are real simple. There
18  will be times today when I ask you a bad question, a
19  question that doesn't make sense. If you would ask me to
20  rephrase the question, I will be happy to do that until I
21  ask a good question.
22       A   Okay.
23       Q   If I ask a question and you answer it, I will
24  assume you understood the question. Fair enough?
25       A   Yes.
```

## Pat Galvez

Page 4

INDEX          iv

INDEX OF EXAMINATION          PAGE
EXAMINATION BY MR. DOUGLAS          5, 114
EXAMINATION BY MR. SCOFIELD          111

INDEX OF EXHIBITS
(None)

INDEX OF INFORMATION REQUESTED BY MR. DOUGLAS
PAGE    LINE      DESCRIPTION
62      10      Roster & racial makeup

INDEX OF OBJECTIONS MADE BY COUNSEL
BY MR. SCOFIELD:        PAGE      LINE
          27        6
          39       22
          56       20
          61        1
          89       19
          92      5, 14
          93        7
         102       13
         104      6, 8
         107       18

## Pat Galvez

Page 6

```
 1       Q   If you need to take a break or for any reason at
 2  any time, just let me know and we can do that. Okay?
 3       A   All right.
 4       Q   Where do you live?
 5       A   Here in Klamath Falls.
 6       Q   Address, please.
 7       A   2504 Chantel Avenue. C-H-A-N-T-E-L Avenue.
 8       Q   How long have you lived there?
 9       A   Almost two years.
10       Q   Who lives in the home with you?
11       A   My wife and my son.
12       Q   How old is your son?
13       A   He's 18.
14       Q   Before that address where did you live?
15       A   I lived in LaGrange, Georgia.
16       Q   How long did you live there?
17       A   Little bit over two years; maybe 15 months.
18       Q   What's your wife's name?
19       A   Becky Galvez.
20       Q   Prior to living in LaGrange, where did you live?
21       A   I lived in Sainte Foy, Canada. Means Santa Fe
22  in Spanish.
23       Q   How long did you live there?
24       A   About 21 months; little under two years.
25       Q   Before that?
```

## Pat Galvez

Page 11

1  nursery. All the administrator contracts. Administrator
2  labor crews would bid, and they would do the task. I
3  would go inspect their work and make sure they are doing
4  the proper work on the land.
5      Q   Does that company still exist?
6      A   I believe the Boise Cascade corporation still
7  exists although they have sold some of their businesses in
8  the Medford area, and I don't know what they still have.
9      Q   Why did you leave that job?
10     A   I left that job because after six years I was
11 still entry-level forestry. There's no room for
12 advancement. And I was looking — taking night classes
13 all those years. I had one full year left to go to get a
14 masters degree, and I decided to obtain that.
15     Q   Where did you get your masters from again?
16     A   At the time it was Southern Oregon State
17 College. Now it's Southern Oregon University.
18     Q   Was the decision to leave yours or somebody
19 else's?
20     A   It was mine.
21     Q   After that where did you work?
22     A   After my graduation from Southern Oregon?
23     Q   Well, after — you left the company in 1986 I
24 take it?
25     A   Yes.

## Pat Galvez

Page 12

1      Q   Where did you work next?
2      A   I went to the summer classes, carried a
3  part-time job for three weeks until the fall classes
4  started, and then went to school full-time through that
5  fall, winter and spring and then graduated.
6      Q   What year did you graduate?
7      A   June of '87.
8      Q   And you just had one job during that time
9  period? One part-time job?
10     A   Actually two. I worked Christmas break as well
11 for UPS.
12     Q   What was the other one?
13     A   The August job was I was doing forest inventory
14 work with a contractor down in Happy Camp, California,
15 measuring timber and property identification lines, things
16 like that.
17     Q   The decision to leave those jobs — was the
18 decision yours or somebody else's?
19     A   The summer job and UPS job?
20     Q   Correct.
21     A   That was mine.
22     Q   So after you got your degree, what was your next
23 job?
24     A   My next job was starting manager trainee for
25 Jeld-Wen.

## Pat Galvez

Page 13

1      Q   What location?
2      A   I started at their White Swan, Washington
3  factory.
4      Q   What were your duties?
5      A   My duties were learning to be a crew supervisor;
6  as Jeld-Wen called them a group manager. And then one of
7  their window or miller production plants.
8      Q   Have you worked with Jeld-Wen uninterrupted
9  since 1987?
10     A   Yes.
11     Q   How long did you have the first job with
12 Jeld-Wen? The first position.
13     A   First position probably six years and three
14 months being a group manager at that factory.
15     Q   All in Washington?
16     A   In White Swan, Washington, yes.
17     Q   Tell me about the rest of your career at
18 Jeld-Wen.
19     A   I was then promoted and took a transfer in
20 October of '93 to a door plant called Yakima Door. It's a
21 company Jeld-Wen had acquired; an acquisition which was
22 actually closer to the town I lived in. In Yakima,
23 Washington I was production manager at that door plant.
24     Q   What's a production manager do?
25     A   Production manager runs the factory as far as

## Pat Galvez

Page 14

1  getting the orders done, scheduling the people, dealing
2  with the customers, the shipping.
3      Q   How long did you have that job?
4      A   Two years. And then I was again promoted to
5  assistant plant manager. Yakima Door was a — it had a
6  sister business called Yakima Manufacturing. They were 12
7  blocks apart. And Jeld-Wen made the decision to transfer
8  the smaller door plant the 12 blocks and blend in the
9  manufacturing and operations with the other plants. At
10 that point I became the assistant to the plant manager at
11 Yakima Manufacturing which is — in those days Jeld-Wen
12 operated businesses by their previous name; their acquired
13 names.
14     Q   Who was your boss?
15     A   My boss at Yakima Manufacturing was Dave
16 Edgerton.
17     Q   Is he still with the company?
18     A   No.
19     Q   What was the difference between the door and the
20 manufacturing plant?
21     A   The manufacturing plant was what they call a
22 millwork plant; taking lumber and cutting the raw material
23 in parts to be used for doors and windows and maybe
24 shaping components. And the door plant actually took wood
25 from the millwork plant and then certain sizes they built

## Pat Galvez

Page 19

1  structure. So I worked with the plant manager and the
2  supervisors and worked with their sales manager on getting
3  contacts and working with the U.S. market.
4      Q   How about after that? Where did you go?
5      A   February of 2002 I then transferred to the
6  Roanoke, Alabama plant.
7      Q   Is that a millwork plant?
8      A   It's a millwork plant.
9      Q   Was.
10     A   It was, right.
11     Q   It's closed now?
12     A   Yes.
13     Q   Jeld-Wen had taken over that plant from another
14  company; is that correct?
15     A   Yes.
16     Q   CMS?
17     A   Yes.
18     Q   Did you come in right when Jeld-Wen took over or
19  was there some lapse?
20     A   There was a lapse.
21     Q   How long was that lapse? If you know.
22     A   I was told Rick Parker, the vice president, and
23  Dan Hees had visited that plant in June of 2003 with the
24  corporate change.
25     Q   You sure about that year?

## Pat Galvez

Page 20

1      MR. SCOFIELD: 2003?
2      THE WITNESS: I'm sorry. 2001. Yes, 2001.
3  Then I arrived down there late February 2002. Actually
4  started in March of 2002.
5  BY MR. DOUGLAS: (Continuing)
6      Q   So there was over six months after Jeld-Wen took
7  over that you weren't there?
8      A   Yes. Six, seven, eight months.
9      Q   Who was in there then? If you know.
10     A   Dan Hees.
11     Q   When did you first meet Dan Hees?
12     A   I met Dan Hees in maybe 1993.
13     Q   You remember where you met him?
14     A   Here in Klamath Falls at some meetings.
15     Q   What type of meeting?
16     A   It was a millwork meeting we used to have called
17  rip and cut meetings. And the purpose of the meetings was
18  to share and learn about lumber processing, cutting,
19  recovery, yield and accounting for that. It was like a
20  three-day seminar.
21     Q   You all don't have those meetings anymore?
22     A   No.
23     Q   Why not?
24     A   Back in those days lumber was a bigger percent
25  of the business of the company and now there's more other

## Pat Galvez

Page 21

1  substitute products -- vinyl, steel, composite woods.
2      Q   When did that stop -- those meetings?
3      A   There they used to do them every two years. And
4  I think the last one was like '95 or '96.
5      Q   What was your title at the Roanoke facility?
6      A   That's a good question. I went there
7  technically as an assistant general manager. Dan was my
8  boss, and I was the acting plant manager because I was
9  there all the time.
10     Q   The decision to move from Quebec to Roanoke,
11  Alabama -- was that yours or somebody else's?
12     A   That was Dan's.
13     Q   You didn't have the option of staying at the
14  Quebec plant?
15     A   I was on a limited five-year -- excuse me --
16  three-year work permit as a U.S. citizen working in
17  Canada. So I would have had to have left eventually.
18     Q   How did you feel about going to work in Roanoke,
19  Alabama?
20     A   I liked the idea.
21     Q   But you lived in LaGrange?
22     A   Yes.
23     Q   How far is that?
24     A   Twenty-eight miles.
25     Q   How long did you work at the Roanoke facility?

## Pat Galvez

Page 22

1      A   Fifteen -- excuse me. Twenty-seven months
2  maybe; from March of '02 until the end of May or early
3  June of '04.
4      Q   Then where did you go?
5      A   I came here to Klamath Falls.
6      Q   To work what job?
7      A   I worked at our millwork plant here, starting
8  out -- I started as safety and quality manager and then
9  last -- about a year ago last May I took over as
10  production manager.
11     Q   Was the move from Roanoke here to Klamath Falls
12  a promotion or demotion or lateral move?
13     A   Lateral move.
14     Q   Since then you have been promoted?
15     A   No.
16     Q   Demoted?
17     A   No.
18     Q   Another lateral move?
19     A   Yes.
20     Q   What are your current duties?
21     A   Currents duties are to oversee the completion of
22  the orders, assist the departments with coordinating all
23  the materials and the processing steps to the finish
24  products and shipping, dealing with customer requests and
25  trying to jostle orders around, things of that nature.

## Pat Galvez

Page 39

1    A   Compared to the testimony of the other
2  coworkers, yes.
3    Q   So her version was supported by the other
4  coworkers?
5    A   Yes.
6    Q   So how long was he suspended for?
7    A   He was suspended for three days. This was prior
8  to the Christmas holidays; plant manager was out. And
9  when he returned we were going to review all the
10  investigations with our plant manager.
11    Q   Who was the plant manager?
12    A   His name is Kim Murrillo.
13    Q   Did that happen?
14    A   It did. I actually called him on a cell phone.
15  And prior to him actual returning from his vacation at
16  Christmas, the male employee resigned.
17    Q   Under pressure or just because?
18    A   Just because. He told me this isn't worth it to
19  me; I'm just going to resign.
20    Q   That strike you as an admission of guilt on his
21  part?
22    MR. SCOFIELD:  Form. But go ahead.
23    MR. DOUGLAS:  You can answer.
24    MR. SCOFIELD:  Please answer.
25    THE WITNESS:  I believe he knew enough coworkers

## Pat Galvez

Page 40

1  were going to talk and support her so I think he thought
2  he knew he was doing the wrong thing.
3  BY MR. DOUGLAS: (Continuing)
4    Q   Okay. Are there any other instances where
5  sexual harassment has been reported to you?
6    A   No.
7    Q   Are you sure about that?
8    A   Yes.
9    Q   Do you know Mr. Ron Bowen?
10    A   Oh, excuse me. Yeah. I do know Ronald.
11    Q   Do you need to change your previous answer?
12    A   Yes, I do.
13    Q   Okay. So how many other times have sexual
14  harassment complaints been made to you other than the two
15  you have told us about?
16    A   One other time.
17    Q   Tell me about that time.
18    A   That was in Roanoke. Was it June of 2003? When
19  Lorena Minix had complained that Ronald Bowen was at work
20  behind a machine, playing with himself.
21    Q   Who reported that to you?
22    A   Reported to me by Richard Fetner.
23    Q   When did you meet Richard Fetner?
24    A   I met Richard in -- first time was third week in
25  January of 2002.

## Pat Galvez

Page 41

1    Q   What occasioned you meeting him?
2    A   I flew from Quebec down to Atlanta and met
3  Dan Hees, and he took me in to visit and look over the
4  mill that I was wanting to transfer to in Roanoke.
5    MR. SCOFIELD: Can we take a break.
6    (Recess.)
7  BY MR. DOUGLAS: (Continuing)
8    Q   Was Fetner already working at that facility in
9  Roanoke?
10    A   Yes.
11    Q   Was he already a Jeld-Wen employee?
12    A   He -- all the employees in Roanoke -- the
13  secretary, Richard and the hourly workers -- being
14  acquired or blended into Jeld-Wen management -- and you
15  would have to check with some other Jeld-Wen
16  administration -- the in process joint venture. And they
17  were Jeld-Wen slash CMS status due to the financial
18  whatever -- acquisition of the whole corporation thing.
19    Q   What was your impression of Mr. Fetner when you
20  met him?
21    A   He was eager; he was hustling around the mill,
22  busy.
23    Q   What was his job at that time?
24    A   Production manager of the factory.
25    Q   Did -- when you were introduced to him, did they

## Pat Galvez

Page 42

1  know -- did Fetner know that you were to be his boss?
2    A   Yes. Dan had told him.
3    Q   That decision to move to Roanoke had already
4  been made?
5    A   Yes.
6    Q   When did you actually move to Roanoke as the
7  plant manager?
8    A   I started early March of 2002 sometime.
9    Q   All right. How many times did you see Fetner
10  between January of '02 and March of '02 when you started
11  the position?
12    A   I think it was just the one time in January.
13  Then I came to work in early March.
14    Q   How much time did you spend with him -- on the
15  January trip with Fetner?
16    A   It was around an hour for that day.
17    Q   Was your impression of him generally positive?
18    A   Yes.
19    Q   Would you say that you all got along?
20    A   Yes.
21    Q   Did he tell you anything personally about him?
22    A   Not that I remember.
23    Q   Did he tell you anything about his previous work
24  history?
25    A   No.

Pat Galvez

Page 43

1  Q  You had no idea where he had worked before other
2  than CMS obviously at that time?
3     A  Right. And I don't even remember how long he
4  had been in that factory. But he had been with them for a
5  while -- quite a while I think.
6     Q  So when you came back in March of '02 to start
7  your position, what was his job then?
8     A  Production manager.
9     A  Mr. Hees called him a group manager.
10    A  That's a Jeld-Wen term for running a crew.
11    Q  Same thing as production manager?
12    A  In Jeld-Wen there's a group manager -- it's like
13  a crew supervisor. And then if you have multiple
14  departments in your factory, they have coordinating group
15  managers who coordinate things. But if it's a smaller
16  factory, then you don't have departments to coordinate;
17  you have a production manager that deals with customers
18  and suppliers.
19    Q  So what was Fetner?
20    A  He was -- he was a group manager. That I was
21  the acting general manager.
22    Q  Why acting?
23    A  Acting because I could not officially be a
24  general manager in Jeld-Wen structure because it was not
25  Jeld-Wen solely owned business.

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

Pat Galvez

Page 44

1  Q  All right.
2  A  I could not be made that title.
3  Q  Who hired Fetner?
4  A  I don't know.
5  Q  Did you?
6  A  Did I hire him?
7  Q  Yes.
8  A  No.
9  Q  Well, I would like to know how many people could
10  have possibly hired him for Jeld-Wen?
11    MR. SCOFIELD: If you know.
12    THE WITNESS: I don't know. He was there when I
13  got there.
14  BY MR. DOUGLAS: (Continuing)
15  Q  Did Dan Hees tell you that he hired Mr. Fetner?
16  A  He didn't say he hired him. He said he was
17  there when Jeld-Wen took over the management.
18  Q  But you are certain you didn't hire him because
19  he was already there when you got there, correct?
20  A  Yes.
21  Q  So you worked with Mr. Fetner on a daily basis?
22  A  Yes.
23  Q  Did you all become friends?
24  A  Work friends.
25  Q  Did you and Mr. Fetner ever socialize outside of

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

Pat Galvez

Page 45

1  the office?
2  A  One time he -- I needed some help and his pickup
3  truck. I was working -- I was moving the hot tub from my
4  rental house to the house I bought. I asked him as well
5  as other men I knew in town to come help me with that. We
6  had a couple of company dinners either with Dan Hees or
7  Christmas dinner with secretaries and Richard.
8  Q  Where were the dinners?
9  A  At a restaurant in LaGrange we went to once or
10  twice and then to the Callaway Gardens for a Christmas
11  dinner event one year.
12  Q  It was you, Mr. Hees, Mr. Fetner and the
13  secretaries?
14  A  And our spouses. And Joe Mendoza was in one of
15  those.
16  Q  Was Mr. Fetner married?
17  A  He talked of his ex-wife. He wasn't married
18  that I knew of.
19  Q  The entire time that you were at the Roanoke
20  facility working with Mr. Fetner, did he tell you anything
21  personally about himself? Anything about his personal
22  life?
23  A  He was proud of his older son that was a lumber
24  buyer -- lumber broker. And then he had his other son
25  that had been in the military. And he talked about how

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

Pat Galvez

Page 46

1  his ex-wife worked at the Wedowee, Alabama plant and their
2  pre-hanging operations. She was a foreman, a supervisor
3  there. And he talked a lot about his grandson didn't live
4  too far away and a granddaughter. He liked to go watch
5  him play sports or Little League.
6  Q  Did Mr. Fetner talk about his son in the lumber
7  business in the presence of Dan Hees?
8  A  I don't recall.
9  Q  Did he talk about a son that was in drug
10  rehabilitation?
11  A  With me, yes.
12  Q  What did he tell you about that?
13  A  He told me his son was in the military and had
14  gotten out and was -- had some drug problems, and he was
15  getting him through that. And that was about it.
16  Q  Did Mr. Fetner ever tell you anything about his
17  sex life?
18  A  No.
19  Q  He never told you about anybody that he had ever
20  been intimate with?
21  A  No.
22  Q  Let me ask you something about the computers at
23  the Roanoke facility. Were there any when you were there?
24  A  Yes.
25  Q  How many that worked?

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Pat Galvez

Page 51

```
1    Q   One or —
2    A   One TV and one VCR.
3    Q   Were they hooked up?
4    A   They were usable, yeah.  Hooked together.
5    Q   What was the purpose of having them?
6    A   The purpose of them was to show safety training
7   videos to crews, and we had one orientation video.
8    Q   Where were they located?
9    A   The TV and VCR were in my office.
10   Q   Just as an aside right here, did the Roanoke
11  facility hire the employees through a temp service after
12  Jeld-Wen took over?
13   A   Yes.
14   Q   Do you recall the name of the temp service or
15  was there more than one?
16   A   There was Express Personnel as a temp service.
17   Q   All of the employees came from there after
18  Jeld-Wen took over?
19   A   I'm going to — almost all of them did.  I would
20  have to look — maybe employee records.  But I started —
21  when we needed to get more employees, I went with the temp
22  service.
23   Q   All right.  Let's go back to the Bowen incident.
24   A   Okay.
25   Q   Mr. Fetner approached you first; is that
```

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

## Pat Galvez

Page 52

```
1   correct?
2    A   Yes.
3    Q   With a complaint from Ms. Minix?
4    A   Yes.
5    Q   Tell me what happened next.
6    A   He told me — I got to work early; just returned
7   from a business trip.  And he said he had a complaint.  He
8   said here's my note from what Lorena complained to me
9   about yesterday after work.  So I read his notes, and I
10  said well, we are going to have to investigate this and
11  find out what she's talking about, what other witnesses
12  there are because this — if this is happening, this can't
13  be happening.
14   Q   What did you do next with his notes?
15   A   He gave them to me, and I typed them up.
16   Q   What did you do with the handwritten notes?
17   A   I probably threw them away or shredded them.
18   Q   Did you leave anything out from the handwritten
19  notes to the — to your typed version of them?
20   A   No.  I copied them as he wrote them.
21   Q   Does he have bad handwriting?
22   A   No.
23   Q   Well then, why not just use his notes?
24   A   Well, I was — I'm a computer user and keyboard
25  user, and I figured I would be sending the information off
```

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

## Pat Galvez

Page 53

```
1   to other parties to help investigate it by E-mail and —
2    Q   Well, why shred his notes?  Why not send his
3   notes off with your typed-up version?
4    A   It's been my — still —
5    Q   It's just your practice?
6    A   My practice.  I write things, clean them up and
7   save the typed copy.  It's neater.
8    Q   Is that a company policy or is that something
9   you do?
10   A   That's me.
11   Q   Does the company have a policy one way or
12  another?
13   A   No.  Not that I'm aware of.
14   Q   So after you typed up the notes — first of all,
15  what did the notes say?  Were they consistent with your
16  description of Ms. Minix's complaint earlier?
17   A   Were his notes consistent with her complaint?
18   Q   Yes.
19   A   Yes.
20   Q   So what did you do next?
21   A   What did I do next?  I interviewed -- that same
22  morning interviewed Lorena Minix and two other witnesses
23  that Lorena said were involved with Richard — who knew
24  were also possible witnesses.
25   Q   When did this happen?
```

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

## Pat Galvez

Page 54

```
1    A   These interviews?
2    Q   When did you get the complaint?
3    A   When did I get the complaint?
4    Q   Yes.
5    A   I got the complaint on Friday morning, June 27th
6   I think.
7    Q   Of 2003?
8    A   2003, yeah.
9    Q   So what did Lorena tell you when you interviewed
10  her?
11   A   She told me that she had seen Ronald Bowen
12  playing with himself behind the machinery that they worked
13  on.
14   Q   Playing with what part of his body?
15   A   His crotch, his penis.
16   Q   Okay.  Did she say whether it was in or outside
17  of his pants?
18   A   Inside.
19   Q   What else did she say?
20   A   She said that he was odd or different and that
21  she didn't want to get him in trouble but this wasn't
22  something that should be going on at work, and she didn't
23  want to have it go on any longer.
24   Q   What did you say?  If anything.
25   A   I said that we would get her information and
```

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

Pat Galvez

Page 55

1  talk to witnesses and talk to him and get to the root of
2  it and get it stopped if it was happening.
3      Q   What did she say?
4      A   What did she say?  She was okay.  She was --
5      Q   Tell me what she said.  If you remember.
6      A   I don't remember her exact words.  I made my
7  document of it at that time.  So all I can tell you is
8  what I recall the gist was if that's okay.
9      Q   That's fine.  I just want you to recall the gist
10 of what you said, not your impression of her at this
11 point.
12     A   Yeah.  She was -- two things.  She wanted it to
13 stop, and she didn't want him to be destroyed.
14     Q   Meaning fired?
15     A   Fired, lose his job, be embarrassed, humiliated
16 or --
17     Q   So she seemed to have some concern for
18 Mr. Bowen?
19     A   She had a lot of concern for Mr. Bowen, yes.
20     Q   Was Mr. Bowen emotionally unstable in your
21 opinion?
22     A   He was quiet, introverted.  I never saw any
23 signs of him being emotionally unstable.
24     Q   Would you describe him as emotionally fragile?
25     A   No.

Pat Galvez

Page 56

1      Q   Okay.  Anything else you can remember about your
2  conversation with Miss Minix?  Was this the next day or
3  the same day?
4      A   This was the same day it was reported to me.
5      Q   Okay.  She was reporting an incident that had
6  happened how long ago?
7      A   Talking to Lorena and investigating with her
8  that time, questioning her and -- week and a half, two
9  weeks later.  She was referring to some different times.
10 It was hard for me to get exactly the times that she
11 recalled.  But there was a Monday the 23rd incident she
12 talked about and then later she talked about Thursday the
13 26th incident.  And then she told me something about early
14 June of that year that she never really told me about the
15 first time.  Those are all in my notes.
16     Q   Okay.  So it -- according to Miss Minix, it was
17 a continuing problem; several instances?  There were
18 several instances?
19     A   Yeah.  She --
20         MR. SCOFIELD:  Object to the form.  It's two
21 different questions.  But go ahead.
22         MR. DOUGLAS:  You can answer.
23         THE WITNESS:  Ask me part of that question.
24 BY MR. DOUGLAS:  (Continuing)
25     Q   Ms. Minix was making complaints about several

Pat Galvez

Page 57

1  instances that Mr. Bowen was engaged in this behavior?
2      A   On my second interview, yes.  I recall she
3  talked of several incidents.  On my first interview with
4  her, she talked about the one incident.
5      Q   When was the one incident in time compared to
6  your interview with her?
7      A   The one incident was Monday the 23rd.  And my
8  interview was with her on Friday the 27th.
9      Q   You received the report from Mr. Fetner on the
10 27th?
11     A   On the 27th.
12     Q   Okay.  Were the complaints of Ms. Minix always
13 the same behavior or were there other things in addition
14 to the playing with himself that she complained about from
15 Mr. Bowen?
16     A   She said him playing with himself was the main
17 incident.  The other two incidents were kind of vague as
18 to exactly what he was doing or what she saw.
19     Q   Do you recall what she said?
20     A   I believe that early June incident was he wanted
21 to look at her.  And then the third incident, which she
22 said happened on the 26th, was he was doing it again.
23     Q   The playing with himself or the wanting to look
24 at her?
25     A   She said doing it again.

Pat Galvez

Page 58

1      Q   You didn't follow up?
2      A   I didn't follow that up.
3      Q   Why not?
4      A   Because I asked her, and she was not very clear
5  on information to give to me.
6      Q   Would you say she was uncooperative?
7      A   No.  She was unclear; she was like a little
8  unsure.
9      Q   So what happened next with regard to this
10 investigation?
11     A   So then I talked to Tawana Zachary that same
12 morning to see what she had seen or witnessed, take notes.
13     Q   Who was Tawana Zachary?
14     A   Coworker of Lorena and Ronald's.
15     Q   Tell me about that.
16     A   Tawana had said she was working nearby Lorena
17 and Ronald's machine.  And Lorena had come up to her and
18 said, I don't believe what Ronald is doing.  Go over here
19 and you tell me what you think he's doing.  And Tawana
20 walked closer to where Ronald was and said she saw him --
21 I think her words were beating his meat -- and went back
22 and told Lorena he's doing that, that s.o.b.
23     Q   Told Lorena that?
24     A   Told Lorena.  And Lorena had said --
25         MR. DOUGLAS:  Off the record.

## Pat Galvez

Page 59

```
 1              (Discussion off the record.)
 2        THE WITNESS: So then Tawana said Lorena told
 3   her well, as soon as I walk over close by him where he
 4   knows I'm walking by, Tawana walked over and got close to
 5   Ronald, and he stood back up and —
 6   BY MR. DOUGLAS: (Continuing)
 7     Q   Stopped doing what he was doing?
 8     A   Stopped doing what he was doing.
 9     Q   What else did Tawana tell you?
10     A   That was really about it. That I do know — I
11   asked her well, if you were working in this area you
12   couldn't see him? Why would you not be able to see him?
13   Was there a load of wood kind of partially obstructing?
14   She said yeah, there might have been a load because I had
15   to get out of my work area when Lorena asked me to take a
16   look at him. So that was about all I talked to her on.
17     Q   So she confirmed the allegation?
18     A   She confirmed the allegation of him behind the
19   machinery with his hands down in his groin, moving them.
20     Q   What did you do next?
21     A   Then I talked to —
22     Q   Is this still the 27th?
23     A   Yes.
24     Q   Of June?
25     A   Yes.
```

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

## Pat Galvez

Page 60

```
 1     Q   '03?
 2     A   Yes.
 3     Q   Okay.
 4     A   Then I talked to another employee, coworker
 5   named — Christy Sanders I think is her name. And she had
 6   told, I think, our other group manager Joe Mendoza that
 7   she heard stories of Ronald and Lorena about this
 8   incident. So I wanted to know what Christy had heard or
 9   talked about. So she had just told me that there was
10   floor rumors that Ronald was doing that, and Lorena and
11   Tawana had seen him. And that was about all her
12   statements to me.
13     Q   Around this time in 2003, how many of the
14   general laborers — is that an appropriate title for their
15   positions?
16     A   Okay. Millworkers.
17     Q   How many of them were in the plant?
18     A   About 30.
19     Q   How many were female?
20     A   About half.
21     Q   So about 15 you think?
22     A   Yes.
23     Q   What was the racial makeup of females?
24     A   You mean Caucasian or African?
25     Q   Or Mexican or whatever.
```

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

## Pat Galvez

Page 61

```
 1        MR. SCOFIELD: Form.
 2        THE WITNESS: I would have to guess. I would
 3   say maybe there was four African women and 10, 11
 4   Caucasian women.
 5   BY MR. DOUGLAS: (Continuing)
 6     Q   Okay. When you left the plant in 2004, was the
 7   makeup roughly the same or had it changed?
 8     A   It had probably — with the temp employees
 9   working there, probably a little more percent of African.
10     Q   But same numbers you think?
11     A   No.
12     Q   More numbers too?
13     A   More numbers. Maybe 36, 38 workers. We started
14   a new machine area.
15     Q   That's counting temporary workers?
16     A   Yes.
17     Q   But as far as employees of Jeld-Wen, was the
18   number still about 30 of millworkers you think?
19     A   No. It was less.
20     Q   What do you think that number would have been?
21     A   Twenty-four.
22     Q   Of the 24, how many would you say were women?
23     A   I'm going to guess about the same, 15.
24     Q   Okay. And the racial makeup of the 15 — let me
25   ask you this: Do you have — can you get this information
```

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

## Pat Galvez

Page 62

```
 1   for me?
 2     A   If I could see a roster of the employees from
 3   payroll or something at that time, I could verify that.
 4     Q   Can you get the roster?
 5     A   I guess you have to check with Rob Sturm.
 6   Should be available.
 7     Q   Okay. Would you get that information to your
 8   lawyers for me? That way you don't have to guess at it.
 9     A   Okay.
10     Q   I want to know in June, July of '03 and when you
11   left in '04, the total number of millworkers and how many
12   were women.
13     A   Okay. And their race?
14     Q   If you can. You can get that for me, can't you?
15     A   I will try. I should — I'll ask.
16     Q   If you would get that information to your
17   lawyers, you won't have to guess at it.
18     A   Okay.
19     Q   What happened next with regard to the Bowen
20   investigation? You talked to Christine.
21     A   Yes. She just verified as I said before.
22     Q   What heard?
23     A   Heard rumors and things were going on but knew
24   nothing firsthand.
25     Q   What happened next?
```

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

## Pat Galvez

Page 63

1    A  That was Friday, 27th. There was inventory that
2  afternoon or Saturday — month-end inventory. I was
3  coming up on 4th of July weekend; we were closed a couple
4  of days. And I then talked to Ronald Bowen the following
5  week — I can't remember the day but my notes say when it
6  was — about the allegations that were made. And I wanted
7  to talk with him about it.
8    Q  Was he at work in the interim?
9    A  Well, the mill would have been closed — I can't
10  remember the day I talked to Ronald. Was it July? Let's
11  see. 27 — I may have talked to him June 30th or July
12  1st. He worked until I talked to him.
13    Q  So did anything change in the workplace between
14  the allegation and corroboration of Miss Minix and
15  Miss Zachary and you talking to Mr. Bowen? Was anybody
16  reassigned or put in different places or anything along
17  those lines?
18    A  Not on that day, the 27th.
19    Q  How about at any time between the time when you
20  did your initial investigation on the 27th and you talked
21  to Mr. Bowen?
22    A  No. I don't think anything changed.
23    Q  So Miss Minix was still working close in
24  proximity to Mr. Bowen?
25    A  Yes.

## Pat Galvez

Page 64

1    Q  Even after you had received corroboration of her
2  complaint?
3    A  Corroboration is a big word. Can you use a
4  simpler word for me.
5    Q  Sure. Even after Miss Zachary had supported
6  Miss Minix's side of the story?
7    A  Okay. Yes.
8    Q  Okay. Would you agree with me that the better
9  practice would have been to put Mr. Bowen somewhere else
10  at that point?
11    A  No. He was the best at running those machines.
12  And if I get back to the point after Lorena having a
13  concern to not hurt him or demoralize him or humiliate
14  him — she was concerned about that. And I told her that
15  we would be working on investigating this, and I would
16  probably be checking with my superiors and our
17  corporate office to find a solution to the problem. And
18  she was content with our action to work on it, and she was
19  cooperating with us to do the investigation. We were
20  working with her; she was working with us. She seemed
21  fine that we would get to the bottom of it, and she would
22  be okay. But she did want to — you know, she had a
23  desire to get away from his work area and —
24    Q  She told you that?
25    A  Yes. But we wanted to make sure we knew the

## Pat Galvez

Page 65

1  facts. And we said we would work on it, and she was okay
2  with that too.
3    Q  So you disagree with me that it would have been
4  the better practice to separate them at that point?
5    A  At that point, no. Until we talked to the
6  witnesses and I got to talk to Ronald, I wanted to keep
7  things as they were.
8    Q  Okay. So looking at some documents that were
9  given to me by Jeld-Wen lawyers, indicates that maybe you
10  spoke with Ronald Bowen on Wednesday, July 2nd, 2003.
11  Does that sound about right?
12    A  That would be right if those are my notes.
13    Q  It's D00532 Bates stamp.
14    MR. SCOFIELD: It's got the numbers on the
15  bottom right-hand side.
16    THE WITNESS: 532. Okay.
17  BY MR. DOUGLAS: (Continuing)
18    Q  Are those your notes from your meeting with
19  Mr. Bowen or your interview with Mr. Bowen?
20    A  Yes.
21    Q  Indicates the interview took place on July 2nd,
22  2003.
23    A  Yes.
24    Q  You believe that to be correct?
25    A  Yes.

## Pat Galvez

Page 66

1    Q  After your interview with Mr. Bowen — first of
2  all, Mr. Bowen — my understanding he quit at some point?
3    A  Yes.
4    Q  Do you recall when that was?
5    A  It was on Wednesday, July — well, July 23rd
6  when Rob Sturm was in the plant.
7    Q  So between July 2nd when you talked to Mr. Bowen
8  and July 23rd when Mr. Sturm came down, were the work area
9  assignments of Mr. Bowen and Miss Minix changed?
10    A  I believe they were. I can't exactly remember.
11    Q  Then why do you believe they were?
12    A  Because I had had time to talk to him and the
13  witnesses. And I do remember Lorena getting moved from
14  this area to the molding area at some point. And if he
15  had quit when Rob Sturm was there on July 23rd, she had
16  already been out of that work area.
17    Q  Can you estimate — first of all, how far is the
18  mold area? Did you say mold?
19    A  Molding.
20    Q  Molding area.
21    A  From where she was, eighty yards.
22    Q  Do you have any estimate as to date of when she
23  was — would have been moved between the 2nd and the 23rd
24  of July?
25    A  I don't recall exactly. I know that from when

## Pat Galvez

Page 67

1  she told me we were — let's say stopped production for
2  inventory for most of the day. We were closed for a
3  couple of days for 4th of July holiday. She was off work
4  three days on vacation in that same time period — 7th
5  8th, 9th, 10th of July. Somewhere in there.
6      Q  Let me ask you this: Maybe I can help you out.
7  Pages D00533, 34 and 35 appear to be second interviews
8  with Tawana Zachary and Lorena Minix; is that correct?
9      A  Yes.
10     Q  So your investigation was still going on on the
11 14th of July?
12     A  Yes.
13     Q  Was he still — was Mr. Bowen and Ms. Minix
14 still in the same area by this date?
15     A  I don't know if they were or weren't.
16     Q  Okay. So that doesn't help you. The fact that
17 your investigation was still ongoing doesn't help your
18 memory as to whether they were still together at that
19 point?
20     A  No, it doesn't help me. I know that the week
21 before this, July 14th, I was waiting for her to come back
22 from her vacation. So she was gone half of the week
23 before that. I just can't remember when we moved her to
24 the molder area. May have been the 7th of July, may have
25 been the 14th or 15th of July.

## Pat Galvez

Page 68

1      Q  Okay. So have you told me everything about your
2  investigation on the 27th of June?
3      A  With three people, yes.
4      Q  Did you do anything else?
5      A  On the investigation?
6      Q  Yes. With regard to the incident at all.
7      A  On the 27th, no. You are probably getting into
8  inventory that day and into Saturday.
9      Q  So what would have happened next?
10     A  Come in the next Monday and started work and
11 then I talked to Ronald there on Wednesday, July 2nd.
12     Q  What did Ronald tell you?
13     A  He told me very little. He didn't say many
14 words, but he — he denied doing what the accusation said
15 he was doing.
16     Q  Did he offer an alternative explanation for what
17 he was doing?
18     A  The only thing he hinted at was possibly his
19 pants were amiss by the belt, and they would pull up his
20 pants.
21     Q  I have a memo. If you will flip to page D00514,
22 says it's to you from C. Robert Sturm. Do you recall
23 getting this memo?
24     A  No.
25     Q  All right. The memo runs from pages 514 through

## Pat Galvez

Page 69

1  page 522. Is today the first time you have seen it?
2      A  I believe so. It is.
3      Q  Would you have any explanation for why it would
4  say it was to you and you wouldn't get it?
5      A  No, I wouldn't.
6      Q  All right. The first sentence says that on
7  Wednesday, July 16th, 2003, Pat Galvez contacted the legal
8  department to report that a production employee, Lorena
9  Minix — skipping a little — had complained of alleged
10 sexual harassment by a coworker, Ronald Bowen.
11        Is that true that you first reported it to —
12 let me rephrase that. When did you first report it to
13 Jeld-Wen legal? If you know.
14     A  Well, if I look on your — D00523 was my E-mail
15 on that date sent to Jeld-Wen legal, Janie Davis. And —
16     Q  So you believe the date to be correct?
17     A  Yes.
18     Q  Who did you tell, if anybody, between June 27th
19 and July 16th about the allegation?
20     A  I told Dan Hees.
21     Q  When did you tell him? If you remember.
22     A  I don't recall. I mean, it was right there in
23 the first day, that Friday the 27th, or the following
24 Monday after I completed some investigations.
25     Q  Tell me about your conversation with Mr. Hees.

## Pat Galvez

Page 70

1      A  I told him that I had had this report from
2  Lorena and that I was — checked with her and Tawana and
3  Christy and was trying to investigate and get the
4  information. And I would keep him posted as I got all the
5  information collected.
6      Q  What did Mr. Hees say?
7      A  He encouraged me to continue the investigation
8  and get the information I needed and then to keep track of
9  it and get it off to Jeld-Wen legal for review when I had
10 everything collected.
11     Q  Okay. So my understanding is that you had an
12 interview with — you had two interviews with Lorena Minix
13 and Tawana Zachary?
14     A  Yes.
15     Q  One on June 27th, 2003; one on the 14th of July
16 2003?
17     A  Yes.
18     Q  You had one interview with Christy Sanders on
19 27th of June, 2003. That would be page 531.
20     A  Okay.
21     Q  Is that correct?
22     A  Yes.
23     Q  And you had one interview with Ronald Bowen on
24 2 July 2003?
25     A  Yes.

Pat Galvez

Page 71

1    Q   Those were all the interviews that you conducted
2  with regard to this incident?
3    A   Yes.
4    Q   And you said Mr. Bowen quit?
5    A   I believe I did.
6    Q   You said it was the day that Mr. Sturm came?
7    A   Yes.
8    Q   Let's go back to D00514 if we could, to the
9  memorandum to you from Mr. Sturm. The date of his memo is
10 27 June 2003 at the top.
11   A   Uh-huh.
12   Q   Do you know if that references -- what's that
13 referencing?
14   A   I don't know what that's referencing. It looks
15 to be incorrect.
16   Q   Because he wouldn't have known until the 16th
17 when you sent your E-mail --
18   A   Right.
19   Q   -- 16th of July 2003, correct?
20   A   Yes.
21   Q   All right.
22   A   Unless he's referring to the first day of the
23 report which was the day Lorena told me or Richard told me
24 Lorena told him.
25   Q   We will ask him about that. The second

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

Pat Galvez

Page 72

1  sentence -- excuse me. The third sentence in the second
2  paragraph -- are you with me?
3    A   Third sentence, yes. After conferring.
4    Q   No. Galvez -- there's a short sentence there.
5  Galvez requested assistance in completing the
6  investigation from the Jeld-Wen legal department.
7       Do you see that?
8    A   Yes.
9    Q   Did I read that correctly?
10   A   Yes.
11   Q   Is that true?
12   A   Yes.
13   Q   Did you ever receive any assistance?
14   A   Yes.
15   Q   That would have been in the form of Mr. Sturm
16 coming to the facility?
17   A   Yes.
18   Q   Next paragraph says that Mr. Sturm indicates
19 that he arrived at the facility on 24 July 2003. Does
20 that sound about right to you?
21   A   Sounds right.
22   Q   And the assistance -- what type of assistance
23 did he provide in the investigation of the Bowen incident?
24   A   He interviewed several of the employees about
25 this incident. I believe he interviewed Lorena and Tawana

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

Pat Galvez

Page 73

1  and Ronald, and he also interviewed me some and Richard
2  Fetner some. The other assistance he did was he conducted
3  a sexual harassment or harassment training to all the
4  crews during that same day.
5    Q   Did you attend that?
6    A   Yes.
7    Q   I think actually your name is on a -- you
8  actually signed the roster, didn't you?
9    A   Yes.
10   Q   Did you -- look at page D00120 I believe. Let's
11 make that 121.
12   A   Okay.
13   Q   As a matter of fact, you were the first one to
14 sign it?
15   A   Yes.
16   Q   Was the training substantially the same as your
17 training back in the '90s with regard to sexual
18 harassment?
19   A   The subject matter, yes.
20   Q   What was different?
21   A   Rob Sturm used more visual displays, overhead.
22   Q   Power Point?
23   A   I think it was a Power Point — good at Power
24 Point. But he did have visual tools to go with the
25 subject he was talking about.

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

Pat Galvez

Page 74

1    Q   Did you have any -- did you take any documents
2  away from that training on the 24th of July 2003?
3    A   No. He was teaching the already printed
4  harassment policy.
5    Q   As printed in the employee handbook or as
6  printed elsewhere?
7    A   As the policy itself — the handbook is like a
8  summary of the policy.
9    Q   So are — employees are given the handbook,
10 correct?
11   A   They are given a handbook.
12   Q   Are they given the entire policy?
13   A   Yes.
14   Q   Okay. Let's go back to page B00515 if we could.
15 Second paragraph. Based on the gravity of Bowen's policy
16 violations and consistent with Jeld-Wen's anti-harassment
17 policy and approach, I would recommend that Bowen's
18 employment terminate and he be designated ineligible for
19 rehire.
20      Did I read that correctly?
21   A   Yes.
22   Q   Mr. Sturm's investigation revealed what your
23 investigation revealed, correct?
24   A   I don't see that in that sentence.
25   Q   It's not in that sentence. I'm asking you —

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

Pat Galvez

Page 75

1  I'm asking you if Mr. Sturm uncovered anything new?
2    A  I would have to read the report.
3    MR. DOUGLAS:  Okay.  Well, go ahead and read it.
4  Let me know when you are ready, and I will ask you some
5  more questions.
6    MR. SCOFIELD:  Take your time.
7    (Interruption in the proceedings.)
8    THE WITNESS:  Okay.  I'm done.
9  BY MR. DOUGLAS:  (Continuing)
10    Q  Did Mr. Sturm's investigation uncover anything
11  that yours did not?
12    A  He did uncover more points, and I knew about,
13  but we basically reached the same decision — I guess
14  credibility of Tawana Zachary, Lorena Minix witnessing.
15  And then Ronald's leaving the work area on that day closed
16  the case, I guess, in my mind.
17    Q  Okay.  What I was kind of getting at was you had
18  as much information to conclude that the allegation was
19  true as Mr. Sturm did, correct?
20    A  Not as much about Ronald Bowen.  His story on
21  Ronald Bowen was more feedback than I was able to get.
22    Q  Not one of you believed Ronald Bowen compared to
23  the other witnesses, correct?
24    A  I didn't know for sure, and Ronald denied it to
25  me so —

Pat Galvez

Page 76

1    Q  So after your interview with Ronald and your
2  second interview with Miss Minix and Miss Zachary, did you
3  believe he had masturbated in front of Miss Minix or did
4  you not believe it?
5    A  He could have.  I was still open on
6  investigation at that point.
7    Q  You weren't sure?
8    A  I wasn't sure.
9    Q  Were you leaning in any direction?
10    A  No.  I was keeping the door open.
11    Q  What is it about Mr. Sturm's investigation, if
12  anything, that would have pushed you over to concluding
13  that he did actually do that?  That Mr. Bowen did actually
14  do that.
15    A  Well, Mr. Sturm says — says I have concluded
16  that Bowen did, in fact, inappropriately touch his
17  genitals on many occasions around his machinery.  This
18  conclusion was reached using a more likely than not
19  standard.  Is he 100 percent sure Ronald did that?
20    Q  No.
21    A  That's my point.  I didn't know if Ronald did or
22  didn't.
23    Q  Did you think it was more likely than not that
24  he had?
25    A  No.

Pat Galvez

Page 77

1    Q  Let me give you the time frame.  After you
2  conducted all your interviews, was it more likely he had
3  done the act or he had not done the act?
4    A  I was neutral because my investigation wasn't
5  done.  I was summarizing my investigations to get legal
6  assistance help.
7    Q  What was left to be done with regard to your
8  investigation?  You had talked to all the witnesses.
9    A  I had talked — I had felt from Lorena Minix's
10  responses to me that the sequence of events was sketchy;
11  you know, it wasn't the same thing each time.  There was
12  new information, which can happen, but I was still trying
13  to get all of the information that would fill in the holes
14  or make it — make it so a decision could be made.
15    Q  Yes.  But what else did you have to investigate?
16  You said your investigation wasn't complete.  What else
17  did you have to investigate?
18    A  On investigation, to my knowledge, there's many
19  stones to turn over.  You know, you go after the biggest
20  ones that will maybe get you the most accurate
21  information.
22    Q  Well, you talked to more people than Mr. Sturm,
23  didn't you?
24    A  Yes.  I talked to Christy.  And I would have
25  talked to others.  There's other names brought up, but I

Pat Galvez

Page 78

1  didn't go there, you know.  I didn't know if Rob Sturm was
2  going to talk to more than he talked to.
3    Q  So your testimony under oath is that after you
4  finished the second interview with Miss Minix and
5  Miss Zachary, you didn't think it was more likely than not
6  that Bowen had done what he was accused of doing?
7    A  I guess so.  I didn't feel it was more likely
8  than not.
9    Q  Did you feel that it was more likely than not
10  that he had not done it?
11    A  That's a lot of double negatives I'm thinking.
12  I wasn't — I didn't feel sure.  He could have; maybe he
13  didn't.  I don't know which side of the fence I was on.
14    Q  You were 50/50 right down the middle?
15    A  I tried to stay 50/50 until I had information
16  that was convincing.
17    Q  What information was it that Mr. Sturm
18  uncovered — let me ask you as we sit here today, do you
19  believe that Mr. Bowen — it's more likely than not that
20  Mr. Bowen did what he was alleged to have done?
21    A  I would say by the fact that he walked out of
22  the plant, walked off the job, he felt he couldn't win or
23  he had done something wrong.
24    Q  Kind of an admission of guilt?
25    A  I think so by that act.

**Pat Galvez**

Page 79

1    Q   So you believed the act of quitting can be an
2  admission of guilt?
3    A   Yes.
4    Q   Makes sense, right?
5    A   Because if you feel that you were right, you are
6  not going to walk away from it.
7    Q   Right. Okay. Looking back, do you wish that
8  you had terminated his employment in the almost month that
9  intervened between the reporting and him leaving the job?
10   A   No.
11   Q   You think you handled it appropriately?
12   A   I think I did.
13   Q   Okay. Let me call your attention to page
14 D00523. This is an E-mail that you sent to Jane Davis and
15 Julie Gillman?
16   A   Yes.
17   Q   Who are those two people?
18   A   Janie Davis and Julie Gillman were Jeld-Wen
19 legal attorneys or legal department here.
20   Q   Do they report to Mr. Sturm or does he report to
21 them or do you know?
22   A   I don't know.
23   Q   Jane Davis a female?
24   A   Yes.
25   Q   Who's Rick Parker?

**Pat Galvez**

Page 81

1    Q   You just still don't remember?
2    A   I don't remember.
3    Q   Okay. All right. Let's get back to the first
4  paragraph. You write that you have been directed to
5  consult -- you -- by Dan Hees on my completion of initial
6  interviews. Did I read that correctly?
7    A   Yes.
8    Q   Mr. Hees told you to coordinate with legal?
9    A   Yes. That was our plan. And Janie Davis and
10 Julie Gillman were people in legal who he knew were
11 involved or specialized or could offer assistant in these
12 matters.
13   Q   Sexual harassment matters?
14   A   Yes.
15   Q   Did you know that?
16   A   I knew Julie; she trained me in Yakima on sexual
17 harassment. So that rang a bell.
18   Q   Couple sentences down, I have been compiling
19 documentation from our interviews. You see that sentence?
20   A   Yes.
21   Q   Did I read that correctly?
22   A   Yes.
23   Q   What documentation?
24   A   The notes of interviews. They are noted down
25 below because of the little bracket marks.

**Pat Galvez**

Page 80

1    A   He was Dan Hees' boss. Was at that time our
2  vice president of millwork manufacturing.
3    Q   And the date on this E-mail is what?
4    A   July 16th, 2003.
5    Q   All right. If you will look down to the
6  paragraph that begins with the word since.
7    A   Okay.
8    Q   The third sentence reads, one employee, Lorena
9  Minix, has moved from her regular work area to another
10 machine in the plant until we get some resolution to this
11 allegation. Did I read that correctly?
12   A   Yes, you did.
13   Q   Did you type that in your E-mail?
14   A   I did.
15   Q   So it would have been sometime at or about July
16 16th, 2003, that she was moved?
17   A   Yes.
18   Q   Since you did your second interviews on July 14
19 there, do you think it would have been between the 14th
20 and 16th that she was moved? Does that help you remember
21 at all?
22   A   She could have been moved between the 14th and
23 16th. The days before -- the week before she was off
24 three days on vacation. Maybe I moved her before her
25 vacation.

**Pat Galvez**

Page 82

1    Q   We have been over all of those notes, correct?
2    A   Yes.
3    Q   So was there any other documentation you were
4  providing?
5    A   No.
6    Q   The next sentence says -- well, excuse me. Two
7  sentences later says, I am taking a couple of vacation
8  days Thursday and Friday of this week. Will be back in
9  the office on Monday.
10       So you were gone on vacation for a couple of
11 days?
12   A   I took a couple of days off; 17th and 18th of
13 July.
14   Q   Back to the paragraph that begins with the word
15 since. The first sentence says, since the alleged
16 incident, hourly workers are behaving normal and doing
17 their job. Did I read that correctly?
18   A   Yes.
19   Q   And you wrote that?
20   A   Yes.
21   Q   What does behaving normal mean?
22   A   It means they are doing their work, they are
23 being productive and getting along with each other.
24 There's no concerns.
25   Q   Do you know or have you ever heard that

Pat Galvez

Page 83

1   Miss Minix made the complaint with regard to Mr. Bowen to
2   Mr. Fetner prior to you finding out?
3       A   Let me repeat that. Did I know that Lorena
4   complained to Richard Fetner before I knew?
5       Q   Yes.
6       A   Yes.
7       Q   How did you know that?
8       A   Richard told me the Friday, 27th of June.
9       Q   What did he tell you?
10      A   He told me that Lorena had complained to him the
11  Thursday afternoon.
12      Q   Just the day before?
13      A   The day before.
14      Q   Just the one time?
15      A   One time.
16      Q   Did Mr. Fetner tell you about Lorena complaining
17  at any other time?
18      A   No.
19      Q   Now, the next paragraph down says attached are
20  eight files of interview documentation on the following
21  situation. Please advise after your review. I need some
22  recommendation on what to do, how to best handle this and
23  the potential effects. Did I read that correctly?
24      A   Yes.
25      Q   Did you write that?

Pat Galvez

Page 84

1       A   Yes.
2       Q   What potential effects?
3       A   The potential effects of harassment.
4       Q   On who?
5       A   On Ronald, Lorena or -- because at this point I
6   think I concluded that -- where did I see it. Maybe I
7   didn't type it in here. I needed to have recommendations
8   on what to do, how to best handle this -- handle --
9   proceed with the investigation, handle for discipline.
10  What do they recommend, what input could they give me.
11      Q   But the potential effects of what?
12      A   Well, the word I chose to say what's going to be
13  the outcome of this for discipline or the employment of
14  these individuals or one individual.
15      Q   Right. Below that it indicates the files that
16  you are giving are Richard Fetner's notes and Joe
17  Mendoza's notes. What was Joe Mendoza's position with the
18  company at that time?
19      A   He was group manager of a column and porch post
20  section at the plant.
21      Q   At the Roanoke facility?
22      A   At the Roanoke facility.
23      Q   When did he leave? Before or after you?
24      A   He left before me.
25      Q   He went to Texas?

Pat Galvez

Page 85

1       A   Yes.
2       Q   So Joe Mendoza gave you notes also?
3       A   He gave me a few notes that were on this file
4   here.
5       Q   What did you do with them?
6       A   Actually he typed them up, and I included them
7   on this E-mail.
8       Q   You included the typed notes?
9       A   Yes.
10      Q   The written notes -- what did you do with them?
11      A   I never had those.
12      Q   Mr. Fetner's notes you destroyed, correct?
13      A   Yes. I was done with them.
14      Q   You had typed them up, and you destroyed the
15  handwritten notes?
16      A   Yes. And Joe's notes Joe typed and gave them to
17  me or sent them to me.
18      Q   All right. If you will flip to page -- actually
19  on the same page, the next section, you say for your info
20  here are the people and positions involved, and you
21  attached interview stories. Did you see that?
22      A   Yes.
23      Q   Did I read that correctly?
24      A   Yes.
25      Q   Lorena Minix you typed female employee and

Pat Galvez

Page 86

1   firsthand witness, stating coworker behaves
2   inappropriately; is that correct?
3       A   Yes.
4       Q   Tawana, nicknamed Tootie, female employee and
5   firsthand witness of coworker's inappropriate behavior.
6       A   Okay.
7       Q   Did you write that?
8       A   Yes.
9       Q   At this time on July 16th, 2003, had you
10  concluded that the behavior had taken place?
11      A   No.
12      Q   Do you know why you chose those words, firsthand
13  witness of coworker's inappropriate behavior if you hadn't
14  concluded that it took place?
15      A   If you look at the line before, Lorena Minix
16  stating coworker behaves inappropriately.
17      Q   Right. I'm asking you about the next line then.
18      A   Right. Yeah.
19      Q   Why did you choose those words?
20      A   I was trying to organize the thoughts of who was
21  who and use as impartial words as I could.
22      Q   So you were giving the employees' words, not
23  necessarily your conclusions; is that fair?
24      A   Yeah. I was taking their interviews, taking
25  their words, their stories, documenting it. But I had not

## Pat Galvez

Page 87

1  reached conclusion myself.
2      Q   What were Joe Mendoza's duties at the plant?
3      A   He supervised the porch post and column
4  production area.
5      Q   When he left, was that part of the plant shut
6  down?
7      A   Yes.
8      Q   So nobody had to come in and perform those
9  duties?
10     A   Correct.
11     Q   Page D00525. Note from manager Richard Fetner
12 on things told to him from hourly worker Lorena Minix.
13 Then there's an entry for Thursday, 6/26/03, 4:05 p.m. Is
14 that just your typing of Fetner's notes verbatim?
15     A   Yes. Starting with the date and time, that's
16 his handwritten notes. I typed 4:05 p.m.  4:20 p.m. were
17 his notes.
18     Q   So the last sentence on the second entry says so
19 I — I take it that would be Fetner?
20     A   Yes.
21     Q   So I told Joe that he could not have that, and
22 we would get together this morning and get it taken care
23 of. Did I read that correctly?
24     A   Yes.
25     Q   What does get it taken care of mean? If you

## Pat Galvez

Page 89

1        MR. SCOFIELD: Then don't guess.
2  BY MR. DOUGLAS: (Continuing)
3      Q   That's just your understanding, but you don't
4  know?
5      A   My understanding is is severance packages,
6  severance agreements are done in cases where the business
7  is discontinuing an operation or job or department.
8      Q   Do you know of any instance where an employee
9  has quit and received a severance package?
10     A   No.
11     Q   How about Richard Fetner?
12     A   I don't know about that.
13     Q   Do you know whether Mr. Fetner quit or not?
14     A   I was told by Dan Hees he resigned.
15     Q   Did you know that he received a severance
16 package?
17     A   No.
18     Q   Would that surprise you?
19        MR. SCOFIELD: Objection; form. Answer the
20 question.
21        THE WITNESS: Would that surprise me. Can I say
22 no opinion? I don't really know that much about severance
23 packages to be surprised or not surprised.
24        MR. SCOFIELD: If that's your answer, that's
25 your answer.

## Pat Galvez

Page 88

1  know.
2      A   It would mean investigate and find out what went
3  on, who saw what.
4      Q   When Mr. Sturm came to the plant on 24 July
5  2003, did you know he was there to do a harassment
6  training program?
7      A   Yes.
8      Q   And to investigate?
9      A   Yes.
10     Q   So you knew the purpose of the visit?
11     A   Yes.
12     Q   Did you have any more contact with Mr. Bowen
13 after he left?
14     A   No.
15     Q   Was he — did he have to sign a severance
16 agreement?
17     A   No.
18     Q   Why not?
19     A   Because he walked off the job, left the plant.
20     Q   What's your understanding of when somebody will
21 be given a severance agreement to sign?
22     A   Would be if the company is going to discontinue
23 their position.
24     Q   Is that company policy? If you know.
25     A   I don't know.

## Pat Galvez

Page 90

1        THE WITNESS: That's my answer.
2  BY MR. DOUGLAS: (Continuing)
3      Q   All right. So when Bowen left, I take it that
4  incident was resolved with his leaving?
5      A   The incident of him leaving?
6      Q   Yes.
7      A   He —
8      Q   He obviously didn't have to be fired?
9      A   True. He left. I'm looking a little puzzled
10 here. If he didn't come in the next day, he didn't come
11 in the next day or the next day, we have a three-day
12 no-call no-show policy. I may have waited until that
13 point to say let's remove him from the payroll. But it
14 would be checked.
15     Q   Don't worry about that. Let me ask you this:
16 Why did you refer this in to the legal department and not
17 the incident that happened here in Klamath Falls earlier
18 this year?
19     A   Did I ever say I didn't refer the incident here
20 at Klamath Falls to the legal department?
21     Q   I thought you did. But if I'm incorrect, let me
22 know.
23     A   I don't remember that.
24     Q   Did you refer the incident here in Klamath Falls
25 to the legal department?

Pat Galvez

Page 91

1    A    I think I did.
2    Q    Did you call them in to do an investigation?
3    A    No.
4    Q    Did you just call them for opinion about
5    discipline?
6    A    I believe I had the information documentation
7    and sent it to my boss Kim Murrillo, and he may have
8    forwarded it to the legal department. At that point the
9    employees resigned, but I'm not 100 percent sure all that
10   was done.
11   Q    Would you ever terminate an employee for
12   harassment without consulting the legal department?
13   A    Yes. If I knew it to be — if I witnessed it
14   firsthand and it was undeniable to me.
15   Q    What if the person admitted it that they engaged
16   in the harassment? You didn't see it but it was admitted
17   by the alleged wrongdoer.
18   A    I would suspend them and pass the information on
19   to the legal department. Hypothetical?
20   Q    It is hypothetical. Would you ever terminate an
21   employee? Not just suspend, but terminate.
22   A    If they admitted to doing it?
23   Q    Yes.
24   A    If it was flagrant and immoral and things like
25   that, yes, if they admitted to it. I would probably have

Pat Galvez

Page 92

1    them sign a statement, I'm going to fire you for doing
2    that, and you admitted it.
3    Q    What type of conduct would you consider
4    flagrant?
5    MR. SCOFIELD: Answer the question. Object to
6    speculation. But go ahead.
7    THE WITNESS: What type of behavior would I
8    consider flagrant?
9    BY MR. DOUGLAS: (Continuing)
10   Q    Yes. I asked if you would ever fire an
11   employee, and you said yes, if it was flagrant and
12   immoral. I'm trying to find out in your mind — I'm
13   starting out with flagrant.
14   MR. SCOFIELD: Same objection. Go ahead.
15   THE WITNESS: Intended, purposeful, non-caring.
16   That type of a — show disrespect; I'm just going to do
17   what I want.
18   BY MR. DOUGLAS: (Continuing)
19   Q    Toward the other person?
20   A    Towards — yeah. Do some action that's
21   intentional. It's intended. They don't care; they are
22   going to do something they know is wrong, or they are
23   seriously out of line.
24   Q    Okay. What about immoral?
25   A    Immoral would be things that are not culturally

Pat Galvez

Page 93

1    acceptable in the workplace.
2    Q    You consider yourself to have the authority to
3    terminate an employee for violating the sexual harassment
4    policy?
5    A    Can you repeat that again.
6    Q    In your opinion, do you have the authority —
7    MR. SCOFIELD: Just object as to the time
8    period. But other than that, answer the question.
9    BY MR. DOUGLAS: (Continuing)
10   Q    Well now, first of all, right now as we sit here
11   today, do you believe you have the authority to fire an
12   employee for violating the company's sexual harassment
13   policy without getting an opinion from legal?
14   A    As I sit here right now, no.
15   Q    Okay. In 2003 did you believe yourself to have
16   that authority?
17   A    I would have suspended anybody in 2003 and
18   called Dan Hees.
19   Q    And why has your opinion changed as you sit here
20   now?
21   A    Well, it hasn't changed. Both cases I believe a
22   general manager of the plant has that authority for hiring
23   and firing. Kim Murrillo is my general manager here. I
24   would suspend someone; he would fire based on my
25   suspension. Dan Hees was a coordinating general manager

Pat Galvez

Page 94

1    where I was acting general manager.
2    Q    So he could have fired somebody for violating
3    the sexual harassment policy?
4    A    Yes.
5    Q    Okay. When did you last speak with Richard
6    Fetner?
7    A    June 26th, 2004.
8    Q    That was your last day?
9    A    Somewhere in there. I was busy getting my
10   furniture loaded and such.
11   Q    You have not spoken word one to him since?
12   A    I talked to him once on the telephone within a
13   month after that when I got to Oregon.
14   Q    What did you talk about in that conversation?
15   If you remember.
16   A    Something on the customer order file or product
17   type. Something with the business.
18   Q    Have you ever talked to Mr. Fetner about these
19   proceedings?
20   A    No.
21   Q    How did you become aware of these complaints?
22   A    These complaints? Not the Ronald Bowen
23   complaint?
24   Q    Not Bowen.
25   MR. SCOFIELD: This lawsuit.

**Pat Galvez**

Page 95

1    THE WITNESS: I became aware of this from Dan
2  Hees telling me that I would be contacted by Scott. Last
3  August maybe, whenever we talked.
4  BY MR. DOUGLAS: (Continuing)
5    Q    So that would have been August of 2005?
6    A    Yes.
7    MR. DOUGLAS: Okay. All right. Let's take
8  about a 10-minute break.
9        (Recess.)
10  BY MR. DOUGLAS: (Continuing)
11    Q    Mr. Galvez, if you would look at pages D00447
12  through D00513. After you have had a chance to look at
13  those documents, I want to ask you a few questions.
14        (Interruption in the proceedings.)
15    Q    Have you reviewed those documents?
16    A    Yes.
17    Q    Do you recognize them?
18    A    I recognize many of them.
19    Q    What are the ones you recognize? What do you
20  recognize them as?
21    A    I recognize these are some of the pictures —
22  Power Point that Rob showed at the training in Alabama.
23    Q    On 24 July 2003?
24    A    Yes.
25    Q    Do you know if Dan Hees was there that day?

**Pat Galvez**

Page 96

1    A    He was there, yes. And he came to the mill the
2  day Rob was there.
3    Q    So if — could I call your attention to D00462.
4    A    Okay.
5    Q    It says two of three. Is that out of a manual
6  somewhere?
7    A    It looks like it could be out of the company
8  policy and procedures manual.
9    Q    Anti-harassment procedures and guidelines,
10  correct?
11    A    Yes.
12    Q    Then it says Jeld-Wen strives to provide a
13  workplace comfortable and free from harassment and
14  discrimination, including that which may be construed to
15  be offensive sexual conduct. Did I read that correctly?
16    A    Yes.
17    Q    So it's a violation of Jeld-Wen harassment
18  policy to engage in conduct that could be construed as
19  offensive sexual conduct even if it's not meant that way;
20  is that true?
21    A    Yes.
22    Q    Have you read any of the depositions that have
23  been taken in this case?
24    A    I have seen part of Dan Hees' deposition.
25    Q    What's the difference between seen and read?

**Pat Galvez**

Page 97

1    A    I have not read it from front to back.
2    Q    The part that you have seen, have you read?
3    A    Yes.
4    Q    Okay. Anybody else's deposition?
5    A    No.
6    Q    Lorena Minix gave her deposition in this matter
7  on 10 April of this year.
8    A    Okay.
9    Q    There was a question asked to her by
10  Mr. Scofield. Do you need the book and page number?
11    MR. SCOFIELD: Yes, I do. Go ahead and read it
12  and show it to him.
13  BY MR. DOUGLAS: (Continuing)
14    Q    If you want me to show it to you — I'm going to
15  read it.
16    A    Okay.
17    Q    Page 222, beginning with line 18, continuing
18  through 223 through line 3. Question by Mr. Scofield.
19  And I will represent to you they were discussing this
20  whole Bowen incident.
21    Question: But Mr. Galvez -- once he found out
22  about it, Tootie went and told him, Mr. Galvez moved
23  you — isn't that correct? -- while he looked into it?
24    Answer: No, they didn't move me. I stayed
25  there for a couple of weeks.

**Pat Galvez**

Page 98

1    Question: If the Jeld-Wen records indicate that
2  they moved you away from -- and suspends question; she
3  interrupts. No, they never moved me.
4    I want to talk about that passage for a minute.
5    A    Okay.
6    Q    Do you want to read it yourself?
7    A    Yeah, please.
8    Q    Sure. It's four pages per page. So I began
9  there.
10    A    Start on line —
11    Q    Just read it to yourself then I'm going to ask
12  you some questions about it.
13    A    Okay.
14    Q    Okay. My first question is did Tawana Zachary
15  tell you about the incident?
16    A    No. Well, I called her and I talked to her and
17  interviewed her. We came to her.
18    Q    After you knew, correct?
19    A    After Lorena had reported it to Richard, and we
20  started investigating.
21    Q    Her first answer with regard to being moved,
22  that she stayed there for a couple of weeks, do you
23  quarrel with that?
24    A    I don't argue that.
25    Q    Certainly she and Mr. Bowen were still working

## Pat Galvez

Page 99

1  in close proximity while you were looking into the
2  allegations?
3      A   Yes.
4      Q   Now, her second answer that they never moved
5  me — if what she means by that is never within two weeks,
6  that's one thing. But if she really means never, you
7  would quarrel with that?
8      A   Yes.
9      Q   Do you have any other documents other than your
10 E-mail that would show when she was moved or that she was
11 moved?
12     A   Not that I have with me. It's possible that the
13 payroll — let me see — production code records can be
14 found you can find her time on a different machine area.
15     Q   Who encodes that information?
16     A   Roxie Giles would be entering the labor entries
17 for each day's work, the hours they work. And I'm not
18 specifically sure what codes we used or — I can't
19 remember the codes we used in the plant.
20     Q   Can those documents be retrieved? And if so,
21 who could retrieve them?
22     A   It would be in our Jeld-Wen payroll system. And
23 the fellow that handled our mill was named Joe somebody.
24 And I think he's still employed here in our payroll
25 department. But that would show the machine that she was

## Pat Galvez

Page 100

1  assigned at, the hours each day.
2      Q   Where is that? Is that here in Klamath Falls?
3      A   Yes.
4      Q   Some guy named Joe?
5      A   Yeah. Sounds like an old movie. But I can't
6  remember his last name — the head payroll man. There's
7  the administrator, and I think his name was Joseph Smith.
8  And then there's another Joe that worked under him. Not
9  that I'm making fun of it but that's just their names.
10     Q   Okay.
11     A   No, no. It wasn't Joseph, it was
12 John DeFrancisco was the head supervisor of payroll.
13     Q   Back then?
14     A   Back then.
15     Q   What's his position now?
16     A   I don't know. I don't have to deal with that in
17 this job. But the guy worked under him was named Joe at
18 the Roanoke.
19     Q   Have you discussed this case other than with
20 lawyers?
21     A   No. Just with some phone calls. Calls with Dan
22 on how things were happening in Alabama after I left.
23     Q   Tell me about those calls.
24     A   He had told me that — I guess chronologically
25 the mill was buried the summer I left; there was a lot of

## Pat Galvez

Page 101

1  business because the market was favorable. He mentioned
2  to me that there was a complaint about Richard Fetner and
3  that Richard resigned and that he had another —
4      Q   Did you inquire about the allegations against
5  Mr. Fetner?
6      A   No.
7      Q   Really?
8      A   No.
9      Q   Now, were you and Richard friends? What did you
10 call yourself?
11     A   I said we were work friends.
12     Q   But you all got along?
13     A   Yes.
14     Q   So Mr. Hees told you there was a complaint
15 against Mr. Fetner. Did he say what it was about?
16     A   Said he came there one time and several women
17 had talked to them; they wanted to meet with him together
18 about Richard doing harassing things.
19     Q   Did he say it was of a sexual nature?
20     A   No.
21     Q   You didn't ask any questions?
22     A   Didn't ask.
23     Q   Didn't want to know?
24     A   I'm very busy at my own job and my own life
25 here. And that was a time in my life where I moved on.

## Pat Galvez

Page 102

1      Q   Were you surprised when Mr. Hees told you there
2  were complaints against Mr. Fetner?
3      A   Yes.
4      Q   Why were you surprised?
5      A   Because busy plant — the people were good
6  people. I didn't realize — I didn't think issues would
7  happen like that.
8      Q   What do you mean the people are good people?
9      A   I got to know all 30 workers; I got to work with
10 them on and off over two years. They were good people.
11     Q   Do you have an opinion whether my clients are
12 telling the truth about Mr. Fetner?
13         MR. SCOFIELD:   Form. Go ahead.
14         THE WITNESS:   I can't say whether they were
15 telling the truth or not. They were nice people to me; I
16 worked with them. You know, we worked hard.
17 BY MR. DOUGLAS: (Continuing)
18     Q   So you don't have an opinion as to whether my
19 clients are telling the truth about the harassment by
20 Mr. Fetner or not?
21     A   No.
22     Q   One way or the other, you don't have an opinion?
23     A   I'm not — I wasn't there with them at the time
24 they said these things happened.
25     Q   What's your understanding of what they said

## Pat Galvez

Page 103

1  happened and how did you develop that understanding?
2      A    Well, talking with Scott; he's filled me in.
3      Q    You don't have to tell me about that.
4          MR. SCOFIELD: Don't talk about what we talked
5   about.
6          THE WITNESS: Okay.
7   BY MR. DOUGLAS: (Continuing)
8      Q    Is it just from Counsel that you have received
9   the information about the complaints?
10     A    Other than Dan Hees telling me that — the
11  complaint about harassment and Richard, and Richard
12  resigned.
13     Q    But that really doesn't tell you much about the
14  complaints themselves, does it?
15     A    No.
16     Q    And you and Mr. Hees didn't make any discussion
17  back and forth or have any other discussion back and forth
18  about the complaints?
19     A    Correct.
20     Q    So Mr. Hees didn't give you any specifics?
21     A    No.
22     Q    And you didn't ask for any?
23     A    No.
24     Q    Okay.  Now that you have heard the complaints,
25  what they are, you still don't have an opinion about

## Pat Galvez

Page 104

1   whether they are true or not?
2      A    Nope.
3      Q    So if anybody testified that you had been told
4   about Mr. Fetner or Mr. Fetner's proclivity to harass, you
5   would deny that?  That was a terrible question.
6          MR. SCOFIELD: Yeah.  Time frame.
7          MR. DOUGLAS: Let me start over.
8          MR. SCOFIELD: Vagueness and things of that
9   nature.
10         MR. DOUGLAS: I don't think time frame is at
11  issue because he said he's never heard anything about
12  Fetner before this.
13         MR. SCOFIELD: Fair enough.
14         THE WITNESS: Right.
15  BY MR. DOUGLAS: (Continuing)
16     Q    Before Dan Hees, you never heard anything bad
17  about Fetner harassing employees?
18     A    Correct.
19     Q    So if somebody were to testify that you had been
20  told in the past back when you worked in Alabama, you
21  would deny that?
22     A    Yes.
23     Q    Okay.  Do you remember Miss Lisa Cook?
24     A    Yes.
25     Q    Who was she?

## Pat Galvez

Page 105

1      A    She was an hourly worker.
2      Q    At the Roanoke facility?
3      A    Yes.
4      Q    Did she ever complain to you regarding Fetner?
5      A    No.
6      Q    Never?
7      A    She complained to me about attendance issues;
8   her being away from work for her son, and Richard not
9   listening to her.  I want to say we wrote her up or give
10  her discipline about having missed time.  She complained
11  that did Richard wasn't understanding of her situation
12  which was a single parent.  But that's what I remember
13  about her.
14     Q    But you deny she made any sort of complaint
15  about Fetner in a harassment context?
16     A    She never complained to me about that.
17     Q    Okay.  Did you ever become aware that Mr. Fetner
18  once worked for a company called Wellborn?
19     A    Yes.  He told me he used to work for Wellborn.
20     Q    Do you have any knowledge, either firsthand or
21  hearsay, about Mr. Fetner harassing anybody at Wellborn
22  when he worked there?
23     A    No.  I have no knowledge of that.
24     Q    Nobody ever told you that?
25     A    Never heard that.

## Pat Galvez

Page 106

1      Q    Okay.  Do you remember a Cathy Thornton?
2      A    Yes.
3      Q    Tell me about her.
4      A    She was a paint line operator.
5      Q    What's a paint line operator do?
6      A    She sets up the priming machine to prime
7   different wood products with coats of different thickness
8   coats of paint on the wood products.  Goes to a drying
9   oven.  Making sure the paint is adhering right, drying
10  properly.
11     Q    Did Mr. Joe Mendoza ever relay any complaints of
12  Cathy Thornton about Mr. Fetner to you?
13     A    No.
14     Q    Did you ever hear of any complaints regarding
15  Cathy Thornton and Richard Fetner from anybody —
16     A    No.
17     Q    — prior to finding out about this lawsuit?
18     A    No.
19     Q    Did you know whether or not Cathy Thornton was
20  going through a divorce during the time that you were at
21  the Roanoke facility?
22     A    No.
23     Q    Don't know one way or the other, and you don't
24  think she was?
25     A    I don't know one way or another.

Pat Galvez

Page 107

1    Q   Never heard anything about that?
2    A   No.
3    Q   Did Mr. Fetner ever tell you that he and
4    Miss Minix had -- at one time had a sexual relationship?
5    A   No.
6    Q   Have you ever heard that?
7    A   I have heard that.
8    Q   Recently?
9    A   Recently from my counsel only.
10   Q   Okay.  Did that surprise you?
11   A   Yes.
12   Q   Why is that?
13   A   It surprised me because Richard was the plant
14   supervisor and very gung ho for work and gung ho in
15   getting work done.  I don't know if that's true or not
16   true.
17   Q   That part is admitted so let's assume it's true.
18       MR. SCOFIELD:  I'm going to object to
19   speculation and relevance and all that other stuff.  But
20   go ahead and answer the question.
21       THE WITNESS:  It just surprised me.  He's
22   professional, gets the work done, stays away from
23   involvement of that nature.  And I don't know anything
24   about this relationship or when it happened.
25   BY MR. DOUGLAS:  (Continuing)

Pat Galvez

Page 108

1    Q   Would you -- first, would you personally if you
2    were unmarried -- if you were single, would you have an
3    intimate relationship with somebody that worked for you?
4        MR. SCOFIELD:  Same objection.  Go ahead.
5        THE WITNESS:  No.
6    BY MR. DOUGLAS:  (Continuing)
7    Q   Would you consider that a violation of Jeld-Wen
8    harassment policy?
9    A   No.  Policy doesn't say you can't date.
10   Q   Okay.
11   A   It's just -- it's against my best interest.  I
12   mean, you work at one place; you live in another place.
13   That's my own choice.
14   Q   You think it's a foolish thing to do?
15   A   For me it would be.  I wouldn't want to do it.
16       MR. DOUGLAS:  Okay.  If you give me a few
17   minutes.  Off the record.
18       (Recess.)
19   BY MR. DOUGLAS:  (Continuing)
20   Q   Okay.  There's one other area that I want to ask
21   you about, and we will wrap up.  If you would turn to page
22   D00520.  This is Mr. Sturm's memo to you.  Section that
23   says note.  You see that?
24   A   Near the top second group, yes.
25   Q   Although my interview with Bowen was nearly

Pat Galvez

Page 109

1    complete, cut short by the pre-scheduled employee break
2    and anti-harassment training, during the training I
3    noticed that Bowen showed up a bit late and stood well off
4    to the side of the group by himself.  He did not interact
5    or visibly react to the training material during the
6    presentation.  At the end of training, Bowen approached me
7    with his brother standing beside him and heatedly yelled
8    toward me that, quote, based on my presentation everyone
9    in the facility was guilty of harassment, unquote.  Before
10   I could react or respond, Bowen's brother pulled him away
11   and said enough -- quote, enough; it's time to go now,
12   unquote.
13       I subsequently learned from Fetner that Bowen
14   and his brother had told Fetner that the two were
15   finished, and they cleared out their personal effects.
16   Fetner understood that the two had quit.
17       Did I read that correctly?
18   A   Yes.
19   Q   Was there any follow up by Mr. Sturm or Dan Hees
20   regarding Mr. Bowen's accusation that based on the
21   presentation, everyone in the facility was guilty of
22   harassment?
23   A   I'm not aware of any.
24   Q   Did Mr. Sturm talk to you about that remark?
25   A   I don't remember that.  I do remember Ronald

Pat Galvez

Page 110

1    standing to the side of the group in the training area,
2    and I do remember after the training was done within 10
3    minutes Richard came up to me and Dan, and Ronald and his
4    brother left the building and took their stuff.  That kind
5    of a report.
6    Q   So you don't remember Ronald Bowen making
7    this --
8    A   No.
9    Q   -- statement?
10   A   No.  I wasn't in that area at the end of the
11   meeting.
12   Q   And at any rate, even if he did make the
13   statement, there was no follow up of that allegation by
14   Mr. Sturm or Dan Hees with you?
15   A   No one followed up with that with me.
16   Q   Nobody called you to conduct further
17   investigation with regard to possible harassment at the
18   facility?
19   A   Correct.
20       MR. DOUGLAS:  Okay.  Well, that's all the
21   questions that I have.
22       MR. SCOFIELD:  Let me ask a couple.
23       THE WITNESS:  Okay.
24   ///
25   ///

**Pat Galvez**

Page 111

```
 1          EXAMINATION
 2  BY MR. SCOFIELD:
 3      Q  On 523 and 524 is your E-mail to Julie Gillman
 4  dated July 16th, 2003; is that correct?
 5      A  Yes.
 6      Q  And in there you state on the first page, sixth
 7  paragraph down, one employee -- that Lorena Minix has been
 8  moved from her regular work area to another machine in the
 9  plant until we get some resolution out of this allegation;
10  is that correct?
11      A  Yes.
12      Q  You stand behind that?
13      A  Yes.
14      Q  This was dated July 16th, 2003?
15      A  Yes.
16      Q  All right. Next page on 524 it shows that you
17  were first notified of this -- only of the allegation
18  against Mr. Bowen on July -- excuse me -- June 27th, 2003?
19      A  That's when I was first notified of this, yes.
20      Q  That was a Friday; is that correct?
21      A  Yes.
22      Q  Then you had Saturday, Sunday, then the next
23  week was the 4th of July week?
24      A  Yes.
25      Q  And when was the plant off?
```

**Pat Galvez**

Page 112

```
 1      A  Plant was closed Friday the 4th and floating
 2  holiday the following Monday the 7th.
 3      Q  Then Lorena took a vacation from when to when?
 4      A  9th to 11th which was a Wednesday, Thursday,
 5  Friday.
 6      Q  So during any of that time period, did Lorena
 7  complain to you that Mr. Bowen was -- lack of a better
 8  word -- playing with himself?
 9      A  No.
10      Q  Did she ever complain to you that you were too
11  slow in moving her away from where she was?
12      A  No. Not to me then or not to me ever.
13      Q  All right.
14      A  She was cooperative with our plan of
15  investigation.
16      Q  And did Lorena -- her primary concern was with
17  Mr. Bowen and his future; is that correct?
18      A  That was a big concern of hers, his well being.
19      Q  Okay. Now let's go to page 517. This is
20  Mr. Sturm's report. And in the 517 in the third full
21  paragraph, the last sentence of the third full paragraph,
22  she, meaning Lorena, said that her desire in complaining
23  was to be moved away from Bowen, not for him to be
24  terminated and that the company had, in fact, moved her
25  away from Bowen as she had desired.
```

**Pat Galvez**

Page 113

```
 1      Q  Is that the conclusion Mr. Sturm came up with?
 2      A  That's his words.
 3      Q  Is that -- do you know of any information that
 4  that statement is incorrect from Lorena?
 5      A  No. I would agree those were her desires.
 6      Q  Okay. Now, you testified earlier that you
 7  became acting general manager in Roanoke in late February
 8  or early March 2002?
 9      A  Yes. Early March 2002.
10      Q  Did you have any involvement in the nuts and
11  bolts of the legal transaction between Jeld-Wen and the
12  previous owner?
13      A  No.
14      Q  Did you have any personal knowledge as to when
15  Jeld-Wen policies were started to be implemented in the
16  Roanoke facility?
17      A  No. They were already in the works when I got
18  there.
19          MR. SCOFIELD: Okay. That's all the questions
20  that I have.
21          MR. DOUGLAS: I have some more questions.
22          MR. SCOFIELD: Certainly.
23  ///
24  ///
25  ///
```

**Pat Galvez**

Page 114

```
 1          FURTHER EXAMINATION
 2  BY MR. DOUGLAS:
 3      Q  The -- you said that you read part of Mr. Hees'
 4  deposition?
 5      A  Yes.
 6      Q  What did you read?
 7      A  I looked at the type of questions, and I just
 8  flipped through the pages and looked at the questions and
 9  the responses here and there. Nothing in particular.
10      Q  Did you start at the beginning?
11      A  I started in the early part, yeah.
12      Q  All right. This deposition is approximately --
13  not approximately. The deposition is exactly 168 pages of
14  questions and answers.
15      A  Okay.
16      Q  How many of those would you say that you read?
17  Did you read.
18      A  I would say maybe the first 40 to 50.
19      Q  Did you get to any of the parts with regard to
20  the allegations my clients are making in this case in
21  reading this deposition?
22      A  No.
23      Q  Was there anything in Mr. Hees' deposition that
24  you disagreed with?
25          MR. SCOFIELD: That you read.
```

**Pat Galvez**

Page 115

```
 1       THE WITNESS: From what I read. Well, him
 2   referring to me as general manager. I was a general
 3   manager, but I wasn't a general manager; I was an acting
 4   general manager. My technical title at Jeld-Wen was
 5   assistant general manager.
 6   BY MR. DOUGLAS: (Continuing)
 7       Q   He was general manager, correct?
 8       A   He was coordinating general manager.
 9       Q   You didn't have a general manager?
10       A   No.
11       Q   Anything else other than that?
12       A   No.
13       MR. DOUGLAS: Okay. That's it. I'm all out of
14   questions.
15       (Deposition concluded at 3:43 p.m.)
16
17           --o0o--
18
19
20
21
22
23
24
25
```

**Pat Galvez**

STATE OF OREGON     )
                    ) ss.   C E R T I F I C A T E
County of Jackson   )

        I, MELANIE J. SAVORD, do hereby certify that:
        At the time and place heretofore mentioned in
the caption of the foregoing matter, I was a Certified
Shorthand Reporter, in and for the State of Oregon;
        That at said time and place I reported in
stenotype all testimony adduced and proceedings had in the
foregoing matter;
        That thereafter my notes were reduced to a
computer-aided transcript and that the foregoing
transcript is a true and correct transcript of all such
testimony adduced and proceedings had and of the whole
thereof, to the best of my ability.
        IN WITNESS THEREOF, I have hereunto set my hand
this 15th day of May, 2006, in the City of Medford, County
of Jackson, State of Oregon.

        _____
        MELANIE J. SAVORD
        Certified Shorthand Reporter
        Certificate No. 96-0325