# EXHIBIT M

## DEPOSITION EXCERPTS OF C. ROBERT STURM

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION


LORENA MINIX, et al.,

                    Plaintiffs,

          vs.                         CASE NO. 3:05CV685-T

JELD-WEN, INC., and
RICHARD FETNER,

                    Defendants.
_____/


DEPOSITION OF CHARLES ROBERT STURM


        BE IT REMEMBERED THAT, pursuant to Notice

of Taking Deposition, the deposition of CHARLES

ROBERT STURM was taken on behalf of the Plaintiffs,

before Melanie J. Savord, Certified Shorthand

Reporter, State of Oregon, on Thursday, May 4, 2006,

beginning at the hour of 9:13 a.m., at the offices

of Jeld-Wen Administration, 3250 Lakeport Boulevard,

in the City of Klamath Falls, County of Klamath,

State of Oregon.

Charles Robert Sturm

APPEARANCES                                    ii

ON BEHALF OF THE PLAINTIFFS:

McNEAL & DOUGLAS
Attorneys at Law
1710 Catherine Court
Auburn, Alabama 36830

BY:  JAMES B. DOUGLAS, JR., ESQ.


ON BEHALF OF THE DEFENDANTS:

SCOFIELD, GERARD, SINGLETARY & POHORELSKY
Attorneys at Law
1114 Ryan Street
Lake Charles, Louisiana 70601

BY:  SCOTT J. SCOFIELD, ESQ.


LEHR, MIDDLEBROOKS, PRICE & VREELAND
Attorneys at Law
Post Office Box 11945
Birmingham, Alabama 35202-1945

BY:  MICHAEL L. THOMPSON, ESQ.
(Appearance by telephone)


REPORTED BY:

MELANIE J. SAVORD
Certified Shorthand Reporter, No. 96-0325
Registered Professional Reporter

ADVANCED COURT REPORTING & VIDEO SERVICE
336 West 6th Street
Medford, Oregon  97501

(541) 732-1988 MEDFORD      (541) 488-5745 ASHLAND
(541) 474-7883 GRANTS PASS     (541) 732-1987 FAX
(800) 343-3396

## Charles Robert Sturm

STIPULATION          iii

PURSUANT TO NOTICE OF TAKING DEPOSITION, the deposition of CHARLES ROBERT STURM was taken on behalf of the Plaintiffs, before Melanie J. Savord, Certified Shorthand Reporter, State of Oregon, at this time and place, on oral interrogatories to be propounded to said witness pursuant to Federal Rules of Civil Procedure.

IT IS STIPULATED AND AGREED that all irregularities as to notice of time and place and manner of taking said deposition are hereby waived, each party reserving the right to object at the time of trial to any question or answer as to the competency, relevancy or materiality thereof, but that objections as to the form of the question or responsiveness of the answers must be made at the time of taking said deposition or shall be deemed to be waived.

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

## Charles Robert Sturm

INDEX          v

INDEX OF OBJECTIONS MADE BY COUNSEL
BY MR. SCOFIELD:

| PAGE | LINE | PAGE | LINE |
|---|---|---|---|
| 15 | 7 | 111 | 14 |
| 39 | 24 | 112 | 6, 17 |
| 46 | 8 | 113 | 14 |
| 51 | 23 | 114 | 3, 24 |
| 69 | 17 | 128 | 17 |
| 72 | 5 | 142 | 4 |
| 91 | 6 | 144 | 11 |
| 94 | 25 | 148 | 15 |
| 96 | 7 | 151 | 1 |
| 97 | 20 | 152 | 2 |
| 103 | 19 | 157 | 9 |
| 105 | 15, 20 | 163 | 25 |
| 109 | 18 | 166 | 12 |
| 110 | 12 | 173 | 25 |

INDEX OF QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 157 | 16 |

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

## Charles Robert Sturm

INDEX          iv

INDEX OF EXAMINATION          PAGE
EXAMINATION BY MR. DOUGLAS          6

INDEX OF EXHIBITS
| | PAGE |
|---|---|
| Deposition Exhibit Number 1 | 10 |
| Notice to Take Deposition | |
| Deposition Exhibit Number 2 | 94 |
| Management Agreement | |
| Deposition Exhibit Number 3 | 98 |
| Several Program | |
| Deposition Exhibit Number 4 | 101 |
| Fetner Severance Agreement | |
| Deposition Exhibit Number 5 | 116 |
| Ethics Policy | |

INDEX OF INFORMATION REQUESTED BY MR. DOUGLAS
| PAGE | LINE | DESCRIPTION |
|---|---|---|
| 30 | 20 | Videotape |
| 55 | 13 | Release |
| 62 | 12 | Management Agreement |
| 65 | 23 | Management Severance |
| 73 | 6 | Severance Policy |
| 93 | 17 | Time Cards |

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

## Charles Robert Sturm

Page 6

1          CHARLES ROBERT STURM,
2     called as a witness on behalf of the
3     Plaintiffs, being first duly sworn to testify
4     the truth, the whole truth, and nothing but
5     the truth, was examined and testified as follows:
6     ///
7          EXAMINATION
8     MR. SCOFIELD:  While we were on the record, I
9     want to make sure that we are on the same page.  First of
10    all, Rob will explain efforts he went to get the E-mails
11    regarding Richard Fetner.  Here is a list I took out of
12    payroll.  Here's a list of all the employees that were
13    there in or about August of 2004.  Here is a CMS Holding
14    Company employee handbook effective January 1st, 2001.
15         Here is our current ethics policy; it's the
16    closest we could find that had anything to do with
17    employees dating.  It doesn't address that directly but
18    it's the closest we could find.
19         Michael -- Mike has suggested that it's common
20    practice in 11th Circuit to divide the deposition between
21    the 30(b)(6) and the fact part because he's both.  So I
22    don't know how that's done.  Mike, if you want to give me
23    any instruction that needs to be done, Jim's open for it.
24    MR. THOMPSON:  It can either be done in one
25    record and -- just it's up to Jim which one he starts

(541)732-1988     Advanced Court Reporting & Video Services     (800) 343-3396

## Charles Robert Sturm

Page 7

1 with, or you can do two separate transcripts.
2     MR. DOUGLAS: We are going to do it all in one
3 record.
4     MR. THOMPSON: Jim, which one are you going to
5 start with?
6     MR. DOUGLAS: I will do the 30(b)(6) first.
7     MR. THOMPSON: Okay.
8     MR. DOUGLAS: If we wander off into the
9 individual part, you know, if you all let me know --
10     MR. SCOFIELD: We would prefer — I would rather
11 not make a bunch of objections. I have never done it that
12 way; Rob has never done it that way. If that's common in
13 the 11th Circuit —
14     MR. THOMPSON: I don't know if it's common
15 practice but that's how we do it.
16     MR. DOUGLAS: I'm just going to — I will start
17 with him as the 30(b)(6). I think because of the nature
18 what he did, there's going to be some overlap.
19     MR. SCOFIELD: That's correct.
20     MR. DOUGLAS: I'm not going to worry too much
21 about it frankly.
22     MR. THOMPSON: There's no way not to have some
23 overlap.
24     MR. SCOFIELD: There's no way not to have
25 overlap.
(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 8

1 BY MR. DOUGLAS:
2   Q   Would you state your full name, please, sir.
3   A   Sure. Charles Robert Sturm, S-T-U-R-M.
4   Q   Mr. Sturm, how are you employed?
5   A   I'm employed by Jeld-Wen.
6   Q   In what capacity?
7   A   Senior corporate counsel.
8   Q   How long have you been with Jeld-Wen in that
9 capacity?
10   A   Since November of 2002.
11   Q   Before then what was your position?
12   A   Before then I worked for a law firm, Little
13 Mendelson.
14   Q   Where is that firm located?
15   A   I was located in San Francisco.
16   Q   Okay. Where did you finish law school?
17   A   Boston University.
18   Q   What year was that?
19   A   '92.
20   Q   Have you been practicing since '92?
21   A   Yes.
22   Q   Given that, I won't go over all the normal
23 formalities of a deposition. Just if I ask a bad question
24 let me know, and I will be happy to rephrase it until we
25 get one that you can understand. Okay?
(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 9

1   A   Sure.
2   Q   Where did you attend college?
3   A   Cornell University.
4   Q   When did you graduate?
5   A   '89.
6   Q   Did you go to college anywhere other than
7 Cornell?
8   A   No.
9   Q   How about high school?
10   A   Horace Greeley High School.
11   Q   Where is that?
12   A   New York.
13   Q   Where in New York?
14   A   Chappaqua, New York.
15   Q   When did you graduate from high school?
16   A   What year?
17   Q   Yeah.
18   A   1985.
19     MR. SCOFIELD: You have some interesting
20 neighbors in Chappaqua.
21     THE WITNESS: We do now.
22 BY MR. DOUGLAS: (Continuing)
23   Q   When you first started working with Jeld-Wen in
24 2002, where were you located? Here in Klamath Falls?
25   A   Correct.
(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 10

1   Q   Have you worked in Klamath Falls the entire time
2 that you have been with Jeld-Wen?
3   A   Up until very recently.
4   Q   What happened very recently?
5   A   As of about two weeks ago, I'm now splitting
6 time between San Francisco and Klamath Falls.
7   Q   Where do you live?
8   A   Well, I split. Where do I live? In which
9 location?
10   Q   Where is your residence?
11   A   My home is in Klamath Falls.
12   Q   Okay. I'm going to show you a document; I will
13 mark it as Exhibit Number 1. It's three pages in length.
14 I would like to ask you if you have ever seen it before.
15     (Marked for identification:
16     Deposition Exhibit Number 1.)
17   A   Yes.
18   Q   Okay. Is that a notice for a 30(b)(6)
19 deposition in this matter?
20   A   Yes.
21   Q   Do you see the Exhibit A that's attached which
22 is a request for documents?
23   A   Yes.
24   Q   Have you reviewed that prior to your deposition
25 today?
(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

unionized? If you know.
A I'm not sure I understand. You mean as a percentage of the overall facilities or employees?
Q Of the overall facilities.
A You are referring domestically?
Q I am.
MR. SCOFIELD: I'm going to object to the form of this. I don't know how it's relevant. But he can answer.
THE WITNESS: A small percentage.
BY MR. DOUGLAS: (Continuing)
Q Less than 10?
A Yeah.
Q Only reason I brought that up -- and I don't want to spend a lot of time on it. You mentioned National Labor Relations Board, and I got this is a nonunion company. You just mentioned that was part of your job.
A (Witness nods head.)
Q Would it be fair to say that doesn't constitute a huge portion of your job?
A I'm not sure what you mean by huge portion. It depends on the time of the year. Certainly collective bargaining negotiations are fairly time consuming and as a consequence when a contract is on the verge of expiring, there will be a significant amount of time and energy

spent preparing for and participating in collective bargaining negotiations. And then there will be other times where there will be very little time spent on traditional labor work.
Q Would you be able to quantify the amount of time you spend, the percentage of time you spend on harassment policy? Specifically sexual harassment.
A Over what period of time? Again, it would depend. There are points in time where I might be involved fairly actively in dealing with gender harassment situations and then there will be other times where it's not an issue.
Q When you came to Jeld-Wen in 2002, did the company have an existing sexual harassment policy?
A Yes.
Q Is that policy completely contained in the employee handbook? Beginning with page 5 I suppose.
MR. SCOFIELD: Off the record.
(Discussion off the record.)
THE WITNESS: Do you mind just rereading it?
THE REPORTER: "QUESTION: Is that policy completely contained in the employee handbook?"
THE WITNESS: The policy is set forth in the employee handbook and the anti-harassment policy contained

in the policies and procedures manual.
BY MR. DOUGLAS: (Continuing)
Q Do employees who were hired receive both of those documents?
A Yes.
Q What, if anything, did you have to do with constructing or formulating the policy?
A You mean revising the policy? I didn't. I came in November of 2002 and the policy existed so I was not involved.
Q In any way with the construction of the policy?
A Not as it existed at the time that I started my employment.
Q Okay. When you started your employment, was the policy changed or revised at any time from 2002 to the present?
A There have been revisions.
Q Tell me about those revisions.
A In general, it's largely the same policy. There have been some tweaks to the policy.
Q Tell me about the tweaks.
A My recollection is that in December of 2002 I was involved in doing a slight modification to the definition of sexual harassment and made a clarification to it.

Q Could you explain that. What was the clarification?
A If you have got the policy if I could take a look at it, that would help. I think you will get a better answer.
Q I don't know if this is the policy, but I will show you what's been previously produced as D00447. There's been earlier testimony that's with regard to a presentation you made. Perhaps the policy is contained in there.
A Yes. The policy 203.
Q Tell me what page you are reading from.
A Sure. It's Bates marked D465.
Q Okay.
A And I had modified item 4, sexual harassment. And the modification had involved adding or changing the language, the last number of words in that to instead read, that is directed toward an individual because of that person's gender.
Q What did it read before that?
A I don't recall exactly what it read but my recollection is that it was -- is that the focus was more on sexual content. And I simply clarified that our view of sexual harassment obviously could include sexual content but also could include content that was gender

## Charles Robert Sturm

Page 19

1  oriented and targeted — perhaps did not involve sexual
2  content.
3    Q    So you expanded the definition?
4    A    Correct.
5    Q    What was the purpose of doing that?  If you
6  remember.
7    A    To upgrade the definition.
8    Q    Why?
9    A    Because I felt it improved the policy.
10   Q    Were there any outside actions that prompted you
11  to do that?
12   A    No.
13   Q    There wasn't new case law that you read or
14  claims that had been filed which made you think the
15  definition needed to be expanded?
16   A    No.  I was new to the company.  And part of my
17  initial review when I came on board was to look at our
18  policies and where I felt it was -- where I felt I could
19  upgrade or improve the policy, I did that.
20   Q    This was in late 2002 you believe?
21   A    Correct.
22   Q    Any other changes made to the Jeld-Wen
23  harassment policy since you have been here?
24   A    None that come to my mind right now.
25   Q    All right.  So basically the company has had the

## Charles Robert Sturm

Page 20

1  identical policy for the last three years, three and a
2  half, four years; is that correct?
3    A    In a general sense.
4    Q    How about in a specific sense?
5    A    Well, again, there may have been some minor
6  changes that I can't recall as I sit here now.  In a
7  general sense it's remained the same with that one change
8  that we just talked about.
9    Q    Would it be fair to say there's been no major
10  changes since you made the change in 2002?
11   A    I think that would be fair to say.
12   Q    Do you know Mr. Dan Hees?
13   A    I should, by the way, just point out that --
14   Q    Are you still answering my previous question?
15   A    Yes.  If you don't mind.
16   Q    I don't.
17   A    It does appear that you provided me with the
18  policy — portions of the policy.  It does appear that
19  there are a couple of pages missing.  So my responses
20  would be as to policy 203 as opposed to the specific pages
21  that I'm looking at because, again, as you can see, 462
22  starts off with A and then 463 jumps to C.
23   Q    Just so we are clear, I'm providing the
24  information as provided to me by your counsel.
25   Q    Do you know Dan Hees?

## Charles Robert Sturm

Page 21

1    A    Yes.
2    Q    Who's Dan Hees?
3    A    He's one of the managers for Jeld-Wen.
4    Q    What are the manager's duties with regard to
5  knowing and implementing the gender harassment policy?
6    A    They are responsible for being familiar with the
7  policy and for complying with it.
8    Q    They just have to know it exists or they have to
9  know what it is?
10   A    Both.
11   Q    I understand everybody should have to comply
12  with the policy, correct?
13   A    Correct.
14   Q    Management and employees, correct?
15   A    Yes.
16   Q    Are managers responsible for implementing the
17  policy?
18   A    Managers have greater responsibility with
19  respect to the policy than non-managers.  And that
20  includes implementing the policy and being — they have
21  greater involvement when the policy is triggered, for
22  example, by somebody raising a complaint.
23   Q    What are a manager's duties when somebody raises
24  a complaint?
25   A    The manager is responsible for — in the general

## Charles Robert Sturm

Page 22

1  sense for getting the ball rolling with respect to
2  initiating an investigation.  And how that occurs depends
3  on the particular facts that we are dealing with.
4    Q    Should a manager know if a complaint is proven
5  true it is in violation of the policy?  Is that something
6  a manager should know?
7    A    In some circumstances.
8    Q    What circumstances should he or she necessarily
9  have to know?
10   A    Well, the legal department and myself in
11  particular is a resource that managers commonly use to
12  assist in determining whether there has been a policy
13  violation or not.
14   Q    Well, let me ask you a hypothetical then.  If a
15  manager receives a complaint that — from an employee that
16  her supervisor propositioned her to have sex on the
17  premises, that would clearly be a violation of the policy,
18  correct?
19   A    If that allegation was true.
20   Q    If the allegation was true?
21   A    Correct.
22   Q    So -- and a manager should know that if that
23  allegation were proven true, it would be a violation of
24  the policy, correct?
25   A    Correct.

## Charles Robert Sturm

Page 23

1    Q   They should be familiar enough with the policy
2  where they should not have to call to ask you if that's a
3  violation, correct?
4    A   I certainly wouldn't discourage them from
5  calling me. I would expect they would have an
6  understanding that was a violation of policy.
7    Q   If a manager calls you under a situation that I
8  just described, would it make you angry if they called to
9  ask if that was a violation of the policy?
10   A   Angry, no.
11   Q   Frustrated?
12   A   Well, I can think of — I think I could be value
13  added to that process.
14   Q   I'm sure you could. But you would expect a
15  manager to know that's a clear violation of the policy,
16  wouldn't you?
17   A   I would expect a manager to know that was a
18  violation of the policy but it wouldn't make me angry that
19  they had called me.
20   Q   Okay. I understand that you would welcome them
21  getting your input on how to proceed with my situation?
22   A   (Witness nods head.)
23   Q   Well, isn't part of your job to make sure that
24  management is familiar with what the policy is and give
25  them information about the policy? Isn't that part of

## Charles Robert Sturm

Page 24

1  what you do?
2    A   That is part of what I do.
3    Q   And it's important to you that management be
4  familiar with the policy and know what to do when they get
5  a complaint, correct?
6    A   That's a fair statement.
7    Q   Do you know a Mr. Joe Mendoza?
8    A   I don't personally know Joe Mendoza.
9    Q   Do you know who he is?
10   A   I know the name.
11   Q   Do you know if he worked at the facility in
12  Roanoke, Alabama?
13   A   I have an understanding that he did.
14   Q   Didn't you see him down there?
15   A   I saw quite a number of people. I may have seen
16  him as well.
17       MR. DOUGLAS:  Why don't you turn in your book
18  there to page D00121 in this notebook. Let's go off the
19  record.
20       (Interruption in the proceedings.)
21  BY MR. DOUGLAS: (Continuing)
22   Q   I'm sorry; I'm going to direct you to page
23  D00296. I will represent to you that it's been
24  represented to me by your counsel that this is page 2.
25  Page 121 that we looked at briefly was page 1 of a

## Charles Robert Sturm

Page 25

1  harassment training attendance acknowledgement dated July
2  24th, 2003. Do you recall going to the facility on that
3  day?
4    A   Actually, my recollection is that I do recall
5  going to the facility; I can't recall if it was the 23rd
6  or the 24th.
7    Q   The name next to number 34 appears to be
8  Joe Mendoza; is that correct?
9    A   I believe so.
10   Q   Does that in any way refresh your memory as to
11  whether or not you saw or spoke to Mr. Mendoza on that
12  day, whatever day you were down there?
13   A   Not really.
14   Q   Okay. The name under his is Mr. Richard Fetner.
15  Do you know that gentleman?
16   A   I know of him.
17   Q   How do you know of him?
18   A   Through his employment with Jeld-Wen.
19   Q   Tell me what you know of him regarding his
20  employment with Jeld-Wen.
21   A   I know that he worked at the Roanoke facility,
22  and I have an understanding of his employment having
23  ended.
24   Q   Do you know what his position was at the Roanoke
25  facility?

## Charles Robert Sturm

Page 26

1    A   I don't know what his specific job title was.
2    Q   How about Mr. Mendoza — do you know what his
3  title was at the Roanoke facility?
4    A   I don't.
5    Q   How about Mr. Hees — you said that he was one
6  of your managers. Do you know what his title was
7  regarding the Roanoke facility?
8    A   I believe his title was coordinating general
9  manager.
10   Q   And do you know a Mr. Pat Galvez?
11   A   I do.
12   Q   How do you know him?
13   A   I've interacted with him on matters.
14   Q   Did you interact with him on matters regarding
15  the Roanoke facility?
16   A   Yes.
17   Q   Do you know what his job title was at the
18  Roanoke facility while he was there?
19   A   I assume you mean at the end. I don't know the
20  detailed understanding of the various positions that he
21  held but my understanding was at the end — my
22  recollection is that he was the acting general manager.
23   Q   Do you have any idea — strike that. If a claim
24  of gender harassment or sexual harassment is made, the
25  employee should follow the guidelines listed in the

## Charles Robert Sturm

Page 27

1  handbook before you, correct?  In other words, there's a
2  portion of harassment policy which tells the employees
3  what to do if they have a complaint; is that correct?
4      A   Correct.
5      Q   I'm reading from page 5.  Says any employee who
6  believes that he/she is being subject to objectionable
7  conduct should promptly notify either their immediate
8  supervisor, their general or corporate manager, vice
9  president or subsidiary president or the legal department
10  and it gives a telephone number.
11      Did I read that correctly?
12      A   I believe you did.
13      Q   All right.  So if an employee has a complaint,
14  they may lodge it to any of those people listed and be in
15  compliance with the policy, correct?
16      A   Correct.
17      Q   Let's assume hypothetically there's a complaint
18  made to a manager.  What then must the manager do with
19  regard to notification of the legal department?  If
20  anything.  I will ask a better question.  Are managers
21  required to report all complaints of sexual harassment to
22  the legal department?
23      A   We recommend it.
24      Q   But it's not required?
25      A   It would not be out of compliance necessarily to

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 28

1  not do it.  But we would recommend it.  I personally when
2  I speak with managers recommend that they rely on the
3  legal department as a resource in those types of
4  situations.
5      Q   So they have the authority to deal with it on
6  their own, but you recommend they contact legal; is that a
7  fair statement?
8      A   Yes.
9      Q   Tell me what you do, if anything, in the
10  dissemination and education of the harassment policy of
11  Jeld-Wen.
12      A   Which piece are you asking about, the
13  dissemination or the education?
14      Q   Both.  You can take them in either order.
15      A   Well, the dissemination is largely handled at
16  the facility level.  In general employees when they
17  commence employment are provided with, among other things,
18  a copy of the handbook and a copy of the anti-harassment
19  policy and an acknowledgement of their willingness and
20  agreement to abide by the requirements.
21      Q   The decision to disseminate — was that already
22  being done when you first came to work here in 2002?
23      A   I'm not sure I understand.  Do you mean
24  specifically with respect to orientation?
25      Q   Yes.

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 29

1      A   Yes.  That existed prior to my arrival.
2      Q   Have you done anything to change or alter or
3  improve the dissemination process since you have been
4  here?
5      A   Somewhat.  I have somewhat changed — I have
6  somewhat modified the process I suppose.
7      Q   Tell me about that.
8      A   I put together an anti-harassment video that was
9  recently completed that has been provided to facilities
10  with a request to be used in the orientation process and
11  that that video to be used in the orientation process and
12  have consequently modified the acknowledgement to
13  incorporate by reference the video and their agreement to
14  comply with the policy and the matters generally discussed
15  in the video.
16      Q   When was the video — has the video been
17  disseminated to the various plants or locations yet?
18      A   The video has been mailed to the plants.
19      Q   When did that occur?
20      A   Earlier this year.
21      Q   2006?
22      A   Either late 2005 or early 2006.
23      Q   When was the video completed?
24      A   Not too long before that.
25      Q   Is the video standard?  Everybody gets the same

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 30

1  one?
2      A   Everyone gets the same video, yes.
3      Q   Where is it now?  Do you have a copy here?
4      A   I would imagine that a copy exists here.  I
5  don't physically have it personally but there's probably a
6  copy, for example, with my administrative assistant.
7      Q   Who is on the videotape?  You?
8      A   Correct.
9      Q   Is it just you?
10      A   Well, it's — no.
11      Q   Who else is on the videotape besides you?
12      A   There was an audience so there are individuals
13  sitting facing me.
14      Q   Is there one audience for the entire video?
15      A   The video was a composite of two seminars that I
16  did in case there were some flubs.  And so the video
17  pulled from two seminars that I presented it.
18      Q   What were the dates of the seminars?
19      A   I don't recall specifically.
20      Q   Okay.  Can you get your lawyer a copy of the
21  videotape today?
22          MR. SCOFIELD:  I don't care.
23          THE WITNESS:  Sure.
24  BY MR. DOUGLAS:  (Continuing)
25      Q   Okay.  Was there any references on the video to

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 31

1  the Roanoke facility?
2      A  I don't believe so.
3      Q  Was there any — was there any mention by you in
4  the video of any complaints at the Roanoke facility even
5  if you didn't identify the facility?
6      A  I don't believe so.
7      Q  During your presentation, did you — did you
8  reference other complaints at all?
9      A  It's been a while since I have personally looked
10  at the video.  I may have.  As I sit here now, I cannot
11  recall.
12      Q  Okay.  Well, if you will get that videotape to
13  your lawyer, I won't ask any more questions about it.
14  I will just watch it.
15      A  Break out the popcorn.
16      Q  Okay.  Any other changes or improvements you
17  made with regard to the dissemination to the
18  anti-harassment policy?
19      A  Again, as I said before, there may have been
20  some minor changes that as I sit here now I can't recall.
21      Q  We talked briefly earlier about you going to the
22  Roanoke facility to do an anti-harassment training in July
23  of 2003; is that correct?
24      A  I did.
25      Q  What did you do at that — what type of

## Charles Robert Sturm

Page 32

1  presentation did you do?  Did you just talk to them or did
2  you have visual aids?  How did that go?
3      A  I talked to them, and I had a Power Point
4  presentation, and I had, I guess, what you would call
5  visual aids.
6      Q  I would like for you to look back at pages
7  D00447 through D00513.
8      A  Can we go off the record.
9          (Recess.)
10  BY MR. DOUGLAS: (Continuing)
11      Q  Back on the record.  Have you reviewed those
12  pages?
13      A  No.  Which pages would you like me to review.
14      Q  Well, my question is going to be simply are the
15  pages Bates stamped D00447 through D00513 -- do they
16  represent the Power Point presentation that you did at the
17  Roanoke facility?
18          MR. SCOFIELD: I would like to comment.  I
19  took -- if these are from Minix's deposition, I took out
20  the ones that dealt with racial discrimination and things
21  of that nature and left the ones with sexual harassment
22  because this is a sexual harassment case now.
23          MR. DOUGLAS: These are not from Miss Minix's
24  deposition.
25          MR. SCOFIELD: Okay.

## Charles Robert Sturm

Page 33

1          MR. DOUGLAS: These are the documents produced.
2          MR. SCOFIELD: Then it should be all the ones
3  from Jeld-Wen sent to Mike.  There may be one or two
4  missing because of copying, but I could easily get you the
5  one I received.  When I talked to Minix, I did not want to
6  talk about racial discrimination or age or gender
7  discrimination because that's not the nature of your
8  complaint.
9          MR. THOMPSON: Can I interject something, Jim?
10          MR. DOUGLAS: Yes.
11          MR. THOMPSON: In Hees' deposition I think you
12  told me you felt some pages were missing from what he
13  produced.
14          MR. SCOFIELD: Mike, you produced everything I
15  sent to you.
16          MR. THOMPSON: Unless a copying — or unless
17  there was some error in processing the documents, we did.
18          MR. DOUGLAS: While he's reviewing that, I'm
19  going to make a call.
20          (Interruption in the proceedings.)
21          THE WITNESS: I have reviewed it.
22  BY MR. DOUGLAS: (Continuing)
23      Q  Do you remember my question?
24      A  Not really.
25      Q  Do those documents represent the Power Point

## Charles Robert Sturm

Page 34

1  presentation you made in Roanoke in July 2003?
2      A  They do.  There are a few that are a bit out of
3  order.
4      Q  They are all there?
5      A  I believe they are all there.
6      Q  Were there other visuals that you used not
7  contained in the documents you have just reviewed?
8      A  I believe that there may have been a white board
9  diagram.  I typically will have a — you know, a white
10  board with butcher block paper off to one side that I may
11  use for a couple of diagrams or to write down some key
12  terms.
13      Q  I take it you wouldn't have those still from a
14  presentation in '03?
15      A  No.
16      Q  Given that you had the videotape now, is it your
17  intent to continue to do these anti-harassment training
18  sessions?
19      A  I will still do live anti-harassment trainings.
20      Q  So the videotape is in addition to you going
21  down wherever you need to go from time to time?
22      A  Correct.
23      Q  How many of the live training sessions would you
24  say you have in a year?
25      A  I'm sorry; I didn't hear that.

## Charles Robert Sturm

Page 35

1    Q   How many of the live training sessions like the
2  one in Roanoke July 2003 — how many of those would you
3  say you do in a year?
4    A   It depends on what year you are talking about.
5    Q   Let's start with 2002 and come through 2005.
6    A   Well, 2002 was an abbreviated year. But during
7  2002 into 2003, one of my goals was to inform general
8  managers and other managers of my existence as a resource
9  to them. And so I put together a fairly aggressive
10  schedule of proactive training in large part to educate
11  employees and managers on our anti-harassment policy and
12  approach and duly to simultaneously let folks put — let
13  folks match a voice with a face and know that I was a new
14  resource to the company who could assist on labor and
15  employment matters. And that second goal was largely
16  accomplished during that time frame.
17    Q   All right. Jeld-Wen as I understand it has
18  different divisions in its company. It has some millwork
19  plants; is that correct?
20    A   Right.
21    Q   Has some door plants?
22    A   Right.
23    Q   Has some distribution centers?
24    A   Correct.
25    Q   Okay. What else does Jeld-Wen have?

## Charles Robert Sturm

Page 36

1    A   Windows.
2    Q   Anything else?
3    A   It has some service entities.
4    Q   Now, if you add all those plants together, about
5  how many does the company have nationwide?
6    A   I can guesstimate. I don't have a specific
7  number as I sit here now.
8    Q   Well, give me your best estimate.
9    A   I'm estimating without enormous comfort in my
10  precision that we are probably at 200.
11    Q   Okay. Is the harassment policy the same for all
12  the facilities?
13    A   It is within Jeld-Wen, Inc. Certainly the
14  millwork and door and window facilities, yes.
15  Domestically.
16    Q   Okay. Have you been to all of the facilities?
17    A   I have not been to every single facility, no.
18    Q   Do you have an estimate as to what percentage of
19  the facilities you have been to?
20    A   I have been to many.
21    Q   Half?
22    A   I'm guessing. To the extent that is what you
23  are looking for, half. Perhaps a little bit more.
24    Q   Would it be fair to say that some of the
25  facilities just by the nature of what they do have more

## Charles Robert Sturm

Page 37

1  employees?
2    A   Certainly some facilities are larger than other
3  facilities. Yes, that's accurate.
4    Q   Is it accurate to say that a millwork plant —
5  the millwork plant, the door plant and window plant would
6  be the types of facilities that would have the highest
7  concentration of employees within the facility?
8    A   Well, that would depend on the facility and the
9  location.
10    Q   Well, would it be the case that a millwork plant
11  typically would have more employees than a service plant?
12    A   Not necessarily.
13    Q   So that's not necessarily true. Okay. Was
14  there any particular facility or type of facility that you
15  were more concerned with educating on the anti-harassment
16  policy than others?
17    A   No. I was concerned as to all of our
18  facilities. I want them all to be aware.
19    Q   There weren't any facts that had come to your
20  attention that, for example, hypothetically speaking, you
21  were having more issues at millwork plants than at other
22  types of facilities?
23    A   No. Not as you have described it. I have done
24  training — I talked just a bit ago about proactive
25  training, and I have done reactive training as well. But

## Charles Robert Sturm

Page 38

1  as it relates to particular divisions, no.
2    Q   Okay. Reactive training would be after a
3  complaint was made or as a result of a complaint?
4    A   It might be.
5    Q   The training at the Roanoke facility could have
6  been described as reactive training, couldn't it?
7    A   At some level.
8    Q   Okay. At what level?
9    A   My purpose in traveling to Roanoke was to do an
10  investigation. And I felt it appropriate both reactively
11  and for the sake of efficiently for me to conduct
12  anti-harassment training while I was there.
13    Q   Fair to say you wanted to make sure to the
14  extent you could control it, you didn't want to have
15  another incident like the one you were going down there
16  for again at the facility, correct?
17    A   Well, I'm not sure I understand that because I
18  had scheduled to perform training before I had conducted
19  the investigation.
20    Q   Had you scheduled the training prior to knowing
21  about an allegation being made at the Roanoke facility?
22    A   No.
23    Q   So it was after you received the notice of
24  complaint that you decided to do the training at the
25  Roanoke facility?

## Charles Robert Sturm

Page 39

1   A   It was after I received the notice of complaint
2   that I decided to visit the Roanoke facility to conduct an
3   investigation and to additionally perform anti-harassment
4   training.
5   Q   One of the reasons that you did the training, I
6   would assume, was to make sure that everybody there knew
7   what — was crystal clear on what the policy was, and you
8   were hopeful there would never be another complaint from
9   that facility, correct?
10   A   Well, I think you have asked two different
11   things.  I did want to make sure that individuals who
12   worked at the facility understood that we had a policy and
13   what that policy involved.  I was hopeful that we would
14   not have complaints in the sense that we would not have
15   facts that would cause somebody to raise a complaint.  But
16   obviously, if there were facts that warranted somebody
17   raising a complaint, I wanted the complaint to be raised.
18   Indeed, I trained on that specific subject.
19   Q   Would it be fair to say that after you completed
20   the training at the Roanoke facility in July of 2003, that
21   you were confident that management at the facility was
22   keenly aware and up to date on the harassment policy when
23   you left?
24       MR. SCOFIELD:  Object to the form; definition of
25   management.  But other than that, please answer the

## Charles Robert Sturm

Page 40

1   question.
2       THE WITNESS:  When I left, I had an
3   understanding that management understood the policy and my
4   expectations with it which included that I was a resource
5   available to assist them with respect to the policy and
6   its requirements.
7   BY MR. DOUGLAS: (Continuing)
8   Q   Since you have been at Jeld-Wen, have you ever
9   done any anti-harassment training at the Sparta, Tennessee
10   facility?
11   A   I believe I have.  But as I sit here right now,
12   I'm not 100 percent certain of that.  I believe I have.
13   Q   Would you have done the same Power Point
14   presentation that you did in Roanoke or do you know?
15   A   I don't know for certain.  It would have been
16   substantively very similar.  Obviously from time to time
17   there are some time constraints, and I may have to adapt
18   to that.
19   Q   Were there any videotapes used at that
20   presentation?  If you know.
21   A   No.  This would have been — no.
22   Q   Have you ever done anti-harassment training at a
23   plant in Corsicana, Texas?
24       MR. SCOFIELD:  That's near Dallas if that helps.
25       THE WITNESS:  It doesn't.  It strikes -- well, I

## Charles Robert Sturm

Page 41

1   believe I have.  Although, again, as I sit here right now,
2   I'm not 100 percent certain.  But I do believe — I think
3   I did.
4   BY MR. DOUGLAS: (Continuing)
5   Q   Would the -- would you have done a Power Point
6   presentation there?
7   A   Correct.
8   Q   Would it have been substantially the same as the
9   documents we reviewed or would it have been different?
10   A   My belief is it would have been generally
11   similar.
12   Q   Would there have been any videotapes used at
13   that training?
14   A   No.
15   Q   Do you have any knowledge about the history of
16   the Roanoke plant?
17   A   I'm not sure what you mean by the history.
18   Q   Well, do you know who Jeld-Wen acquired it from?
19   A   CMS.
20   Q   How do you have that knowledge?
21   A   I have acquired that knowledge through the
22   course of my employment.
23   Q   Okay.  What, if anything, did you know about CMS
24   prior to Jeld-Wen taking over operation of the Roanoke
25   facility?

## Charles Robert Sturm

Page 42

1   A   Not a great deal.
2   Q   What does that mean?  What did you know?
3   A   I knew it existed; I knew the acronym.  I mean,
4   I'm not sure I understand what you are asking me.
5   Q   Did you have anything to do with the decision of
6   Jeld-Wen taking over operations of the Roanoke facility?
7   Were you involved with that in any way?
8   A   No.
9   Q   Were you involved with the staffing of the
10   facility once Jeld-Wen took it over in any way?
11   A   No.
12   Q   Does your office have anything to do with
13   payroll?
14   A   When you say my office --
15   Q   The legal department.  Is payroll in the legal
16   department or is it separate?
17   A   It's a separate department.
18   Q   Do you know where it is?  Where it's located?
19   A   Physically?
20   Q   Yes.
21   A   Yes.
22   Q   Where?
23   A   Down the street.
24   Q   Here in Klamath Falls?
25   A   Correct.  Well, the main payroll is here in

## Charles Robert Sturm

Page 43

1   Klamath Falls.
2     Q   Okay. What's the non-main payroll?
3     A   There are payroll personnel at -- there are
4   individuals at facilities who have certain payroll
5   functions. The main payroll department, which I believe
6   you were asking me about, is headquartered and housed here
7   in Klamath Falls.
8     Q   Okay. What's the company policy with regard to
9   discipline? Assuming violation of gender harassment
10  policy is proved, discipline as to the offending employee.
11    A   On the assumption that there is a demonstrable
12  violation, discipline is issued commensurate with the
13  offense.
14    Q   Do you or the legal department have any say-so
15  in what the discipline will be?
16    A   I'm not sure what you mean by say-so.
17    Q   That is a bit of a Southern phrase. What I'm
18  trying to get is who makes the decision regarding
19  discipline? Is it management? Is it the legal
20  department? Is it both? Does it depend on the situation?
21  Is discipline always the same?
22    A   It would depend on the situation.
23    Q   Okay. So it's not necessarily a terminable
24  offense. Any violation of the policy is not necessarily a
25  terminable offense?

## Charles Robert Sturm

Page 44

1     A   Any violation of anti-harassment policy?
2     Q   Right.
3     A   Right. It's not necessarily termination.
4     Q   It could be if the violation is serious enough?
5     A   Correct.
6     Q   Who makes the decision whether the violation is
7   serious enough?
8     A   In general -- well, it would depend on the
9   situation.
10    Q   Okay. Tell me how many different entities or
11  groups or however you want to describe the subset, whether
12  it be legal or management, in what situation would what
13  group decide discipline.
14    A   Well, in general, management makes the decision
15  and oftentimes the legal department is involved in
16  providing guidance with respect to the decision.
17    Q   Would it be fair to say that the final decision
18  maker would be somebody in management and not the legal
19  department?
20    A   Correct.
21    Q   Have there been occasions to your knowledge
22  where management and the legal department have disagreed
23  over discipline regarding an offending employee of the
24  anti-harassment policy?
25    A   With respect to a claim of sexual harassment?

## Charles Robert Sturm

Page 45

1     Q   Correct.
2     A   As I sit here now, I don't have a recollection
3   of such an occasion.
4     Q   Before I forget, how many states are you
5   licensed to practice law in?
6     A   Two.
7     Q   What are they?
8     A   California, Oregon, and I'm not sure of my
9   status in Pennsylvania.
10    Q   Okay. You have never had your license revoked
11  or suspended?
12    A   Correct. I mean, I'm not sure of my status
13  because I have initiated the process of being admitted.
14  But I don't know where they are at in terms of processing
15  that.
16    Q   Fair enough. The closure of facilities or
17  specifically the plant in Roanoke -- is that something
18  that the legal department would have anything to do with
19  regard to the decision to close a plant?
20    A   You are talking specifically with respect to
21  Roanoke?
22    Q   Right now, yes.
23    A   I was not involved; I was not personally
24  involved.
25    Q   Do you know whether or not the decision to

## Charles Robert Sturm

Page 46

1   close -- I'm sure legal is involved in the closing because
2   you have to do severance packages and the rest of it. But
3   is legal involved with the decision to maintain or close a
4   plant? To your knowledge.
5     A   When you say legal, are you referring to the
6   department or to me?
7     Q   The legal department.
8         MR. SCOFIELD: Object to the form because it
9   involved -- maybe I'm interrupting too much. You mean
10  preparing the legal papers or making the decision whether
11  or not to close the plant?
12        MR. DOUGLAS: The decision to close the plant.
13        THE WITNESS: You are talking generally or with
14  respect to Roanoke?
15        MR. DOUGLAS: Both.
16        THE WITNESS: Well, I ask because I don't know
17  whether Sam Porter the general counsel -- he might have
18  some involvement. I don't know one way or the other. As
19  a general matter, there may have been occasions where he
20  has participated at some level in the decision. I don't
21  know one way or the other.
22        MR. DOUGLAS: Okay.
23        THE WITNESS: If your question as to both -- if
24  your question is specifically to myself and relates to the
25  decision, the decision itself to close, no.

## Charles Robert Sturm

Page 59

1   the document -- of the severance and release agreement?
2      A   Yes.
3      Q   What was your involvement with that?
4      A   It's a general agreement that wasn't specific to
5   Roanoke.  Again, it's an agreement that's used generally
6   with our facilities.
7      Q   Any time a plant closes?
8      A   That would be one example.
9      Q   What would other examples be?
10     A   It's used in connection with all severance
11  distributions whether it be a plant closing or otherwise.
12     Q   Well, the purpose of the -- or the trigger
13  mechanisms of the severance program are spelled out in the
14  severance policy, correct?
15     A   The handbook summarizes an aspect or an area
16  where severance is involved.
17     Q   And there are other areas where severance is
18  involved?
19     A   Correct.
20     Q   Can you tell me just what the other areas are?
21  Just briefly.
22     A   Well, as I testified previously, there's
23  slightly different program for managers.
24     Q   What type of managers qualify for that program?
25     A   Generally all Jeld-Wen, Inc. managers.

## Charles Robert Sturm

Page 60

1      Q   Group managers?
2      A   Jeld-Wen, Inc. managers.
3      Q   I heard what you said.  I was asking another
4   question.  Would that include group managers as that term
5   has been described to me by other employees?
6      A   Generally, yes.
7      Q   Obviously general managers it would apply?
8      A   Correct.
9      Q   Coordinating general managers obviously it would
10  apply?
11     A   Correct.
12     Q   Is there such thing as acting group manager?
13     A   It's not a term I'm specifically familiar with.
14     Q   So you don't know what an acting group manager
15  is or if that is a proper title within Jeld-Wen?
16     A   It may exist or may not exist.  I don't have
17  particular knowledge.
18     Q   So I guess if I asked you if the manager
19  severance program should apply to an acting group manager,
20  you wouldn't have an opinion?
21     A   I would have an opinion.
22     Q   Okay.  What would that be?
23     A   That it would apply.
24     Q   Okay.  Tell me the differences in the severance
25  program for managers versus hourly employees if you would.

## Charles Robert Sturm

Page 61

1      MR. SCOFIELD:  Just -- this is a matter of
2   clarification.  You have discussed acting general manager
3   versus acting group manager.  I think there's a -- there
4   was a distinction made yesterday, and I don't know if
5   that's what you are trying to get at or not.  I don't know
6   if I'm helpful or --
7      THE WITNESS:  That's a good point.  I used the
8   term acting general manager earlier and you used a
9   different term so I assume that you were referring to
10  something different than what I had referred to.
11     MR. DOUGLAS:  I was.
12     THE WITNESS:  Okay.
13     MR. SCOFIELD:  I'm sorry.
14  BY MR. DOUGLAS: (Continuing)
15     Q   So I'm getting to Mr. Fetner who has been
16  described in any manner of position titles by different
17  people.  I'm not being difficult; I'm trying to --
18     MR. SCOFIELD:  I'm not trying to be either.  I
19  didn't mean to interrupt your flow.
20  BY MR. DOUGLAS: (Continuing)
21     Q   No problem.  Tell me the difference in the
22  management severance versus the employee severance.
23     A   It's -- the benefits are -- I believe the
24  benefits are slightly higher for managers.
25     Q   Which benefits?  Obviously the bonuses would be

## Charles Robert Sturm

Page 62

1   higher because they make more money.  Or is the formula
2   higher?
3      A   Well, a manager who has signed a management
4   agreement would have certain severance opportunities on a
5   termination by Jeld-Wen.
6      Q   Okay.
7      A   Again, conditioned on signing off on a severance
8   and release agreement and that would be -- that would be
9   available.
10     Q   Did Mr. Fetner sign a management agreement?
11     A   I don't know.
12     Q   If he did, I don't have it, and I need it.  And
13  I have requested it.  If he didn't, I need to know that he
14  did not.  Who can find that out for me?
15     MR. SCOFIELD:  We can.
16     MR. DOUGLAS:  Okay.  Can you find that out at
17  lunch when you get the release and severance agreement?
18     MR. SCOFIELD:  Yes, we will.  Right before lunch
19  we will double-check our list.
20  BY MR. DOUGLAS: (Continuing)
21     Q   You don't recall seeing a management agreement
22  in his file?
23     A   I don't recall seeing it.
24     Q   I'm trying to figure out how the guy walked away
25  with four or five thousand dollars is the only thing

## Charles Robert Sturm

Page 67

1　Jeld-Wen, Roanoke, Alabama as of whatever date that was,
2　10/13. I told him if that's what he wanted to do, I'm not
3　going to fight it. I would prefer that he come to the
4　plant after everybody leaves so that it's not
5　uncomfortable for him and some other people, and he picked
6　up his things. And he did. And he asked that I treat him
7　fair with the severance package. I told him that that
8　will be — it's a standard thing. It's whatever hours you
9　have worked and it will be a format. I will get that to
10　him. I will have him look at it; he will sign off on it.
11　And I did. That's when I met him the week after that.
12　　　Did I read that correctly?
13　　A  I believe you did.
14　　Q  Okay. So Mr. Hees is implying here, and I will
15　represent to you that he stated in other parts of his
16　deposition that he got with somebody here in Klamath Falls
17　about the severance package. Did he ever talk to you
18　about it?
19　　A  Again, as I sit here now, I cannot recall. I
20　take a lot of telephone calls.
21　　Q  I understand. Do you take a lot of telephone
22　calls with regard to situations like this where a manager
23　is resigning in the face of complaints?
24　　A  Some.
25　　Q  Okay. If you will flip with me in the book, the

## Charles Robert Sturm

Page 68

1　notebook, to D00316. You recall a little while ago I
2　asked you if you were involved with the drafting of the
3　letter or the severance package, you or anybody at legal.
4　And you asked me what letter. You recall that testimony?
5　　A  Yes.
6　　Q  Okay. This is the letter I was referring to.
7　It's a letter by Dan Hees with regard to the closing of
8　the manufacturing plant in Roanoke. Have you seen that
9　letter before today?
10　　A  I believe I have.
11　　Q  Did you or to your knowledge anybody in legal
12　have anything to do with the drafting of this letter,
13　document D00316?
14　　A  I don't recall.
15　　Q  All right. I will direct your attention to the
16　second paragraph. It reads all regular full-time
17　employees who stay for the 30 days will receive benefits
18　in accordance with Jeld-Wen's severance policy. Severance
19　benefits include, colon: Prorated five-year bonus,
20　severance pay and current and accrued vacation pay.
21　　　Did I read that correctly?
22　　A  Yes.
23　　Q  Is there anything in this letter which informs
24　the employees that in order to obtain their severance they
25　will have to sign a release?

## Charles Robert Sturm

Page 69

1　　A  Yes.
2　　Q  Where is that?
3　　A  The reference in the first sentence that the
4　issuance of severance is in accordance with and thus
5　conditioned on satisfaction of the Jeld-Wen severance
6　policy.
7　　Q  Which the employees don't receive?
8　　A  Well, they would if they asked.
9　　Q  We have been through this. It's not in the
10　handbook which they do get. It's a policy they have to
11　ask for, correct?
12　　A  Yes.
13　　Q  Would you agree with me that it is extremely
14　unfair to the employees to tell them they are going to get
15　severance and then when they get the severance document it
16　contains a release?
17　　　MR. SCOFIELD: Objection; form.
18　　　THE WITNESS: No.
19　BY MR. DOUGLAS: (Continuing)
20　　Q  You think that's fair?
21　　A  I don't think this is unfair.
22　　Q  Okay. I want to make sure you know what this
23　is. My question is do you agree with me that it's unfair
24　that a letter go out telling employees they are entitled
25　to severance and then —

## Charles Robert Sturm

Page 70

1　　A  In accordance with Jeld-Wen severance policy.
2　　Q  Right. And then which they are not given?
3　　A  If an employee is unclear about the severance
4　policy, all they need do is ask. They can ask their
5　manager, they can ask the general manager, they can call
6　in to the legal department; they have got a copy of the
7　telephone number in to the legal department. I had been
8　at the facility previously personally so they knew — many
9　of them knew who I was individually and personally. It's
10　included in the handbook, it's included in the
11　anti-harassment policy that is posted in the facility.
12　　Q  It's not included in the handbook. You talking
13　about the severance policy?
14　　A  I'm talking about the telephone number in to the
15　legal department.
16　　Q  Fine. Go ahead and finish your answer.
17　　A  The answer is I don't think it's unfair.
18　　Q  Okay. Well, I'm going to — it's fine that you
19　agree with — or disagree with me. I don't have any
20　problem with that. But let me finish my question. We
21　have already established the givens. The givens are the
22　severance policy is not given to the employees unless they
23　call and ask for it, correct?
24　　A  Generally, correct.
25　　Q  The severance policy is mentioned in the

## Charles Robert Sturm

Page 71

1  Jeld-Wen handbook given to the employees, correct?
2      A    There is a mention in the handbook of the
3  severance policy.
4      Q    The aspects of the release being tied to
5  severance benefits is left out of the handbook, correct?
6      A    The anti-harassment policy is also mentioned.
7      Q    I'm not talking about that right now. I'm
8  talking about severance. No mention of a release in order
9  to get severance benefits in the handbook, correct?
10     A    Correct.
11     Q    Mr. Hees' letter makes no mention of the release
12 provision in the Jeld-Wen severance policy in his letter,
13 correct?
14     A    Mr. Hees' letter says that benefits are in
15 accordance with and as conditioned on Jeld-Wen's --
16 satisfying Jeld-Wen's severance policy.
17     Q    I understand. But he does not mention the
18 release part of the severance in his letter?
19     A    Not expressly.
20     Q    Not at all. The word release doesn't appear in
21 this letter?
22     A    It is correct that the word release does not
23 appear in the letter.
24     Q    Okay. So given all that, you disagree with me
25 that it's unfair to condition severance on the signing of

## Charles Robert Sturm

Page 72

1  a release?
2      A    I think --
3          MR. SCOFIELD: It's been asked and answered, but
4  I will instruct the witness to answer the question.
5          THE WITNESS: I think there's a double negative.
6  I disagree with you. I understand what you are saying,
7  and I disagree with that.
8  BY MR. DOUGLAS: (Continuing)
9      Q    Okay. I believe you testified that you don't --
10 you have seen this letter before, but you don't recall or
11 you were not involved in the formulating of it? The
12 drafting of it?
13     A    That I do not recall.
14     Q    Okay. Would it surprise you that Mr. Hees told
15 me that Lisa Bode was involved in the drafting of it?
16     A    Would that surprised me? No.
17     Q    Would you consider that outside of what you know
18 to be her job responsibilities?
19     A    No. Not necessarily.
20     Q    So that seems -- that seems standard procedure
21 to you? I just don't know who Miss Bode is.
22     A    I don't know that it's standard procedure. But
23 it wouldn't surprise me if she did have involvement in it.
24     Q    Do you know if anyone in the legal department
25 had any involvement with the letter?

## Charles Robert Sturm

Page 73

1      A    Again, I don't recall. My expectation is that
2  if somebody in the legal department had involvement, that
3  would have been me.
4      Q    Okay. You don't recall you have testified?
5      A    Correct.
6      Q    All right. I will need -- I don't know if I
7  have asked for this yet, but I need the severance policy
8  that references the release. Can you get that for me too?
9          MR. SCOFIELD: If I have it, yes.
10         MR. DOUGLAS: Well, I'm sure he has it. He's
11 testified how easy it is to get. You can get that for me.
12         THE WITNESS: Well, I have also testified that
13 somebody asks questions -- or to the extent I have not
14 testified I'm happy to do so. If somebody were to ask
15 questions, at a bare minimum it would be explained that
16 you will need to sign off on a release. And for the vast
17 majority of individuals, that's not an issue. Again, this
18 is not a policy that was -- that's -- or practices that is
19 specific to Roanoke.
20 BY MR. DOUGLAS: (Continuing)
21     Q    I understand. But you can give me that policy,
22 right?
23     A    Correct.
24     Q    You will do that at lunch for me?
25     A    Yes.

## Charles Robert Sturm

Page 74

1          MR. DOUGLAS: Thank you. Off the record.
2          (Discussion off the record.)
3  BY MR. DOUGLAS: (Continuing)
4      Q    Back on. If at any point you need to clarify
5  your answer, that's fine; you can do so. All right. How
6  many Jeld-Wen facilities in the state of Alabama in 2003
7  and 2004? If you know.
8      A    Either one or two I think.
9      Q    Okay. The Roanoke facility was one, correct?
10     A    Correct.
11     Q    What was the other one you are thinking of? I
12 have had testimony that there was a distributing plant in
13 Wedowee, Alabama. Are you familiar with that?
14     A    I'm familiar with the name Wedowee. I'm
15 familiar with the location Wedowee, and I think I'm
16 familiar with Wedowee by virtue of their having been a
17 facility there or by virtue of it being a facility
18 location.
19     Q    How about Hartselle? Was there one in
20 Hartselle, Alabama?
21     A    I don't believe so.
22     Q    Okay. Are there any other plants in Alabama
23 that you know about?
24     A    I don't believe so.
25     Q    How many complaints of sexual harassment are you

**Charles Robert Sturm**

Page 87

1    Q. Now, the suspended from payroll — there's no
2  negative connotation to be derived from this form
3  regarding Miss Minix's performance?
4    A. That's correct. There is no negative.
5    Q. If you could flip to page D00220. You recognize
6  that document?
7    A. Do I recognize the document? No, not
8  specifically. I recognize the form.
9    Q. Appears to be a final employee warning notice
10 for an employee, Lisa Cook, who may be a witness in this
11 case; is that correct?
12   A. That she may be a witness in this case?
13   Q. I'm representing to you that she may be a
14 witness in this case. Does this appear to be a final
15 employee warning notice for tardiness and absenteeism?
16   A. In violation of company rules or policies, yes.
17   Q. The explanation of offense section — I'm going
18 to direct you to the second line from the bottom. There's
19 a sentence that picked up in the middle of the line,
20 management discussed. Do you see where I'm reading from?
21   A. Yes.
22   Q. Management discussed and suggested for Lisa to
23 produce second day care provider requirement of sending
24 ill children home.
25   A. No. I think you are missing a line.

**Charles Robert Sturm**

Page 88

1    Q. I'm sorry. Second opinion medical services that
2  could possibly support FMLA requirements and aid in the
3  absence situation. No FMLA options have yet been
4  requested nor submitted by Lisa.
5    With your assistance, did I read that correctly?
6    A. Yes. I believe so.
7    Q. All right. Is it company policy to suggest FMLA
8  if it might apply or is it the employee's responsibility
9  to request it?
10   A. As a general matter, it is an issue of notice.
11 And commonly that notice comes from the employee making a
12 request.
13   Q. All right. If you could flip to D00301. I will
14 represent to you that this is part of Richard Fetner's
15 personnel file that was produced in discovery. Appears to
16 be the second page that I have of an application; is that
17 correct?
18   MR. SCOFIELD: It says application up there.
19   THE WITNESS: Yes, it appears to be the second
20 page.
21 BY MR. DOUGLAS: (Continuing)
22   Q. Okay. Do you see at the top where it says
23 present employer? Actually it doesn't — on my copy part
24 of present is off. But Wellborn Cabinets 5/95 through the
25 present, duties supervisor?

**Charles Robert Sturm**

Page 89

1    A. I see that.
2    Q. Do you know if it would be company policy before
3  hiring Mr. Fetner that Wellborn Cabinets be contacted for
4  reference purposes?
5    A. I don't know what CMS — before Jeld-Wen
6  acquired CMS, I don't know what their policies and
7  practices were.
8    Q. My understanding Jeld-Wen basically came in and
9  took over operations of the CMS plant in Roanoke, correct?
10   A. Over a period of time.
11   Q. Eventually some of the employees of CMS became
12 employees of Jeld-Wen, correct?
13   A. Correct.
14   Q. Including Mr. Fetner?
15   A. Correct.
16   Q. So at the point in time that he became an
17 employee of Jeld-Wen, would it have been company policy to
18 contact his previous employers?
19   A. Not necessarily.
20   Q. Why not?
21   A. For a new hire where — in a new hire situation
22 in a classic sense where there is no knowledge regarding
23 the employee, it would be customary to contact a former
24 employer. Of course, when Jeld-Wen acquired CMS, that was
25 a different situation. In other words, it wouldn't

**Charles Robert Sturm**

Page 90

1  necessarily have been customary to go back and contact
2  employers that actually preceded the prior employer, i.e.,
3  the acquired company.
4    Q. There's no company policy regarding checking
5  references in this situation one way or the other I take
6  it?
7    A. Correct.
8    Q. If you would flip to pages D00352 to 357. I
9  believe this is a letter that you sent to the EEOC in
10 Alabama regarding this case; am I correct?
11   A. That's correct.
12   Q. I just want to call your attention to page 352
13 under summary of the company's position, allegations that
14 Minix was subjected to unlawful harassment are utterly
15 baseless. And I want to ask you does that mean that you
16 disbelieved her allegations or were you simply stating a
17 legal opinion?
18   A. I was stating that even if the EEOC were to
19 accept her allegations, the conclusion that Miss Minix was
20 subjected to unlawful harassment was a baseless
21 conclusion.
22   Q. Well, the reason I ask is the next sentence
23 says, furthermore, the company took immediate and
24 appropriate action upon receiving her complaints. So the
25 way I read that — feel free to correct me since this is

## Charles Robert Sturm

Page 91

1  your work here. The way I read that is that you
2  disbelieve her allegations and, furthermore, even if her
3  allegations were true, the company took immediate action
4  which would absolve them of liability. Is that not what
5  you mean to say there?
6      MR. SCOFIELD: Object to the form. But go
7  ahead.
8      THE WITNESS: Can I see the charge, please.
9      MR. DOUGLAS: Certainly. I'm trying to think of
10 the best way for me to get you that information quickly
11 here.
12     THE WITNESS: If it's in the binder you can just
13 refer me to the page number.
14     MR. DOUGLAS: I'm working on that as we speak.
15     THE WITNESS: I would like to run to the men's
16 room.
17     MR. DOUGLAS: Okay. Let's take a break.
18          (Recess.)
19     MR. DOUGLAS: The charge of discrimination from
20 Miss Minix is on D00402.
21     THE WITNESS: Thank you. Okay.
22 BY MR. DOUGLAS: (Continuing)
23     Q   My question is, did you disbelieve the
24 allegations of Miss Minix?
25     A   As set forth in the charge, yes.

## Charles Robert Sturm

Page 92

1      Q   I'm talking about the factual allegation, not
2  whether or not they constituted harassment under the law.
3      A   Both. With respect to the facts and the legal
4  conclusion that she was apparently drawing; that those
5  facts as set forth, if true, would have been unlawful
6  harassment.
7      Q   Why did you disbelieve her allegations?
8      A   Among other things, I didn't view it to be
9  credible. The claim that on a continuous basis throughout
10 2004 and until approximately August of 2004 I was
11 subjected to unwelcome hugging, rubbing and touching of my
12 body and suggestions that I come to his house for sex.
13     Q   Why didn't you find that credible?
14     A   Among other things, the absence of complaints by
15 her.
16     Q   What are the other things?
17     A   The information that was gathered in preparation
18 of this letter.
19     Q   Okay. We will talk about that in just a second.
20 As I go through these documents, I notice for some
21 employees, specifically Lisa Cook, and I'm referencing
22 page D00244, there appears to be a time card. Actually
23 there are several. That's just the one that I flipped to.
24 Is that a time card?
25     A   It looks to be a time card.

## Charles Robert Sturm

Page 93

1      Q   Okay. I don't have any time card for my
2  clients. Are those not in their personnel files?
3      A   As a matter of practice or as a matter of fact?
4      Q   Fact.
5      A   I personally do not know.
6      Q   As a matter of practice, would they be in the
7  personnel files of my clients?
8      A   Well, I don't know what the facility's practice
9  was. If you are asking me separate from that whether I
10 would generally view time cards to be documents that would
11 be included in their personnel files, I would say no.
12     Q   Exhibit A to the Notice of Deposition marked
13 Exhibit 1 requested any documents not privileged
14 containing the name of any plaintiff. Now, is the name of
15 Lisa Cook on the top of her time card?
16     A   On the assumption this is her time card, yes.
17     Q   All right. Well, can you tell me why I do not
18 have time cards for my clients if the company has them?
19     A   I do not know that the company has them.
20     Q   Okay.
21     A   Among other things.
22     Q   Well, I would need those documents. If the
23 company has them, will you get them to your lawyers?
24     A   Sure. I don't know whether my lawyers intend to
25 object, but I will provide them.

## Charles Robert Sturm

Page 94

1      MR. DOUGLAS: Surely you don't have objection to
2  giving me my clients' time cards.
3      MR. SCOFIELD: I don't see any right now.
4      MR. DOUGLAS: We have had some issues in
5  depositions about people not able to nail down dates.
6  That might be helpful.
7      MR. SCOFIELD: If you think they will be helpful
8  and we have them, we will give them to you.
9  BY MR. DOUGLAS: (Continuing)
10     Q   Let's mark for identification one of the
11 documents that you provided to me over the lunch break.
12 I'll mark it as Deposition Exhibit Number 2. Is that --
13 you identify it for the record.
14          (Marked for identification:
15          Deposition Exhibit Number 2.)
16     A   You had requested a management agreement. And
17 in response to the request, I provided you with one.
18     Q   A sample management agreement?
19     A   Correct.
20     Q   I believe you testified earlier that it's the
21 execution of this agreement that would entitle a person to
22 management severance; is that correct?
23     A   Well, the severance piece --
24     Q   Hold on. Is that what you testified to earlier?
25     MR. SCOFIELD: Object. If you recall exactly

## Charles Robert Sturm

Page 99

1  severance and release agreement will contain a full and
2  global release of claims and potential claims against
3  Jeld-Wen. Under normal circumstances, if the severance
4  and release agreement is executed and is not timely
5  revoked, employees will be entitled to severance pay in
6  the following forms.
7      Q   I just wanted you to read the release language.
8  Is that just one sentence or are there others?
9      MR. SCOFIELD: With the staff and hourly or the
10  management?
11     MR. DOUGLAS: Both.
12     THE WITNESS: I don't understand the question
13  then.
14  BY MR. DOUGLAS: (Continuing)
15     Q   We were discussing the fact that language
16  regarding a release wasn't in the handbook earlier. You
17  recall that?
18     A   Yes.
19     Q   And you told me it was in the severance program
20  in the policies and procedures manual. You recall that?
21     A   Yes.
22     Q   Okay. I would like for you to read the portions
23  that relate to release. And you read me one sentence just
24  a second ago with regard to release.
25     A   That was specific to the staff and hourly that

## Charles Robert Sturm

Page 100

1  if the severance and release agreement is executed and not
2  timely revoked, employees will be entitled to severance
3  pay in the following forms. Then it lists them.
4      With respect to managers in probably identical
5  fashion it reads, under normal circumstances if the
6  severance and release agreement is executed and is not
7  timely revoked, management employees will be entitled to
8  severance pay in the following forms.
9      Q   Then it lists the forms?
10     A   It lists them.
11     Q   Back to the employees and hourly workers. There
12  are two sentences with regard to the release, correct?
13  One that it would be signed and, B, if it weren't revoked,
14  they would be entitled to severance. Is that a good
15  paraphrase?
16     A   Right.
17     Q   Wouldn't it be extremely simple and, in fact, it
18  would not even affect your pagination, to put those two
19  sentences in the handbook when you give it to the
20  employees?
21     A   Would it be simple and affect the pagination?
22     Q   And not affect your pagination.
23     A   It could be included if you are asking me
24  hypothetically.
25     Q   It is just a couple of sentences. It would be

## Charles Robert Sturm

Page 101

1  no problem to put it in the handbook?
2      A   I don't know if it would be a problem. It could
3  be included.
4      Q   What problem might it be? How much more paper
5  would it take to put it in the handbook? To put those two
6  sentences in the handbook?
7      A   It could be included.
8      Q   Okay. All right. I'm going to mark as
9  Exhibit 4 the -- what purports to be the severance and
10  release agreement for Mr. Fetner that we spoke about
11  before lunch. Does that appear to be --
12            (Marked for identification:
13            Deposition Exhibit Number 4.)
14     A   I'm sorry. What did you ask me?
15     Q   Does that appear to be the severance and release
16  agreement executed by Mr. Fetner?
17     A   Yes.
18     Q   Okay. There's three aspects to his severance.
19  The first is severance in the form of prorated five-year
20  bonus; is that correct?
21     A   Yes.
22     Q   14 --
23     A   86.39.
24     Q   The second category.
25     A   Severance in the form of severance pay,

## Charles Robert Sturm

Page 102

1  $4,750.17.
2      Q   How is that calculated? If you know.
3      A   Based on his pay rate.
4      Q   Is it the one week of pay for every two years of
5  service? Is that formula?
6      A   My assumption would be not.
7      Q   I was just reading from the management severance
8  program, the second page of Deposition Exhibit 3.
9      A   That's for job elimination. My assumption would
10  be that it was calculated based on the formula in
11  Exhibit 2.
12     Q   Which is the management agreement?
13     A   Correct.
14     Q   May I see that. Which number, 13 or 14?
15     A   Paragraph one.
16     Q   Okay.
17     A   Fourteen.
18     Q   Paragraph 14 reads or the heading is termination
19  of employment by employer, correct?
20     A   I believe that's the heading.
21     Q   Mr. Fetner wasn't terminated, was he? He
22  resigned?
23     A   My understanding is that Mr. Fetner elected to
24  resign in the face of termination.
25     Q   Who was threatening to terminate him from your

## Charles Robert Sturm
### Page 107

1 package.
2    Would that be consistent with Jeld-Wen policy
3 for someone who had violated the harassment policy?
4    A   I don't know whether this individual was a
5 manager or non-manager.
6    Q   He was an hourly employee according to Mr. Hees.
7    A   Then yes, that would be consistent.
8    Q   If it's a manager who is terminated —
9 hypothetically, if it's a manager who's terminated for
10 violating the company's sexual harassment policy, would
11 they be entitled to a severance package?
12    A   If there was a manager who was terminated in
13 connection with a violation of the company's
14 anti-harassment policy, it would depend on the nature of
15 the offense.
16    Q   How severe the offense was?
17    A   Correct. What it was.
18    Q   You testified about that earlier?
19    A   Correct.
20    Q   Let me direct you to page 103 of Mr. Hees'
21 deposition.
22    A   Yes, sir.
23    Q   Line 11 I asked a question, okay. If a
24 management employee like Mr. Fetner is terminated, do they
25 receive a severance package? Then there was an objection.

## Charles Robert Sturm
### Page 108

1 The witness answered, if he's terminated? Then I amplify
2 my question with the word fired.
3    A   I think he questioned you it looks like as
4 opposed to answering.
5    Q   Yeah. He said if he's terminated was his
6 question back to me. I said fired.
7    Answer: Just for what reason?
8    Question: For cause. Let's say it was for
9 stealing.
10    Answer: No.
11    Question: No severance package?
12    Answer: No.
13    Question: How about it they were fired for
14 sexual harassment?
15    Answer: I don't think so.
16    Is Mr. Hees correct?
17    A   In which respect?
18    Q   That if a management employee is fired for
19 sexual harassment, he doesn't think they would be entitled
20 to a severance package.
21    A   It would depend on the nature of the offense.
22    Q   Well, what would you classify as a minor sexual
23 harassment offense?
24    A   An individual — I don't know if I would use the
25 word minor. But a potential non-disqualifying act might

## Charles Robert Sturm
### Page 109

1 be one or two stray remarks that were inappropriate, at
2 odds with our anti-harassment policy. May very well
3 subject the manager to discipline but may not necessarily
4 disqualify him or her from severance. Obviously on the
5 flip side you could certainly envision severe forms of
6 sexual harassment, even unlawful harassment, that would —
7 it would depend on the circumstances.
8    Q   Okay. When you went to the Roanoke facility in
9 2003, both to investigate a claim of harassment by Lorena
10 Minix against Ronald Bowen and to do training — you
11 recall that?
12    A   I do.
13    Q   Mr. Galvez testified yesterday that on June
14 27th, 2003, he was alerted to the — he was given the
15 allegation by Miss Minix. And he further confirmed the
16 allegation with the employee named Tawana Zachary. You
17 read that in his E-mails to you, correct?
18    MR. SCOFIELD: I'm going to object to the word
19 confirm. I think he said corroborate.
20    MR. DOUGLAS: You are right. That is what he
21 said.
22    THE WITNESS: Did you say I read that in E-mails
23 from him to me?
24 BY MR. DOUGLAS: (Continuing)
25    Q   I did say that. That's not what I mean. I will

## Charles Robert Sturm
### Page 110

1 withdraw that. I assume that to be true that on June
2 27th, 2003, he received the allegation of harassment,
3 talked to Ms. Minix and Miss Zachary. Okay. For purposes
4 of my question, I want you to assume that to be true.
5    A   Okay.
6    Q   I want you to further assume that Miss Minix and
7 Mr. Bowen worked in the same general area in the plant.
8 And finally, I want you to assume for purposes of my
9 question that they remained in close proximity until mid-
10 July. Is it appropriate that they were not separated in
11 proximity prior to mid-July?
12    MR. SCOFIELD: Let me raise an objection to the
13 form of relevance because you didn't complete the whole
14 factual scenario. But other than that, please answer the
15 question.
16    THE WITNESS: I don't know what — in your
17 assumption, I'm not sure what your assumption provides for
18 as far as what Miss Minix had told Mr. Galvez as to what
19 had occurred and, B, what her expectations were.
20 BY MR. DOUGLAS: (Continuing)
21    Q   Well, the allegations were that — this is from
22 your memorandum — was that he was masturbating in her
23 presence in the facility.
24    A   Well, when I spoke with Miss Minix to do the
25 investigation, Miss Minix expressed appreciation at the

## Charles Robert Sturm

Page 111

1  way the company had handled the situation and that, in
2  fact, the company had moved -- had moved her away from him
3  and that she was appreciative of that. When I spoke with
4  Miss Minix, at no time did she express any concern in the
5  manner that that had been handled, resentment at the way
6  it had been handled, or otherwise raise any issues with
7  respect to that.
8      Q  Okay. Well, now that you have got that in,
9  please answer my question. Do you think it's appropriate
10  to keep the complaining employee in close proximity to the
11  person she's complaining about if the complaint includes
12  grabbing the genital area or should they be moved right
13  away?
14      MR. SCOFIELD: Same objection I had before.
15  Please answer the question. In fact, I think you already
16  did, but you want to take another crack at it, go ahead.
17      THE WITNESS: In many circumstances separation
18  would be -- separation may be appropriate.
19  BY MR. DOUGLAS: (Continuing)
20      Q  You don't necessarily think it was appropriate
21  in the Minix situation of 2003?
22      A  My understanding is that there was separation.
23  And again, when I spoke with Miss Minix, she expressed her
24  appreciation at the separation, that she thought the
25  company had handled that appropriately, and she did not

## Charles Robert Sturm

Page 112

1  raise any concerns despite spending time with me talking
2  about it.
3      Q  If there was a time lull of a couple of weeks
4  before the separation took place, do you think that
5  appropriate?
6      MR. SCOFIELD: Same objection.
7      THE WITNESS: Well, I must say in large part
8  that's a function of the complaining individual. And my
9  understanding based on the time that I spent with her at
10  the time shortly after the incident was that Miss Minix --
11  again, I'm somewhat repeating myself -- was comfortable
12  with the way the company had handled the situation.
13  BY MR. DOUGLAS: (Continuing)
14      Q  What if the complaining employee requests
15  separation along with the allegation? Do you think it
16  reasonable to wait two weeks to give the separation?
17      MR. SCOFIELD: Well, I'm going to object to that
18  as form because the record doesn't say it was two weeks.
19      THE WITNESS: I think it depends on the
20  circumstances. And I think perhaps more appropriately in
21  this circumstance Miss Minix had, in my interactions with
22  her, expressed appreciation at the way the company had
23  handled this. There was no expression of concern on her
24  part that -- for example, that she had felt the company
25  waited too long. That was not at all part of her

## Charles Robert Sturm

Page 113

1  communication to me. Quite to the contrary, as a matter
2  of fact, she represented to me appreciation at the way the
3  company had resolved the situation, including and
4  specifically with respect to having moved her in what she
5  apparently viewed to be a timely fashion. Again, there
6  was no claim on her part that the company had
7  inappropriately delayed in taking remedial steps and --
8  BY MR. DOUGLAS: (Continuing)
9      Q  Well, Miss Minix has testified in deposition
10  that she requested to be moved and nothing happened for
11  two weeks. Now, if she made the complaint and requested
12  separation and nothing happened for two weeks, do you
13  think that's appropriate?
14      MR. SCOFIELD: Objection; same. In fact, this
15  question has been asked five times.
16      MR. DOUGLAS: It's been asked but not answered.
17      MR. SCOFIELD: Yes, he has. In my opinion he's
18  answered it.
19      THE WITNESS: I believe I answered it. I have
20  attempted to answer it.
21  BY MR. DOUGLAS: (Continuing)
22      Q  What you have said Miss Minix expressed
23  appreciation to you so you think it was handled fine.
24  That wasn't my question.
25      My question was if somebody complains and asks

## Charles Robert Sturm

Page 114

1  to be separated and takes two weeks to separate them from
2  the offending employee, is that okay?
3      MR. SCOFIELD: I object to the relevance because
4  the record shows otherwise.
5      MR. DOUGLAS: What she told him is not the
6  record. The record is what's testified to under oath.
7  That's what Miss Minix testified. If you think it's
8  reasonable, tell me it's reasonable.
9      THE WITNESS: I think it would depend on the
10  circumstances. It would depend on the allegations. It
11  would depend on how quickly the company is capable of
12  doing at least some level of investigation. And in this
13  case and perhaps most importantly, Miss Minix herself had
14  expressed appreciation at the way the company handled the
15  situation and the fact that the company had moved her
16  consistent with her request.
17  BY MR. DOUGLAS: (Continuing)
18      Q  Let me go at it this way then. You would not --
19  if I suggested to you that in my opinion if an employee
20  complains about this type of conduct Miss Minix was
21  complaining about with regard to Mr. Bowen, they should be
22  immediately separated no matter what, you would disagree
23  with me?
24      MR. SCOFIELD: Same objection. To me it's not
25  relevant because that's not the facts. This particular

## Charles Robert Sturm

Page 115

```
1    client appreciated them and this particular witness
2    appreciated them. And other than that, please answer the
3    question.
4        THE WITNESS: I think it would depend on the
5    circumstances. It would depend on the nature of the
6    complaint, the ability to do some investigating, the
7    nature of the concern and request by the complaining
8    individual. I think it would depend --
9    BY MR. DOUGLAS: (Continuing)
10   Q    So automatic separation?
11   A    In response to every claim that's raised?
12   Q    Like this complaint like this, immediate
13   separation isn't required?
14   A    Immediate separation as a response to an
15   anti-harassment complaint is -- in all cases is not
16   appropriate.
17   Q    Okay. I have asked several people if Jeld-Wen
18   has a company policy with regard to dating employees --
19   employees dating one another or employees dating
20   management. Is there a company policy to your knowledge?
21   A    There is not a formal policy with respect to
22   that. I assume that you mean some sort of prohibition or
23   restriction.
24   Q    I'm just asking if it exists.
25   A    It does not exist. That does not exist.
```

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 117

```
1    A    Okay.
2    Q    So that's our -- she had just disclosed that to
3    Mr. Hees, and Mr. Hees was reporting it to me.
4    A    Okay.
5    Q    If you go to page 77. I would like for you to
6    read pages 77 and page 78 through line 7. Then I would
7    like to ask you some questions about it.
8        MR. SCOFIELD: 77 through what?
9        MR. DOUGLAS: Through 78, line 7.
10       MR. SCOFIELD: Give me two minutes.
11       MR. DOUGLAS: Sure.
12       (Interruption in the proceedings.)
13   BY MR. DOUGLAS: (Continuing)
14   Q    Have you read that passage?
15   A    Yes.
16   Q    I will represent to you that this is Mr. Hees'
17   recantation of the allegations reported to him by
18   Miss Minix on October 13th, 2004. This is what Mr. Hees
19   says that Miss Minix said to him.
20   A    Okay. This is his recounting.
21   Q    Right. Okay. And you have read that passage?
22   A    Yes.
23   Q    In your opinion, if these allegations were true,
24   would they violate the company's anti-harassment policy?
25   A    Some of them would, yes.
```

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 116

```
1    Q    There was a document produced to me by your
2    counsel earlier today I have marked as Deposition Exhibit
3    Number 5. Can you identify the document for the record.
4        (Marked for identification:
5        Deposition Exhibit Number 5.)
6    A    Yes. It's our ethics policy.
7    Q    And nothing in there specifically about dating
8    or not dating, correct?
9    A    Correct.
10   Q    Okay. If I could direct your attention to page
11   77 of Mr. Hees' deposition. Are you there?
12   A    Yes.
13   Q    If you go back to page 76 and read the last six
14   lines, you will see that Miss Minix had just disclosed to
15   Mr. Hees that she and Mr. Fetner had a previous -- at a
16   minimum, sexual encounter; perhaps a sexual relationship.
17   Would you agree?
18   A    I'm not sure what the difference between a
19   sexual encounter and sexual relationship is unless you are
20   meaning the amount of time spent.
21   Q    All I mean by that is that he mentions -- he
22   reports Miss Minix is saying that she and Richard had a
23   relationship and then says on line 22 that she said,
24   quote, we had sex. So unclear to me exactly what that
25   means.
```

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 118

```
1    Q    Which ones would and which ones would not?
2    A    I'm sorry. Frame the specific piece again. 77
3    to top of 78?
4    Q    Yes. 77 to -- through line 7 of page 78.
5    A    The primary issue is whether the conduct is
6    unwelcome. It's certainly a central issue. And if he is
7    repeatedly asking her out and that is not welcome, and
8    particularly if she has made that unwelcomeness known,
9    then that would be a violation of Jeld-Wen's
10   anti-harassment policy.
11   Q    Which one of these allegations would violate the
12   policy? None that you could say for sure? It would
13   depend whether it was welcome or unwelcome?
14   A    Well, she seems -- I'm not sure I understand
15   the -- she seems to be saying here, I believe, that he was
16   asking her out on dates and that she was -- there was a
17   period of time when that was consensual; she was in a
18   consensual relationship.
19   Q    Correct.
20   A    But at a point in time that relationship ended
21   and thereafter his requests for dates and whatnot to her
22   were no longer welcome.
23   Q    So at that point it would be a violation of the
24   company policy for him to ask her out on dates if she told
25   him, we're done, which are the words used on line 18 on
```

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 127

1    Question: How about asking Linda to sit on his
2  lap?
3        Answer: That's not appropriate.
4        My next question -- my question was, in your
5  opinion is that in violation of Jeld-Wen policy?
6        Answer: In my opinion?
7        Question: Yes.
8        Answer: Well, that would go to our legal
9  people.
10       Question: Right. But I'm asking your opinion.
11  You have to follow the policy too, right?
12       Answer: Yeah.
13       Question: Okay. So in your opinion, would it
14  be a violation of the policy?
15       The Witness answers: I don't know.
16       Question: You don't know?
17       Answer: Would it be a violation? I don't think
18  so.
19       Do you agree or disagree with Mr. Hees?
20    A   Well, I'm not entirely sure what Mr. Hees is
21  talking about because you then say okay, but you didn't
22  think that was appropriate. And he says I thought that if
23  that's what Richard -- then I want to talk to Richard
24  about it --
25       Question: Right.

## Charles Robert Sturm

Page 128

1        Answer: -- so we can get both sides of the
2  story.
3        So I can't tell if Mr. Hees is saying that it
4  might not be a violation if Richard, in fact, says it
5  didn't happen, and he in the course of his investigation
6  concludes that it did not happen, in which case I would
7  agree that it would not be a violation.
8    Q   Clearly if the allegations are false it wouldn't
9  be a violation?
10    A   Correct. Thus given the piece that you didn't
11  read. I cannot tell whether that was Mr. Hees' thinking
12  in his answers.
13    Q   Well, I assure you having been there that it was
14  not. I was asking him do these acts violate the policy,
15  and he was saying he didn't think so. If that's true, do
16  you disagree with him?
17       MR. SCOFIELD: Again, subject to my objections.
18  Go ahead.
19       THE WITNESS: Again, I wasn't there, and I can't
20  speculate what was going on in his head. If those
21  allegations were true, then that would be a violation of
22  Jeld-Wen policy.
23  BY MR. DOUGLAS: (Continuing)
24    Q   If he said they were not, if proven true you
25  would disagree with him?

## Charles Robert Sturm

Page 129

1    A   If he said they were not, if known or expected
2  to be true by him at the time, then I would disagree with
3  that, correct.
4    Q   Would you find it at all disconcerting that one
5  of your managers would have a different opinion than you
6  do about what violates the company policy?
7    A   Well, I don't know if I would find it
8  disconcerting that they might not have the exact same
9  understanding as myself on company policy.
10    Q   These remarks about your bottom looks like
11  basketballs; let's go dribbling -- that is clearly
12  inappropriate and a violation of company policy, correct?
13    A   If it took place, that is a clear violation of
14  company policy.
15    Q   Mr. Hees should know that?
16    A   Again, I don't know what Mr. Hees was thinking.
17    Q   My question is he should know that as a manager
18  of Jeld-Wen, shouldn't he?
19    A   He should know that conduct, if true,
20  violates Jeld-Wen policy.
21    Q   And, in fact, one of the instructions to an
22  employee who believes they have been harassed -- one of
23  the things they can do is report it to a manager, correct?
24    A   Correct.
25    Q   And if they report it to a manager, they have

## Charles Robert Sturm

Page 130

1  fulfilled their duty under the handbook under the
2  harassment policy, correct?
3    A   And if they do not feel that the response from
4  that manager is appropriate or acceptable, they are
5  encouraged to escalate the complaint.
6    Q   What does escalate the complaint mean? Complain
7  to somebody higher?
8    A   When I, for example, conduct on-site training,
9  part of my on-site training is to emphasize the legal
10  department as a resource to individuals who may observe or
11  be victims of conduct that they view to be in violation of
12  the anti-harassment policy and to encourage them to raise
13  those concerns, bring those concerns directly to our
14  attention. That's why the telephone number is included --
15  that's why it's included in the handbook. That's why it's
16  included in the policy itself which is posted at the
17  facility.
18    Q   Okay. The handbook, reading from page 5 says,
19  any employee who believes that he/she is being subject to
20  objectionable conduct should promptly notify either their
21  immediate supervisor, their general or corporate manager,
22  vice president or subsidiary president or the legal
23  department. And it gives the phone number, correct?
24    A   You have it; I don't. But I don't have any
25  reason to believe you are not reading it correctly.

---

**Charles Robert Sturm**

Page 135

1    Q   One of Miss Sims' allegations on page 147 —
2        MR. SCOFIELD:  Again, Linda?
3  BY MR. DOUGLAS: (Continuing)
4    Q   Linda Sims, yes.  Was that Mr. Fetner asked her
5  to come decorate his bedroom.
6        Would that be a violation of company policy if
7  Mr. Fetner asked her to come help him decorate his
8  bedroom?
9    A   I don't know the context.  I don't know if she
10 had spoken to him about being an interior designer.  I
11 don't know the facts.  So it's hard for me to respond.
12 Ordinarily that's not an appropriate comment.
13   Q   If an employee is punished by management for
14 refusing to either go out with him or reciprocate a
15 romantic proposition, that's inappropriate, wouldn't it
16 be?
17   A   Correct.
18   Q   Miss Linda Sims says that she was sent home on
19 occasion when there was work to do on her job.  And I'm
20 referring to pages 150 and 151 of her deposition.  It
21 would be inappropriate for Mr. Fetner to send her home if
22 there was work to do on her job because she had rebuffed
23 advances, wouldn't it?
24       MR. SCOFIELD:  If that's a hypothetical I will
25 allow the question.  But otherwise, I will object.  Go

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

---

**Charles Robert Sturm**

Page 136

1  ahead and answer the question.
2        THE WITNESS:  If that is, in fact, what took
3  place, that would be particularly inappropriate.
4  BY MR. DOUGLAS: (Continuing)
5    Q   That would be an employment action that would be
6  a retaliation, wouldn't it?
7    A   Well, I don't know if you are asking me a legal
8  question.  It would be in violation of company policy.
9    Q   All right.  Let's return to Mr. Hees' deposition
10 beginning on page 83, line 9 through lines 21.  I will
11 represent to you these were allegations that Lisa Cook
12 made to Mr. Hees according to Mr. Hees.
13       Have you read it?
14   A   Yes.
15   Q   Would those allegations, if true, be a violation
16 of company anti-harassment policy?
17   A   Again, I don't know the context here.  I don't
18 know if — for example, who initiated this conversation.
19 I don't know whether perhaps Lisa initiated this
20 conversation.  I don't know the circumstances.  But in
21 general, that type of discussion is not an appropriate
22 workplace discussion.
23   Q   But not necessarily a violation of the policy?
24       MR. SCOFIELD:  Sexual harassment?
25       MR. DOUGLAS:  Sexual harassment policy.

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

---

**Charles Robert Sturm**

Page 137

1        THE WITNESS:  I could certainly envision it
2  being in violation of the company's anti-harassment
3  policy, depending upon what the surrounding circumstances
4  were.
5  BY MR. DOUGLAS: (Continuing)
6    Q   Let me read on because I think I actually asked
7  a good question this time.  Line 22, would that request to
8  an employee to go to the — to a home for a hot tub or
9  shower be a violation of the Jeld-Wen sexual harassment
10 policy in your opinion?
11       Answer by Mr. Hees:  I don't think so.
12       Do you agree with him?
13   A   Well, I don't know what was going on in his
14 head.  In most circumstances, I would disagree with that.
15 But again, I don't know what his thought process or
16 understanding of the facts or assumption as to the facts
17 was.
18   Q   Page 84 of Mr. Hees' deposition, beginning with
19 line 4 continuing through the end of the page — if you
20 would read that for me.
21   A   Okay.
22   Q   Would those allegations, if true, constitute a
23 violation of the Jeld-Wen anti-harassment policy?
24   A   Yes.  If true.
25   Q   Okay.  Just to be fair, after a page of asking

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

---

**Charles Robert Sturm**

Page 138

1  him, Mr. Hees agreed with you on page 86.
2        MR. SCOFIELD:  Just for the record, that's the
3  one about intentionally touching her breasts?
4        MR. DOUGLAS:  Correct.
5  BY MR. DOUGLAS: (Continuing)
6    Q   Now if we could review the allegations of Cathy
7  Thornton as recounted by Mr. Hees that begin on page 86,
8  line 4 continuing through the end of the page, line 24.  I
9  would like for you to read that, please.
10   A   86, 24?
11   Q   Yes.
12   A   Okay.
13   Q   Basically two allegations recounted here.  One
14 that Mr. Fetner was requesting oral sex from
15 Miss Thornton; secondly, a remark regarding her nipples;
16 is that correct?
17   A   Can you — can you repeat that.
18       MR. DOUGLAS:  Sure.
19       THE REPORTER:  "QUESTION:  Basically
20 two allegations recounted here.  One that
21 Mr. Fetner was requesting oral sex from
22 Miss Thornton; secondly, a remark regarding
23 her nipples; is that correct?"
24       THE WITNESS:  Certainly the first one.  I'm not
25 sure — I guess it's that there's — it's assumed to be an

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 139

1  association between his comment and the nipples.
2  BY MR. DOUGLAS: (Continuing)
3     Q   Okay. Let's assume that's the case.
4     A   Okay.
5     Q   Would either or both of those violate the
6  company's anti-harassment policy?
7     A   Yes.
8     Q   Both?
9     A   Yes. Again, based on my assumption, yes.
10     Q   And on the next page, Mr. Hees indicated that
11  the proposition would be a violation; he said absolutely
12  on page 87, line 2.
13     A   Uh-huh.
14     Q   Then my next question to him on line 5, how
15  about the remarks regarding, you know, her nipples? Would
16  that be a violation of the Jeld-Wen sexual harassment
17  policy?
18      Answer: A violation of the policy. I would say
19  no.
20      Do you disagree with Mr. Hees on that one?
21     A   I don't know what Mr. Hees' thought process was
22  or the assumptions -- the factual assumptions that
23  Mr. Hees had when he was responding.
24     Q   But this is his first meeting with them.
25     A   Who's them?

## Charles Robert Sturm

Page 140

1     Q   All of these ladies. He met with them all at
2  one time on October 13th, 2004. You are aware of that,
3  right?
4     A   My point -- I don't know what his assumptions
5  were, particularly his factual assumptions, when he
6  responded no. But having said that, if true and if
7  Mr. Fetner's gesture was related to erect nipples, that
8  would be a violation of the Jeld-Wen policy.
9     Q   Would that cause you enormous consternation if
10  Mr. Hees didn't see it the same way?
11     A   If Mr. Hees had the same factual understanding
12  as to what took place that my answer is based on, then I
13  would be disappointed in that.
14     Q   Okay. I'm going to talk to you briefly about
15  Brenda Sims. Actually, the previous page, 19 line 20 is a
16  question by Mr. Scofield.
17      MR. SCOFIELD: This is different deposition.
18  BY MR. DOUGLAS: (Continuing)
19     Q   Question is: All right. You say the
20  particulars of your discrimination -- sexual
21  discrimination. Is that starting the first sentence -- I
22  believe you are reading off her --
23      MR. SCOFIELD: Correct.
24     Q   -- charge; her EEOC charge. I believe I have
25  been subjected to sexual harassment from my supervisor

## Charles Robert Sturm

Page 141

1  that consisted of the rubbing and touching of my body to
2  include my legs and breast.
3      If those allegations were true, I believe you
4  have already testified that would be a violation of
5  company policy?
6     A   Certainly. On the assumption that it was not
7  welcome.
8     Q   She recounts a second occasion on page 54, lines
9  13 through --
10     A   Maybe I just -- I'm sorry. But regardless of
11  welcomeness, if true it would be inappropriate workplace
12  conduct.
13     Q   Okay. Line 13. Yes. The other time he touched
14  my breast he called me in the break room; he wanted to
15  talk to me. He was just standing right in front of me and
16  he just reached up and grabs my breast.
17      Question: Straightforward and grabbed your
18  breast?
19      Answer: Yes.
20      Clearly that would be a violation of company
21  policy, correct?
22     A   If true as that was just described, that would
23  violate company policy.
24     Q   It would be particularly egregious for a manager
25  to do something like that because they have the ability to

## Charles Robert Sturm

Page 142

1  make employees come where they want them to be?
2     A   Well --
3     Q   Would you agree with that statement I just made?
4      MR. SCOFIELD: Objection to the extent it calls
5  for legal conclusion.
6      THE WITNESS: I wouldn't want -- I don't want my
7  managers -- I don't want our managers engaging in that
8  conduct. I don't want our non-managers engaging in
9  inappropriate conduct.
10  BY MR. DOUGLAS: (Continuing)
11     Q   Well, we talked earlier about whether conduct is
12  flagrant or not. You remember that discussion in your
13  earlier testimony?
14     A   I know what you are referring to.
15     Q   Okay. Would you agree with me that these types
16  of things are even more serious when the offending party,
17  if true, is a manager because they have authority over the
18  employee? They are in a position of power?
19     A   I would agree that as a general matter we have
20  higher expectations of our managers and we as a matter of
21  policy expect something more from our managers.
22     Q   Miss Brenda Sims indicates in her deposition --
23  she's specifically responding to a question from
24  Mr. Scofield regarding verbal -- alleged verbal
25  harassment. Specifically the question from Mr. Scofield

## Charles Robert Sturm

Page 151

1    MR. SCOFIELD: I would object because I think
2  Dan Hees testified not only the willing -- he asked and
3  they preferred all --
4  BY MR. DOUGLAS: (Continuing)
5    Q. He said Lorena said yes, and the rest of them
6  acknowledged yes. I can dig it out if we have to. But my
7  question is going to be do you think it appropriate that
8  the interviews were conducted together rather than
9  separately?
10    A. Can you read back the first part of the
11  question, please.
12    THE REPORTER: "QUESTION: But my
13  question is going to be do you think it were
14  appropriate that the interviews were
15  conducted together rather than separately?"
16    MR. DOUGLAS: I will withdraw the other
17  question. Just answer that question for me.
18    THE WITNESS: Can we go off the record.
19    (Discussion off the record.)
20    MR. DOUGLAS: Let's go back on. Will you read
21  my question.
22    THE REPORTER: "QUESTION: But my
23  question is going to be do you think it
24  appropriate that the interviews were
25  conducted together rather than separately?"

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 152

1    THE WITNESS: I think --
2    MR. SCOFIELD: Well, let me make my objection
3  because I don't think it's relevant question because
4  that's not what the testimony and the record reflects.
5  Subject to that objection, please answer the question.
6    THE WITNESS: I think in general the optimal
7  approach is ordinarily to conduct the interviews
8  individually.
9  BY MR. DOUGLAS: (Continuing)
10    Q. Why is that?
11    A. However, there may be circumstances where that's
12  either not necessary and there may also be other
13  circumstances where although perhaps not optimal, it
14  nevertheless is satisfactory. I don't know the specific
15  circumstances here. It sounds like it was at the request
16  of at least one of the individuals who self-proclaimed
17  herself to be the spokesperson. There may be, for
18  example, time constraints; there may be resource
19  constraints if there's one individual. So typically in an
20  investigation situation you need to weigh a number of
21  different factors and come up with the most -- with an
22  appropriate way of conducting the investigation and
23  ideally the most appropriate way of doing it.
24    Q. Why would you say in general it would be optimal
25  to interview people separately?

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 153

1    A. Well, sometimes particularly where the
2  individuals don't want to be spoken with in a group
3  situation you may get better -- you may get better
4  information.
5    Q. Would you agree with me that people will more
6  likely divulge embarrassing situations on a one-on-one
7  setting versus a group setting?
8    A. Not necessarily.
9    Q. You don't agree with me on that?
10    A. There are circumstances where that dynamic may
11  exist.
12    Q. You can think of a circumstance where that
13  dynamic does not exist?
14    A. Well, as you described, I can think of a
15  circumstance where that would not exist where, for
16  example, you have a group of individuals who are very
17  close with each other and, indeed, perhaps have
18  represented to the interviewer who has asked whether they
19  wish it to be individual has affirmatively requested that
20  it not be done. Perhaps they want other individuals there
21  for support. And, indeed, would be less candid and less
22  open in a one-on-one situation than they would be having
23  the support of their coworkers together with them.
24    Q. Okay. Do you know a Jennifer Palmer?
25    A. Yes.

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 154

1    Q. Who is that?
2    A. She works in the legal department; she's a
3  manager.
4    Q. Does she work for you?
5    A. Yes.
6    Q. She reports to you?
7    A. Correct.
8    Q. How long has she been with the company?
9    A. She's been with Jeld-Wen, I believe, five or six
10  years.
11    Q. I want to get back to something I was asking you
12  earlier. If an employee complains to management -- let's
13  say hypothetically, an employee makes a sexual harassment
14  complaint to their group manager. In your opinion, is the
15  company on notice at that point of the harassment?
16    A. I'm not sure what you mean by on notice. I
17  think at that point the group manager should be responsive
18  to the complaint.
19    Q. That wasn't my question though. Would you
20  consider the company on notice of the harassment?
21    A. Well, I'm not sure what you mean by on notice.
22  If you mean does that discussion or disclosure to the
23  group manager trigger on the group manager's part a
24  responsibility to act, then my answer would be yes.
25    Q. What if the group manager doesn't act?

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 155

1    A   What do you mean, if the group manager doesn't
2  act?
3    Q   What then? Is the ball back then in the
4  employee's court or is the company on notice of the
5  harassment in your opinion?
6    A   If the group manager doesn't act and that's at
7  odds with the desire of the complaining individual, then I
8  think ideally that complaining individual would then
9  notify either the group manager's manager, perhaps the
10  general manager, perhaps the legal department. And I
11  think simultaneous with that there would be a failing on
12  the part of the group manager's part.
13    Q   I'm going to try my question again. Is the
14  company on notice if an employee complains to her group
15  manager about harassment?
16    A   Well, I think candidly I answered that in a way
17  that I thought was responsive or thought that was
18  responsive. I don't really understand what you are trying
19  to use the term notice for. Presumably, you know, if
20  notice -- if by notice you mean does the group manager or
21  whatever manager the complaint is reported to have an
22  expectation under our policy that he or she will act, then
23  the answer would be yes. Our policy would -- under our
24  policy, that group manager should then initiate activity,
25  depending upon the nature of the complaint. And that

## Charles Robert Sturm

Page 156

1  activity might be to notify a superior manager, it might
2  be to investigate it, could be number of different things.
3  That would depend on the nature of the complaint.
4    Q   All right. If the group manager fails to act at
5  all --
6    A   Right.
7    Q   -- that would certainly be a violation of the
8  Jeld-Wen policy by the group manager under an obligation
9  to at least report?
10    A   Under most -- in most circumstances, you know,
11  if somebody were to raise -- I could envision a very
12  trivial situation. For example, somebody says hey, I
13  don't like the fact that -- I want to raise a complaint --
14  my window doesn't open.
15    Q   I'm talking about a complaint of sexual
16  harassment -- propositioning for sex in the workplace
17  reported to the group manager about Mr. Fetner. Just to
18  make it more specific, certainly if that was done, the
19  person that was reporting to the group manager would be
20  under an obligation to report immediately, right?
21    A   Initiate activity, correct.
22    Q   If the group manager did nothing, hypothetically
23  that would be a violation of the policy?
24    A   By that manager?
25    Q   Yeah. By that manager.

## Charles Robert Sturm

Page 157

1    A   Correct.
2    Q   My question to you is actually a legal question.
3  Would you consider the company on notice of the
4  harassment?
5    A   Well, this is -- with all due respect, you have
6  asked me the same question five times, and I have
7  dutifully tried to answer it.
8    Q   Do you have a legal opinion?
9       MR. SCOFIELD: Object to asking for legal
10  conclusion when he's here for Jeld-Wen's policies.
11       MR. DOUGLAS: Go ahead and answer.
12       MR. SCOFIELD: Well, if you don't, that's fine.
13       THE WITNESS: I have attempted to answer
14  already. I mean, the question hasn't changed any.
15  BY MR. DOUGLAS: (Continuing)
16    Q   All right. Well, let me change the question.
17  Assuming my hypothetical situation that we have been
18  talking about, would you consider the company on notice
19  for purposes of the fifth element of proving a Title VII
20  claim?
21       MR. SCOFIELD: Object for legal question.
22  Instruct my client not to answer.
23       THE WITNESS: I have been instructed not to
24  answer.
25       MR. DOUGLAS: Will you certify that question,

## Charles Robert Sturm

Page 158

1  please.
2       MR. SCOFIELD: Asked and answered also.
3  BY MR. DOUGLAS: (Continuing)
4    Q   All right. Mr. Hees referenced a conference
5  call between he and Mr. Pat Galvez. Were you on that
6  conference call in the last few weeks or maybe few months?
7       MR. SCOFIELD: Could you point out -- there may
8  have been more than one so you may want to point out where
9  in the deposition.
10       MR. DOUGLAS: Sure. It's page 150.
11       THE WITNESS: In Hees' depo?
12       MR. DOUGLAS: In Hees' depo. Page 150 beginning
13  with line 21.
14       (Interruption in the proceedings.)
15       THE WITNESS: Is there a question pending?
16  BY MR. DOUGLAS: (Continuing)
17    Q   Yeah. The question is were you part of this
18  conference call? He says that counsel was on the
19  conference call. I don't know if he's referring to you or
20  Mr. Thompson or Mr. Scofield.
21    A   So not the 150; you are talking 151.
22    Q   It's the same conference call in my opinion.
23    A   No, I don't think so. He says on 150 have you
24  had any conversations with Mr. Galvez regarding this
25  matter? Yes. Outside the presence of counsel? Right.

## Charles Robert Sturm

Page 159

1    Tell me about those.
2       Q   Right.  And then --
3       A   Down below it looks like you are talking about
4    something separate.
5       Q   I don't think it's separate.  I think he just --
6    I think he just -- I think Mr. Thompson just cued him to
7    the -- at any rate, do you know if you were part of any
8    conversation with Hees and Galvez regarding this case?
9    And for the record I'm moving into your individual conduct
10   with regard to this case.
11      MR. SCOFIELD:  Okay.
12      THE WITNESS:  For the record, it's 4:05.  I
13   don't have a recollection of participating in a conference
14   call with the two of them.  I can't definitively say that
15   I didn't, but I don't believe so.  And I don't have a
16   recollection as I sit here now.
17   BY MR. DOUGLAS:  (Continuing)
18      Q   Okay.  And obviously you have been testifying
19   about the things you have done in this case as I have
20   asked you so -- but I'm going to ask you in the next 30
21   minutes or so about what actions you took in the 2003
22   complaint with regard to Mr. Bowen and the 2004 complaint
23   regarding my client.
24      A   Is this a natural point to take a break?
25      MR. DOUGLAS:  Sure.

## Charles Robert Sturm

Page 160

1       (Recess.)
2    BY MR. DOUGLAS:  (Continuing)
3       Q   Let's flip to page D00317 through 319.  This is
4    a memo from Dan Hees to Jeld-Wen and it's dated on January
5    30th, 2005, regarding 10/13/04 Alabama issue.  Did you
6    receive this letter or this memo from Mr. Hees?
7       A   I received this memo; I can't recall how it came
8    to me.
9       Q   You don't know if it was directed to you or not?
10      A   I don't know if this -- if he was directing this
11   memo to me.  I don't know.
12      Q   His explanation for the date being January 30,
13   2005, was that the date it printed off -- printed it off.
14   He said he prepared it within a week of October 13th,
15   2004.  Do you have an opinion as to whether his computer
16   operates that way or not?
17      A   That wouldn't surprise me.
18      Q   Okay.  Let me call your attention to D00320
19   through 321.  It's another memo from Dan Hees to Jeld-Wen
20   regarding the 10/13/04.
21      A   Yes.
22      Q   Have you -- did you receive that memo from
23   Mr. Hees?
24      A   I did receive this memo.  As I sit here, I can't
25   recall -- specifically recall how it came to me, whether

## Charles Robert Sturm

Page 161

1    it came directly from Mr. Hees.
2       Q   Okay.  Or somebody else forwarded it to you?
3       A   I can't recall.
4       Q   Would -- can you tell whether this would have
5    come via E-mail or not?
6       A   What do you mean?
7       Q   Would it have been transmitted to Oregon via
8    E-mail or via mail or do you know?
9       A   You mean how did I get it?  Did I get it by mail
10   or E-mail?
11      Q   Yeah.
12      A   Or via some other way?  Perhaps fax.  I don't
13   know.
14      Q   Well, there's no fax information stamped at the
15   top so I was prepared to eliminate that.
16      A   But I don't know if the version that's here is
17   specifically the one that I looked at.  In other words, I
18   don't know if the document you are looking at was the
19   document pre-fax and this doesn't have a fax tracking
20   number.  I don't know how it came to me, whether it was by
21   mail --
22      Q   Other witnesses have testified about interoffice
23   E-mail or intercompany E-mail.  You are familiar with that
24   I take it?
25      A   Intercompany E-mail?

## Charles Robert Sturm

Page 162

1       Q   Yes.
2       A   Yes.  I'm familiar with it.
3       Q   Did you try to obtain E-mails regarding
4    Mr. Fetner in advance of your deposition today?
5       A   Yes.
6       Q   Did you uncover any?
7       A   No.
8       Q   Tell me what you did to try to get them.
9       A   I contacted the manager in our information --
10   NIS department who has responsibility for that type of
11   activity to determine whether or not we could retrieve any
12   E-mails and let alone E-mails that would be specific to
13   matters we have been talking about.  And we are not able
14   to do that.  We do not have the ability to access those
15   off a server, and we do not have the computers any longer
16   so we don't have access to a hard drive system where we
17   might make an attempt to try to retrieve data.
18      Q   So the computers that were in use at the Roanoke
19   facility in 2003, 2004 don't exist any longer?
20      A   Either they don't exist or we don't have them.
21      Q   Okay.  All right.  On page D00320, the last
22   paragraph reads, I told Richard that I have heard enough
23   from our conversation this morning.  It is my
24   determination that Richard cannot treat some employees
25   different than others.  When it comes to this topic, he is

## Charles Robert Sturm
### Page 163

1  backing himself into a corner, and Jeld-Wen will not
2  endorse his actions even though this appears to be the
3  early stage of an issue Jeld-Wen does not want to get
4  involved in any further.  That as of today, Richard Fetner
5  will no longer be employed by Jeld-Wen.
6       Did I read that correctly?
7  A  What were the last — yes.
8  Q  The next paragraph read, Richard felt that the
9  outcome was too severe, and I was being too hard on him.
10  Richard felt I should have given him a verbal warning,
11  time off or have to apologize to the employees to make
12  things right.  But I told Richard that we are working with
13  a zero tolerance issue, and I don't have to deal with
14  warnings.
15       Did I read that — those few sentences
16  correctly?
17  A  Yes.
18  Q  Was it based on this memo that you drew your
19  earlier assertion that Fetner resigned in the face of
20  possible termination?
21  A  Certainly in part.
22  Q  Would you agree with me that this memo regarding
23  Fetner's no longer working for the company is incongruent
24  with Mr. Hees' deposition excerpts that we read earlier?
25       MR. SCOFIELD: Form.  You can answer the

### Page 164

1  question as best you can.
2       THE WITNESS: Incongruent meaning contradictory?
3       MR. DOUGLAS: Yes.
4       THE WITNESS: Not necessarily, no.
5  BY MR. DOUGLAS: (Continuing)
6  Q  Well, would you agree with me that the tone of
7  this memo indicates that Fetner was basically fired or
8  resigned in the face of immediate termination?
9  A  Well, I think it is fair that — to say that
10  Mr. Fetner resigned under circumstances where Mr. Hees had
11  an intention or expectation of termination.
12  Q  You don't find that at all inconsistent with
13  Mr. Hees' remarks in his deposition that he thought
14  Mr. Fetner was being set up?
15  A  Well, my understanding is that Mr. Hees found
16  not credible certain allegations that were raised by the
17  complaining individuals.  However, also found violations
18  of company policy on the part of Mr. Fetner with respect
19  to conduct that Mr. Hees found had occurred.  And
20  consequently, I don't view those as being incompatible.
21  Certainly Mr. Hees — there are situations where a
22  complaint is raised, an investigation is conducted, the
23  party who does the investigation does not find credible
24  all or part of the allegations but, nevertheless, does
25  find violations of company policy that may lead to

### Page 165

1  discipline up to and including termination.
2  Q  Did you view Mr. Fetner's resigning as an
3  admission of guilt as to the allegations?
4  A  No.  Not necessarily.
5  Q  Would you ever resign if false allegations about
6  sexual allegations were made about you?
7  A  I have never faced that situation, but I would
8  not foreclose the possibility of me resigning even in the
9  face of false allegations, particularly if I anticipated
10  that my employment at the end of the day might terminate.
11  I could envision reasons where it might be advantageous
12  for me to preemptively resign, particularly if I had
13  engaged in conduct that although particularly if —
14  although I hadn't engaged in the conduct that had been
15  alleged about me, I had engaged in conduct that I either
16  knew or came to understand was in violation of company
17  policy.
18  Q  Fair enough.  Don't you think the better company
19  policy for someone like Mr. Fetner would be just to fire
20  him and not pay him a severance under these circumstances?
21  A  Not necessarily.
22  Q  You think he deserved that $8,000?
23  A  I'm not sure that's the way I would characterize
24  the situation.  I know, for example, that in connection
25  with his employment ending we obtained from him an

### Page 166

1  executed release.  I know that that has value and that
2  certainly has a level of comfort, both to Jeld-Wen and to
3  myself and perhaps to the manager.  I am personally aware
4  of situations where individuals who were alleged to have
5  engaged in harassment had then come back claiming that the
6  allegations were false and raised claims like defamation
7  claims, wrongful discharge claims and a variety of tort
8  claims against the employer, against managers who
9  participated, who had discussions regarding it.  I am
10  sensitive to those issues.
11  Q  So do you think he deserved that $8,000?
12       MR. SCOFIELD: Object; he answered that
13  question.
14       MR. DOUGLAS: No, he didn't.
15       MR. SCOFIELD: Yeah, he did.
16       MR. DOUGLAS: He said there were reasons for
17  paying him like avoiding future liability.  My question
18  was do you think he deserved the $8,000?
19       MR. SCOFIELD: Your question was $8,000 worth
20  the release?
21       MR. DOUGLAS: That wasn't the question.  He
22  answered that question, but I didn't ask it.
23       THE WITNESS: I'm not sure whether I think he
24  deserved the money.  I think he had spent time with the
25  company.  My understanding is that he had disputed many,

## Charles Robert Sturm

Page 167

1  if not most, of the allegations that were raised. And I
2  think perhaps most importantly that -- well, I think
3  coupled with that there was a value associated with the
4  way it ended.
5  BY MR. DOUGLAS: (Continuing)
6      Q   Okay. If you would go to page D00387 and
7  following.
8      A   I have also dealt with, or I'm aware of the
9  potential for contractual type claims to be raised in the
10  absence of having made the payment.
11     Q   He would have to have a written contract to
12  exercise those claims, wouldn't he? He certainly would
13  under Alabama law.
14     A   Now you are speaking like a defense lawyer. I'm
15  aware that there's a difference between raising claims and
16  the validity of the claims. I do not know -- we have been
17  through this. I do not know the status of the management
18  agreement. I don't know what --
19     Q   Fair enough. I did want to ask you about
20  Fetner's resignation letter. You didn't find it over
21  lunch?
22     A   No.
23     Q   You all looked in his file?
24     A   Correct.
25     Q   Do you remember if you ever saw one or not?

## Charles Robert Sturm

Page 168

1      A   I have thought about it, and I can't recall one
2  way or the other. I have a vague recollection that
3  perhaps I had but it may be that I was simply told of it.
4  I can't recall.
5      Q   Do you know anywhere else it might be?
6      A   No. That has not been explored. I don't have
7  knowledge.
8      Q   Okay. Pages 387 and following. Are those your
9  responses or is that your response to the EEOC regarding
10  complainants Linda Sims, Brenda Sims and Lorena Minix?
11     A   Is this a different set of pages than the pages
12  you asked me about previously?
13     Q   No. It's the same.
14     A   Well, I believe you asked me that question.
15     Q   You prepared this document, correct?
16     A   Correct.
17     Q   And in it you provided both a factual and legal
18  defense of Jeld-Wen as to these particular claims?
19     A   I guess that's a way of describing it.
20     Q   What other actions did you personally take with
21  regard to these complaints?
22         MR. SCOFIELD: You mean other than preparing
23  this document?
24         MR. DOUGLAS: Yeah.
25         MR. SCOFIELD: Okay.

## Charles Robert Sturm

Page 169

1         THE WITNESS: I'm not sure I understand that.
2  BY MR. DOUGLAS: (Continuing)
3      Q   Let me ask a better question. Did you conduct
4  an investigation yourself of the allegations? You did
5  not, did you?
6      A   I spoke with individuals in order to get facts
7  and complete this and confirm that it was accurate before
8  it was -- in the process of creating it.
9      Q   Okay. I'm not asking about that document. I'm
10  talking about apart from that document, what else did you
11  have to do with regard to this matter?
12     A   Among the activities was to communicate for a
13  period of time with the EEOC. My recollection is that
14  there was a discussion -- there was initiation by the EEOC
15  of mediation at one point in time and so I served as the
16  contact person.
17     Q   You didn't perform any investigation of the
18  allegations themselves, did you? They were reported to
19  you by somebody, correct?
20     A   Well, I guess the problem I'm having is I don't
21  know if you are using the term investigation as a term of
22  art. I had discussions with people to gather facts that
23  were separate from the matters -- the investigatory
24  matters that we have been talking about that Dan Hees had
25  been involved in.

## Charles Robert Sturm

Page 170

1      Q   You didn't talk to any of the participants; is
2  that correct?
3      A   That is correct. Indeed, I am not sure at this
4  point that I would even have been ethically permitted to
5  do that.
6      Q   Did you ever speak to Mr. Fetner about this
7  matter?
8      A   I don't believe so.
9      Q   Have you spoken to Mr. Fetner since he left
10  Jeld-Wen as an employee?
11     A   I don't believe I have.
12     Q   Can you say for certain that you have not?
13     A   I can say with fair certainty that I have not.
14  I don't believe I have.
15     Q   Other than your counsel, have you spoken to
16  anybody regarding this matter since the EEOC made its
17  decision?
18         MR. SCOFIELD: You mean outside the presence of
19  counsel or to counsel?
20         MR. DOUGLAS: Outside of the presence of
21  counsel.
22         THE WITNESS: Well I spoke with IS.
23  BY MR. DOUGLAS: (Continuing)
24     Q   Who's IS?
25     A   We just talked about that. Information --

## Charles Robert Sturm

Page 171

1  information services about E-mail.
2  Q  Okay.
3  A  I had a discussion with Barry Homrighaus to
4  confirm some information.
5  Q  Who is that?
6  A  He's a responsible — he was senior vice
7  president with responsibility over this facility.
8  Q  When did you talk to him?
9  A  I had two brief conversations; one would have
10  been last week, and one would have been earlier this week.
11  Q  What were both of those conversations about?
12  A  To confirm my understanding of the decision to
13  close the Roanoke facility.
14  Q  Okay. What did he say?
15  A  He said that it was a decision made in
16  connection — made in or about November of 2003 to close
17  the facility in 2004.
18  Q  Was that it?
19  A  And then — that was the first conversation.
20  And then the second conversation he confirmed the timing
21  of the actual closure.
22  Q  Okay. If you would go to page D00514 through
23  D00522. Appears to be a memo to Pat Galvez from you; is
24  that correct?
25  A  It's a memo that on the first page reads to Pat

## Charles Robert Sturm

Page 172

1  Galvez. It was actually a memorandum issued to Dan Hees
2  primarily.
3  Q  Mr. Galvez testified yesterday that he had never
4  seen this memo. Would that surprise you?
5  A  No.
6  Q  You sent it to Mr. Hees and Mr. Homrighaus. And
7  it just purports to be a recap of the 2003 investigation;
8  is that correct?
9  A  I don't know if I would call it a recap but it
10  was a recounting is the word I think you have used. A
11  recounting of my interviews, the information that I
12  gathered, a discussion of the process used and then some
13  conclusions.
14  Q  You indicated that in your opinion using a more
15  likely than not standard, that Mr. Bowen had violated the
16  company's sexual harassment policy with regard to
17  Miss Minix; is that true?
18  A  Yes.
19  Q  What were the facts that led you to conclude
20  that?
21  A  Primarily the information that I obtained during
22  the course of my interviews, the reaction that Mr. Bowen
23  had to the anti-harassment training.
24  Q  And his reaction was to say that everybody in
25  the plant was guilty of harassment?

## Charles Robert Sturm

Page 173

1  A  That was one reaction.
2  Q  Was that one of the ones you were speaking of
3  just a second ago?
4  A  No. The primary reactions that I was speaking
5  of was him somewhat — I don't know if aloof is the right
6  word but somewhat awkwardly standing off to the side
7  uncomfortably as I went through the training as well as
8  the response that he had following the training. I found
9  his responses to be very disjointed, and I did not find
10  him to be particularly credible.
11  Q  Did you find Miss Minix and Miss Zachary to be
12  credible?
13  A  I generally found them to be credible with
14  respect to this, yes.
15  Q  Did you consider Miss Minix's credibility to be
16  bolstered by the corroboration of Miss Zachary?
17  A  I took into account that this was — that there
18  was corroboration. Certainly there were two individuals
19  who represented to me having seen the conduct about which
20  Miss Minix was complaining.
21  Q  If several employees complain about similar
22  conduct from a manager, do you necessarily find their
23  allegations to be more credible because there's more of
24  them?
25  MR. SCOFIELD: Form. Answer the question.

## Charles Robert Sturm

Page 174

1  THE WITNESS: There is — I find it to be
2  relevant if there are multiple parties that are
3  complaining about conduct in a consistent manner. That's
4  certainly factored into the assessment. That's not
5  irrelevant.
6  BY MR. DOUGLAS: (Continuing)
7  Q  Okay. Did you undertake any investigation
8  regarding Mr. Bowen's contention that everybody was in
9  violation of the policy at the Roanoke facility?
10  MR. SCOFIELD: Including Lorena? I'm sorry,
11  Jim.
12  THE WITNESS: Mr. Bowen was the only individual
13  with who I spoke. That was a unique allegation to
14  Mr. Bowen. Neither Miss Minix nor Ms. Zachary raised
15  those types of concerns. Frankly, Mr. Bowen's — I did
16  not — I did not speak with individuals above and beyond
17  the individuals in my report with the exception of perhaps
18  having spoken with Mr. Galvez about that.
19  Q  Did you speak to Fetner at all on that trip?
20  A  I imagine that I did at least briefly for
21  coordinating issues perhaps. I don't recall specifically.
22  Q  But with regard to Mr. Bowen's assertion that
23  everybody was in violation of the policy, you just
24  dismissed that?
25  A  I don't know that I dismissed that. I did not

## Charles Robert Sturm

Page 175

1  find it to be --
2      Q   Did not believe it?
3      A   I did not find it to be credible.  It was at
4  odds with what Miss Minix and Miss Zachary were telling
5  me.
6      Q   What did they tell you with regard to other
7  possible harassments in the facility?
8      A   When I talked with them about violations of our
9  anti-harassment policy, they explained to me that the
10  problem at the facility was specific to Mr. Bowen.
11      Q   And given all that, you didn't feel the need to
12  investigate Mr. Bowen's claims?  I'm not saying you should
13  have.  I'm just trying to figure out what you did.
14      A   I told you I spoke with the three individuals in
15  this report.  I know I spoke to Mr. Galvez.
16      Q   That was it?  That's all I need.
17      A   In essence.
18      Q   Okay.  You made no investigation of Mr. Bowen's
19  claims specifically?
20      A   Well, no.  I just said that I spoke with
21  Miss Zachary, Miss Minix and Mr. Galvez.
22      Q   That was before the statement by Mr. Bowen
23  though, correct?
24      A   I spoke with Miss Minix twice; I spoke with
25  Miss Minix once before and once after.

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 176

1      Q   After the statement of Mr. Bowen?
2      A   Correct.
3      Q   Did you speak to Mr. Galvez before or after the
4  statement of Mr. Bowen?
5      A   Oh, sure.  I spoke with Mr. Galvez before and
6  after.
7      Q   Okay.  How about Miss Zachary?
8      A   I believe that -- I believe that I spoke with
9  Miss Zachary before.
10      Q   Other than --
11      A   Of course, I had no opportunity to find out what
12  Mr. Bowen was referring to.
13      Q   Because he left?
14      A   Because he left.
15      Q   All right.  You believe you spoke both to
16  Miss Minix and Mr. Galvez about Mr. Bowen's statement that
17  everybody was in violation of the policy?
18      A   No, not specifically.  I spoke to Miss Minix
19  about her concerns at the facility.
20      Q   Right.  You testified to that.  She said they
21  were limited to Bowen?
22      A   Correct.  Frankly, I had no idea what Mr. Bowen
23  was referring to because he stormed out.
24      Q   You didn't take any further investigation other
25  than what you have testified to regarding his statement?

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

Page 177

1      A   Correct.
2          MR. DOUGLAS:  All right.  Let's go off the
3  record for a second.
4          (Recess.)
5  BY MR. DOUGLAS: (Continuing)
6      Q   Okay.  There was a document produced to me today
7  indicating the employees -- the hourly employees -- I
8  guess all the employees at the Roanoke facility as of
9  12/15/04.  Would you be able to identify --
10          MR. SCOFIELD:  I think that's the day this was
11  printed on.
12          MR. DOUGLAS:  Okay.
13          MR. SCOFIELD:  Because Richard Fetner's name is
14  on there.
15  BY MR. DOUGLAS: (Continuing)
16      Q   It certainly is.  All right.  At any rate, it's
17  a roster of employees.  Would you be able to identify them
18  for me?  Do you know who they are?  If you can't, just
19  tell me.
20      A   I'm 99 percent certain the answer is no.
21          MR. DOUGLAS:  I won't ask you about it then.
22  All right.  That's all the questions I have.
23          MR. SCOFIELD:  I have no questions.
24          (Deposition concluded at 4:51 p.m.)
25              --oOo--

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396

## Charles Robert Sturm

STATE OF OREGON       )
                      ) ss.   C E R T I F I C A T E
County of Jackson     )

        I, MELANIE J. SAVORD, do hereby certify that:
        At the time and place heretofore mentioned in
the caption of the foregoing matter, I was a Certified
Shorthand Reporter, in and for the State of Oregon;
        That said time and place I reported in
stenotype all testimony adduced and proceedings had in the
foregoing matter;
        That thereafter my notes were reduced to a
computer-aided transcript and that the foregoing
transcript is a true and correct transcript of all such
testimony adduced and proceedings had and of the whole
thereof, to the best of my ability.
        IN WITNESS THEREOF, I have hereunto set my hand
this 15th day of May, 2006, in the City of Medford, County
of Jackson, State of Oregon.


        _____
        MELANIE J. SAVORD
        Certified Shorthand Reporter
        Certificate No. 96-0325

(541)732-1988    Advanced Court Reporting & Video Services    (800) 343-3396