# EXHIBIT N

**DEPOSITION EXCERPTS OF C. ROXI GILES**

Case 3:05-cv-00685-MHT-VPM   Document 32-15   Filed 06/08/2006   Page 2 of 15

Deposition of Roxi Giles                                        May 8, 2006

## Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
 2    FOR THE MIDDLE DISTRICT OF ALABAMA
 3              EASTERN DIVISION
 4
 5    LORENA MINIX, BRENDA SIMS
      and LINDA SIMS,
 6
         Plaintiffs,
 7
      vs.            CIVIL ACTION NO.
 8                   3:05CV685-M
 9    JELD-WEN, INC. and
      RICHARD FETNER,
10
         Defendants.
11
12              * * * * * * * * * * * *
13
14       DEPOSITION OF ROXI GILES, taken pursuant to
15    stipulation and agreement before Lyn Daugherty,
16    Certified Shorthand Reporter and Commissioner for
17    the State of Alabama at Large, in the Law Offices
18    of McNeal & Douglas, 1710 Catherine Court, Suite B,
19    Auburn, Alabama, on Monday, May 8th, 2006,
20    commencing at approximately 3:30 p.m.
21
22              * * * * * * * * * * * *
23
```

## Page 2

```
 1              APPEARANCES
 2   FOR THE PLAINTIFFS:
 3   Mr. James B. Douglas, Jr.
     McNEAL & DOUGLAS
 4   Attorneys at Law
     1710 Catherine Court, Suite B
 5   Auburn, Alabama 36830
 6   Mr. Matthew W. White
     ADAMS, UMBACH, DAVIDSON & WHITE
 7   Attorneys at Law
     205 South 9th Street
 8   P.O. Box 2069
     Opelika, Alabama 36803-2069
 9
     FOR THE DEFENDANT JELD-WEN:
10
     Mr. Michael L. Thompson
11   LEHR, MIDDLEBROOKS, PRICE & VREELAND
     Attorneys at Law
12   2021 Third Avenue North
     Birmingham, Alabama 35203
13
     Mr. Scott J. Scofield (Via Telephone)
14   SCOFIELD, GERARD, SINGLETARY & POHORELSKY
     Attorneys at Law
15   1114 Ryan Street
     Lake Charles, Louisiana 70601
16
17              * * * * * * * * * * * *
18         EXAMINATION INDEX
19
     BY MR. DOUGLAS . . . . . . . . . . 4
20
21
         (No exhibits marked to this deposition.)
22
23
```

## Page 3

```
 1              STIPULATIONS
 2       It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of ROXI GILES is taken pursuant to the
 5   Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Lyn Daugherty,
 7   Certified Shorthand Reporter, and Commissioner for
 8   the State of Alabama at Large, without the
 9   formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16       It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23       It is further stipulated and agreed by and
```

## Page 4

```
 1   between the parties hereto and the witness that the
 2   signature of the witness to this deposition is
 3   hereby not waived.
 4              * * * * * * * * * * * *
 5         COURT REPORTER: Usual
 6            stipulations?
 7         MR. THOMPSON: She'll read and
 8            sign. Other than that ...
 9              * * * * * * * * * * * *
10            ROXI GILES
11       The witness, after having first been duly sworn
12   to speak the truth, the whole truth and nothing but
13   the truth testified as follows:
14         MR. THOMPSON: And you can send me
15            her travel with the errata
16            sheet.
17            EXAMINATION
18   BY MR. DOUGLAS:
19   Q.  Would you state your name, please, ma'am.
20   A.  Roxi Giles.
21   Q.  Would you be kind enough to spell your name
22       for us.
23   A.  R-O-X-I, G-I-L-E-S.
```

1 (Pages 1 to 4)

Page 17

```
 1   Q.  Why did you leave your job before Jeld-Wen
 2       to take this job?
 3   A.  Sir?
 4   Q.  Where did you work right before Jeld-Wen?
 5       I'm sorry.
 6   A.  Cagle's.
 7   Q.  Why did you leave that job?
 8   A.  Because we moved to Alabama and I wanted a
 9       job closer.
10   Q.  Why did you move to Alabama?
11   A.  Because we found some land that we wanted
12       to buy and we bought the land and built a
13       home.
14   Q.  Does your husband work?
15   A.  Yes, sir.
16   Q.  Where does he work?
17   A.  Douglasville, Georgia.
18   Q.  So the purpose of moving to Alabama was to
19       buy the land?
20   A.  Yes, sir.
21   Q.  And you wanted a job closer to your home?
22   A.  Yes, sir.
23   Q.  When you were hired by Jeld-Wen in 2002,
```

Page 18

```
 1       what were you hired as?  What was your
 2       position?
 3   A.  Administrative assistant.
 4   Q.  To who?
 5   A.  Pat Galvez.
 6   Q.  What was his title?
 7   A.  Assistant general manager, plant manager.
 8   Q.  Who was he an assistant to?
 9   A.  Dan Hees.
10   Q.  From Sparta, Tennessee?
11   A.  Yes, sir.
12   Q.  And what was he?
13   A.  He was general manager.
14   Q.  Did you know anybody at Jeld-Wen before you
15       put in your application?
16   A.  No, sir.
17   Q.  Who interviewed you?
18   A.  Pat Galvez.
19   Q.  Did he also hire you?
20   A.  Yes, sir.
21   Q.  When you left the job at Cagle's, how much
22       were you making?
23   A.  How much was I making?
```

Page 19

```
 1   Q.  Yes.
 2   A.  Between 16 and 18 an hour.
 3   Q.  16 and $18 an hour?
 4   A.  Yes, sir.
 5   Q.  When you were hired at Jeld-Wen, what was
 6       your rate of pay?
 7   A.  Between 11 and $12 an hour.
 8   Q.  So you took a pretty decent pay cut?
 9   A.  Yes, sir.
10   Q.  What are you making now at Jeld-Wen?
11   A.  $11 an hour.
12   Q.  So have you not received a raise in the
13       last four years?
14   A.  Yes, sir.
15   Q.  Okay.  Forgive me.  Those numbers don't
16       seem to --
17   A.  No.
18          MR. THOMPSON:  Are you nervous?
19          THE WITNESS:  No.  Can I explain?
20          MR. THOMPSON:  Sure.
21   A.  Okay.  The plant closed.  And when the
22       plant closed, they moved me to the -- they
23       opened up a new department in Austell, at
```

Page 20

```
 1       the Austell plant, Jeld-Wen Austell plant.
 2   Q.  Is that in Georgia?
 3   A.  Yes, sir.  They moved me out there.  And
 4       when they did, they gave me a pay increase.
 5   Q.  To what?
 6   A.  To $14 an hour.
 7   Q.  Then what happened?
 8   A.  Then another position has recently come
 9       open at the Wedowee plant back -- which is
10       back close to home, and I turned in my
11       notice there and came -- transferred out to
12       Wedowee.
13   Q.  Took a pay cut to work closer to home?
14   A.  Yes, sir.
15   Q.  The time you were working at the Roanoke
16       plant, what was your salary?
17   A.  Between 12 and $14.
18   Q.  Did you get raises?
19   A.  Yes, sir.
20   Q.  How often did you get raises at the Roanoke
21       plant?
22   A.  I think we got a yearly raise.  I think it
23       was around June.
```

Page 25

1   A. Yeah. Kathy Conger, Richard and Pat. We
2      had Christmas dinner one year.
3   Q. At whose house?
4   A. Oh, it was at a restaurant.
5   Q. Whose treat?
6   A. Jeld-Wen.
7   Q. Who coordinated it? Pat?
8   A. Yes, sir.
9   Q. Any other occasions where you socialized
10     outside the office with anybody at work?
11  A. No, sir.
12  Q. Did you ever take complaints from
13     employees?
14        MR. THOMPSON: I'm going to object
15        to the form.
16  Q. You can answer.
17        MR. THOMPSON: Go ahead and
18        answer. Just ignore me.
19  A. No, sir.
20  Q. Did you ever engage in office gossip with
21     any of the employees there?
22  A. No, sir.
23  Q. Did you ever hear office gossip?

Page 26

1   A. Yes, sir.
2   Q. You just didn't participate in it?
3   A. Yes, sir.
4   Q. Is that correct?
5   A. That's correct.
6   Q. So would it be fair to say with regard to
7      office gossip you were all ears?
8   A. No, sir.
9   Q. Did you ever solicit or inquire about
10     office gossip?
11  A. No, sir.
12  Q. Would it be fair to say that the only way
13     you heard of it was if you happened to be
14     where other people were talking?
15  A. Yes, sir.
16  Q. Did anybody ever come to you in a
17     one-on-one setting to engage in office
18     gossip?
19  A. Yes, sir.
20  Q. On how many occasions?
21  A. I don't know.
22  Q. Well, tell me about the times you can
23     remember.

Page 27

1   A. I can't.
2   Q. Well, then how do you know --
3   A. Because I -- Because they came and talked,
4      but it went in one ear and out the other.
5   Q. Did anybody ever come to you and ask you to
6      report any behavior to a supervisor?
7   A. No.
8   Q. That never happened?
9   A. No.
10  Q. When did you first meet Richard Fetner?
11  A. July 2002 when Pat interviewed me.
12  Q. And how was Mr. Fetner introduced to you?
13  A. Richard Fetner.
14  Q. He just said this is Richard Fetner?
15  A. Yes. He's the plant manager.
16  Q. Well, that's what I was interested in.
17  A. Okay.
18  Q. And would you consider yourself and
19     Mr. Fetner friends?
20  A. Acquaintances.
21  Q. Do you like him?
22  A. Yes, sir.
23        MR. DOUGLAS: Off the record.

Page 28

1         (Off-the-record discussion.)
2   Q. How about Joe Mendoza, did you like him?
3   A. Yes, sir.
4   Q. When did you meet him?
5   A. I can't remember when he was hired.
6   Q. He came after you were hired?
7   A. Yes, sir.
8   Q. Was he equal with Mr. Fetner or above him
9      as far as rank goes or below him?
10  A. Equal, to my knowledge.
11  Q. Pat Galvez?
12  A. Yes, sir.
13  Q. I assume you met him when you interviewed?
14  A. Yes, sir.
15  Q. Did you like him?
16  A. Yes, sir.
17  Q. Do you consider him a friend of yours?
18  A. Yes, sir.
19  Q. Do you stay in contact with him today?
20  A. Yes, sir.
21  Q. How often do y'all speak?
22  A. Probably once a month.
23  Q. Have y'all discussed this case or any of

Page 33

1    MR. THOMPSON: Object to the form.
2  Q. Go ahead and answer.
3  A. Ask the question again.
4  Q. Yes, ma'am. Can you state to me for
5     certain that you did not -- that Mr. Hees
6     did not tell you about the allegations
7     against Mr. Fetner?
8  A. No.
9  Q. Can you tell me that you don't think he
10    did?
11 A. No.
12 Q. I'm trying to figure out what I don't
13    remember means when you say it. To some
14    people it might mean I have no memory. To
15    some people it might mean I don't think --
16    Do you see what I'm saying?
17 A. Yeah.
18 Q. When people say I don't remember, it means
19    different things. I'm just trying to
20    figure out what that means when you say I
21    don't remember whether he did or not.
22 A. I don't remember.
23 Q. One way or the other?

Page 34

1  A. No, sir.
2  Q. Were you curious as to why he was letting
3     Richard go?
4  A. No.
5  Q. Why?
6  A. It wasn't none of my business.
7  Q. Well, you told me you liked the guy; right?
8  A. Yeah.
9  Q. Don't you care when one of your coworkers
10    loses their job?
11 A. Well, I mean, yes.
12 Q. But you didn't want to know why?
13 A. No.
14 Q. Because it was none of your business?
15 A. Right.
16 Q. Did you call Richard and ask him what had
17    happened?
18 A. No.
19 Q. Were you curious?
20 A. Yes.
21 Q. But you just didn't want to get in his
22    business; is that right?
23 A. Right.

Page 35

1  Q. Did you ask anybody at the plant what had
2     happened?
3  A. No.
4  Q. As we sit here today, are you familiar with
5     what the allegations are being made by
6     these three ladies?
7  A. Yes.
8  Q. How did you become aware of those
9     allegations?
10 A. I don't remember.
11 Q. When did you become aware of these
12    allegations?
13 A. I don't remember. I don't know.
14 Q. Can you give me a year? 2004, 2005 or
15    2006?
16 A. I don't remember.
17 Q. Just have no idea?
18 A. No, sir.
19 Q. Do you have any idea if the information
20    came from Mr. Thompson or Mr. Scofield when
21    you learned of the allegations?
22 A. I don't remember.
23    MR. THOMPSON: I can't help you.

Page 36

1  A. I don't remember.
2  Q. Do you remember if the allegations were
3     first told to you by a male or a female?
4  A. Male.
5  Q. Do you know if that person was a lawyer or
6     not?
7  A. No.
8  Q. Do you know if that person worked at the
9     Roanoke facility?
10 A. No.
11 Q. They did not or you don't remember?
12 A. No, they did not.
13 Q. Are you now remembering who it might have
14    been?
15 A. Yes.
16 Q. Who was it?
17 A. It was Dan Hees.
18 Q. What did he tell you?
19 A. He told me that he had to take a deposition
20    about the case.
21 Q. Okay. What else was said?
22 A. That it was allegations against Richard and
23    the three ladies.

Page 37

1  Q. And what did he tell you about the
2     allegations?
3  A. That it was sexual harassment.
4  Q. What else did he say?
5  A. That's all.
6  Q. Did you ask him what the specifics of the
7     sexual harassment were?
8  A. No, sir.
9  Q. Did he tell you?
10 A. No, sir.
11 Q. What, if anything, did you say when he told
12    you it was about sexual harassment?
13 A. About the case?
14 Q. Yeah.
15 A. I told him it was stupid.
16 Q. What did he say when you said it's stupid?
17 A. Nothing.
18 Q. He didn't say, yeah, you're right?
19 A. He might have.
20 Q. Well, let's think hard and see if you can
21    remember what he said. Did he agree with
22    you that it was stupid?
23 A. I don't remember.

Page 38

1  Q. Why did you tell him you thought it was
2     stupid?
3  A. Because it is.
4  Q. Tell me why you hold that opinion.
5         (Interruption.)
6  Q. It's just your opinion, ma'am. You're
7     entitled to it. Just tell me what it is.
8  A. I don't know. I just thought it -- think
9     it's a waste of time.
10 Q. Okay. Prior to Mr. Hees telling you that
11    he gave a deposition -- That would have
12    been this year; correct?
13 A. Prior to?
14 Q. Yeah. He told you this year, 2006; right?
15 A. Yes.
16 Q. The conversation you just had with Mr. Hees
17    that you're telling me about was in 2006?
18 A. Yes, sir.
19 Q. So between October of 2004 and whenever you
20    had this conversation with Mr. Hees in 2006
21    you knew nothing about the case; is that
22    right?
23          MR. THOMPSON: Object to the form.

Page 39

1  A. No.
2  Q. That's not correct or you knew nothing
3     about the case?
4  A. I knew nothing.
5  Q. About the case?
6  A. Yes, sir.
7  Q. Is that correct?
8  A. Yes, sir.
9  Q. And you knew nothing about the allegations
10    being made against Mr. Fetner; is that
11    correct?
12 A. I knew that he -- I knew there was a case
13    against Richard and the ladies, but I did
14    not know anything about it.
15 Q. Did you know that the case concerned
16    allegations of sexual harassment before
17    Mr. Hees told you?
18 A. No.
19 Q. You just knew there was a case?
20 A. I knew that there were allegations against
21    Richard.
22 Q. Did you know that the allegations were
23    sexual harassment?

Page 40

1  A. Yes.
2  Q. When did you first come about that
3     information?
4  A. I don't remember the date.
5  Q. Do you remember the year?
6  A. No, sir.
7  Q. Do you remember who gave you the
8     information where you first learned about
9     the allegations of sexual harassment?
10 A. Dan told me, Dan Hees.
11 Q. And this was before 2006?
12 A. I don't remember.
13 Q. When Dan Hees first told you about the
14    allegations of sexual harassment, what did
15    he say?
16 A. That he had to give a deposition.
17 Q. You were telling me about that conversation
18    a few minutes ago?
19 A. Yes, sir.
20 Q. Is that the first time you learned about
21    the allegations in this case being sexual
22    harassment?
23 A. Yes, sir.

Page 41

1  Q. Now, tell me why you think the case is
2     stupid.
3         Let me ask you a different question.
4     Are you saying that you don't believe what
5     they're saying, or are you saying it's no
6     big deal even if it's true?
7         MR. THOMPSON: Object to the
8            form. I don't think you've
9            established she knows what
10           they're saying.
11        MR. DOUGLAS: She can answer my
12           question.
13 Q. He's trying to tell you what to answer, but
14    you need to answer my question.
15        MR. THOMPSON: No, I wasn't. I
16           was trying to say you don't
17           have the foundation to get
18           that opinion from her because
19           I don't think she has the
20           knowledge to have that
21           opinion.
22 A. It's just my opinion.
23 Q. I respect your opinion. I'm just trying to

Page 42

1     figure out why you have it. Do you believe
2     the allegations being made -- I'll make
3     your lawyer happy. What do you understand
4     that the allegations are that are being
5     made against Mr. Fetner?
6  A. That he sexually harassed the three ladies.
7  Q. Did Mr. Hees tell you what the harassment
8     was?
9  A. No.
10 Q. He just said sexual harassment?
11 A. Yes.
12 Q. He didn't tell you whether they involved
13    touching or talking or anything along that
14    line?
15 A. No.
16 Q. He just said sexual harassment?
17 A. Yes.
18 Q. Now, do you -- When you say that the case
19    is stupid, do you mean to say that you
20    don't believe they were sexually harassed
21    or that it's no big deal if they were --
22        MR. THOMPSON: Object to the form.
23 Q. -- or something different?

Page 43

1         MR. THOMPSON: Same objection.
2  A. I don't know.
3  Q. Yes, ma'am, you do know. It's your
4     opinion.
5  A. Maybe it's the wrong word.
6  Q. I haven't quarreled with the word. I'm
7     just trying to figure out why you feel that
8     way.
9         Ma'am?
10 A. Yes, sir.
11 Q. Would you kindly answer my question?
12 A. I don't know. I just -- Maybe it's the
13    wrong word.
14 Q. Well, do you believe that my clients were
15    sexually harassed by Mr. Fetner?
16        MR. THOMPSON: Object to the form.
17 A. I don't know.
18 Q. You don't know one way or the other?
19 A. No.
20 Q. Let me ask you this: Do you think people
21    sue people too much --
22 A. Yes.
23 Q. -- in this country?

Page 44

1     Do you think people sue folks when they
2     ought to just go on about their lives and
3     not worry about things? Do you have that
4     opinion?
5  A. Yes.
6         MR. THOMPSON: Object to the form.
7  Q. Is that how you feel about my clients?
8  A. I don't know about the case. I mean, I
9     don't know what happened.
10 Q. Well, if you don't know what happened, then
11    tell me why you think the case is stupid.
12 A. Well, it's the wrong word.
13 Q. Is there another word that you would use to
14    describe it?
15 A. No, sir. I'm sorry.
16 Q. You don't have to apologize to me for
17    anything.
18        Did Mr. Hees agree with you that the
19    case was stupid?
20 A. No.
21        MR. THOMPSON: Object to the form.
22 Q. He didn't say anything?
23 A. No.

## Page 45

1  Q. In one of your earlier answers you said
2     that you thought the case was a waste of
3     time. Do you recall saying that just a few
4     minutes ago?
5  A. Yes.
6  Q. What did you mean by that?
7  A. I don't know. It's just my opinion.
8  Q. Okay. Can you tell me why it's your
9     opinion? Why do you think the case is a
10    waste of time?
11 A. No, I can't.
12 Q. Did Mr. Hees on any other occasion talk to
13    you about the facts of the case?
14 A. No, sir.
15 Q. Have you talked with anybody else about the
16    case other than Mr. Thompson or
17    Mr. Scofield, the lawyers?
18 A. No, sir.
19 Q. Have you talked to anybody that works at
20    Jeld-Wen about the case?
21 A. No, sir.
22 Q. Nobody?
23 A. (Witness shakes head).

## Page 46

1  Q. Is that correct?
2  A. Yes, sir.
3  Q. Do you believe that in the workplace
4     environment a certain amount of kidding
5     around and joking just goes with the
6     territory?
7  A. I'm not sure.
8  Q. You don't know if you believe that or not?
9  A. You have to make it more plain.
10 Q. You want me to ask a better question?
11 A. Yeah.
12 Q. Is it your opinion that a certain amount of
13    flirting in the workplace is just part of
14    the --
15 A. No.
16 Q. -- territory?
17 A. No.
18 Q. You don't believe that?
19 A. No.
20 Q. You believe that sort of thing should be
21    against the rules?
22 A. Yes.
23 Q. To flirt in the workplace?

## Page 47

1  A. Yes.
2  Q. So certainly any type of unwanted touching
3     should definitely be against the rules;
4     correct?
5  A. Yes, sir.
6  Q. And you believe that?
7  A. Yes, sir.
8  Q. And if you were the victim of sexual
9     harassment, would you report those
10    allegations to your superiors?
11 A. Yes, sir.
12 Q. You just wouldn't put up with it?
13 A. No, sir.
14 Q. And your company, Jeld-Wen, actually has an
15    anti-harassment policy, does it not?
16 A. Yes, sir.
17 Q. And you're required to read it when you're
18    hired?
19 A. Yes, sir.
20 Q. And did you read it?
21 A. Yes, sir.
22 Q. If you'd open that little book in front of
23    you to the first page past the contents

## Page 48

1     page. Does that appear to be the employee
2     handbook you received when you started at
3     Jeld-Wen?
4  A. Yes, sir.
5  Q. If we can flip over ...
6  A. 11?
7  Q. Yes. D00011.
8  A. Okay.
9  Q. And that outlines the harassment policy; is
10    that correct?
11 A. Yes, sir.
12 Q. And were you aware of that policy when you
13    first started working at Jeld-Wen?
14 A. Yes, sir.
15 Q. Do you agree with the policy?
16 A. Yes, sir.
17 Q. And do you believe that people in the
18    workplace have the right to work free from
19    unwanted sexual harassment?
20 A. Yes, sir.
21 Q. If we could flip over to page D00021, I
22    believe, where it says severance program.
23 A. Yes, sir.

12 (Pages 45 to 48)

Page 49

1  Q. Did you receive documentation regarding the
2     severance program other than what was in
3     this handbook?
4  A. Yes, sir.
5  Q. Tell me about that. Or did you just
6     receive the handbook?
7  A. They sent us a letter telling us that the
8     plant was closing.
9  Q. I'm talking about when you first started
10    working there.
11 A. I can't remember. I can't remember.
12 Q. Do you remember the hand -- getting the
13    handbook?
14 A. Yes, sir.
15 Q. Did you read about the severance program in
16    the handbook when you received it?
17 A. Yes.
18 Q. And the next correspondence you received
19    regarding the severance program was the
20    letter that the plant was closing?
21 A. Yes, sir.
22 Q. Is that correct?
23 A. Yes, sir.

Page 50

1  Q. Do you believe that sexual talk in the
2     workplace is okay?
3  A. No, sir.
4  Q. And would you consider that sexual
5     harassment if somebody was talking about
6     sex around you?
7  A. Yes, sir.
8        MR. THOMPSON: Object to the form.
9  Q. Okay. Other than the conversation with
10    Mr. Hees that you've told me about, is
11    there anybody else you've talked to about
12    the case other than lawyers?
13 A. No, sir.
14 Q. And you haven't talked to anybody that you
15    worked with about the case; is that
16    correct?
17 A. No, sir.
18 Q. So that is correct?
19 A. That's correct.
20 Q. Did you ever receive any correspondence
21    from the EEOC regarding this matter? Do
22    you know what the EEOC is?
23 A. No, sir.

Page 51

1  Q. Have you ever received envelopes from the
2     EEOC since you've been working at Jeld-Wen?
3  A. I can't remember.
4  Q. Don't remember one way or the other?
5  A. No, sir.
6  Q. When did you first meet Lorena Minix?
7  A. July 2002.
8  Q. Was she already working when you started?
9  A. Yes, sir.
10 Q. Do you have an opinion of her?
11 A. No, sir.
12 Q. Did y'all socialize at all outside the
13    office?
14 A. No, sir.
15 Q. Was she a disciplinary problem employee?
16 A. No, sir.
17 Q. Would you say you liked or disliked her or
18    neither?
19 A. I liked her.
20 Q. How about Linda Sims --
21 A. Yes, sir.
22 Q. -- when did you meet her?
23 A. When she hired on. I can't remember when

Page 52

1     she started.
2  Q. Was she a problem employee as far as
3     discipline goes?
4  A. No, sir.
5  Q. Did you like her?
6  A. Yes, sir.
7  Q. How about Brenda Sims, when did you meet
8     her?
9  A. When she hired on.
10 Q. Was she a problem employee discipline-wise?
11 A. No, sir.
12 Q. Did you like her?
13 A. Yes, sir.
14 Q. Where was your office at the Roanoke
15    facility?
16 A. It was in a trailer up above the plant. It
17    was part of -- It was an office and then
18    the plant was down there.
19 Q. Below you?
20 A. Yes, sir.
21 Q. Could you see the plant?
22 A. Yes, sir.
23 Q. Could you see all parts of the plant?

Page 53

1   A.  No, sir.
2   Q.  What parts could you not see?
3   A.  The machining part which is the back -- we
4       called it the back.
5   Q.  Could you see the paint room?
6   A.  Yes, sir. Well, no, sir.
7   Q.  How about the station where Ms. Minix
8       worked?
9   A.  No, sir.
10  Q.  How about the station where Ms. Linda Sims
11      worked?
12  A.  No, sir.
13  Q.  How about the station where Ms. Brenda Sims
14      worked?
15  A.  No, sir. Not one of them.
16  Q.  Which one could you not see?
17  A.  The machining.
18  Q.  Which one could you see?
19  A.  The cut --
20          MR. THOMPSON: You can describe it
21          to him if you don't know what
22          it's called.
23  A.  It's where they cut up the wood for scraps

Page 54

1       and then the putty tables.
2   Q.  You could see those places?
3   A.  Yes, sir.
4   Q.  But you could not see --
5   A.  Not the machining area.
6   Q.  Did you have regular work hours?
7   A.  Yes, sir.
8   Q.  When were they?
9   A.  Seven to five.
10  Q.  Monday through Friday?
11  A.  Yes, sir.
12  Q.  Did you have a computer at your desk?
13  A.  Yes, sir.
14  Q.  Did that computer have Internet access?
15  A.  Yes, sir.
16  Q.  Was there a computer in Mr. Galvez's office
17      after he left?
18  A.  No, sir.
19  Q.  Was there any other computer on the site
20      after Mr. Galvez left other than yours?
21  A.  Yes, sir.
22  Q.  Where was it?
23  A.  It was in Kathy's old office.

Page 55

1   Q.  Kathy Conger?
2   A.  Yes, sir.
3   Q.  Was there a door to her office?
4   A.  Yes, sir.
5   Q.  So was there Internet access on that
6       computer?
7   A.  Yes, sir.
8   Q.  Did you ever see Mr. Fetner on the
9       computer?
10  A.  No, sir.
11  Q.  Not one time?
12  A.  No, sir.
13  Q.  Did you ever see him e-mailing on the
14      computer?
15  A.  No, sir.
16  Q.  Did you e-mail on the computers?
17  A.  Yes, sir.
18  Q.  My understanding is y'all had an
19      interoffice e-mail type of deal where you
20      could e-mail other Jeld-Wen workers; is
21      that correct?
22  A.  Yes, sir.
23  Q.  Were you aware that Mr. Fetner and

Page 56

1       Ms. Lorena Minix had a sexual relationship
2       at any time?
3   A.  Yes, sir.
4   Q.  How were you aware of that?
5   A.  I was told.
6   Q.  By who?
7   A.  I don't remember.
8   Q.  By one of them or somebody else?
9   A.  I don't remember.
10  Q.  Were you told while it was going on or
11      after it was over?
12  A.  After.
13  Q.  Were you told after these allegations were
14      made?
15  A.  Yes.
16  Q.  Do you really not remember who told you
17      or --
18  A.  No, sir.
19  Q.  -- you just don't want to tell me?
20  A.  I don't remember.
21  Q.  Did that surprise you?
22  A.  Yes, sir.
23  Q.  Why is that?

Page 57

1   A. I don't know. Just did.
2        MR. DOUGLAS: I'm going to take
3        about a five-minute break and
4        I'll be right back.
5        (Brief recess was taken.)
6   Q. Did you ever hear any rumors of Joe Mendoza
7      and Lisa Cook being involved?
8   A. Yes.
9   Q. Who did you hear those rumors from?
10  A. I don't remember.
11  Q. What were the rumors?
12  A. That they were seeing each other.
13  Q. Sexually?
14  A. No. All I heard was --
15  Q. Dating?
16  A. Yes.
17  Q. Were either or both of them married at the
18     time?
19  A. Yes.
20  Q. Either or both?
21  A. Both.
22  Q. Do you know who Lisa's husband was?
23  A. No.

Page 58

1   Q. Do you know who Joe's wife was?
2   A. Ophelia.
3   Q. Ophelia Mendoza?
4   A. I don't remember her name. I can't
5      remember.
6   Q. Did that Ophelia come out of the air?
7   A. It was something like Ophelia. I can't
8      remember.
9   Q. All right.
10  A. It started with an O.
11  Q. Did you hear of any rumors of any
12     relationships with Ms. Minix with anybody
13     other than Mr. Fetner at the plant?
14  A. Repeat that.
15  Q. Yes. Did you hear any rumors of Ms. Minix,
16     Lorena Minix, being involved with anybody
17     other than Richard Fetner?
18  A. No.
19  Q. Just Richard Fetner?
20  A. Yes.
21  Q. How about Linda Sims, did you hear rumors
22     of her being involved with anybody at the
23     plant?

Page 59

1   A. No, sir.
2   Q. How about Brenda Sims?
3   A. No, sir.
4   Q. How about Mary Lou Laws?
5   A. No, sir.
6   Q. How about Kathy Thornton?
7   A. Yes, sir.
8   Q. Who did you hear rumors that she was
9      involved with?
10  A. One of the other plant employees.
11  Q. What is his or her name?
12  A. Jeff is all I remember.
13  Q. What was Jeff's job?
14  A. He worked on the glue machine.
15  Q. Was he an older gentleman?
16  A. No, sir.
17  Q. How old was he?
18  A. I don't know.
19  Q. Would you guess twenties? Thirties?
20     Forties?
21  A. Twenties.
22  Q. Did you hear any rumors about Mr. Fetner
23     being involved with anybody other than

Page 60

1      Ms. Minix?
2   A. No.
3   Q. Are you sure?
4   A. Yes.
5   Q. At the time that you and Mr. Fetner worked
6      together, were you aware of any complaints
7      which were made against him?
8   A. No.
9   Q. None at all?
10  A. No.
11  Q. Are there any employees at the facility in
12     Wedowee who worked at Roanoke when you
13     worked there?
14  A. Not to my knowledge.
15  Q. I'll show you what was marked as
16     Plaintiff's Exhibit Number 1 to a previous
17     deposition. If you could just look over
18     that list and tell me if any of those
19     people work at the Wedowee plant or have
20     worked at the Wedowee plant.
21  A. I don't know.
22  Q. Do you recognize any that definitely did
23     work at the Wedowee plant?

Page 61

1  A. No. Because I've only been there a week.
2  Q. To your knowledge, none of these employees
3     worked there?
4  A. No.
5  Q. Can you tell me who told you about the
6     rumors regarding Kathy Thornton and Jeff?
7  A. Kathy.
8  Q. Well, that's not really a rumor, is it?
9  A. No.
10 Q. What did she tell you?
11 A. That she was seeing him.
12 Q. Jeff?
13 A. Yes.
14 Q. Did she say that she was seeing him
15    intimately?
16 A. No.
17 Q. Were her words I'm seeing Jeff?
18 A. Yes.
19 Q. And what did you say?
20 A. Okay.
21 Q. Really? That's what you said? Okay?
22 A. Yeah. Good.
23 Q. And was she married at the time?

Page 62

1  A. Yes.
2  Q. Was she still with her husband at the time?
3  A. Yes.
4  Q. Did you dislike her husband?
5  A. I didn't know him.
6  Q. Had she told you bad things about him?
7  A. No.
8  Q. Do you recall who told you about
9     Mr. Mendoza and Ms. Cook?
10 A. No.
11 Q. And you don't remember who told you about
12    Ms. Minix and Mr. Fetner?
13 A. No.
14 Q. Were you offended by the people in the
15    plant seeing one another?
16 A. No.
17 Q. Were you offended by the fact that some of
18    them were married and seeing other people?
19 A. No.
20 Q. Did you just figure it wasn't any of your
21    business?
22 A. Yes.
23 Q. Were you and Kathy friends?

Page 63

1  A. Acquaintances.
2  Q. Did y'all talk a lot on the job?
3  A. No.
4  Q. Well, did she seem to trust you? I mean,
5     that's a pretty personal piece of
6     information she gave you.
7  A. I guess.
8  Q. What is your opinion of her? Do you think
9     she's an honest person?
10 A. I don't have one.
11 Q. You don't have an opinion about whether
12    she's honest or not?
13 A. I don't have one, no.
14 Q. You don't think she's dishonest. You just
15    don't have an opinion at all?
16 A. I don't know about her.
17 Q. Regarding her honesty you don't have an
18    opinion at all?
19 A. No.
20 Q. How about any of my clients, do you have an
21    opinion with regard to their honesty?
22 A. No, sir.
23 Q. How about Mr. Fetner, do you have an

Page 64

1     opinion with regard to his honesty?
2  A. No, sir.
3  Q. Do you know why Kathy Conger left Jeld-Wen?
4  A. She told me she was going to work for MW --
5     WM -- MW Freight Lines.
6  Q. Did she ever tell you she had heard any
7     complaints about Mr. Fetner?
8  A. No.
9  Q. Was there a period of time that you were
10    laid off when the plant closed?
11 A. No.
12 Q. So you went straight to Georgia?
13 A. Yes, sir.
14 Q. To the Austell facility?
15 A. Yes.
16 Q. Have you ever been given a severance
17    package by the company?
18 A. No.
19 Q. Who told you about the job at the Wedowee
20    plant?
21 A. Jackie Wortham.
22 Q. Who is that?
23 A. He works at the plant.

**Page 65**

1  Q. At the Wedowee plant?
2  A. Yes, sir.
3  Q. Did Mr. Fetner ever tell you that he was
4     going to resign?
5  A. No, sir.
6  Q. Never?
7  A. No, sir.
8  Q. Have you ever seen a resignation letter
9     from Mr. Fetner to the company?
10 A. No.
11 Q. Is your understanding that Mr. Fetner was
12    fired by Mr. Hees?
13 A. Yes, sir.
14 Q. Would it surprise you if I told you that
15    Mr. Fetner resigned and Mr. Hees did not
16    fire him?
17 A. Would it surprise me?
18 Q. Yes, ma'am.
19 A. No.
20 Q. One of the reasons that I'm taking your
21    deposition today is that opposing counsel
22    has listed you as someone who may have
23    information with regard to this case. Do

**Page 66**

1     you know anything about whether the
2     allegations my clients made are true or
3     not?
4  A. No.
5        MR. THOMPSON: Object to the form.
6  Q. From your office could you see where Kathy
7     Thornton worked?
8        MR. THOMPSON: Do you understand
9           his question?
10 A. No.
11 Q. You don't understand my question?
12 A. I couldn't see her.
13 Q. You couldn't see her. Okay.
14 A. I had to think.
15       MR. THOMPSON: That's fine.
16       MR. WHITE: Can we go off the
17          record?
18       MR. THOMPSON: Sure.
19       (Off-the-record discussion.)
20 Q. What do you know about the dissemination of
21    the Jeld-Wen harassment policy?
22       (Interruption.)
23 Q. Are you familiar with the policy of the

**Page 67**

1     company regarding handing out the
2     harassment material?
3  A. Yes.
4  Q. What is it?
5  A. When they -- It's in the handbook. So when
6     they're employed, they sign a form that
7     says they received the handbook.
8  Q. And did my clients sign those forms?
9  A. Yes.
10 Q. Did you have them sign those forms?
11 A. Brenda and Linda.
12 Q. You had Brenda and Linda sign those forms?
13 A. Yes.
14 Q. And you put it in their file?
15 A. Yes, sir.
16 Q. Did they indicate that they had read it, or
17    did they just hand you the piece of paper
18    back?
19 A. No. They have to sign -- excuse me. They
20    do have to sign a sexual harassment form, a
21    separate one, and it is put in their file.
22    And it states that they have read the
23    sexual harassment policy.

**Page 68**

1  Q. And it's your job to make sure that that's
2     done; is that correct?
3  A. Yes, sir.
4  Q. And you did that for Linda and Brenda Sims?
5  A. Yes, sir.
6  Q. Well, I just want to run through these
7     allegations real fast. Linda Sims said
8     that Mr. Fetner told her that her butt
9     looks like basketballs and he wanted to go
10    dribbling. Do you have any idea whether
11    that did or did not happen?
12 A. No, I do not.
13 Q. Certainly, if it did, that would be a
14    violation of the company policy, wouldn't
15    it?
16 A. Yes, sir.
17 Q. Is the first time you heard that allegation
18    right now?
19 A. Yes, sir.
20 Q. Do you know if Mr. Fetner ever asked Linda
21    Sims out on dates?
22 A. No.
23 Q. You don't know either way?

Page 69

1   A.  I do not know.
2   Q.  Do you know if Mr. Fetner ever told Linda
3       Sims or asked her are you as sweet as you
4       look?
5   A.  No, I do not.
6   Q.  You don't know either way?
7   A.  No, sir.
8   Q.  Do you know if Mr. Fetner ever said to
9       Linda Sims, you can't be your age and have
10      moves like that?
11  A.  No, sir. I've never -- I don't -- I've
12      never heard that.
13  Q.  If the remark -- You don't know if that
14      remark was made or not?
15  A.  No, sir.
16  Q.  Ms. Sims makes an allegation that
17      Mr. Fetner told her one time that one of
18      your basketballs looks deflated; I have a
19      needle and want to pump it up. Do you have
20      any idea whether that remark was made?
21  A.  No, sir.
22  Q.  Did Ms. Linda Sims ever tell you that
23      Mr. Fetner treated her good?

Page 70

1   A.  No, sir.
2   Q.  Ms. Brenda Sims makes allegations of
3       Mr. Fetner touching her on her breast. Did
4       you ever see that?
5   A.  No, sir.
6   Q.  Do you know whether or not it happened?
7   A.  No, sir.
8   Q.  Obviously, if it did, it would be a
9       violation of the company's policy; correct?
10  A.  Yes, sir.
11  Q.  And you certainly wouldn't stand for
12      treatment like that, would you?
13  A.  No, sir.
14  Q.  Ms. Sims said that Mr. Fetner would ask her
15      to get together and ask her to come to
16      her -- his house for beer and that if she
17      came he would fix her timecard for her. Do
18      you know if that ever happened?
19  A.  No, sir.
20  Q.  How often -- How much did Mr. Fetner work?
21      Was he there all the time?
22  A.  Yes, sir.
23  Q.  Ms. Minix alleges that Mr. Fetner would hug

Page 71

1       her from behind and touch her breasts. Do
2       you know if that happened or not?
3   A.  No, sir, I do not.
4   Q.  Certainly that would be a violation of the
5       company's policy; correct?
6   A.  Yes, sir.
7   Q.  And certainly you wouldn't stand for any
8       type of treatment like that, would you?
9   A.  No, sir.
10  Q.  Is there anything else you know about this
11      case?
12          MR. THOMPSON: Object to the form.
13  A.  No, sir.
14          MR. DOUGLAS: Okay. Well, I don't
15      have any more questions.
16      Mr. Thompson may or may not
17      have some questions.
18          MR. THOMPSON: No.
19          MR. DOUGLAS: Okay. You're free
20      to go.
21      (Deposition was concluded at
22      approximately 5:00 p.m.)
23

Page 72

1           * * * * * * * * * * * * * *
2           FURTHER DEPONENT SAITH NOT
3           * * * * * * * * * * * * * *
4
5           REPORTER'S CERTIFICATE
6   STATE OF ALABAMA:
7   MONTGOMERY COUNTY:
8       I, Lyn Daugherty, Certified Shorthand
9   Reporter and Commissioner for the State of Alabama
10  at Large, do hereby certify that I reported the
11  deposition of:
12          ROXI GILES
13  who was duly sworn by me to speak the truth, the
14  whole truth and nothing but the truth, in the
15  matter of:
16          LORENA MINIX, BRENDA SIMS and LINDA
17          SIMS,
18          Plaintiffs,
19          vs.
20          JELD-WEN, INC. and RICHARD FETNER,
21          Defendants.
22          IN THE UNITED STATES DISTRICT COURT
23          FOR THE MIDDLE DISTRICT OF ALABAMA

Page 73

```
 1              EASTERN DIVISION
 2         Civil Action No. 3:05CV685-M
 3   on Monday, May 8th, 2006.
 4         The foregoing 72 computer-printed pages
 5   contain a true and correct transcript of the
 6   examination of said witness by counsel for the
 7   parties set out herein.  The reading and signing is
 8   hereby not waived.
 9         I further certify that I am neither of kin
10   nor of counsel to the parties to said cause nor in
11   any manner interested in the results thereof.
12         This 25th day of May 2006.
13
14
15         _____
           Lyn Daugherty,
16         Certified Shorthand Reporter
           And Commissioner for the
17         State of Alabama at Large
18
19
20
21
22
23
```

Page 74

```
 1         * * * * * * * * * * * * *
 2             WITNESS SIGNATURE PAGE
 3         * * * * * * * * * * * * *
 4
 5   In Re: Lorena Minix, Brenda Sims and Linda Sims
         vs. Jeld-Wen, Inc. and Richard Fetner
 6
 7
 8      I, ROXI GILES, hereby certify that I have
 9   read the foregoing transcript of my deposition
10   given on Monday, May 8th, 2006, and it is a true
11   and correct transcript of the testimony given by me
12   at the time and place stated with the corrections,
13   if any, and the reasons therefor noted on a
14   separate sheet of paper and attached hereto.
15
16         _____
              ROXI GILES
17
         SWORN TO AND SUBSCRIBED before me this _____
18
     day of _____, 2006.
19
20
         _____
21          NOTARY PUBLIC
22          MY COMMISSION EXPIRES:
23       _____
```