# EXHIBIT O

## DEPOSITION EXCERPTS OF KATHY THORNTON

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  CASE NUMBER:  3:05-CV-00685-T
6  Lorena Minix, et al.,
7      Plaintiffs,
8      vs.
9  JELD-WEN, inc., et al.,
10     Defendants.
11
12  S T I P U L A T I O N
13  IT IS STIPULATED AND AGREED by and
14  between the parties through their respective
15  counsel, that the deposition of Kathy Ann
16  Thornton may be taken before Sara Mahler,
17  CSR, at the offices of McNeal & Douglas, at
18  1710 Catherine Court, Suite B, Auburn,
19  Alabama 36831, on the 9th day of May, 2006.
20
21  DEPOSITION OF KATHY ANN THORNTON
22  48318
23

Page 3

1  * * * * * * * * * * * *
2  I N D E X
3  EXAMINATION
4  PAGE
5  By Mr. Thompson ..................... 7
6  By Mr. White ..................... 146
7  EXAMINATION CONTINUED
8  PAGE
9  By Mr. Thompson ................... 169
10  DEFENDANT'S EXHIBITS
11  PAGE
12  Ex. 1 - Subpoena to attend
13      deposition  .............. 21
14  Ex. 2 - Roster for antiharassment
15      meeting .................. 69
16  * * * * * * * * * * * *
17
18
19
20
21
22
23

Page 2

1  IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the reading
3  of the deposition by the witness is not
4  waived, the deposition to have the same
5  force and effect as if full compliance had
6  been had with all laws and rules of Court
7  relating to the taking of depositions.
8  IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10  any objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties
13  may make objections and assign grounds at
14  the time of the trial, or at the time said
15  deposition is offered in evidence, or prior
16  thereto.
17  IT IS FURTHER STIPULATED AND
18  AGREED that the notice of filing of the
19  deposition by the Commissioner is waived.
20
21  * * * * * * * * * * * *
22
23

Page 4

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  CASE NUMBER:  3:05-CV-00685-T
6  Lorena Minix, et al.,
7      Plaintiffs,
8      vs.
9  JELD-WEN, inc., et al.,
10     Defendants.
11
12  BEFORE:
13      SARA MAHLER, Commissioner.
14  APPEARANCES:
15      JAMES B. DOUGLAS, ESQUIRE, of
16  McNeal & Douglas, 1710 Catherine Court,
17  Suite B, Auburn, Alabama 36831, appearing on
18  behalf of the Plaintiffs.
19      MATTHEW W. WHITE, ESQUIRE, of
20  Adams, Umbach, Davidson & White, 205 South
21  Ninth Street, Opelika, Alabama 36803,
22  appearing on behalf of the Plaintiffs.
23      MICHAEL L. THOMPSON, ESQUIRE, of

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 5

1  Lehr, Middlebrooks, Price & Vreeland, 2021
2  Third Avenue North, Birmingham, Alabama
3  35203, appearing on behalf of the
4  Defendants.
5       SCOTT J. SCOFIELD, ESQUIRE, of
6  Scofield, Gerard, Singletary & Pohorelsky,
7  1114 Ryan Street, Lake Charles, Louisiana
8  70601, appearing by phone on behalf of the
9  Defendants.
10
11       Also Present:  Lorena Minix
12            * * * * * *
13
14       I, SARA MAHLER, CSR, a Court
15  Reporter of Wetumpka, Alabama, acting as
16  Commissioner, certify that on this date, as
17  provided by the Federal Rules of Civil
18  Procedure and the foregoing stipulation of
19  counsel, there came before me at the offices
20  of McNeal & Douglas, 1710 Catherine Court,
21  Suite B, Auburn, Alabama 36831, beginning at
22  10:45 a.m., Kathy Ann Thornton, witness in
23  the above cause, for oral examination,

Page 6

1  whereupon the following proceedings were
2  had:
3       KATHY ANN THORNTON,
4  being first duly sworn, was examined and
5  testified as follows:
6       COURT REPORTER:  Usual
7  stipulations?
8       MR. THOMPSON:  That's fine.
9       MR. WHITE:  Yes.
10       MR. THOMPSON:  Usual
11  stipulations?
12       MR. WHITE:  Yes.  Kathy, one
13  thing you have the option to do at the end
14  of your deposition.  The court reporter is
15  going to type it up, and you have the option
16  to do what's called read and sign your
17  deposition, which means you can read it to
18  make sure there's -- you know, she wrote it
19  down what you said.
20       And if there's some
21  typographical error in there, you can change
22  it, or you can just let it go into the
23  Record as is, and just trust that the court

Page 7

1  reporter is writing down everything you say
2  correctly.  Whichever one you want to do.
3       THE WITNESS:  Okay.
4       MR. WHITE:  Do you want to
5  read and sign or do you just want to --
6       THE WITNESS:  Yes.
7       MR. WHITE:  You do want to
8  read and sign.  Okay.
9            EXAMINATION
10  BY MR. THOMPSON:
11       Q.    Can you state your full name
12  for the Record, please?
13       A.    Kathy Ann Thornton.
14       Q.    Is that Kathy with a K or with
15  a C?
16       A.    A K.
17       Q.    With a K?
18       A.    Uh-huh.
19       Q.    And it's K-A-T-H-Y, not E-Y?
20       A.    Yes, sir.
21       Q.    I've seen it spelled about
22  four different ways.  Have you ever been
23  known by any other name?

Page 8

1       A.    No.
2       Q.    All right.  Ms. Thornton, my
3  name is Mike Thompson.  And I'm an attorney,
4  and I represent GELD-WEN in a lawsuit that
5  Lorena Minix, Linda Sims and Brenda Sims
6  have filed against JELD-WEN and a gentleman
7  by the name of Richard Fetner.  Okay?
8       A.    Uh-huh.
9       Q.    We've got to stop you right
10  now.  One of the things that you've got to
11  do for her is, you've got to say yes or no
12  or be audible with your answers, because she
13  can't take down head nods and she can't take
14  down uh-huhs and huh-uhs.  She can take them
15  down, but they all look the same on the
16  Record.  Okay?
17       A.    Okay.
18       Q.    We've also got with us a
19  gentleman named Scott Scofield who is my
20  co-counsel.  He's here by phone.  He also
21  represents JELD-WEN, and Mr. Matt White
22  represents the plaintiffs.  Okay?
23       A.    Okay.

2 (Pages 5 to 8)

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 9

1      MR. WHITE:  And just so you
2  know, Jim Douglas is another lawyer that
3  represents the plaintiffs, and he may walk
4  in the door any minute.  So if he does,
5  you'll know who that is.
6      THE WITNESS:  Okay.
7      Q.   Okay.  During the course of
8  the deposition, I may use the word
9  "JELD-WEN", and when I do, I'm referring to
10  your former employer, JELD-WEN, Inc.  Okay?
11      A.   Okay.
12      Q.   And the court reporter has
13  sworn you in; right?
14      A.   Yes.
15      Q.   And you're aware that you're
16  under oath here today, and that you've sworn
17  to tell the truth, and that your oath
18  carries the same weight during this
19  deposition that it will carry in Court?
20      A.   Yes.
21      Q.   You're a truthful person;
22  right?
23      A.   Uh-huh.

Page 10

1      Q.   You got to say yes or no.
2      A.   Yes.
3      Q.   Well, Everybody does it.  Is
4  there anything we can do to make you less
5  nervous?
6      A.   No.  I'll be all right.
7      Q.   Okay.  I'm going to ask you
8  questions for a little while today, and I
9  don't know how long it will take.  It will
10  take a little while.
11      If during the course of my
12  asking you questions, you don't understand
13  my question, I'm going to ask you if you
14  will just ask me to rephrase or see if I can
15  put it in some way that you can understand
16  it.  Okay?
17      A.   Okay.
18      Q.   The converse of that is that
19  if I ask you a question, and you answer it,
20  I'm going to assume that you understood it
21  and gave me an answer to the question I
22  asked, okay?
23      A.   Okay.

Page 11

1      Q.   All right.  Now, are you on
2  any medication today?
3      A.   No, sir.
4      Q.   Okay.  Are you impaired in any
5  way, whatsoever, this morning?
6      A.   No, sir.
7      Q.   Okay.  How do you feel?
8      A.   Good, just nervous.
9      Q.   Just nervous?
10      A.   Just nervous.
11      Q.   I've already asked if there is
12  anything we can do to make you less nervous
13      A.   I know.  It's fine.
14      Q.   Now, we can take a break any
15  time you need to take a break to go to the
16  ladies room or whatever.  Just ask and we'll
17  go off the Record and take a quick break or
18  whatever, okay?
19      A.   Okay.
20      Q.   What did you do to prepare for
21  the deposition today?
22      A.   Nothing.
23      Q.   Okay.  You didn't talk to

Page 12

1  anybody to get ready for the deposition or
2  anything like that?
3      A.   No.  I talked to the lawyer
4  last week.
5      Q.   Okay.  You talked to the
6  lawyer, and you indicated, Matt White, last
7  week?
8      A.   Yes.
9      Q.   Okay.  When last week did you
10  talk to Matt White?
11      A.   Wednesday, I believe.
12      Q.   And what did y'all talk about?
13      A.   We just -- I just talked more
14  about just going over what I had told him
15  the first time I talked to him.
16      Q.   Okay.  And you say you talked
17  to him before?
18      A.   Uh-huh.
19      Q.   Yes or no?
20      A.   Yes.
21      Q.   And did Mr. White call you?
22      A.   No, sir.  Lorena had called
23  me.

3 (Pages 9 to 12)

Page 13

1  Q.   Okay. Ms. Minix called you?
2  A.   Yes, sir.
3  Q.   And then you in turn called
4  Mr. White?
5  A.   No. They just told me where
6  to show up at to talk to him.
7  Q.   Okay. So, you actually
8  physically met with him?
9  A.   Yes.
10  Q.   Okay. Where did you meet with
11  him?
12  A.   At Rio's Tanning Bed that
13  Lorena Minix owns.
14  Q.   Rio's Tanning Bed?
15  A.   Uh-huh.
16  Q.   Do they have a kitchen or
17  break room or something like that?
18  A.   A small office.
19  Q.   A small office. Who else was
20  present for that meeting?
21  A.   Just me and him.
22  Q.   Just you and Mr. White?
23  A.   Yes, sir.

Page 14

1  Q.   And that meeting would have
2  been in May of 2006?
3  A.   Yes, sir.
4  Q.   Okay. How long did that
5  meeting last?
6  A.   About fifteen minutes.
7  Q.   Okay. What did Mr. White tell
8  you?
9  A.   He just told me just to review
10  what I had told him. I hadn't really talked
11  about any of it since a few months, and he
12  just wanted me to tell him again.
13  Q.   Okay. And did you look at any
14  documents during that meeting?
15  A.   No.
16  Q.   So, you just basically told
17  him again what you told him several months
18  before?
19  A.   Yes, sir.
20  Q.   That was a yes?
21  A.   Yes, sir.
22  Q.   When you talked with him
23  several months before, where did you meet

Page 15

1  with him?
2  A.   His law office.
3  Q.   In Opelika?
4  A.   Yes, sir.
5  Q.   When was that meeting?
6  A.   I can't remember.
7  Q.   Was it in 2006?
8  A.   No. It was 2005.
9  Q.   2005. Was it during football
10  season?
11  A.   I don't know.
12  Q.   You don't remember?
13  A.   I don't remember.
14  Q.   Do you remember what season it
15  was or anything at all? Was it hot, cold?
16  Was it as cold as it is in this room?
17  A.   Let's see, I would say summer
18  because my son had went up there with me.
19  Apparently, he was out of school.
20  Q.   Okay. So, you think you met
21  with him in the summer of 2005?
22  A.   Yes.
23  Q.   And who was with you at that

Page 16

1  meeting?
2  A.   Lorena Minix, Linda Sims, me,
3  and my son had went with me.
4  Q.   What's your son's name?
5  A.   Brandon Thornton.
6  Q.   Brandon Thornton. How old is
7  Brandon?
8  A.   He's nine, now.
9  Q.   So, he would have been eight
10  or nine at that time?
11  A.   Uh-huh. Yes, sir.
12  Q.   Did he participate in the
13  meeting?
14  A.   No, sir. He played on the
15  computer with Matt's daughter in the other
16  room.
17  Q.   Okay. So, the folks that
18  actually met with Mr. White would have been
19  you, Ms. Linda Sims?
20  A.   Uh-huh. Yes, sir.
21  Q.   Ms. Minix and then Mr. White;
22  right?
23  A.   Yes, sir.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 37

1  Q.  D-U-K-E?
2  A.  Yes, sir.  Harmon.  I guess
3  that's it.
4  Q.  And these are all in the
5  Lafayette valley area?
6  A.  Wedowee.  The Harmons are in
7  Wedowee.
8  Q.  You lived in that area your
9  whole life?
10  A.  Yes, sir.
11  Q.  Most of your family is still
12  there?
13  A.  Yes, sir.
14  Q.  And McManus, that's your mom's
15  folks?
16  A.  Yes, sir.
17  Q.  And so, your mom is from this
18  area, originally?
19  A.  Yes, sir.
20  Q.  And Harmon is your dad's
21  folks?
22  A.  Yes, sir.
23  Q.  Both parents are from this

Page 38

1  area.  Who are the Dukes?
2  A.  My Aunt Gail, that's her
3  husband.
4  Q.  What is her husband's first
5  name?
6  A.  Terry Duke.
7  Q.  Have you ever been a party to
8  a lawsuit?
9  A.  No, sir.
10  Q.  You were divorced from
11  Mr. Thornton in 2003?
12  A.  I better change that.  It
13  might be 2004.
14  Q.  Okay.  So, sometime in
15  2003/2004?
16  A.  Yes, sir.
17  Q.  Did you separate from him for
18  a while?
19  A.  Yes, sir.
20  Q.  Who filed for a divorce?
21  A.  He did.
22  Q.  Do you know why?
23  A.  We hadn't been getting along

Page 39

1  in a while.  He was in a vehicular homicide.
2  He was drinking and driving and killed
3  somebody.  And after that, it just went down
4  hill.
5  Q.  So, your marriage wasn't good
6  after that event?
7  A.  No, sir.
8  Q.  Do you recall when that
9  occurred?
10  A.  May 28th, 2004.
11  Q.  Was that the date your divorce
12  was filed or the day of the accident?
13  A.  That was the day the accident
14  happened.
15  Q.  And it was in 2004?
16  A.  Yes.
17  Q.  So, you probably did get
18  divorced in 2004?
19  A.  Yes.
20  Q.  I'm not trying -- I'm just
21  trying to put some parameters on when
22  everything happened.
23  A.  Okay.

Page 40

1  Q.  We can go get the Court
2  records and see when the divorce actually
3  was filed?
4  A.  Okay.
5  Q.  Was it a contested divorce?
6  A.  No.  I just signed the papers.
7  Q.  Okay.  So, there wasn't any
8  fight over anything?
9  A.  No, sir.
10  Q.  Okay.  Were there any issues
11  regarding who would get custody of Brandon?
12  A.  No, sir.  He just gave me
13  custody of him.  He may be going to jail, so
14  there wasn't no sense in him getting
15  custody.
16  Q.  That was going to be my next
17  question.  He hadn't been tried yet?
18  A.  He's supposed to go to court
19  next month, in June.
20  Q.  Did you have a lawyer during
21  this divorce?
22  A.  No, sir.
23  Q.  Do you have any lawyers you

10 (Pages 37 to 40)

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 49

1   Q.   P-U-L-E?
2   A.   P-O-O-L-E.
3   Q.   Would you spell that again.
4   A.   P-O-O-L-E.
5   Q.   They recommend you apply for a
6   job out there?
7   A.   Yes, sir.
8   Q.   Who hired you?
9   A.   I'm not sure. I only know the
10  secretary's name at that time.
11  Q.   What was her name?
12  A.   Sherry Rogers.
13  Q.   Who interviewed you?
14  A.   I'm not sure.
15  Q.   Do you know a gentleman named
16  Richard Fetner?
17  A.   Yes, sir.
18  Q.   Okay. Mr. Fetner was not
19  working at the plant at that time?
20  A.   No, sir.
21  Q.   Other than Ms. Messer and
22  Ms. Poole, did you have any other family
23  that worked at the plant?

Page 50

1   A.   No, sir.
2   Q.   And how long did they work at
3   the plant?
4   A.   My mother-in-law had worked
5   there about four or five years, I believe.
6   Q.   Okay. How long did she
7   continue to work there?
8   A.   Until it closed. I believe
9   she was there when it closed.
10  Q.   Okay. So, she continued to
11  work there for a long time?
12  A.   Yes, sir.
13  Q.   What about Ms. Poole?
14  A.   No, she quit.
15  Q.   When did she quit?
16  A.   I'm not sure.
17  Q.   Do you know why she quit?
18  A.   Just wanted another job.
19  Q.   At some point in time, you
20  became a JELD-WEN, Inc. employee; correct?
21  A.   Yes, sir.
22  Q.   And was that 2002?
23  A.   I'm not sure what year they

Page 51

1   took over.
2   Q.   Okay. Did you interview with
3   anyone?
4   A.   No, sir.
5   Q.   For a job at JELD-WEN?
6   A.   No, sir.
7   Q.   Just one day you were a CMS
8   employee, and the next day you were a
9   JELD-WEN employee?
10  A.   Yes, sir.
11  Q.   Do you recall -- Strike that.
12  Did you start getting checks that said
13  JELD-WEN on them?
14  A.   Yes, sir.
15  Q.   Do you remember when that was?
16  A.   No, sir.
17  Q.   Did you have a job title?
18  A.   Paint room operator.
19  Q.   Was that your job title when
20  you started with CMS?
21  A.   No, sir. I was moulder
22  operator.
23  Q.   What did do you as a moulder

Page 52

1   operator?
2   A.   Graded the wood when it came
3   out of the moulder to keep the bad from the
4   good separated.
5   Q.   You graded the wood and
6   separated the bad wood from the good wood?
7   A.   Yes.
8   Q.   How long did you do that?
9   A.   About three years.
10  Q.   What was your next position at
11  the plant?
12  A.   Paint room operator.
13  Q.   Okay. So, those were the only
14  two positions you held?
15  A.   Yes, sir.
16  Q.   And so, at the time JELD-WEN
17  took over the plant, and you became a
18  JELD-WEN employee, you were the paint room
19  operator?
20  A.   Yes, sir.
21  Q.   And can you describe the paint
22  room to me?
23  A.   It's a long room. Probably

13 (Pages 49 to 52)

Page 53

1  longer than this room.  It had conveyer
2  belts.
3      Q.    So, it's longer than thirty
4  feet long?
5      A.    Yes.
6      Q.    And you would run the door
7  jams through there?
8      A.    I was on one end of it, and I
9  put the door jams on the conveyer belt, and
10  it would go into the paint machine and come
11  out on another conveyer belt.
12          Then it would go through an
13  oven, then another conveyer belt, and then
14  drop down on another conveyer belt where the
15  man would stack it off.
16      Q.    Okay.  So, somebody else —
17  You were on the loading end of the painting
18  machine?
19      A.    Yes, sir.
20      Q.    And someone else was on the
21  other end?
22      A.    Other end.
23      Q.    Who was that someone else or

Page 54

1  did it vary from time to time?
2      A.    It was usually Danny
3  Greathouse.
4      Q.    And did Danny report to you?
5      A.    No, sir.
6      Q.    Who else ran that?
7      A.    It was just me and him.
8      Q.    Okay.  You said most of the
9  time it was Danny Greathouse.  Were there
10  other people that performed it?
11      A.    Yeah.  If he was out, you
12  know, every now and then, Richard would have
13  to put somebody else in there.
14      Q.    So, people got shifted around
15  from job to job?
16      A.    Just only when Danny was out.
17      Q.    Could you see Danny from what
18  I'm going to refer to as the loading end of
19  the paint machine?
20      A.    No, sir.  There was a five
21  hundred gallon paint tote that stood in
22  front of the paint machine.
23          I had to take the paint out of

Page 55

1  there to fill up the paint machine.  It was
2  between us.  I'd have to look around the
3  paint tote to see Danny.
4      Q.    You are saying tote?
5      A.    Yes, sir.
6      Q.    You mean a big fifty-five
7  gallon —
8      A.    Yes.  We call them --
9      Q.    It was a big tank?
10      A.    Yes, sir.
11      Q.    Okay.  And so, you could --
12  Could you see the loading end of the paint
13  machine from what I'll call the receiving
14  end of the paint machine?
15      A.    No, sir.
16      Q.    So, you couldn't see Danny?
17  He couldn't see you?
18      A.    No, sir.
19      Q.    Is that correct?
20      A.    That's right.
21      Q.    I asked you a bad question,
22  and it will show up on the Record poorly.
23  That's why I had to, sort of, clarify that.

Page 56

1          Anyone work in the paint room
2  other than you as the loader and Danny or
3  his substitute as the receiver?
4      A.    The Hyster driver had to bring
5  the wood into the paint room, but other than
6  that, that was it.
7      Q.    You are talking about the
8  forklift operator?
9      A.    Yes.
10      Q.    He would bring wood in when
11  you needed wood?
12      A.    Yes.
13      Q.    Was the paint room completely
14  enclosed?
15      A.    All except there was a door on
16  my end for the forklift driver to bring the
17  wood in, and there was a door on the other
18  end to pull the wood out of the building.
19      Q.    Okay.  How big were these
20  doors?
21      A.    Big enough for a forklift
22  driver to go in and go around.
23      Q.    So, six feet?

14 (Pages 53 to 56)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 57

1    A.    Yes.
2    Q.    Is that about right, about six
3  feet wide?
4    A.    Yes, sir.
5    Q.    And what was in between the
6  doors?
7    A.    Sometimes they -- in the
8  winter time, they would have to put wood --
9  stack wood in there.  They would stack wood
10 in there sometimes when they didn't have no
11 room anywhere else.
12   Q.    Between the doors, were there
13 windows where you could see in the paint
14 room?
15   A.    No.  It was just a wall.
16   Q.    So, it was a solid wall?
17   A.    Solid wall.
18   Q.    If you were in the plant,
19 outside looking in through the door, through
20 either door, could you see where you were
21 working?
22   A.    You could see where I was
23 working, but you couldn't see me because the

Page 58

1  wood would be in front of me.
2    Q.    So, the wood would block
3  someone's view of you?
4    A.    Yes.  In the winter time when
5  it gets cold, they would have plastic things
6  over the door.  They would have to come down
7  to keep the heat on the inside of the paint
8  room so the paint wouldn't freeze.
9    Q.    So, you were pretty secluded?
10   A.    From everybody.
11   Q.    Okay.  What did do you if
12 there was nothing to paint?
13   A.    Most of the time he made me
14 sweep the floor, but I would try to go and
15 work on a machine somewhere, another
16 machine.
17   Q.    Who made you sweep the floor?
18   A.    Richard.
19   Q.    By Richard, we are talking
20 about Richard Fetner?
21   A.    Richard Fetner.
22   Q.    You can call him Richard.  I
23 don't care.  I want to make sure it's clear

Page 59

1  for her.
2    A.    Okay.
3    Q.    Now, he would make you sweep
4  the floor in the entire plant or just the
5  paint room?
6    A.    Just the paint room.
7    Q.    So, he would make you clean up
8  your work area?
9    A.    Yes.
10   Q.    And you say you would try to
11 go run a machine?
12   A.    Yes, sir.
13   Q.    What type of machines did you
14 run?
15   A.    I knew how to run most of them
16 in there.
17   Q.    So, at some point in time you
18 had run most of the machines in there?
19   A.    Yes.
20   Q.    On both the cutting end of the
21 line?
22   A.    Yes, sir.
23   Q.    And the moulding end of the

Page 60

1  line?
2    A.    Yes, sir.
3    Q.    So, you knew how to run the
4  planer?
5    A.    No, sir.  I didn't know how to
6  run that.
7    Q.    Do you know what the planer
8  was?
9    A.    No, sir.
10   Q.    Okay.  So, I may just be using
11 a word for machine that doesn't exist?
12   A.    Yes.
13   Q.    Did you know how to cut heads?
14   A.    Yes, sir.
15   Q.    What is cutting heads?
16   A.    It's cutting the ends off the
17 heads.  You just stick it down in this
18 machine, and it goes through and then cut
19 the ends off of them.
20   Q.    Did that -- Did the machine
21 have a name or you just refer to as cutting
22 heads?
23   A.    Just cutting heads.

15 (Pages 57 to 60)

Page 61

1    Q.    Okay.  How many times did you
2  do that?
3    A.    I'm not sure.  Ten or fifteen
4  times.
5    Q.    You are talking about ten or
6  fifteen different occasions you were
7  assigned to cut heads?
8    A.    Yes, sir.
9    Q.    Not ten or fifteen boards to
10  cut?
11    A.    No.  Just different times.
12    Q.    Okay.  What about -- Did you
13  run the brick mould machine?
14    A.    Yes, sir.
15    Q.    How many times did you do
16  that?
17    A.    Oh, about ten, fifteen
18  different times.
19    Q.    What about any of the -- What
20  about the strike router?
21    A.    No.  I really didn't run that
22  too much.
23    Q.    So, you ran it some just not

Page 62

1  too much?
2    A.    I probably loaded it a couple
3  times.
4    Q.    Do you have a hinge router?
5    A.    Yes.
6    Q.    Did you run the hinge router?
7    A.    Yes, sir.
8    Q.    And how many times did you do
9  that?
10    A.    About fifteen, twenty times.
11    Q.    Fifteen or twenty shifts?
12    A.    Yes, sir.  It really wasn't
13  shifts.  Sometimes if we get caught up in
14  the paint room, and we done sweep the paint
15  room and he needed some hinges run, if
16  somebody was out, he would take me back
17  there, and I would run it maybe ten minutes,
18  and I would come back in the paint room.
19    Q.    You just filled in where you
20  were needed?
21    A.    Yes.  Occasionally.
22    Q.    Did everybody out there pretty
23  well do that?

Page 63

1    A.    Yes, sir.
2    Q.    Was there a door lock router?
3    A.    Yes, sir.
4    Q.    Did you run it?
5    A.    Yes, sir.
6    Q.    How many times did you run it?
7    A.    Ten, fifteen times.
8    Q.    Other than those jobs we've
9  talked about, were there other things that
10  you -- other jobs you did out there?
11    A.    I worked in the back sometimes
12  and on the Greycon.
13    Q.    The Greycon.  What's the
14  Greycon?
15    A.    It's where just plain wood
16  comes in, and they cut the knots out of it,
17  and it separates the width of the board
18  before it goes to the finger joiner.
19    Q.    Before it starts the moulding
20  process?
21    A.    Yes, sir.
22    Q.    Did you ever work on the
23  finger joiner?

Page 64

1    A.    Not too much.
2    Q.    How often?
3    A.    About two or three times.
4    Q.    Is the finger joiner the same
5  thing as working in the glue room?
6    A.    Yes.  They glue the wood
7  together.
8    Q.    Does the finger joiner
9  actually do that?
10    A.    Yes, sir.
11    Q.    So, if I asked you if you
12  worked in the glue room, it would be the
13  same answer.  The two to three times you
14  worked on the finger joiner?
15    A.    Yes, sir.
16    Q.    I'm sorry.  I don't completely
17  understand, so I have to have your help.
18         These jobs all have about the
19  same difficulty in performing them?
20    A.    Yes, sir.
21    Q.    And you were always able to do
22  all the jobs?
23    A.    Yes, sir.

16 (Pages 61 to 64)

Page 65

1  Q.    And you did them well?
2  A.    No complaints.
3  Q.    No complaints.  No complaints
4  about having to do any of those jobs?
5  A.    No, sir.
6  Q.    Is it common for people to
7  have to do different jobs?
8  A.    Yes, sir.
9  Q.    Was that common the entire
10 time you worked there?
11 A.    Yes, sir.
12 Q.    Did JELD-WEN have a sexual
13 harassment policy?
14 A.    Yes, sir.
15 Q.    Did CMS have a sexual
16 harassment policy?
17 A.    Yes, sir.
18        MR. DOUGLAS: Kathy, be sure
19 that you let him finish his question before
20 you answer, okay.
21        THE WITNESS:  Okay.
22        MR. DOUGLAS:  That way the
23 Record will read easier.

Page 66

1  Q.    Let me show you what's been
2  marked as Bates labeled D01 through 24 and
3  ask if you've seen that document before?
4  A.    Yes, sir.
5  Q.    What is that, Ms. Thornton?
6  A.    It's the sexual -- I meant the
7  handbook we got when JELD-WEN took over.
8  Q.    And you actually received a
9  copy of that handbook?
10 A.    Yes, sir.
11 Q.    Did all of the employees
12 receive a copy of the handbook?
13 A.    Yes, sir.
14 Q.    Does that have the sexual
15 harassment policy in it?
16 A.    Yes, sir.
17 Q.    Did you ever read that policy?
18 A.    Not all of it.
19 Q.    Okay.  Which -- I'll tell you.
20 Let me get you to identify D 0025 and D 0026
21 for me.  Have you seen that document before?
22        MR. DOUGLAS:  Mike, I think
23 it's three zeros.  I think it's D 00025.

Page 67

1        MR. THOMPSON:  It's a five
2  digit code each time, isn't that right?
3  A.    I don't remember seeing this
4  one.
5  Q.    Okay.  Look back with me, if
6  you would, at the handbook then, please.  I
7  want to call your attention to page six --
8  page five of the handbook, which at the
9  bottom right hand corner, it's going to be
10 marked D 00011.  Do you see that?
11 A.    Yes, sir.
12 Q.    Okay.  Is that the JELD-WEN
13 harassment policy?
14 A.    Yes, sir.
15 Q.    And have you read that policy
16 before?
17 A.    Yes, sir.
18 Q.    Okay.  Have you read that
19 entire policy before?
20 A.    Yes, sir.
21 Q.    So, if you testified earlier
22 that you didn't think you read all of it?
23 A.    I went back and read parts of

Page 68

1  it when I needed to.
2  Q.    Okay.  When did you read the
3  harassment policy?
4  A.    When the lawyers came to
5  JELD-WEN and was stressing the sexual
6  harassment policy.
7  Q.    Okay.  Was that in July of
8  2003?
9  A.    Yes.
10 Q.    Lots of lawyers.  Do you
11 remember this lawyer's name?
12 A.    No, sir.
13 Q.    What did he look like?
14 A.    I'm not sure.
15 Q.    Is it a male or female?
16 A.    Male.
17 Q.    Okay.  Did he talk to you
18 about sexual harassment?
19 A.    He talked to the whole plant
20 and brought a video for us to watch.
21 Q.    Was it a video, or was it a
22 PowerPoint presentation?
23 A.    A PowerPoint presentation.

17 (Pages 65 to 68)

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 69

1    Q.    Did you sign a roster
2  indicating you were attending that?
3    A.    Yes, sir.
4          (Defendant's Exhibit 2 was
5          marked for identification
6          purposes.)
7    Q.    I want to show you what I'll
8  mark as Defendant's Exhibit 2 and ask you to
9  look at that. I specifically want to call
10 your attention to line number 16.
11   A.    Yes, sir.
12   Q.    That's your signature at line
13 16?
14   A.    Yes, sir.
15   Q.    Where you signed and indicated
16 that you attended this antiharassment
17 seminar?
18   A.    Yes, sir.
19   Q.    And you say you went back and
20 read the antiharassment policy at that time,
21 correct?
22   A.    Yes, sir.
23   Q.    Was there anything about the

Page 70

1  antiharassment policy that you did not
2  understand?
3    A.    No, sir.
4    Q.    Okay. Did the lawyer who --
5  I'll represent to you that the lawyer who
6  was there was named Mr. Sturm, Rob Sturm,
7  okay?
8    A.    Okay.
9    Q.    Did Mr. Sturm give you the
10 opportunity to ask questions during that
11 presentation?
12   A.    Yes, sir.
13   Q.    Okay. Did you ever violate
14 any JELD-WEN policies?
15   A.    No, sir.
16   Q.    Were you ever given a verbal
17 warning or written warning or anything like
18 that for behavior contrary to policy?
19   A.    No, sir.
20   Q.    I'm not talking about just the
21 sexual harassment policy. I'm talking about
22 everything?
23   A.    No, sir.

Page 71

1    Q.    You rode down here today with
2  Lorena Minix; right?
3    A.    Yes, sir.
4    Q.    How long have you known
5  Ms. Minix?
6    A.    Since she started working back
7  at JELD-WEN.
8    Q.    So, what, in 2001?
9    A.    I guess.
10   Q.    Whenever it was?
11   A.    Whenever she started.
12   Q.    Okay. Is she your friend?
13   A.    At first she was just somebody
14 I worked with.
15   Q.    Is she your friend now?
16   A.    Yes. She was my friend.
17 She's my friend. She is. I mean we didn't
18 go out after work and you know, on the
19 weekends and stuff like that. We worked
20 together. We were friends. We talked.
21   Q.    And that was at first?
22   A.    Yes.
23   Q.    Did y'all ever come to a point

Page 72

1  in time where your friendship got such that
2  you went out on the weekends?
3    A.    No.
4    Q.    This is what I was talking
5  about. You just need to let me ramble my
6  question out, and then answer it because
7  what she ends up doing is typing what I say
8  on top of what you say, and it's a mess.
9    A.    Okay.
10   Q.    Have you ever done anything
11 socially outside of work with Ms. Minix?
12   A.    Only ride to the lawyer's
13 office and up here.
14   Q.    And that was the earlier time
15 you told me about in summer of '05 when
16 Brandon went to the office with you?
17   A.    Yes, sir.
18   Q.    And then today?
19   A.    Yes, sir.
20   Q.    Okay. What did y'all talk
21 about on the ride to the lawyer's office in
22 the summer of '05?
23   A.    I don't know.

18 (Pages 69 to 72)

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 81

1  running that day?
2      A.    No, sir.
3      Q.    Were the paint lines running
4  that day?
5      A.    I can't remember. I'm sure it
6  had run some that day.
7      Q.    Okay. They weren't running at
8  the time you met with him?
9      A.    No, sir.
10     Q.    Okay. Were you out of work
11 for a time in September or October 2004?
12     A.    I can't remember.
13     Q.    Did you take a vacation during
14 that time?
15     A.    I can't remember.
16     Q.    Okay. What was the purpose of
17 the meeting with Mr. Hees?
18     A.    To tell him about Richard
19 Fetner.
20     Q.    Okay. Who told you to attend
21 the meeting?
22     A.    We just all agreed.
23     Q.    Who is "we"?

---

Page 82

1      A.    Lorena Minix, Brenda Sims,
2  Lisa Cook, Mary Lou.
3      Q.    Did Mary Lou attend the
4  meeting?
5      A.    I believe so.
6      Q.    Okay. Is your memory pretty
7  good about what happened at that meeting
8  that day?
9      A.    Somewhat.
10     Q.    Did you take any notes during
11 that meeting?
12     A.    No, sir.
13     Q.    Okay. Who told you where the
14 meeting would be and when it would be and
15 all that kind of stuff?
16     A.    We just all agreed to have it
17 in the paint room since it was secluded from
18 everybody else.
19     Q.    Okay. And that is the five
20 women you just talked about?
21     A.    Yes.
22     Q.    And how did the meeting begin?
23     A.    One of us started telling

---

Page 83

1  Dan – I think it was Lorena had started.
2      Q.    Okay. So, Lorena went first,
3  and what did she say?
4      A.    I'm not sure.
5      Q.    You're not sure what she said?
6      A.    No, sir.
7      Q.    Do you remember anything she
8  said?
9      A.    No, sir.
10     Q.    Who went next?
11     A.    Probably Brenda.
12     Q.    Brenda Sims?
13     A.    Yes, sir.
14     Q.    What did Brenda say?
15     A.    I'm not sure. I'm not sure
16 what anybody said but me.
17     Q.    You don't remember what
18 anybody said but you?
19     A.    Not enough to say it and it
20 wasn't true or messed up.
21     Q.    Well, I'm not worried about
22 you messing up. I do want to know anything
23 that you remember?

---

Page 84

1      A.    Just let's see. Richard
2  touching, saying things, ugly things, dirty
3  things, dirty jokes, wanting to go out with
4  us.
5          Lorena said that she had went
6  out with Richard, and I told -- I had told
7  Dan that I had.
8      Q.    That you went out with
9  Richard?
10     A.    I didn't go out. I slept with
11 him.
12     Q.    Okay.
13     A.    Most of us -- a lot of
14 touching and talking.
15     Q.    Is that generally what
16 everybody was telling?
17     A.    Yes, sir.
18     Q.    Okay. You don't remember
19 specifically who told him what?
20     A.    I think Lisa said that he was
21 touching her and he was trying to kiss her.
22     Q.    Okay. Now, do you remember
23 anything else anybody else said?

---

21 (Pages 81 to 84)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 85

1    A.    No, sir.
2    Q.    Okay. Did you take notes
3  during the meeting?
4    A.    No, sir.
5    Q.    Did any of the other women
6  take notes?
7    A.    No, sir.
8    Q.    Have you ever gone back and
9  written down what was said or what happened?
10   A.    I've written down what I —
11  what had happened to me.
12   Q.    Okay, where did you write that
13  down?
14   A.    Just on a notebook at home.
15   Q.    Do you still have that?
16   A.    No.
17   Q.    What did you do with it?
18   A.    I just throwed it away.
19   Q.    Okay. What did you tell
20  Mr. Hees during that meeting?
21   A.    I told him that Richard had
22  been touching me and grabbing me and he
23  would leave me over on inventories after

Page 86

1  everybody else had left. Asked me if I
2  would give him a blowjob. He would grab his
3  self in front of me.
4    Q.    He would grab his pants in
5  front of you?
6    A.    Yes.
7    Q.    And grab his crotch?
8    A.    Yes, sir.
9    Q.    Did he say anything when he
10  did this?
11   A.    He asked me if I wanted any of
12  that.
13   Q.    Okay. Any other conduct that
14  you reported to Mr. Hees?
15   A.    If I had a shirt on or
16  something and my nipples were sticking out,
17  he would ask me if they needed massaging.
18  If I was cold. If he could suck on them.
19  He would ask me to come over to his house at
20  least a hundred times a day.
21   Q.    Okay. Anything else that you
22  told Mr. Hees? Are you okay?
23   A.    Uh-huh.

Page 87

1    MR. WHITE: Mike, would you
2  reask your last question? I don't think she
3  got it.
4    MR. THOMPSON: I asked if she
5  was okay. She rubbed her eye. I asked if
6  she was okay. She was just thinking.
7    THE WITNESS: I'm fine.
8    MR. DOUGLAS: I apologize.
9    A.    I told Dan that I went over to
10  his house and slept with him one day.
11   Q.    Okay. You said he was
12  touching and grabbing you?
13   A.    Yes, sir.
14   Q.    Where was he touching and
15  grabbing you?
16   A.    Breast. He would rub against
17  my breast, and he would grab me on the
18  behind. And he would come up behind me, if
19  I was working and didn't know he was there
20  and stick broom handles and stuff up my
21  shorts.
22   Q.    Up your shorts?
23   A.    Yes.

Page 88

1    Q.    Do you wear shorts to work?
2    A.    Yes.
3    Q.    Okay. Anything else that you
4  told Mr. Hees?
5    A.    I think that's it.
6    Q.    Okay. You understand that
7  Ms. Minix, Ms. Sims, Ms. Linda Sims, and
8  Ms. Brenda Sims, are making allegations of
9  inappropriate sexual conduct by Mr. Fetner
10  in this lawsuit; right?
11   A.    Yes, sir.
12   Q.    Did you ever witness any of
13  this conduct towards them by Mr. Fetner?
14   A.    No, sir. I thought it was
15  just me.
16   Q.    You thought it was just you?
17   A.    Yes, sir.
18   Q.    What about any conduct
19  directed towards Lisa Cook, if there was
20  any?
21   A.    I never witnessed any.
22   Q.    Other than the conduct that
23  Mr. Fetner allegedly directed towards you,

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 89

1  did you ever witness any sexually
2  inappropriate conduct at the JELD-WEN
3  facility?
4  　　A.　　No.
5  　　Q.　　Okay.  What was the mood of
6  the meeting with Mr. Hees?
7  　　A.　　It was tense.  It was just
8  nervous, shocked.
9  　　Q.　　You were surprised to hear
10  these allegations from the other women?
11  　　A.　　Yes.
12  　　Q.　　How did y'all decide to get
13  together and meet?
14  　　A.　　We just -- We all eat lunch
15  together, and we all, kind of, got to
16  talking one day.  And one person would say
17  something, and the other person would say
18  something else about it.
19  　　　　And then it went on, and it
20  just kept going on, so we just decided to
21  tell.
22  　　Q.　　Okay.  And when was this
23  talking at lunch going on?

Page 90

1  　　A.　　It was several days.
2  　　Q.　　How long before the meeting
3  with Mr. Hees?
4  　　A.　　Probably four or five weeks.
5  　　Q.　　You met with Mr. Hees in
6  October, mid-October.  It would have been
7  early September or so?
8  　　A.　　Yes.
9  　　Q.　　Who all was talking at that
10  lunch meeting?
11  　　A.　　Me, Lorena, Brenda, Linda.
12  Linda was at that meeting, too.  I don't
13  know if I said that.
14  　　Q.　　Anybody else talking at lunch?
15  　　A.　　Lisa.
16  　　Q.　　Mary Lou?
17  　　A.　　Yes.
18  　　Q.　　Anyone else?
19  　　A.　　No.
20  　　Q.　　So the six of you got together
21  and decided to tell?
22  　　A.　　We was just eating -- Yes,
23  yes.

Page 91

1  　　Q.　　Okay.  So, you reported
2  Mr. Fetner's conduct to Mr. Hees like the
3  sexual harassment policy requires that you
4  do?
5  　　A.　　Yes.
6  　　Q.　　Okay.  And that was October
7  13, 2004?
8  　　A.　　Yes, sir.
9  　　Q.　　What did you want to happen?
10  　　A.　　Him to be fired.
11  　　Q.　　Okay.  You wanted the conduct
12  to stop?
13  　　A.　　Yes.
14  　　Q.　　Okay.  Mr. Fetner had -- was
15  at a dentist appointment when you met with
16  Mr. Hees?
17  　　A.　　Yes.
18  　　Q.　　Okay.  Now, Mr. Fetner did not
19  work for JELD-WEN after October 13th; is
20  that correct?
21  　　A.　　No, sir.
22  　　Q.　　That's not correct?
23  　　A.　　I'm sorry.  He didn't work.

Page 92

1  　　Q.　　I'm sorry.  It's just a poor
2  question.  He never worked for JELD-WEN
3  after that, did he?
4  　　A.　　No, sir.
5  　　Q.　　Okay.  Do you know why?
6  　　A.　　They told him -- What Danny
7  said was that he told him he had to quit.
8  　　Q.　　Okay.  Other than Mr. Fetner,
9  did anyone direct any conduct towards you
10  that you found to be sexually offensive
11  while were you employed at JELD-WEN?
12  　　A.　　No.
13  　　Q.　　So, he was the only one?
14  　　A.　　Yes.
15  　　Q.　　Okay.  Do you know what
16  Mr. Fetner's intent was when he directed his
17  conduct towards you?
18  　　　　MR. WHITE:  Object to the
19  form.
20  　　Q.　　I'm just asking if you know.
21  　　A.　　I don't know.
22  　　Q.　　Okay.
23  　　A.　　I thought if I had sex with

23 (Pages 89 to 92)

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 93

1  him, I thought that's what he wanted at
2  first.
3      Q.    Okay.  So, you had sex with
4  him how many times?
5      A.    One.
6      Q.    And this was at his house?
7      A.    Yes, sir.
8      Q.    When was that?
9      A.    I'm not sure.
10     Q.    How long before you reported
11  the conduct to Mr. Hees was it?
12     A.    Three or four months, I guess.
13     Q.    So, it would have been
14  sometime during the summer of 2004?
15     ·A.    Yes, sir.
16     Q.    Okay.  Was it on a weekend?
17     A.    No.
18     Q.    Was it during the week?
19     A.    Yes.
20     Q.    Was it on a work day?
21     A.    Yes.
22     Q.    And y'all left work and went
23  over to his house?

Page 94

1      A.    Yes.
2      Q.    Did you lose any time that
3  day?
4      A.    No.
5      Q.    Okay.  Was it -- Were you a
6  willing participant?
7      A.    Yes.  I felt like that was my
8  only option.  I didn't know what to do.
9      Q.    Okay.  But it was a
10  consensual?
11     A.    Yes.
12     Q.    How long were y'all gone from
13  the plant?
14     A.    Oh, it was after work.  It was
15  after work.
16     Q.    After work?
17     A.    Yes.  It was after work.
18     Q.    So, you just went home with
19  him one night after work?
20     A.    It was one afternoon.  It
21  lasted about two minutes.  It was on a
22  Monday.  It was on a Monday because he told
23  me to hurry up and get dressed.  He had to

Page 95

1  get to a commissioner's meeting, and that
2  always happens on a Monday.
3      Q.    And the sex lasted about two
4  minutes?
5      A.    Yes.  It was --
6      Q.    Sorry to delve in these
7  personal issues, but it's just, kind of, the
8  nature of the lawsuit.  I know we are all
9  adults, and you understand that.
10         So, he told you to hurry up
11  and get dressed because he had to go to this
12  meeting?
13     A.    Yes, sir.
14     Q.    Were y'all drinking any that
15  evening?
16     A.    No.
17     Q.    Okay.  You said you felt like
18  that was what you needed to do to stop his
19  other conduct?
20     A.    Yes.
21     Q.    Okay.  You felt like that was
22  the choice you had to stop that other
23  conduct?

Page 96

1      A.    Yes.
2      Q.    Was there any other reason you
3  had sex with him?
4      A.    No.  I didn't want to.
5      Q.    He didn't put a gun to your
6  head or anything like that, did he?
7      A.    It felt like it, but, no.
8      Q.    Okay.  Did he -- Did y'all go
9  to his house in separate cars?
10     A.    Yes.
11     Q.    Okay.  Did you follow him
12  there?
13     A.    Yes.
14     Q.    How far is his house from the
15  plant, minutes not miles?
16     A.    Six, seven minutes.
17     Q.    Okay.  Now, this other conduct
18  that you've talked about, him grabbing his
19  crotch, rubbing a board or a stick up your
20  shorts, requesting oral sex, keeping you in
21  to do inventory, making comments about your
22  nipples, things like that, touching and
23  grabbing you, did that occur in the presence

24 (Pages 93 to 96)

Page 97

1   of anyone else?
2       A.   No.
3       Q.   He always did that where no
4   one else could see you?
5       A.   I was always secluded from
6   everybody else.
7       Q.   Okay.  And how many times did
8   he -- Other than this one time when y'all
9   had consensual sex, how many times did he
10  touch your breasts?
11      A.   Several.  Sometimes every day.
12      Q.   Would he come up to you and
13  hug you or would he just --
14      A.   Hug me, rub right here
15  (indicating), come up behind me and just
16  grab them.
17      Q.   Just grab you from behind?
18      A.   Yes, like I was his.
19      Q.   So, that occurred on a
20  frequent basis?
21      A.   All the time.
22      Q.   Okay.  And you also testified
23  that he grabbed your behind?

Page 98

1       A.   Yes.
2       Q.   How often did that happen?
3       A.   Few times a week.
4       Q.   Not as often as the touching
5   of the breast?
6       A.   Uh-huh.
7       Q.   You need to say yes or no for
8   me.
9       A.   Yes.
10      Q.   What about -- And when did
11  this conduct begin?
12      A.   Right when he started working
13  there.
14      Q.   Okay.
15      A.   Well, he didn't start touching
16  and grabbing after a little while.  But he
17  had started asking me to go out with him and
18  everything when he first started.
19      Q.   Did he ask you to go out with
20  him, or did he just ask you to come over to
21  his house and have sex with him?
22      A.   He said he was lonely and
23  needed somebody to talk to.  He was going

Page 99

1   through a divorce.
2       Q.   Okay.  Did you ever talk to
3   him about that kind of stuff?
4       A.   No.
5       Q.   Do you know anything about his
6   divorce?
7       A.   No.
8       Q.   Okay.  Globally, when did this
9   conduct end?
10      A.   When he got fired.
11      Q.   Okay.
12      A.   Quit -- When he quit.
13      Q.   And that goes for all this
14  conduct.  It occurred on a regular basis
15  from the time he was hired until the time
16  his employment ended?
17      A.   Yes.
18      Q.   Is that correct?
19      A.   Yes.
20      Q.   Okay.  When did he, or, I
21  guess, how many occasions did he grab his
22  crotch and make comments to you?
23      A.   He probably done that seven,

Page 100

1   eight, nine times, somewhere in there.
2       Q.   Was that before or after you
3   slept with him?
4       A.   After.
5       Q.   Okay.  Did he continue to ask
6   you out after you slept with him?
7       A.   Yes.  He would ask me to come
8   over to his house every day.
9       Q.   Okay.  Did you ever go back?
10      A.   No.
11      Q.   You said he rubbed -- I'm
12  sorry.  I can't remember.  Did you
13  characterize it as a stick or a broom stick?
14      A.   Yes.  A broom handle of a
15  broom.  I have to bend over to put the paint
16  in the paint machine, and I wouldn't know he
17  was there.  He would just grab a broom and
18  put it up my shorts.
19      Q.   And he would stick the broom
20  handle up your shorts?
21      A.   Yes.
22      Q.   How many times did he do that?
23      A.   Two or three times.

25 (Pages 97 to 100)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 101

1    Q.    Was a broom handle something
2  that was in the paint room?
3    A.    Yes.
4    Q.    What was its purpose?
5    A.    To sweep the floor with.
6    Q.    It was on the broom?
7    A.    Yes.
8    Q.    Okay.  You said requested, I
9  think your words were, a blowjob?
10    A.    Yes.
11    Q.    When was that?
12    A.    It was sometime when we was
13  having to do inventory.  He was -- We were
14  doing inventory together.  He put me doing
15  inventory with him.
16          And there is an old paint
17  building on the outside of the plant.  It
18  was the old paint room, and they keep lumber
19  in that sometimes, so we went out there to
20  count the lumber out there, and he asked me
21  if I would give him a blowjob.
22    Q.    Okay.  Did you?
23    A.    No.  I just walked out.

Page 102

1    Q.    Was that before or after you
2  slept with him?
3    A.    After.
4    Q.    Okay.  So, that would have
5  been sometime within a few months of your
6  first report to Dan Hees; correct?
7    A.    Yes.  It got worse.
8  Everything got worse after I slept with him.
9    Q.    Okay.  It got worse after you
10  slept with him?
11    A.    Worse.
12    Q.    Redoubled his efforts?
13    A.    Yes.
14    Q.    You said he kept you to do
15  inventory; is that correct?
16    A.    Yes.
17    Q.    Were other employees also kept
18  to do inventory?
19    A.    Yes, but a lot of times he
20  would send them on.
21    Q.    Okay.  Who all was kept to do
22  inventory?
23    A.    Several people.  It was

Page 103

1  different some months.  Towanna, Lorena, a
2  guy named Leon, Danny done it some, Luther,
3  McCray, Junior.
4    Q.    Okay.  Anybody else?
5    A.    Dennis Shelnutt.
6    Q.    Anybody else?
7    A.    I can't remember anybody else.
8    Q.    Did he ask you out?
9    A.    He would just ask me if I
10  would come to his house.
11    Q.    Okay.  He never asked you to
12  go out on a --
13    A.    -- Date, no.  He just wanted
14  me to come to his house.
15    Q.    Okay.  And you just went that
16  one time?
17    A.    Yes.
18    Q.    And you don't believe that
19  anyone ever saw any of this?
20    A.    Not as far as I know, nobody
21  did.
22    Q.    Okay.  That was due to the
23  nature of where you worked?

Page 104

1    A.    Yes.
2    Q.    Okay.  You're meeting with
3  Mr. Hees on October 13, 2004, do you recall
4  laughing during the meeting?
5    A.    No.
6    Q.    Okay.  If Lorena Sims
7  testified that -- I'm sorry.  If Linda Sims
8  testified that you did would you have any
9  reason to controvert that testimony?
10    A.    No.
11    Q.    So, you might have laughed
12  during the meeting?
13    A.    I might have did.
14    Q.    Do you recall other people
15  laughing during the meeting?
16    A.    No.
17    Q.    Was Mr. Hees professional
18  during this meeting?
19    A.    Yes.
20    Q.    Were you happy with the way he
21  acted during the meeting?
22    A.    I was happy that he was going
23  to get rid of Richard, but I wasn't happy,

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 105

1  no.
2      Q.    You weren't happy about
3  Mr. Fetner's conduct; correct?
4      A.    Right.
5      Q.    Was there anything else you
6  weren't happy about?
7      A.    No.
8      Q.    Did Mr. Hees do anything that
9  made you unhappy?
10     A.    No.
11     Q.    Okay.  And to your knowledge
12 this was the first time you reported these
13 allegations to anyone at JELD-WEN
14 management?
15     A.    Yes -- No.  I told a plant
16 manager, Joe Mendoza about it when he was
17 working there.
18     Q.    Okay.  What did you tell
19 Mr. Mendoza?
20     A.    I told him everything that I
21 told you except that I had slept with him.
22 I don't think I slept -- I hadn't slept with
23 him, when he was working there.

Page 106

1      Q.    When did you tell Mr. Mendoza?
2      A.    A couple months after he
3  started working there.
4      Q.    Where was Mr. Mendoza when you
5  told him?
6      A.    In the paint room.
7      Q.    Okay.  And what exactly did
8  you tell him?
9      A.    That Richard was touching me
10 and saying stuff.
11     Q.    Is that what your words were
12 to him?  He's touching me and saying stuff?
13     A.    Yes.
14     Q.    Did you tell him anything
15 else?
16     A.    I can't remember.
17     Q.    What did Mr. Mendoza say?
18     A.    He was surprised.
19         MR. WHITE:  I'm sorry.  I
20 didn't hear that.
21     A.    He was surprised.
22     Q.    He was surprised.  What did he
23 say?

Page 107

1      A.    He really didn't say nothing.
2  About every day, every other day, he would
3  come in there and ask me if Richard had done
4  anything that day.  He never did go to Pat
5  or Dan about it.
6      Q.    You never did, or he never
7  did?
8      A.    He never did.
9      Q.    Did you, other than this
10 meeting on October 13, 2004, go to Pat or
11 Dan about any of this?
12     A.    No, just Joe.
13     Q.    Just Joe.  You said he would
14 ask you every other day or so if Mr. Fetner
15 bothered you?
16     A.    Yes, that day.
17     Q.    And what would you tell him?
18     A.    If he had touched me that day
19 or tried to kiss me or what he said, or if
20 it was that day he had put the broom up my
21 shorts.  If he had done it that day, I had
22 told him.
23     Q.    Okay.  What was your reaction

Page 108

1  to Mr. Fetner's conduct?
2      A.    Mad.  When I told Joe, I had
3  done had enough that day.  It just come
4  flying out of my mouth.  I was mad and
5  aggravated.
6      Q.    You told Joe because you got
7  so frustrated and mad about it?
8      A.    Yes.  I thought I was the only
9  one.  I didn't think nobody would believe
10 me.  It would be my word against Richard.
11     Q.    Okay.
12     A.    And then if he wouldn't have
13 fired him, he would have made my life hell.
14     Q.    That's what you thought?
15     A.    Yes.
16     Q.    And you thought that because
17 he was your supervisor?
18     A.    Yes.
19     Q.    Why didn't you -- why didn't
20 you call JELD-WEN'S telephone number they
21 provide in the policy?
22     A.    I don't know.
23     Q.    No reason?

27 (Pages 105 to 108)

Page 109

1     A.    No reason.
2     Q.    Why didn't you tell Mr. Hees?
3     A.    I thought Joe was going to
4   help me out.
5     Q.    You thought Joe was going to
6   do something about it?
7     A.    Yes, sir.
8     Q.    When the conduct continued
9   after you first told Joe about it, why
10   didn't you tell somebody else about it?
11     A.    I didn't think nobody would
12   believe me.
13     Q.    You didn't think you would be
14   believed?
15     A.    I started going through my
16   divorce. Lorena, we would talk, and then
17   Lorena would say stuff to Richard and
18   everything.
19         And Richard had come in there
20   one day and asked me if I had said anything
21   to anybody, and I told him no. He said well
22   you know if you say anything, you're going
23   to lose your son, and he walked out.

Page 110

1     Q.    If you say anything about what
2   he's doing, you would lose your son?
3     A.    Yes. Because I was going
4   through a divorce. I guess, you know, he
5   was going -- well, I can't -- I don't know
6   what he was going to do.
7     Q.    Tell me what you think.
8     A.    He was probably going to say
9   we had sex together, and that's adultery,
10   and I was going to lose my son. I was
11   assuming that's what he meant.
12     Q.    You had sex with Mr. Fetner
13   while you were married?
14     A.    Yes.
15     Q.    Okay.
16     A.    He knew I was going through a
17   divorce.
18     Q.    And he had recently been
19   divorced?
20     A.    Yes.
21     Q.    Did y'all talk about that
22   anymore?
23     A.    No.

Page 111

1     Q.    Was it your belief that he
2   would use some of his political connections?
3     A.    Yes.
4     Q.    Let me finish. Your belief
5   that he would use his political connections
6   to influence your custody issues?
7     A.    Yes. I waited until my
8   divorce was over before I met with Dan.
9     Q.    Is that one of the reasons you
10   waited to report it to Dan?
11     A.    Waited, yes.
12     Q.    Okay. Mr. Fetner wouldn't
13   have had any sway on your custody issues due
14   to him being a supervisor at JELD-WEN?
15     A.    No.
16     Q.    It would have only been his
17   political connections he has?
18     A.    Yes.
19     Q.    Is that yes?
20     A.    Yes.
21     Q.    Other than Mr. Hees on October
22   13, your two meetings with Matt White that
23   we've talked about, and here today, who else

Page 112

1   have you discussed these allegations with?
2     A.    We had met with a lawyer named
3   Chad Lee at somebody's house. I'm not sure
4   who. I didn't know him, but to see what we
5   need to do, you know, as far as our rights
6   and everything. What we needed to do.
7     Q.    Just as an informational type
8   thing?
9     A.    Yes.
10     Q.    Was Mr. Lee ever your lawyer?
11     A.    No.
12     Q.    Okay. What did Mr. Lee tell
13   you needed to do?
14     A.    I can't remember.
15     Q.    Did he tell you you needed to
16   report it to someone at JELD-WEN?
17     A.    Yes. That was before we told
18   Dan.
19     Q.    So, was one of the reasons
20   that you told Dan was because Mr. Lee told
21   you to?
22     A.    Well, we were going to. We
23   just needed to know -- just kind of.

28 (Pages 109 to 112)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 113

1    Q.    Whose house did you meet with
2  Mr. Lee?
3    A.    I don't know who it was.
4    Q.    Who all met with Mr. Lee?
5    A.    Me and Lisa and Lorena, Mary
6  Lou, Brenda and Linda.
7    Q.    Do you recall when that
8  meeting was?
9    A.    No.
10    Q.    Do you recall even generally
11  when it was?
12    A.    I was going through my
13  divorce. Probably a month or so before we
14  told Dan.
15    Q.    What all did y'all tell
16  Mr. Lee?
17    A.    The same thing.
18    Q.    Just told him what all the
19  allegations were?
20    A.    Yes.
21    Q.    Did you see any lawyers other
22  than Mr. Lee?
23    A.    No, sir.

Page 114

1    Q.    Did you ever meet with a
2  lawyer named Dee Lee Love. Ms. Love. It's
3  a female.
4    A.    No. I never did.
5    Q.    Were you scheduled to?
6    A.    Yes.
7    Q.    Why didn't you go meet with
8  her?
9    A.    I'm not sure.
10    Q.    Did you have a scheduling
11  conflict, or you just decided you didn't
12  want to talk?
13    A.    Probably couldn't get off work
14  or something with my son or something like
15  that.
16    Q.    That was after the plant
17  closed?
18    A.    Yes.
19    Q.    Did you ever meet with anyone
20  at the EEOC about these claims?
21    A.    No, sir.
22    Q.    Did you ever talk to an
23  investigator on the phone?

Page 115

1    A.    No, sir.
2    Q.    Do you know if an investigator
3  ever attempted to contact you?
4    A.    No, sir.
5    Q.    You don't know one way or the
6  other.
7    A.    I don't know.
8    Q.    Okay. You understand that the
9  EEOC investigates claims of harassment?
10    A.    Yes.
11    Q.    Okay. And you understand that
12  they render decisions about whether
13  harassment has occurred or not?
14    A.    Yes.
15    Q.    Okay. Would it surprise you
16  to know that the EEOC determined that there
17  was no cause to believe that JELD-WEN was
18  liable for sexual harassment?
19    A.    I didn't know that.
20    Q.    Okay. Would it surprise you
21  to learn that?
22    A.    Yes.
23    Q.    Why would it surprise you?

Page 116

1    A.    I don't know.
2    Q.    After you reported it --
3  reported Mr. Fetner's conduct to Mr. Hees,
4  there was no other inappropriate sexual
5  conduct at the plant; correct?
6    A.    No.
7    Q.    That's not correct?
8    A.    There was no more sexual
9  harassment at the plant.
10    Q.    It ended when Mr. Fetner was
11  gone; correct?
12    A.    Yes, yes.
13    Q.    So, your reporting it to
14  Mr. Hees effectively ended the conduct;
15  correct?
16    A.    Yes.
17    Q.    Was there anything beyond that
18  that you wanted Mr. Hees to do?
19    A.    I wanted -- I just wanted him
20  to be fired.
21    Q.    You wanted him to be fired
22  rather than --
23    A.    No. Yes. I don't believe he

29 (Pages 113 to 116)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 117

1  deserved an option.
2     Q.    So, if it had been your
3  decision, you would have fired him?
4     A.    They told -- In the meeting,
5  they said -- they said that it would be, you
6  know, fired, you know. Not the option to
7  quit, they were going to fire him.
8     Q.    Now, you're talking about a
9  second meeting you had with Mr. Hees that
10  day?
11     A.    No. The meeting they had
12  given us on sexual harassment.
13     Q.    Explain that to me. The
14  training presentation you went through?
15     A.    Yes.
16     Q.    Mr. Sturm, whoever the lawyer
17  was, said that if somebody was sexually --
18  if one employee was sexually harassing
19  another employee, the employee would be
20  terminated?
21     A.    Yes, fired.
22     Q.    Did you understand the things
23  that Mr. Sturm was saying during that

Page 118

1  meeting?
2     A.    Yes. I couldn't remember what
3  all he said.
4     Q.    Okay. At the time of this
5  meeting with Mr. Sturm, had you slept with
6  Richard prior to that time, Richard Fetner?
7     A.    No.
8     Q.    So, this was before that;
9  right?
10     A.    I slept with Richard after the
11  meetings.
12     Q.    I meant the meeting was before
13  you slept with him?
14     A.    Yes.
15     Q.    Okay. Did you ask him
16  questions during the meeting?
17     A.    No, sir.
18     Q.    Okay. Did Mr. Hees meet with
19  you again after your initial meeting with
20  him on the 13th?
21     A.    Yes.
22     Q.    Tell me about that meeting?
23     A.    He just told us what he had

Page 119

1  told Richard, and he said Richard didn't say
2  anything. That he just got his stuff and
3  left.
4     Q.    Okay. Do you know that to be
5  true?
6     A.    I don't know it's true. It's
7  just what they told me.
8     Q.    Did you find Mr. Hees to be
9  approachable during your employment there?
10     A.    Yes.
11     Q.    How often was he around the
12  plant?
13     A.    In the beginning, he wasn't
14  there hardly at all. Then he was there
15  sometimes. Some weeks he was there every
16  day.
17     Q.    Okay. Did you know how to
18  reach Mr. Hees, if you needed to?
19     A.    No.
20     Q.    Did you ever ask anyone how to
21  reach him?
22     A.    No.
23     Q.    Did you find Ms. Giles to be

Page 120

1  approachable, Roxy Giles?
2     A.    Yes.
3     Q.    Do you think if you had asked
4  her for Mr. Hees telephone number, she would
5  have given it to you?
6     A.    Yes.
7     Q.    Okay. Did you know what
8  Mr. Hees's position was?
9     A.    No.
10     Q.    Did you know he was Pat
11  Galvez's boss?
12     A.    Yes.
13     Q.    Okay. Why did you never
14  report these allegations to Mr. Galvez?
15     A.    I didn't think he would
16  believe me.
17     Q.    You just didn't think you
18  would be believed?
19     A.    It was just me. There wasn't
20  no witnesses. Didn't nobody see nothing.
21  You know, it would be my word against
22  Richard's. And I don't think that would
23  have been a good enough reason for him to

30 (Pages 117 to 120)

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 121

1    fire Richard. And then Richard would know
2    who turned him in. And -- Huh-uh.
3        Q.    So, you just didn't?
4        A.    And I needed my job.
5        Q.    Okay.
6        A.    I thought maybe after the big
7    sexual harassment meeting with the lawyers
8    and everything, I thought maybe that would
9    end it, but it didn't.
10        Right after the meetings, he
11    come and made some remark to me.
12        Q.    Okay. Did you ever talk
13    one-on-one with that lawyer that was there?
14        A.    No.
15        Q.    So, even though he told you
16    during that meeting to come forward and
17    report sexual harassment, you didn't go talk
18    to him?
19        A.    No.
20        Q.    Okay. Did you know he'd come
21    all the way across the country to make that
22    presentation?
23        A.    No.

Page 122

1        Q.    You didn't know where he'd
2    come from?
3        A.    Joe knew at that time that he
4    was doing that.
5        Q.    Okay. Let me show you what's
6    Bates labeled D 00447 through 513. I'm just
7    going to show it to you, and it's loose.
8        I just want you to look at
9    that, and tell me if that's the PowerPoint
10    presentation the lawyer made.
11        A.    Yes, sir.
12        Q.    And you understood everything
13    the lawyer was saying?
14        A.    Yes, sir.
15        Q.    All right. Did Mr. Hees tell
16    you anything else in that second meeting on
17    October 13?
18        A.    I don't remember if he did.
19        Q.    Who all was present for that
20    meeting.
21        A.    Me and Lisa and Lorena and
22    Brenda and Mary Lou and Linda.
23        Q.    Was Mary Lou there?

Page 123

1        A.    No. She had had her finger
2    cut in an accident. I don't believe she was
3    there.
4        Q.    You just -- you just thought
5    she might have been there because she was
6    part of the lunch group that talked about?
7        A.    Yes.
8        Q.    How often did y'all talk about
9    that at lunch?
10        A.    Just occasionally, until we
11    got more details about it and everything.
12        Q.    Okay.
13        A.    I didn't realize it was
14    happening to anybody else.
15        Q.    Until that meeting?
16        A.    Yes.
17        Q.    Well, until those lunch
18    meetings?
19        A.    Until those lunch talks.
20        Q.    When did those lunch talks
21    begin?
22        A.    I can't remember. It was
23    after the meeting, the sexual harassment

Page 124

1    meeting.
2        Q.    Okay. That was in July of
3    2003. How long after that would it have
4    been?
5        A.    I guess three or four months.
6        Q.    So, at that time, you knew
7    that there would be more than just you
8    coming forward to make allegations against
9    Mr. Fetner?
10        A.    Yes.
11        Q.    Is that correct?
12        A.    Yes.
13        Q.    When was the last time you
14    mentioned it to Mr. Mendoza?
15        A.    Before he left. Before they
16    transferred him out.
17        Q.    Okay. And was that -- where
18    were you talking to Mr. Mendoza at that
19    time?
20        A.    Mostly in the paint room. He
21    would come in there and ask me.
22        Q.    Just checking on you and see
23    how things were going?

31 (Pages 121 to 124)

Page 125

```
1    A.    If I was okay, yes.
2    Q.    Who was your supervisor?
3    A.    Richard Fetner.
4    Q.    Okay.  And Mr. Mendoza
5  supervised some other part of the plant?
6    A.    Yes.
7    Q.    Okay.  And who did he
8  supervise?
9    A.    The back part.  The shipping
10 department, I believe.
11   Q.    So, Mr. Mendoza was not your
12 immediate supervisor?
13   A.    No.
14   Q.    At any time when you worked
15 there, then?
16   A.    No.
17   Q.    Okay.  You worked at JELD-WEN
18 until November 24, 2004?
19   A.    Yes.
20   Q.    Okay.  And you left because
21 the plant closed?
22   A.    Yes.
23   Q.    And you said earlier you
```

Page 126

```
1  accepted a severance payment?
2    A.    Yes.
3    Q.    Okay.  Do you have any
4  problems with that severance payment?
5    A.    No.
6    Q.    Any problems with the
7  agreement?
8    A.    No.
9    Q.    Did you get a chance to read
10 over the agreement before you signed it?
11   A.    Yes.
12   Q.    Did you actually read it
13 before you signed it?
14   A.    Yes.
15   Q.    Did you understand everything
16 in the agreement before you signed it?
17   A.    Yes.
18   Q.    Let me finish or it will be --
19 what will happen, there will be yes in the
20 middle of my sentence.
21        She's really good, but she is
22 not good enough to do that.  She's only got
23 ten fingers.
```

Page 127

```
1    Q.    Did you consult with a lawyer
2  at all about the severance agreement?
3    A.    No.
4    Q.    Did you think about doing
5  that?
6    A.    No.
7    Q.    Did you consult with anyone
8  about it?
9    A.    No.
10   Q.    You didn't ask your dad or
11 anybody like that about it?
12   A.    No.
13   Q.    Okay.  When did the -- forgive
14 me if I missed it.  When did the painting
15 operation or the paint lines, when did those
16 stop?
17   A.    Probably just about a week
18 before that it actually shut down.  They put
19 us all in the back to finish up shipping.
20   Q.    Okay.  And in the back, what
21 were you doing?
22   A.    Different things, just
23 whatever needed to be done.
```

Page 128

```
1    Q.    Just whatever needed to be
2  done.  And was that finishing work on the
3  product or was it preparing -- I guess what
4  I'm getting at, were you preparing the wood
5  to be moulded or were you finishing what had
6  already been moulded?
7    A.    Finishing up.
8    Q.    Okay.  Is it your
9  understanding that some folks stayed after
10 that, and did some more cutting work?
11   A.    Yes.
12   Q.    Did you have the opportunity
13 to stay and do cutting work?
14   A.    Yes.
15   Q.    Why didn't you?
16   A.    Because I think they were
17 going to be after Christmas, and I wanted to
18 use my severance pay to buy my son's
19 Christmas with that year.
20   Q.    That's fair enough.  Do you
21 remember Mr. Hees telling you you could
22 inquire about transferring to another
23 JELD-WEN facility?
```

32 (Pages 125 to 128)

Page 129

1   A.   Yes.
2   Q.   What did he say?
3   A.   He told me I could move to
4  Tennessee and work at that Tennessee plant,
5  and they would give me, I think, a thousand
6  dollars to move up there and relocate and
7  everything.
8   Q.   And you didn't want to do
9  that?
10   A.   No.
11   Q.   You've been in Roanoke all
12  your life?
13   A.   All my life.
14   Q.   Don't know anything else?
15   A.   Huh-huh. No.
16   Q.   Is that a no? Is that why you
17  just didn't want to relocate? Is that why
18  you didn't take that job?
19   A.   Yes.
20   Q.   Has Ms. Minix ever told you
21  why she didn't continue to work at JELD-WEN
22  until mid-December?
23   A.   No.

Page 130

1   Q.   When did you first hear any
2  rumors that the plant might close?
3   A.   It was about a month before.
4  Dan had a meeting with us and give us our
5  paper and told us it was shutting down, and
6  give us our paper with the date on it and
7  how much your severance pay was going to be.
8   Q.   Okay. So, had you heard any
9  rumors that the plant might close down
10  before then?
11   A.   No.
12   Q.   You had not?
13   A.   Huh-uh. There is always
14  rumors. I heard rumors for seven years, and
15  it never did.
16   Q.   There are rumors all the time?
17   A.   All the time.
18   Q.   Is it -- It's not an uncommon
19  occurrence in that Roanoke, Wedowee area up
20  there for a plant like that to close down?
21   A.   Huh-uh.
22   Q.   You got to say yes or no.
23   A.   No.

Page 131

1   Q.   It's not uncommon; correct?
2   A.   No.
3   Q.   Am I correct in what I'm
4  saying?
5   A.   Yes.
6   Q.   Have you ever discussed sex,
7  your sex life, or her sex life with
8  Ms. Minix?
9   A.   Not sex life. I tell her if I
10  got a boyfriend, and she tell me if she's
11  got one.
12   Q.   How often do y'all talk about
13  that?
14   A.   Today was the first time I've
15  seen her, and she told me she had a new
16  boyfriend.
17   Q.   Okay. Did she tell you she
18  was happy?
19   A.   Yes.
20   Q.   Are you aware that Ms. Minix
21  also had a consensual sexual relationship
22  with Mr. Fetner?
23   A.   Yes.

Page 132

1   Q.   How are you aware of that?
2   A.   She told me.
3   Q.   When did she tell you that?
4   A.   I think she told me before we
5  talked to Dan. She told me.
6   Q.   So, at one of those lunch
7  meetings?
8   A.   Yes.
9   Q.   So, she just told everybody?
10   A.   Yes.
11   Q.   And did you tell her the same
12  thing? That you'd also done that?
13   A.   I just told her, yes. I
14  didn't tell everybody.
15   Q.   You just told Ms. Minix?
16   A.   Yes.
17   Q.   And where were you when you
18  told her?
19   A.   In the paint room, I think.
20   Q.   Was that before you spoke to
21  Mr. Hees?
22   A.   Yes.
23   Q.   Okay. Are you aware of anyone

33 (Pages 129 to 132)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 141

1    A.    I haven't seen him.  I don't
2 know why.  I don't know.  What am I supposed
3 to do?
4    Q.    You saw him sometime after
5 that; correct?
6    A.    Yes.  It really never come up
7 anymore.
8    Q.    Do you know someone named
9 Jason Urshery?
10   A.    Urshery.
11   Q.    Urshery?
12   A.    He used to work at the plant.
13   Q.    Did you work with Jason?
14   A.    No.
15   Q.    Did y'all at work at the plant
16 at the same time?
17   A.    Yes.
18   Q.    That was back when it was
19 Millworks Specialties?
20   A.    He might have worked there
21 some when it was JELD-WEN.  I'm not sure.
22   Q.    Okay.  What happened to Jason?
23 Why did he no longer work there?

Page 142

1    A.    I don't know.
2    Q.    Do you know if Ms. Minix ever
3 got in a fight with him?
4    A.    I think that was before I
5 started, I believe.
6    Q.    Okay.  Have you ever heard
7 anything about that?
8    A.    I heard rumors.
9    Q.    What'd you hear?
10   A.    Just they got to fighting.
11 She slapped him, I think.  I'm not sure what
12 they were fighting over, fussing over.
13   Q.    You've testified truthfully
14 and completely up to this point?
15   A.    Yes, sir.
16         (Recess taken.)
17   Q.    You know that you are still
18 under oath?
19   A.    Yes.
20   Q.    And you've testified
21 truthfully and completely up to this point?
22   A.    Yes.
23   Q.    When you were having lunch

Page 143

1 with this group you were talking about, was
2 anyone other than the persons you've already
3 mentioned to me, present?
4    A.    Yes.
5    Q.    Who else was present?
6    A.    I believe.
7    Q.    Sorry who else would have been
8 present?
9    A.    My boyfriend, Jeff Estes,
10 Robert, well, we call him Junior Davidson,
11 Dennis Shelnutt.
12   Q.    Did they hear your -- anyone
13 else?
14   A.    No.  I'm not sure if they
15 heard.
16   Q.    Were they, sort of, sitting
17 off a little bit further away?
18   A.    There was two picnic tables.
19 I believe we were at one, and they were at
20 the other.
21   Q.    Was it common for the six of
22 you to eat lunch together?
23   A.    No, it wasn't.

Page 144

1    Q.    You just did it from time to
2 time?
3    A.    From time to time.
4    Q.    And during those occasions,
5 you talked about some of these -- this
6 alleged conduct that Mr. Fetner was engaging
7 in?
8    A.    Yes.
9    Q.    Is that yes?
10   A.    Yes.
11   Q.    Did y'all ever discuss what
12 lawyers had told anyone?
13   A.    No.
14   Q.    During these picnic table
15 discussions?
16   A.    No.
17   Q.    When did you first know that
18 Ms. Minix or either of the Ms. Sims had
19 retained Mr. White as their counsel?
20   A.    I'm not sure.
21   Q.    Is it sometime before your
22 JELD-WEN employment ended?
23   A.    No.  It was after.

36 (Pages 141 to 144)

Page 165

1  the driveway.
2      Q.    Okay.  I'm sorry.  I
3  interrupted you.  You were saying something
4  about later that day.
5      A.    Later that afternoon, he had
6  asked me if I would come over to his house.
7  He told me just because I was giving it to
8  him -- let me see.  He said even though I'm
9  giving it to him, I could still give it to
10  him.
11      Q.    Even though you're giving it
12  to Mr. Estes?
13      A.    Yes, I could still give it to
14  him, he said.  He said:  Even though you're
15  giving to him, you could still give it to
16  me.
17      Q.    Do you know -- Did you ever
18  have a conversation with Mr. Estes about him
19  being fired?
20      A.    Yes.
21      Q.    And who fired Mr. Estes?
22      A.    He was working through a
23  temporary service, through Kelly Services.

Page 166

1      Q.    Okay.  Does he know who fired
2  him, or was he just told not to come back?
3      A.    Richard had told the temporary
4  service something or another, and they
5  called him and told him not to show back up
6  at work.
7          It was like that next two or
8  three days after he knew that I was at Rock
9  Mills at his house.
10      Q.    So, Mr. Estes was fired within
11  two or three days of Mr. Fetner learning
12  that you were at his house?
13          MR. THOMPSON:  Object to the
14  form.
15      A.    Yes.
16      Q.    After the -- And I'm jumping
17  again.  After this meeting that y'all had in
18  2003, when the lawyer from JELD-WEN came
19  down, I believe you testified earlier that
20  Mr. Fetner made some kind of remark after
21  that meeting.
22          Do you remember testifying to
23  that?  Made some kind of comment to you

Page 167

1  about it or some kind of remark to you about
2  what the lawyer had to say?
3      A.    I can't remember.  I can't
4  remember now.
5      Q.    Who was Bob Boyce?  Do you
6  know -- or Bob Boyce?
7      A.    No.
8      Q.    Okay.  Do you know -- After
9  Fetner was fired, was there a guy that came
10  down and took his place for a while before
11  the plant closed?
12      A.    Yes.
13      Q.    Was his name Bob?  Do you
14  remember?
15      A.    I guess.  I'm not sure.
16      Q.    Okay.  And do you -- Did Bob
17  ever make any statements to you about
18  Mr. Fetner?
19      A.    No.
20      Q.    Did Bob ever make any
21  statements to you about the allegations that
22  have been made by our clients?
23      A.    No.

Page 168

1          MR. WHITE:  Let me just look
2  real quick.  I may be finished.
3      Q.    Were you -- You're aware that
4  JELD-WEN now has a plant that operates in
5  Wedowee; is that correct?
6          MR. THOMPSON:  Object to the
7  form.
8      A.    Yes.
9      Q.    Were you ever offered a job at
10  the Wedowee location?
11      A.    No.
12      Q.    To your knowledge, was anybody
13  that was working at the Roanoke plant ever
14  offered a job at the Wedowee location?
15      A.    They told us we could go put
16  an application in down there, but there
17  wasn't no guarantee that we would get hired.
18      Q.    Okay.  Did they tell you
19  that -- Was it known at the time the Roanoke
20  plant closed, that the Wedowee plant was
21  going to be opening?
22          MR. THOMPSON:  Object to the
23  form.

42 (Pages 165 to 168)

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 169

1  A.  No.
2  Q.  Okay.  Who told you that could
3  you go put in an application?
4  A.  Dan Hees.
5  MR. WHITE:  All right.  That's
6  all I've got.
7  BY MR. THOMPSON:
8  Q.  Ms. Thornton, just a few
9  follow-ups.  Do you know what the JELD-WEN'S
10  facility in Wedowee, do you know what they
11  do?
12  A.  No.
13  Q.  You don't know what they make?
14  A.  No.
15  Q.  You don't know if they make
16  anything?
17  A.  I've always been told that
18  they made windows or doors, or something.
19  I'm not sure.  I've never been in there.
20  Q.  What you've been told is that
21  they do something different than what was
22  done at the mill?
23  A.  Yes.

Page 170

1  Q.  Mr. White was asking you about
2  -- You said Mr. Estes?
3  A.  Yes.
4  Q.  That Mr. Estes was told by a
5  temp service he should no longer --
6  A.  Go to work.
7  Q.  -- Go to work at JELD-WEN;
8  correct?
9  A.  Yes.
10  Q.  What's the basis of your
11  knowledge of that?
12  A.  Jeff had actually --
13  Q.  Did Jeff Estes tell you this?
14  A.  Yes.
15  Q.  Jeff Estes told you something
16  that the temporary service representative
17  had told him?
18  A.  Well, he had went to work one
19  day, and it was actually the day that he
20  wasn't supposed to be there, and he didn't
21  know that he wasn't supposed to be there.
22  And Richard had to call the
23  temp service back, and the temp service said

Page 171

1  that they couldn't get ahold of Jeff Estes
2  to tell him not to come back to work.  So
3  that night the temp service got ahold of
4  Jeff and told him not to go back to work at
5  JELD-WEN.
6  Q.  Okay.  So, your knowledge
7  about all of that comes from Mr. Estes
8  telling you that?
9  A.  Yes.
10  Q.  And it's your understanding
11  that Mr. Estes was told this by the
12  temporary service?
13  A.  Yes.
14  Q.  You never heard Mr. Fetner say
15  anything to the temporary service about that
16  issue?
17  A.  No.
18  Q.  Now, Mr. White has clarified
19  -- That I said or may have said.  I don't
20  know if I said it or not, that you had a
21  consensual sexual relationship with
22  Mr. Fetner.  It's incorrect to say you had a
23  relationship?

Page 172

1  A.  I didn't have no relationship.
2  I had sex with him one time.
3  Q.  Was the sex on one time, was
4  it consensual?
5  A.  Yes.
6  Q.  It wasn't rape?
7  A.  No.
8  Q.  Did you kiss him?
9  A.  No.
10  Q.  You didn't kiss him at all?
11  A.  No.
12  Q.  Did you get completely
13  undressed in his house?
14  A.  No.  He didn't either.
15  Q.  I'm going to jump around a
16  little bit too.  Mr. White asked you about
17  some jokes that Mr. Fetner would tell.
18  A.  Yes.
19  Q.  Okay.  Did -- what was --
20  first of all, he asked you if you ever heard
21  him tell jokes in the presence of anyone
22  other than you.
23  A.  Yes.

43 (Pages 169 to 172)

Page 173

1    Q.    And you said, you did also in
2  the presence of Danny Greathouse?
3    A.    Yes.
4    Q.    Anybody other than you and
5  Danny Greathouse you heard him tell jokes in
6  front of?
7    A.    No.
8    Q.    Okay.  What was
9  Mr. Greathouse's reaction to Mr. Fetner's
10  jokes?
11    A.    He just laughed and carried on
12  with him.
13    Q.    Okay.  Were they funny jokes?
14    A.    I guess so.
15    Q.    Did you laugh?  Did you laugh
16  at some of them?
17    A.    I snickered.
18    Q.    Snickered?
19    A.    Yes.
20    Q.    Some of them funnier than
21  others?
22    A.    It wasn't impressive.
23    Q.    Some of the jokes were funny,

Page 174

1  and some of them weren't, or he wasn't a
2  good joke teller?
3    A.    I laughed at them, but I
4  wasn't impressed by them.
5    Q.    Were you offended by them?
6    A.    Yes.
7    Q.    Did you ever tell jokes in the
8  workplace?
9    A.    Not dirty jokes.
10    Q.    Not jokes of a sexual nature?
11    A.    Yes.
12    Q.    Did you ever hear anyone else
13  telling jokes of a sexual nature in the
14  workplace, or was it just Mr. Fetner?
15    A.    I've never had nobody else
16  ever tell me a sexual joke but Richard.
17    Q.    No one else in your entire
18  life has ever told you a sexual joke?
19    A.    Yes, in my life, not there.
20    Q.    Have you laughed at those
21  jokes when other people have told you those
22  jokes?
23    A.    Yes.

Page 175

1    Q.    Okay.  Now, just forgive me.
2  This is somewhat delicate.  You told
3  Mr. White that Mr. Fetner would oftentimes
4  grab his crotch, which is something you
5  testified when we were talking earlier.  And
6  sometimes you could tell that "it", meaning
7  his penis, was erect when he would grab it;
8  correct?
9    A.    Yes.
10    Q.    Okay.  Did he ever expose
11  himself to you at work?  Did he ever take
12  his penis out at work?
13    A.    No.
14    Q.    Okay.  The only time you ever
15  saw his penis was at his house?
16    A.    Yes.
17    Q.    Did you ever file a criminal
18  complaint against Mr. Fetner?
19    A.    No.
20    Q.    This grabbing your breast and
21  grabbing your buttocks and that kind of
22  stuff, was that something you wanted him to
23  do?

Page 176

1    A.    No.
2    Q.    Okay.  So, he was doing that
3  against your will?
4    A.    Yes.  He tried to play it off
5  like being playful, like it was a joke, or
6  he wasn't doing nothing wrong.  He was just
7  playing around.  I guess like husband and
8  wife do.
9    Q.    But you didn't think it was
10  playing around?
11    A.    No.
12    Q.    Okay.  Now, you said you heard
13  rumors about -- I'm not sure -- You said
14  Lisa Cook told you that she and Joe Mendoza
15  were having an affair?
16    A.    She didn't tell me they were
17  having an affair.  She told me she had seen
18  him after work.
19    Q.    Did she tell you what they did
20  when she saw him after work?
21    A.    No.
22    Q.    How many times do you think
23  she saw him?

44 (Pages 173 to 176)

## FOSHEE & TURNER COURT REPORTERS

```
 1              C E R T I F I C A T E

 2   STATE OF ALABAMA      )

 3   COUNTY OF JEFFERSON )

 4

 5              I hereby certify that the

 6   above and foregoing proceeding was taken

 7   down by me by stenographic means, and that

 8   the content herein was produced in

 9   transcript form by computer aid under my

10   supervision, and that the foregoing

11   represents, to the best of my ability, a

12   true and correct transcript of the

13   proceedings occurring on said date at said

14   time.

15              I further certify that I am

16   neither of counsel nor of kin to the

17   parties to the action; nor am I in anywise

18   interested in the result of said case.

19

20

21   _____

22   Court Reporter and Commissioner

23
```