# EXHIBIT P

**DEPOSITION EXCERPTS OF LISA COOK**

# FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3          EASTERN DIVISION
4
5    CIVIL ACTION NO.: 3:05-cv-685-T
6    LORENA MINIX, et al.,
7          Plaintiffs,
8          vs.
9    JELD-WEN, INC., and
10   RICHARD FETNER,
11         Defendants.
12
13        S T I P U L A T I O N
14        IT IS STIPULATED AND AGREED by and
15   between the parties through their respective
16   counsel, that the deposition of Lisa Cook
17   may be taken before Angela Smith, RPR, CRR,
18   at the offices of McNeal & Douglas, at 1710
19   Catherine Court, Ste: B, Auburn, Alabama
20   36831, on the 18th day of May, 2006.
21
22        DEPOSITION OF LISA COOK
23

Page 2

1        IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is waived,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating to
7    the taking of depositions.
8        IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17        IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21        * * * * * * * * * * * * *
22
23

Page 3

1    * * * * * * * * * * * * *
2          I N D E X
3        EXAMINATION
4               PAGE
5    By Mr. Thompson ..................... 6
6    By Mr. Douglas .................... 143
7    EXAMINATION CONTINUED
8               PAGE
9    By Mr. Thompson ................... 217
10   DEFENDANT'S EXHIBITS
11              PAGE
12   Ex. 1 - 7/03 acknowledgment of
13        attendance at seminar .... 68
14        * * * * * * * * * * * * *
15
16
17
18
19
20
21
22
23

Page 4

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3          EASTERN DIVISION
4
5    CIVIL ACTION NO.: 3:05-cv-685-T
6    LORENA MINIX, et al.,
7          Plaintiffs,
8          vs.
9    JELD-WEN, INC., and
10   RICHARD FETNER,
11         Defendants.
12   BEFORE:
13        ANGELA SMITH, Commissioner.
14
15   APPEARANCES:
16        MATTHEW WHITE, ESQUIRE, of ADAMS,
17   UMBACH, DAVIDSON & WHITE, 205 S. Ninth St.,
18   Opelika, Alabama 36803, appearing on behalf
19   of the Plaintiff.
20        JAMES B. DOUGLAS, JR., ESQUIRE, of
21   MCNEAL & DOUGLAS, 1710 Catherine Court, Ste:
22   B, Auburn, Alabama 36831, appearing on
23   behalf of the Plaintiff.

1 (Pages 1 to 4)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 5

1  APPEARANCES (continued):
2      MICHAEL THOMPSON, ESQUIRE, of
3  LEHR, MIDDLEBROOKS, PRICE & VREELAND, 2021
4  3rd Avenue N., Birmingham, Alabama 35203,
5  appearing on behalf of the Defendant,
6  JELD-WEN, inc.
7          * * * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 6

1      I, ANGELA SMITH, RPR, CRR, a Court
2  Reporter of Wetumpka, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Federal Rules of Civil
5  Procedure and the foregoing stipulation of
6  counsel, there came before me at the offices
7  of McNeal & Douglas, 1710 Catherine Court,
8  Ste: B, Auburn, Alabama 36831, beginning at
9  10:05 a.m., Lisa Cook, witness in the above
10  cause, for oral examination, whereupon the
11  following proceedings were had:
12          LISA COOK,
13  being first duly sworn, was examined and
14  testified as follows:
15          COURT REPORTER:  Usual
16  stipulations?
17          MR. THOMPSON:  Yeah.
18          MR. DOUGLAS:  Yes.
19          EXAMINATION
20  BY MR. THOMPSON:
21      Q.    Would you please state your
22  full name for the Record.
23      A.    Lisa Ann Cook.

Page 7

1      Q.    Okay.  And, Ms. Cook, have you
2  ever been known by any other name?
3      A.    No, sir.
4      Q.    Okay.  My name is Mike
5  Thompson.  I'm a lawyer.  And I represent
6  JELD-WEN, Incorporated in a lawsuit that's
7  been filed against JELD-WEN and another
8  former employee named Richard Fetner by
9  Lorena Minix, Linda Sims and Brenda Sims.
10  Okay?
11      A.    Yes, sir.
12      Q.    Do you understand that?
13      A.    Yes, sir.
14      Q.    Okay.  Any time I use the term
15  "JELD-WEN" here in this deposition, I'm
16  referring to JELD-WEN, your former employer.
17  Okay?
18      A.    Okay.
19      Q.    Now, the court reporter has
20  placed you under oath.  One thing you've got
21  to do is, you've got to answer out loud.
22  She can't take down your nod.
23      A.    Yes, sir.

Page 8

1      Q.    I understand them, the
2  computer doesn't understand them.
3      A.    Yes, sir.
4      Q.    Okay.  You've sworn to tell
5  the truth, the whole truth and nothing but
6  the truth here today.  Do you understand
7  that?
8      A.    Yes, sir.
9      Q.    Okay.  Is there -- Do you
10  understand that this oath you've taken in
11  this conference room here today carries with
12  it the same penalties of perjury as it would
13  if you were sitting in the courtroom?  Do
14  you understand that?
15      A.    Yes, sir.
16      Q.    Okay.  And you're a truthful
17  person?
18      A.    Yes, sir.
19      Q.    So, we're not going to have
20  any problem with that today; right?
21      A.    No, sir.
22      Q.    One of the things that
23  Mr. Douglas was mentioning to you -- First,

# FREEDOM COURT REPORTING

Page 17

1  documents later on. It's important that you
2  be able to read and write to look at those.
3  We all have run into circumstances where
4  we've handed someone a document and they
5  couldn't read it. So . . .
6        You received a subpoena from
7  me; is that correct?
8     A.   Yes, sir.
9     Q.   And on that subpoena we
10 requested that you bring any documents that
11 you reviewed to prepare for your deposition;
12 is that right?
13    A.   Yes, sir.
14    Q.   And did you review anything to
15 get ready for your deposition?
16    A.   No, sir.
17    Q.   We requested that you bring
18 any documents that you had relevant to your
19 employment with JELD-WEN; is that correct?
20    A.   Yes, sir.
21    Q.   Do you have any documents that
22 relate in any way to your employment with
23 JELD-WEN?

Page 18

1     A.   Not with me. The only thing I
2  have is check stubs.
3     Q.   Check stubs?
4     A.   Yes, sir.
5     Q.   We don't need those. So
6  that's fair. You have a former
7  sister-in-law named Stacy Overton; is that
8  right?
9     A.   Yes, sir.
10    Q.   Okay. And are you aware that
11 we took Ms. Overton's deposition a week and
12 a half ago, a week ago, something like that?
13    A.   Yes, sir.
14    Q.   Have you talked to her since
15 then?
16    A.   I don't think I've talked to
17 her since. I talked to her before.
18    Q.   Okay. And we -- And,
19 obviously, your deposition was scheduled
20 before hers?
21    A.   Yes, sir.
22    Q.   Did you know that?
23    A.   Yes, sir.

Page 19

1     Q.   Okay. And so I asked
2  Ms. Overton about when she had talked to
3  you. Okay?
4     A.   Yes, sir.
5     Q.   And Ms. Overton said that you
6  told her -- She said she had to come and she
7  was very, very upset about it and she was
8  referring to you as she.
9        MR. DOUGLAS: Mike, can you
10 give us a book and page reference number on
11 that?
12       MR. THOMPSON: Absolutely.
13 I'm sorry. It's page thirty-nine from
14 Overton I started reading on line eleven.
15    Q.   Continuing: She, being you,
16 didn't want to come because she said that
17 she didn't want to be any part of it because
18 she had got what she asked for and that was
19 to not have to work for Richard anymore.
20    A.   Yes, sir.
21    Q.   And did you tell Ms. Overton
22 that?
23    A.   Yes, sir.

Page 20

1     Q.   Okay. And did you tell her
2  that within a week or so prior to your --
3  the time that your first deposition was
4  scheduled?
5     A.   Did I tell her that within --
6     Q.   Yeah. That's a poorly asked
7  question. So let me sort of back up on
8  that. Do you remember when you talked to
9  Ms. Overton about coming down here?
10    A.   It was probably a day or so
11 after I received my subpoena to come down
12 here.
13    Q.   Okay. So, either right at the
14 end of April or right at the beginning of
15 May; correct?
16    A.   Yes, sir.
17    Q.   And this passage that I've
18 just read from her deposition, you told her
19 that; right?
20    A.   Yes, sir.
21    Q.   Okay. And you told her that
22 during that phone conversation; right?
23    A.   Yes, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1  Q.  Did you tell her that you
2  weren't going to come for your deposition at
3  that time?
4  A.  Did I tell her that I wasn't?
5  Q.  Uh-huh.
6  A.  I told her I wasn't sure.
7  Q.  You weren't sure whether you
8  were going to come?
9  A.  Yes, sir.
10  Q.  Why weren't you sure that you
11  were going to come?
12  A.  Like I said, I didn't want to
13  have anything to do with it. And I had told
14  them, me and Lorena and Brenda and Linda,
15  over, you know, a year ago that I didn't
16  want to have anything to do with this.
17       You know, like I stated to
18  Stacy, you know, I didn't want to work for
19  Richard anymore, and that's, you know, all I
20  asked for and that's, you know, what
21  happened. So, you know, I didn't want to be
22  involved in any of this.
23  Q.  So, once you got the relief

Page 22

1  you were looking for, and that was not
2  working for Richard anymore, you were
3  satisfied?
4  A.  I was satisfied, yes, sir.
5  Q.  Okay. And so, that's why you
6  didn't want to be involved in their lawsuit?
7  A.  Yes, sir.
8  Q.  Okay. And when you talked to
9  Dan Hees on October 13th, that's what you
10  wanted, you didn't want to have to work for
11  Richard anymore; right?
12  A.  Yes, sir.
13  Q.  Are you mad about being
14  involved in this lawsuit?
15  A.  Am I mad? I'm very upset
16  about it, yes, sir.
17  Q.  Okay. Why are you upset?
18  A.  Because it has caused me a few
19  personal problems at home. And, like I
20  said, I just don't want to have anything to
21  do with it, period. Because I don't feel
22  that what they're doing is right.
23  Q.  Okay. What who is doing is

Page 23

1  right?
2  A.  Lorena and Linda and Brenda.
3  Q.  Okay. You say you don't feel
4  like what they're doing is right, what do
5  you mean by that?
6  A.  As far as the lawsuit.
7  Q.  Why is that?
8  A.  Well, I just feel that they're
9  out for the money. And, you know, the main
10  thing to me was not to have to work for
11  Richard anymore, you know.
12  Q.  Okay. What have they told you
13  that makes you think they're out for the
14  money?
15  A.  They haven't told me anything,
16  really, it's just knowing them and being
17  around them.
18  Q.  Okay. What characteristics do
19  they have that knowing them and being around
20  them leads you to that conclusion?
21       MR. DOUGLAS: I object to the
22  form of that question. You can go ahead and
23  answer.

Page 24

1  A.  Oh, okay. Can you repeat the
2  question?
3  Q.  Sure. Have you observed any
4  characteristics or mannerisms in those three
5  ladies that leads you to the conclusion that
6  they're just out for the money?
7       MR. DOUGLAS: Object to the
8  form.
9  A.  Just to hear them talk, you
10  know, because on -- when we had a
11  conversation with Dan Hees after, I guess,
12  Richard was let go, one of the first
13  questions that one of them asked was: Are
14  we going to get anything out of this, as far
15  as a monetary settlement?
16       And that was not my intentions
17  of it to begin with. My intentions was not
18  to have to work with Richard anymore. So,
19  to me, that showed that that's what they
20  were out for.
21  Q.  Okay. And which one of them
22  asked if they were going to get anything out
23  of this?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1    A.    I'm really not sure if it was
2  Lorena or Linda.  I can't remember, but it
3  was one of the two.
4    Q.    Okay.  And by Linda, you mean
5  Linda Sims?
6    A.    Yes, sir.
7    Q.    And do you recall the words
8  they actually used?  Was it:  Are we going
9  to get anything out of this, as far as —
10    A.    I think so.  As far as the
11  monetary and stuff.  I mean:  Will we
12  receive anything for having to, you know,
13  deal with him and put up with him?  I think
14  that's the way it was said.  You know, it's
15  been so long ago, I'm really not sure.
16    Q.    Okay.  And they used the word
17  "money" or "monetary" in that statement?
18    A.    I hate to answer it yes or no,
19  because, you know, I'm really not sure,
20  but . . .
21    Q.    You think so, you're just not
22  sure?
23    A.    Yes, sir.  I'm not sure.

Page 26

1    Q.    Okay.  That's fair enough.  Is
2  there any other reason you think they're
3  just out for the money?
4    A.    I mean, that basically, you
5  know, just — I mean, you know, just —
6  being — You know, hearing what they said
7  about it, and them asking, you know, Dan
8  that.
9    Q.    Okay.  Had you ever talked to
10  anyone before speaking to Dan about trying
11  to get some money out of this?
12    A.    Had I?
13    Q.    Well, had you ever heard
14  anyone talking about trying to get some
15  money out of this?
16    A.    No, sir.
17    Q.    Have you ever heard any of
18  them say:  Let's go see a lawyer and try to
19  get some money out of this?
20    A.    No, sir.  Not before talking
21  to Dan Hees, no, sir.
22    Q.    Not before talking to Dan
23  Hees?

Page 27

1    A.    No, sir.
2    Q.    And the first time you talked
3  to Dan Hees was this October 13, 2004,
4  meeting?  And the first time you talked to
5  Dan Hees about Mr. Fetner's conduct was this
6  October 13, 2004, meeting?
7    A.    I'm not sure of the exact
8  date, but — it was in 2004, I'm pretty
9  You know, I'm not sure of the exact date.
10    Q.    That's fair enough.
11    MR. DOUGLAS:  Mike, I think
12  it's fair the witness knows Dan Hees said
13  that's when the date was.
14    THE WITNESS:  Okay.  I mean,
15  I'm not — I mean, I'm not going to sit here
16  and say that because I'm not sure of the
17  exact date.
18    MR. DOUGLAS:  I don't want you
19  to think we're trying to trick you or
20  anything like that.
21    Q.    Yeah.  Let me — Yeah.  Let me
22  just try to — You met with Mr. Hees with
23  Ms. Minix, Ms. Sims, Ms. Sims and

Page 28

1  Ms. Thornton; is that correct?
2    A.    And Mary Lou Laws was with us,
3  also, I do believe.
4    Q.    Okay.  You think Mary Lou was
5  there?
6    A.    I'm almost positive she was.
7    Q.    Is it possible she was out
8  that day with her finger injury?
9    A.    I was thinking that was after
10  that.
11    Q.    Okay.  Was that meeting with
12  Mr. Hees, was it on — was it in the
13  morning?
14    A.    It was in the morning.
15    Q.    Did it —
16    A.    After first break or during
17  first break, I think.
18    Q.    And did it occur in the paint
19  room?
20    A.    Yes, sir.
21    Q.    Okay.  And that's when y'all
22  explained or reported —
23    A.    Yes, sir.

7  (Pages 25 to 28)

# FREEDOM COURT REPORTING

Page 29

1  Q.  -- what Mr. Fetner had
2  allegedly done to the five or six of you?
3  A.  Yes, sir.
4  Q.  Okay.  And was that meeting
5  the first time that you talked to Dan Hees
6  about that?
7  A.  Yes, sir.
8  Q.  Okay.  Are you aware of any
9  audio or video recordings of any JELD-WEN
10 employee, former or current employee?
11 A.  No, sir.
12 Q.  How old are you?
13 A.  Thirty.
14 Q.  What's your date of birth?
15 A.  12/10/75.
16 Q.  And your Social Security
17 number?
18 A.  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.
19 Q.  Do you have any telephone
20 numbers, other than the one we previously
21 talked about?
22 A.  I have my mother's, who lives,
23 like, ten apartments down from me, that I

Page 30

1  can be reached at.
2  Q.  Okay.  What's her number?
3  A.  (334) 863-8286.  And I have a
4  work number, but my schedule is different
5  every week.  So, I mean, you could try me
6  there.
7  Q.  Is that at The Galley?
8  A.  Yes, sir.
9  Q.  Is that the proper name, The
10 Galley Restaurant?
11 A.  Yes, sir.  The Galley
12 Restaurant.
13 Q.  What's the number there?
14 A.  (334) 863-8928.
15 Q.  Okay.  And you're renting an
16 apartment?
17 A.  Yes, sir.
18 Q.  On Rebecca Lane?
19 A.  Yes, sir.
20 Q.  How long have you lived there?
21 A.  Since November of 2005.
22 Q.  Okay.  Where did you live
23 before then?

Page 31

1  A.  LaFayette, Alabama.
2  Q.  Did you live in a house or an
3  apartment?
4  A.  A house.
5  Q.  What was that address?
6  A.  1191 County Road 48,
7  LaFayette, and I think the zip code is
8  36862.
9  Q.  Okay.  And how long did you
10 live there?
11 A.  About three years.
12 Q.  So, from 2002 to 2005?
13 A.  Yes, sir.
14 Q.  Where did you live before
15 that?
16 A.  Lincoln -- I don't know if
17 it's Lincoln Road, Avenue or Street, in
18 Roanoke.  I can't remember which one.  I
19 think it's Lincoln Street in Roanoke.
20 Q.  Do you remember the street
21 number?
22 A.  No, sir.
23 Q.  Okay.  How long did you live

Page 32

1  there?
2  A.  Approximately six months.
3  Q.  So, just during 2002?
4  A.  Yes, sir.
5  Q.  Okay.  And where did you live
6  before that?
7  A.  I lived with my
8  ex-sister-in-law, and I'm not sure what the
9  address of that was.
10 Q.  That's when you lived with
11 Stacy Overton?
12 A.  Yes, sir.
13 Q.  How long did you live with
14 Ms. Overton?
15 A.  Three or four months, maybe.
16 Q.  And before that, where were
17 you residing?
18 A.  On County Road 65, Roanoke.
19 Q.  And how long did you live on
20 County Road 65?
21 A.  Maybe a year and a half.
22 Q.  So, that takes us back to 2000
23 to 2001, something like that?

8 (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1  that?
2      A.   No, sir.  Other than the
3  activities my child is participating in.
4      Q.   Okay.  After you finished high
5  school, where did you go to work, or did you
6  just go to school?
7      A.   I worked at The Galley from
8  the time I was fifteen until I graduated
9  Southern Union.
10     Q.   Did you work anywhere else
11 until 1997?
12     A.   Huh-uh.  No, sir.
13     Q.   After finishing Southern
14 Union, where did you go to work?
15     A.   Wellborn Cabinets in Ashland.
16     Q.   What were you doing for
17 Wellborn?
18     A.   Shipping clerk.
19     Q.   After Wellborn, where did you
20 go to work?
21     A.   Candlewick Mills.
22     Q.   When was that?
23     A.   It was about three or four

Page 46

1  months after I quit Wellborn, I do believe.
2      Q.   So, you stayed at Wellborn for
3  three or four months?
4      A.   No.  I stayed at Wellborn for
5  two years.  I'm sorry.
6      Q.   From '97 to '99?
7      A.   I think so.
8      Q.   Okay.  And you say you went to
9  Candlewick sometime in '99, also?
10     A.   Yes, sir.
11     Q.   How long did you work at
12 Candlewick?
13     A.   Three or four months.
14     Q.   What were you doing there?
15     A.   I guess you would just call it
16 a machine operator, a heat set operator.
17     Q.   Were you making yarn?
18     A.   Yes, sir.
19     Q.   And after you left Candlewick,
20 where did you go, to Millwork Specialties?
21     A.   Yes, sir.  It was 2001, before
22 I went to Millwork.
23     Q.   What did you do from when you

Page 47

1  stopped working at Candlewick until when you
2  started working at Millwork?
3      A.   I worked at John Boy's for
4  about six months.  And then from the time I
5  quit there, I didn't work anywhere for a
6  while.
7      Q.   What is John Boy's?
8      A.   It's a restaurant in Roanoke.
9      Q.   Wait staff?
10     A.   Yes, sir.
11     Q.   Why did you leave The Galley?
12     A.   It changed management and,
13 plus, I was offered a better — you know, I
14 graduated Southern Union and I was out for a
15 better job at Wellborn.
16     Q.   Okay.  Why did you leave
17 Wellborn?
18     A.   Time and hours.
19     Q.   Just —
20     A.   Too many hours.
21     Q.   Any other reason you left
22 Wellborn?
23     A.   No, sir.

Page 48

1      Q.   What about Candlewick Yarns?
2      A.   Candlewick?  The shift.  They
3  had put me on night shift.  I was working
4  seven at night until seven in the morning
5  and had two kids to take care of.
6      Q.   Okay.  Why did you leave John
7  Boy's?
8      A.   I'm really not sure.  I just
9  quit, I think.
10     Q.   And after you worked at John
11 Boy's, you started working at Millwork
12 Specialties?
13     A.   Yes, sir.
14     Q.   Okay.  And that was a Millwork
15 plant in Roanoke, Alabama?
16     A.   Yes, sir.
17     Q.   At some point after that,
18 JELD-WEN, my client, took over that plant;
19 is that correct?
20     A.   Yes, sir.
21     Q.   Okay.  So, when you started,
22 you were not a JELD-WEN employee?
23     A.   Yes, sir.

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

Page 49

1    Q.    That's correct, isn't it?
2    A.    That's correct, yes, sir.
3    Q.    Okay. At some point in time,
4  your JELD-WEN employment ended when the
5  plant closed; right?
6    A.    Yes, sir.
7    Q.    Okay. Where did you go to
8  work after that?
9    A.    I didn't. I didn't work until
10  August of 2005.
11    Q.    How did you subsist in the
12  meantime?
13    A.    Unemployment.
14    Q.    Okay. In August of 2005, is
15  that when you went back to work at The
16  Galley?
17    A.    I went back to work at The
18  Galley and at WW Trucking in Roanoke.
19    Q.    Start both at the same time?
20    A.    I think The Galley was
21  actually maybe in September.
22    Q.    And you're no longer working
23  at WW Trucking -- is it WTW Trucking?

Page 50

1    A.    It's WTW Enterprises, doing
2  business as WW Trucking.
3    Q.    Okay. Is that Wendell
4  Williams?
5    A.    Yes, sir.
6    Q.    Is Mr. Williams a nice guy?
7    A.    To a point, yes, sir.
8    Q.    What did you do for WTW
9  Trucking?
10    A.    Clerk.
11    Q.    Okay. And you're no longer
12  working there, why?
13    A.    No, sir. Because me and
14  Mr. Williams had a disagreement.
15    Q.    And what was that disagreement
16  about?
17    A.    Pretty much he said I was
18  taking advantage of them.
19    Q.    Did he tell you how you were
20  taking advantage of them?
21    A.    Pretty much doing like I
22  wanted to do, I think is how he said it.
23    Q.    Did you agree with that?

Page 51

1    A.    No, sir.
2    Q.    Okay. Why not?
3    A.    Because I worked every day of
4  the week, except for Sundays. I did
5  everything they asked me to do, even stuff
6  outside of the job that they asked me to do,
7  I done for them, you know.
8    Q.    Did they -- They say you took
9  too many personal calls at work?
10    A.    No, sir.
11    Q.    Okay. Did you have a
12  disagreement with them about smoking, taking
13  smoke breaks, things like that?
14    A.    He said something about me
15  taking too many smoke breaks. But that was
16  not the reason I got angry. The reason I
17  got angry is because he said that I had
18  taken advantage of him.
19    Q.    Okay. And you just walked out
20  one day; right?
21    A.    I just walked out, yes, sir.
22    Q.    And you still work at The
23  Galley; right?

Page 52

1    A.    Yes, sir.
2    Q.    And you're wait staff at The
3  Galley?
4    A.    Yes, sir.
5    Q.    Who hired you to work
6  at Millwork Specialties?
7    A.    Richard Fetner.
8    Q.    Okay. Did you know Mr. Fetner
9  when you were working at Wellborn?
10    A.    I knew him. I didn't have --
11  I did not work for him, but I knew him, yes,
12  sir.
13    Q.    Okay. Do you know why
14  Mr. Fetner left employment at Wellborn?
15    A.    No, sir. I heard rumors, but
16  I do not know why he left.
17    Q.    Okay. So, you have no
18  firsthand knowledge of why he left?
19    A.    No, sir.
20    Q.    Okay. What were the rumors
21  that you heard?
22    A.    The rumors I heard was that
23  there were several cases of sexual

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1  harassment charges that people were trying
2  to bring against him, but that was only
3  hearsay.
4      Q.   Who did you hear those from?
5      A.   Different people, you know,
6  that I had worked with at Wellborn. I'm not
7  really sure exactly who it was.
8      Q.   So, you just don't remember
9  who they were?
10     A.   No, sir.
11     Q.   Let me show you what purports
12 to be your application. It's Bates labeled
13 D 252 and 253. Is that your signature on
14 the second page, ma'am?
15     A.   Yes, sir.
16     Q.   Okay. And that's an
17 application you put in to get a job with
18 Millwork Specialties, Inc.?
19     A.   Yes, sir.
20     Q.   Okay. And did you know who
21 owned Millwork Specialties, Inc.?
22     A.   No, sir.
23     Q.   Did you ever hear about a

Page 54

1  company called CMS Holding Company?
2      A.   Yes, sir.
3      Q.   Who were they?
4      A.   I'm not sure. I just heard
5  the name. I guess they were the company
6  that owned it before JELD-WEN owned it. I'm
7  really not sure.
8      Q.   Okay. Did any of your family
9  members work at the Roanoke Millworks plant?
10     A.   My mother did and my father
11 did.
12     Q.   Okay. And when did they work
13 there?
14     A.   My mother started before I
15 did. I think she started in 2000, maybe.
16 And my father came to work there after I
17 started there. And I'm not sure what the
18 dates are on that. But my mother was before
19 me and my father was after I had started
20 working there.
21     Q.   Okay. What was your mother —
22 What did she do out there?
23     A.   She was a machine operator.

Page 55

1  She cut heads.
2      Q.   She was a machine operator,
3  that means she was a general laborer?
4      A.   Yes, sir.
5      Q.   So, she operated a bunch of
6  different machines?
7      A.   Mainly one, but she did run --
8  I mean, occasionally she did do other jobs.
9      Q.   Was it common to be moved
10 around from job to job from time to time?
11     A.   Yes, sir.
12     Q.   Okay. And your mother's name
13 is Elizabeth; right?
14     A.   Yes, sir.
15     Q.   Okay. And your father's name
16 is Willis?
17     A.   Willis, yes, sir.
18     Q.   Now, what did Mr. Willis Cook,
19 what did he do out there?
20     A.   He worked on the cutting line
21 and he drove a forklift.
22     Q.   Okay. So, your mom worked in
23 the moulding area?

Page 56

1      A.   Yes, sir.
2      Q.   And your father worked on the
3  cut line, which would have been processing
4  the wood before it went into the moulding
5  area; is that right?
6      A.   Yes, sir.
7      Q.   And both your mother and
8  father were working at the plant at the time
9  it closed; correct?
10     A.   Yes, sir.
11     Q.   Did Mr. Fetner ask your — I'm
12 sorry. Strike that.
13         Did your mother ask Mr. Fetner
14 to hire you?
15     A.   She told him that I was
16 looking for a job. And he told her to tell
17 me to come out there and fill out an
18 application.
19     Q.   You're close to your mom and
20 dad?
21     A.   Yes, sir.
22     Q.   And you talk to them about
23 your problems?

14  (Pages 53 to 56)

## FREEDOM COURT REPORTING

Page 57

1    A.    Most of them, yes, sir.
2    Q.    You became a JELD-WEN employee
3    in 2002?
4    A.    Yes, sir.  Well, I -- I mean,
5    when JELD-WEN -- I was employed at Millwork
6    Specialties in 2001.
7    Q.    Okay.  So, you became an
8    employee at that millwork plant in 2001,
9    when Millwork Specialties, Inc., was
10    operating?
11    A.    Yes, sir.
12    Q.    One of the things you need to
13    do is just let me get all my verbose
14    question out so she doesn't have us talking
15    over each other.
16    A.    Okay.
17    Q.    Okay.  At some point after
18    that, you became a JELD-WEN employee; is
19    that correct?
20    A.    Yes, sir.
21    Q.    Do you recall what year that
22    was?
23    A.    It was -- I guess it would be

Page 58

1    in 2002, because it was about a year after I
2    started.
3    Q.    Okay.  So about a year after
4    you started.  And if you look at that
5    document I handed you, on the second page
6    where your signature is, it shows that you
7    submitted your application on July 15, 2001;
8    is that correct?
9    A.    Yes, sir.
10    Q.    Did you start to work with
11    Millwork Specialties shortly after you
12    submitted that application?
13    A.    Yes, sir.
14    Q.    Okay.  So, it would have been
15    about a year after that, you believe, when
16    you became a JELD-WEN employee?
17    A.    I think so yes, sir.
18    Q.    Did you interview with anyone
19    at JELD-WEN when you transitioned from being
20    a Millwork Specialties, Inc., employee to
21    being a JELD-WEN employee, or just one day
22    you were a Millwork Specialties, Inc.,
23    employee and the next day --

Page 59

1    A.    Well, I think we had group
2    meetings.  Pat Galvez, I think that was his
3    name, he was our plant manager and he kind
4    of -- we would have group meetings and we
5    just all kind of transferred over to
6    JELD-WEN.
7    Q.    So, he was just telling you
8    what JELD-WEN was going to do and stuff like
9    that?
10    A.    Yes, sir.
11    Q.    Did he tell you no one was
12    going to lose their job in the transition,
13    things like -- Do you remember what he said?
14    A.    No, sir.  But, I mean, he, you
15    know, assured us, as far as our jobs,
16    nothing was going to change.  There might be
17    some changes, you know, within the company,
18    like insurance and stuff like that, but
19    nothing as far as our jobs.
20    Q.    You had to fill out a bunch of
21    new forms and things like that, didn't you?
22    A.    Yes, sir.
23    Q.    What was your job title?

Page 60

1    A.    Machine operator.
2    Q.    Okay.  And your immediate
3    supervisor was Richard Fetner?
4    A.    Yes, sir.
5    Q.    Was that true the entire time
6    you worked there?  At least -- Well, was
7    that true until his employment ended?
8    A.    Yes, sir.
9    Q.    What were your duties?  What
10    did you do?
11    A.    I ran a moulder.  I ran just
12    about all the machines out there.  Whatever
13    I was told to do, that's what I did.
14    Q.    When you say you ran all the
15    machines, you mean you ran all the moulding
16    machines?
17    A.    I ran all the moulders.  I ran
18    all the machines in the back, as far as the
19    finishing part, the hinge machines, the
20    stripe machines.
21    Q.    Those are routers?
22    A.    The routers, yes, sir.
23    Q.    Okay.  Stripe router, hinge

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 61

1  router?
2      A.   Yes, sir.  I was at the brick
3  mould machine, but I'm not sure what they
4  call it, but what cut the angles on the
5  brick moulds.
6      Q.   Did you cut heads?
7      A.   Yes, sir.
8      Q.   What does that mean?
9      A.   You put them into this machine
10 and it cuts them down to, you know, the
11 desired size that they have for an order,
12 like thirty-two inches or thirty-six inches.
13     Q.   Did you ever work outside the
14 — Strike that.
15          Tell me, was just the moulding
16 machines in the back?
17     A.   Well, I think they considered
18 it the back.  There was the paint room and
19 then the moulders.  And then you come down
20 and you had the glue machine and the machine
21 that my mother worked at.  And the finger
22 joiner machine.
23          And then you come into another

Page 62

1  building, and that's back there where all
2  the hinge routers and everything was, and
3  the cutting line.
4      Q.   Okay.  So, they were all kind
5  of back there together, then?
6      A.   It just ran in a straight
7  line, like — What we call the back is where
8  I was at on the routers and stuff.
9      Q.   Okay.
10     A.   Most of the time.
11     Q.   Okay.  So, you worked a
12 variety of jobs in the plant?
13     A.   Yes, sir.
14     Q.   Did you ever work with Patrick
15 Williams or the cut line crew?
16     A.   Yes, sir.
17     Q.   How often did you do that?
18     A.   Not very often.  Just
19 occasionally.  Maybe two or three times a
20 month.
21     Q.   That would just be a temporary
22 deal?
23     A.   Yes, sir.  If somebody was out

Page 63

1  and they needed somebody to fill in, then I
2  would go back there.
3      Q.   Okay.  What about the finger
4  joiner, did you ever work on that?
5      A.   Yes, sir.  Not very much,
6  though.  Maybe eight times the whole time I
7  was there.
8      Q.   Did you ever work in the glue
9  room?
10     A.   On the glue machine?
11     Q.   On the glue machine.
12     A.   I don't think I ever worked on
13 the glue machine.
14     Q.   Was all the work in the plant
15 of the same general difficulty level that
16 the general laborers would perform?
17     A.   I guess so.  Pretty much.  I
18 guess so.
19     Q.   Do you feel like you performed
20 the functions you were assigned well?
21     A.   Yes, sir.
22     Q.   Were you ever assigned to do
23 anything that you couldn't do?

Page 64

1      A.   No, sir.
2      Q.   Do you recall what jobs Linda
3  Sims performed at the plant?
4      A.   The stripe machine, stripe
5  router.  I do believe she was — And I'm not
6  sure — She may have run a moulder a couple
7  of times, but I'm not positive on that.
8      Q.   The brick moulder?
9      A.   Well, it was the moulders up
10 front that did the jambs and the brick
11 mouldings.
12     Q.   And those were also -- The two
13 jobs you told me that Linda Sims might have
14 performed were also jobs that you performed
15 from time to time?
16     A.   Yes, sir.
17     Q.   Mr. Fetner assigned you to
18 perform these jobs?
19     A.   Yes, sir.
20     Q.   Okay.  Were you ever performed
21 to assign -- I'm sorry, were you ever
22 assigned to perform Linda Sims' job?
23     A.   Did I ever do her job?

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1  Q.  Yeah.
2  A.  Yes, sir.
3  Q.  On a day that she was present?
4  A.  Yes, sir. I'm sure
5  occasionally there was times when I did her
6  job when she was there.
7  Q.  Okay.  And what would she do?
8  A.  She would be doing a different
9  job, maybe on a different router or filling
10  in for somebody else on a different job that
11  wasn't there.
12  Q.  Just doing what needed to be
13  done?
14  A.  Yes, sir.
15  Q.  Let me show you what's marked
16  as D 1 to D 24.  And just for the Record,
17  it's got some zeros in there as well, and
18  ask if you've seen that before?
19  A.  Have I seen this before?
20  Q.  Uh-huh.
21  A.  Yes, sir.
22  Q.  And what is that?
23  A.  That's an employee handbook

Page 66

1  for JELD-WEN.
2  Q.  Okay.  Did you get a chance to
3  read that?
4  A.  I read a good bit of it
5  because I think we had a test on it.  We
6  were given a test on certain parts of it.
7  Q.  Okay.  And did you — Was
8  there any part of it that you didn't
9  understand?
10  A.  No, sir.
11  Q.  Look with me at, I think it's
12  page six of the handbook.  Let me tell you
13  what the — I think it's D 11.  Do you see
14  JELD-WEN's harassment policy there?
15  A.  Yes, sir.
16  Q.  Were you aware of that
17  harassment policy?
18  A.  Yes, sir.
19  Q.  How was that communicated to
20  you?
21  A.  As far as somebody telling us
22  about it or --
23  Q.  Well, one, it was in the

Page 67

1  handbook; right?
2  A.  Right.
3  Q.  Okay.  And did you get a
4  handbook at the time JELD-WEN took over the
5  plant in 2002?
6  A.  Yes, sir.
7  Q.  Okay.  And how else did you
8  learn about the harassment policy?
9  A.  As far as — I guess when
10  Richard started doing things that he
11  shouldn't do — shouldn't be doing, and we
12  were trying to figure out what we needed to
13  do and how we needed to do it.
14  Q.  Okay.  And when was that?
15  A.  2004.
16  Q.  Okay.  And we'll talk about
17  that just a little bit later.
18  A.  All right.
19  Q.  When you read the harassment
20  policy, was there anything about it you
21  didn't understand?
22  A.  No, sir.
23  Q.  So, you understood all the

Page 68

1  harassment policy?
2  A.  Yes, sir.
3  (Defendant's Exhibit 1 was
4  marked for identification
5  purposes.)
6  Q.  I'm going to show you what
7  I've marked as Defendant's Exhibit 1, which
8  is also Bates labeled D 245.  And I'm going
9  to ask you to look at line six on there.  Is
10  that your signature?
11  A.  Yes, sir.
12  Q.  Did you attend a harassment
13  training seminar in July of 2003?
14  A.  Yes, sir.
15  Q.  Okay.  And who spoke at that
16  seminar?
17  A.  I'm not sure.  I think he was
18  a lawyer from — for JELD-WEN.
19  Q.  Okay.
20  A.  I'm not sure what his name
21  was, but I remember we watched some films.
22  I do believe we watched films that day.
23  Q.  Was it a Power Point

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1 presentation you watched? Something on a
2 screen that you watched?
3     A.    It was on a screen, yes, sir.
4     Q.    Okay. Did you have any
5 questions that day?
6     A.    No, sir.
7     Q.    Okay. Did you understand what
8 the lawyer was telling you?
9     A.    Yes, sir.
10    Q.    Do you remember what the
11 lawyer's name is?
12    A.    No, sir.
13    Q.    Okay. Were you disciplined
14 for attendance violations while you worked
15 for JELD-WEN?
16    A.    Yes, sir.
17    Q.    Okay. And you don't contest
18 that you were out for those occasions?
19    A.    No, sir. I was out.
20    Q.    Okay. And did the warnings
21 you received, did they make you mad?
22    A.    No, sir. They didn't make me
23 mad, but I was kind of upset because I

Page 70

1 explained to them that my little girl was
2 sick a lot and that was one of the reasons
3 that I was out.
4     Q.    Because you didn't have other
5 child care options?
6     A.    Well, I had a day care, but,
7 you know, the day care will not keep them if
8 they're running a fever or throwing up, you
9 know.
10    Q.    I know. All right. So, did
11 you -- Did you complain to anyone about
12 that?
13    A.    I talked to Mr. Pat Galvez
14 about it, yes, sir.
15    Q.    Okay. Did you tell Mr. Galvez
16 that you didn't think Mr. Fetner was
17 understanding of your need to be out?
18    A.    Well, I think it was -- Well,
19 I talked to both of them, actually. And
20 after I talked to them, you know, they tried
21 to help me, as far as trying to find a
22 different doctor for her, you know, making
23 her better -- she had problems with her

Page 71

1 tonsils. And the doctor that she was using
2 wouldn't take her tonsils out. And that was
3 causing me to be out with her a lot. And
4 they tried to help me find another doctor
5 that maybe would, you know, do better for
6 her.
7     Q.    Were they also trying to help
8 you obtain FMLA leave, or some type of leave
9 where your absences would be excused?
10    A.    Yes, sir.
11    Q.    Let me ask you about some
12 people -- We've been going about an hour,
13 are you okay?
14    A.    Yes, sir. I'm fine.
15        MR. THOMPSON: Are you guys
16 fine?
17    Q.    How long have you known Lorena
18 Minix?
19    A.    Just the time that we worked
20 at Millwork.
21    Q.    Okay. Is she a friend of
22 yours?
23    A.    She's an acquaintance.

Page 72

1     Q.    Do you feel like she's drug
2 you into this, this lawsuit?
3     A.    Yes, sir.
4     Q.    Does that make you upset with
5 her in some way?
6     A.    Yes, sir.
7     Q.    Have you told her that?
8     A.    She pretty much knows. No, I
9 have not directly told her that, but . . .
10    Q.    What about Brenda Sims, do you
11 know Ms. Sims?
12    A.    Yes, sir.
13    Q.    How long have you known Brenda
14 Sims?
15    A.    Just for the little bit of
16 time that we worked at Millwork together.
17    Q.    She was only there a short
18 time; right?
19    A.    A short time, yes, sir.
20    Q.    Was she a friend of yours?
21    A.    She was a coworker.
22    Q.    But not a friend?
23    A.    No, sir. I mean, you know

18 (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 81

1  MR. DOUGLAS: Zachary, Tooty
2  Zachary.
3  A.  Zachary. Owensby was her
4  maiden name.
5  Q.  So, you've known her for a
6  while?
7  A.  Yes, sir.
8  Q.  Did y'all go to school
9  together?
10  A.  Part time. We went to
11  elementary school together. And then we
12  went to two different schools for several
13  years. Then we went to high school
14  together.
15  Q.  Is she a friend of yours?
16  A.  Yes, sir.
17  Q.  Is she a good friend?
18  A.  I consider her a good friend,
19  yes, sir.
20  Q.  Now, we talked earlier about
21  the meeting that y'all had with Mr. Hees.
22  Do you recall that?
23  A.  Yes, sir.

Page 82

1  Q.  Okay. And what was the
2  purpose of that meeting?
3  A.  To talk to him about some of
4  the things that Mr. Fetner had been doing.
5  Q.  Okay. And is that -- You said
6  earlier that Richard started doing these
7  things in 2004; is that correct?
8  MR. DOUGLAS: Object to the
9  form.
10  A.  Yes, sir. Most of it, I'd
11  say.
12  Q.  Okay.
13  A.  The worst part of it.
14  Q.  When had he started doing the
15  things that you wanted to tell Mr. Hees
16  about, and he being Mr. Fetner?
17  A.  Probably the beginning of --
18  the end of 2003, the beginning of 2004.
19  Q.  So, sometime in December of
20  '03, January of '04?
21  A.  Yes, sir.
22  Q.  Who told you to attend the
23  meeting?

Page 83

1  A.  Who told me to attend the
2  meeting with Dan Hees?
3  Q.  Yes, ma'am.
4  A.  Nobody told me to attend it.
5  We had just all got together and spoken
6  about it. And I think Lorena or Linda, one,
7  told Dan that we all wanted to talk to him
8  sometime that day about Richard.
9  Q.  Okay. And then someone told
10  you that there would be a meeting in the
11  morning in the paint room?
12  A.  Yes, sir.
13  Q.  Okay. Who told you that?
14  A.  I want to say it was Lorena or
15  Linda. I'm really not sure which one — you
16  know, exactly which one it was.
17  Q.  When you say: We all
18  got together and decided there needed to be
19  a meeting, who is we?
20  A.  That was me and Lorena and
21  Brenda and Linda and Cathy and Mary Lou.
22  Q.  Okay. And how did that
23  meeting begin?

Page 84

1  A.  We just all went to the paint
2  room and he just asked us one by one, you
3  know, what we had to say, or what our
4  problem was, should I say.
5  Q.  Okay. And who started?
6  A.  I'm really not sure. Cathy, I
7  want to say, but I'm not sure exactly who
8  went first.
9  Q.  Okay. And what did Cathy tell
10  Mr. Hees?
11  A.  Just the things that Richard
12  had made her do -- that Richard had done to
13  make her feel uncomfortable.
14  Q.  Do you remember what those
15  were?
16  A.  Just the things that he would
17  say to her. I don't remember specifics.
18  She said that he made her feel like that if
19  she didn't do things that he wanted her to
20  do, that her job would be jeopardized. I do
21  remember that.
22  Q.  Is that all you remember her
23  telling him?

21 (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1    A.    Yes, sir.
2    Q.    Okay. Ms. Thornton worked in
3  the paint room?
4    A.    Yes, sir.
5    Q.    Did you ever see Mr. Fetner
6  direct any conduct towards her that was
7  inappropriate?
8    A.    I never seen anything
9  firsthand. I just -- you know, the hearsay
10 of what she, you know --
11   Q.    She told you?
12   A.    -- what she would tell, yes,
13 sir.
14   Q.    Okay. After Ms. Thornton, who
15 went next? Let me ask you. What was
16 Mr. Hees's reaction to what Ms. Thornton
17 said?
18   A.    He kind of acted surprised and
19 stunned and, you know, wanted to know more.
20   Q.    Did he seem concerned about
21 her allegations?
22        MR. DOUGLAS:  Object to the
23 form.

Page 86

1    A.    Yes, sir.
2    Q.    All right. After
3  Ms. Thornton, who went next?
4    A.    I'm not sure the order that we
5  all went in. I mean --
6    Q.    That's fair enough. Who do
7  you recall going next? I guess if you don't
8  remember the order --
9    A.    I don't remember the order.
10   Q.    What do you recall being said
11 and who said it? In fact, why don't we do
12 it this way. What do you recall Ms. Minix
13 saying?
14   A.    Just Richard saying things
15 and, you know, doing things that made her
16 uncomfortable, as far as, you know, putting
17 his hands on her or just comments that he
18 would make to her.
19   Q.    Okay. Did she tell Mr. Hees
20 the types of things he would say or what
21 he'd said?
22   A.    I'm sure she did, but I don't
23 remember, you know.

Page 87

1    Q.    You just don't have any
2  specific recollection right now?
3    A.    No, sir.
4    Q.    What about the things that she
5  alleged he would do to her, do you remember
6  those?
7    A.    Just putting his hands -- I
8  mean, he would come up behind you, you know,
9  and put his hands around your waist or just
10 rub on you or stuff like that.
11   Q.    Okay. And what about Linda
12 Sims?
13   A.    Basically, the same, you know,
14 as far as the touching and the comments that
15 he would make.
16   Q.    That he would come up behind,
17 put his arms around her?
18   A.    Yes, sir.
19   Q.    Anything else?
20   A.    Just comments. I'm not sure
21 of the specific comments, but just little
22 things that he would say to people or me and
23 her and the other four.

Page 88

1    Q.    Okay. What was Mr. Hees's
2  reaction to Ms. Minix's report? Was it the
3  same as with Ms. Thornton?
4    A.    Yes, sir. He seemed kind of
5  stunned, but seemed concerned and, you know,
6  was trying to, you know, find out more, you
7  know, as much as he could about what was
8  going on.
9    Q.    Was he taking notes during
10 this time?
11   A.    I remember him writing our
12 names down. Yes, sir, I think he was taking
13 notes.
14   Q.    Same thing with Ms. Sims, was
15 his reaction the same to her report as well?
16   A.    Yes, sir.
17   Q.    Okay. What about Brenda Sims,
18 what did she report?
19   A.    Pretty much the same thing. I
20 mean, the comments, the touching.
21   Q.    We've been going about an hour
22 and fifteen minutes or so. Do you remember
23 whether or not Ms. Laws was at that meeting

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 89

1  or not now?
2      A.   I'm thinking she was.
3          MR. DOUGLAS:  I think it would
4  be fair to tell the witness, since we've
5  taken everybody else's deposition --
6      Q.   Yeah.  She wasn't there.  Our
7  impression is she was not there, that she
8  was out that day?
9      A.   I was thinking that she was
10  there.  Because you had asked me earlier:
11  Was she out with her finger?
12      Q.   Right.
13      A.   And I was thinking that
14  happened after that.  But, you know, that's
15  been a long time ago.  And I'm really not
16  sure.  But I was thinking she was there.
17  She might not have been, you know.
18          MR. DOUGLAS:  I just want the
19  witness to know that we've taken everybody
20  else's deposition.
21          THE WITNESS:  Yes, sir.
22          MR. DOUGLAS:  And they've said
23  things about you and the meeting and

Page 90

1  everything else.  So we've got a whole lot
2  of information.
3          THE WITNESS:  Yes, sir.
4          MR. DOUGLAS:  And everybody --
5  Most everybody says she was not there.
6          MR. WHITE:  But we haven't
7  talked to Ms. Laws, herself.
8          MR. DOUGLAS:  Sure.
9          MR. WHITE:  About whether or
10  not she was there and what she says about
11  that.
12          MR. DOUGLAS:  Anyway.  All
13  right.
14          MR. THOMPSON:  It would be
15  about five to one if she says she was there.
16      A.   I mean, like I -- You know,
17  I'm not sure.  I thought that there were six
18  of us in there, but . . .
19      Q.   That's about as fair enough.
20  Okay.  What did you report to Mr. Hees?
21      A.   Such things as Richard
22  touching me, making me feel uncomfortable,
23  comments he would make, things he would do.

Page 91

1  Just he'd come up behind you and reach
2  around you or make sure that he touched your
3  breast with his arm when he come by you, you
4  know.
5      Q.   Okay.  Let's kind of break
6  those down a little bit.  You said you told
7  Mr. Hees that Mr. Fetner touched you?
8      A.   Yes, sir.
9      Q.   Okay.  Where did he touch you?
10      A.   Well, he did touch me between
11  the legs one time, when I was sitting in his
12  office, talking to him about some
13  work-related stuff.
14      Q.   In your private area?
15      A.   Yes, sir.
16      Q.   Just the two of you in the
17  office?
18      A.   Yes, sir.
19      Q.   Okay.  So, to your knowledge,
20  no one saw that?
21      A.   Right.  Yes, sir.
22      Q.   Okay.  And did you tell
23  Mr. Hees that?

Page 92

1      A.   Yes, sir.  I do believe I did.
2      Q.   Okay.  Where else did
3  Mr. Fetner touch you?
4      A.   He would always come up behind
5  you and rub you on your back, you know, hug
6  you around the waist or take his arm and try
7  to touch your breast with it or some little
8  something like that.
9      Q.   Just kind of try to slide in a
10  touch?
11      A.   Yes, sir.
12      Q.   Any other times you contend he
13  touched you inappropriately?
14      A.   I mean, that was like an
15  everyday thing.
16      Q.   The rubbing you on the back
17  and trying to touch you?
18      A.   Yes, sir.
19      Q.   Okay.  And that's what began
20  in December of '03 or January of '04?
21      A.   Yes, sir.
22      Q.   Okay.  When did he touch you
23  between your legs in the -- in his office?

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1    A.    I don't remember a specific
2  date. I mean, it's — I mean, I don't know
3  any specific dates. I just know that it
4  happened.
5    Q.    That's fair enough. Was it in
6  the summer of 2004? Do you remember
7  generally when it happened?
8    A.    I'd say spring, summer, of
9  2004.
10    Q.    Okay. And he would come up
11  behind you when you were working on the
12  floor and rub your back?
13    A.    Yes, sir.
14    Q.    And hug on you and stuff?
15    A.    Yes, sir.
16    Q.    Okay. And you say that was
17  kind of constant from the first part of '04
18  through the end of his employment?
19    A.    Yes, sir.
20    Q.    You say he made you
21  uncomfortable at work.
22    A.    Yes, sir.
23    Q.    How would he make you

Page 94

1  uncomfortable at work?
2    A.    By coming up and rubbing on me
3  and touching me and just little comments
4  that he would make.
5    Q.    We've talked about all the
6  touching; right?
7    A.    Yes, sir.
8    Q.    What about the — Is there any
9  touching we haven't talked about?
10    A.    No, sir.
11    Q.    What type of comments would he
12  make to you?
13    A.    Just — I don't remember a
14  specific comment. Just, you know, something
15  about looking good that day. Just saying —
16  You know, just saying — Just saying it in a
17  vulgar way. I'm not sure on specific
18  comments, but it was stuff that made me feel
19  uncomfortable, I can tell you that.
20    Q.    Would he say it to you real
21  quietly where only you could hear it? Would
22  he whisper it in your ear? Would he — I
23  mean, how would he say it to you?

Page 95

1    A.    He did. Or I could be over
2  there at my machine by myself and he would
3  come by and say it to me there. Or he'd
4  come by and whisper something in your ear.
5    Q.    He'd do it where other people
6  couldn't hear it?
7    A.    Yes, sir.
8    Q.    Did he ever tell you you
9  needed to take a bubble bath to get rid of a
10  rash or something like that?
11    A.    I had a sunburn, an extremely
12  bad sunburn one time, and he offered me a
13  vinegar bath at his house on my lunch break.
14    Q.    Did you feel that was
15  inappropriate?
16    A.    Yes, sir.
17    Q.    Did he ever try to kiss you?
18    A.    Yes, sir.
19    Q.    How many times did that
20  happen?
21    A.    Once or twice.
22    Q.    Did you ever kiss him?
23    A.    No, sir.

Page 96

1    Q.    Did you ever have any intimate
2  contact with him at all?
3    A.    No, sir.
4    Q.    The way that he acted towards
5  you, was it sort of your understanding
6  that's the same way he acted towards
7  Ms. Minix, Ms. Sims, Ms. Sims and
8  Ms. Thornton?
9    A.    Yes, sir.
10    Q.    Where he sort of talked to
11  them quietly where other people couldn't
12  hear?
13    A.    Yes, sir.
14    Q.    Did you ever witness any
15  inappropriate conduct that he directed
16  towards Ms. Minix?
17    A.    I mean, I would see him come
18  up and you, you know, be talking to her, but as
19  far as me hearing anything, or, you know, I
20  would see him come up to the other ones and,
21  you know, rub them on the back or something
22  like that.
23    Q.    Okay. And how would they

24  (Pages 93 to 96)

## FREEDOM COURT REPORTING

Page 97

1  react?
2      A.     Most of the time they tried to
3  get away from him.
4      Q.     Just kind of shirk away from
5  him?
6      A.     Yes, sir.
7      Q.     Okay. Is that how Ms. Minix
8  would react?
9      A.     Yes, sir.
10      Q.     Do you ever recall seeing her
11  do that?
12      A.     Moving away from him?
13      Q.     Yeah.
14      A.     Yes, sir.
15      Q.     How many times?
16      A.     Several times.
17      Q.     And would that have been in
18  2004?
19      A.     Yes, sir.
20      Q.     What about Linda Sims, did you
21  ever see him direct any -- at the -- Let me
22  back up to Ms. Minix real quick.
23      A.     Yes, sir.

Page 98

1      Q.     When you saw him -- Did you
2  see him hug her?
3      A.     Yes, sir. He'd come around
4  and put his arm around her and squeeze them
5  up tight.
6      Q.     Okay. And could you tell --
7  How far away from them were you?
8      A.     I mean, within seeing
9  distance, but I wouldn't be able to hear
10  what they say. I'd be at a machine over
11  from them or something like that.
12      Q.     So, you couldn't hear what was
13  being said?
14      A.     No, sir. Not over the
15  machines running and --
16      Q.     So, you didn't know whether it
17  was a consensual hug or a nonconsensual hug?
18      A.     Right.
19      Q.     Same thing true for Ms. Sims,
20  Linda Sims?
21      A.     Yes, sir.
22      Q.     So, you couldn't hear what
23  Mr. Fetner was telling Ms. Linda Sims?

Page 99

1      A.     No, sir.
2      Q.     That's correct, you could not
3  hear what he was telling her; right?
4      A.     Right.
5      Q.     Okay. Did you see Mr. Fetner
6  hug Ms. Sims?
7      A.     Yes, sir.
8      Q.     Okay. And you couldn't tell
9  whether that hug was consensual or
10  nonconsensual?
11      A.     Well, I could see her kind of,
12  you know --
13      Q.     Shirking away from him?
14      A.     -- pulling away from him, yes,
15  sir.
16      Q.     But you didn't know why she
17  was pulling away?
18      A.     No, sir.
19      Q.     What about Brenda Sims? Well,
20  let me -- Did you ever see Mr. Fetner direct
21  any conduct towards Ms. Linda Sims that was
22  inappropriate?
23      A.     Just, you know, what I

Page 100

1  consider was inappropriate, him over there
2  hugging on her and, you know, her be pulling
3  away. To me, that's inappropriate, you
4  know, if the person is not wanting it.
5      Q.     Okay. But you couldn't tell,
6  just by looking, whether it was
7  inappropriate or not?
8      A.     Exactly.
9      Q.     Is that correct?
10      A.     Yes, sir.
11      Q.     Okay. What about Ms. Brenda
12  Sims, did you ever see Mr. Fetner direct any
13  conduct towards her that was inappropriate?
14      A.     Same as everybody else, the
15  hugging her and touching her.
16      Q.     Just hugging her?
17      A.     Rubbing her -- You know,
18  rubbing on the back and stuff like that.
19      Q.     Rubbing her on the back?
20      A.     Yes, sir.
21      Q.     How was -- How did Ms. Sims
22  react, Ms. Brenda Sims?
23      A.     Pretty much the same way as

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 101

1  everybody else did, trying to get away from
2  him.
3      Q.    Just kind of shirked away?
4      A.    Yes, sir.
5      Q.    Okay.  So, you couldn't tell,
6  from where you were standing, whether the
7  hug was consensual or nonconsensual or what
8  was being said?
9      A.    No, sir.
10     Q.    That's correct?
11     A.    Yes, sir, that's correct.
12     Q.    Ms. Thornton was sort of
13 isolated from everyone else?
14     A.    Yes, sir.
15     Q.    So, you never saw him direct
16 any conduct Ms. -- him being Mr. Fetner,
17 direct any conduct towards Ms. Thornton?
18     A.    No, sir.
19     Q.    You just know what she told
20 you?
21     A.    What she told me, yes, sir.
22     Q.    Other than those -- What about
23 Mary Lou Laws?  Did you ever see Mr. Fetner

Page 102

1  direct any conduct toward Ms. Laws that was
2  inappropriate?
3      A.    Just the touching and stuff,
4  and what she would tell me.
5      Q.    Okay.  Not what she told you,
6  but what you actually saw with your own two
7  eyes?
8      A.    The rubbing on the back.  The
9  same thing that he did to everybody else.
10     Q.    Rubbed her back?
11     A.    Rubbed her back.
12     Q.    Gave her hugs?
13     A.    Coming up and squeezing her
14 and hugging her.
15     Q.    Okay.  You saw all these hugs
16 from behind or did you see them from the
17 front?
18     A.    Just looking straight at them.
19 I mean, they could be turned this way, they
20 might be turned the other way.
21     Q.    Okay.  So, you saw them from
22 the front, back, side?
23     A.    Yes, sir.  All different

Page 103

1  angles.
2      Q.    Same thing, you couldn't hear
3  what he was telling her?
4      A.    Yes, sir.  No, sir, I could
5  not.  Sorry.
6      Q.    So, you didn't know whether
7  that hug was consensual or nonconsensual?
8      A.    No, sir.
9      Q.    That's correct, you don't
10 know?
11     A.    That's correct.
12     Q.    Okay.  Other than Ms. Minix,
13 the two Ms. Sims, Ms. Laws, and --
14          MR. DOUGLAS:  Thornton.
15     Q.    Yeah, but other than the four
16 of them, Ms. Minix, Ms. Sims, Ms. Sims, and
17 Ms. Laws, did you ever see with your own
18 eyes Mr. Fetner engage in any conduct that
19 was inappropriate?
20     A.    No, sir.
21     Q.    Did you ever see anyone else
22 at the JELD-WEN facility engage in any
23 conduct that was inappropriate and of a

Page 104

1  sexual nature?
2      A.    There was one guy that had a
3  fascination or something with Lorena, I
4  guess you did say.  But, you know, as far as
5  seeing him do anything, I can't say that I
6  seen him do anything.  It was just a known
7  thing that, you know, he would stand over
8  there and cry about her and stuff like that.
9      Q.    Was that Ronald Bowen?
10     A.    Yes, sir.
11     Q.    Did Ms. Minix ever tell you
12 anything about Mr. Bowen?
13     A.    Yes, sir.
14     Q.    What did she tell you?
15     A.    She would just tell me things
16 that he would say and fantasies that he
17 would tell her that he was having about
18 them.  She told me of an incident of
19 something that he was doing behind a
20 machine.  I never seen it for myself, you
21 know, but I know what she told me.
22     Q.    Okay.  And did she report that
23 conduct?

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1    A.    I don't think she actually
2  reported it herself.  I think somebody else
3  reported it.
4    Q.    Okay.  Did she ever tell you
5  whether she was satisfied with the result of
6  that conduct having been reported or not
7  satisfied or anything of that nature?
8    A.    Well, she made the comment
9  that she not wanting Ronald to lose his job,
10  but I think she was kind of relieved not to
11  have to work with him anymore.
12    Q.    So, did she actually tell you
13  she did not want him to lose his job?
14    A.    She did make that comment,
15  yes, sir.
16    Q.    Was that after his employment
17  ended?
18    A.    I think it was before and
19  after.  I mean, she made the comment a
20  couple of times.  You know, she didn't want
21  to have to put up with what he was doing,
22  but she didn't want him to have to lose his
23  job.

Page 106

1    Q.    Okay.  Did she ever tell you
2  she was satisfied with the result?
3    A.    She -- I don't remember her
4  ever making any comment about it.
5    Q.    Okay.  This meeting with
6  Mr. Hees, going back a little bit, what was
7  the mood of that meeting?
8    A.    The mood?
9    MR. DOUGLAS:  Object to the
10  form.
11    Q.    Was it serious?
12    A.    Yes, sir.
13    Q.    Okay.  Did anyone laugh during
14  the meeting?
15    A.    There was a few giggles, yes,
16  sir.
17    Q.    Okay.  Who giggled during the
18  meeting?
19    A.    I think everybody probably
20  giggled a couple of times, it was just pure
21  amazement of what some of the things that
22  Richard had done and said to them, you know.
23    Q.    Both the -- The five women who

Page 107

1  were present, as well as Mr. Hees?
2    A.    Yes, sir.
3    Q.    Okay.  So, you reported the
4  conduct to Mr. Hees, like the policy
5  required that you report it; is that
6  correct?
7    A.    Yes, sir.
8    Q.    Okay.  And you've already
9  testified what you wanted to happen, you
10  didn't want to work for Richard anymore?
11    A.    Yes, sir.
12    Q.    Okay.  Was the -- Do you need
13  a break or anything?
14    A.    No, sir.
15    Q.    Was the day that you guys met
16  with Mr. Hees, was that Mr. Fetner's last
17  day at JELD-WEN?
18    A.    Yes, sir.  I never seen him
19  out there anymore.
20    Q.    Okay.  Other than Mr. Fetner,
21  did anyone direct any conduct towards you
22  that you found to be sexually offensive?
23    A.    No, sir.

Page 108

1    Q.    Do you have any idea what
2  Mr. Fetner's intent was when he directed
3  this alleged conduct toward you?
4    MR. WHITE:  Object to the
5  form.  Both of us.  I'm sorry.  Didn't mean
6  to scare you.
7    MR. THOMPSON:  It's hard to be
8  quiet.
9    (Requested portion of the
10    Record was read by the
11    Reporter.)
12    A.    What was his intentions, I
13  guess you could say?
14    Q.    Yes, ma'am.
15    A.    To me, I felt like his
16  intentions was to have a relationship -- not
17  a relationship, but a sexual relationship or
18  -- you know, what he could do to get as
19  close as he could to us, you know
20    Q.    Okay.  Did you ever tell your
21  dad about what Mr. Fetner was allegedly
22  doing?
23    A.    No, sir.

27 (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1  Q.  Why not?
2  A.  Because I wanted my daddy to
3  keep his job.  And I knew if he found out
4  about it that he would probably lose his
5  temper.
6  Q.  Did you ever tell your mom?
7  A.  Yes, sir.
8  Q.  Did you tell your mom before
9  you told Mr. Hees?
10  A.  Yes, sir.
11  Q.  What did your mom tell you you
12  needed to do about it?
13  A.  To talk to somebody about it.
14  Q.  Talk to somebody over
15  Mr. Fetner?
16  A.  Yes, sir.  Somebody like Pat
17  Galvez or somebody above -- like somebody
18  above Mr. Fetner, yes, sir.
19  Q.  And that's what y'all did when
20  you talked to Mr. Hees?
21  A.  Yes, sir.
22  Q.  And your talking to Mr. Hees
23  was the first time you reported the conduct

Page 110

1  to anybody in JELD-WEN's management?
2  A.  Yes, sir.
3  Q.  How long before that meeting
4  with Mr. Hees did you talk to your mom about
5  it?
6  A.  Probably a month or so.
7  Q.  So, that would have been in
8  September of '04, sometime in there?
9  A.  Yes, sir.
10  Q.  Now, I may have already asked
11  this.  Whose idea was it to have the meeting
12  with Mr. Hees?
13  A.  Basically, all of us.  I mean,
14  we just all got together and was talking
15  about it and decided we needed to talk to
16  someone about it.
17  Q.  And you told me earlier you've
18  never met with anyone from the EEOC?
19  A.  No, sir.
20  Q.  Okay.  Does it surprise you to
21  know that the EEOC determined that there was
22  not cause to believe that JELD-WEN was
23  liable for sexual harassment?

Page 111

1  A.  Excuse me?
2  Q.  Would it surprise you to know?
3  A.  Would it surprise me?  No.
4  Q.  Is that because they got rid
5  of Mr. Fetner when you reported it?
6  A.  Yes, sir.
7  Q.  Did you -- You've already told
8  me that you didn't meet with Mr. Douglas and
9  Mr. White; correct?
10  A.  Correct.
11  Q.  Did you ever meet with any
12  other attorneys about these -- Mr. Fetner's
13  conduct?
14  A.  No, sir.
15  Q.  Did you ever meet with Chad
16  Lee?
17  A.  Oh, yes, sir, I did.  I'm
18  sorry.  I'm sorry.
19  Q.  That's all right.  Did you
20  know Chad was an attorney?
21  A.  Yes, sir.
22  Q.  Okay.  When did you meet with
23  Mr. Lee?

Page 112

1  A.  I'm not sure on the date.  I
2  can tell you where it was at, but . . .
3  Q.  Why don't you tell me where it
4  is, and we'll try to work out some of the
5  timing of it.
6  A.  It was at my babysitter's
7  house, Jean Windsor's house.
8  Q.  And Ms. Windsor baby-sits your
9  children?
10  A.  Yes, sir.
11  Q.  Okay.  And so, you met Mr. Lee
12  at Ms. Windsor's house; right?
13  A.  Yes, sir.
14  Q.  How did you come to meet with
15  Mr. Lee at Ms. Windsor's house?
16  A.  Ms. Windsor's sister works for
17  John Tinney, and John Tinney and Chad Lee
18  were working in the same office or still
19  working in the same office, maybe.
20  Q.  So, Ms. Windsor kind of set
21  you up with Mr. Lee?
22  A.  Well, no, she just kind of
23  volunteered -- We wanted to have a neutral

28 (Pages 109 to 112)

# FREEDOM COURT REPORTING

Page 113

1  place to meet and she just kind of
2  volunteered.  But she does not want to have
3  anything to do with this.  I mean, she knows
4  -- You know, she was not even in there when
5  we were having the meeting, we was just at
6  her house.
7       Q.    Fair enough.  And who all met
8  with Mr. Lee?
9       A.    That would be me, Lorena
10  Minix, Brenda Sims, Linda Sims, Cathy
11  Thornton.  And I know for a fact Mary Lou
12  Laws was down there that day.
13       Q.    So, six of you met with
14  Mr. Lee?
15       A.    Yes, sir.
16       Q.    Okay.  And that meeting was
17  before you met with Mr. Hees?
18       A.    Yes, sir.  I think so.
19       Q.    I think somebody else has
20  already testified it was before you met with
21  Mr. Hees.
22       A.    Yes, sir.
23       Q.    Do you have any recollection

Page 114

1  differently?
2       A.    No, sir.
3       Q.    And what did y'all discuss
4  with Mr. Lee?
5       A.    Basically, the -- Well, we
6  just told him what was going on and asked
7  him what should we do?  And he took down
8  statements, you know, from each of us, as
9  far as what had happened to us and
10  everything.  And he was -- I think he was --
11  he asked for our handbook and he was going
12  to try to find out what he could, you know,
13  as far as what we could do.
14       Q.    Okay.  And did he tell you to
15  tell somebody over Mr. Fetner what was going
16  on, to report it to somebody at JELD-WEN?
17       A.    I think he might have told us
18  that we had to, you know, go by the
19  guidelines in the handbook, as far as, you
20  know, because notifying somebody within the
21  JELD-WEN company about what was going on.
22       Q.    Somebody that JELD-WEN had
23  designated to accept these reports?

Page 115

1       A.    Yes, sir.
2       Q.    And you never retained Mr. Lee
3  as your counsel?
4       A.    No, sir.
5       Q.    That's correct, isn't it?
6       A.    That's correct.
7       Q.    Did any of the other ladies
8  who met with Mr. Lee on that day, did they
9  ever retain Mr. Lee as their counsel?
10       A.    Not to my knowledge.  I'm not
11  sure.
12       Q.    To your knowledge, the first
13  time that any of them reported it to
14  JELD-WEN management was that meeting y'all
15  had with Dan Hees?
16       A.    Yes, sir.
17       Q.    And no one has ever told you
18  any different?
19       A.    Right.
20       Q.    Okay.
21       A.    Yes, sir.  That's correct.
22       Q.    Let me just try to --
23  Ms. Thornton testified that the six ladies

Page 116

1  used to have lunch together at some picnic
2  tables; is that correct?
3       A.    Yes, sir.
4       Q.    And that during some of these
5  lunches, you discussed Mr. Fetner's conduct?
6       A.    Yes, sir.
7       Q.    Okay.  Is that true?
8       A.    Yes, sir.
9       Q.    Okay.  When -- When was the
10  time frame, relative to when you reported it
11  to Mr. Hees, that you guys were talking
12  about Mr. Fetner's conduct at these lunches
13  at the picnic tables?
14       A.    I'm pretty sure it was during
15  the summertime when we were talking about
16  this because we didn't eat lunch outside
17  during the wintertime.  So it was, you know,
18  summer, early fall.
19       Q.    That helps.  The picnic tables
20  were outside?
21       A.    Yes, sir.
22       Q.    And what did y'all discuss
23  during these lunches?

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1    A.    Just the different things he
2   would do, as far as the comments and the
3   touching.
4    Q.    And is this how you came to
5   know that he was directing this conduct
6   towards other women in the facility?
7    A.    Yes, sir.
8    Q.    Other than these picnic-table
9   lunches and the meeting with Mr. Lee, have
10   you discussed these allegations -- and the
11   meeting with Mr. Hees, have you discussed
12   these allegations about Mr. Fetner's conduct
13   with Ms. Minix at any other time?
14    A.    With Ms. Minix?
15    Q.    Uh-huh.
16    A.    Not that I can remember.
17    Q.    What about with Ms. Thornton?
18    A.    No, sir. I mean, you know, we
19   might, you know, talk to each other about it
20   at work, or something, but as far as outside
21   of work, you know, meeting to talk about it,
22   no, sir.
23    Q.    Okay. What about either of

Page 118

1   the Ms. Sims?
2    A.    Linda, like I said before, had
3   called me, you know, once or twice on the
4   phone.
5    Q.    When she called you, did you
6   talk about the allegations or did she just
7   ask you to go meet with either Mr. White or
8   Mr. Douglas?
9    A.    Yes, sir. She had asked me,
10   you know, would I, you know, go give my side
11   of the story or my statement about it, and
12   stuff.
13    Q.    Did you -- You said Mr. Chad
14   Lee took a statement from you.
15    A.    He took, like, notes from each
16   of us, what happened to us.
17    Q.    So, he had a note pad and he
18   took his notes down?
19    A.    Yes, sir.
20    Q.    He didn't ask you to sign
21   anything or anything like that?
22    A.    No, sir, we did not sign
23   anything.

Page 119

1    Q.    And you didn't read his notes?
2    A.    No, sir.
3    Q.    What about Mary Lou Laws, did
4   you ever talk to her about these
5   allegations, other than those times we just
6   talked about?
7    A.    No, sir.
8    Q.    When is the last time that you
9   saw Ms. Thornton?
10    A.    I seen her about three or four
11   weeks ago, just in a parking lot at a
12   grocery store in Roanoke, but, you know, it
13   was just a: Hey, how are you doing?
14    Q.    Is there more than one grocery
15   store in Roanoke?
16    A.    No, sir. Well, there's a
17   Wal-Mart grocery store -- There's the
18   grocery store in Wal-Mart and then there's a
19   Piggly Wiggly. And I seen her at the Piggly
20   Wiggly parking lot.
21    Q.    I grew up in a small town, and
22   I can go to Wal-Mart on a Saturday and see
23   half the people I graduated with.

Page 120

1        Anyway, other than the people
2   we've talked about today, have you discussed
3   the allegations that Fetner directed as
4   inappropriate conduct towards you with
5   anyone else?
6    A.    Just my mother.
7    Q.    Okay. And that was both
8   before and after you talked to Mr. Hees?
9    A.    Yes, sir.
10    Q.    To your knowledge, does your
11   dad even know, as of this day, what
12   happened?
13    A.    He knows -- He knows the
14   basic, you know, sexual harassment, but as
15   far as details about the situation, no, sir,
16   he does not know.
17    Q.    Where does he work now?
18    A.    I'm not sure of the name of
19   the place. It's a sewing plant in Roanoke
20   this man has just opened up. I'm not even
21   sure of the name of it.
22    Q.    Okay. Now, Mr. Hees met with
23   you a second time on that day; is that

30  (Pages 117 to 120)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 121

1  correct?
2     A.    It was either that day or the
3  next morning. I'm not sure.
4     Q.    Okay.
5     A.    But he did meet with us a
6  second time.
7     Q.    Okay. What did he tell you
8  during that meeting?
9     A.    That --
10    Q.    Mr. Fetner's employment had
11 ended?
12    A.    Yes, sir. That he had been
13 relieved of his job.
14    Q.    Did he tell you anything else?
15    A.    Just -- Not that I can recall.
16    Q.    Okay. And you were satisfied
17 with this result?
18    A.    Yes, sir.
19    Q.    Are you still satisfied with
20 that result, as you sit here today?
21    A.    Yes, sir.
22    Q.    Okay. Did Ms. Minix make any
23 comment about that?

Page 122

1     A.    Yes, sir. She wanted to know
2  if they were going to get anything for the
3  stuff that they had to put up, I guess you
4  would say.
5     Q.    Okay.
6     A.    Or we had put up with.
7     Q.    And did she say she was
8  looking for some money or something?
9     A.    I'm not -- I'm not for sure
10 that that exact -- that those exact words
11 come out of her mouth, but that was what I
12 felt like she was insinuating.
13    Q.    Okay. And what was Mr. Hees's
14 response?
15    A.    No, sir. He said: No, ma'am,
16 we would not be getting any kind of
17 compensation or anything, no, sir.
18    Q.    Okay. And as you sit here
19 right now, you remember that it was
20 Ms. Minix that said that?
21    A.    Yes, sir.
22    MR. DOUGLAS: Object to the
23 form of that last question.

Page 123

1     MR. THOMPSON: What's the
2  basis of the objection?
3     MR. DOUGLAS: Well, she said
4  compensation, and you asked a question: It
5  was Ms. Minix that said that? I think it
6  was Mr. Hees that the witness said used that
7  word, and I think this witness has said she
8  doesn't remember what words were used.
9     MR. THOMPSON: That's fair
10 enough.
11    Q.    I'm going to clarify. You
12 remember that Ms. Minix asked if you were
13 going to, quote: Get anything for it, end
14 quote; correct?
15    A.    Yes, sir.
16    Q.    Okay. You just don't remember
17 whether she said anything about --
18    A.    Monetary or --
19    Q.    -- or what exactly it was?
20    A.    -- what exactly, yes, sir.
21    Q.    Okay. What about Ms. Linda
22 Sims?
23    A.    Did she make a comment?

Page 124

1     Q.    Yes, ma'am. During that
2  second meeting with Mr. Hees.
3     A.    I really can't remember.
4     Q.    Brenda Sims?
5     A.    I really can't remember. I
6  remember somebody asking something about --
7  I think maybe was this going to be on his
8  record, you know, for the reason of him
9  getting fired, but, you know, I'm not -- I'm
10 not sure. I don't want to be down as saying
11 that somebody said that.
12    Q.    That's fair enough. You said
13 Mr. Fetner started acting inappropriately in
14 January of '04, is that correct, or December
15 of '03, January of '04, that time frame?
16    A.    Yes, sir.
17    Q.    Okay. Why didn't you report
18 it until October of 2004?
19    A.    Well, I needed my job. And
20 just like with Ms. Thornton, a lot of times
21 he made you feel like your job would be
22 jeopardized, you know, if anything was said
23 or done.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 125

1    Q.    Okay. And that was just a
2  feeling that you had?
3    A.    Yes, sir. He never come out
4  and said: Well, if you don't do this,
5  you're going to lose your job, but that was
6  just the feeling that you got from him.
7    Q.    That was just the sense you
8  had?
9    A.    Yes, sir.
10    Q.    Okay. Were you aware of
11  anybody ever losing their job for reporting
12  him?
13    A.    No, sir.
14    Q.    I'm not suggesting there was,
15  I'm just asking if you're aware of any.
16    A.    Yes, sir.
17    Q.    Okay. You worked at JELD-WEN
18  until mid-December of 2004; is that correct?
19    A.    Yes, sir.
20    Q.    Okay. What were you doing?
21    A.    What was I doing when I —
22    Q.    At the end?
23    A.    — at the end? I was working

Page 126

1  on the cutting line, I think.
2    Q.    Because they had closed the
3  moulding operations down?
4    A.    They had closed everything
5  down but the cutting line, I do believe.
6    Q.    Who were you working with on
7  the cutting line?
8    A.    That would be my daddy and
9  Belinda Morgan and Tooty, or Towanna,
10  whatever you want to call her, Liz —
11    Q.    I think we're the only three
12  people that call her Towanna.
13    A.    — Liz. I can't even remember
14  Liz's last name.
15    Q.    What about Patrick Williams?
16    A.    Patrick Williams and David —
17  David Hill and Luther McRae.
18    Q.    Okay. Luther McRae, was that
19  — was he the preacher?
20    A.    No. That was —
21    Q.    The other Luther?
22    A.    The other Luther.
23    Q.    Okay.

Page 127

1    A.    There was a young Luther and
2  the old Luther.
3    Q.    This was the younger Luther?
4    A.    This is the younger Luther.
5    Q.    Luther McRae was the younger
6  Luther?
7    A.    Yes, sir. Luther Phillips was
8  the older — was the preacher.
9    Q.    Okay. Luther Phillips was the
10  preacher. Okay. Who offered you the
11  opportunity to continue working on the cut
12  line in December?
13    A.    Okay. Bob.
14    Q.    Bob Boise?
15    A.    Yes, sir. That's it.
16    Q.    Did he offer that opportunity
17  to a group of people or did he come to you
18  individually and offer you that?
19    A.    There was several people that
20  he offered it to, I do believe.
21    Q.    Okay. Did he offer it to
22  Ms. Minix?
23    A.    I'm really not sure.

Page 128

1    Q.    Okay. Did she ever tell you
2  why she didn't continue to work until
3  mid-December?
4    A.    No, sir.
5    Q.    When did you first hear rumors
6  that JELD-WEN might close the plant down?
7    A.    Probably November of 2004.
8  October or November of 2004. I'm not sure.
9    Q.    So, a few months before it
10  actually closed down?
11    A.    Yes, sir.
12    Q.    Had you heard any rumors
13  before then that the plant might close or
14  the plant was in trouble, anything like
15  that?
16    A.    I heard rumors like that the
17  whole time I worked there, just about it.
18    Q.    Those rumors were always
19  floating around?
20    A.    Yes, sir.
21    Q.    Okay. Have you ever discussed
22  sex with Ms. Minix?
23    A.    Have I ever discussed sex with

32  (Pages 125 to 128)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 129

1   her?
2        Q.    Yes, ma'am.
3        A.    Yes, sir.
4        Q.    Okay.  When was that?
5        A.    Several occasions, just having
6   a girl-to-girl talk, I reckon.
7        Q.    What did she tell you?
8        A.    I don't remember any
9   specifics, you know, just — Just like I
10  said, a girl —
11       Q.    Did she tell you anything
12  about her relationship with Richard Fetner?
13       A.    Yes, sir.
14       Q.    What did she tell you?
15       A.    She said that they had dated,
16  and they had had sex one time and had not
17  had a relationship since then.
18       Q.    Was she mad about that?
19       A.    No, sir.  I don't think so.
20       Q.    When did she tell you that?
21       A.    Summer of 2004, maybe.
22       Q.    Did you ever date anyone who
23  worked at the Roanoke plant?

Page 130

1        A.    No, sir.
2        Q.    Did you ever date Joe Mendoza?
3        A.    No, sir.
4        Q.    Do you know who Joe Mendoza
5   is?
6        A.    Yes, sir.
7        Q.    His title was group manager?
8        A.    Group manager, assistant plant
9   manager, something.
10       Q.    Okay.
11       A.    Manager was all, you know —
12       Q.    Okay.  He was kind of like a
13  foreman?
14       A.    Yes, sir.
15       Q.    He worked under Pat Galvez?
16       A.    Yes, sir.
17       Q.    So, were you ever intimate
18  with Mr. Mendoza?
19       A.    No, sir.
20       Q.    Did you ever kiss him?
21       A.    No, sir.
22       Q.    Hold hands with him?
23       A.    No, sir.

Page 131

1        Q.    You never had sex with him?
2        A.    No, sir.
3        Q.    Okay.  Are you aware there are
4   rumors that you were doing those things with
5   him?
6        A.    Yes, sir.
7        Q.    How did you become aware of
8   those rumors?
9        A.    Just hearing them or people
10  asking me about them.
11       Q.    Have you always denied them?
12       A.    Yes, sir.
13       Q.    Did you ever tell anyone that
14  you were seeing Mr. Mendoza after work?
15       A.    No, sir.
16       Q.    Did you ever see him after
17  work?
18       A.    No, sir.
19       Q.    As far as you know, did he
20  drive straight home every day when work was
21  over?
22            MR. DOUGLAS:  Object to the
23  form of that question.

Page 132

1        A.    That, I don't know.
2        Q.    I'm just asking, as far as you
3   know?
4        A.    No, sir.  I mean —
5        Q.    You don't know any
6   different —
7        A.    I don't know anything about
8   his drive home.
9        Q.    Okay.  Did you ever date
10  Richard Fetner?
11       A.    No, sir.
12       Q.    Were you ever intimate with
13  him in any way?
14       A.    No, sir.
15       Q.    You never kissed him, held
16  hands with him or anything like that?
17       A.    No, sir.  Other than the time
18  that he tried to kiss me, but I did not kiss
19  him back, if that's considering us kissing,
20  you know.
21       Q.    I was more along the lines of
22  asking you if you ever willingly
23  participated?

33 (Pages 129 to 132)

# FREEDOM COURT REPORTING

### Page 133

1    A.    Willingly kissed him, no, sir.

2    Q.    Are you aware of anyone having

3  intimate contact, including sex of any type,

4  at the JELD-WEN workplace?

5    A.    At the workplace?

6    Q.    Right.

7    A.    No, sir.

8    Q.    To your knowledge, is Wendell

9  Williams related to anyone who worked at

10  JELD-WEN?

11    A.    He is married to the secretary

12  -- that was the secretary at JELD-WEN.

13    Q.    Cathy Conger?

14    A.    Cathy Conger, yes, sir.

15    Q.    And does -- I guess she's

16  Ms. Williams now?

17    A.    Ms. Williams, yes, sir.

18    Q.    Did you ever talk to -- And

19  Ms. Williams works there in the office?

20    A.    At what office?

21    Q.    At whatever they call it, WTW

22  Trucking?

23    A.    Yes, sir.  She was office

### Page 134

1  manager there.

2    Q.    Did you ever discuss Fetner's

3  conduct with Ms. Williams?

4    A.    I think I might have, once or

5  twice, but not -- you know, not in much

6  detail.

7    Q.    Have you ever seen Mr. Fetner

8  outside of work?

9    A.    Yes, sir.  As far as me and

10  him meeting out of work or just --

11    Q.    You're right.  That's not a

12  very good question.  Have you ever been over

13  to his house?

14    A.    Me and my sister-in-law took

15  the kids trick-or-treating over there one

16  Halloween, but that's it.

17    Q.    Okay.  Is that Stacy Cook

18  Overton?

19    A.    Yes, sir.

20    Q.    Did you go inside his house on

21  that occasion?

22    A.    Yes, sir.

23    Q.    Why did you go inside?

### Page 135

1    A.    The kids went in to get some

2  candy, and I do believe I used the restroom.

3    Q.    When you went inside to use

4  the restroom, did Mr. Fetner continue to --

5  Was Mr. Fetner sitting outside, handing out

6  candy when you got there?

7    A.    I think all of them were

8  standing, like, in the den or living room or

9  something, and I went and used the restroom.

10    Q.    By all of them, you mean Stacy

11  and the kids?

12    A.    Yes, sir.

13    Q.    Okay.  And Mr. Fetner was

14  inside the living room, also?

15    A.    With them, yes, sir.

16    Q.    Is that the only time you've

17  been to his house?

18    A.    Yes, sir.

19    Q.    Have you ever eaten a meal

20  with him?

21    A.    Yes, sir.

22    Q.    When was that?  How many

23  times?

### Page 136

1    A.    Once.

2    Q.    Okay.  When was that?

3    A.    I'm not sure of the date.  I

4  want to say August or September -- August,

5  maybe, of 2001.  August or September, maybe.

6  I'm not sure of the exact date.

7    Q.    Okay.  You're pretty sure it

8  was 2001, though?  I'm not saying it wasn't,

9  I'm just asking.

10    A.    Yes, sir.

11    Q.    All right.  Who else was --

12  Where did you eat a meal with him?

13    A.    That would be at my

14  sister-in-law's house.

15    Q.    Stacy Overton's?

16    A.    Stacy Overton's, yes, sir.

17    Q.    All right.  Who all was there?

18    A.    It was me and Stacy, Richard

19  and Heather Hartley.

20    Q.    Okay.  Was this on a Friday,

21  after work?

22    A.    I do believe so, yes, sir.

23    Q.    Okay.  And were you drinking

# FREEDOM COURT REPORTING

Page 149

1  really were?
2      A.    No, sir.
3      Q.    And nobody told you to
4  exaggerate your claims, did they?
5      A.    No, sir.
6      Q.    Were you put up to making the
7  complaint to Mr. Hees by anybody?
8      A.    No, sir.
9      Q.    Okay. You did that of your
10  own free will?
11      A.    Yes, sir.
12      Q.    And because the things that
13  were happening were offensive to you?
14      A.    Yes, sir.
15      Q.    And that's why you told
16  Mr. Hees?
17      A.    Yes, sir.
18      Q.    Ms. Minix didn't try to get
19  you to lie about Mr. Fetner or anything?
20      A.    No, sir.
21      Q.    I want to call your attention
22  to when you and Stacy Overton and Mr. Fetner
23  and the other lady, Heather, were at Stacy's

Page 150

1  house.
2      A.    Yes, sir.
3      Q.    Stacy testified that
4  Mr. Fetner told y'all that y'all owed him a
5  beer or some beers because he had gotten
6  y'all out of trouble for being late and
7  stuff. Does that sound right to you?
8      A.    He would always make little
9  comments that: Well, you owe me one. But,
10  you know, I'm not going to say it was
11  specifically for being late to work or what
12  it was for, but he would always make little
13  comments like: Well, you owe me for this or
14  something like that. I'm not going to say
15  it was specifically because we had been late
16  to work or anything.
17      Q.    Stacy said that's why he wound
18  up at her house, because he had said: Y'all
19  owe me one or that he — First of all, do
20  you recall him not getting y'all in trouble
21  if you were late or anything along those
22  lines?
23      A.    Well, I stay in trouble a lot

Page 151

1  being late, you know, honestly.
2      Q.    Okay.
3      A.    I mean, he might have fixed it
4  to where I didn't lose my job or something,
5  I'm not sure, but, I mean, he just --
6      Q.    Did he ever tell you he was
7  doing that for you?
8      A.    He might have made the
9  insinuation that he did. Whether he did or
10  he didn't, I'm not sure.
11      Q.    Okay. Do you — Would you
12  dispute Stacy's account if that's how it was
13  he came to be drinking beer with y'all?
14      A.    No, sir.
15      Q.    During the interviews with Dan
16  Hees, did he offer to speak with you
17  separately or individually?
18      A.    No, sir.
19      Q.    Was Mr. Hees one of the ones
20  laughing as y'all were telling of the
21  allegations -- as you were giving him the
22  allegations?
23      A.    Yes, sir. I mean, he cackled

Page 152

1  a couple of times, yes, sir.
2      Q.    Did the things that he was
3  laughing at, or cackling at, to use your
4  words, did you think those things were
5  funny?
6      A.    They might have been -- I
7  mean, it might have been funny, the way they
8  were coming out or being said, but in all
9  seriousness, no, sir, they were not funny at
10  all.
11      Q.    Would you have preferred to
12  have met with him alone?
13      A.    It really wouldn't have
14  mattered, as long as he heard what I had to
15  say.
16      Q.    Okay. You gave us your
17  current cell phone number. Were you using
18  that same cell phone number in 2003 and
19  2004?
20      A.    No, sir.
21      Q.    Do you know what number you
22  were using in 2003, 2004?
23      A.    Did I — I had a cell phone.

38 (Pages 149 to 152)

# FREEDOM COURT REPORTING

Page 153

1  No, it was not the same number, but I'm not
2  sure what the number was.
3      Q.    Who was your provider of cell
4  phone service back then?
5      A.    Unicel.
6      Q.    Are they still in business?
7      A.    Yes, sir.
8      Q.    Have they been bought out by
9  anybody?
10     A.    Not that I know of.
11     Q.    So, they're still called
12  Unicel?
13     A.    Yes, sir.
14     Q.    Okay.  You understand that to
15  verify information, we'll subpoena your cell
16  phone records?
17     A.    Okay.
18     Q.    Have you spoken to Joe Mendoza
19  in the last two years?
20     A.    In the last two years, no,
21  sir.
22     Q.    Not at all?
23     A.    No, sir.

Page 154

1      Q.    So, your cell phone records
2  would not reflect any telephone calls to
3  him?
4      A.    No, sir.
5      Q.    Nor him to you?
6      A.    No, sir.
7      Q.    Do you know if Mr. Mendoza had
8  a cell phone back when you guys were working
9  together?
10     A.    Yes, sir.
11     Q.    Who is your cell phone service
12  with now?
13     A.    Unicel.
14     Q.    Same company?
15     A.    Yes, sir.
16     Q.    I jotted down several things
17  that you said when you were talking about
18  your allegations towards Mr. Fetner, and I'd
19  like you to elaborate on them, if you could.
20     A.    Okay.
21     Q.    Okay.  You said that Richard
22  would make little comments --
23     A.    Yes, sir.

Page 155

1      Q.    -- when he was touching you
2  inappropriately; is that correct?
3      A.    Yes, sir.
4      Q.    What were those comments?
5      A.    You know, I don't remember
6  specifics.  I mean, he would say something
7  like, you know, to the extent:  You're
8  looking good today, or you're looking hot
9  today, or something like that.  You know, I
10  don't remember exactly what was said, but
11  that would be to the extent of it.
12     Q.    Did he ever proposition you?
13  Did he ever ask you for any type of sexual
14  favor?
15         MR. THOMPSON:  Object to the
16  form.
17     A.    I would say not directly, but,
18  you know, he would insinuate it.
19     Q.    Tell me how he would insinuate
20  it.
21     A.    Well, you know, I took the
22  vinegar bath that he offered me at my lunch
23  break, you know, I took that, you know, as

Page 156

1  if I went over there, he might try
2  something, but, you know, I don't know.
3      Q.    Do you recall testifying
4  earlier today that some of his comments were
5  dirty?  Do you remember saying he would make
6  dirty comments?
7      A.    Yes, sir.
8      Q.    What dirty comments would he
9  make?
10     A.    Like, dirty jokes, you know,
11  some kind of little dirty joke.  Just -- I
12  don't remember specifics.  I mean, I just
13  know, you know, the stuff he said, you know,
14  was vulgar and stuff.
15     Q.    So, would these dirty jokes
16  have sexual connotations to them, they were
17  about sex?
18     A.    Yes, sir.
19     Q.    And he would tell them to you
20  in the work places?
21     A.    Yes, sir.
22     Q.    Did you hear him tell them to
23  other people in the workplace?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 157

1    A.    Sometimes. You know, there
2 might be one or two of us, you know,
3 standing there, and he'd tell us together,
4 or we might be individual, different times
5 and, you know, different people there.
6    Q.    And he'd tell them a lot,
7 wouldn't he?
8    A.    Yes, sir.
9    Q.    Do you recall any of the jokes
10 in specific?
11    A.    No, sir.
12    Q.    Do you recall if he would use
13 any vulgar words to describe either sex or
14 sexual parts of the human body?
15    A.    No, sir.
16    Q.    You don't remember or he
17 didn't?
18    A.    I don't remember.
19    Q.    And you don't remember any of
20 the specific jokes that he told?
21    A.    No, sir, I do not.
22    Q.    You testified that when you
23 spoke to your mother regarding what

Page 158

1 Mr. Fetner was doing, that I believe you
2 said that: You tell Pat Galvez or somebody.
3 Do you remember testifying to that earlier
4 today?
5        MR. THOMPSON: Object to the
6 form. That's not what she said. She said
7 her mom told her to tell Pat Galvez.
8    Q.    Did your mom tell you to tell
9 Pat Galvez?
10    A.    Yes, sir. She told me I
11 needed to talk to someone about it.
12    Q.    Okay.
13    A.    She suggested Pat Galvez.
14    Q.    Did your mom suggest Galvez or
15 was that what you were thinking when your
16 mom said somebody?
17    A.    My mom suggested Pat.
18    Q.    Okay. So, Mr. Galvez was
19 there while this conduct was going on?
20    A.    Yes, sir.
21    Q.    And you saw Mr. Fetner put his
22 arms on other female workers?
23    A.    Yes, sir.

Page 159

1    Q.    He did that in the open?
2    A.    Yes, sir.
3    Q.    And during this time,
4 Mr. Galvez was head of the plant; is that
5 correct?
6    A.    Yes, sir.
7    Q.    Did you ever witness -- I
8 believe you testified you did witness
9 Mr. Fetner rubbing up against other women's
10 breasts when he would hug them?
11    A.    Yes, sir.
12    Q.    So, that was done in public?
13    A.    Yes, sir.
14    Q.    And you saw it?
15    A.    Yes, sir.
16    Q.    And Mr. Galvez was plant
17 manager at the time?
18    A.    Yes, sir.
19    Q.    You're certain of all that?
20    A.    Yes, sir.
21    Q.    You testified that you heard
22 rumors that Richard Fetner had to leave
23 Wellborn because of sexual harassment

Page 160

1 allegations.
2    A.    Yes, sir.
3    Q.    First of all, who told you
4 this?
5    A.    I'm not for certain. I'm not
6 sure. It's just, you know, when you work in
7 a big plant like Wellborn was, rumors fly
8 everywhere. And I'm not sure on any names
9 or -- you know, it was just rumors, pure
10 rumors.
11    Q.    Do you think the person that
12 told you of the rumors was a coworker?
13    A.    I think they might have been
14 employed at Wellborn, but I'm not sure, at
15 one point in time, you know.
16    Q.    Do you think it was somebody
17 that you talked with on a regular basis at
18 Wellborn?
19    A.    No, sir. I mean, I'm really
20 not sure who it was. I just remember it
21 being said.
22    Q.    By somebody else; right?
23    A.    Yes, sir.

40  (Pages 157 to 160)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1    Q.    Not you?
2    A.    Not me.
3    Q.    Do you recall any of the names
4  of the people who were allegedly being
5  harassed?
6    A.    No, sir.
7    Q.    Do you know who, if anybody,
8  Mr. Fetner dated at Wellborn?
9    A.    There was one girl, but I'm
10  not sure of what her name was.
11    Q.    Do you know any of the letters
12  in either her first or last name?
13    A.    No, sir. I mean . . .
14    Q.    When you left JELD-WEN, when
15  the plant closed, you signed a severance and
16  release agreement?
17    A.    Yes, sir.
18    Q.    Do you recall how much money
19  you got?
20    A.    I want to say right around a
21  thousand dollars, maybe.
22    Q.    Back to the Wellborn question
23  again. The rumors that you heard about

Page 162

1  Fetner were while you were working at
2  Wellborn; right?
3    A.    It was right at -- I think,
4  yes, sir.
5    Q.    So, you were working there at
6  the time you heard the rumors?
7    A.    Yes, sir. And I even heard
8  more rumors after I was not working there.
9    Q.    Okay.
10    A.    Because he quit after I quit.
11    Q.    Who told you the rumors after
12  you stopped working there?
13    A.    I'm not sure.
14    Q.    Really?
15    A.    Really. I'm not sure.
16    Q.    Do you remember the names of
17  any of the people he was rumored to have
18  harassed?
19    A.    No, sir. I never heard any
20  names except that one lady, and I cannot
21  remember her name.
22    Q.    She worked at Wellborn with
23  you?

Page 163

1    A.    She didn't work with me. She
2  worked at Wellborn in a different
3  department.
4    Q.    Do you know if she was white
5  or black?
6    A.    No, sir -- Well, I think she
7  was white, yes, sir. I think she was white.
8    Q.    Do you know if she was old or
9  young?
10    A.    That, I do not know.
11    Q.    Do you have a sense of whether
12  she was older or younger than you?
13    A.    I would say she was older than
14  me.
15    Q.    Do you know a Jackie Hodnet?
16    A.    Jackie Hodnet?
17    Q.    Yes.
18    A.    No, sir.
19    Q.    I believe you stated that your
20  complaint regarding Mr. Fetner at JELD-WEN
21  was made to Mr. Hees and Mr. Hees only; is
22  that correct?
23    A.    Yes, sir.

Page 164

1    Q.    Why didn't you tell
2  Mr. Galvez, like your mom said?
3    A.    Because all of us got together
4  and decided we'd just talk to Dan about it.
5    Q.    Do you remember testifying
6  earlier that you felt if you said anything,
7  that Richard said some things that made you
8  feel like your job would be in jeopardy?
9    A.    Yes, sir.
10    Q.    What would he say that would
11  make you feel that way?
12    A.    Well, if you ever did anything
13  against him or to make him mad, he would --
14  it seemed like he would deliberately put you
15  on jobs that he knew you didn't like or just
16  give you a really hard time at work.
17    Q.    What do you mean, give you a
18  real hard time?
19    A.    I mean, just stay on you
20  constantly, you know, about: You're not
21  doing this good enough, you're not doing
22  that good enough, you know, you need to be
23  faster, you know, you need to do this

41 (Pages 161 to 164)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1  A.   I remember hearing that rumor,
2  but I did not hear it from her.  And I can't
3  remember whether she said anything to Mr. --
4  to Dan about it or not.  I can't remember.
5  But I remember -- I'm not going to say she
6  directly told me that, but I remember
7  hearing that said.
8  Q.   Mr. Hees testified that she
9  told him that in that meeting.
10  A.   He testified to that?
11  Q.   Yeah.  Would you dispute that?
12  A.   No.  I mean, I'm not sure if
13  she told me or not, but I did hear, you
14  know, that being said.  But I'm not -- you
15  know.
16  Q.   About how many gatherings did
17  you have with any of the other women where
18  you discussed Mr. Fetner's behavior?
19  A.   Outside of work or at work?  I
20  mean, every day we ate lunch, you know, --
21  Q.   Y'all talked about it every
22  day?
23  A.   I'm not going to say every

Page 178

1  day, but it was talked about often.
2  Q.   At least once a week?
3  A.   Yes, sir.
4  Q.   And were y'all just exchanging
5  stories of the things he had done to you?
6  A.   Yes, sir.
7  Q.   Did you tell them about him
8  rubbing you?
9  A.   Yes, sir.
10  Q.   And they told you about the
11  things he had done to them?
12  A.   Yes, sir.
13  Q.   Now, with regard to Cathy
14  Thornton, is there anything else that Cathy
15  told you, either at those gatherings or in
16  the meeting with Mr. Hees, that you hadn't
17  testified to?
18  A.   She didn't tell me, but it was
19  relayed to me through one of the other girls
20  that there was something else that happened,
21  but as far as Cathy telling me, she hadn't
22  told me anything.  There is one thing that
23  I mean, I was told that her and Richard had

Page 179

1  sex.
2  Q.   Who told you that?
3  A.   It was Lorena, I do believe.
4  Q.   When did she tell you that?
5  A.   I'm trying to think if it was
6  the meeting -- if it was before we had the
7  -- I think it was before the meeting we had
8  with Dan.
9  Q.   Anything else that Cathy told
10  you that you hadn't testified about?
11  A.   Not that I can remember.
12  Q.   Okay.  What did Lorena tell
13  you that Mr. Fetner was doing, either in the
14  gatherings or in the meeting with Dan Hees,
15  to her?
16  A.   To her?  You know, just the
17  touching and the comments.  You know, the
18  same thing he was doing to everybody.  I
19  mean, you know, we basically figured out
20  that he was going around each morning, you
21  know, saying the same thing to every one of
22  us, and doing the same thing, you know, the
23  little touching and rubbing and hugging.

Page 180

1  Q.   By comments, you mean the
2  dirty jokes?
3  A.   The dirty jokes or:  You sure
4  are looking good this morning, you know, or
5  something like that.
6  Q.   Did you ever hear him make a
7  remark to Linda Sims that her butt looked
8  like basketballs or anything along that
9  line?
10  A.   I didn't hear the comment.  I
11  heard, you know, through them that he made
12  the comment about her butt looking like the
13  basketballs.  I didn't actually hear him say
14  it.
15  Q.   What did Linda tell you that
16  he had done to her, Linda Sims?
17  A.   You know, the touching, the
18  hugging, the comments.  I mean, you know,
19  you could -- You know, you'd see him walk
20  over there and put his arm around her and
21  squeeze up.  You'd see her try to get away.
22  Just same stuff.
23  Q.   How about Brenda Sims, what

45 (Pages 177 to 180)

# FREEDOM COURT REPORTING

Page 201

1  would say that such and such made the
2  comment, that, you know, they noticed
3  Richard, you know, putting his arm around a
4  woman or something, you know. Like you
5  said, general knowledge.
6      Q.    So, he wasn't -- Fetner wasn't
7  trying to hide what he was doing?
8          MR. THOMPSON:  Object to the
9  form.
10     A.    No.
11     Q.    All right. I want to ask you
12 about one other thing.
13     A.    Okay.
14     Q.    And before I ask you, I'll
15 tell you that Cathy Thornton testified about
16 all of y'all going to see Chad Lee.
17     A.    Yes, sir.
18     Q.    You remember you forgot about
19 that and then remembered it later?
20     A.    Yes, sir.
21     Q.    Let me ask you this. Why did
22 you go see Mr. Lee?
23     A.    Because we -- We were not sure

Page 202

1  what to do, you know, how to go about, you
2  know, talking to anybody about the
3  situation. And when we talked to him, you
4  know, that's when he advised us to get the
5  handbook and, you know, see how their policy
6  was and what we should do.
7      Q.    You understand that lawyers
8  file lawsuits sometimes, don't you?
9      A.    Sir?
10     Q.    You understand that lawyers
11 file lawsuits sometimes, don't you?
12     A.    Yes, sir.
13     Q.    Did you ever consider filing a
14 lawsuit?
15     A.    Maybe for a slight moment,
16 but, no. I just didn't want any thing --
17 You know, once I didn't have to work with
18 Richard Fetner anymore, I was satisfied.
19     Q.    Plus, you had signed a
20 release?
21         MR. THOMPSON:  Object to the
22 form.
23     A.    Right.

Page 203

1      Q.    Is that right?
2      A.    Yes, sir.
3      Q.    You had signed a release,
4  releasing your claims for your severance;
5  correct?
6      A.    Right. Yes, sir.
7      Q.    Did that have anything to do
8  with why you didn't file a lawsuit?
9      A.    No, sir.
10     Q.    Nothing at all?
11     A.    Nothing at all.
12     Q.    I'll go ahead and tell you
13 that Cathy Thornton admitted in her
14 deposition that she did have sex with
15 Mr. Fetner.
16     A.    Yes, sir.
17     Q.    Does that surprise you?
18     A.    Well, I think I -- Well, I
19 told you that she didn't tell me directly,
20 but I had heard from Lorena that I think
21 that she did.
22     Q.    She testified that she was
23 just trying to get him off her back?

Page 204

1      A.    Yes, sir.
2      Q.    Does that surprise you?
3      A.    No, sir. That's --
4      Q.    Why doesn't that surprise you?
5      A.    Probably because he aggravated
6  her so much that she would do anything to,
7  you know, get him to give her a break or,
8  you know, lighten up on her or something.
9      Q.    And you can understand that
10 thinking?
11         MR. THOMPSON:  Object to the
12 form.
13     A.    Yes, sir.
14     Q.    Did you ever think about doing
15 that, just to get him off your back?
16     A.    As far as having sex with him?
17 No, sir. You know I just had to deal with
18 it.
19     Q.    My last subject is, I want to
20 talk to you about Mr. Mendoza. And I want
21 to tell you that in addition to subpoenaing
22 your records, I'll also subpoena his cell
23 phone records.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 217 |
| --- |

1    MR. THOMPSON: I've just got a
2 couple of follow-ups.
3    EXAMINATION CONTINUED
4 BY MR. THOMPSON:
5    Q.    Mr. Douglas asked you about
6 some cell phone conversations that you had
7 with Mr. Mendoza. Do you recall that
8 testimony a few minutes ago?
9    A.    Yes, sir.
10    Q.    Were those telephone
11 conversations, were they between the time
12 that Mr. Mendoza left and the time that your
13 employment with JELD-WEN ended?
14    A.    Between the time that he left
15 and my employment —
16    Q.    Between the time he left
17 Roanoke and the time your JELD-WEN
18 employment ended.
19    A.    Yes, sir.
20    Q.    Do you recall when they were?
21    A.    No, sir.
22    Q.    Okay. Were they a few months
23 after he left, or can you quantify it in

| Page 218 |
| --- |

1 that way in any way?
2    A.    I'd say a month or so after he
3 left.
4    Q.    You testified that Mr. Fetner
5 was telling what I'll characterize
6 inappropriate jokes in the workplace. Okay?
7    A.    Yes, sir.
8    Q.    Dirty jokes?
9    A.    Yes, sir.
10    Q.    Who else was telling dirty
11 jokes in the workplace?
12    A.    I guess we could all be guilty
13 of that at one time or another.
14    Q.    Everybody was telling dirty
15 jokes?
16    A.    I'm not going to say
17 everybody, no.
18    Q.    Lorena Minix was telling dirty
19 jokes in the workplace?
20    A.    Oh, yes.
21    Q.    Often?
22    A.    You know, every once in a
23 while. I'm not going to say every day or

| Page 219 |
| --- |

1 something like that.
2    Q.    Do you remember any of the
3 jokes that she told?
4    A.    No, sir.
5    Q.    You just remember she told
6 dirty jokes?
7    A.    Yes, sir. And, you know, this
8 may make me sound bad, so did I, you know.
9    Q.    And it was — Would y'all just
10 laugh if the joke was funny?
11    A.    Yes, sir.
12    Q.    Did you take offense at the
13 jokes?
14    A.    No, sir.
15    Q.    What about Ms. Sims and
16 Ms. Sims, do you remember them telling jokes
17 in the workplace?
18    A.    I'm not going to say for sure,
19 you know.
20    Q.    And they were only there a
21 short time?
22    A.    Yes, sir.
23    Q.    Do you remember what your

| Page 220 |
| --- |

1 starting pay was with Millwork Specialties,
2 or do you remember about what it was?
3    A.    I want to say it was — It was
4 either — It was between — It was either
5 six-fifty or seven. I'm not sure exactly
6 which one it was.
7    Q.    What was your pay at the time
8 the plant closed?
9    A.    I had just got to top pay for
10 machine operators, and it was 9.08, I do
11 believe.
12    Q.    And at no time did your pay
13 decrease while you were working at JELD-WEN?
14    A.    No, sir.
15    Q.    That is correct; right?
16    A.    That is correct.
17    Q.    You testified that, what I
18 wrote down is: We all got together and
19 bought Mr. Smith some type of red bikini
20 underwear. Do you remember that testimony?
21    A.    Yes, sir.
22    Q.    Okay. Who is we all got
23 together? Who is the we?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 221

1    A.    I mean, it was pretty much
2  everybody that worked for Phil, I mean --
3    Q.    That would have included who?
4    A.    Me, and I want to say Lorena
5  and them was working for him at the time.
6    Q.    Who is and them?  The Sims
7  ladies?
8    A.    No.  I don't think they were
9  working there at the time.  Some people up
10 front, like Deana -- I'm not sure who all
11 pitched in.  I just know the people that was
12 working there, you know, because I didn't
13 take up the money.
14   Q.    Okay.  Who took up the money?
15   A.    I don't know who took up the
16 money.  I want to say Richard took up the
17 money, but I'm not --
18   Q.    Was it funny?
19   A.    Yes, sir, it was funny.
20   Q.    Was it real funny?
21   A.    Yes, sir.
22   Q.    Did you observe anyone who
23 took offense to it?

Page 223

1         MR. WHITE:  We're done.  Thank
2  you.
3  (The deposition was concluded at 1:17 p.m.,
4  May 18, 2006.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 222

1    A.    No, sir.
2    Q.    Last thing I want to ask you
3  about is, you -- Mr. Douglas was asking you
4  about being in trouble or for something
5  along those lines.  And then you said
6  something to the effect that you stayed in
7  trouble about being late.  Do you remember
8  that?
9    A.    Yes, sir.
10   Q.    Okay.  When JELD-WEN started
11 running the plant, you became a JELD-WEN
12 employee, they enforced their policy more
13 strictly than Millwork Specialties had?
14   A.    Yes, sir.
15   Q.    And you were disciplined per
16 their policy?
17   A.    Yes, sir.
18   Q.    Okay.  And so you noticed that
19 they enforced their policies more strictly
20 and took more serious stuff like that?
21   A.    Yes, sir.
22        MR. THOMPSON:  I appreciate
23 you driving down today.

Page 224

1         REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4       I, Angela Smith, Registered
5  Professional Reporter and Commissioner for
6  the State of Alabama at Large, do hereby
7  certify that the above and foregoing
8  proceeding was taken down by me by
9  stenographic means, and that the content
10 herein was produced in transcript form by
11 computer aid under my supervision, and
12 that the foregoing represents, to the best
13 of my ability, a true and correct
14 transcript of the proceedings occurring on
15 said date and at said time.
16      I further certify that I am neither
17 of kin nor of counsel to the parties to the
18 action; nor in any manner interested in the
19 result of said case.
20
21
                          _____
22                        Angela Smith, RPR, CRR,
                          for the State of
23                        Alabama at Large.

56  (Pages 221 to 224)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660