IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| LORENA MINIX, et al., | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:05cv685-T |
| | ) | |
| JELD-WEN, INC. | ) | |
| | ) | |
| DEFENDANT. | ) | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT JELD-WEN, INC.'S
MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** all Plaintiffs and move this Honorable Court deny Defendant Jeld- Wen, Inc.'s Motion for Summary Judgment.

**I. PROCEDURAL HISTORY**

On July 26, 2005, Plaintiffs filed this lawsuit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000 et. al., 42 U.S.C. 1981(a), and a state law claim of outrage. Plaintiffs have dismissed the claims against Defendant Richard Fetner, without prejudice, as he previously filed for bankruptcy protection. Plaintiffs have also dismissed their outrage claims against Defendant Jeld-Wen, Inc. Defendant Jeld-Wen, Inc. has filed a Motion for Summary Judgment. As to the Plaintiffs' remaining claims, this opposition follows.

## II. FACTS

Plaintiffs Lorena Minix, Brenda Sims, and Linda Sims are all former female employees of Defendant Jeld-Wen, Inc. (hereinafter "Defendant"). All three Plaintiffs were subjected to unwelcome workplace harassment by their supervisor, Richard Fetner. Additionally, three other women, Kathy Thornton, Lisa Cook, and Stacy Cook Overton[1] were also subject to Fetner's unwelcome and unlawful harassment. Although the three Plaintiffs are making identical claims, the factual circumstances regarding each Plaintiff's experience is somewhat different, therefore; each Plaintiff's factual allegations will be recounted separately.

A.    **Plaintiff Lorena Minix's factual basis for her claims.**

Plaintiff Lorena Minix was hired by Fetner to work for Millworks Specialty, Inc. in September of 2001.[2] (Minix depo. p. 174, ll.16-23). Defendant eventually took over operation of this facility in late 2001 or early 2002 and retained Fetner and Plaintiff Lorena Minix as employees. (Hees depo. p. 37, ll.16-25). Fetner was Plaintiff Lorena Minix's supervisor. (Minix depo. p. 183, ll. 11-14). In 2003, Plaintiff Lorena Minix was sexually harassed by a co-employee, Ronald Bowen, who masturbated in front of her on the job. (Minix depo. p. 219, ll. 7-10).

Ms. Minix complained to her supervisor, Fetner, but it was only when another co-employee reported the conduct to Pat Galvez, the general manager of the facility, that an investigation took place. (Minix depo. p. 222, ll. 1-5).[3] Although not part of Plaintiff

---

[1] Although Ms. Overton was harassed by Fetner while both were employed by a company other than Defendant, her testimony is relevant to show the propensity of Fetner which was ignored by Defendant.
[2] Ms. Minix previously worked at the facility in the 1990's.
[3] Notwithstanding Defendant's assertion to the contrary, Minix was not at all pleased with the investigation as she was made to work with Bowen an additional two weeks after the incident, even though the incident was corroborated by another employee. (Minix depo. p. 222, ll. 22, 23).

Lorena Minix's claims, this incident illustrates the environment the Plaintiffs were made to work in as well as Fetner's indifference to it.

During 2001 and early 2002, Plaintiff Lorena Minix and Fetner were sexually involved. (Minix depo. p. 207, ll. 20-22). In 2004, although the consensual relationship was over, Fetner began to sexually harass Ms. Minix. Ms. Minix testified, "He'd come behind you and hug you, but, he'd put his arms across your boobs, or he'd spank you on your butt. But he was always talking --- talking that stuff, you know, like; let's go have about four hours of sex." (Minix depo. p. 27, ll. 3-8). Ms. Minix indicated that his conduct happened, "every day or every other day." (Minix depo. p. 279, ll. 2, 3).

Fetner also offered to "fix" Ms. Minix's time card if she would go to his house to drink beer and have sex. (Minix depo. p. 284, ll. 2-14). Furthermore, Fetner once told Ms. Minix, "I'd like to eat you from the top of your head to you toes." (Minix depo. p. 285, ll. 6-8). Again, Ms. Minix indicated this conduct was an everyday or every other day occurrence for months. (Minix depo. p. 310, ll. 2-6). This conduct continued until Fetner was allowed to resign and receive a severance package of over eight-thousand-dollars ($8,000.00). (See discussion infra.)

**B.      Plaintiff Brenda Sims' factual basis for her claims**

Plaintiff Brenda Sims began working for Defendant through a personnel company and became an employee of Defendant on or about June 1, 2004. (Brenda Sims ex. 18). Plaintiff Brenda Sims was also interviewed, hired, and supervised by Fetner. (Brenda Sims depo. p. 106, ll. 13-16). Ms. Brenda Sims was victimized by Fetner's advances immediately after she was hired. (Brenda Sims depo. p. 152, l. 20).

Fetner, on two occasions, rubbed Plaintiff Brenda Sims' legs, once close to her knee and the other time on her upper thigh. (Brenda Sims depo. pp. 150, 151, ll. 22, 23, 1-19). Both instances occurred in Fetner's office. Id. Fetner also twice touched Ms. Brenda Sims' breast. (Brenda Sims depo. pp. 153, 154). On one occasion, Fetner came up beside Ms. Brenda Sims and touched her breast while putting his arm around her. Id. On another occasion, he simply grabbed her breast, after calling her into the break room. Id.

In addition to the physical harassment, Fetner propositioned Ms. Brenda Sims repeatedly. (Brenda Sims depo. p. 160, ll. 12-15). From June 2004 though August 2004, Fetner told Ms. Brenda Sims that, should she come to his house, she wouldn't have to worry about missing work time. (Brenda Sims depo. pp. 158, 159, ll. 22, 23, 1, 2). Ms. Brenda Sims indicated that she thought Fetner was attempting to have sex with her. (Brenda Sims depo. p. 165, ll. 1, 2).

C.  **Plaintiff Linda Sims' factual basis for her claims**

Plaintiff Linda Sims (no relation to Brenda) became an employee of Defendant on or about June 8, 2004. (Linda Sims, ex. 18). From the beginning of her employment, Plaintiff Linda Sims was subjected to unwelcome harassment by Fetner, her supervisor, who was responsible for all day to day operations of the plant at this time. (Linda Sims depo. p. 133, ll. 1-7). (Fetner depo. p. 31, ll. 14-17). Fetner harassed Ms. Linda Sims by making sexual comments about her body parts, requests for dates, and touching her body without permission. (Linda Sims, Id.). Specifically, Fetner told Ms. Linda Sims that her "butt" looked like two basketballs, and he wanted to go dribbling. (Linda Sims depo. p. 134, 135, ll. 2, 11, 22, 31).

Fetner would also mimic dribbling a basketball when he walked by Ms. Linda Sims. (Linda Sims depo. p. 135, ll. 10-13). On One occasion, again in the break room, Fetner came behind Ms. Linda Sims and indicated one of her "basketballs" looked deflated, " and he had a needle that he could pump me up." (Linda Sims depo. p. 136, ll. 16-20). Fetner also told Ms. Linda Sims that he would play with her "basketballs" if they were alone. (Linda Sims depo. p. 140, ll. 21-23).

In addition, Fetner, the first week Ms. Linda Sims began working at the facility, began to ask her out on dates. (Linda Sims depo. p. 147, ll. 7-10). He also asked her to come to his house and decorate his bedroom. (Linda Sims depo. p. 147, ll. 12, 13). When Ms. Sims declined Fetner's advances, he would send her home, even if there was work to do on her job. (Linda Sims depo. p. 151, ll. 7-8).

Regarding the defendant's response to the complaints being made, On October 13, 2004, Dan Hees, Coordinating General Manager and Fetner's boss, met with Ms. Linda Sims as well as the other complaining employees. Hees was extremely unprofessional in the interview, even asking Ms. Linda Sims, after she recounted Fetner's abuse, whether she had played basketball lately. (Linda Sims depo. P. 163, ll. 2-4). Mr. Hees conduct and failure to even know, much less implement, the Defendant's anti-harassment policy will be discussed infra.

Ms. Linda Sims was clearly unsatisfied with Defendant's investigation and ultimate handling of the situation because Fetner was allowed to resign and, "go back and start this problem that he clearly had over again." (Linda Sims depo. p. 171, ll. 16-19).

D.  **Kathy Thornton's allegations**

Kathy Thornton worked at the Roanoke, Alabama, facility beginning in 1997 and became an employee of the Defendant when they took over operations in 2002. (Thornton depo. pp. 46, 50). Ms. Thornton is not a Plaintiff in this action because she was persuaded to sign a severance and release agreement when the plant closed in 2004.

Ms. Thornton was harassed by Fetner constantly. Fetner touched her, grabbed her, grabbed himself in front of her, and requested oral sex from her on the job. (Thornton depo. pp. 85, 86, ll. 21-23, 1-4). If Ms. Thornton was wearing a shirt which showed her "nipples," Fetner would ask, "if they needed massaging, if he could suck on them." Ms. Thornton also testified that Fetner would ask her to come over to his house at least a hundred times a day. (Thornton depo. P. 86, ll. 15-20).

Fetner rubbed Ms. Thornton's breast, and grabbed her on the "behind." (Thornton depo. P. 81, ll. 16-21). He also came up behind her to stick broom handles up her shorts. [4] Id. Ms. Thornton, in an effort to halt the harassment, had sexual intercourse with Fetner on one occasion. (Thornton depo. pp. 92- 94, ll. 23, 1-23, 1-8). Thornton described her desperation in sleeping with Fetner by saying she felt like a "gun was to her head." (Thornton depo. P. 96, ll. 5-7).

Most importantly, Ms. Thornton reported Fetner's conduct to Joe Mendoza, Coordinating Group Manager at the plant, while it was happening. (Thornton depo. p. 105, ll. 15-23). (Mendoza depo. p. 12, ll. 20-23). After Ms. Thornton reported the conduct, Mendoza repeatedly asked about the conduct, but never reported it to his supervisors, Dan Hees or Pat Galvez. (Thornton depo. p. 107, ll. 1-7). Thornton believed that Mendoza would help her. (Thornton depo. p. 109, ll. 3,4).

Mendoza entered management with Defendant in 1990. (Mendoza depo. p. 16, l. 11). He testified that the company had an anti-harassment policy at that time, that he was familiar with it, and that, as a manager, he was to be able to implement it. (Mendoza depo. p. 17, ll. 17-23). Mendoza left the Roanoke facility in 2003, therefore; Defendant was on notice of Fetner's abuse for many months prior to his conduct toward the three Plaintiffs in the case sub juduice.[5] Lisa Cook, another former employee of Defendant, indicated that Mendoza told her that Kathy Thornton had complained to him about Fetner's conduct. (Cook depo. p. 208, ll. 17-23).

### E. Lisa Cook's Allegations

Lisa Cook, not a party to this action, was harassed by Fetner in much the same way as the other female employees. On one occasion, Fetner touched her between her legs in her "private" area. (Cook depo. p. 91, ll. 10-15). Ms. Cook testified further that Fetner would, "always come up behind you and rub you on your back, you know, hug you around the waist or take his arm and try to touch your breast…" (Cook depo. p. 92, ll. 4-8). Cook further testified that it was "an every day thing." (Cook depo. p. 92, ll. 14, 15).

Fetner also attempted to forcibly kiss Ms. Cook, offered her a vinegar bath on her lunch break and made "vulgar" comments about how good she looked. (Cook depo. pp. 94, 95, ll. 13-19, 80-23). Cook indicated that Fetner told "dirty jokes" "a lot" in the workplace, and that the jokes were about sex. (Cook depo. pp. 156, 157, ll. 3-23, 1-8). Cook also testified that pranks, of a sexual nature, were common in the plant. (Cook

---

[4] This happened three or four times. (Thornton depo. P. 100, ll. 23, 23).
[5] Mendoza denies Thornton reported the allegations to him.

depo. p. 16, ll. 14-18). Cook also testified that Fetner referred to women's private parts as "pussy cat." (Cook depo. p. 187, ll. 6-9).

### F. Stacy Overton's allegations

Stacy Overton testified that, while working for Defendant's predecessor company, Fetner forced her to have sex with him at her house. (Overton depo. p. 61, ll. 1-16). Although Fetner did not work for Defendant at the time, the incident further elucidates his pattern to violate the law by taking advantage of female subordinates.

### G.    Defendant's Investigation

As stated earlier, on October 13, 2004, in response to a phone communication from Plaintiff Brenda Sims, Dan Hees, based in Sparta, TN, came to the Roanoke facility. Hees had been a management employee for Defendant since 1993. (Hees depo. p. 22, l. 15). Hees went through Defendant's pre-training on anti-harassment in the late 1990's. (Hees depo. p. 26, l. 3). Hees met with Plaintiffs, Kathy Thornton, and Lisa Cook about the allegations discussed supra. (Hees depo. p. 71, ll. 15, 16).

In deposition testimony, Hees indicated that Ms. Minix's allegations, including unwelcome propositioning and unwelcome touching, would not violate Defendant's anti-harassment policy. (Hees depo. pp. 79, 80, ll. 14-25, 1-4). Robert Sturm, legal counsel for Defendant, and Defendant's 30(b)(6) representative for this matter, indicated that some of the conduct was, in fact, a violation of Defendant's policy. (Sturm depo. pp. 118, 119, ll. 20-25, 1-11). In other words, Hees, a manager in the direct chain of persons to report harassment to, is not familiar enough with Defendant's policy to recognize a violation of it.

Hees, although required to enforce the policy, did not think Ms. Linda Sims' allegations, regarding the "basketball" comments violated the Defendant's policy either. (Hees depo. pp. 80, 82, ll. 70-25, 1-25, 1-4). Again, Sturm, Defendant's legal counsel and corporate representative for this case, indicated that Ms. Linda Sims' allegations would violate company policy, notwithstanding Hees' opinion to the contrary (Sturm depo. p. 126, ll. 13, 14).

Regarding Kathy Thornton's allegations of Mr. Fetner's remarks about her "nipples," Hees did not believe said remarks violated Defendant's policy. (Hees depo. p. 87, l. 8). Sturm found Hees' answer regarding this allegation disappointing, assuming he and Mr. Hees had the same factual understanding. (Sturm depo. p. 140, ll. 11-13). The fact that Hees, the General Manager, cannot recognize clear violations of Defendant's policy undercuts Defendant's contention that it takes its policy seriously or took this investigation seriously.[6] Furthermore, Hees testified that he thought the complaints were not true or embellished and that Fetner was being set up by the female workers. (Hees depo. p. 97, ll. 1-23).

Finally, although Fetner resigned and was entitled to no severance under the Defendant's severance program, he was nevertheless paid $8,049.33. (Sturm ex. 2,3,4). Defendant's severance program specifically states, "severance will not be paid to an employee who quits." (Sturm ex. 3). Nothing in the management agreement refutes this. (Sturm ex. 2). It is undisputed that Fetner resigned, and the payment to him was a violation of Defendant's policies.

In view of the serious allegations made by six female employees, Defendant's decision to reward his conduct undercuts all its arguments of good faith in dealing with

the Plaintiffs' legitimate complaints. Defendant failed to enforce its policy against sexual harassment and should not be permitted to prevail on its motion for summary judgement. Furthermore, Defendant was on notice of Fetner's conduct before Plaintiffs' were harassed and should be held liable for his actions.

### III. ARGUMENT

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). After the moving party informs the court of the basis for the motion, the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-moving party must affirmatively set forth the specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e).

The court must view all the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of that party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). The court is not to weigh the evidence or to determine the truth of the issues but only determine whether a genuine issue exists for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). As a genuine issue of material fact exists as to whether Defendant can be held liable for Fetner's actions, Defendant's motion for summary judgment is due to be denied.

Plaintiffs claim to have been the victims of workplace sexual harassment, as prohibited by Title VII. To establish a prima facie case of sexual harassment, Plaintiffs must show (1) that they belong to a protected group; (2) that they have been subjected to

---

[6] Hees did say requests for oral sex and intentional touching of breast violated Defendant's policy.

unwelcome sexual harassment; (3) that the harassment was based on their sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis exists for holding the employer liable. Hulsey v. Pride Rests.,LLC, 367 F.3d 1238, 1244 (11th Cir. 2004). Defendant is moving for summary judgment based only on the fifth element. As such, should an issue of fact exist as to whether Defendant can be held liable, its motion would be due to be denied.

There are two ways an employer can be held liable for supervisor workplace sexual harassment; direct liability and vicarious liability. Howard v. City of Robertsdale, 2006 WL 304552 (11th Cir. 2006). The court is to examine both, even if the defendant has a written policy against sexual harassment. Id at 3-5. Defendant only discusses vicarious liability in its brief.

An employer can be held directly liable for supervisory harassment if it knew or should have known of the harassment but failed to take remedial action. Dees v. Johnson Controls World Servs., Inc., 168 F.3d 417, 421-422 (11th Cir. 1999). In this case, Defendant knew that Fetner was harassing Kathy Thornton. Ms. Thornton reported the harassment to Joe Mendoza, coordinating group manager at the facility. (See discussion supra). Ms. Thornton reported the entirety of her complaints, including having a broom stick stuck in her paints and requests for oral sex on the jobsite to Mendoza. Mendoza told another employee, Lisa Cook, about Ms. Thornton's complaints, but he did nothing to address the issue of Fetner's serious harassment of Ms. Thornton.

Ms. Thornton's report to Mendoza, a management employee of Defendant since 1990, places Defendant on notice of Fetner's conduct. Fetner's subsequent harassment of

the Plaintiffs would never have occurred had Defendant addressed the issue after Ms. Thornton's complaints to Mendoza. As such, Defendant both knew and should have known that Fetner was preying on his female subordinates. At a minimum, a jury question certainly exists that would permit that reasonable conclusion.

Defendant's submission of evidence in support of its motion, particularly that of Mr. Sturm (ex. D) seems to suggest that Mendoza is not a proper management employee to make complaints to. This contention is both illogical and an attempt to change, without the benefit of cross-examination, Sturm's deposition testimony. Although Sturm was unsure of most employees' titles, he was specifically asked the role of managers, not a particular type of manager, in implementing Defendant's policy against harassment.

According to Sturm, "Managers have greater responsibility with respect to the policy than non-managers. And that includes implementing the policy and being—they have greater involvement when the policy is triggered, for example, by somebody raising a complaint." (Sturm depo. p. 21, ll. 18-22). Mendoza failed to abide by this responsibility, and the Court should not accept a self-serving affidavit over deposition testimony, subject to cross-examination. Furthermore, the policy itself encourages employees to make reports to corporate managers (undefined by the policy, although Mendoza would qualify under a reasonable reading thereof).

In Dees, the Eleventh Circuit held that the Defendant, could be held directly liable because the Plaintiff had lodged complaints of sexual harassment and Defendant had failed to take corrective action. Dees at 422-423. In other words, Defendant knew or should have known of the conduct, and this knowledge created a jury question as to defendant's liability. Id. Likewise in this matter, Defendant was put on notice by Ms.

Thornton's previous complaints and failed to take any corrective action. Therefore, Defendant may be held directly liable for Fetner's subsequent conduct.

In <u>Brooks v. H.J. Russell & Company,</u> 66 F.Supp. 1349 (N.D. Ga. Thrash), the court, interpreting <u>Dees,</u> denied Defendant's motion for summary judgment, even though the company had an anti-harassment policy because a question of fact existed as to whether the company could be held liable when it had notice of previous reports of harassment and took no corrective action. <u>Id</u>. Such is the case in the matter sub judice based on Ms. Thornton's previous complaints.

In addition to direct liability being imposed on an employer if it knew or should have known of supervisory harassment, said liability can also occur if facts exist to impute constructive knowledge to the company of the harassment. See <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642 (11th Cir. 1997). Constructive knowledge can be imputed where, "an atmosphere of inappropriate sexual behavior may have permeated the workplace." <u>Id</u> at 647.

In this case, Fetner was harassing six female employees simultaneously, representing over half the Caucasian female employees (Fetner's apparent victim group of choice) working at the plant. (Fetner ex. 1). He was requesting sexual favors on the job, he was touching women between their legs and on their breasts, he was trying to forcibly kiss them, he was grabbing his own genitalia, he was making repeated requests for sex in exchange for "fixing" time cards, he was constantly telling sexual jokes and making comments about female subordinates body parts, and, frankly, committing sexual battery on some of the employees. (<u>See</u> discussion <u>supra</u>). Additionally, the Ronald Bowen incident reveals that masturbation was occurring at the facility.

With the exception of employees in the Allen case having sexual intercourse at the plant, the conduct of Fetner and Bowen is nearly identical to that described in Allen. Clearly, facts exist whereby a reasonable jury could conclude that Defendant's plant was permeated with illegal sexual harassment to preclude granting Defendant's motion for summary judgment. As such, defendant may be held directly liable as it had constructive knowledge of the harassment, as defined by Allen.

In summary, Defendant may be held directly liable both because it had notice of Fetner's propensities and failed to remedy the conduct and constructive notice under the principles in Allen. These facts preclude the granting of Defendant's motion for summary judgment.

Defendant may also be vicariously liable for Fetner's actions if it fails to satisfy the Ellerth/Faragher affirmative defense. This assumes the Court does not find Fetner's promises to falsify time cards and sending plaintiffs home, even though there was work to be done, a tangible employment action. Should these actions raise a jury question as to said issue, then Defendant would be precluded from asserting the Ellerth/Faragher defense. The Ellerth/Faragher defense has two elements: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. See Walton v. Johnson & Johnson Serv., Inc., 347 F.3d 1272 (11th Cir. 2003), cert. denied. 124 S.Ct. 1714 (2004).

Although an employer can generally satisfy the first element by promulgating a comprehensive anti-harassment policy and promptly responding to the employee's

complaint, an employer must <u>vigorously enforce</u> the policy to satisfy the first element. <u>Howard</u> at p. 3 (citing <u>Farley v. Am. Cast Iron Pipe Co.</u>, 115 F.3d 1548 11th Cir. 1997). Implicit in vigorous enforcement is the requirement that those responsible in management for enforcement be competent as to what constitutes violations of the policy.

As stated earlier, Dan Hees, general manager and ultimate decision maker regarding this facility did not think most of the conduct complained of was a violation of Defendant's policy. Since Defendant, for purposes of this motion does not deny that the conduct is in violation of Title VII, a reasonable inference would be that the person in management responsible to enforce the policy at this facility does not recognize illegal sexual harassment when it is presented to him. In fact, Hees immediately concluded that the allegations were false or embellished.

As Hees does not even know what conduct violates Defendant's policy as the person with primary management responsibility of the facility, vigorous enforcement is not possible. As such, a question of fact exists as to whether or not Defendant has met the first element of the <u>Ellerth/Faragher</u> defense, thereby precluding granting Defendant's motion for summary judgment.

Furthermore, Defendant's decision to violate its own severance policy (as discussed <u>supra</u>), in paying Fetner in excess of $8000.00, after he quit and was entitled to nothing, also shows a failure by Defendant to vigorously enforce its policy. To violate its own policy and reward Fetner's illegal conduct shows a lack of seriousness by the Defendant regarding its self-righteous assertions that "harassment, in any form, will not be tolerated." This failure by Defendant to vigorously enforce its policy constitutes a

failure to satisfy the first element of its asserted defense, and mandates the denial of its motion for summary judgment.

The second element, "that the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer" is, arguably, not satisfied either. Plaintiff Lorena Minix was unsatisfied with Defendant's handling of her previous harassment complaint at the hands of Ronald Bowen. She was not satisfied because she was made to continue to work with him after he masturbated in front of her and that the company, as with Fetner, did not fire him. In fact, Bowen quit after being shown an anti-harassment presentation by Robert Sturm. Bowen stormed out, exclaiming that everyone in the plant was guilty of harassment based on the presentation, and Sturm took no further investigation regarding Bowen's claim. (Sturm depo. pp. 174-177). This is also further evidence of Defendant being on notice of harassment occurring at its facility.

As this incident relates to Defendant's attempt to satisfy of the second element of Ellerth/Faragher, Plaintiff Minix could reasonably conclude, having not been satisfied with the Bowen investigation, that earlier reporting of Fetner's conduct would be to no avail. The facts could lead a reasonable jury to conclude such, at any rate.

Given the widespread and public nature of Fetner's conduct, which was unceasing, it is arguable that any victim, in that environment could reasonably conclude that reporting the conduct would be fruitless. As a genuine issue of fact exists on the question, summary judgment would be inappropriate.

## IV. CONCLUSION

Based on the forgoing, because genuine issues of fact exists which would permit Defendant to be held liable, both directly (notice with failure to take remedial action and constructive knowledge) and vicariously, Plaintiffs requests this Honorable Court deny Defendant's motion for summary judgment.

Respectfully submitted this the 23rd day of June, 2006.

James B. Douglas, Jr.
Attorney for Plaintiff
McNeal & Douglas, Attorneys at Law. L.L.C.
AL Bar #8935-u83j
P.O. Box 1423
Auburn, Alabama, 36831
334-821-1596

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the following by sending a copy of same by first class U.S. mail, postage prepaid and properly addressed.

Dated this the 23rd day of June, 2006.

Micheal L. Thompson
Lehr, Middlebrooks, Price & Vreeland, P.C.
Post Office Box 11945
Birmingham, AL 35202-1945

Scott Scofield, Esq.
Scofield, Gerard, Singletary & Pohorelsky
1114 Ryan Street
Post Office Drawer 3028
Lake Charles, LA 70601

James B. Douglas, Jr.