# EXHIBIT D

# DEPOSITION EXCERPTS OF KATHY THORNTON

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 45

1  A. Yes, sir.
2  Q. Any other hobbies or anything
3  like that?
4  A. No, sir.
5  Q. You and Mr. Estes have any
6  pursuits that y'all enjoy together?
7  A. We like to go fishing. Went
8  to the fair in Columbus, Saturday. We try
9  to do a lot of family stuff with my son.
10 Flea markets, yard sales.
11 Q. Did you go fishing this
12 weekend?
13 A. No. We went to the fair in
14 Columbus.
15        (Off-the-Record discussion
16        was held.)
17 Q. After you finished at Randolph
18 County, who was your first employer?
19 A. JELD-WEN -- no wait. It was
20 Mill Works Specialties then. JELD-WEN
21 hadn't bought it out.
22 Q. You started working for Mill
23 Works Specialties?

Page 46

1  A. Yes, sir. It was the same
2  building.
3  Q. Okay. When was that?
4  A. I started in '97.
5  Q. What'd you do from '96 to '97?
6  A. Stayed at home with my son.
7  My son was born in December of '96. The
8  same year I graduated. He was ten months
9  old when I started working.
10 Q. So, you started in October of
11 '97?
12 A. Yes, sir.
13 Q. Okay. After the JELD-WEN
14 facility closed, who was your employer after
15 that?
16 A. Rock Mills Daycare and
17 Preschool.
18 Q. And that's where you're
19 currently employed?
20 A. Yes, sir.
21 Q. What do you do there?
22 A. Take care of eight two-year
23 olds.

Page 47

1  Q. And you've been employed --
2  what was your first day of work there?
3  A. July of last year.
4  Q. So, July of 2005?
5  A. Yes, sir.
6  Q. What did you do between?
7  A. Drawed unemployment.
8  Q. From November of '04 to July
9  '05, you drew unemployment?
10 A. Yes, sir.
11 Q. Were you out looking for a
12 job?
13 A. Yes, sir.
14 Q. Just didn't have any luck?
15 A. No, sir.
16 Q. So, you started working for
17 Mill Works Specialties, Inc. in October of
18 1997; is that correct?
19 A. Yes, sir.
20 Q. Is that company owned by an
21 entity called CMS?
22 A. Yes, sir.
23 Q. Let me ask you about a

Page 48

1  document. I'm not going to make an exhibit
2  to your deposition. There's a number in the
3  bottom right hand corner. It's called a
4  Bates number, and that's Bates number
5  D000272, and I'm just identifying it for
6  her.
7         Is that the first page of the
8  employment application you submitted to Mill
9  Works Specialties?
10 A. Yes, sir.
11 Q. Okay. Did you know anyone
12 that worked there at that time?
13 A. My mother-in-law, and my
14 sister-in-law.
15 Q. Your mother-in-law and your
16 sister-in-law. Who were they?
17 A. Theresa Messer.
18 Q. Messer? M-E-S-S --
19 A. -- E-R.
20 Q. And your sister-in-law was?
21 A. Lisa Poole.
22 Q. P-U-L-L?
23 A. -E.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 49

1  Q.  P-U-L-E?
2  A.  P-O-O-L-E.
3  Q.  Would you spell that again.
4  A.  P-O-O-L-E.
5  Q.  They recommend you apply for a
6  job out there?
7  A.  Yes, sir.
8  Q.  Who hired you?
9  A.  I'm not sure. I only know the
10 secretary's name at that time.
11 Q.  What was her name?
12 A.  Sherry Rogers.
13 Q.  Who interviewed you?
14 A.  I'm not sure.
15 Q.  Do you know a gentleman named
16 Richard Fetner?
17 A.  Yes, sir.
18 Q.  Okay. Mr. Fetner was not
19 working at the plant at that time?
20 A.  No, sir.
21 Q.  Other than Ms. Messer and
22 Ms. Poole, did you have any other family
23 that worked at the plant?

Page 50

1  A.  No, sir.
2  Q.  And how long did they work at
3  the plant?
4  A.  My mother-in-law had worked
5  there about four or five years, I believe.
6  Q.  Okay. How long did she
7  continue to work there?
8  A.  Until it closed. I believe
9  she was there when it closed.
10 Q.  Okay. So, she continued to
11 work there for a long time?
12 A.  Yes, sir.
13 Q.  What about Ms. Poole?
14 A.  No, she quit.
15 Q.  When did she quit?
16 A.  I'm not sure.
17 Q.  Do you know why she quit?
18 A.  Just wanted another job.
19 Q.  At some point in time, you
20 became a JELD-WEN, Inc. employee; correct?
21 A.  Yes, sir.
22 Q.  And was that 2002?
23 A.  I'm not sure what year they

Page 51

1  took over.
2  Q.  Okay. Did you interview with
3  anyone?
4  A.  No, sir.
5  Q.  For a job at JELD-WEN?
6  A.  No, sir.
7  Q.  Just one day you were a CMS
8  employee, and the next day you were a
9  JELD-WEN employee?
10 A.  Yes, sir.
11 Q.  Do you recall -- Strike that.
12 Did you start getting checks that said
13 JELD-WEN on them?
14 A.  Yes, sir.
15 Q.  Do you remember when that was?
16 A.  No, sir.
17 Q.  Did you have a job title?
18 A.  Paint room operator.
19 Q.  Was that your job title when
20 you started with CMS?
21 A.  No, sir. I was moulder
22 operator.
23 Q.  What did do you as a moulder

Page 52

1  operator?
2  A.  Graded the wood when it came
3  out of the moulder to keep the bad from the
4  good separated.
5  Q.  You graded the wood and
6  separated the bad wood from the good wood?
7  A.  Yes.
8  Q.  How long did you do that?
9  A.  About three years.
10 Q.  What was your next position at
11 the plant?
12 A.  Paint room operator.
13 Q.  Okay. So, those were the only
14 two positions you held?
15 A.  Yes, sir.
16 Q.  And so, at the time JELD-WEN
17 took over the plant, and you became a
18 JELD-WEN employee, you were the paint room
19 operator?
20 A.  Yes, sir.
21 Q.  And can you describe the paint
22 room to me?
23 A.  It's a long room. Probably

13 (Pages 49 to 52)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 85

1    A.   No, sir.
2    Q.   Okay. Did you take notes
3 during the meeting?
4    A.   No, sir.
5    Q.   Did any of the other women
6 take notes?
7    A.   No, sir.
8    Q.   Have you ever gone back and
9 written down what was said or what happened?
10   A.   I've written down what I --
11 what had happened to me.
12   Q.   Okay, where did you write that
13 down?
14   A.   Just on a notebook at home.
15   Q.   Do you still have that?
16   A.   No.
17   Q.   What did you do with it?
18   A.   I just throwed it away.
19   Q.   Okay. What did you tell
20 Mr. Hees during that meeting?
21   A.   I told him that Richard had
22 been touching me and grabbing me and he
23 would leave me over on inventories after

Page 86

1 everybody else had left. Asked me if I
2 would give him a blowjob. He would grab his
3 self in front of me.
4    Q.   He would grab his pants in
5 front of you?
6    A.   Yes.
7    Q.   And grab his crotch?
8    A.   Yes, sir.
9    Q.   Did he say anything when he
10 did this?
11   A.   He asked me if I wanted any of
12 that.
13   Q.   Okay. Any other conduct that
14 you reported to Mr. Hees?
15   A.   If I had a shirt on or
16 something and my nipples were sticking out,
17 he would ask me if they needed massaging.
18 If I was cold. If he could suck on them.
19 He would ask me to come over to his house at
20 least a hundred times a day.
21   Q.   Okay. Anything else that you
22 told Mr. Hees? Are you okay?
23   A.   Uh-huh.

Page 87

1         MR. WHITE: Mike, would you
2 reask your last question? I don't think she
3 got it.
4         MR. THOMPSON: I asked if she
5 was okay. She rubbed her eye. I asked if
6 she was okay. She was just thinking.
7         THE WITNESS: I'm fine.
8         MR. DOUGLAS: I apologize.
9    A.   I told Dan that I went over to
10 his house and slept with him one day.
11   Q.   Okay. You said he was
12 touching and grabbing you?
13   A.   Yes, sir.
14   Q.   Where was he touching and
15 grabbing you?
16   A.   Breast. He would rub against
17 my breast, and he would grab me on the
18 behind. And he would come up behind me, if
19 I was working and didn't know he was there
20 and stick broom handles and stuff up my
21 shorts.
22   Q.   Up your shorts?
23   A.   Yes.

Page 88

1    Q.   Do you wear shorts to work?
2    A.   Yes.
3    Q.   Okay. Anything else that you
4 told Mr. Hees?
5    A.   I think that's it.
6    Q.   Okay. You understand that
7 Ms. Minix, Ms. Sims, Ms. Linda Sims, and
8 Ms. Brenda Sims, are making allegations of
9 inappropriate sexual conduct by Mr. Fetner
10 in this lawsuit; right?
11   A.   Yes, sir.
12   Q.   Did you ever witness any of
13 this conduct towards them by Mr. Fetner?
14   A.   No, sir. I thought it was
15 just me.
16   Q.   You thought it was just you?
17   A.   Yes, sir.
18   Q.   What about any conduct
19 directed towards Lisa Cook, if there was
20 any?
21   A.   I never witnessed any.
22   Q.   Other than the conduct that
23 Mr. Fetner allegedly directed towards you,

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 89

1  did you ever witness any sexually
2  inappropriate conduct at the JELD-WEN
3  facility?
4      A.  No.
5      Q.  Okay. What was the mood of
6  the meeting with Mr. Hees?
7      A.  It was tense. It was just
8  nervous, shocked.
9      Q.  You were surprised to hear
10  these allegations from the other women?
11      A.  Yes.
12      Q.  How did y'all decide to get
13  together and meet?
14      A.  We just -- We all eat lunch
15  together, and we all, kind of, got to
16  talking one day. And one person would say
17  something, and the other person would say
18  something else about it.
19          And then it went on, and it
20  just kept going on, so we just decided to
21  tell.
22      Q.  Okay. And when was this
23  talking at lunch going on?

Page 90

1      A.  It was several days.
2      Q.  How long before the meeting
3  with Mr. Hees?
4      A.  Probably four or five weeks.
5      Q.  You met with Mr. Hees in
6  October, mid-October. It would have been
7  early September or so?
8      A.  Yes.
9      Q.  Who all was talking at that
10  lunch meeting?
11      A.  Me, Lorena, Brenda, Linda.
12  Linda was at that meeting, too. I don't
13  know if I said that.
14      Q.  Anybody else talking at lunch?
15      A.  Lisa.
16      Q.  Mary Lou?
17      A.  Yes.
18      Q.  Anyone else?
19      A.  No.
20      Q.  So the six of you got together
21  and decided to tell?
22      A.  We was just eating -- Yes,
23  yes.

Page 91

1      Q.  Okay. So, you reported
2  Mr. Fetner's conduct to Mr. Hees like the
3  sexual harassment policy requires that you
4  do?
5      A.  Yes.
6      Q.  Okay. And that was October
7  13, 2004?
8      A.  Yes, sir.
9      Q.  What did you want to happen?
10      A.  Him to be fired.
11      Q.  Okay. You wanted the conduct
12  to stop?
13      A.  Yes.
14      Q.  Okay. Mr. Fetner had -- was
15  at a dentist appointment when you met with
16  Mr. Hees?
17      A.  Yes.
18      Q.  Okay. Now, Mr. Fetner did not
19  work for JELD-WEN after October 13th; is
20  that correct?
21      A.  No, sir.
22      Q.  That's not correct?
23      A.  I'm sorry. He didn't work.

Page 92

1      Q.  I'm sorry. It's just a poor
2  question. He never worked for JELD-WEN
3  after that, did he?
4      A.  No, sir.
5      Q.  Okay. Do you know why?
6      A.  They told him -- What Danny
7  said was that he told him he had to quit.
8      Q.  Okay. Other than Mr. Fetner,
9  did anyone direct any conduct towards you
10  that you found to be sexually offensive
11  while were you employed at JELD-WEN?
12      A.  No.
13      Q.  So, he was the only one?
14      A.  Yes.
15      Q.  Okay. Do you know what
16  Mr. Fetner's intent was when he directed his
17  conduct towards you?
18          MR. WHITE:  Object to the
19  form.
20      Q.  I'm just asking if you know.
21      A.  I don't know.
22      Q.  Okay.
23      A.  I thought if I had sex with

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 93

1  him, I thought that's what he wanted at
2  first.
3      Q.   Okay. So, you had sex with
4  him how many times?
5      A.   One.
6      Q.   And this was at his house?
7      A.   Yes, sir.
8      Q.   When was that?
9      A.   I'm not sure.
10     Q.   How long before you reported
11 the conduct to Mr. Hees was it?
12     A.   Three or four months, I guess.
13     Q.   So, it would have been
14 sometime during the summer of 2004?
15     A.   Yes, sir.
16     Q.   Okay. Was it on a weekend?
17     A.   No.
18     Q.   Was it during the week?
19     A.   Yes.
20     Q.   Was it on a work day?
21     A.   Yes.
22     Q.   And y'all left work and went
23 over to his house?

Page 94

1      A.   Yes.
2      Q.   Did you lose any time that
3  day?
4      A.   No.
5      Q.   Okay. Was it -- Were you a
6  willing participant?
7      A.   Yes. I felt like that was my
8  only option. I didn't know what to do.
9      Q.   Okay. But it was a
10 consensual?
11     A.   Yes.
12     Q.   How long were y'all gone from
13 the plant?
14     A.   Oh, it was after work. It was
15 after work.
16     Q.   After work?
17     A.   Yes. It was after work.
18     Q.   So, you just went home with
19 him one night after work?
20     A.   It was one afternoon. It
21 lasted about two minutes. It was on a
22 Monday. It was on a Monday because he told
23 me to hurry up and get dressed. He had to

Page 95

1  get to a commissioner's meeting, and that
2  always happens on a Monday.
3      Q.   And the sex lasted about two
4  minutes?
5      A.   Yes. It was --
6      Q.   Sorry to delve in these
7  personal issues, but it's just, kind of, the
8  nature of the lawsuit. I know we are all
9  adults, and you understand that.
10          So, he told you to hurry up
11 and get dressed because he had to go to this
12 meeting?
13     A.   Yes, sir.
14     Q.   Were y'all drinking any that
15 evening?
16     A.   No.
17     Q.   Okay. You said you felt like
18 that was what you needed to do to stop his
19 other conduct?
20     A.   Yes.
21     Q.   Okay. You felt like that was
22 the choice you had to stop that other
23 conduct?

Page 96

1      A.   Yes.
2      Q.   Was there any other reason you
3  had sex with him?
4      A.   No. I didn't want to.
5      Q.   He didn't put a gun to your
6  head or anything like that, did he?
7      A.   It felt like it, but, no.
8      Q.   Okay. Did he -- Did y'all go
9  to his house in separate cars?
10     A.   Yes.
11     Q.   Okay. Did you follow him
12 there?
13     A.   Yes.
14     Q.   How far is his house from the
15 plant, minutes not miles?
16     A.   Six, seven minutes.
17     Q.   Okay. Now, this other conduct
18 that you've talked about, him grabbing his
19 crotch, rubbing a board or a stick up your
20 shorts, requesting oral sex, keeping you in
21 to do inventory, making comments about your
22 nipples, things like that, touching and
23 grabbing you, did that occur in the presence

24 (Pages 93 to 96)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 97

1  of anyone else?
2     A.   No.
3     Q.   He always did that where no
4  one else could see you?
5     A.   I was always secluded from
6  everybody else.
7     Q.   Okay. And how many times did
8  he -- Other than this one time when y'all
9  had consensual sex, how many times did he
10 touch your breasts?
11    A.   Several. Sometimes every day.
12    Q.   Would he come up to you and
13 hug you or would he just --
14    A.   Hug me, rub right here
15 (indicating), come up behind me and just
16 grab them.
17    Q.   Just grab you from behind?
18    A.   Yes, like I was his.
19    Q.   So, that occurred on a
20 frequent basis?
21    A.   All the time.
22    Q.   Okay. And you also testified
23 that he grabbed your behind?

Page 98

1     A.   Yes.
2     Q.   How often did that happen?
3     A.   Few times a week.
4     Q.   Not as often as the touching
5  of the breast?
6     A.   Uh-huh.
7     Q.   You need to say yes or no for
8  me.
9     A.   Yes.
10    Q.   What about -- And when did
11 this conduct begin?
12    A.   Right when he started working
13 there.
14    Q.   Okay.
15    A.   Well, he didn't start touching
16 and grabbing after a little while. But he
17 had started asking me to go out with him and
18 everything when he first started.
19    Q.   Did he ask you to go out with
20 him, or did he just ask you to come over to
21 his house and have sex with him?
22    A.   He said he was lonely and
23 needed somebody to talk to. He was going

Page 99

1  through a divorce.
2     Q.   Okay. Did you ever talk to
3  him about that kind of stuff?
4     A.   No.
5     Q.   Do you know anything about his
6  divorce?
7     A.   No.
8     Q.   Okay. Globally, when did this
9  conduct end?
10    A.   When he got fired.
11    Q.   Okay.
12    A.   Quit -- When he quit.
13    Q.   And that goes for all this
14 conduct. It occurred on a regular basis
15 from the time he was hired until the time
16 his employment ended?
17    A.   Yes.
18    Q.   Is that correct?
19    A.   Yes.
20    Q.   Okay. When did he, or, I
21 guess, how many occasions did he grab his
22 crotch and make comments to you?
23    A.   He probably done that seven,

Page 100

1  eight, nine times, somewhere in there.
2     Q.   Was that before or after you
3  slept with him?
4     A.   After.
5     Q.   Okay. Did he continue to ask
6  you out after you slept with him?
7     A.   Yes. He would ask me to come
8  over to his house every day.
9     Q.   Okay. Did you ever go back?
10    A.   No.
11    Q.   You said he rubbed -- I'm
12 sorry. I can't remember. Did you
13 characterize it as a stick or a broom stick?
14    A.   Yes. A broom handle of a
15 broom. I have to bend over to put the paint
16 in the paint machine, and I wouldn't know he
17 was there. He would just grab a broom and
18 put it up my shorts.
19    Q.   And he would stick the broom
20 handle up your shorts?
21    A.   Yes.
22    Q.   How many times did he do that?
23    A.   Two or three times.

25 (Pages 97 to 100)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 105

1  no.
2  Q. You weren't happy about
3  Mr. Fetner's conduct; correct?
4  A. Right.
5  Q. Was there anything else you
6  weren't happy about?
7  A. No.
8  Q. Did Mr. Hees do anything that
9  made you unhappy?
10 A. No.
11 Q. Okay. And to your knowledge
12 this was the first time you reported these
13 allegations to anyone at JELD-WEN
14 management?
15 A. Yes -- No. I told a plant
16 manager, Joe Mendoza about it when he was
17 working there.
18 Q. Okay. What did you tell
19 Mr. Mendoza?
20 A. I told him everything that I
21 told you except that I had slept with him.
22 I don't think I slept -- I hadn't slept with
23 him, when he was working there.

Page 106

1  Q. When did you tell Mr. Mendoza?
2  A. A couple months after he
3  started working there.
4  Q. Where was Mr. Mendoza when you
5  told him?
6  A. In the paint room.
7  Q. Okay. And what exactly did
8  you tell him?
9  A. That Richard was touching me
10 and saying stuff.
11 Q. Is that what your words were
12 to him? He's touching me and saying stuff?
13 A. Yes.
14 Q. Did you tell him anything
15 else?
16 A. I can't remember.
17 Q. What did Mr. Mendoza say?
18 A. He was surprised.
19    MR. WHITE: I'm sorry. I
20 didn't hear that.
21 A. He was surprised.
22 Q. He was surprised. What did he
23 say?

Page 107

1  A. He really didn't say nothing.
2  About every day, every other day, he would
3  come in there and ask me if Richard had done
4  anything that day. He never did go to Pat
5  or Dan about it.
6  Q. You never did, or he never
7  did?
8  A. He never did.
9  Q. Did you, other than this
10 meeting on October 13, 2004, go to Pat or
11 Dan about any of this?
12 A. No, just Joe.
13 Q. Just Joe. You said he would
14 ask you every other day or so if Mr. Fetner
15 bothered you?
16 A. Yes, that day.
17 Q. And what would you tell him?
18 A. If he had touched me that day
19 or tried to kiss me or what he said, or if
20 it was that day he had put the broom up my
21 shorts. If he had done it that day, I had
22 told him.
23 Q. Okay. What was your reaction

Page 108

1  to Mr. Fetner's conduct?
2  A. Mad. When I told Joe, I had
3  done had enough that day. It just come
4  flying out of my mouth. I was mad and
5  aggravated.
6  Q. You told Joe because you got
7  so frustrated and mad about it?
8  A. Yes. I thought I was the only
9  one. I didn't think nobody would believe
10 me. It would be my word against Richard.
11 Q. Okay.
12 A. And then if he wouldn't have
13 fired him, he would have made my life hell.
14 Q. That's what you thought?
15 A. Yes.
16 Q. And you thought that because
17 he was your supervisor?
18 A. Yes.
19 Q. Why didn't you -- why didn't
20 you call JELD-WEN'S telephone number they
21 provide in the policy?
22 A. I don't know.
23 Q. No reason?

27 (Pages 105 to 108)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 109

1  A.  No reason.
2  Q.  Why didn't you tell Mr. Hees?
3  A.  I thought Joe was going to
4  help me out.
5  Q.  You thought Joe was going to
6  do something about it?
7  A.  Yes, sir.
8  Q.  When the conduct continued
9  after you first told Joe about it, why
10 didn't you tell somebody else about it?
11 A.  I didn't think nobody would
12 believe me.
13 Q.  You didn't think you would be
14 believed?
15 A.  I started going through my
16 divorce. Lorena, we would talk, and then
17 Lorena would say stuff to Richard and
18 everything.
19     And Richard had come in there
20 one day and asked me if I had said anything
21 to anybody, and I told him no. He said well
22 you know if you say anything, you're going
23 to lose your son, and he walked out.

Page 110

1  Q.  If you say anything about what
2  he's doing, you would lose your son?
3  A.  Yes. Because I was going
4  through a divorce. I guess, you know, he
5  was going -- well, I can't -- I don't know
6  what he was going to do.
7  Q.  Tell me what you think.
8  A.  He was probably going to say
9  we had sex together, and that's adultery,
10 and I was going to lose my son. I was
11 assuming that's what he meant.
12 Q.  You had sex with Mr. Fetner
13 while you were married?
14 A.  Yes.
15 Q.  Okay.
16 A.  He knew I was going through a
17 divorce.
18 Q.  And he had recently been
19 divorced?
20 A.  Yes.
21 Q.  Did y'all talk about that
22 anymore?
23 A.  No.

Page 111

1  Q.  Was it your belief that he
2  would use some of his political connections?
3  A.  Yes.
4  Q.  Let me finish. Your belief
5  that he would use his political connections
6  to influence your custody issues?
7  A.  Yes. I waited until my
8  divorce was over before I met with Dan.
9  Q.  Is that one of the reasons you
10 waited to report it to Dan?
11 A.  Waited, yes.
12 Q.  Okay. Mr. Fetner wouldn't
13 have had any sway on your custody issues due
14 to him being a supervisor at JELD-WEN?
15 A.  No.
16 Q.  It would have only been his
17 political connections he has?
18 A.  Yes.
19 Q.  Is that yes?
20 A.  Yes.
21 Q.  Other than Mr. Hees on October
22 13, your two meetings with Matt White that
23 we've talked about, and here today, who else

Page 112

1  have you discussed these allegations with?
2  A.  We had met with a lawyer named
3  Chad Lee at somebody's house. I'm not sure
4  who. I didn't know him, but to see what we
5  need to do, you know, as far as our rights
6  and everything. What we needed to do.
7  Q.  Just as an informational type
8  thing?
9  A.  Yes.
10 Q.  Was Mr. Lee ever your lawyer?
11 A.  No.
12 Q.  Okay. What did Mr. Lee tell
13 you needed to do?
14 A.  I can't remember.
15 Q.  Did he tell you you needed to
16 report it to someone at JELD-WEN?
17 A.  Yes. That was before we told
18 Dan.
19 Q.  So, was one of the reasons
20 that you told Dan was because Mr. Lee told
21 you to?
22 A.  Well, we were going to. We
23 just needed to know -- just kind of.

28 (Pages 109 to 112)