# EXHIBIT F

# DEPOSITION EXCERPTS OF DAN HEES

37

1  anti-harassment training for all the employees that were
2  there.
3      Q.   Okay.  Was it as a result of this complaint
4  that the training was done, if you know?
5           MR. THOMPSON:  Object to form.
6      Q.   BY MR. DOUGLAS:  You can answer.
7      A.   I think since Rob was there to do the
8  investigation, he found it fit to do the training at the
9  same time.
10     Q.   Okay.  When did the Roanoke plant open, if you
11 know?
12     A.   When did it open?  The Roanoke plant was a part
13 of CMS.  And CMS Company was a customer of Jeld-Wen.
14 Jeld-Wen sold them doors and windows and millwork.  They
15 have been around there for a long time.
16     Q.   Okay.  When did Jeld-Wen buy the facility, if
17 you know?
18     A.   Exact date, I don't know.  But Jeld-Wen took
19 over the CMS operation with the bank because they
20 weren't paying their bills.
21     Q.   Got you.
22     A.   So, we had legal -- I guess the legal okay to
23 take over.  So, we were taking over at the end of 2001,
24 but 2002.  Whether it was purchased, I don't know.  I
25 don't have that --

```
 1   meetings?
 2              MR. THOMPSON:  Same objection.
 3        Q.    BY MR. DOUGLAS:  You can answer.
 4        A.    We had at least two a year.
 5        Q.    Do you have more or less than that now?
 6        A.    I would say we have less than that now.
 7        Q.    Once a year?
 8        A.    Yeah.
 9        Q.    Sometimes none a year?
10        A.    We'll meet at least once a year.
11        Q.    Okay.  Do you have any idea for the reduction
12   in those meetings?  Any idea why that's so?
13        A.    Basically in our group it's because of the
14   reduction of the millwork plants.  There was 13 or 14
15   when I joined Jeld-Wen in 1993.  And now we have five.
16        Q.    Okay.  At the plant manager meeting when you
17   believe you may have first heard of the sexual
18   harassment policy, who brought it up, if you remember?
19        A.    Well, at that time our Vice President was Rick
20   Parker.  When he sends out the itineraries of the
21   information that we talk about, it was one of the
22   topics.  So, that's -- it would be Rick Parker.
23        Q.    Did you receive written information at that
24   meeting?
25        A.    Yeah.  Yes.
```

1   gotten out of college?
2       A.   Correct.
3       Q.   When did you first -- well, before I ask you
4   that, have you ever written or published anything?
5       A.   Written or published anything?
6       Q.   Have you ever published any writings?
7       A.   Writings, no.
8       Q.   When you first came to work with Jeld-Wen in
9   1993, did the company have a sexual harassment policy?
10      A.   1993.  I'm not sure.
11      Q.   Would it be fair to say if they had one, you
12  don't remember it?
13      A.   Yeah, that would be fair.
14      Q.   All right.  What year was it that you first
15  remember the company having a sexual harassment policy?
16      A.   Probably in the mid '90's.  1995, 1996.
17      Q.   Do you have any knowledge of what prompted the
18  adoption of the policy?
19      A.   I think it's all the -- the news and all the
20  things going on with harassment, it became a hot topic.
21          MR. THOMPSON:  He asked you if you had any
22  knowledge.  You just need to answer his question.
23          THE WITNESS:  Okay.  Say that again.
24          MR. DOUGLAS:  Can you read back my question?
25

79

Q. Okay. Did -- what were your reasons for going down to the Roanoke plant and -- well, I guess you didn't know this harassment conversation was going to come up, did you?

A. No.

Q. Okay. You just thought you were going to talk to Brenda about what Richard told her?

A. Working -- yeah.

Q. All right. Let me ask you about the incidences that she told you about. Is it a violation of Jeld-Wen policy for a manager and an hourly employee to have a consensual sexual relationship?

A. I don't think it's against the policy.

Q. The episodes that she -- or the allegations that she imparted to you with regard to going to get beer once or twice --

A. Right.

Q. -- and the things that she said. Would that be a violation of the Jeld-Wen harassment policy, in your opinion?

MR. THOMPSON: Object to form.

THE WITNESS: I don't think it is.

Q. BY MR. DOUGLAS: Okay. How about the hugging once or twice?

MR. THOMPSON: Object to form.

80

                    THE WITNESS: I don't think it's against the
policy. But it doesn't seem -- it seems --
        Q.  BY MR. DOUGLAS: It seems harmless to you?
        A.  Yeah.
        Q.  Okay. All right. So, who is the next lady
that spoke?
        A.  The next one was Linda. Linda Sims. I asked
if -- or she started telling me that Richard on occasion
-- or not on occasion. She said Richard has referred to
her rear end as basketballs. And I said, okay, what
does that mean. I've never heard of that. I have heard
a lot of things. I don't know if that's a compliment or
a cut down. What does that mean. She said, well, it
means that -- what it means. She said, I think it's a
compliment. I said, how many times did he refer to your
rear end as a basketball. She said once. I said, did
you tell him to quit saying that. She said, I did. She
said, but on another occasion he would walk through the
plant, and he would act like he's dribbling. I said,
how many times did that happen. She said just the one
time.
            I said, all right, anything else. She said,
yes, there was an occasion when she went to ask Richard
a question in his office. The door was open. Some kind
of a supplier or salesman was walking through the plant.

1   Q.   How about the act of dribbling?
2   A.   I don't think so.
3   Q.   And how about asking Linda to sit on his lap?
4   A.   That's not appropriate.
5
6              (Off the Record Discussion)
7
8         MR. DOUGLAS:  What was my last question?
9
10  (Court Reporter Reads Back Requested Portion of
11  Transcript)
12
13  Q.   BY MR. DOUGLAS:  My question was, in your
14  opinion is that in violation of the Jeld-Wen policy?
15  A.   In my opinion?
16  Q.   Yes.
17  A.   Well, that would go to our legal people.
18  Q.   Right.  But I'm asking your opinion.  You have
19  to follow the policy, too, right?
20  A.   Yeah.
21  Q.   Okay.  So, in your opinion would it be a
22  violation of the policy?
23         MR. THOMPSON:  Object to form.
24         THE WITNESS:  I don't know.
25  Q.   BY MR. DOUGLAS:  You don't know?

83

1       A.    Would it be a violation?  I don't think so.

2       Q.    Okay.  But you didn't think that was

3  appropriate?

4       A.    I thought that if that's -- if that's what

5  Richard did, then I want to talk to Richard about it.

6       Q.    Right.

7       A.    So we can get both sides of the story.

8       Q.    Okay.  Who spoke next of the ladies?

9       A.    The next hourly employee was Lisa Cook.

10:14:46 10     Q.    What did she say?

11      A.    Lisa told me there was a conversation that she

12 had with Richard that required -- they were talking

13 about hot tubs and bubble baths and all that.  And

14 Richard had asked her to go to his house for a bubble

15 bath or shower.  I said, did you go.  She said no.  I

16 said, how many times did you have that conversation.

17 She said, just the once.  That was it.  Has he ever

18 bothered you about it.  No.  Just happened one time or

19 one conversation.  That was Lisa Cook.

10:15:32 20     Q.    She didn't have any other allegations?

21      A.    No.

22      Q.    Would that request to an employee to go to the

23 -- to a home for a hot tub or a shower be a violation of

24 the Jeld-Wen sexual harassment policy in your opinion?

25      A.    I don't think so.

```
 1        Q.   Who spoke next?
 2        A.   The next one was Brenda Sims.
 3        Q.   What did she say?
 4        A.   Brenda said that she has an issue with Richard.
 5   When he was training her to cut on the chop saw, that he
 6   would get too close to her.  And when he would show her
 7   how to cut, that he would purposely have his elbow touch
 8   her side and touch -- hit one of her breasts.
 9        Q.   What did you say?
10        A.   I said, did you say something to Richard about
11   it.  She said, yes, I told him to back off.  And I asked
12   if Richard did, and she said yes.  That was it.  That
13   was her issue.
14        Q.   Did you ask her if it happened more than once?
15        A.   She said it was the one time.  It was the one
16   time when he was doing training with her.  And it was --
17   I asked where that was.  And she said it was in the back
18   of the plant where the millwork is, where we cut wood.
19   Rip wood and cut wood, so there is a chop saw there.
20        Q.   Is that a -- is that area of the plant
21   semi-private, totally out in the open?
22        A.   It's totally in the open.
23        Q.   Okay.
24        A.   Back there, there's maybe 10, 15 employees that
25   work around the area.
```

87

1  on premises would be a violation of the policy?

2  A. Absolutely.

3  Q. Okay. If true?

4  A. Right.

5  Q. How about the remark regarding, you know, her
6  nipples? Would that be a violation of Jeld-Wen sexual
7  harassment policy?

8  A. A violation of policy? No. I would say no.

9  Q. Did she tell you about any other incidents?

10 A. No. That was her two.

11 Q. Okay. So, what was said next at the meeting,
12 if anything?

13 A. We had already been there for about half an
14 hour. Spent maybe 10 minutes talking about the issue of
15 moving people around and that that's not just Richard
16 picking on Brenda. They all concurred that that's what
17 happens, and that's not a problem. 20 minutes on this
18 topic right here.

19         I summarized everything by saying that I
20 thought that this is a little unusual that this is all
21 going on. I asked how long has Richard been making
22 these gestures or doing these things that you are saying
23 are inappropriate. And they all said it's been going on
24 forever. That's just the way Richard is. I said, this
25 has been going on forever.

```
 1   conversation with Mr. Fetner after you had heard the
 2   five hourly employees stories and you had heard a part
 3   of what Mr. Fetner would say, did you believe or
 4   disbelieve either one of the sides?
 5              MR. THOMPSON: Everything or about --
 6       Q.    BY MR. DOUGLAS: I'm sorry. That was a bad
 7   question. I guess you would say that Mr. Fetner and
 8   Lorena Minix pretty much agreed on what had happened?
 9       A.    Yes.
10       Q.    Their stories were the same, right?
11       A.    Yeah.
12       Q.    Actually identical?
13       A.    Yeah. They both admitted a relationship, sex.
14       Q.    And then the incident --
15       A.    They broke it off.
16       Q.    -- the bear hugging?
17       A.    Yeah.
18       Q.    But with regard to the other employees, did you
19   -- at that time did you believe what they were saying?
20       A.    My tendency was not to or that it was
21   embellished. It was brought up.
22       Q.    So, you thought they were setting him up?
23       A.    Yes.
24       Q.    Okay. I'm going to show you a document which
25   was produced to me by your lawyers or Jeld-Wen's lawyers
```