# EXHIBIT G

# DEPOSITION EXCERPTS OF ROBERT STRUM

1        Q    Which ones would and which ones would not?

2        A    I'm sorry.  Frame the specific piece again.  77

3    to top of 78?

4        Q    Yes.  77 to -- through line 7 of page 78.

5        A    The primary issue is whether the conduct is

6    unwelcome.  It's certainly a central issue.  And if he is

7    repeatedly asking her out and that is not welcome, and

8    particularly if she has made that unwelcomeness known,

9    then that would be a violation of Jeld-Wen's

10   anti-harassment policy.

11       Q    Which one of these allegations would violate the

12   policy?  None that you could say for sure?  It would

13   depend whether it was welcome or unwelcome?

14       A    Well, she seems -- I'm not sure I understand

15   the -- she seems to be saying here, I believe, that he was

16   asking her out on dates and that she was -- there was a

17   period of time when that was consensual; she was in a

18   consensual relationship.

19       Q    Correct.

20       A    But at a point in time that relationship ended

21   and thereafter his requests for dates and whatnot to her

22   were no longer welcome.

23       Q    So at that point it would be a violation of the

24   company policy for him to ask her out on dates if she told

25   him, we're done, which are the words used on line 18 on

1    page 77; is that correct?

2         A    Correct.  And she makes reference to looks like

3    unwelcome touching.  That too would violate our

4    anti-harassment policy.

5         Q    Are you referring to the bear hug -- coming up

6    behind me and putting his arms around me and giving me a

7    bear hug?  Is that what you are referring to?

8         A    Well, that's what she's referring to and --

9         Q    I was asking if that's what you were referring

10   to in your answer.

11        A    Yes.

12        Q    All right.  If you would skip over to page 79,

13   line 9.

14             Question:  All right.  Let me ask you about the

15   incidents that she told you about.  Is it a violation of

16   Jeld-Wen policy for a manager and an hourly employee to

17   have a consensual sexual relationship?

18             Answer by Mr. Hees:  I don't think it's against

19   the policy.

20             You would agree with him there, correct?

21        A    Correct.

22        Q    Question:  The episodes that she or the

23   allegations that she imparted to you with regard to going

24   to get beer once or twice --

25             Answer:  Right.

1     A    Yes.

2     Q    Line 5, question: Okay. All right. So who was

3  the next lady that spoke? And then the following answer

4  by Mr. Hees recounting the allegations of Linda Sims that

5  he says she told him that runs through page 81, line 7.

6  So if you would take a look at that for me.

7     A    Okay.

8     Q    All right. Would those allegations, if proven

9  true, be a violation of the company's sexual harassment

10  policy?

11     A    Page 87 through --

12     Q    Page 80, line 7 through page 81, line 7.

13     A    Yes. Those allegations, if accurate, would

14  reflect violations of company policy.

15     Q    All right. I'm going to read page 81, starting

16  with line 19.

17         Question: Okay. All right. Have you told me

18  about all the allegations made by Linda Sims that she told

19  you that day on October 13th?

20         Answer: Right. Yeah.

21         Question: The basketball remark -- would that

22  be a violation of Jeld-Wen policy in your opinion?

23         Answer: I don't think so.

24         Question: How about the dribbling?

25         Answer: I don't think so.

1      Q    All of these ladies.  He met with them all at

2    one time on October 13th, 2004.  You are aware of that,

3    right?

4      A    My point -- I don't know what his assumptions

5    were, particularly his factual assumptions, when he

6    responded no.  But having said that, if true and if

7    Mr. Fetner's gesture was related to erect nipples, that

8    would be a violation of the Jeld-Wen policy.

9      Q    Would that cause you enormous consternation if

10   Mr. Hees didn't see it the same way?

11     A    If Mr. Hees had the same factual understanding

12   as to what took place that my answer is based on, then I

13   would be disappointed in that.

14     Q    Okay.  I'm going to talk to you briefly about

15   Brenda Sims.  Actually, the previous page, 19 line 20 is a

16   question by Mr. Scofield.

17         MR. SCOFIELD:  This is different deposition.

18   BY MR. DOUGLAS:  (Continuing)

19     Q    Question is:  All right.  You say the

20   particulars of your discrimination -- sexual

21   discrimination.  Is that starting the first sentence -- I

22   believe you are reading off her --

23         MR. SCOFIELD:  Correct.

24     Q    -- charge; her EEOC charge.  I believe I have

25   been subjected to sexual harassment from my supervisor

# JELD-WEN.

Date:_____

Name
Address

Re:    Management Employment Agreement -Management Position

Dear _____:

The purpose of this document is to familiarize you with the terms and conditions of your employment as a manager with JELD-WEN. Whether you are just starting your career with JELD-WEN or have been a long-time employee, please read through the following information and sign where indicated below. We believe that a clear understanding of the employment terms and conditions can be mutually beneficial to both you and JELD-WEN. If you have any questions about any aspect of this document, please feel free to consult with your own legal or tax counsel, or with any member of the Board of Directors.

1.  <u>Job Position</u>.    Your current position is «JobTitle» with «Company». You agree to exert your best efforts and substantially all of your time and attention to this position and to the successful completion of the tasks and goals mutually agreed upon.

2.  <u>Board of Directors</u>.    As with all corporations, JELD-WEN is managed by its Board of Directors who are elected annually by the stockholders of the corporation. The Board of Directors determines the policies under which the Company will operate and appoints officers to see that the policies are executed properly. Each year the Board of Directors makes decisions relating to the salary, bonuses, benefits, and other terms and conditions of your employment. All of these benefits are subject to change if the Board of Directors determines that change is warranted for any reason.

3.  <u>Compensation</u>.    Your current annual salary has been established by the Board of Directors. This salary will be paid bi-weekly. Unless your job or responsibilities change during the year or unless you are in the management trainee program, your salary will remain the same all year. The Board of Directors reviews all salaries once a year, usually in late February and early March. Any changes in your salary would be made on April 1 each year and you will be informed, prior to that date, what your salary will be for the next twelve-month period beginning each April 1.

4.  <u>Bonuses</u>.    JELD-WEN has developed an annual bonus program to reward those managers who have contributed toward the Company's success in achieving its goals. Bonuses are based on the profitability of your division or JELD-WEN as a whole. If neither is profitable, there will be no bonuses (unless there is a carry over from the prior year). Your specific bonus will be determined by the Board of Directors, at its total discretion. Some of the factors which influence the Board include: the extent of profitability of your division or the company overall, your level of responsibility, and your performance during the year. All bonuses will be determined based on the full-year results of your division and JELD-WEN and shall be paid on or before March 15 each year. Social security taxes are withheld from bonus payments; withholding for Federal and State income taxes will be at 15% and 5% respectively, unless a different rate is required in your state. You should evaluate the adequacy of the taxes withheld and review your situation with your personal tax advisor for any other actions you may need to take, such as adjusting exemptions or the amounts withheld from your wages each pay period.

Management Employment Agreement [OMA]
Page 1



DEPOSITION
EXHIBIT
2

12/03

5. <u>Employee Recognition and Bonus Program</u>.    As a way to reward long-term employment with the Company, JELD-WEN has a program to pay a bonus to employees who complete five full calendar years of service with the Company and for every five full calendar year period thereafter. This bonus is computed on the total or aggregate of your gross benefit wages during each 5-year period. The amount of the first 5-year bonus is 1% of the total gross benefit wages for the 5-year period. The second bonus is earned after completion of 10 full calendar years of service and is equal to 2% of the total gross benefit wages for the second 5-year period. The third bonus is earned after the completion of 15 full calendar years of service and is equal to 3% of the total gross benefit wages for the third 5-year period. Additional bonuses are earned after completion of every 5-year period thereafter and each is equal to 3% of the total gross benefit wages paid for each such 5-year period. All bonuses earned under this program are paid on or before March 15 each year. Payment shall be made in the form of a contribution to the JELD-WEN Employee Stock Bonus and Retirement Plan to your 401(k) account.

6. <u>Vacations</u>.    You shall be entitled to paid vacation in accordance with JELD-WEN's vacation policy as determined by the Board of Directors. JELD-WEN's current vacation policy for managers is 2 weeks of vacation after 1 year, 3 weeks of vacation after 5 full calendar years, 4 weeks of vacation after 10 full calendar years, and 5 weeks of vacation after 20 full calendar years. You must take at least one week of vacation. If you do not use all of your available vacation, you may be paid for the unused vacation at the end of the year. If you become disabled or die during the year, any unused vacation will be paid to you or to your estate. If your employment is terminated during the year by the Company, you will be entitled to payment of any unused vacation unless you are terminated because of criminal or unethical acts, or for a major violation of JELD-WEN's policies and procedures. If your employment is terminated by you, with at least two weeks notice, you will be entitled to any unused vacation. If you terminate your employment without at least two weeks notice, your unused vacation will be forfeited subject to state law.

7. <u>Other Benefits</u>.    JELD-WEN has provided a number of other benefits to which you will be entitled. This includes, but is not necessarily limited to, group health insurance program, group life insurance program, a retirement plan, and a continuing income program (for disability or death). All of these programs are subject to the policies and conditions of each program and are further subject to modification by the Board of Directors. These benefits, as well as other benefits discussed in this document, are further discussed in the "JELD-WEN Employee Handbook" and the Management Benefit Analysis (MBA) summary that you will receive annually around the end of March.

8. <u>Stock Ownership</u>.    As a management employee, you shall be entitled to become a stockholder of JELD-WEN, either by purchasing stock outright or through participation in the JELD-WEN Employee Stock Bonus and Retirement Plan. JELD-WEN is a privately-owned company whose stock is not traded publicly. Therefore, JELD-WEN has placed certain restrictions on the amount of stock you can purchase, your ability to transfer or sell your shares, and under what circumstances and at what price JELD-WEN will repurchase your shares. All of these policies shall be made available to you and are subject to modification by the Board of Directors.

9. <u>Special Stock Program</u>.    As additional consideration for your execution of this Management Employee Agreement, you will be entitled to participate in a special stock program established by JELD-WEN. This program allows you, when you are age 55 or older, to sell up to ten percent (10%) of your JELD-WEN shares each year at full adjusted book value. In addition, following your retirement (if you are age 55 or older), you may be entitled to retain up to fifty percent (50%) of your JELD-WEN shares and will be allowed to sell up to ten percent (10%) of these remaining shares each year at full adjusted book value. Of course, the other programs relating to stock repurchases will continue to be available to you as well. These are the major provisions of this special stock program; the specific terms and conditions are contained in the actual policy which shall govern. A copy of this policy will be made available to you. As with any of JELD-WEN's

Management Employment Agreement [OMA]
Page 2

policies, this special stock program is subject to modification by JELD-WEN's Board of Directors and any such changes shall automatically modify this provision.

10. Confidentiality. Trade Secrets.   Due to your position of responsibility with JELD-WEN, you will be exposed to matters of confidence relating to cost data, formulas, patterns, compilations, programs, devices, methods, techniques, processes, manufacturing processes, customer information, pricing, JELD-WEN policies and procedures and other financial data. JELD-WEN regards all such information as confidential and in many cases as trade secrets. We expect that during your employment with JELD-WEN that all such information shall be treated as confidential by you and you will not discuss or disclose such information to anyone who is not in a similar position of trust and confidence with JELD-WEN. If you are to leave JELD-WEN's employment, we must similarly require that any such information shall be treated as confidential and trade secrets and shall not be discussed or disclosed to any outside party under any circumstances whatsoever.

11. Suggestions-Inventions-Patents.   One of your responsibilities as a manager of JELD-WEN is to look for ways of improving performance *in the areas of* efficiency, quality, material usage, safety *and other areas.* Your thoughts and suggestions relating to innovations *and improvements* shall be submitted either formally or informally to JELD-WEN and shall belong to JELD-WEN.

*All intellectual property (including, without limitation, all inventions, discoveries, patents, trademarks, copyrights, works, trade secrets, and know-how) conceived, created, authored, or contributed to by you, alone or with others, during your employment with JELD-WEN that is either (a) related to the business or anticipated business of JELD-WEN or (b) within the scope of your employment shall be the property of JELD-WEN. You agree to assign all right, title, and interest in any such intellectual property to JELD-WEN, and hereby do so to the extent not done shall already created or otherwise previously, and to cooperate with JELD-WEN in protecting such intellectual property, including without limitation disclosing such intellectual property to JELD-WEN and signing any necessary documents.*

*The immediately preceding paragraph shall not require you to assign, or offer to assign, an invention that was developed entirely on your own time without using any of JELD-WEN's equipment, supplies, facilities, or trade secret information, unless the invention either (a) relates at the time of conception or reduction to practice of the invention to JELD-WEN's business, or actual or demonstrably anticipated research or development of JELD-WEN or (b) results from any work performed by you for JELD-WEN, in which either case the immediately preceding paragraph shall apply and JELD-WEN shall own such invention. Your rights in this regard may be governed by Cal. Labor Code Section 2870 or a similar statute. If any invention developed entirely on your own time relates in any way whatsoever to the business or anticipated business of JELD-WEN (including, without limitation, possibly useful in any of the products, processes, or designs used or sold by JELD-WEN, within a technical area of interest or possible interest to JELD-WEN, or possibly useful in a new business line related to JELD-WEN's business or anticipated business), or if you anticipate filing a patent application or otherwise seeking protection for the invention, then you agree to notify JELD-WEN of such invention within a reasonable time after its conception (but no later than prior to seeking protection for the invention), even if it was developed entirely on your own time and you believe that JELD-WEN does not own the invention. In no way shall this paragraph modify any common-law, statutory, or other right provided to JELD-WEN, and JELD-WEN retains all such rights. Nor does this paragraph modify any obligation of confidentiality or other obligation that you may have to JELD-WEN.*

12. Employment at Will.   While we try to hire only employees who are interested in a long-term career with JELD-WEN, over time there may be circumstances which arise that can affect the desirability of a continued employment relationship. As a result, either you, the employee,

Management Employment Agreement [OMA]
Page 3

or JELD-WEN, the employer, has the right to terminate the employment relationship at any time for any reason or for no reason. *Nothing in this Agreement or the relationship between you and JELD-WEN, either now or in the future, whether oral, written or implied, may be construed or interpreted to create an employment relationship that is other than at-will.*

13. Termination of Employment by Employee.    Although we hope our working relationship is a lasting one, if you have doubts, or feel that you might need to make a change for any reason, we ask that you discuss this frankly with your immediate manager at least 30 days prior to your taking any irrevocable action. Should your manager and/or other JELD-WEN managers be unable to change your mind; you should give JELD-WEN a minimum of two weeks notice prior to your leaving. If you do so, you will be entitled to receive compensation for any vacation not yet taken during the current calendar year. You will however *not be eligible for* bonuses that might have been *earned and/or* paid in the future. In the event you initiate such action you agree in advance that you will not in any case accept a job in which you would be competing against JELD-WEN or any of its affiliates for a period of three years from your date of resignation. In the event that this non-compete provision is held invalid or unenforceable because of the unreasonableness of the scope of the subject matter, time or geographical area, then such non-compete provision shall be effective for such subject matter, time, or geographical area as may be determined by a court of competent jurisdiction to be reasonable.

14. Termination of Employment by Employer.    We sincerely try to make every *reasonable* effort to help our managers succeed. *Unless* there have been unusual circumstances (criminal, ethical or for major violation of JELD-WEN's policies and procedures) or the timing proves impractical for business reasons, your manager *should* attempt to frankly discuss the possibility of dismissal with you at least 30 days prior to any direct action being taken, so that all facts and circumstances can be fully discussed and hopefully a mutually agreeable solution found. *If you execute and do not revoke the JELD-WEN Severance Agreement, which will contain a full and global release of claims and potential claims against JELD-WEN, you will also be entitled to receive* two weeks' notice *(unless already provided)* and be entitled to compensation for any unused vacation time *(not paid out with final wages)* as well as one month's severance pay and the pro-rated amount of the annual bonus to which you might otherwise be entitled. In the event management terminates your employment because of criminal or unethical acts or for major violation of JELD-WEN's policies and procedures, you will *not* be entitled to *receive* notice *pay,* unused vacation pay, severance pay or pro-rated bonus payment.

15. Ethics.    JELD-WEN strives to maintain a reputation for integrity, fair dealing and the highest standard of business ethics in all of its relationships, including suppliers and customers as well as JELD-WEN's competitors. Commitment to these ethical principles is considered to be an integral part of your responsibility.

16. <u>Continuing Agreement</u>.     Subject to the changes which may be made as outlined in the foregoing paragraphs, this agreement shall continue in full force and effect so long as the employment relationship exists; <u>provided</u>, however, that the terms and conditions contained in paragraphs 10, 11, and 13 shall continue in full force and effect beyond the termination of the employment relationship.

Sincerely,

JELD-WEN, inc.

R.C. Wendt
President

I have read and understand the foregoing information relating to my employment with JELD-WEN. I accept employment with JELD-WEN on these terms and conditions.

SAMPLE
(Manager's Name)

**JELD-WEN**

CORPORATE POLICIES AND PROCEDURES

PROC. 220: Severance Program
PAGE:    1 of 2
DATE:    12/03

### 220. Severance Program

A.    General:

In the event an employee's job is discontinued or eliminated and no other suitable position is available, *employees, under normal circumstances, will be given two weeks notice and* the severance program outlined below will be applied. Severance shall not be paid to an employee who quits, is discharged for cause*, who declines an offer to return to work while on temporary layoff or during any temporary layoff. *As set forth below,* severance shall be paid to employees who have not been *recalled* from a temporary layoff and have been terminated pursuant to our 6-month neutral leave *procedure.* (*For management employees discharged *for reasons other than job elimination*, refer to their management employment agreement, Form 1134.)

To ensure uniformity and the timely issuance of severance checks, notify the *Corporate Services d*epartment for computation of all severance packages at least two weeks prior to the planned date of severance. The *Corporate Services d*epartment will refer appropriate severances to the Corporate Legal *d*epartment in the event a release form is needed before payment is made.

B.    Staff & Hourly Program:

*The JELD-WEN Severance and Release Agreement will contain a full and global release of claims and potential claims against JELD-WEN. Under normal circumstances, if the Severance and Release Agreement is executed and is not timely revoked,* employees will be entitled to *severance pay in the following forms*:

*1.    Two weeks notice pay (if not already provided).*

*2.    A prorated* amount of their 5-year bonus. (Prorated amounts for the last year worked are computed on benefit dollars which do not include severance pay or pay for unused vacation.)

*3.*    Compensation for any unused vacation time (which was earned in the previous year) and for vacation earned in the current year (which would normally accrue at year end for use in the following year), prorated to date of termination. *Note: If applicable state law requires, accrued unused vacation will be*



DEPOSITION
EXHIBIT
3

PERSONNEL

PROCEDURE

> *paid out as final wages, not as severance, without the need to execute the JELD-WEN Severance and Release Agreement.*

4.  *One* week of pay for every two years of service, up to a maximum of 10 weeks, with a minimum of one week. *Severance pay will be based on an employee's base pay rate and does not include shift differentials.*

## C.   Management Severance Program:

*The JELD-WEN Severance and Release Agreement will contain a full and global release of claims and potential claims against JELD-WEN.* Under normal circumstances, *if the Severance and Release Agreement is executed, and is not timely revoked,* management employees will be entitled to *severance pay in the following forms*:

1.  *Two weeks notice pay (if not already provided).*

2.  *A prorated* amount of their annual bonus to which the employee might otherwise be entitled.

3.  *A prorated* amount of their 5-year bonus.

4.  Compensation for any <u>unused</u> vacation time (earned in the previous year) and for vacation earned in the current year (which would normally accrue at year end for use in the following year) prorated to date of termination. *Note: If applicable state law requires, accrued unused vacation will be paid out as final wages, not as severance, without the need to execute the JELD-WEN Severance and Release Agreement.*

5.  *One* week of pay *for every* two years of service, up to a maximum of 10 weeks, with a minimum of one month.

## D.   Referral Assistance:

Occasionally employees may be displaced due to technological changes, physical impairments which cannot be reasonably accommodated, or other circumstances beyond their control. If employees have demonstrated a willingness to work, have certain skills and abilities, but there is no opening in the company to which they can be transferred, a reasonable effort should be made by management to assist employees in finding employment elsewhere in the community in a job for which they are suited.

---

**PERSONNEL**                                                      **PROCEDURE**

# JELD-WEN.

**Legal Department**

P.O. Box 1329
3250 Lakeport Blvd.
Klamath Falls, OR
97601-1099 USA

541 850-2618 Tel
541 885-7447 Fax
www.jeld-wen.com

Windows / Doors / Millwork

Monday, October 18, 2004

**CONFIDENTIAL**

Richard H Fetner
567 Davis Dr
Roanoke AL, 36274

### Re: Severance and Release Agreement

Dear Richard:

Your employment with JELD-WEN ("the Company") has ended, or is ending, effective 10/13/2004.

The Company has agreed to make available to you a severance and release agreement ("the Agreement"). Under this agreement, if you choose to accept it and do not exercise your right to revoke, as set forth below in paragraph 8, you will receive severance compensation above and beyond your final paycheck in a gross amount as follows (to be paid within 7 and 14 days after upon receipt by Daniel Hees of the executed original of this Agreement):

| | |
|---|---|
| Severance in the form of Prorated 5-yr Bonus | $1,486.39 |
| Severance in the form of Severance pay | $4,750.17 |
| Severance in the form of Accrued Vacation | $1,812.76 |
| **Total =** | **$8,049.33** |

In exchange for these additional benefits, which you would otherwise not be entitled to receive, you agree to the terms described below, which include a general release of claims.



DEPOSITION
EXHIBIT
4

Severance Agreement - Richard H Fetner
10/18/2004
Page 2

## Separation Agreement

### 1 - Release Of Claims

In consideration for the separation benefits in this Agreement, which include significant consideration which you would not necessarily otherwise be entitled to receive, you agree to fully release the Company, its parent and related corporations, affiliates and joint ventures, partnerships, predecessor and successor organizations and all current and former partners, members, officers, directors, employees, agents, insurers, shareholders, representatives and assigns from any and all liability, damages or causes of action, direct or indirect, known or unknown including, without limitation, all claims relating in any way to your employment with the Company or the termination of that employment. This release includes, but is not limited to, any claims for additional compensation, benefits or wages in any form, damages, reemployment or reinstatement. This release also includes, but is not limited to, all claims for relief or remedy under any state or federal laws, including ERISA, 29 USC § 1001 et seq., Title VII of the Civil Rights Act of 1964, 42 USC § 2000e as amended, the Post Civil War Civil Rights Acts, 42 USC §§ 1981-88, the Equal Pay Act, the Age Discrimination in Employment Act, the Americans With Disabilities Act, the Older Workers' Benefit Protection Act, the Federal Family and Medical Leave Act, the Worker Adjustment and Retraining Notification Act, the Rehabilitation Act of 1973, the Uniformed Services Employment and Reemployment Rights Act, the Fair Labor Standards Act, Executive Order 11246, and all other laws and contract, tort or other common or statutory law theories and all labor, employment or wage laws of any state, including but limited to your state of residence and state where you performed work for

To the extent that it is applicable, you hereby waive all statutory rights that do or might be deemed to require an express waiver as to claims, that you do not know about or suspect exist in your favor at the time of executing this Agreement, which if known by you, would have materially affected your consideration of this Agreement. Claims that may arise after the date this Agreement is executed are not waived.

### 2 - Tax Consequences

No representations are made by the Company as to the tax consequences of the payments described in this Agreement.

### 3 - Knowing and Voluntary Acceptance of Agreement and Releas

You acknowledge that you have carefully read the Agreement, understand its contents, and have not been prevented from consulting with an attorney if you wish to do so; you understand that you are releasing legal rights, including, without limitation, those identified in the Release of Claims set forth above. You also acknowledge that, as consideration for executing this Agreement, including the Release of Claims, you are receiving additional benefits and compensation to which you would not otherwise be entitled.

Attached as Exhibit 'A' is a list of the job titles and ages of all individuals eligible for the severance program. Attached as Exhibit 'B' is a list of the ages of all individuals in your job classification who are ineligible for the severance program because they have not been selected for layoff.

Severance Agreement - Richard H Fetner
10/18/2004
Page 3

**4 - Applicable Law and Dispute Resolution**

This Agreement shall be construed in accordance with and governed by the statutes and common law of the state of the Company's facility that employs you (or employed you at the time your employment terminated) or, for sales representatives and similarly situated employees, the state where you primarily work(ed) for the Company. Any disputes arising in connection with the terms or enforcement of this Agreement shall be resolved by confidential mediation or binding arbitration in accordance with the procedures of the American Arbitration Association or other procedures agreed upon by you and the Company. The costs of mediation and arbitration shall be borne equally by you and the Company.

**5 - Confidential and Proprietary Information and Non-Competition**

You acknowledge that you have a fiduciary duty as an employee of the Company to keep confidential all proprietary and/or confidential information obtained by you during the course of your employment (including, but not limited to, as set forth in the Management Employment Agreement that you may have previously entered into with the Company, e.g., the section addressing Confidentiality and Trade Secrets), and that you have continuing obligations to the Company pursuant to do so. You hereby acknowledge and expressly reaffirm these obligations in exchange for the consideration provided to you under this Agreement.

**6 - Intellectual Property**

You acknowledge that all intellectual property (including without limitation any invention, design, technique, patent, or the like) conceived or created by you during your employment with the Company is the property of the Company, under both the Management Employment Agreement you may have previously entered into with the Company, e.g., the section addressing Suggestions-Inventions-Patents, and statutory and common law. You also acknowledge that you have an obligation to cooperate with the Company in disclosing such intellectual property to the Company, and in assigning such intellectual property to the Company, including signing any necessary documents. You hereby acknowledge and expressly reaffirm these obligations, and further agree to cooperate with the Company after your employment ends by disclosing and confirming the Company's ownership in any such intellectual property conceived or created during your employment with the Company (including without limitation signing necessary documents at the Company 's request), in exchange for the consideration provided to you under this Agreement.

**7 - Acknowledgement**

You acknowledge that this Agreement contains the entire agreement and understanding between you and the Company and supersedes and replaces all prior negotiations and agreements concerning the subjects of this Agreement. You acknowledge that (a) you have read the Agreement and understand the effect of your release and that you are releasing legal rights; (b) are not relying on any representations or statements made by the Company, in executing this Agreement, other than those specifically contained in this Agreement; (c) you have had adequate time to consider this Agreement (as set out below); (d) as consideration for executing this Agreement, you have received additional benefits and compensation of value to which you would not otherwise be entitled; and (e) you have been, and hereby are, advised in writing to review this Agreement with legal counsel of your choice.

Severance Agreement - Richard H Fetner
10/18/2004
Page 4

**8 - Time for Consideration of Offer and Agreement**

You acknowledge that this offer provides you with a period of at least forty-five (45) days from the date of receipt for your consideration of the offer (the "consideration period"). In the event you have not executed this Agreement by the expiration of the offer period, the offer shall expire. You may execute this Agreement at any time during this consideration period.

This Agreement shall be effective on the date it is signed. However, you shall have a period of seven (7) days from your execution of this Agreement in which you may revoke this Agreement. Notice of this revocation, if any, shall be made in writing addressed to Daniel Hees. In the event you do not exercise your right to revoke this Agreement, this Agreement shall remain in effect and shall become effective and irrevocable on the date immediately following the seven (7) day revocation period described above.

**9 - Severability**

If any term, clause or portion of this Agreement shall, for any reason, be held to be invalid or unenforceable or to be contrary to public policy or any law, then the remainder of this Agreement shall not be affected by such invalidity or unenforceability but shall remain in full force and effect, as if the invalid or unenforceable term or portion thereof had not existed within this Agreement.

Sincerely,

**JELD-WEN, Inc.**

By: Daniel Hees - General Manager

I have read and understand the foregoing Agreement and, by signing below, I voluntarily enter into this Agreement and understand that I am waiving and releasing legal claims that I may have against the Company.

Accepted: ___5-21-___ 2004

Richard H Fetner

1      A    Yes.

2      Q    Who's Dan Hees?

3      A    He's one of the managers for Jeld-Wen.

4      Q    What are the manager's duties with regard to

5   knowing and implementing the gender harassment policy?

6      A    They are responsible for being familiar with the

7   policy and for complying with it.

8      Q    They just have to know it exists or they have to

9   know what it is?

10      A    Both.

11      Q    I understand everybody should have to comply

12   with the policy, correct?

13      A    Correct.

14      Q    Management and employees, correct?

15      A    Yes.

16      Q    Are managers responsible for implementing the

17   policy?

18      A    Managers have greater responsibility with

19   respect to the policy than non-managers.  And that

20   includes implementing the policy and being -- they have

21   greater involvement when the policy is triggered, for

22   example, by somebody raising a complaint.

23      Q    What are a manager's duties when somebody raises

24   a complaint?

25      A    The manager is responsible for -- in the general

174

1        THE WITNESS:  There is -- I find it to be

2    relevant if there are multiple parties that are

3    complaining about conduct in a consistent manner.  That's

4    certainly factored into the assessment.  That's not

5    irrelevant.

6    BY MR. DOUGLAS:  (Continuing)

7        Q    Okay.  Did you undertake any investigation

8    regarding Mr. Bowen's contention that everybody was in

9    violation of the policy at the Roanoke facility?

10        MR. SCOFIELD:  Including Lorena?  I'm sorry,

11    Jim.

12        THE WITNESS:  Mr. Bowen was the only individual

13    with who I spoke.  That was a unique allegation to

14    Mr. Bowen.  Neither Miss Minix nor Ms. Zachary raised

15    those types of concerns.  Frankly, Mr. Bowen's -- I did

16    not -- I did not speak with individuals above and beyond

17    the individuals in my report with the exception of perhaps

18    having spoken with Mr. Galvez about that.

19        Q    Did you speak to Fetner at all on that trip?

20        A    I imagine that I did at least briefly for

21    coordinating issues perhaps.  I don't recall specifically.

22        Q    But with regard to Mr. Bowen's assertion that

23    everybody was in violation of the policy, you just

24    dismissed that?

25        A    I don't know that I dismissed that.  I did not

CHARLES ROBERT STORM

1  find it to be --

2      Q    Did not believe it?

3      A    I did not find it to be credible.  It was at

4  odds with what Miss Minix and Miss Zachary were telling

5  me.

6      Q    What did they tell you with regard to other

7  possible harassments in the facility?

8      A    When I talked with them about violations of our

9  anti-harassment policy, they explained to me that the

10  problem at the facility was specific to Mr. Bowen.

11      Q    And given all that, you didn't feel the need to

12  investigate Mr. Bowen's claims?  I'm not saying you should

13  have.  I'm just trying to figure out what you did.

14      A    I told you I spoke with the three individuals in

15  this report.  I know I spoke to Mr. Galvez.

16      Q    That was it?  That's all I need.

17      A    In essence.

18      Q    Okay.  You made no investigation of Mr. Bowen's

19  claims specifically?

20      A    Well, no.  I just said that I spoke with

21  Miss Zachary, Miss Minix and Mr. Galvez.

22      Q    That was before the statement by Mr. Bowen

23  though, correct?

24      A    I spoke with Miss Minix twice; I spoke with

25  Miss Minix once before and once after.

1          Q    After the statement of Mr. Bowen?

2          A    Correct.

3          Q    Did you speak to Mr. Galvez before or after the

4     statement of Mr. Bowen?

5          A    Oh, sure.  I spoke with Mr. Galvez before and

6     after.

7          Q    Okay.  How about Miss Zachary?

8          A    I believe that -- I believe that I spoke with

9     Miss Zachary before.

10         Q    Other than --

11         A    Of course, I had no opportunity to find out what

12    Mr. Bowen was referring to.

13         Q    Because he left?

14         A    Because he left.

15         Q    All right.  You believe you spoke both to

16    Miss Minix and Mr. Galvez about Mr. Bowen's statement that

17    everybody was in violation of the policy?

18         A    No, not specifically.  I spoke to Miss Minix

19    about her concerns at the facility.

20         Q    Right.  You testified to that.  She said they

21    were limited to Bowen?

22         A    Correct.  Frankly, I had no idea what Mr. Bowen

23    was referring to because he stormed out.

24         Q    You didn't take any further investigation other

25    than what you have testified to regarding his statement?

```
 1          A    Correct.

 2               MR. DOUGLAS:  All right.  Let's go off the

 3     record for a second.

 4                             (Recess.)

 5     BY MR. DOUGLAS: (Continuing)

 6          Q    Okay.  There was a document produced to me today

 7     indicating the employees -- the hourly employees -- I

 8     guess all the employees at the Roanoke facility as of

 9     12/15/04.  Would you be able to identify --

10               MR. SCOFIELD:  I think that's the day this was

11     printed out.

12               MR. DOUGLAS:  Okay.

13               MR. SCOFIELD:  Because Richard Fetner's name is

14     on there.

15     BY MR. DOUGLAS: (Continuing)

16          Q    It certainly is.  All right.  At any rate, it's

17     a roster of employees.  Would you be able to identify them

18     for me?  Do you know who they are?  If you can't, just

19     tell me.

20          A    I'm 99 percent certain the answer is no.

21               MR. DOUGLAS:  I won't ask you about it then.

22     All right.  That's all the questions I have.

23               MR. SCOFIELD:  I have no questions.

24                    (Deposition concluded at 4:51 p.m.)

25                             --o0o--
```