# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| LORENA MINIX, BRENDA SIMS, and LINDA SIMS, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | CIVIL ACTION NUMBER: 3:05-cv-00685-T |
| v. | ) ) | |
| JELD-WEN, inc. | ) ) | |
| Defendant. | ) | |

DEFENDANT JELD-WEN, inc.'s REPLY BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I.    INTRODUCTION.

Defendant JELD-WEN, inc. ("JELD-WEN") files this Reply to Plaintiffs' Brief in Opposition to Defendant JELD-WEN, inc.'s Motion for Summary Judgment ("Plaintiffs' Brief"). JELD-WEN's Reply addresses many (but not all) of the unfounded factual misstatements and assertions set forth in Plaintiffs' Brief as well as Plaintiffs' erroneous legal argument that JELD-WEN's "higher management" had sufficient notice of the alleged harassment to prohibit JELD-WEN's exercise of the Faragher/Ellerth affirmative defense. Finally, in the alternative, the Reply addresses claims abandoned by Plaintiffs for which JELD-WEN requests partial summary judgment.

II.    JELD-WEN EXERCISED REASONABLE CARE TO PREVENT SEXUAL HARASSMENT.

A.    Plaintiffs' Brief Addresses Irrelevant Allegations.

This is a sexual harassment case wherein Defendant JELD-WEN moved for summary judgment solely on the basis that there can be no liability because the employment of the alleged offender ended the same morning that Plaintiffs first reported

the alleged conduct.  Plaintiffs' Brief exercises significant effort to document the severity of the alleged conduct, including conduct directed at three persons who are not plaintiffs in this case but those alleged facts are irrelevant to and do not in any manner negate that JELD-WEN's motion is well taken.  See Plaintiffs' Brief, pp. 2-8.  The severity of the alleged conduct has absolutely no bearing on the applicability and dispositive impact of the Faragher/Ellerth affirmative defense.

Plaintiffs' focus on the alleged conduct is misguided as the relevant issue is the timing and sufficiency of JELD-WEN's notice in order to correct the misconduct.  **As established in its primary brief, neither Plaintiffs nor the non-plaintiff complaining parties afforded JELD-WEN such notice prior to October 13, 2004, and when the notice was provided, the alleged problem was corrected that same day.**[1]

### B.    JELD-WEN's Sexual Harassment Policy is Effective.

Plaintiffs admit that they each received, were aware of and fully understood JELD-WEN's anti-harassment policy.  Minix, 186:18-21; B. Sims, 113:5-19; L. Sims, 119:14-19, 120:21-23.  Therefore, JELD-WEN properly "disseminated" its anti-harassment policy. See EEOC v. Cagle's, Inc., 168 Fed.Appx. 917 (11th Cir. 2006).  Plaintiffs do not contest the adequacy of JELD-WEN's policy, which defines and provides examples of harassment and advises that complaining employees shall "not be discriminated against for reporting harassment. . . ." Id.  JELD-WEN's policy specifically

---

[1]    Notwithstanding that JELD-WEN does not contest the "severe and pervasive" element for summary judgment purposes, it is perhaps worth noting that Stacy Overton, one of the non-Plaintiffs upon whose testimony the Plaintiffs rely, unequivocally testified that the alleged conduct related to her occurred before either she or Fetner were employed by JELD-WEN and occurred away from work.  Overton, 99:3-16 (a copy of the referenced page is attached for the Court's convenience).  Her testimony is not relevant for any purpose whatsoever and is immaterial and inadmissible under Fed. R. Evid. 412.  Furthermore, another non-Plaintiff, Kathy Thornton, testified that no other employee – management or non-management – witnessed the conduct that Fetner allegedly directed towards her and that she did not complain about Fenter's alleged conduct to anyone designated in JELD-WEN's anti-harassment policy until the October 13, 2004 meeting.  Thornton, 107:9-12.

provides "alternative means of redress"[2] by instructing employees to notify "either their immediate supervisor, their General or Corporate Manager, Vice President, or Subsidiary President, or the Legal Department at (541) 882-3451."  Minix, EX-26 (page 5).

### 1.    Plaintiff's Brief Mischaracterizes Hees' testimony.

Plaintiffs attempt to avoid dismissal by repeatedly attacking Dan Hees' ability to implement JELD-WEN's anti-harassment policy (See Plaintiffs' Brief, pp. 8-10).  Not only do such efforts mischaracterize his deposition testimony, they are also irrelevant for summary judgment purposes.

Plaintiffs' Brief acknowledges that Hees received sexual harassment training from JELD-WEN's in-house counsel and that he was aware of JELD-WEN's policies. Plaintiffs' Brief, p.8.  Hees accurately testified that JELD-WEN's policy does not prohibit consensual dating between a supervisor and a subordinate or a consensual hug occurring once or twice.  Hees, 79, 80, 83, 121, 132.  Hees also testified that he was to contact JELD-WEN's employment law specialist, attorney Rob Sturm, for guidance upon receiving a harassment complaint.  Hees, 35-36, 95-96, 99, 131, 133.  Hees identified the following as hypothetical conduct that would violate JELD-WEN's policy or warrant contacting JELD-WEN's legal department and/or further investigation:

(2)    Fetner asking plaintiff Linda Sims to sit on his lap.   Hees, 82;

(3)    Fetner brushing against plaintiff Brenda Sims' breast while teaching her how to operate a machine. Hees, 84-86, 124;

(4)    Fetner asking Kathy Thornton for a "blow job".  Hees, 84-86, 124;

(5)    Unwelcome hugs.  Hees, 121, 131;

---

[2]    Howard v. City of Robertsdale, 168 Fed. Appx. 883, 888 n. 5 (11th Cir. 2006).

(6)    Unwelcome requests for dates.  Hees, 122; and,

(7)    Explicit requests for sex.  Hees, 123.

Hees' understanding of the policy was thus sufficient to handle all complaints by all Plaintiffs.  Besides, Hees testified that even if his opinion differed with that of JELD-WEN's in-house employment lawyer, he would defer to Sturm.   Hees, 165:4-7. Therefore, it is immaterial if Hees' understanding of exactly what conduct is prohibited by JELD-WEN's sexual harassment policy somewhat differs from that of Sturm.

More importantly, Hees' speculation regarding different hypothetical situations is immaterial.   The only material facts relate to what actually happened in this case.  The record is clear that upon receiving a complaint by an employee (Brenda Sims) about being moved to different job stations, Hees promptly scheduled a meeting with her on October 13, 2004.  Hees, 70:3-18.  When Brenda Sims appeared at the October 13th meeting with four additional employees,  Hees listened to each employees' allegations regarding Fetner and immediately began an investigation that ended the same morning with Fetner's resignation.[3]

Plaintiffs assert that Hees "immediately concluded that the allegations were false and embellished."  Plaintiffs' Brief, p.15.  Hees actually testified that he was disturbed that, all of a sudden, five employees complained about Fetner.  Hees, 93:3-13.  Hees testified that he believed Minix's allegations, but, at the time, had a "tendency" not to

---

[3]       Although JELD-WEN's prompt action prevented Fetner from ever bothering plaintiffs again, Plaintiffs complain that Fetner received a severance package.  Plaintiffs' concerns are immaterial.  Carter v. American Online, Inc., 208 F.Supp. 1278 (M.D. Fla 2001) ("Whether the harassment was abated for the "right" reason should not affect this determination, as long as the abatement [of the harassment] was permanent and effective.")  Moreover, the severance package had value to both JELD-WEN and plaintiffs in that Fetner, a Roanoke city councilman agreed to release all claims against JELD-WEN and all current and former "employees" such as plaintiffs.  Sturm Depo., EX-4.  Thus, the severance package prevented Fetner from suing both JELD-WEN and plaintiffs for defamation or invasion of privacy to protect his political future.

believe the others or believed that their complaints were embellished. Hees 97:6-23. Hees' disturbance was understandable because no one had complained to him before about Fetner. Hees 93:1-10. (In fact, for the same reason, Towanna Zachery disbelieves her former co-workers. Zachery 39:14-23; 40:1-7). Nonetheless, Hees told the five employees "you all know what our policy is. That we don't tolerate it. It's zero tolerance. I do have to listen to the other side . . . I will talk to Richard [Fetner] right now. . . ." Hees 88:19-25; 89:1-7.

Hees interviewed Fetner later that morning. Hees 94:1-8. When Hees advised Fetner that the allegations would be investigated by "the legal department . . . just like they did in 2003," Fetner resigned. Hees, 95:22-25; 96:1-24.

### 2. The Company Has Consistently Demonstrated Its Compliance In Promptly Investigating Harassment Complaints.

Plaintiffs confirm that they base no claim on the earlier Ronald Bowen incident; however, this incident, cited in Plaintiffs' Brief, highlights the Company's commitment toward following its anti-harassment policy. Plaintiffs disingenuously imply that in June 2003, Minix complained to her immediate supervisor, Richard Fetner, about Bowen's masturbating in front of her, but Fetner did nothing until Towanna "Tooty" Zachery[4] complained about Bowen. Plaintiffs' Brief, p. 2. Presumably, this is an unfounded effort to undermine the substantial evidence that JELD-WEN took and enforced its policy seriously. However, Plaintiffs fail to inform the Court that Minix made her "report" to Fetner at the end of a Thursday shift and Galvez initiated an investigation the very next day. See discussion at ¶19 of JELD-WEN's primary brief, p.7. Furthermore, in her

---

[4]    Ms. Zachery never saw any improper conduct by anyone other than Ronald Bowen. Zachery 42:7-15.

deposition, Ms. Minix clarified that she did not even tell Fetner what her allegations were, testifying at pages 223 and 224 as follows:

Q       Okay.    If JELD-WEN records indicate that Mr. Galvez then contacted – talked to you, did he talk to you?

A       Yes.

Q       All right.

A       Then I had to tell what happened.  I mean, I went to him and told him - I told Richard Fetner, I said:  Look, you know, I've got to be moved.

Q       All right.

A       [Fetner] said:  What did [Bowen] do?  I said:  I don't want to tell on [Bowen], I just want to be moved.  Because he was, he was very smart, very intelligent.

Q       Talking about Mr. Bowen?

A       Yes.  You know, he was good for the plant.

Q       All right.

A       So I just told [Fetner] I wanted to be moved.  **I wasn't going to tell him why.  Because I knew they would fire [Bowen]**.

Q       Okay.  All right.

A       So then I had to, after.

Q       But at what point – When Tooty went and told Mr. Galvez?

A       Uh-huh.  Yes.

Q       Then Mr. Galvez went and spoke with you?

A       Yes.

Q       All right.  And Mr. Galvez went and spoke with Tooty?

A       Yes.

6

Minix, 223:4-25; 224:1-11 (emphasis added).

JELD-WEN promptly investigated Bowen's alleged behavior within hours of Minix's request that she be "moved" and Minix's suggestion that JELD-WEN did not timely investigate her claim is unsupported by the record evidence.  The record shows that <u>when</u> an employee makes a proper complaint to the persons designated by the anti-harassment policy to receive them, JELD-WEN acts swiftly to prevent further harassment.  Although Plaintiffs' Brief argues that JELD-WEN was "indifferen[t]" to sexual harassment, the undisputed record - and Sturm's 2709 mile trip to Roanoke to investigate the allegations - shows otherwise.  Sturm, 38:9-12, 39:1-4.

Plaintiffs' Brief makes similarly misleading assertions regarding JELD-WEN's separation of Minix and Bowen during the investigation.  <u>See</u> Plaintiffs' Brief, p.16. Minix and Bowen only worked together on a couple of occasions after the commencement of the investigation and Galvez and Fetner closely monitored the work area to ensure that there were no additional incidences. Galvez, 82:14-24, 112:6-9; Fetner, 221:14-21; <u>see</u> Galvez, ¶¶ 2-4, EX-A (noting that Minix and Bowen worked together only 3½ days).

### 3.    JELD-WEN's Responses to the Bowen and Fetner Incidents Illustrate JELD-WEN's Vigorous Enforcement of Its Policy.

Plaintiffs cannot establish that JELD-WEN failed to "vigorously" enforce its policy upon receiving a complaint through the proper reporting channels, in sharp contrast with the assertion advanced in Plaintiffs' Brief.  <u>Howard</u>, *supra*, at 887. Zachery's complaints about Bowen to her immediate supervisor prompted an immediate investigation that culminated in Bowen's resignation.  Minix, 234:3-10.  Likewise, within hours of meeting with Plaintiffs, Hees advised Fetner that JELD-WEN's Legal Department would be

called in to "sort out" plaintiffs' allegations, thus prompting Fetner to resign the same morning that Plaintiffs complained.  Hees, 95:6-96:5.

## III.    JELD-WEN WAS NOT ON NOTICE OF FETNER'S CONDUCT PRIOR TO OCTOBER 13, 2004, AS MATTER OF LAW.

### A.    JELD-WEN Is Not Directly Liable For Fetner's Conduct.

Plaintiffs fail to establish any basis to hold JELD-WEN liable for Fetner's alleged conduct.  Plaintiffs primarily rest their case upon a direct liability theory, asserting that JELD-WEN had sufficient legal notice because Kathy Thornton purportedly told Group Manager Joe Mendoza about alleged misconduct by Fetner sometime before October 2003.  Plaintiffs' Brief, pp. 6, 12; Mendoza, 6:4-11.    However, non-Plaintiff Thornton's alleged 2003 report to Joe Mendoza, a person who was neither her direct supervisor nor a person designated in JELD-WEN's policy to receive harassment complaints, is insufficient to put JELD-WEN on notice.  "Direct liability arises when the employer either knew or should have known of supervisor harassment but failed to take remedial action."  Howard, *supra*, at 889.  To establish actual knowledge, plaintiffs must submit admissible evidence that either "higher management" or a person "designated" by JELD-WEN's anti-harassment policy received notice of complaints about Fetner.  Carter v. America Online, Inc., 208 F. Supp. 2d 1271, 1277 (M.D. Fla. 2001).  The Supreme Court defines "higher management" as "a supervisor with **immediate** (or successively higher) authority over the employee."  Faragher v. City of Boca Raton, 118 S.Ct. 2275, at 2279 (1998) (emphasis added).    Consistent with Faragher, JELD-WEN's policy designates the following to receive complaints by victimized employees:  "either their **immediate** supervisor, their General or Corporate Manager, Vice President, or

Subsidiary President, or the Legal Department at (541) 882-3451." (emphasis added.) JELD-WEN's Evidentiary Submission, EX-A.

Mendoza was not Kathy Thornton's "immediate supervisor", and he, as a Group Manger (or even coordinating group manager) was not in Thornton's reporting hierarchy. Thornton, 125:2-16. Rather, Fetner who was also a Group Manager, was Thornton's and each Plaintiffs' immediate supervisor, and Fetner reported to Pat Galvez who reported to Dan Hees. Plaintiff Minix even identified Hees as "the one [they] were supposed to talk to about Fetner's conduct." Minix, 275:8-13. As such, Thornton's alleged discussions with Mendoza, a lower level supervisor who was not in her reporting hierarchy, did not constitute notice to JELD-WEN. Plaintiffs are not permitted to rewrite JELD-WEN's policy to fit their facts.

Plaintiffs cite two readily distinguishable cases to support their proposition that Thornton's alleged discussion with Mendoza constitutes notice to JELD-WEN. In Brooks v. H.J. Russell & Company, the plaintiff failed to complain about her supervisor's conduct for five months. 66 F. Supp. 2d 1349 (N.D. Ga. 1999). Nonetheless, because a victimized non-plaintiff had previously complained to the "highest level of management" about the same harassing supervisor, a fact-issue existed based on the highest-level manager's failure to act on the non-plaintiff's complaints. *Id.* Similarly, in Dees v. Johnson, a non-plaintiff had previously complained to the company's Human Resources Department about the same supervisors' conduct. 168 F.3d 417, 419-420, 422 (11th Cir. 1999). The Human Resources Department was specifically responsible for investigating sexual harassment allegations. *Id*. Thus, Dees found a fact issue existed regarding notice. *Id*.

In the instant case, Kathy Thornton and Lisa Cook admitted that Mendoza was never their "supervisor," immediate or otherwise.   Mendoza's alleged knowledge thus cannot be imputed to JELD-WEN because he was not "a supervisor with immediate (or successively higher) authority over [Thornton or Cook]."   Faragher, 118 S.Ct. at 2279. Furthermore, Mendoza had not been "designated" by JELD-WEN to receive a complaint and held a position akin to a foreman.   Notice to an employee outside "the proper channels for reporting complaints" is insufficient to create an issue of fact.   Carter v. America Online, Inc., 208 F. Supp. 2d 1271, 1277 (M.D. Fla. 2001).  Indeed, according to non-Plaintiff Lisa Cook, Mendoza's alleged advice to Thornton was "to get her to go to [General Manager] Pat [Galvez] about it," i.e, follow the JELD-WEN anti-harassment policy.  Cook, 28:13-23.

Carter explained its holding as follows:

> Namely, an appropriate balance must be struck between preventing workplace harassment and giving employers a reasonable opportunity to cure it.  In this Court's view, and absent a contrary directive from the Court of Appeals, an employer in most cases cannot be held liable for co-worker harassment when the complaining employee did not report the harassment pursuant to publicized and reasonable procedures.
>
> Of course, the Court can envision some rare circumstances where an employer might be considered to have notice of harassment despite an employee's failure to complain to the proper persons.   For example, complaints made to a company's CEO, even if inconsistent with a reporting policy, would probably suffice to place an employer on notice.  **When an employee complains to a low-level supervisor, however, in lieu of following a reasonable anti-harassment policy**, this Court has grave concerns about attributing notice to the employer.

Carter, 208 F.Supp.2d 1271, 1277 (emphasis added).

The Eleventh Circuit recently concurred with <u>Carter's</u> holding in <u>Howard v. City of Robertsdale</u>, 168 Fed. Appx. 883, 888 n. 5 (11th Cir. 2006):  "An employee cannot satisfy the reasonable requirement by making informal complaints to individuals not authorized to receive such complaints."  <u>See also</u> <u>Madray v. Publix Supermarkets, Inc.</u>, 208 F.3d 1290, 1300 (11th Cir. 2000)  ("[Employer] cannot be considered to have been placed on notice of [supervisor's] harassing behavior by plaintiff's informal complaints to individuals not designated by [employer] to receive or process sexual harassment complaints.")  Accordingly, non-Plaintiff Thornton's report to Mendoza in 2003 did not put JELD-WEN on notice of Fetner's conduct.

### B.     Sturm's Testimony was Consistent With the Policy.

Plaintiffs apparently (and erroneously) argue that Sturm's deposition testimony somehow altered the notice requirements of JELD-WEN's policy.  <u>See</u> Plaintiffs' Brief, p.12.  But Sturm simply testified that managers "have greater involvement when the policy is triggered, for example, by somebody raising a complaint."  Sturm 21:16-25; 22:1-7.  Notable is Plaintiffs omission that Sturm testified that he did not know Mendoza.  Sturm, 27:7-16.  Nor did he know Mendoza's title *vis a vis* anyone else.  *Id*, 26:2-4.  Sturm only testified that if an employee makes a complaint to "**their**" Group Manager, the Group Manager has a responsibility to act.  Sturm, 154:1-24 (emphasis added).  Sturm's testimony is consistent with JELD-WEN's policy in that a report to "their" Group Manager would be a report to the employee's immediate supervisor.   JELD-WEN Evidentiary Submission, EX-A.

### C.     JELD-WEN is Not Vicariously Liable.

JELD-WEN also did not have constructive knowledge of Fetner's alleged conduct.  In fact, Plaintiffs do not (and could not) seriously argue that JELD-WEN is

"vicariously liable" for Fetner's alleged conduct.    Howard v. City of Robertsdale, 168 Fed.Appx. 883, 886 (11th Cir. 2006).  Plaintiffs do not specifically allege they suffered any "tangible employment action" by Fetner.    Under Howard, a case also cited by Plaintiffs, this failure limits Plaintiffs' claim to a hostile work environment claim.    Id. at 886, n. 2.  As in Howard, Fetner's allegedly inappropriate conduct was outside the presence of Pat Galvez and other JELD-WEN managers where there were no witnesses other than possibly other hourly workers.  L. Sims, 145:22; 146:9; B. Sims, 152:16-18; 154:2-4; 155:11-12; L. Minix, 280:12; 281:19.    Notably, due to the pre-existing layout of the facility, Galvez could not even see from his work location the areas where Fetner's conduct allegedly occurred.    L. Sims, 97:17-23; B. Sims, 49:10-12; Minix, 80:3-9; 82:10-22; 288:4-13; 291:12-18, Ex. 7; Giles, 53:2-54:5.  Minix accurately agreed that Fetner's alleged surreptitious conduct could be described as "sneaky." Minix, 277:22 – 278:3.

The record evidence thus demonstrates that JELD-WEN lacked constructive knowledge of Fetner's alleged conduct.

### D.    None of the Three Plaintiffs Suffered any Tangible Employment Action.

#### 1.    Linda Sims' Feelings And Guesses Cannot Create An Issue of Fact.

Plaintiffs did not introduce any admissible evidence suggesting (let alone establishing) that Fetner took any tangible employment action against any of them "because of their sex."  42 U.S.C. §2000e-2(a).  Minix admitted that she was never threatened by Fetner.    Minix, 269:21-23, 270:1-9.  Minix also stated that no other Plaintiff was threatened by Fetner. Id. Nonetheless, Linda Sims alleges that more than two months after Fetner's conduct ceased, a co-employee, Phil Smith told her that she

could go home early.  Linda Sims "feels" that it was because she rejected Fetner's advances.  L. Sims, 150:6-23.  However, as this Court has recently noted, "the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  Toney, 2006 WL 691188, p.2-3.  Toney v. Montgomery Job Corps, 2006 WL 691188, p. 7 (M.D. Ala. 2006) (slip copy).  Linda Sims appears to be the only one of the three Plaintiffs asserting this allegation.

Linda Sims alleges that when she "declined Fetner's advances, he would send her home, even if there was work to do on her job."  Plaintiffs' Brief, p. 5.  However, Plaintiffs fail to advise the Court that, among other deficiencies, this assertion is based upon Linda Sims' inadmissible speculation.  In her deposition, Linda Sims testified as follows:

Q    Were you ever asked to go home because Mr. Fetner – you refused Mr. Fetner's advances?

A    I **felt** like that was why.

Q    Okay.  You felt like it, did anybody ever tell you that?

A    **No**.

Q    . . . Did Phil Smith give you a reason why you were being sent home?

A    I'm not for sure if he did or not.  I think he just come told us that we **could** go home, which I don't think either one of us wanted to go home, but – **I'm not for sure.  I'm not for sure**.

L. Sims, 150:6-23 (emphasis added).

Rule 56(e) requires plaintiffs to oppose JELD-WEN's motion with admissible, specific facts.  Speculation, subjective beliefs, and inadmissible hearsay cannot create

an issue of fact. _Id_. <u>Wallace v. Teledyne Continental Motors</u>, 138 Fed.Appx. 138, 143 (11th Cir. 2005). <u>See</u> <u>also</u> <u>Foraker v. Appollo Group, Inc.</u>, 427 F. Supp. 936, 944 (D. Ariz. 2006) (holding that plaintiffs "I don't recall…" was insufficient evidence in opposing summary judgment). Thus, Linda Sims' admittedly uncertain, speculative feelings cannot, as a matter of law, create an issue of fact that she was told she "could" go home because she "refused Mr. Fetner's advances." L. Sims, 150: 6-9.

Linda Sims does testify that when she was told by Phil Smith she could go home, "there was work on my job. . . ." L. Sims, 151:1-5. However, when Linda Sims went home, she called the 800-number of JELD-WEN's legal department to complain in October. L. Sims, 154:16 - 155:5. On or about that same day, Brenda Sims called Dan Hees to complain about being moved to different work stations. _Id._, Minix 276:9-14; B. Sims, EX-31. The plaintiffs then met with Dan Hees a few days later on October 13, 2004. _Id_.

Thus, Linda Sims alleges she was sent home in early October 2004, or about 45 days before the plant shut down for economic inefficiencies. B. Sims, EX-E. Later that same month, on October 26, 2004, Linda Sims "declare[d] under penalty of perjury" in her EEOC charge that the **last** date Fetner harassed her was on August 1, 2004. L. Sims, Ex. 22. During her deposition, Linda Sims unequivocally confirmed that Fetner had stopped allegedly harassing her by August 1, 2004. L. Sims, 130:5 - 132:8.

Thus, no juror could lawfully give credence to Linda Sims' uncertain and speculative feelings that in October, Phil Smith told a low seniority employee she "could" go home just before the entire plant closed because Linda Sims refused Fetner's advances well over two months earlier. <u>See</u> <u>Mann v. Olsten Certified Healthcare Corp.</u>,

49 F.Supp.2d 1307, 1317-1318 (M.D. Ala. 1999) ("To create a genuine issue of material fact sufficient to survive summary judgment, 'a mere scintilla' of evidence supporting the [nonmoving] party will not suffice. . . .")

### 2.    Brenda Sims' Changes in Laborer Positions is Not a Tangible Employment Action.

Brenda Sims appears to argue that moving her from one general laborer task or work station to another was an adverse employment action.[5]  Sims, EX-31.  Because Brenda Sims admits that she could perform each assigned task, no adverse employment action has been taken against her.  See Toney, supra at 7 (internal transfer from one office to another "constituted change in work assignment instead of adverse employment action sufficient to support Title VII retaliation claim."); and Williams v. Glover, 2006 WL 861353 (M.D. Ala.) (forced movement to smaller office and change in work assignment not adverse employment action.).

Furthermore, JELD-WEN notes that Brenda Sims' change in job assignment is easily distinguished from the change in job assignment addressed by the U.S. Supreme Court in Burlington Northern & Santa Fe Railway v. White, 2006 WL 1698953 (June 22, 2006).  White, a retaliation case rather than a sexual harassment case, addresses whether the movement of plaintiff White from a more prestigious fork lift operator position to a "track laborer" position that was "more arduous and dirtier" is sufficient to constitute an adverse employment action.  Id., p. 12.  The Supreme Court noted that not all job reassignments would be actionable and that the action must be judged based on "the circumstances of the particular case."  Id., p. 12.  Here, the reassignment from one general laborer work station to another - the conduct about which Brenda Sims

---

[5]    Plaintiff Minix does not appear to allege any tangible employment action.

complains – was standard procedure.  Hees, 72:7-9.  There is no evidence that one

work station enjoyed greater prestige or that any work station was significantly more

difficult than another.  That Brenda Sims preferred one work station over another would

not constitute an adverse employment action, even under the standard established by

White.  Consequently, Plaintiff cannot establish a "tangible employment action" to

undermine the Ellerth/Faragher affirmative defense that JELD-WEN established through

its prompt and effective efforts to prevent and correct offending conduct.

## IV.    ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT.

JELD-WEN fully and firmly maintains that complete summary judgment is obliged

based on the record undisputed material facts.  Nevertheless, it is perhaps worth noting

that Plaintiffs have not addressed JELD-WEN's alternative motion that summary

judgment be entered as to any Plaintiff who has not satisfied her burden even if one of

the other Plaintiff's claims survive summary judgment.  Likewise, Plaintiffs have not

satisfied their burden on any claim for punitive damages and JELD-WEN is entitled to

summary judgment on any claim for punitive damages.

Furthermore, Plaintiffs have raised no argument and presented no evidence that

summary judgment is due to be entered on any liability and/or damages claims

premised on the closing of the Roanoke Facility and JELD-WEN is entitled to Summary

Judgment based on Plaintiffs' abandonment of same.  See, e.g., Road Sprinkler Fitters

Local Union No. 669 v. Independent Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir.

1994) (holding that a district court can "properly treat as abandoned a claim alleged in

the complaint but not even raised as a ground for summary judgment") (citing Lazzara

v. Howard A. Esser, Inc., 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not

pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)

## V.   **CONCLUSION**.

Plaintiffs' response to JELD-WEN's Motion for Summary Judgment notably omits (as it must) any justification whatsoever for Plaintiffs' failure to report Fetner's alleged conduct until October 13, 2004, the date his employment ended.   JELD-WEN upheld its end of the bargain by promulgating and enforcing an effective policy prohibiting sexual harassment in order to create and maintain a harassment-free workplace.   Plaintiffs' unexcused delay, coupled with JELD-WEN's effective action upon receiving notification on October 13, require the issuance of Summary Judgment.

Accordingly, JELD-WEN respectfully requests that the Court enter Summary Judgment on Plaintiff's claims for the reasons stated both in its primary brief and herein.

Respectfully Submitted,

s/Michael L. Thompson THO152

OF COUNSEL:
LEHR MIDDLEBROOKS & VREELAND, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945
(205) 326-3002

Scott J. Scofield, Esq.
SCOFIELD, GERARD, SINGLETARY & POHORESLSKY
1114 Ryan Street
Lake Charles, Louisiana 70601
(337) 433-9436

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James B. Douglas, Jr., Esq.
McNeal & Douglas, Attorneys at Law, L.L.C.
P.O. Box 1423
Auburn, AL  36831

Matthew W. White, Esq.
Adams, Umbach, Davidson & White, LLP
P.O. Box 2069
Opelika, AL  36803-2069

Respectfully submitted,

s/Michael L. Thompson
Michael L.  Thompson
Lehr Middlebrooks & Vreeland, P.C.
P.O. Box 11945
Birmingham, AL 35202-1945
Phone:  (205) 326-3002
Fax:  (205) 326-3008
E-mail: mthompson@lehrmiddlebrooks.com
Bar No.: ASB-5417-o46m

157051.doc

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
 2    FOR THE MIDDLE DISTRICT OF ALABAMA
 3             EASTERN DIVISION
 4
 5    CASE NUMBER:  3:05-CV-00685-T
 6    Lorena Minix, et al.,
 7         Plaintiffs,
 8         vs.
 9    JELD-WEN, inc., et al.,
10         Defendants.
11
12         S T I P U L A T I O N
13         IT IS STIPULATED AND AGREED by and
14    between the parties through their respective
15    counsel, that the deposition of Stacy Cook
16    Overton may be taken before Sara Overton,
17    CSR, at the offices of McNeal & Douglas, at
18    1710 Catherine Court, Suite B, Auburn,
19    Alabama 36831, on the 9th day of May, 2006.
20
21    DEPOSITION OF STACY COOK OVERTON
22             48318
23
```

Page 3

```
 1         * * * * * * * * * * * * *
 2              I N D E X
 3            EXAMINATION
 4                        PAGE
 5    By Mr. Thompson ..................... 7
 6    By Mr. White ...................... 75
 7      EXAMINATION CONTINUED
 8                        PAGE
 9    By Mr. Thompson ................... 97
10    By Mr. White ..................... 103
11    By Mr. Thompson ................. 104
12      DEFENDANT'S EXHIBITS
13                        PAGE
14    Ex. 1 - The subpoena ............... 13
15         * * * * * * * * * * * * *
16
17
18
19
20
21
22
23
```

Page 2

```
 1         IT IS FURTHER STIPULATED AND
 2    AGREED that the signature to and the reading
 3    of the deposition by the witness is waived,
 4    the deposition to have the same force and
 5    effect as if full compliance had been had
 6    with all laws and rules of Court relating to
 7    the taking of depositions.
 8         IT IS FURTHER STIPULATED AND
 9    AGREED that it shall not be necessary for
10    any objections to be made by counsel to any
11    questions except as to form or leading
12    questions, and that counsel for the parties
13    may make objections and assign grounds at
14    the time of the trial, or at the time said
15    deposition is offered in evidence, or prior
16    thereto.
17         IT IS FURTHER STIPULATED AND
18    AGREED that the notice of filing of the
19    deposition by the Commissioner is waived.
20
21         * * * * * * * * * * * * *
22
23
```

Page 4

```
 1    IN THE UNITED STATES DISTRICT COURT
 2    FOR THE MIDDLE DISTRICT OF ALABAMA
 3             EASTERN DIVISION
 4
 5    CASE NUMBER:  3:05-CV-00685-T
 6    Lorena Minix, et al.,
 7         Plaintiffs,
 8         vs.
 9    JELD-WEN, inc., et al.,
10         Defendants.
11
12    BEFORE:
13         SARA MAHLER, Commissioner.
14    APPEARANCES:
15         JAMES B. DOUGLAS, ESQUIRE, of
16    McNeal & Douglas, 1710 Catherine Court,
17    Suite B, Auburn, Alabama 36831, appearing on
18    behalf of the Plaintiffs.
19         MATTHEW W. WHITE, ESQUIRE, of
20    Adams, Umbach, Davidson & White, 205 South
21    Ninth Street, Opelika, Alabama 36803,
22    appearing on behalf of the Plaintiffs.
23         MICHAEL L. THOMPSON, ESQUIRE, of
```

1 (Pages 1 to 4)

Page 5

1  Lehr, Middlebrooks, Price & Vreeland, 2021
2  Third Avenue North, Birmingham, Alabama
3  35203, appearing on behalf of the
4  Defendants.
5       SCOTT J. SCOFIELD, ESQUIRE, of
6  Scofield, Gerard, Singletary & Pohorelsky,
7  1114 Ryan Street, Lake Charles, Louisiana
8  70601, appearing by phone on behalf of the
9  Defendants.
10                * * * * * *
11
12       I, SARA MAHLER, CSR, a Court
13  Reporter of Wetumpka, Alabama, acting as
14  Commissioner, certify that on this date, as
15  provided by the Federal Rules of Civil
16  Procedure and the foregoing stipulation of
17  counsel, there came before me at the offices
18  of McNeal & Douglas, 1710 Catherine Court,
19  Suite B, Auburn, Alabama 36831, beginning at
20  2:10 p.m., Stacy Cook Overton, witness in
21  the above cause, for oral examination,
22  whereupon the following proceedings were
23  had:

Page 6

1       STACY COOK OVERTON,
2  being first duly sworn, was examined and
3  testified as follows:
4       COURT REPORTER:  Usual
5  stipulations.
6       MR. WHITE:  Yes.
7       MR. THOMPSON:  Yes.  Let me
8  explain to her.  My name is Mike Thompson.
9  I'm a lawyer for JELD-WEN.  Okay?
10       THE WITNESS:  Uh-huh.
11       MR. THOMPSON:  And I'm going
12  to take your deposition today.  And these
13  gentlemen here, Mr. White and Mr. Douglas,
14  represent three ladies, Lorena Minix, Brenda
15  Sims and Linda Sims who have filed a lawsuit
16  against JELD-WEN and a gentleman named
17  Richard Fetner.  Okay?  Do you understand
18  that?
19       THE WITNESS:  Yes.
20       MR. THOMPSON:  Okay.  There's
21  another gentleman on the phone, my
22  co-counsel, Mr. Scofield and I represent
23  JELD-WEN.  Okay?

Page 7

1       THE WITNESS:  Okay.
2       MR. THOMPSON:  One thing
3  you've got to do is, you've got to answer
4  out loud so she can take it down.  Okay?
5       THE WITNESS:  Okay.
6       MR. THOMPSON:  All right.  You
7  have the right to read your deposition after
8  she's typed it up.  She's going to type down
9  everything you say under oath.  Okay?
10       THE WITNESS:  Okay.
11       MR. THOMPSON:  Do you want to
12  read and sign your deposition?
13       THE WITNESS:  No.
14       EXAMINATION
15  BY MR. THOMPSON:
16       Q.    Would you state your full name
17  for the Record, please.
18       A.    Stacy Michelle Overton.
19       Q.    Okay.  Have you ever been
20  known by any other names?
21       A.    Stacy Norred.
22       Q.    N-O-O-R-D?
23       A.    N-O-R-R-E-D.

Page 8

1       Q.    Okay.  Any names other than
2  that?
3       A.    No.
4       Q.    Have you ever been known as
5  Stacy Cook?
6       A.    That was my maiden name.
7       Q.    So, you were Stacy Cook?
8       A.    Right.  I've been married
9  twice.
10       Q.    Okay.  Once you were married
11  to somebody named Norred?
12       A.    Uh-huh.
13       Q.    And once you were married to a
14  Mr. Overton?
15       A.    Right.
16       Q.    I've told you before, my name
17  is Mike Thompson.  I'm a lawyer for
18  JELD-WEN.  Okay?
19       A.    Okay.
20       Q.    The court reporter has placed
21  you under oath.  Do you understand what that
22  means?
23       A.    Yes.

2 (Pages 5 to 8)

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 97

1      We know about -- Let me just
2   go through the list:  Linda Sims, Brenda
3   Sims, Lorena Minix, yourself, Cathy
4   Thornton.  Do you know of anybody other than
5   that?
6          MR. THOMPSON:  Object to the
7   form.
8      A.    No.  Because I didn't even
9   know Kathy had made allegations, and I don't
10  know Linda and Brenda.
11     Q.    My question is:  Do you know
12  of anybody other than that who have made --
13  who you've heard, either by rumor or word of
14  mouth or otherwise, that have made
15  complaints about Fetner behaving
16  inappropriately towards them?
17     A.    No.
18         MR. WHITE:  That's all I have.
19         EXAMINATION CONTINUED
20  BY MR. THOMPSON:
21     Q.    Ms. Overton, I've got just a
22  couple of follow-ups.  What's your current
23  phone number?

Page 98

1      A.    (334) 863-8379.
2      Q.    That's a home number?
3      A.    Yes.
4      Q.    Do you have a cell phone?
5      A.    Yes.  I have two.
6      Q.    You have two?
7      A.    Well, I have one and my
8   husband has one, so . . .
9      Q.    What is your number?
10     A.    (334) 885-0396.
11     Q.    Now, you contacted Mr. White
12  and Mr. Douglas and apparently tried to call
13  me?
14     A.    Yes.  I found your number
15  later, but it was -- I was waiting on a call
16  back from him, so I didn't attempt to call.
17     Q.    All right.  Trying to get out
18  of giving your deposition today; correct?
19     A.    Yes.
20     Q.    Because you don't think you
21  have any knowledge that's relevant to the
22  case because this incident with Mr. Fetner
23  occurred before you became a JELD-WEN

Page 99

1   employee; correct?
2      A.    Yes.
3      Q.    Is there any doubt in your
4   mind that that incident occurred after you
5   became a JELD-WEN employee?
6      A.    Oh, I know for a fact that it
7   didn't because I was with my -- I was dating
8   my husband now at that time, when JELD-WEN
9   took over, and I know it happened well
10  before him.
11     Q.    When was your first date with
12  your current husband?
13     A.    November the 6th, -- November
14  the 14th, six months before we married, in
15  2002, was it?
16     Q.    So, November 11, 2001?
17     A.    I believe so.
18     Q.    And how long before then did
19  this incident with Mr. -- Did it happen in
20  the late spring or sometime before then?
21     A.    I just know -- I mean, I do
22  remember I had on shorts, but I don't
23  remember -- I don't really know.

Page 100

1      Q.    Okay.  This incident with
2   Mr. Fetner that has been characterized as a
3   sexual encounter, so I'll use that.
4      A.    Right.
5      Q.    This sexual encounter with
6   Mr. Fetner happened before you ever laid
7   eyes on Dan Hees?
8      A.    Dan who?
9      Q.    Had you ever seen the man
10  named Dan?
11     A.    Oh, yes.  Way before.
12     Q.    Way before then?
13     A.    I believe it happened before
14  Lorena even worked there.
15     Q.    Okay.  And you were drinking
16  that afternoon?
17     A.    That morning, yes.  It was
18  about lunchtime.  I think we got off at
19  10:30 that morning, and where we usually get
20  off at twelve.
21     Q.    So you had been drinking since
22  at least 10:30 or so?
23     A.    Probably so.

25 (Pages 97 to 100)