IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| LORENA MINIX, et al., )<br>)<br>PLAINTIFFS, )<br>)<br>v. )<br>)<br>)<br>JELD-WEN, INC. )<br>)<br>DEFENDANT. ) | CIVIL ACTION NO. 3:05cv685-T |

PLAINTIFFS' RESPONSE TO DEFENDANT'S REPLY BRIEF

**COMES NOW** all Plaintiffs, and hereby file their response to Defendant's reply brief in support of its motion for summary judgment as follows.

### I. INTRODUCTION

Defendant filed a motion for summary judgment in this matter. Plaintiffs thereafter filed a response which clearly indicated that genuine issues of material fact existed, precluding the granting of Defendant's motion. Defendant then filed a reply brief, where it resorted to personal invective and hyperbole regarding Plaintiffs' opposition and basically re-argues its initial brief. Defendant essentially urges the Court to view the evidence in a favorable light towards the Defendant which, of course, is the opposite viewing the Court is required to take. See Matsushita Elec. Indus. Co. v. Zerith Radio Corp., 475 U. S. 574 (1986).

Defendant categorizes Plaintiff's factual citations, in their opposition, as "unfounded factual misstatements." This assertion is both false and incredible. Plaintiffs made approximately sixty-nine factual assertions in their opposition brief. All of these

facts contain specific references to the record, and each citation was submitted to the Court in Plaintiffs' evidentiary submission.

## II. DEFENDANT DID NOT ADDRESS THE FACT THAT IT COULD BE LIABLE UNDER ALLEN V. TYSON FOODS, INC.

In its reply brief, Defendant did not address Plaintiff's argument that Defendant can be held liable for Fetner's harassment of the Plaintiffs because, "an atmosphere of inappropriate sexual behavior may have permeated the workplace." Allen, 121 F. 3d 642 (11th Cir. 1997). Under Allen, if this atmosphere exists, the employer is deemed to have constructive knowledge of the harassment, making the employer liable for the harassment.

The overwhelming testimony, outlined in Plaintiffs' opposition brief, that this atmosphere existed at the Defendant's facility, clearly creates a genuine issue of material fact, making summary judgment improper. Defendant's failure to raise any response in its reply brief verifies that it cannot avoid a jury determination on whether it had constructive knowledge under the Allen principles.

## III. DEFENDANT HAD PRIOR NOTICE OF FETNER'S CONDUCT

As stated in Plaintiffs' opposition brief, Kathy Thornton reported severe harassment by Fetner to Joe Mendoza, Coordinating Group Manager at the facility, prior to Fetner's harassment of the Plaintiffs. (Thornton depo. p. 107, ll. 1-7). Defendant's contention, in its reply brief, that it had no prior notice of Fetner's harassment is bellied by this fact.

An employer is directly liable for supervisory harassment if it knew or should have known of the harassment but failed to take remedial action. See Dees v. Johnson Controls World Serv. Inc., 168 F. 3d 417, 421-422 (11th Cir. 1999). Thornton's report to

Mendoza, and Mendoza's failure to act upon it, places Defendant on notice of Fetner's harassment. At a minimum, a genuine issue of material fact exist, as to the notice issue, which necessitates the denial of Defendant's motion for summary judgment.

Defendant seeks to avoid responsibility by arguing that Mendoza, although in management since 1990, and the coordinating group manager at the facility, is not in a "higher management" position that would place him in the group of persons which employees should make harassment complaints to. Unfortunately for Defendant, Mendoza, himself, states otherwise. Mendoza testified as follows:

> Q. "As someone who is in management what are your responsibilities with regard to the anti-harassment policy, if anything?
>
> A. Well first of all you should make your employees aware of that, even though it's in the handbook, because the majority of people don't read it, the majority of employees don't read it, just to make them aware of the fact that harassment, how our stance is on harassment, and that they're able to, you know, <u>they should come to us if they want to complain</u> or come to the immediate supervisor. (Mendoza depo. p. 17, ll. 2-11, attached to this response as exhibit "A").

Mendoza admits that he is a proper management official to receive a report of harassment from an employee. Obviously, notwithstanding Defendant's reply brief, Mendoza was a "designated" person to receive complaints regarding harassment by Defendant. At a minimum, a factual dispute exists regarding the issue which precludes summary judgment. Ms. Thornton's complaints to Mendoza regarding Fetner, which were not addressed by Defendant, placed

Defendant on prior notice, thereby making Defendant directly liable for Fetner's actions.

Defendant cites Howard v. City of Robertsdale, 2006 WL 304663 (11th Cir. 2006) and Carter v. American Online, Inc. 207 F. Supp 2d 1271 (M.D. Fla. 2001) to support its contention that Mendoza's knowledge is not imputable to the company. Unlike those cases, however, Mendoza admits that he is a proper management employee to receive complaints. The Plaintiffs in Howard and Carter did not make complaints to any management employee with authority to accept said complaints, as Mendoza was in the case sub judice.

Defendant's reply brief also attempts to rehabilitate Rob Sturm's deposition testimony, regarding the responsibility of managers after receiving a harassment complaint. As noted in Plaintiffs' opposition brief, Sturm testified, "Managers have a greater responsibility with respect to the policy than non-managers. And that includes implementing the policy and being – they have greater involvement when the policy is triggered, for example, by somebody raising a complaint." (Sturm depo. p. 21, ll. 18-22). Mendoza failed to fulfil his responsibility by ignoring Ms. Thronton's complaints.

Defendant's attempt to have the Court view Sturm's testimony in a different light, first with a self-serving affidavit, not subject to cross-examination, then in its reply brief, is inconsistent with proper summary judgment evaluation by the Court. Viewing the evidence in its light most favorable to the Plaintiffs, the deposition testimony of Sturm and Mendoza, obviously create a fact question

as to whether Ms. Thornton's complaints placed Defendant on notice of Fetner's harassment. These facts preclude summary judgment.

### IV. HEES' TESTIMONY DEMONSTRATED HIS INABILITY TO IMPLEMENT DEFENDANT'S POLICY AND WAS NOT MISCHARACTERIZED IN ANY WAY

Defendant devotes several pages in its reply brief to attempt to rehabilitate the unsupportable testimony of Dan Hees, the employee responsible for investigating the Plaintiffs' complaints. Plaintiffs argue, in their opposition brief, that the Defendant can be held vicariously liable because Hees failed to recognize obvious violations of the Defendant's anti-harassment policy. In its reply, Defendant characterizes these complaints as "hypothetical" conduct. Obviously, the complaints were those made by Plaintiffs and other female employees, not "hypothetical."

Hees' contentions, regarding Fetner's conduct, in deposition testimony, each of which was cited and filed with the Plaintiffs' opposition, that unwelcome touching of Plaintiff Minix, comments comparing Plaintiff Linda Sims' buttox to basketballs, and commenting on Ms. Thornton's nipples, did not violate Defendant's policy, would make any reasonable juror skeptical that Defendant vigorously enforces its policy. Hees, notwithstanding Defendant's reply brief, immediately concluded that Plaintiffs and the other female employees were "setting him (Fetner) up." (Hees depo. p. 97, l. 22).

Hees' inability to recognize violations of the policy and his pre-judgment of the Plaintiffs' complaints are relevant to rebut Defendant's contention that it vigorously enforced its policy, which is required to prevail on an Ellerth/Faragher

defense. The recognition of Hees' incorrect interpretations of the Defendant's policy was also discussed by Sturm, in his deposition, which was included in Plaintiff's opposition brief.

Furthermore, the fact that Defendant violated its own policy and rewarded Fetner's conduct, by paying him a generous severance package, also undercuts its argument that it vigorously enforces its policy against harassment. The fact that Defendant's reply brief only mentions this incredible act in a footnote, and declares it irrelevant, is quite illustrative.

## V. THE BOWEN INCIDENT

Plaintiffs raised the Bowen incident to show that Plaintiff Minix was not satisfied with a previous sexual harassment investigation, because she was made to work with Bowen, who had masturbated in front of her, for an additional two weeks. Plaintiff Minix was very clear on this point, as cited in Plaintiffs' opposition brief.

Defendant argues a contrary position, using other testimony and exhibits indicating that Plaintiff Minix and Bowen only worked together a few days after the harassment report was made. This argument by Defendant merely illustrates that a genuine issue of fact exist that can only be resolved by a jury. For summary judgment purposes, Defendant again ignores that the Court must accept the Plaintiffs' version of events and resolve all issues in the light most favorable to the Plaintiffs. Defendant is improperly asking the Court to resolve the factual disputes in Defendant's favor.

## VI. DEFENDANT'S ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT

Regarding Defendant's alternative motion for partial summary judgment, Plaintiffs should maintain all damages available to them, should the matter proceed to trial. Plaintiffs' opposition was predicated on the fact that Defendant's motion should be denied in full. However, as to specific aspects of Defendant's motion for partial summary judgment, Plaintiffs do not contest that they should not receive damages resulting from the closing of the facility, and Plaintiffs admit that each must carry their burden individually, which they have, of presenting substantial evidence to avoid summary judgment.

Regarding punitive damages, should the court find that a genuine issue of fact exists on Defendant's liability, then punitive damages should be submitted to the jury, if Plaintiffs satisfy the requirements under applicable law for the awarding of punitive damages. The Defendant's conduct, if proven, would certainly warrant a punitive damages charge to the jury.

## VII. THE BURLINGTON NORTHERN & SANTA FE RAILWAY v. WHITE CASE DOES NOT APPLY TO THIS CASE

One of the Defendant's stated reasons for its need for a reply brief, although suspect because the overwhelming majority of its reply is merely a re-argument of its initial brief, was to address the impact of the White case. See White, 2006, WL 1698953 (June 2, 2006). This case was decided before Plaintiffs' brief was submitted and reviewed by the undersigned. Although the White decision would make Plaintiff Brenda Sims reassignment a tangible

employment action, the Supreme Court was clear that its decision was limited to retaliation cases under Title VII, not an underlying claim for sexual harassment.

## VIII. CONCLUSION

Plaintiffs have offered evidence which a reasonable jury could conclude that Defendant is directly liable to Plaintiffs based on its prior notice of Fetner's harassment, and that Defendant had constructive knowledge, based on the <u>Allen</u> principles, which Defendant failed to respond to in its reply brief. As such, Defendant's motion for summary judgment is due to be denied.

Respectfully submitted this the 16th day of August, 2006.

James B. Douglas, Jr.
Attorney for Plaintiff
McNeal & Douglas, Attorneys at Law. L.L.C.
AL Bar #8935-u83j
P.O. Box 1423
Auburn, Alabama, 36831
334-821-1596

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the following by use of this Court's electronic filing system.

Dated this the 16th day of August, 2006.

Micheal L. Thompson
Lehr, Middlebrooks, Price & Vreeland, P.C.
Post Office Box 11945
Birmingham, AL 35202-1945

Scott Scofield, Esq.
Scofield, Gerard, Singletary & Pohorelsky
1114 Ryan Street

Post Office Drawer 3028
Lake Charles, LA 70601

                                                  James B. Douglas, Jr.

Oral Deposition of Jose Mendoza, Jr., Taken on May 23, 2006

## Page 14

1. A. Let me see. (Counting) Six.
2. Q. Do you remember their names?
3. A. Let me see. Fingerjoint department was David, I
4. think it was David Hill; Patrick, I don't remember his last
5. name; and Luther. Luther, I don't remember his last name
6. either.
7. Q. Okay.
8. A. And then in the column turning department it was Bill
9. Keller. I want to say -- there was two females, a Janet, I
10. believe, and another -- a Lisa. A Lisa. Lisa, I don't
11. remember her last name.
12. Q. Not Lisa Feldman?
13. A. No, not Lisa Feldman. She was a chunkier little
14. girl. She was a chunky little girl. I mean, I don't -- no --
15. no offense, it's just I don't --
16. Q. None taken.
17. A. I'm sorry. It's just I don't remember her name.
18.    MR. SCOFIELD: Just don't start talking about
19. bald, whatever you do.
20. A. I don't remember her last name.
21. Q. (BY MR. DOUGLAS) Do you know or have you ever known
22. Brenda Simms?
23. A. No.
24. Q. How about Linda Simms?
25. A. No.

## Page 15

1. Q. Lorena Minix you probably would know?
2. A. Lorena -- Lorena, I think I finally put the name to
3. the face, but as far as remembering her, I mean, I knew of
4. her. I know that she dyed her hair a lot, black or something.
5. Q. Well, how did you know it was dyed?
6. A. Because that's what pretty much everybody -- she
7. would come in with black hair sometimes and then bluish hair
8. another and then another kind of hair. It was dyed. That was
9. just my assumption, I don't -- I don't know.
10. Q. Dye it blue or dye it black or dye --
11. A. Dye it all kinds. Because there were days that she
12. come black and other days she would come blue.
13.    MR. SCOFIELD: I don't have that problem.
14. Q. (BY MR. DOUGLAS) Okay. When did -- well, first of
15. all, does Jeld-Wen have a policy against sexual harassment in
16. the workplace?
17. A. There's a policy that identifies sexual harassment in
18. our harassment policy.
19. Q. At Jeld --
20. A. That's just a -- that's a category of the harassment
21. policy.
22. Q. Okay. There's -- there's policies against various
23. types of harassment, one of them being sexual harassment?
24. A. Uh-huh.
25. Q. Is that correct?

## Page 16

1. A. That's correct.
2. Q. Are you familiar with the policy?
3. A. Uh-huh.
4. Q. Is that a yes?
5. A. Yes. Yes.
6. Q. Were you familiar with it back in 2003 when you
7. worked at the Roanoke facility in Alabama?
8. A. Yes.
9. Q. When did Jeld-Wen first have a anti-sexual harassment
10. policy, if you know?
11. A. I don't know. When I got into management in 1990 it
12. was already in effect.
13. Q. Is that right?
14. A. Yeah.
15. Q. Are you certain about that?
16. A. I'm pretty sure.
17. Q. Okay. Has it changed over the years?
18. A. As far as the categories and -- and how we're
19. supposed to treat it, the steps, no, I don't think it's
20. changed.
21. Q. So you think it's the same as it was back in 1990?
22. A. Uh-huh.
23. Q. Is that correct?
24. A. Yeah.
25. Q. That's yes?

## Page 17

1. A. Yes.
2. Q. As someone who is in management what are your
3. responsibilities with regard to the anti-harassment policy, if
4. anything?
5. A. Well, first of all you should make your employees
6. aware of that, even though it's in the handbook, because the
7. majority of people don't read it, the majority of employees
8. don't read it, just to make them aware of the fact that
9. harassment, how our stance is on harassment, and that they're
10. able to, you know, they should come to us if they want to
11. complain or come to the immediate supervisor.
12. Q. I'm going to show you a document which was provided
13. to me by Jeld-Wen's lawyers. It's marked D-00026. If you'll
14. see at the bottom there's a letter D, it says Harassment
15. Training for Managers. Do you see that?
16. A. Uh-huh.
17. Q. If you'll flip to the next page, D-00027, it reads,
18. All managers will be made familiar with company policy
19. regarding harassment and encourage employees to come forward to
20. report any harassment. All managers will receive a copy of
21. this policy and it will be included in the company handbook as
22. well. Did I read that correctly?
23. A. Uh-huh.
24. Q. Is that yes?
25. A. Yes.