IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION


LORENA MINIX, et al.,           )
                                )
       Plaintiffs,              )
                                )        CIVIL ACTION NO.
       v.                       )         3:05cv685-MHT
                                )
JELD-WEN, INC., and            )
RICHARD FETNER,                )
                                )
       Defendants.             )

<u>ORDER ON PRETRIAL HEARING</u>

<u>A pretrial hearing was held in this case on September 6, 2006, wherein the following</u>

<u>proceedings were held and actions taken:</u>

    **1.**    **PARTIES AND TRIAL COUNSEL:**

Lorena Minix, Plaintiff
Brenda Sims, Plaintiff
Linda Sims, Plaintiff
Jeld-Wen, Inc., Defendant
Matthew W. White, Attorney for Plaintiffs
James B. Douglas, Jr., Attorney for Plaintiffs
Michael L. Thompson, Attorney for Defendant
Scott Scofield, Esq., Attorney for Defendant

    **2.**    **COUNSEL APPEARING AT PRETRIAL HEARING:**

**Same as Trial counsel.  Mr. Scofield appeared via telephone with permission of the Court.**

**<u>JURISDICTION AND VENUE:</u>**

The allegations in this case are characterized as violations of Title VII of the Civil Rights Act of 1964 which involve a question of Federal Law. Venue is proper in the Unites States District Court for the Middle District of Alabama, Eastern Division.

**3.    PLEADINGS:**

The pleadings filed in this case were: the Complaint, Answer, Plaintiffs' Motion to Dismiss Defendant Fetner (granted) and Defendant's Motion for Summary Judgment (pending).

**CONTENTIONS OF THE PARTIES:**

**(a).    The Plaintiff:**

Plaintiffs' contend that they were sexually harassed, in violation of Title VII of the Civil Rights Act of 1964 by Richard Fetner, their direct supervisor. Plaintiffs' contend they were subject to repeated and unwelcomed sexual advances by Fetner and that said conduct was severe and pervasive enough to alter the terms and conditions of their employment with Defendant Jeld-Wen, Inc. Plaintiffs' contend that the harassment included unwelcome touching, inappropriate remarks in the workplace of a sexual nature, and repeated requests for sexual favors in the workplace.

Plaintiffs' contend that Defendant Jeld-Wen, Inc. is liable for the conduct of Fetner because it was on notice of Fetner's conduct and

failed to take curative measures to correct the harassment. Plaintiffs'
contend that Fetner's conduct was reported by a non-plaintiff employee,
Kathy Thornton, to a management employee, Joe Mendoza, who was in
management with Defendants for over a decade. Plaintiffs' contend that
Defendant Jeld-Wen, Inc., is directly liable for the harassment of Fetner
due to its failure to take action after Ms. Thornton reported Fetner's
conduct to Joe Mendoza, the coordinating group manager at the facility
in question.

Plaintiffs' further contend that Defendant is liable for Fetner's
conduct because it had constructive knowledge of the harassment
because "an atmosphere of inappropriate sexual behavior permeated
the workplace." Plaintiffs' contend that the almost daily harassment of
female employees, including requesting sexual favors on the job,
touching women between their legs and on their breasts, trying to
forcibly kiss women at the workplace, grabbing his own genitalia,
making repeated requests for sex in exchange for altering time cards,
telling sexual jokes, and making comments about female employees
body parts is sufficient evidence to impute constructive knowledge and,
therefore, make Defendant Jeld-Wen, Inc. liable for his actions.

3

Plaintiffs' further contend that Defendant Jeld-Wen, Inc. is vicariously liable for Fetner's conduct, as it has failed to satisfy the Ellerth-Faragher affirmative defense.  Plaintiffs' contend that the general manager of the facility, Dan Hees, did not understand the written policy of Defendant Jeld-Wen, Inc. well enough to properly enforce it. Plaintiffs' contend that Hees did not know what constituted violations of the policy and that Hees' Deposition testimony was at variance with the company's representative regarding what constituted a violation of the policy.

Plaintiffs' contend that they were severely damaged by the conduct of Defendant and all Plaintiffs' suffered enormous emotional damage and mental anguish. Plaintiffs' contend that Defendants should also be punished by the imposition of punitive damages as allowed by the Act.

(b).  The Defendant:

1.  JELD-WEN is head-quartered in Klamath Falls, Oregon, and manufactures building products including windows and doors.  JELD-WEN acquired a mill-works plant in Roanoke, Alabama from Millwork Specialties, Inc. and the employees at the facility became JELD-WEN employees in early 2002.

4

2. The Roanoke facility produced wooden components (exterior jambs and brick mold) used in the construction of door frames. The components produced at the Roanoke facility – i.e., the door frame pieces - were then shipped to other locations for assembly.

3. From 2002 through 2004, JELD-WEN operated three mill-works plants in Eastern North America including plants in Sparta, Tennessee; Quebec, Canada; and the Roanoke facility. Dan Hees was the Coordinating General Manager of the three plants and was based out of the Sparta, Tennessee facility. Pat Galvez transferred from the Quebec facility to the Roanoke facility in early 2002 to serve as the Acting General (i.e., Plant) Manager for the Roanoke facility. Galvez reported to Hees. Richard Fetner, a former Millworks Specialties, Inc., employee, was a Group Manager, i.e., a position akin to a foreman, and reported directly to Galvez. Joe Mendoza also transferred to the Roanoke facility and worked as a Group Manager from October 2002 until October 2003, when he transferred to a JELD-WEN facility in Corsicana, Texas. Mendoza and Fetner were equal in the plant hierarchy and both reported to Galvez. Galvez transferred to a JELD-WEN facility in Oregon in June or July 2004.

4. During the brief time that he worked at the Roanoke facility, Mendoza was never the immediate supervisor for Lorena Minix, Linda Sims or Brenda Sims, the three complaining parties in this action. Mendoza was also never the immediate supervisor of Cathy Thornton, Lisa Cook or Mary Lou Laws who were also employed at the Roanoke facility.

5. Plaintiffs Minix and Linda Sims knew that Hees was over both Galvez and Fetner and they knew how to reach Hees if they needed him. Hees visited the Roanoke Plant once or twice a month for a period of 2 –3 days each visit. He visited Roanoke more often after Galvez transferred.

6. Most of the positions in the Roanoke facility, including the positions held by the three Plaintiffs, were general laborer jobs. General laborers were expected to work a variety of jobs in different areas and moved frequently to accommodate production requirements. All of the work performed by the general laborers was at about the same difficulty level.

7. **JELD-WEN has a written policy that prohibits harassment. JELD-WEN's Anti-Harassment Procedures and Guidelines ("anti-harassment policy") is provided to all JELD-WEN employees both in the JELD-WEN Employee Handbook and as a separate stand-alone policy. Plaintiffs received a copy of the handbook and even produced a copy of the handbook during discovery. The anti-harassment policy is also posted at JELD-WEN's facilities.**

8. **The anti-harassment policy provides in pertinent part:**

> **JELD-WEN strives to provide a productive and comfortable working environment free from harassment or discrimination including that which may be construed to be offensive sexual conduct. This policy applies to every aspect of the employment relationship throughout the organization and to the dealings of employees with one another, as well as with vendors and customers.**
>
> **Harassment in any form will not be tolerated by the company. Any employee who violates this policy is subject to discipline up to and including discharge.**
>
> **\* \* \***
>
> **Employees will be made aware of this policy and are encouraged to not tolerate harassment. Any employee who believes that he/she is being subject to objectionable conduct should promptly notify either their immediate Supervisor, their General or Corporate Manager, Vice President or Subsidiary President, or the Legal Department at (541) 882-3451. Any Supervisor, General or Corporate Manager, Vice President or Subsidiary President, who has questions concerning harassment complaints shall contact the Legal Department.**
>
> **\* \* \***
>
> **Every complaint of harassment will be investigated promptly, thoroughly, fairly, and objectively.**

* * *

> **If the information collected during the investigation establishes that harassment or other objectionable conduct did occur, disciplinary action will be promptly taken against the harasser, up to and including termination if appropriate. Employees will not be discriminated or retaliated against for reporting harassment or participating in an investigation.**

9. **Each new JELD-WEN employee is required to sign an acknowledgement that provides:**

> **I have received training/instruction on JELD-WEN's Anti-Harassment Procedures and Guidelines and I understand its contents. I agree to abide by this policy and I understand that my conduct will be governed by this policy the duration of my employment.**

10. **Each Plaintiff has previously testified under oath that she was aware of and fully understood the anti-harassment policy.**

11. **Employees should follow the guidelines listed in the policy for reporting harassment allegations. Employees are encouraged to escalate their complaint to a higher level when they do not feel the initial response was appropriate or acceptable. In addition to the Legal Department, Hees (as the Coordinating General Manager) and Galvez (as the Acting General Manager) along with an employee's immediate supervisor were appropriate persons to receive reports of harassment under JELD-WEN's policy. Group Manager is JELD-WEN's term for a foreman or forewoman and is not a position designated under JELD-WEN's policy to receive complaints of harassment except where the complaint is made by one of the employees directly supervised by the Group Manager to whom the alleged conduct is reported.**

12. **Plaintiff Minix indicated that Galvez was a "very nice" guy and that she was comfortable approaching him regarding issues related to her employment, including requests for time off to address personal matters.**

13.     The manager designated in JELD-WEN's anti-harassment policy is responsible for initiating an investigation of any allegation of harassment. JELD-WEN's Legal Department serves as a resource for the investigation and to determine whether particular conduct violates JELD-WEN's policy.

14.     Richard Fetner was employed as a JELD-WEN Group Manager and understood that JELD-WEN did not tolerate harassment in any form.

15.     Plaintiff Minix initially worked at the Roanoke facility during the 1990's. According to Minix, she returned to work at the Roanoke facility in September 2001 while the facility was operated by Millworks Specialties, Inc.

16.     Minix was re-hired by Richard Fetner when he was employed by Millwork Specialties. Fetner was also her immediate supervisor until his JELD-WEN employment terminated.

17.     Minix was a general laborer with JELD-WEN and primarily worked on the dado machine although she also worked on the routers, on the brick mould machine, on the cut line and she also worked as an inspector.

18.     As noted in her EEOC charge and the Complaint filed in this action, Minix and Fetner dated and had a consensual sexual relationship during 2001-2002. The relationship ended because Fetner quit calling Minix.

19.     Minix's hourly pay rate never decreased while she worked at JELD-WEN and she never suffered a tangible adverse employment decision while employed by JELD-WEN.

20.    At the end of her shift on Thursday, June 26, 2003, Minix requested that Fetner move her away from co-employee Ronald Bowen. Minix did not tell Fetner why she wanted to be moved, she just told him that she wanted to be moved. Fetner reported Minix's request to Galvez, the Acting General Manager, soon thereafter. On June 27th, the next day, Towanna Zachery told Pat Galvez that Bowen was engaging in inappropriate conduct. Galvez began an investigation of the allegations. Galvez met with Minix on the morning of Friday, June 27th and she relayed the allegations regarding Bowen.

21.    Minix reported no additional complaints about Bowen's conduct after she reported the conduct to Fetner on June 26th and Galvez and Fetner watched her work area closely during the investigation.

22.    Minix expressed concern for Bowen during the investigation process and told Galvez that she did not want Bowen to lose his job because he was "good for the plant." According to Minix, she and Bowen were not separated for a "couple of weeks" and she had to work with him "about a week".

23.    As part of his investigation, Galvez met with Bowen on Wednesday, July 2nd and Bowen denied the allegation. The plant was shut down for the July 4th holiday on Friday July 4th and Monday July 7th and Minix was on vacation from July 9th until July 11th. Minix was assigned to work on another machine where she was further separated from Bowen after she returned from her vacation. Galvez met with Minix again on July 14, 2003 to conduct a follow-up interview.

24.    Consistent with JELD-WEN's practice, Galvez contacted JELD-WEN's legal department on July 16, 2003, for further assistance with the allegations. In July 2003, Rob Sturm, a labor and employment attorney with JELD-WEN's in-house legal department in Oregon, traveled to Roanoke - a distance of some 2,709 miles - to further investigate Minix's allegations. Minix talked to the JELD-

9

WEN lawyer "about a week" after she talked with Galvez about the issue.

25.    Minix found Sturm to be attentive and, as she described, "he was right on the point" with his questions. Sturm talked with Minix both before and after he spoke with Bowen and her complaints were limited to Bowen. She made no complaints to him regarding Richard Fetner or any other JELD-WEN employee.

26.    Sturm decided to conduct anti-harassment training while he was in Roanoke. On July 24, 2003, Sturm interviewed Minix, another witness and Bowen, but did not complete his investigation prior to the time that the anti-harassment training was scheduled to begin.

27.    Sturm used an approximately 66-slide Power Point presentation in his anti-harassment training. The anti-harassment training was presented to the entire plant. Minix and Fetner, as well as fellow employees Towanna Zachery, Kathy Thornton and Lisa Cook all attended the training. The presentation included instructions regarding how harassment concerns should be reported to JELD-WEN.

28.    Bowen confronted Sturm and walked off the job immediately after the PowerPoint presentation on July 23rd.

29.    Minix took over Bowen's job after his employment ended and she received an increase in pay related to this move.

30.    Minix agrees that Galvez and Sturm took action once she apprised them of the situation. She also expressed appreciation to Sturm regarding the manner in which JELD-WEN handled the matter.

31.    Minix told co-Plaintiffs Brenda Sims and Linda Sims about JELD-WEN's in-house attorney Rob Sturm traveling all the way from Oregon to investigate Bowen and that Bowen left as a result of Minix's complaint.

32.     Plaintiff Linda Sims was assigned to work at JELD-WEN's Roanoke facility on or about April 19, 2004 by Express Personnel, a provider of temporary employees. Linda Sims became a JELD-WEN employee on or about June 8, 2004.

33.     Linda Sims was a general laborer and performed a variety of general laborer positions in the Roanoke facility. Linda Sims worked on the door lock router, the dado machine and in the glue room. She never had any problem performing any of the work that she was assigned. Her salary increased but never decreased during the time that she was employed by JELD-WEN and she never suffered a tangible adverse employment decision while employed by JELD-WEN.

34.     Plaintiff Brenda Sims was assigned to work at JELD-WEN's Roanoke facility on or about May 14, 2004 by Express Personnel. Brenda Sims became a JELD-WEN employee on or about June 1, 2004. Brenda Sims is not related to Linda Sims.

35.     Brenda Sims was a general laborer and performed a variety of general laborer positions in the Roanoke facility. Brenda Sims worked in the cutting area, the dado machine area, on the glue machine and once in the paint room. Brenda Sims had no problems working in the cutting area, on the routers or in the glue room and could not say whether working on a router or working in the cutting area was harder. Brenda Sims was able to handle every task that she was assigned to perform. Her salary increased but never decreased during her JELD-WEN employment and she never suffered a tangible adverse employment decision while employed by JELD-WEN.

36.     Plaintiffs complaint about Fetner's allegedly sexually harassing conduct in this lawsuit. Plaintiffs' complaints in this case are limited to Fetner's conduct and they do not allege inappropriate conduct by any other JELD-WEN employee.

37.     Plaintiffs complain that Fetner directed inappropriate verbal conduct towards them by asking each of them out on dates and, in

11

the case of Linda Sims, commenting on her anatomy. Plaintiffs further complain that Fetner would hug and/or otherwise touch each of them in a manner that they found to be inappropriate by, for example, brushing up against their breasts when training them on a machine.

38.     In her sworn EEOC Charge, dated December 13, 2004, Minix contends that Fetner began harassing her on September 1, 2001 and that his harassment of her ended on July 1, 2004.

39.     In her sworn EEOC Charge, dated November 11, 2004, Linda Sims contends that Fetner began harassing her on April 1, 2004 and that his harassment of her ended on August 1, 2004.

40.     In her sworn EEOC Charge, dated November 29, 2004, Brenda Sims contends that Fetner began harassing her on June 1, 2004 and that his harassment of her ended on August 1, 2004.

41.     According to Plaintiffs, Fetner would engage in this inappropriate conduct outside the presence of Galvez and other JELD-WEN managers where there were no witnesses other than possibly other hourly workers. Notably, due to the pre-existing design of the facility, Galvez could not even see the areas where Fetner's conduct allegedly occurred from his office.

42.     Fetner denies that he engaged in any of the alleged conduct.

43.     Minix testified that Fetner's alleged conduct was similar to his conduct when they were dating and she would "joke back with him about it" and "just play it off."

44.     Plaintiffs reacted to Fetner's conduct by, in Minix's case, acting like the conduct did not occur; in Brenda Sims' case, by walking away from Fetner; and in Linda Sims' case, she just froze up.

45.     Sometime prior to October 13, 2004, Minix told Fetner that "he should be ashamed of what he's doing."

46.    Brenda Sims complains that Fetner, her immediate supervisor, would move her to different jobs that she "didn't like" even though she could perform the work at each job.

47.    Linda Sims also contends that Fetner moved her to jobs that no one else wanted to do although she was capable of performing each job after she learned how to perform it.

48.    According to Kathy Thornton, she, the three Plaintiffs, Lisa Cook and Mary Lou Laws ate lunch together on several occasions during 2004 and discussed Fetner's inappropriate conduct.  During one of these lunch meetings that Thornton believes was in early September 2004, the six women decided to report Fetner's conduct.

49.    In August 2004, Plaintiffs Minix and Linda Sims met with an investigator from the Equal Employment Opportunity Commission, the federal government agency tasked with among other things, investigating claims of harassment.  The EEOC investigator instructed them to report Fetner's alleged conduct to the people over Fetner in JELD-WEN management.

50.    Plaintiff Minix told her health care provider, Nurse Practitioner Charlotte Bishop, about Fetner's conduct sometime prior to October 13, 2004.  Ms. Bishop instructed Minix to report Fetner's conduct to JELD-WEN management.

51.    Plaintiff Brenda Sims told her health care provider, Bill Caypless, about Fetner's alleged conduct.  Mr. Caypless instructed Sims to report Fetner's conduct to Fetner's boss.

52.    Plaintiff Linda Sims told her health care provider, Dr. Russell Peterson, about Fetner's alleged conduct on August 25, 2004.  Dr. Peterson instructed Sims to "contact somebody higher up and talk to them about this problem."

53.    Finally, the three Plaintiffs and three of their co-workers, Kathy Thornton, Mary Lou Laws and Lisa Cook met with attorney-friend Chad Lee at Ms. Cook's babysitter's house sometime prior

13

to August 24, 2004.  Mr. Lee instructed the six women to review JELD-WEN's handbook and report Fetner's alleged conduct to the appropriate management official.

54.    Despite the advice of all of these persons, Plaintiffs failed to report Fetner's alleged conduct until October 2004.

55.    Plaintiff Brenda Sims left a message for Dan Hees in Sparta, Tennessee on or about October 8, 2004.  Brenda Sims obtained Hees' number by calling JELD-WEN'S corporate headquarters in Oregon. Hees called her back at her house a couple of days later and arranged a meeting in Roanoke.

56.    Plaintiff Linda Sims called JELD-WEN's "800" number in October 2004.  JELD-WEN's legal department called her back a few days later and left a message indicating that the legal department was interested in talking to her.  The person requested that Sims call her back on the  "800" number but Linda Sims did not return the call.

57.    Hees traveled from Sparta, Tennessee and was scheduled to meet with Brenda Sims on October 13, 2004.  Hees believed that the meeting was to discuss Fetner assigning Brenda Sims to work different laborer positions at the Roanoke facility.  Instead, Hees met with Minix, Linda Sims, Brenda Sims, Thornton and Lisa Cook about 9:00 AM in the Roanoke facility's paint room.  The women selected Hees because they "felt like he was the one [they] were supposed to talk to."

58.    The meeting began with Brenda Sims complaining that Fetner was moving her to jobs where she was not comfortable.  Then the five women relayed their allegations regarding Fetner's inappropriate conduct to Hees during this meeting which lasted approximately 30 to 45 minutes.

59.    According to Plaintiffs, Hees was "nice", attentive, appeared concerned and took notes during the meeting although it is likely that everyone in the meeting "giggled" when discussing some of the allegations.  Minix even laughed when discussing some of the allegations during her deposition.

14

60.     The October 13, 2004 meeting with Hees was the first occasion that any Plaintiff reported Fetner's conduct. Hees never personally witnessed Fetner engage in any inappropriate conduct of a sexual nature and the October 13, 2004 meeting was the first time he learned of such allegations.

61.     Ms. Thornton and Ms. Cook reported the conduct because they did not want to have to work with Fetner any longer and wanted the conduct to halt. Ms. Cook was satisfied once she no longer had to work for Fetner.

62.     Fetner was at a dentist appointment when Hees met with the five women. Hees contacted Fetner a short time after the meeting with the five women ended and met him at a local coffee shop to further investigate the allegations. According to Hees, Fetner told Hees that he would "make it simple for you" and he resigned during this meeting after Hees informed him that JELD-WEN's legal department would be contacted to investigate the allegations. Fetner did not return to work at JELD-WEN after his meeting with Hees and he never directed any additional inappropriate conduct towards any of the Plaintiffs. According to Fetner, Hees told him "that I could get my stuff, what I had left in the office that evening." No further investigation was necessary because Fetner's employment had terminated.

63.     Hees returned to the Roanoke facility and met with the five women at the plant later on October 13, 2004. He informed them that Fetner no longer worked for JELD-WEN. Either Minix or Linda Sims asked Hees: "[a]re we going to get anything out of this" which Cook interpreted as a request for monetary compensation.

64.     The five women confirmed to Hees that none of them were "short paid" or "lost time" or had their pay reduced during the time about which they were complaining.

65.        Plaintiffs do not contend that any sexually inappropriate conduct occurred after Fetner's employment ended.

66.        In or about November 2003, or about a year before Plaintiffs first reported Fetner's alleged conduct, JELD-WEN, inc. decided that the millworks facility in Roanoke, Alabama would be closed during 2004.  Barry Homrighaus, JELD-WEN's President-Window Group, made the decision to close the Roanoke facility with input from his subordinate manager, Rick Parker.

67.        The Roanoke facility was closed because of issues related to economic efficiency in that foreign competition suppressed the price of the door components produced by the plant and because JELD-WEN, inc.'s Sparta, Tennessee plant produced the same door frame components on a larger and more efficient scale.

68.        The Plaintiffs had heard rumors that the plant would close at least as early as 2003.

69.        On October 21, 2004, Hees met with the Roanoke facility employees and announced that the plant would not operate in 2005.

70.        Plaintiff Minix's last day of work at JELD-WEN was November 28, 2004.  Minix was asked to work a little longer but she declined because she was ready to "get out of there."

71.        Plaintiff Linda Sims' last day of work at JELD-WEN was November 24, 2004.

72.        Plaintiff Brenda Sims' last day of work at JELD-WEN was also in November 2004.

73.        Plaintiff Brenda Sims filed an EEOC Charge of Discrimination on November 29, 2004 alleging that Fetner rubbed and touched her legs and breasts and invited her to his house between June 1, 2004 and August 1, 2004.

16

74.     Plaintiff Linda Sims filed an EEOC Charge on November 11, 2004 alleging that Fetner made sexual comments regarding her body, requested that she go out on dates and touched her between April 1, 2004 and August 1, 2004.

75.     Plaintiff Minix filed an EEOC Charge on December 13, 2004 alleging that she was subjected to unwelcome hugging, rubbing, and touching as well as invitations that she go to Fetner's house.  The charge indicates that the earliest date that the inappropriate conduct occurred was September 1, 2001 and that the latest was July 1, 2004.

76.     Each Plaintiff cooperated fully with the EEOC investigation and provided the EEOC investigator with any and all information that the Plaintiff had to support her claim.

77.     The EEOC dismissed the Plaintiffs' charges, finding no cause to believe that JELD-WEN had violated Title VII and sent a letter to Plaintiffs' counsel before issuing the determination stating:

    Evidence from the Respondent [JELD-WEN] indicates that the Company took immediate and appropriate action upon receiving the complaint from your client.  Evidence further shows that the Respondent immediately terminated the employment of the alleged harasser, Richard Fetner.  Respondent contends that your client suffered no tangible injury.  In regards to your client being moved from location to another, Respondent concludes that when business is slow, employees might need to move around to get work completed and that certain employees do not have specific work areas.  Finally, Respondent states that no employee would be moved from another job position without proper safety training.

Your client has not provided sufficient evidence to show that the company did not take immediate action to rectify the problem once she complained to management.

78.     JELD-WEN did not learn that Plaintiffs filed EEOC complaints until at least December 2004.

79.     Plaintiffs never filed criminal charges against Mr. Fetner for any of his alleged conduct.

80.     JELD-WEN is not liable to the Plaintiffs for monetary damages because they cannot prove that they were subjected to unwelcome harassment; they cannot prove that the harassment was based on their gender; nor can they prove that the harassment was sufficiently severe or pervasive to alter the terms and conditions of their employment and create a discriminatorily abusive working environment.

81.     JELD-WEN is also not liable to the Plaintiffs because it adopted, distributed and enforced a policy prohibiting conduct such as that alleged by the Plaintiffs and Plaintiffs failed to reasonably use the mechanisms in the policy to report the alleged conduct.  Thus, JELD-WEN was not afforded the opportunity to correct the behavior alleged by Plaintiffs in a timely fashion.  When Plaintiffs finally did inform JELD-WEN, JELD-WEN quickly initiated an investigation and Mr. Fetner's employment ended before an investigation could be completed and a determination made as to whether Mr. Fetner had actually engaged in the conduct alleged.  In any event, the Plaintiffs do not allege that Mr. Fetner bothered them in any manner after they finally reported their allegations to JELD-WEN.

82.     JELD-WEN at all times acted in good faith and with reasonable grounds to believe that its actions did not violate the statutes cited in the Complaint and JELD-WEN is not liable for damages, including punitive damages, because neither it nor any of its agents committed any unlawful acts with willful, malicious, or reckless indifference to the protected rights of plaintiffs, nor did JELD-WEN authorize or ratify any such practices.

83.     The statute of limitations has run on all or most of Plaintiffs' claims against JELD-WEN.

84.     Plaintiffs failed to mitigate their damages.

18

## STIPULATIONS BY AND BETWEEN THE PARTIES:

1.     Defendant JELD-WEN, inc. is head-quartered in Klamath Falls, Oregon, and manufactures building products, including windows and doors.  It acquired a mill-works plant in Roanoke, Alabama, which was the facility where all of the complaints that Plaintiffs allege in this case arose.

2.     JELD-WEN, inc. had an anti-harassment policy that was read by all of the Plaintiffs before the time of the allegations of their various complaints.

3.     Plaintiffs Minix, B. Sims, and L. Sims were all laborers at the facility, and Richard Fetner was their immediate supervisor.

4.     Plaintiffs and two other female employees met with Dan Hees, coordinating general manager at the facility, on October 13, 2004, to report alleged harassment by Mr. Fetner, against them.

5.     Fetner  was confronted by Hees on October 13, 2004, and resigned the same day.

It is ORDERED that:

(1) The jury selection and trial of this cause, which is to last five (5) days, are set for October 23, 2006, at 10:00 a.m., at the federal courthouse in Opelika, Alabama;

(2) The parties are to file their pre-trial briefs, by no later than October 18, 2006;

(3) Each party shall have available at the time of trial, for use by the court (the judge, the courtroom deputy clerk, and the law clerk), three copies of the list of his or her exhibits;

(4) At least three days before trial, counsel are to contact the courtroom deputy clerk about the procedures for pre-marking all trial exhibits;

(5) Each party shall have available a sufficient number of copies of each photostatically reproducible exhibit for each of the jurors, opposing counsel, the courtroom deputy clerk, the law clerk, and the judge; and

(6) All understandings, agreements, and stipulations contained in this pretrial order shall be binding on all parties unless an objection is noted and filed with the court within seven (7) days from the date of this order.

DONE, this the 14th day of September, 2006.

    /s/ Myron H. Thompson    
    UNITED STATES DISTRICT JUDGE