**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

---

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  CASE NUMBER: 3:05-CV-00685-T
6  Lorena Minix, et al.,
7      Plaintiffs,
8      vs.
9  JELD-WEN, inc., et al.,
10     Defendants.
11
12     S T I P U L A T I O N
13     IT IS STIPULATED AND AGREED by and
14 between the parties through their respective
15 counsel, that the deposition of Kathy Ann
16 Thornton may be taken before Sara Mahler,
17 CSR, at the offices of McNeal & Douglas, at
18 1710 Catherine Court, Suite B, Auburn,
19 Alabama 36831, on the 9th day of May, 2006.
20
21     DEPOSITION OF KATHY ANN THORNTON
22                  48318
23

---

Page 2

1      IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the reading
3  of the deposition by the witness is not
4  waived, the deposition to have the same
5  force and effect as if full compliance had
6  been had with all laws and rules of Court
7  relating to the taking of depositions.
8      IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10 any objections to be made by counsel to any
11 questions except as to form or leading
12 questions, and that counsel for the parties
13 may make objections and assign grounds at
14 the time of the trial, or at the time said
15 deposition is offered in evidence, or prior
16 thereto.
17     IT IS FURTHER STIPULATED AND
18 AGREED that the notice of filing of the
19 deposition by the Commissioner is waived.
20
21     * * * * * * * * * * * *
22
23

---

Page 3

1      * * * * * * * * * * * * *
2              I N D E X
3            EXAMINATION
4                          PAGE
5  By Mr. Thompson .................... 7
6  By Mr. White ...................... 146
7       EXAMINATION CONTINUED
8                          PAGE
9  By Mr. Thompson .................... 169
10      DEFENDANT'S EXHIBITS
11                         PAGE
12 Ex. 1 - Subpoena to attend
13     deposition .............. 21
14 Ex. 2 - Roster for antiharassment
15     meeting .................. 69
16     * * * * * * * * * * * * *
17
18
19
20
21
22
23

---

Page 4

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  CASE NUMBER: 3:05-CV-00685-T
6  Lorena Minix, et al.,
7      Plaintiffs,
8      vs.
9  JELD-WEN, inc., et al.,
10     Defendants.
11
12 BEFORE:
13     SARA MAHLER, Commissioner.
14 APPEARANCES:
15     JAMES B. DOUGLAS, ESQUIRE, of
16 McNeal & Douglas, 1710 Catherine Court,
17 Suite B, Auburn, Alabama 36831, appearing on
18 behalf of the Plaintiffs.
19     MATTHEW W. WHITE, ESQUIRE, of
20 Adams, Umbach, Davidson & White, 205 South
21 Ninth Street, Opelika, Alabama 36803,
22 appearing on behalf of the Plaintiffs.
23     MICHAEL L. THOMPSON, ESQUIRE, of

---

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink
1-800-888-DEPO



EXHIBIT A

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 53

1  longer than this room. It had conveyer
2  belts.
3  Q.  So, it's longer than thirty
4  feet long?
5  A.  Yes.
6  Q.  And you would run the door
7  jams through there?
8  A.  I was on one end of it, and I
9  put the door jams on the conveyer belt, and
10  it would go into the paint machine and come
11  out on another conveyer belt.
12      Then it would go through an
13  oven, then another conveyer belt, and then
14  drop down on another conveyer belt where the
15  man would stack it off.
16  Q.  Okay. So, somebody else --
17  You were on the loading end of the painting
18  machine?
19  A.  Yes, sir.
20  Q.  And someone else was on the
21  other end?
22  A.  Other end.
23  Q.  Who was that someone else or

Page 54

1  did it vary from time to time?
2  A.  It was usually Danny
3  Greathouse.
4  Q.  And did Danny report to you?
5  A.  No, sir.
6  Q.  Who else ran that?
7  A.  It was just me and him.
8  Q.  Okay. You said most of the
9  time it was Danny Greathouse. Were there
10  other people that performed it?
11  A.  Yeah. If he was out, you
12  know, every now and then, Richard would have
13  to put somebody else in there.
14  Q.  So, people got shifted around
15  from job to job?
16  A.  Just only when Danny was out.
17  Q.  Could you see Danny from what
18  I'm going to refer to as the loading end of
19  the paint machine?
20  A.  No, sir. There was a five
21  hundred gallon paint tote that stood in
22  front of the paint machine.
23      I had to take the paint out of

Page 55

1  there to fill up the paint machine. It was
2  between us. I'd have to look around the
3  paint tote to see Danny.
4  Q.  You are saying tote?
5  A.  Yes, sir.
6  Q.  You mean a big fifty-five
7  gallon --
8  A.  Yes. We call them --
9  Q.  It was a big tank?
10  A.  Yes, sir.
11  Q.  Okay. And so, you could --
12  Could you see the loading end of the paint
13  machine from what I'll call the receiving
14  end of the paint machine?
15  A.  No, sir.
16  Q.  So, you couldn't see Danny?
17  He couldn't see you?
18  A.  No, sir.
19  Q.  Is that correct?
20  A.  That's right.
21  Q.  I asked you a bad question,
22  and it will show up on the Record poorly.
23  That's why I had to, sort of, clarify that.

Page 56

1      Anyone work in the paint room
2  other than you as the loader and Danny or
3  his substitute as the receiver?
4  A.  The Hyster driver had to bring
5  the wood into the paint room, but other than
6  that, that was it.
7  Q.  You are talking about the
8  forklift operator?
9  A.  Yes.
10  Q.  He would bring wood in when
11  you needed wood?
12  A.  Yes.
13  Q.  Was the paint room completely
14  enclosed?
15  A.  All except there was a door on
16  my end for the forklift driver to bring the
17  wood in, and there was a door on the other
18  end to pull the wood out of the building.
19  Q.  Okay. How big were these
20  doors?
21  A.  Big enough for a forklift
22  driver to go in and go around.
23  Q.  So, six feet?

14 (Pages 53 to 56)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 57

1    A.    Yes.
2    Q.    Is that about right, about six
3  feet wide?
4    A.    Yes, sir.
5    Q.    And what was in between the
6  doors?
7    A.    Sometimes they -- in the
8  winter time, they would have to put wood --
9  stack wood in there. They would stack wood
10 in there sometimes when they didn't have no
11 room anywhere else.
12   Q.    Between the doors, were there
13 windows where you could see in the paint
14 room?
15   A.    No. It was just a wall.
16   Q.    So, it was a solid wall?
17   A.    Solid wall.
18   Q.    If you were in the plant,
19 outside looking in through the door, through
20 either door, could you see where you were
21 working?
22   A.    You could see where I was
23 working, but you couldn't see me because the

Page 58

1  wood would be in front of me.
2    Q.    So, the wood would block
3  someone's view of you?
4    A.    Yes. In the winter time when
5  it gets cold, they would have plastic things
6  over the door. They would have to come down
7  to keep the heat on the inside of the paint
8  room so the paint wouldn't freeze.
9    Q.    So, you were pretty secluded?
10   A.    From everybody.
11   Q.    Okay. What did do you if
12 there was nothing to paint?
13   A.    Most of the time he made me
14 sweep the floor, but I would try to go and
15 work on a machine somewhere, another
16 machine.
17   Q.    Who made you sweep the floor?
18   A.    Richard.
19   Q.    By Richard, we are talking
20 about Richard Fetner?
21   A.    Richard Fetner.
22   Q.    You can call him Richard. I
23 don't care. I want to make sure it's clear

Page 59

1  for her.
2    A.    Okay.
3    Q.    Now, he would make you sweep
4  the floor in the entire plant or just the
5  paint room?
6    A.    Just the paint room.
7    Q.    So, he would make you clean up
8  your work area?
9    A.    Yes.
10   Q.    And you say you would try to
11 go run a machine?
12   A.    Yes, sir.
13   Q.    What type of machines did you
14 run?
15   A.    I knew how to run most of them
16 in there.
17   Q.    So, at some point in time you
18 had run most of the machines in there?
19   A.    Yes.
20   Q.    On both the cutting end of the
21 line?
22   A.    Yes, sir.
23   Q.    And the moulding end of the

Page 60

1  line?
2    A.    Yes, sir.
3    Q.    So, you knew how to run the
4  planer?
5    A.    No, sir. I didn't know how to
6  run that.
7    Q.    Do you know what the planer
8  was?
9    A.    No, sir.
10   Q.    Okay. So, I may just be using
11 a word for machine that doesn't exist?
12   A.    Yes.
13   Q.    Did you know how to cut heads?
14   A.    Yes, sir.
15   Q.    What is cutting heads?
16   A.    It's cutting the ends off the
17 heads. You just stick it down in this
18 machine, and it goes through and then cut
19 the ends off of them.
20   Q.    Did that -- Did the machine
21 have a name or you just refer to as cutting
22 heads?
23   A.    Just cutting heads.

15 (Pages 57 to 60)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 65

1  Q. And you did them well?
2  A. No complaints.
3  Q. No complaints. No complaints
4  about having to do any of those jobs?
5  A. No, sir.
6  Q. Is it common for people to
7  have to do different jobs?
8  A. Yes, sir.
9  Q. Was that common the entire
10 time you worked there?
11 A. Yes, sir.
12 Q. Did JELD-WEN have a sexual
13 harassment policy?
14 A. Yes, sir.
15 Q. Did CMS have a sexual
16 harassment policy?
17 A. Yes, sir.
18     MR. DOUGLAS: Kathy, be sure
19 that you let him finish his question before
20 you answer, okay.
21     THE WITNESS: Okay.
22     MR. DOUGLAS: That way the
23 Record will read easier.

Page 66

1  Q. Let me show you what's been
2  marked as Bates labeled D01 through 24 and
3  ask if you've seen that document before?
4  A. Yes, sir.
5  Q. What is that, Ms. Thornton?
6  A. It's the sexual -- I meant the
7  handbook we got when JELD-WEN took over.
8  Q. And you actually received a
9  copy of that handbook?
10 A. Yes, sir.
11 Q. Did all of the employees
12 receive a copy of the handbook?
13 A. Yes, sir.
14 Q. Does that have the sexual
15 harassment policy in it?
16 A. Yes, sir.
17 Q. Did you ever read that policy?
18 A. Not all of it.
19 Q. Okay. Which -- I'll tell you.
20 Let me get you to identify D 0025 and D 0026
21 for me. Have you seen that document before?
22     MR. DOUGLAS: Mike, I think
23 it's three zeros. I think it's D 00025.

Page 67

1     MR. THOMPSON: It's a five
2  digit code each time, isn't that right?
3  A. I don't remember seeing this
4  one.
5  Q. Okay. Look back with me, if
6  you would, at the handbook then, please. I
7  want to call your attention to page six --
8  page five of the handbook, which at the
9  bottom right hand corner, it's going to be
10 marked D 00011. Do you see that?
11 A. Yes, sir.
12 Q. Okay. Is that the JELD-WEN
13 harassment policy?
14 A. Yes, sir.
15 Q. And have you read that policy
16 before?
17 A. Yes, sir.
18 Q. Okay. Have you read that
19 entire policy before?
20 A. Yes, sir.
21 Q. So, if you testified earlier
22 that you didn't think you read all of it?
23 A. I went back and read parts of

Page 68

1  it when I needed to.
2  Q. Okay. When did you read the
3  harassment policy?
4  A. When the lawyers came to
5  JELD-WEN and was stressing the sexual
6  harassment policy.
7  Q. Okay. Was that in July of
8  2003?
9  A. Yes.
10 Q. Lots of lawyers. Do you
11 remember this lawyer's name?
12 A. No, sir.
13 Q. What did he look like?
14 A. I'm not sure.
15 Q. Is it a male or female?
16 A. Male.
17 Q. Okay. Did he talk to you
18 about sexual harassment?
19 A. He talked to the whole plant
20 and brought a video for us to watch.
21 Q. Was it a video, or was it a
22 PowerPoint presentation?
23 A. A PowerPoint presentation.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 81

1 running that day?
2   A.   No, sir.
3   Q.   Were the paint lines running
4 that day?
5   A.   I can't remember. I'm sure it
6 had run some that day.
7   Q.   Okay. They weren't running at
8 the time you met with him?
9   A.   No, sir.
10   Q.   Okay. Were you out of work
11 for a time in September or October 2004?
12   A.   I can't remember.
13   Q.   Did you take a vacation during
14 that time?
15   A.   I can't remember.
16   Q.   Okay. What was the purpose of
17 the meeting with Mr. Hees?
18   A.   To tell him about Richard
19 Fetner.
20   Q.   Okay. Who told you to attend
21 the meeting?
22   A.   We just all agreed.
23   Q.   Who is "we"?

Page 82

1   A.   Lorena Minix, Brenda Sims,
2 Lisa Cook, Mary Lou.
3   Q.   Did Mary Lou attend the
4 meeting?
5   A.   I believe so.
6   Q.   Okay. Is your memory pretty
7 good about what happened at that meeting
8 that day?
9   A.   Somewhat.
10   Q.   Did you take any notes during
11 that meeting?
12   A.   No, sir.
13   Q.   Okay. Who told you where the
14 meeting would be and when it would be and
15 all that kind of stuff?
16   A.   We just all agreed to have it
17 in the paint room since it was secluded from
18 everybody else.
19   Q.   Okay. And that is the five
20 women you just talked about?
21   A.   Yes.
22   Q.   And how did the meeting begin?
23   A.   One of us started telling

Page 83

1 Dan -- I think it was Lorena had started.
2   Q.   Okay. So, Lorena went first,
3 and what did she say?
4   A.   I'm not sure.
5   Q.   You're not sure what she said?
6   A.   No, sir.
7   Q.   Do you remember anything she
8 said?
9   A.   No, sir.
10   Q.   Who went next?
11   A.   Probably Brenda.
12   Q.   Brenda Sims?
13   A.   Yes, sir.
14   Q.   What did Brenda say?
15   A.   I'm not sure. I'm not sure
16 what anybody said but me.
17   Q.   You don't remember what
18 anybody said but you?
19   A.   Not enough to say it and it
20 wasn't true or messed up.
21   Q.   Well, I'm not worried about
22 you messing up. I do want to know anything
23 that you remember?

Page 84

1   A.   Just let's see. Richard
2 touching, saying things, ugly things, dirty
3 things, dirty jokes, wanting to go out with
4 us.
5       Lorena said that she had went
6 out with Richard, and I told -- I had told
7 Dan that I had.
8   Q.   That you went out with
9 Richard?
10   A.   I didn't go out. I slept with
11 him.
12   Q.   Okay.
13   A.   Most of us -- a lot of
14 touching and talking.
15   Q.   Is that generally what
16 everybody was telling?
17   A.   Yes, sir.
18   Q.   Okay. You don't remember
19 specifically who told him what?
20   A.   I think Lisa said that he was
21 touching her and he was trying to kiss her.
22   Q.   Okay. Now, do you remember
23 anything else anybody else said?

21 (Pages 81 to 84)

Page 85

1   A.   No, sir.
2   Q.   Okay. Did you take notes
3   during the meeting?
4   A.   No, sir.
5   Q.   Did any of the other women
6   take notes?
7   A.   No, sir.
8   Q.   Have you ever gone back and
9   written down what was said or what happened?
10  A.   I've written down what I --
11  what had happened to me.
12  Q.   Okay, where did you write that
13  down?
14  A.   Just on a notebook at home.
15  Q.   Do you still have that?
16  A.   No.
17  Q.   What did you do with it?
18  A.   I just throwed it away.
19  Q.   Okay. What did you tell
20  Mr. Hees during that meeting?
21  A.   I told him that Richard had
22  been touching me and grabbing me and he
23  would leave me over on inventories after

Page 86

1   everybody else had left. Asked me if I
2   would give him a blowjob. He would grab his
3   self in front of me.
4   Q.   He would grab his pants in
5   front of you?
6   A.   Yes.
7   Q.   And grab his crotch?
8   A.   Yes, sir.
9   Q.   Did he say anything when he
10  did this?
11  A.   He asked me if I wanted any of
12  that.
13  Q.   Okay. Any other conduct that
14  you reported to Mr. Hees?
15  A.   If I had a shirt on or
16  something and my nipples were sticking out,
17  he would ask me if they needed massaging.
18  If I was cold. If he could suck on them.
19  He would ask me to come over to his house at
20  least a hundred times a day.
21  Q.   Okay. Anything else that you
22  told Mr. Hees? Are you okay?
23  A.   Uh-huh.

Page 87

1       MR. WHITE: Mike, would you
2   reask your last question? I don't think she
3   got it.
4       MR. THOMPSON: I asked if she
5   was okay. She rubbed her eye. I asked if
6   she was okay. She was just thinking.
7       THE WITNESS: I'm fine.
8       MR. DOUGLAS: I apologize.
9   A.   I told Dan that I went over to
10  his house and slept with him one day.
11  Q.   Okay. You said he was
12  touching and grabbing you?
13  A.   Yes, sir.
14  Q.   Where was he touching and
15  grabbing you?
16  A.   Breast. He would rub against
17  my breast, and he would grab me on the
18  behind. And he would come up behind me, if
19  I was working and didn't know he was there
20  and stick broom handles and stuff up my
21  shorts.
22  Q.   Up your shorts?
23  A.   Yes.

Page 88

1   Q.   Do you wear shorts to work?
2   A.   Yes.
3   Q.   Okay. Anything else that you
4   told Mr. Hees?
5   A.   I think that's it.
6   Q.   Okay. You understand that
7   Ms. Minix, Ms. Sims, Ms. Linda Sims, and
8   Ms. Brenda Sims, are making allegations of
9   inappropriate sexual conduct by Mr. Fetner
10  in this lawsuit; right?
11  A.   Yes, sir.
12  Q.   Did you ever witness any of
13  this conduct towards them by Mr. Fetner?
14  A.   No, sir. I thought it was
15  just me.
16  Q.   You thought it was just you?
17  A.   Yes, sir.
18  Q.   What about any conduct
19  directed towards Lisa Cook, if there was
20  any?
21  A.   I never witnessed any.
22  Q.   Other than the conduct that
23  Mr. Fetner allegedly directed towards you,

22 (Pages 85 to 88)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 89

1  did you ever witness any sexually
2  inappropriate conduct at the JELD-WEN
3  facility?
4      A.   No.
5      Q.   Okay. What was the mood of
6  the meeting with Mr. Hees?
7      A.   It was tense. It was just
8  nervous, shocked.
9      Q.   You were surprised to hear
10 these allegations from the other women?
11     A.   Yes.
12     Q.   How did y'all decide to get
13 together and meet?
14     A.   We just -- We all eat lunch
15 together, and we all, kind of, got to
16 talking one day. And one person would say
17 something, and the other person would say
18 something else about it.
19          And then it went on, and it
20 just kept going on, so we just decided to
21 tell.
22     Q.   Okay. And when was this
23 talking at lunch going on?

Page 90

1      A.   It was several days.
2      Q.   How long before the meeting
3  with Mr. Hees?
4      A.   Probably four or five weeks.
5      Q.   You met with Mr. Hees in
6  October, mid-October. It would have been
7  early September or so?
8      A.   Yes.
9      Q.   Who all was talking at that
10 lunch meeting?
11     A.   Me, Lorena, Brenda, Linda.
12 Linda was at that meeting, too. I don't
13 know if I said that.
14     Q.   Anybody else talking at lunch?
15     A.   Lisa.
16     Q.   Mary Lou?
17     A.   Yes.
18     Q.   Anyone else?
19     A.   No.
20     Q.   So the six of you got together
21 and decided to tell?
22     A.   We was just eating -- Yes,
23 yes.

Page 91

1      Q.   Okay. So, you reported
2  Mr. Fetner's conduct to Mr. Hees like the
3  sexual harassment policy requires that you
4  do?
5      A.   Yes.
6      Q.   Okay. And that was October
7  13, 2004?
8      A.   Yes, sir.
9      Q.   What did you want to happen?
10     A.   Him to be fired.
11     Q.   Okay. You wanted the conduct
12 to stop?
13     A.   Yes.
14     Q.   Okay. Mr. Fetner had -- was
15 at a dentist appointment when you met with
16 Mr. Hees?
17     A.   Yes.
18     Q.   Okay. Now, Mr. Fetner did not
19 work for JELD-WEN after October 13th; is
20 that correct?
21     A.   No, sir.
22     Q.   That's not correct?
23     A.   I'm sorry. He didn't work.

Page 92

1      Q.   I'm sorry. It's just a poor
2  question. He never worked for JELD-WEN
3  after that, did he?
4      A.   No, sir.
5      Q.   Okay. Do you know why?
6      A.   They told him -- What Danny
7  said was that he told him he had to quit.
8      Q.   Okay. Other than Mr. Fetner,
9  did anyone direct any conduct towards you
10 that you found to be sexually offensive
11 while were you employed at JELD-WEN?
12     A.   No.
13     Q.   So, he was the only one?
14     A.   Yes.
15     Q.   Okay. Do you know what
16 Mr. Fetner's intent was when he directed his
17 conduct towards you?
18          MR. WHITE: Object to the
19 form.
20     Q.   I'm just asking if you know.
21     A.   I don't know.
22     Q.   Okay.
23     A.   I thought if I had sex with

23 (Pages 89 to 92)

Page 93

him, I thought that's what he wanted at first.
Q. Okay. So, you had sex with him how many times?
A. One.
Q. And this was at his house?
A. Yes, sir.
Q. When was that?
A. I'm not sure.
Q. How long before you reported the conduct to Mr. Hees was it?
A. Three or four months, I guess.
Q. So, it would have been sometime during the summer of 2004?
A. Yes, sir.
Q. Okay. Was it on a weekend?
A. No.
Q. Was it during the week?
A. Yes.
Q. Was it on a work day?
A. Yes.
Q. And y'all left work and went over to his house?

Page 94

A. Yes.
Q. Did you lose any time that day?
A. No.
Q. Okay. Was it -- Were you a willing participant?
A. Yes. I felt like that was my only option. I didn't know what to do.
Q. Okay. But it was a consensual?
A. Yes.
Q. How long were y'all gone from the plant?
A. Oh, it was after work. It was after work.
Q. After work?
A. Yes. It was after work.
Q. So, you just went home with him one night after work?
A. It was one afternoon. It lasted about two minutes. It was on a Monday. It was on a Monday because he told me to hurry up and get dressed. He had to

Page 95

get to a commissioner's meeting, and that always happens on a Monday.
Q. And the sex lasted about two minutes?
A. Yes. It was --
Q. Sorry to delve in these personal issues, but it's just, kind of, the nature of the lawsuit. I know we are all adults, and you understand that.
So, he told you to hurry up and get dressed because he had to go to this meeting?
A. Yes, sir.
Q. Were y'all drinking any that evening?
A. No.
Q. Okay. You said you felt like that was what you needed to do to stop his other conduct?
A. Yes.
Q. Okay. You felt like that was the choice you had to stop that other conduct?

Page 96

A. Yes.
Q. Was there any other reason you had sex with him?
A. No. I didn't want to.
Q. He didn't put a gun to your head or anything like that, did he?
A. It felt like it, but, no.
Q. Okay. Did he -- Did y'all go to his house in separate cars?
A. Yes.
Q. Okay. Did you follow him there?
A. Yes.
Q. How far is his house from the plant, minutes not miles?
A. Six, seven minutes.
Q. Okay. Now, this other conduct that you've talked about, him grabbing his crotch, rubbing a board or a stick up your shorts, requesting oral sex, keeping you in to do inventory, making comments about your nipples, things like that, touching and grabbing you, did that occur in the presence

24 (Pages 93 to 96)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 97

1  of anyone else?
2      A.   No.
3      Q.   He always did that where no
4  one else could see you?
5      A.   I was always secluded from
6  everybody else.
7      Q.   Okay. And how many times did
8  he -- Other than this one time when y'all
9  had consensual sex, how many times did he
10 touch your breasts?
11     A.   Several. Sometimes every day.
12     Q.   Would he come up to you and
13 hug you or would he just --
14     A.   Hug me, rub right here
15 (indicating), come up behind me and just
16 grab them.
17     Q.   Just grab you from behind?
18     A.   Yes, like I was his.
19     Q.   So, that occurred on a
20 frequent basis?
21     A.   All the time.
22     Q.   Okay. And you also testified
23 that he grabbed your behind?

Page 98

1      A.   Yes.
2      Q.   How often did that happen?
3      A.   Few times a week.
4      Q.   Not as often as the touching
5  of the breast?
6      A.   Uh-huh.
7      Q.   You need to say yes or no for
8  me.
9      A.   Yes.
10     Q.   What about -- And when did
11 this conduct begin?
12     A.   Right when he started working
13 there.
14     Q.   Okay.
15     A.   Well, he didn't start touching
16 and grabbing after a little while. But he
17 had started asking me to go out with him and
18 everything when he first started.
19     Q.   Did he ask you to go out with
20 him, or did he just ask you to come over to
21 his house and have sex with him?
22     A.   He said he was lonely and
23 needed somebody to talk to. He was going

Page 99

1  through a divorce.
2      Q.   Okay. Did you ever talk to
3  him about that kind of stuff?
4      A.   No.
5      Q.   Do you know anything about his
6  divorce?
7      A.   No.
8      Q.   Okay. Globally, when did this
9  conduct end?
10     A.   When he got fired.
11     Q.   Okay.
12     A.   Quit -- When he quit.
13     Q.   And that goes for all this
14 conduct. It occurred on a regular basis
15 from the time he was hired until the time
16 his employment ended?
17     A.   Yes.
18     Q.   Is that correct?
19     A.   Yes.
20     Q.   Okay. When did he, or, I
21 guess, how many occasions did he grab his
22 crotch and make comments to you?
23     A.   He probably done that seven,

Page 100

1  eight, nine times, somewhere in there.
2      Q.   Was that before or after you
3  slept with him?
4      A.   After.
5      Q.   Okay. Did he continue to ask
6  you out after you slept with him?
7      A.   Yes. He would ask me to come
8  over to his house every day.
9      Q.   Okay. Did you ever go back?
10     A.   No.
11     Q.   You said he rubbed -- I'm
12 sorry. I can't remember. Did you
13 characterize it as a stick or a broom stick?
14     A.   Yes. A broom handle of a
15 broom. I have to bend over to put the paint
16 in the paint machine, and I wouldn't know he
17 was there. He would just grab a broom and
18 put it up my shorts.
19     Q.   And he would stick the broom
20 handle up your shorts?
21     A.   Yes.
22     Q.   How many times did he do that?
23     A.   Two or three times.

25 (Pages 97 to 100)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 101

1  Q. Was a broom handle something
2  that was in the paint room?
3  A. Yes.
4  Q. What was its purpose?
5  A. To sweep the floor with.
6  Q. It was on the broom?
7  A. Yes.
8  Q. Okay. You said requested, I
9  think your words were, a blowjob?
10 A. Yes.
11 Q. When was that?
12 A. It was sometime when we was
13 having to do inventory. He was -- We were
14 doing inventory together. He put me doing
15 inventory with him.
16     And there is an old paint
17 building on the outside of the plant. It
18 was the old paint room, and they keep lumber
19 in that sometimes, so we went out there to
20 count the lumber out there, and he asked me
21 if I would give him a blowjob.
22 Q. Okay. Did you?
23 A. No. I just walked out.

Page 102

1  Q. Was that before or after you
2  slept with him?
3  A. After.
4  Q. Okay. So, that would have
5  been sometime within a few months of your
6  first report to Dan Hees; correct?
7  A. Yes. It got worse.
8  Everything got worse after I slept with him.
9  Q. Okay. It got worse after you
10 slept with him?
11 A. Worse.
12 Q. Redoubled his efforts?
13 A. Yes.
14 Q. You said he kept you to do
15 inventory; is that correct?
16 A. Yes.
17 Q. Were other employees also kept
18 to do inventory?
19 A. Yes, but a lot of times he
20 would send them on.
21 Q. Okay. Who all was kept to do
22 inventory?
23 A. Several people. It was

Page 103

1  different some months. Towanna, Lorena, a
2  guy named Leon, Danny done it some, Luther,
3  McCray, Junior.
4  Q. Okay. Anybody else?
5  A. Dennis Shelnutt.
6  Q. Anybody else?
7  A. I can't remember anybody else.
8  Q. Did he ask you out?
9  A. He would just ask me if I
10 would come to his house.
11 Q. Okay. He never asked you to
12 go out on a --
13 A. -- Date, no. He just wanted
14 me to come to his house.
15 Q. Okay. And you just went that
16 one time?
17 A. Yes.
18 Q. And you don't believe that
19 anyone ever saw any of this?
20 A. Not as far as I know, nobody
21 did.
22 Q. Okay. That was due to the
23 nature of where you worked?

Page 104

1  A. Yes.
2  Q. Okay. You're meeting with
3  Mr. Hees on October 13, 2004, do you recall
4  laughing during the meeting?
5  A. No.
6  Q. Okay. If Lorena Sims
7  testified that -- I'm sorry. If Linda Sims
8  testified that you did would you have any
9  reason to controvert that testimony?
10 A. No.
11 Q. So, you might have laughed
12 during the meeting?
13 A. I might have did.
14 Q. Do you recall other people
15 laughing during the meeting?
16 A. No.
17 Q. Was Mr. Hees professional
18 during this meeting?
19 A. Yes.
20 Q. Were you happy with the way he
21 acted during the meeting?
22 A. I was happy that he was going
23 to get rid of Richard, but I wasn't happy,

26 (Pages 101 to 104)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 105

1  no.
2  Q. You weren't happy about
3  Mr. Fetner's conduct; correct?
4  A. Right.
5  Q. Was there anything else you
6  weren't happy about?
7  A. No.
8  Q. Did Mr. Hees do anything that
9  made you unhappy?
10  A. No.
11  Q. Okay. And to your knowledge
12  this was the first time you reported these
13  allegations to anyone at JELD-WEN
14  management?
15  A. Yes -- No. I told a plant
16  manager, Joe Mendoza about it when he was
17  working there.
18  Q. Okay. What did you tell
19  Mr. Mendoza?
20  A. I told him everything that I
21  told you except that I had slept with him.
22  I don't think I slept -- I hadn't slept with
23  him, when he was working there.

Page 106

1  Q. When did you tell Mr. Mendoza?
2  A. A couple months after he
3  started working there.
4  Q. Where was Mr. Mendoza when you
5  told him?
6  A. In the paint room.
7  Q. Okay. And what exactly did
8  you tell him?
9  A. That Richard was touching me
10  and saying stuff.
11  Q. Is that what your words were
12  to him? He's touching me and saying stuff?
13  A. Yes.
14  Q. Did you tell him anything
15  else?
16  A. I can't remember.
17  Q. What did Mr. Mendoza say?
18  A. He was surprised.
19    MR. WHITE: I'm sorry. I
20  didn't hear that.
21  A. He was surprised.
22  Q. He was surprised. What did he
23  say?

Page 107

1  A. He really didn't say nothing.
2  About every day, every other day, he would
3  come in there and ask me if Richard had done
4  anything that day. He never did go to Pat
5  or Dan about it.
6  Q. You never did, or he never
7  did?
8  A. He never did.
9  Q. Did you, other than this
10  meeting on October 13, 2004, go to Pat or
11  Dan about any of this?
12  A. No, just Joe.
13  Q. Just Joe. You said he would
14  ask you every other day or so if Mr. Fetner
15  bothered you?
16  A. Yes, that day.
17  Q. And what would you tell him?
18  A. If he had touched me that day
19  or tried to kiss me or what he said, or if
20  it was that day he had put the broom up my
21  shorts. If he had done it that day, I had
22  told him.
23  Q. Okay. What was your reaction

Page 108

1  to Mr. Fetner's conduct?
2  A. Mad. When I told Joe, I had
3  done had enough that day. It just come
4  flying out of my mouth. I was mad and
5  aggravated.
6  Q. You told Joe because you got
7  so frustrated and mad about it?
8  A. Yes. I thought I was the only
9  one. I didn't think nobody would believe
10  me. It would be my word against Richard.
11  Q. Okay.
12  A. And then if he wouldn't have
13  fired him, he would have made my life hell.
14  Q. That's what you thought?
15  A. Yes.
16  Q. And you thought that because
17  he was your supervisor?
18  A. Yes.
19  Q. Why didn't you -- why didn't
20  you call JELD-WEN'S telephone number they
21  provide in the policy?
22  A. I don't know.
23  Q. No reason?

27 (Pages 105 to 108)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 117

1  deserved an option.
2      Q.    So, if it had been your
3  decision, you would have fired him?
4      A.    They told -- In the meeting,
5  they said -- they said that it would be, you
6  know, fired, you know. Not the option to
7  quit, they were going to fire him.
8      Q.    Now, you're talking about a
9  second meeting you had with Mr. Hees that
10 day?
11     A.    No. The meeting they had
12 given us on sexual harassment.
13     Q.    Explain that to me. The
14 training presentation you went through?
15     A.    Yes.
16     Q.    Mr. Sturm, whoever the lawyer
17 was, said that if somebody was sexually --
18 if one employee was sexually harassing
19 another employee, the employee would be
20 terminated?
21     A.    Yes, fired.
22     Q.    Did you understand the things
23 that Mr. Sturm was saying during that

Page 118

1  meeting?
2      A.    Yes. I couldn't remember what
3  all he said.
4      Q.    Okay. At the time of this
5  meeting with Mr. Sturm, had you slept with
6  Richard prior to that time, Richard Fetner?
7      A.    No.
8      Q.    So, this was before that;
9  right?
10     A.    I slept with Richard after the
11 meetings.
12     Q.    I meant the meeting was before
13 you slept with him?
14     A.    Yes.
15     Q.    Okay. Did you ask him
16 questions during the meeting?
17     A.    No, sir.
18     Q.    Okay. Did Mr. Hees meet with
19 you again after your initial meeting with
20 him on the 13th?
21     A.    Yes.
22     Q.    Tell me about that meeting?
23     A.    He just told us what he had

Page 119

1  told Richard, and he said Richard didn't say
2  anything. That he just got his stuff and
3  left.
4      Q.    Okay. Do you know that to be
5  true?
6      A.    I don't know it's true. It's
7  just what they told me.
8      Q.    Did you find Mr. Hees to be
9  approachable during your employment there?
10     A.    Yes.
11     Q.    How often was he around the
12 plant?
13     A.    In the beginning, he wasn't
14 there hardly at all. Then he was there
15 sometimes. Some weeks he was there every
16 day.
17     Q.    Okay. Did you know how to
18 reach Mr. Hees, if you needed to?
19     A.    No.
20     Q.    Did you ever ask anyone how to
21 reach him?
22     A.    No.
23     Q.    Did you find Ms. Giles to be

Page 120

1  approachable, Roxy Giles?
2      A.    Yes.
3      Q.    Do you think if you had asked
4  her for Mr. Hees telephone number, she would
5  have given it to you?
6      A.    Yes.
7      Q.    Okay. Did you know what
8  Mr. Hees's position was?
9      A.    No.
10     Q.    Did you know he was Pat
11 Galvez's boss?
12     A.    Yes.
13     Q.    Okay. Why did you never
14 report these allegations to Mr. Galvez?
15     A.    I didn't think he would
16 believe me.
17     Q.    You just didn't think you
18 would be believed?
19     A.    It was just me. There wasn't
20 no witnesses. Didn't nobody see nothing.
21 You know, it would be my word against
22 Richard's. And I don't think that would
23 have been a good enough reason for him to

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 125

1   A.   If I was okay, yes.
2   Q.   Who was your supervisor?
3   A.   Richard Fetner.
4   Q.   Okay. And Mr. Mendoza
5 supervised some other part of the plant?
6   A.   Yes.
7   Q.   Okay. And who did he
8 supervise?
9   A.   The back part. The shipping
10 department, I believe.
11  Q.   So, Mr. Mendoza was not your
12 immediate supervisor?
13  A.   No.
14  Q.   At any time when you worked
15 there, then?
16  A.   No.
17  Q.   Okay. You worked at JELD-WEN
18 until November 24, 2004?
19  A.   Yes.
20  Q.   Okay. And you left because
21 the plant closed?
22  A.   Yes.
23  Q.   And you said earlier you

Page 126

1 accepted a severance payment?
2   A.   Yes.
3   Q.   Okay. Do you have any
4 problems with that severance payment?
5   A.   No.
6   Q.   Any problems with the
7 agreement?
8   A.   No.
9   Q.   Did you get a chance to read
10 over the agreement before you signed it?
11  A.   Yes.
12  Q.   Did you actually read it
13 before you signed it?
14  A.   Yes.
15  Q.   Did you understand everything
16 in the agreement before you signed it?
17  A.   Yes.
18  Q.   Let me finish or it will be --
19 what will happen, there will be yes in the
20 middle of my sentence.
21       She's really good, but she is
22 not good enough to do that. She's only got
23 ten fingers.

Page 127

1   Did you consult with a lawyer
2 at all about the severance agreement?
3   A.   No.
4   Q.   Did you think about doing
5 that?
6   A.   No.
7   Q.   Did you consult with anyone
8 about it?
9   A.   No.
10  Q.   You didn't ask your dad or
11 anybody like that about it?
12  A.   No.
13  Q.   Okay. When did the -- forgive
14 me if I missed it. When did the painting
15 operation or the paint lines, when did those
16 stop?
17  A.   Probably just about a week
18 before that it actually shut down. They put
19 us all in the back to finish up shipping.
20  Q.   Okay. And in the back, what
21 were you doing?
22  A.   Different things, just
23 whatever needed to be done.

Page 128

1   Q.   Just whatever needed to be
2 done. And was that finishing work on the
3 product or was it preparing -- I guess what
4 I'm getting at, were you preparing the wood
5 to be moulded or were you finishing what had
6 already been moulded?
7   A.   Finishing up.
8   Q.   Okay. Is it your
9 understanding that some folks stayed after
10 that, and did some more cutting work?
11  A.   Yes.
12  Q.   Did you have the opportunity
13 to stay and do cutting work?
14  A.   Yes.
15  Q.   Why didn't you?
16  A.   Because I think they were
17 going to be after Christmas, and I wanted to
18 use my severance pay to buy my son's
19 Christmas with that year.
20  Q.   That's fair enough. Do you
21 remember Mr. Hees telling you you could
22 inquire about transferring to another
23 JELD-WEN facility?

32 (Pages 125 to 128)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 169

1   A.   No.
2   Q.   Okay. Who told you that could
3 you go put in an application?
4   A.   Dan Hees.
5       MR. WHITE: All right. That's
6 all I've got.
7 BY MR. THOMPSON:
8   Q.   Ms. Thornton, just a few
9 follow-ups. Do you know what the JELD-WEN'S
10 facility in Wedowee, do you know what they
11 do?
12  A.   No.
13  Q.   You don't know what they make?
14  A.   No.
15  Q.   You don't know if they make
16 anything?
17  A.   I've always been told that
18 they made windows or doors, or something.
19 I'm not sure. I've never been in there.
20  Q.   What you've been told is that
21 they do something different than what was
22 done at the mill?
23  A.   Yes.

Page 170

1   Q.   Mr. White was asking you about
2 -- You said Mr. Estes?
3   A.   Yes.
4   Q.   That Mr. Estes was told by a
5 temp service he should no longer --
6   A.   Go to work.
7   Q.   -- Go to work at JELD-WEN;
8 correct?
9   A.   Yes.
10  Q.   What's the basis of your
11 knowledge of that?
12  A.   Jeff had actually --
13  Q.   Did Jeff Estes tell you this?
14  A.   Yes.
15  Q.   Jeff Estes told you something
16 that the temporary service representative
17 had told him?
18  A.   Well, he had went to work one
19 day, and it was actually the day that he
20 wasn't supposed to be there, and he didn't
21 know that he wasn't supposed to be there.
22       And Richard had to call the
23 temp service back, and the temp service said

Page 171

1 that they couldn't get ahold of Jeff Estes
2 to tell him not to come back to work. So
3 that night the temp service got ahold of
4 Jeff and told him not to go back to work at
5 JELD-WEN.
6   Q.   Okay. So, your knowledge
7 about all of that comes from Mr. Estes
8 telling you that?
9   A.   Yes.
10  Q.   And it's your understanding
11 that Mr. Estes was told this by the
12 temporary service?
13  A.   Yes.
14  Q.   You never heard Mr. Fetner say
15 anything to the temporary service about that
16 issue?
17  A.   No.
18  Q.   Now, Mr. White has clarified
19 -- That I said or may have said. I don't
20 know if I said it or not, that you had a
21 consensual sexual relationship with
22 Mr. Fetner. It's incorrect to say you had a
23 relationship?

Page 172

1   A.   I didn't have no relationship.
2 I had sex with him one time.
3   Q.   Was the sex on one time, was
4 it consensual?
5   A.   Yes.
6   Q.   It wasn't rape?
7   A.   No.
8   Q.   Did you kiss him?
9   A.   No.
10  Q.   You didn't kiss him at all?
11  A.   No.
12  Q.   Did you get completely
13 undressed in his house?
14  A.   No. He didn't either.
15  Q.   I'm going to jump around a
16 little bit too. Mr. White asked you about
17 some jokes that Mr. Fetner would tell.
18  A.   Yes.
19  Q.   Okay. Did -- what was --
20 first of all, he asked you if you ever heard
21 him tell jokes in the presence of anyone
22 other than you.
23  A.   Yes.

43 (Pages 169 to 172)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 177

1  A.  I don't know.
2  Q.  Did she ever tell you?
3  A.  No.
4  Q.  What was Lisa's job?
5  A.  Brick mould machine.
6  Q.  Mr. Mendoza was over the porch
7  column and something operation?
8  A.  Yes. It was back there in the
9  same building that Lisa worked in.
10 Q.  Okay. So, Mr. Fetner then was
11 Ms. Cook's direct supervisor, immediate
12 supervisor?
13 A.  Yes, until they closed that
14 part of that plant down.
15 Q.  Okay.
16 A.  Then he became Lisa and them's
17 supervisor.
18 Q.  Then Mr. Mendoza became Lisa's
19 supervisor?
20 A.  Yes.
21 Q.  Okay. Do you know when they
22 closed that part of the plant down?
23 A.  No.

Page 178

1  Q.  It wasn't too long before
2  Mr. Mendoza was transferred?
3  A.  It wasn't too long.
4  Q.  Just a few weeks?
5  A.  Probably a couple of months.
6  Q.  Couple of months. Eight weeks
7  or so?
8  A.  Yes.
9  Q.  You've talked to Ms. Minix
10 during this deposition, during the breaks
11 and things like that?
12 A.  Yes.
13 Q.  Have y'all talked about any of
14 your testimony?
15 A.  No.
16 Q.  Have you talked about any of
17 the events that happened at the JELD-WEN
18 facility?
19 A.  No.
20    MR. THOMPSON: That's all I
21 have for now.
22    MR. WHITE: That's all we
23 have.

Page 179

1  (The deposition was concluded at 1:45 p.m.,
2  May 9, 2006.)

Page 180

1        REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4     I, Sara Mahler, Certified Shorthand
5  Reporter and Commissioner for the State of
6  Alabama at Large, do hereby certify that the
7  above and foregoing proceeding was taken
8  down by me by stenographic means, and that
9  the content herein was produced in
10 transcript form by computer aid under my
11 supervision, and that the foregoing
12 represents, to the best of my ability, a
13 true and correct transcript of the
14 proceedings occurring on said date and at
15 said time.
16    I further certify that I am neither
17 of kin nor of counsel to the parties to the
18 action; nor in any manner interested in the
19 result of said case.
20
21
22     Sara Mahler, CSR,
        for the State of
23      Alabama at Large.

45 (Pages 177 to 180)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO