## FREEDOM COURT REPORTING

**Page 1**

```
 1   IN THE UNITED STATES DISTRICT COURT
 2    FOR THE MIDDLE DISTRICT OF ALABAMA
 3              EASTERN DIVISION
 4
 5   CIVIL ACTION NO.: 3:05-cv-685-T
 6   LORENA MINIX, et al.,
 7       Plaintiffs,
 8       vs.
 9   JELD-WEN, INC., and
10   RICHARD FETNER,
11       Defendants.
12
13            S T I P U L A T I O N
14       IT IS STIPULATED AND AGREED by and
15   between the parties through their respective
16   counsel, that the deposition of Lorena Minix
17   may be taken before Angela Smith, RPR, CRR,
18   at the offices of McNeal & Douglas, at 1710
19   Catherine Court, Ste: B, Auburn, Alabama
20   36831, on the 10th day of April, 2006.
21
22        DEPOSITION OF LORENA MINIX
23
```

**Page 2**

```
 1       IT IS FURTHER STIPULATED AND
 2   AGREED that the signature to and the reading
 3   of the deposition by the witness is waived,
 4   the deposition to have the same force and
 5   effect as if full compliance had been had
 6   with all laws and rules of Court relating to
 7   the taking of depositions.
 8       IT IS FURTHER STIPULATED AND
 9   AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17       IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21         * * * * * * * * * * * *
22
23
```

**Page 3**

```
 1         * * * * * * * * * * * *
 2              I N D E X
 3            EXAMINATION
 4                        PAGE
 5   By Mr. Scofield ..................... 13
 6   By Mr. Thompson .................... 314
 7       DEFENDANT'S EXHIBITS
 8                        PAGE
 9   Ex. 1 - Ms. Minix's birth
10        certificate .............. 17
11   Ex. 2 - Ms. Minix's driver's
12        license issued in '01 .... 17
13   Ex. 3 - Records of Ms. Minix's
14        family members ........... 23
15   Ex. 4 - Document regarding
16        Ms. Minix's brother ...... 37
17   Ex. 4-A - Documents regarding
18        power of attorney for
19        mother ................... 38
20   Ex. 5 - Answers to
21        interrogatories .......... 45
22   Ex. 6 - Application for
23        employment ............... 69
```

**Page 4**

```
 1   Ex. 7 - Magazine with the layout
 2        of the plant facility .... 74
 3   Ex. 8 - Ms. Minix's unemployment
 4        records .................. 103
 5   Ex. 9 - Employment document from
 6        Roanoke Electronic ...... 108
 7   Ex. 10 - Termination documents
 8        from Wellborn ........... 129
 9   Ex. 11 - 11/8/94 Blue Cross Blue
10        Shield enrollment
11        document ................ 138
12   Ex. 12 - 3/22/95 Court documents
13        regarding assault
14        charge .................. 139
15   Ex. 13 - Excuse from work to see
16        Dr. Peterson ............ 140
17   Ex. 14 - Payroll documents from
18        '96 ..................... 142
19   Ex. 15 - 2/28/97 document
20        regarding working with
21        Mr. Bowen ............... 143
22   Ex. 16 - Employment records ....... 146
23   Ex. 17 - Pharmacy records from
```

1 (Pages 1 to 4)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-8**


EXHIBIT C

**FREEDOM COURT REPORTING**

Page 277

1   A.   No. I don't remember him
2   saying that.
3   Q.   You don't remember that. Then
4   after that discussion, do you recall talking
5   about -- about Richard getting too loose
6   with the way he talks to employees?
7   A.   Uh-huh. Yes. That's
8   something I remember us talking to him
9   about, really.
10  Q.   Okay. All right. And what
11  did you tell Mr. Hees about Richard Fetner?
12  A.   I told him he was sexually
13  harassing me, and putting his hands on me,
14  and asking me to go buy some beer and have
15  sex with him, and all that kind of stuff.
16  Q.   Now, you said that he was --
17  Let's talk about -- not the verbal stuff
18  right now, but any of the putting the hands
19  on you. Did he -- Did Mr. Fetner put any of
20  the hands on you on any of your private
21  parts?
22  A.   Well, yes. He would -- He
23  would do it in a way where he thought you

Page 278

1   wouldn't think anything about it.
2   Q.   A sneaky way?
3   A.   Yeah. He'd come behind you
4   and hug you, but he'd put his arms across
5   your boobs, or he'd spank you on your butt.
6   But he was always talking -- talking that
7   stuff, you know, like: Let's go have about
8   four hours of sex. You know, he -- He was
9   just nasty.
10      MR. WHITE:   Are you asking her
11  everything that Fetner did to her, or are
12  you just -- I mean --
13      MR. SCOFIELD:   Well, what I'd
14  like to break this down to is stuff that he
15  did physically. And then the next question
16  I was going to ask: Where was it and did
17  anybody witness it?
18  A.   Oh, it was -- Yeah, yeah.
19  Q.   Let's talk about --
20      MR. WHITE:   Do you understand
21  what he's asking you? He wants you to tell
22  him every time that he touched you
23  physically, take them each one at a time and

Page 279

1   tell him about it and what he did.
2   A.   It just happened -- It would
3   just happen every day or every other day.
4   Q.   Well, let's -- Do you recall
5   -- Let's back up a little bit. Was this the
6   first time you talked to Dan Hees about
7   Richard Fetner?
8   A.   Yes.
9   Q.   All right. And you had not
10  talked to Pat Galvez about it?
11  A.   No, we didn't.
12  Q.   So, this was -- This was the
13  first -- Or Rob Sturm, when you met with Rob
14  Sturm, did you talk to Attorney Rob Sturm
15  about Richard Fetner?
16  A.   Oh, no, no.
17  Q.   Okay. So, this was the first
18  time you went to JELD-WEN management about
19  Mr. Fetner; is that correct?
20  A.   Yes.
21  Q.   Okay. Now, you -- What I'm
22  trying to get at is, you already said that
23  he'd grab you and -- sneakily grab your boob

Page 280

1   and pat you on the butt and stuff, did he do
2   that in front of other people?
3   A.   He would hug me out there in
4   front of everybody, he'd come up behind me
5   and put his arms around me. Or he'd grab
6   you by your arm, but his fingers would be
7   where he could rub your boob.
8   Q.   And was it -- Did you feel
9   that was sexual in nature?
10  A.   No. That was Richard. That
11  was just Richard.
12  Q.   Okay. Now, who saw this? Can
13  you think of anybody who saw it?
14  A.   Probably Brenda --
15  Q.   Okay.
16  A.   -- and Linda, both, probably
17  saw it. Or Tooty saw it. Most of the
18  people back there.
19  Q.   Now, we're talking about in
20  the dado machine area?
21  A.   Right.
22  Q.   Okay. And did he ever do this
23  anywhere else?

70 (Pages 277 to 280)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 281

1   A.   Yeah. In his office, you
2   know.
3   Q.   In Richard's office?
4   A.   Yes.
5   Q.   Okay. Did he do it in any
6   other parts of the plant?
7   A.   No. It was just in his
8   office.
9   Q.   Or the dado area?
10  A.   Yeah.
11  Q.   All right. And you believe
12  Brenda saw this, and you believe Tooty saw
13  this. Anybody else?
14  A.   Linda.
15  Q.   Linda. Anybody else?
16  A.   Oh, yeah. Mike Weathers.
17  Now, he saw all this.
18  Q.   Mike who?
19  A.   Weathers.
20  Q.   Okay. Where is he?
21  A.   He's in Rock Mills.
22  Q.   That's in Alabama?
23  A.   Yes.

Page 282

1   Q.   All right.
2   A.   Now, he worked with me.
3   Q.   Okay.
4   A.   After Ronald Owen got fired,
5   then I took over Ronald's part, and then
6   this Mike Weathers starting working with me.
7   Q.   Did you have any problems with
8   Mr. Weathers?
9   A.   No, not at all.
10  Q.   All right. Now, that's the
11  physical part. Can you remember anything
12  else Richard did physically that perhaps
13  anybody else saw while you were at
14  JELD-WEN's facility?
15  A.   No, no.
16  Q.   All right. And when did this
17  occur?
18  A.   Gosh, I don't know. I think
19  it occurred for months, you know.
20  Q.   Okay.
21  A.   Sometime every day, sometime
22  every other day, once a week, sometimes --
23  But he was also, you know, fiddling with the

Page 283

1   other girls.
2   Q.   Did -- When he would come up
3   and hug you and things of that nature, how
4   would you react?
5   A.   I would react like it didn't
6   happen, you know, but then I'd talk to the
7   girls about it.
8   Q.   But you would react to Richard
9   like it didn't happen?
10  A.   Play dumb. Play like you
11  didn't know what he was doing.
12  Q.   Okay. I mean, you didn't call
13  your son up and say: Go over to the
14  Spectrum over there, and whip Richard's ass
15  or anything like that?
16  A.   No, no, no. But my son did
17  call Richard and talk to him.
18  Q.   When did this happen?
19  A.   This happened when Ronald was
20  doing his stuff.
21  Q.   Okay. Now, let's talk about
22  verbal stuff. What would -- What would
23  Richard do that you felt like was

Page 284

1   inappropriate, sexually, verbally?
2   A.   He'd tell me, he'd say: Why
3   don't you come over to the house. You know,
4   I'll buy some beer, come over to the house,
5   we'll watch TV.
6        Then sometimes he'd come up to
7   me and he'd say: We'll go get some beer and
8   we'll go home and have about four hours of
9   sex, you know. He couldn't, probably. But
10  anyway, that's the way he'd do it. And
11  even, you know, he'd come -- One time he
12  wanted me to come on my lunch break, you
13  know, and he said he'd fix my time, you
14  know, my time card.
15  Q.   Now, again, the same kind of
16  questions, did anybody overhear this, these
17  types of comments?
18  A.   No, no.
19  Q.   How did you react? Did you
20  play dumb or did you say: Richard --
21  A.   No. I'd say: Richard, you
22  know, you can't do all that. You know, I'd
23  just kind of joke back with him about it.

71 (Pages 281 to 284)

**FREEDOM COURT REPORTING**

Page 293

1  Q.  To your knowledge, Cathy
2  Thornton rejected all these overtures?
3  A.  Yes. And he --
4  Q.  Let me ask you this. Did you
5  ever see any of this happen to Cathy
6  Thornton?
7  A.  No, no, I didn't.
8  Q.  Okay. Do you know of anybody
9  else that did?
10  A.  I don't think so.
11  Q.  What about Lisa Cook, did
12  anybody see that? Did you see that?
13  A.  Oh, no. I saw him hug her.
14  Q.  Yeah.
15  A.  But I didn't see him put his
16  hands on her.
17  Q.  Okay. Brenda Sims. What did
18  Brenda Sims complain about?
19  A.  The hugging.
20  Q.  Hugging?
21  A.  The having her by her arm and
22  rubbing her boob at the same time.
23  Q.  Did you ever see that happen?

Page 294

1  A.  Yeah, I saw him hug her.
2  Q.  With Brenda?
3  A.  Uh-huh.
4  Q.  That all occurred in the dado
5  room?
6  A.  Yeah. We were all back there,
7  except for Cathy.
8  Q.  Okay. And to your knowledge,
9  Brenda Sims always rejected?
10  A.  Yes.
11  Q.  All right. Anything else you
12  recall about Brenda Sims?
13  A.  No. That's it.
14  Q.  To your knowledge, was this
15  the first time that -- We already talked
16  about you, but was this the first time,
17  Brenda Sims, Linda Sims, Cathy Thornton,
18  Lisa Cook complained to Dan Hees about
19  Richard Fetner, to your knowledge?
20  A.  No. I heard that Cathy and
21  Lisa reported this back way back, you know,
22  a year or so ago. And to who --
23  MR. WHITE: A year or so ago,

Page 295

1  or a year or so prior to your reporting it
2  to Dan Hees?
3  THE WITNESS: No, this was
4  before -- This was before we found out about
5  all of us.
6  MR. WHITE: Okay. Go ahead.
7  A.  They reported it to somebody.
8  So I don't know who they --
9  Q.  Let's take this two steps at a
10  time, then. To your knowledge, did Brenda
11  or Linda Sims make any complaints about
12  Richard Fetner to Dan Hees or Pat Galvez
13  before October 13, 2004?
14  A.  No.
15  Q.  To your knowledge, did Cathy
16  Thornton and Lisa Cook make -- complain
17  about Richard Fetner before October 13,
18  2004?
19  A.  Yes, they did.
20  Q.  All right. And what is the
21  basis of your knowledge about that?
22  A.  Well, I just heard they did.
23  Q.  Okay. So, this is hearsay?

Page 296

1  A.  Yeah.
2  Q.  All right. Who did you hear
3  it from?
4  A.  Cathy.
5  Q.  Okay. And do you recall what
6  Cathy had said?
7  A.  Yes.
8  Q.  What did Cathy say about who
9  she complained to?
10  A.  I don't remember who she said
11  she complained to and talked to about
12  Richard, the way he was doing.
13  Q.  Okay.
14  A.  I just heard after we all got
15  this lawsuit going, you know, then that's
16  when they told us: We had reported it way
17  back.
18  Q.  Cathy did?
19  A.  Uh-huh. Cathy and Lisa did.
20  Q.  Cathy and Lisa did. But it's
21  fair to say you don't know who they reported
22  to or when?
23  A.  No, I don't.

74 (Pages 293 to 296)

**FREEDOM COURT REPORTING**

Page 317

1  MR. SCOFIELD: That's fine.
2  (The deposition was concluded at 5:30 p.m.,
3  April 10, 2006.)

Page 318

1  REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4      I, Angela Smith, Registered
5  Professional Reporter and Commissioner for
6  the State of Alabama at Large, do hereby
7  certify that the above and foregoing
8  proceeding was taken down by me by
9  stenographic means, and that the content
10 herein was produced in transcript form by
11 computer aid under my supervision, and
12 that the foregoing represents, to the best
13 of my ability, a true and correct
14 transcript of the proceedings occurring on
15 said date and at said time.
16     I further certify that I am neither
17 of kin nor of counsel to the parties to the
18 action; nor in any manner interested in the
19 result of said case.
20
21
22     Angela Smith, RPR, CRR,
       for the State of
23     Alabama at Large.

80 (Pages 317 to 318)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

| JELD-WEN<br>CORPORATE POLICIES AND PROCEDURES | PROC. 203: Anti-Harassment<br>PAGE: 1 of 3<br>DATE: *12/02* |
|---|---|

203. <u>Anti-Harassment Procedures</u>

    A.    <u>General:</u>

JELD-WEN strives to provide a productive working environment free from harassment or discrimination, including that which may be construed to be offensive sexual conduct. This policy applies to every aspect of the employment relationship throughout the organization and to the dealings of employees with one another, as well as with vendors and customers.

Harassment in any form will not be tolerated by the Company. Any employee who violates this policy is subject to discipline up to and including discharge. In addition, any client, customer, or vendor of the Company who engages in such conduct will be informed of our policy and will be dealt with accordingly, with the aim of completely eliminating the harassment.

This Anti-Harassment Policy shall be prominently posted in all of our facilities and reprinted in the You and JELD-WEN company handbook.

    B.    <u>Definition:</u>

Harassment includes, but is not limited to, the following behaviors, if such behaviors create an intimidating, hostile, or offensive environment:

    1.    <u>Verbal Harassment</u>:

Derogatory comments, jokes, slurs, or abusive language.

    2.    <u>Physical Harassment</u>:

Unwanted physical contact, or assault.

    3.    <u>Visual Harassment</u>:

Leering, making sexual gestures, displaying derogatory or sexually suggestive objects, pictures, posters, cartoons, drawings, or clothing printed with derogatory material.

    4.    <u>Sexual Harassment</u>:

Minix - 27

| PERSONNEL | PROCEDURES |
|---|---|

| JELD-WEN | PROC. 203: Anti-Harassment |
|---|---|
| CORPORATE POLICIES AND PROCEDURES | PAGE:    2 of 3<br>DATE:    *12/02* |

Unwelcome sexual advances, request for sexual favors, offering employment benefits in exchange for sexual favors, or any other verbal or physical conduct that is directed toward an individual because of that person's gender.

C. **Procedures:**

1. Employees will be made aware of JELD-WEN's policy and will be encouraged to not tolerate harassment. Any employee who believes that he/she is being subjected to objectionable conduct should promptly notify either their immediate supervisor, their General or Corporate Manager, Vice President, or Subsidiary President or the Legal Department at (541) 882-3451. Any supervisor, General or Corporate Manager, Vice President, or Subsidiary President who has questions concerning harassment complaints shall contact the Legal Department.

2. Employees are encouraged to report any conduct they may witness against someone else, whether verbal, visual, physical, sexual, or otherwise, that they believe constitutes harassment. They should follow the same steps of contacting their immediate supervisor, their General or Corporate Manager, Vice President, or Subsidiary President, or the Legal Department.

3. Every complaint of harassment will be investigated promptly, thoroughly, fairly, and objectively. A written investigative report will be completed for each complaint. The investigator should take detailed statements from the person making the complaint, the alleged harasser, the harassee, and witnesses. The complaint will be kept as confidential as possible: information will be disseminated on a "need-to-know" basis, only. Basic results of the investigation will be reported to the individual registering the complaint.

4. If the information collected during the investigation establishes that harassment or other objectionable conduct did occur, disciplinary action will be promptly taken against the harasser, up to and including termination if appropriate.

5. Employees will not be discriminated or retaliated against for reporting harassment or participating in an investigation.

D. **Harassment Training for Managers:**

| **JELD-WEN** CORPORATE POLICIES AND PROCEDURES | PROC. 203: Anti-Harassment<br>PAGE: 3 of 3<br>DATE: *12/02* |
|---|---|

All Managers will be made familiar with the Company Policy regarding harassment and encourage employees to come forward to report any harassment. All Managers will receive a copy of this policy and it will be included in the Company Handbook as well.

| **PERSONNEL** | **PROCEDURES** |
|---|---|

JELD-WEN, Inc./Lorena Minix, et al. - Documents Produced by Plaintiffs                P0007