# FREEDOM COURT REPORTING

## Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3       EASTERN DIVISION
4
5  CIVIL ACTION NO.: 3:05-cv-685-T
6  LORENA MINIX, et al.,
7       Plaintiffs,
8  vs.
9  JELD-WEN, INC., and
10 RICHARD FETNER,
11      Defendants.
12
13      STIPULATION
14      IT IS STIPULATED AND AGREED by and
15 between the parties through their respective
16 counsel, that the deposition of Brenda Sims
17 may be taken before Angela Smith, RPR, CRR,
18 at the offices of McNeal & Douglas, at 1710
19 Catherine Court, Ste: B, Auburn, Alabama
20 36831, on the 11th day of April, 2006.
21
22      DEPOSITION OF BRENDA SIMS
23

## Page 2

1       IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the reading
3  of the deposition by the witness is waived,
4  the deposition to have the same force and
5  effect as if full compliance had been had
6  with all laws and rules of Court relating to
7  the taking of depositions.
8       IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10 any objections to be made by counsel to any
11 questions except as to form or leading
12 questions, and that counsel for the parties
13 may make objections and assign grounds at
14 the time of the trial, or at the time said
15 deposition is offered in evidence, or prior
16 thereto.
17      IT IS FURTHER STIPULATED AND
18 AGREED that the notice of filing of the
19 deposition by the Commissioner is waived.
20
21      * * * * * * * * * * * *
22
23

## Page 3

1       * * * * * * * * * * * *
2            I N D E X
3          EXAMINATION
4              PAGE
5  By Mr. Scofield ..................... 10
6       DEFENDANT'S EXHIBITS
7              PAGE
8  Ex. 1 - Copy of Ms. Sims'
9       driver's license and SS
10      number .................... 13
11 Ex. 2 - Ms. Sims' GED certificate .. 32
12 Ex. 3 - The interrogatories ........ 34
13 Ex. 6 - Map of the layout of the
14      JELD-WEN plant ........... 44
15 Ex. 4 - Medical records from
16      Woodland Clinic .......... 65
17 Ex. 5 - 7/21/98 medical record ..... 71
18 Ex. 7 - 4/19/00 medical records
19      with Woodland Clinic ..... 76
20 Ex. 8 - 8/7/00 medical record
21      from Woodland Clinic ..... 78
22 Ex. 9 - 5/7/01 medical record
23      from Woodland Clinic ..... 78

## Page 4

1  Ex. 10 - 3/1/02 medical record
2       from Woodland Clinic ..... 79
3  Ex. 11 - 11/32/03 medical record
4       from Woodland Clinic.  .. 80
5  Ex. 11-A - 4/20/04 medical
6       record.  ................. 85
7  Ex. 12 - 5/14/04 Express
8       documents ................ 87
9  Ex. 13 - 4/28/04 application for
10      employment at JELD-WEN ... 92
11 Ex. 14 - 5/10/04 Employee
12      Orientation ............. 111
13 Ex. 15 - Pages 4 through 8 ........ 112
14 Exs. 16 and 17 - Acknowledgments
15      of receipt of polices ... 121
16 Ex. 18 - 6/1/04 form signed for
17      W-4 Forms ................ 122
18 Ex. 19 - 6/1/04 for for health
19      plan ..................... 122
20 Ex. 20 - 5/26/04 medical record ... 123
21 Exs. 21 and 22 - Employee
22      Handbook tests .......... 125
23 Ex. 23 - A document from APS ...... 130


367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-


EXHIBIT D

# FREEDOM COURT REPORTING

Page 5

1  Ex. 24 - Survey taken by APS ...... 134
2  Ex. 25 - 6/27/05 telephone
3      interview ............... 135
4  Ex. 26 - 5/13/05 Propex documents . 139
5  Ex. 27 - Application for
6      employment at Emerson ... 140
7  Ex. 28 - 6/20/05 employment
8      document ................ 142
9  Ex. 29 - 11/7/05 Emerson
10     orientation checklist ... 143
11 Ex. 30 - 11/23/04 Charge of
12     Discrimination .......... 144
13 Ex. 31 - Charge of Discrimination . 157
14 Ex. 32 - The police report ........ 174
15 Ex. 34 - 6/29/04 note to pay five
16     hundred dollars ......... 176
17 Ex. 33 - The complaint filed
18     against Ms. Sims ........ 179
19 Ex. 35 - 8/3/04 order requiring
20     Ms. Sims to appear for
21     trial ................... 180
22 Ex. 36 - Medical record from
23     Woodland Health Clinic .. 182

Page 6

1  Ex. 37 - 8/30/04 medical record ... 183
2  Ex. 38 - 9/1/04 medical record .... 185
3  Ex. 39 - 10/9/04 letter to the
4      EEOC .................... 186
5  Ex. 40 - 10/13/04 EEOC case log ... 190
6  Ex. 41 - 10/22/41 medical record .. 205
7  Ex. 42 - 11/18/04 medical record .. 206
8  Ex. 43 - A medical record ......... 210
9  Ex. 43-A - 2/05 medical record .... 210
10 Ex. 43-B - Medical record for
11     kidney ailment at
12     Wedowee ................. 211
13 Ex. 43-C - 11/3/05 medical record . 211
14 Ex 43-D - 2/21/06 medical record .. 212
15 Ex. 44 - 4/19/05 letter to
16     Mr. White ............... 213
17 Ex. 45 - EEOC Dismissal and
18     Notice of Rights ........ 214
19 Ex. 46 - 11/28/04 letter from
20     Industrial Relations .... 216
21 Ex. 47 - Letter from Industrial
22     Relations Re: Roanoke
23     job ..................... 217

Page 7

1  Ex. 48 - Severance and Release
2      Package ................. 219
3  Ex. 49 - 10/13/04, Mr. Fetner's
4      last day of work
5      document ................ 222
6          * * * * * * * * * * * *

Page 8

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3       EASTERN DIVISION
4
5   CIVIL ACTION NO.: 3:05-cv-685-T
6   LORENA MINIX, et al.,
7       Plaintiffs,
8       vs.
9   JELD-WEN, INC., and
10  RICHARD FETNER,
11      Defendants.
12  BEFORE:
13      ANGELA SMITH, Commissioner.
14  APPEARANCES:
15      JAMES B. DOUGLAS, JR., ESQUIRE, of
16  MCNEAL & DOUGLAS, 1710 Catherine Court, Ste:
17  B, Auburn, Alabama 36831, appearing on
18  behalf of the Plaintiff.
19      SCOTT J. SCOFIELD, ESQUIRE, of
20  SCOFIELD, GERARD, SINGLETARY & POHORELSKY,
21  1114 Ryan Street, Lake Charles, Louisiana
22  70601, appearing on behalf of the Defendant,
23  JELD-WEN, inc.

**FREEDOM COURT REPORTING**

Page 49

1  Q.  If I drew that line right
2  there and put Richard, that would be
3  accurate?
4  A.  Yes.
5  Q.  All right. And you had a wall
6  that separated the dado machine so that Pat
7  and Roxie could not see into the dado
8  machine?
9  A.  No.
10 Q.  Could Pat and Roxie, from
11 where they were, see into the cutting area?
12 A.  No.
13 Q.  Okay. Now, what was in this
14 room that Pat and Roxie were next to?
15 A.  They were saws. I don't know
16 what you call them.
17 Q.  Did you ever work in there?
18 A.  Yes.
19 Q.  Okay. Can I just put saws?
20 A.  Uh-huh.
21 Q.  All right. And anything else
22 in there? Saws?
23 A.  A glue machine.

Page 50

1  Q.  Glue machine. All right. So,
2  am I correct to say that you worked in the
3  cutting area and the dado machine area and
4  where the saws and glue machines are?
5  A.  Yes.
6  Q.  Did you work in the paint
7  room?
8  A.  One time.
9  Q.  Okay. And that's right here
10 where it says: Paint room?
11 A.  Yes.
12 Q.  Okay. Now, did you have to
13 work out here outside any of these three
14 buildings in the storage area?
15 A.  No, I didn't.
16 Q.  Okay. Now, did you work with
17 Cathy Thornton?
18 A.  No.
19 Q.  Did you work with Lisa Cook?
20 A.  Yes.
21 Q.  Okay. Where did you work with
22 Lisa Cook?
23 A.  In the -- Where you've got the

Page 51

1  X right there.
2  Q.  The X?
3  A.  Right.
4  Q.  I'll just put dado. Is that
5  okay with you?
6  A.  Fine.
7  Q.  Dado and router?
8  A.  Yes.
9  Q.  And what else did you say?
10 A.  There was another one, but I
11 don't know what it was called.
12 Q.  Okay. That's fine. And
13 another machine?
14 A.  Yes.
15 Q.  Okay. So, you worked with
16 Lisa Cook in there?
17 A.  Yes.
18 Q.  Did you ever witness Richard
19 do anything wrong to Lisa?
20 A.  Yes, I did.
21 Q.  All right. And what did
22 Richard do, Fetner?
23 A.  He rubbed up the side of her

Page 52

1  breast.
2  Q.  Okay. Under what context? He
3  walked up to her and just grabbed it?
4  A.  He was standing there talking
5  to her, and he got close enough to where he
6  could touch her.
7  Q.  He just reached over and
8  touched her side?
9  A.  Yes.
10 Q.  Patting her breast?
11 A.  Rubbed her.
12 Q.  Okay. And what did Lisa --
13 How did she respond to that?
14 A.  She moved away.
15 Q.  Okay. Did she yell or scream
16 at him?
17 A.  No.
18 Q.  Okay. Stacy Cook, where did
19 she -- Let's go back to Cathy Thornton. Did
20 you ever work with Cathy Thornton?
21 A.  Not work with her, no.
22 Q.  I think I already asked you
23 that. Lisa Cook did work at JELD-WEN?

13 (Pages 49 to 52)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 149

1  A. Yes.
2  Q. All right. But you just don't
3  recall when?
4  A. No, I don't.
5  Q. Was it while you were still
6  working for JELD-WEN?
7  A. I'm not sure.
8  Q. Okay. As of November 23,
9  2004, had you retained a lawyer?
10  A. No.
11  Q. You did not hire Ms. Love?
12  A. No.
13  Q. All right. Had you consulted
14  an attorney before November 23, 2004?
15  A. No.
16  Q. Not your family attorney, not
17  any of the attorneys we talked about earlier
18  in your deposition?
19  A. No.
20  Q. All right. You say the
21  particulars of your discrimination, sexual
22  discrimination, is that starting the first
23  sentence: I believe I have been subjected

Page 150

1  to sexual harassment from my supervisor,
2  which consisted of the rubbing and touching
3  of my body, to include my legs and breast;
4  is that correct?
5  A. Yes.
6  Q. Who is the supervisor you're
7  referring to?
8  A. Richard Fetner.
9  Q. Nobody else?
10  A. Nobody else.
11  Q. Not Mr. Smith?
12  A. No.
13  Q. Not Dan Hees?
14  A. No.
15  Q. Not Pat Galvez?
16  A. No.
17  Q. Where -- Well, could you
18  describe the -- Without getting too graphic,
19  could you describe the rubbing and touching
20  of your legs and breasts by Mr. Fetner. How
21  would it occur?
22  A. I was in the office one day.
23  Q. Mr. Fetner's office?

Page 151

1  A. Right. And I don't remember
2  why I was in there or what we were talking
3  about, and he started rubbing my leg.
4  Q. Closer to your knee or closer
5  to somewhere else?
6  A. Close to my knee.
7  Q. Okay.
8  A. And then the other time I went
9  in there to use the phone, and instead of
10  him putting it over here for me to use it,
11  he had me go behind him.
12  Q. And when you're talking about
13  him, being Mr. Fetner?
14  A. Richard Fetner.
15  Q. All right.
16  A. And when I went behind to use
17  the phone, he started rubbing my upper
18  thigh, and I hung the phone up and walked
19  out of the office.
20  Q. Did you tell Mr. Fetner at
21  either one of those times that that was
22  inappropriate and to stop doing that?
23  A. The first time I did.

Page 152

1  Q. Okay. And how did Mr. Fetner
2  respond?
3  A. He just laughed.
4  Q. Okay. Did you laugh, also?
5  A. No.
6  Q. The second time, when he went
7  into the office and rearranged the phone so
8  he could grab your thigh?
9  A. Rub my -- Rub my upper thigh.
10  Q. Rub your upper thigh, and you
11  left, did you say anything to him?
12  A. No. I just walked out.
13  Q. And do you recall when this
14  happened?
15  A. No.
16  Q. Did anybody witness -- To your
17  knowledge, did anybody witness this happen?
18  A. No.
19  Q. You say: This conduct was
20  continuous during the period June 2004 and
21  August of 2004. Is there any -- Can you
22  think of any other instances where
23  Mr. Fetner did anything sexually

38 (Pages 149 to 152)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 153

1  inappropriate to you?
2      A.   He touched my breasts.
3      Q.   Okay. How did that come
4  about?
5      A.   I had to work over a few
6  minutes, me and Mike Weathers, one
7  afternoon, and Richard wanted us to finish
8  the pallet. So we got through with the
9  pallet. Everybody else was gone. We
10 started cleaning up. He come and told me,
11 he said: Clean that up tomorrow. Just go
12 on, go on, go on. And he was trying to get
13 me out ahead of Mike. And I started walking
14 on out, and he come up beside me, put his
15 arm around me and touched my breast.
16     Q.   Arm around your back?
17     A.   Around my back and under my --
18     Q.   Underneath your underarms?
19     A.   Right.
20     Q.   And then grabbed your breast?
21     A.   Right. And I pulled away from
22 him.
23     Q.   Did you say anything to him?

Page 154

1      A.   No.
2      Q.   Did Mr. Weathers or anyone
3  else see this?
4      A.   No.
5      Q.   Did you say anything to
6  Mr. Fetner about that?
7      A.   No.
8      Q.   And do you recall when this
9  was?
10     A.   No.
11     Q.   And, again, anytime you want
12 to take a break, you may. Anything else?
13     A.   Yes. The other time he
14 touched my breast, he called me in the break
15 room, he wanted to talk to me. And he was
16 standing right in front of me and he just
17 reached up and grabbed my breast.
18     Q.   Straightforward and just
19 grabbed your breast?
20     A.   Yes.
21     Q.   Now, what room was this in?
22     A.   The break room.
23     Q.   On Exhibit Number 6, could you

Page 155

1  tell me where that is, the break room.
2      A.   It was probably up under
3  Roxie's and them's office, I think.
4      Q.   Right under here (indicating)?
5      A.   Right in there somewhere
6  (indicating).
7      Q.   Okay. So what I wrote down:
8  Saws and glue machine, it would be right
9  under Pat or Roxie's thing?
10     A.   Right in there somewhere, yes.
11     Q.   Okay. And no one saw that?
12     A.   No.
13     Q.   And what did you tell
14 Mr. Fetner?
15     A.   Nothing. I just turned around
16 and walked out. It made me sick to my
17 stomach.
18     Q.   Anything else physical? You
19 have the statement in here about that he
20 asked you --
21     A.   Well, he would ask me to go to
22 his house.
23     Q.   Before we get to that, I want

Page 156

1  to make sure I get all the physical.
2      A.   Well, that's --
3      Q.   That was it?
4      A.   As far as I can remember,
5  that's the only times he touched me.
6      Q.   Did you keep a diary of this?
7      A.   I wrote it down, yes.
8      Q.   Okay. Where is that?
9      A.   It's at home somewhere.
10     Q.   Does it have the dates on
11 there?
12     A.   I'm not really sure.
13     Q.   When did you make this diary?
14     A.   When I -- I sit down, when I
15 was going to fill out the papers for the
16 EEOC.
17     Q.   So, it was done after the --
18     A.   After the --
19     Q.   In other words, it wasn't done
20 -- Say, if it happened on Monday, June the
21 1, you didn't go home that night and write
22 it down, it was later on?
23     A.   Right.

39 (Pages 153 to 156)

## FREEDOM COURT REPORTING

Page 157

1  Q. Okay. And did you make this
2  diary before you hired a lawyer?
3  A. Yes.
4  Q. Okay.
5  A. It's not really a diary. I
6  just wrote it down on paper, on a sheet of
7  paper.
8  Q. To help you fill out -- make
9  up the Charge of Discrimination?
10      MR. DOUGLAS: Object to the
11 form of the question. But go ahead.
12 A. Yes.
13 Q. To help you fill out --
14 A. To help me remember what
15 happened.
16     (Defendant's Exhibit 31
17      was marked for
18      identification purposes.)
19 Q. What happened. Did you also
20 use that diary to help you draft this Charge
21 of Discrimination marked as Exhibit Number
22 31?
23     MR. DOUGLAS: Object to the

Page 158

1  form.
2  A. I don't understand what you're
3  talking about.
4  Q. Well, when you filled out this
5  Charge of Discrimination marked as Exhibit
6  Number 31, signed by you on November 23,
7  2004, did you refer to that diary in helping
8  you write these charges?
9      MR. DOUGLAS: Object to the
10 form.
11 A. Yes.
12     MR. DOUGLAS: That's fine.
13 You answered.
14 Q. Subject to your attorney's
15 objection, your answer was yes?
16 A. Yes.
17 Q. Okay. All right. Now, let's
18 talk about the verbal things that Mr. Fetner
19 said or -- to you, that you found
20 objectionable. On here it says: My
21 supervisor, meaning Mr. Fetner, suggested
22 that I come to his house. And he also
23 stated that should I come, I would have no

Page 159

1  worry about my work time. When did this
2  happen?
3  A. Over the period of time, June
4  through August. I don't know the exact
5  dates.
6  Q. Would your diary have the
7  exact date?
8      MR. DOUGLAS: Object to the
9  form. I'm just objecting to the use of the
10 term "diary", because she hasn't adopted it.
11 Q. Well, that piece of paper that
12 you wrote stuff on, what do you want to call
13 that?
14 A. It was just a piece of paper,
15 so I could remember what was done.
16 Q. So I'm just going to call it
17 the piece of paper.
18 A. Okay.
19 Q. All right. The piece of
20 paper, did it have dates on there?
21 A. I -- I don't remember.
22 Q. All right. Is there any
23 particular reason why that was not produced

Page 160

1  to us earlier, to your knowledge?
2  A. No.
3  Q. Okay.
4  A. I mean, it was just something
5  I scribbled out, you know, to help me fill
6  out the papers for the EEOC.
7  Q. Okay. Now, would you have an
8  objection of giving it to your lawyer, and
9  having your lawyer decide whether or not he
10 can give that to us?
11 A. If I can find it.
12 Q. Okay. How many times did
13 Mr. Fetner ask you to come, to you?
14 A. Quite a few. I don't remember
15 exactly how many, but quite a few.
16 Q. You said: In retaliation for
17 my rejection of sexual harassment, I am
18 moved from my normal work assignment and
19 placed on other jobs. What do you mean by
20 that?
21 A. He would pull me off of my
22 regular job, even if I had work, and put me
23 on different jobs.

40 (Pages 157 to 160)

## FREEDOM COURT REPORTING

Page 221

1  offered originally?
2      A.   I really don't know.
3           MR. SCOFIELD: Okay. I'm
4  basically through. Can I talk to my
5  cocounsel about five minutes?
6           MR. DOUGLAS: Sure.
7              (Recess taken.)
8      Q.   When is the last time you've
9  taken any type of antidepressants or nerve
10 pills?
11     A.   I'm on antidepressants now.
12     Q.   Ma'am?
13     A.   I'm on depression pills now.
14     Q.   Are you still having concerns
15 and worries about the silicon in your body?
16     A.   Of course, I worry about it.
17     Q.   Is things with Luke, is that
18 better now?
19     A.   Oh, yes, that's fine.
20     Q.   Okay. When you went to --
21 came up here yesterday and went home, can
22 y'all remember what y'all talked about?
23     A.   Going home?

Page 222

1      Q.   Yeah. Did you talk about the
2  case?
3      A.   I don't think so.
4      Q.   Okay. What about on the way
5  up here?
6      A.   We went shopping.
7            (Defendant's Exhibit 49
8             was marked for
9             identification purposes.)
10     Q.   Okay. Let me mark this
11 Exhibit Number 49. This is a document that
12 says that the last day at work for Richard
13 Fetner was October 13, 2004. And I want --
14 I know you've never seen this before, but I
15 want to know if you have any evidence or
16 memory that may contradict that date that
17 that was his last day?
18     A.   I don't remember what his last
19 day was.
20     Q.   Okay. Have you left anything
21 out -- We've had a few breaks today, and
22 just got off one, can you think of anything
23 you left out of your deposition that you'd

Page 223

1  like to add or take away? Any changes you'd
2  like to make, without looking at your
3  attorney?
4      A.   Well, now, Phil Smith, when
5  Richard left, he was over that department.
6      Q.   Okay. But only when
7  Mr. Fetner left?
8      A.   Only when Mr. Fetner left.
9      Q.   And you did the best you could
10 to tell the truth?
11     A.   Yes, I did.
12          MR. SCOFIELD: At this time,
13 I'd like to -- without any seeking of
14 stipulation from Counsel, I'd like to leave
15 the Record open in the event that we may
16 need to do this again, to talk about any new
17 additional documents that have come in and
18 limited to that. You don't have to make any
19 agreement. I'd just like to make that on
20 the Record that we still have not received
21 all of our subpoenas back yet. If something
22 comes up that we'd like to --
23          MR. THOMPSON: She's got some

Page 224

1  documents right here.
2           MR. SCOFIELD: And she's got a
3  document, too. If, in fact, we need to talk
4  about that, we'd like to reserve the right
5  to the extent allowed by law to ask
6  questions on those new documents.
7           MR. DOUGLAS: All I can say is
8  that we'll talk about them. And he's got to
9  get new information.
10          MR. SCOFIELD: That's all I
11 want to do. I just want to know -- I just
12 don't want to foreclose the right to ask you
13 that, or the Court.
14          MR. DOUGLAS: And I believe
15 she stated she didn't know if she had that
16 paper or not. She stated she was going to
17 try to find that paper, not that she still
18 had it.
19          MR. SCOFIELD: Okay.
20          THE WITNESS: Because I might
21 have throwed it away.
22          MR. SCOFIELD: The deposition
23 is now concluded, unless you have questions.

56 (Pages 221 to 224)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 225

1  MR. DOUGLAS: I don't.
2  MR. SCOFIELD: Ms. Brenda,
3  thank you so very much.
4  (The deposition was concluded at 4:06 p.m.,
5  April 11, 2006.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 226

1  REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4      I, Angela Smith, Registered
5  Professional Reporter and Commissioner for
6  the State of Alabama at Large, do hereby
7  certify that the above and foregoing
8  proceeding was taken down by me by
9  stenographic means, and that the content
10 herein was produced in transcript form by
11 computer aid under my supervision, and
12 that the foregoing represents, to the best
13 of my ability, a true and correct
14 transcript of the proceedings occurring on
15 said date and at said time.
16     I further certify that I am neither
17 of kin nor of counsel to the parties to the
18 action; nor in any manner interested in the
19 result of said case.
20
21
22     Angela Smith, RPR, CRR,
        for the State of
23      Alabama at Large.

57 (Pages 225 to 226)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**