**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF ALABAMA
 2                       EASTERN DIVISION

 3     LORENA MINIX, et al.,          )

 4          Plaintiffs,               )
                                      )
 5     vs.                            ) Civil Action No.
                                      ) 3:05CV685-T
 6     JELD-WEN, INC. and RICHARD     )
       FETNER,                        )
 7                                    )
            Defendants.               )
 8
       - - - - - - - - - - - - - - - - - - - - - - -
 9                     Deposition of:

10                        DAN HEES

11                     April 28, 2006

12     - - - - - - - - - - - - - - - - - - - - - - - -
       APPEARANCES:
13          Hon. James B. Douglas, Jr.
            MCNEAL & DOUGLAS
14          1710 Catherine Court, Suite B
            Auburn, Alabama
15
                Appearing on behalf of the Plaintiffs.
16
            Hon. Michael L. Thompson
17          LEHR, MIDDLEBROOKS & VREELAND
            2021 Third Avenue North
18          Birmingham, Alabama

19          Hon. Scott Scofield
            SCOFIELD, GERARD, SINGLETARY & POHORELSKY
20          1114 Ryan Street
            Lake Charles, Louisiana
21
                Appearing on behalf of the Defendants.
22
       Reported by: Robin Avery
23     - - - - - - - - - - - - - - - - - - - - - - - -
                 ACCREDITED COURT REPORTING
24                  608 North Walnut Street
                 Murfreesboro, Tennessee  37130
25                    (615) 890-5993
```

**Page 2**

                        INDEX
                              PAGE NO.

EXAMINATION OF DAN HEES:

     Direct by Mr. Douglas . . . . . . . . . . . . 3

     Cross by Mr. Thompson . . . . . . . . . . . .164

     Redirect by Mr. Douglas . . . . . . . . . .166

     Recross by Mr. Thompson . . . . . . . . . . .166

     Further Redirect by Mr. Douglas . . . . . . .168

                        EXHIBITS

                         None

                      STIPULATION
          It was stipulated and agreed by and between
the respective parties of the herein-entitled cause of
action that the deposition herein was taken by notice
and/or agreement pursuant to the Alabama Rules of Civil
Procedure and/or Federal Rules of Civil Procedure,
whichever is applicable, before Robin Avery of
Accredited Court Reporting, Court Reporter and Notary
Public at Large in the State of Tennessee;
          That all testimony and proceedings be written
down in shorthand by her and thereafter transcribed by
her or under her direction, and that said deposition may
be read and used in evidence in said cause of action in
any trial thereon or any proceeding therein;
          That all objections, except as to the form of
the questions, are reserved to on or before the hearing,
and it is further agreed that all formalities as to
caption, certificate, transmission, filing, etc.,
excluding the reading and signing of the completed
deposition by the witness, are expressly waived.

* Note: All proper names, unless provided by Counsel
to the reporter, represent the best phonetic
approximation of the name.

**Page 3**

```
 1                       DAN HEES,

 2    having first been duly sworn or affirmed, was deposed

 3    and examined as follows:

 4

 5                  DIRECT EXAMINATION

 6

 7    QUESTIONS BY MR. DOUGLAS:

 8

 9        Q.   BY MR. DOUGLAS:  All right.  Would you state

10    your name, please, sir?

11        A.   Dan Hees.

12        Q.   And, Mr. Hees, my name is Jim Douglas.  I

13    represent both Ms. Sims and Ms. Minix in this lawsuit.

14    We have met before, correct?

15        A.   Correct.

16        Q.   I am going to be taking your deposition this

17    morning.  Have you ever given a deposition before?

18        A.   Yes.

19        Q.   Okay.  We'll get to that in a minute.  My

20    ground rules are real simple.  If I ask a question that

21    doesn't make sense to you or is poorly worded, if you

22    would ask me to rephrase that question, I'll be happy to

23    do that as many times as it takes for me to ask a good

24    question that you understand.  Okay?

25        A.   Okay.
```

**Page 4**

```
 1        Q.   If I ask a question and you offer an answer,

 2    I'll assume that you understood my question.  Is that

 3    fair?

 4        A.   That's fair.

 5        Q.   Okay.  If at any time you need to take a break

 6    for any reason, just let me know.  And it's not an

 7    endurance test.  And we'll take a break whenever you

 8    need to.  Okay?

 9        A.   Okay.

10        Q.   All right.  How many times other than today

11    have you given your deposition?

12        A.   Any deposition?

13        Q.   Yes.

14        A.   Once.

15        Q.   When was that?

16        A.   A couple of years ago.

17        Q.   What was it about?

18        A.   It was a workman's comp case.

19        Q.   Why were you giving your deposition in that

20    case?

21        A.   I was the manager of this plant.  And it had to

22    do with us contesting it.  We protested.

23        Q.   So, there was an employee who claimed to have

24    been hurt on the job, is that correct?

25        A.   Correct.
```

EXHIBIT
E

PENGAD-Bayonne, N. J.

61

1    A.    Do I know him?

2    Q.    Yes.

3    A.    Yes, I do.

4    Q.    Who is he?

5    A.    Joe Mendoza is a Group Manager for Jeld-Wen.

6    Q.    Where does he work?

7    A.    Today?

8    Q.    Today?

9    A.    He works at Corsicana, Texas.

09:36:58 10    Q.    At a plant in Corsicana?

11    A.    It's a window plant.

12    Q.    To your knowledge was he ever at the Roanoke

13    facility?

14    A.    Yes, he was.

15    Q.    When was he at the Roanoke facility?

16    A.    He was there from the end of 2002 to the end of

17    2003.

18    Q.    Did he have any involvement with regard to the

19    Minix and Bowen incident to your knowledge?

09:37:44 20    A.    I don't -- yeah, I don't think so.

21    Q.    What was his capacity at the Roanoke facility?

22    A.    He was a Group Manager.

23    Q.    Would he have been Ms. Minix' supervisor in

24    2003?

25    A.    I don't believe so. Joe Mendoza ran the column

62

1    and the porch post department.

2    Q.    Did you ever become friends with Mr. Fetner?

3    A.    Just business.

4    Q.    You all never socialized outside of work?

5    A.    No.

6    Q.    Did you ever go on any out of town trips with

7    Mr. Fetner?

8    A.    No.

9    Q.    Did you ever have dinner with Mr. Fetner?

09:38:28 10    A.    Had lunch a couple of times.

11    Q.    But never supper, as we would say here in the

12    South?

13    A.    Supper, no. Lunch with Pat.

14    Q.    Just the midday meal with Mr. Fetner, is that

15    correct?

16    A.    Yeah. At Gedneys.

17    Q.    Did Mr. Fetner tell you about his personal life

18    at any point in time?

19    A.    I have heard things.

09:40:02 20    Q.    From Mr. Fetner?

21    A.    A little bit.

22    Q.    Okay. Tell me what Mr. Fetner told you about

23    his personal life.

24    A.    That he was trying to get one of his sons out

25    of rehab. He had an issue with one of his kids. That

63

1    it was time consuming, and it was costly to get him in

2    and get him out of the rehab center. So, I know he had

3    an issue there. A couple times Rich would talk to me

4    about his health, his -- he had to go to the doctor a

5    couple of times. High blood pressure. Things like

6    that.

7    Q.    Did you ever have any conversations with Mr.

8    Fetner about women?

9    A.    No.

09:40:52 10    Q.    Did Mr. Fetner ever tell you that he had ever

11    been involved with anybody that he worked with --

12    sexually I mean?

13    A.    He did on October 13th.

14    Q.    In connection to this incident?

15    A.    To the incident, yeah.

16    Q.    Okay. Other than that?

17    A.    No.

18    Q.    Prior to that, any indication by Mr. Fetner he

19    had ever been involved with anybody that he worked with?

09:41:20 20    A.    No.

21    Q.    Did Mr. Fetner have a cell phone?

22    A.    Yes.

23    Q.    Do you know the number?

24    A.    I could get it. I don't know it off the top of

25    my head.

64

1    Q.    In 2003, 2004 did you have a cell phone?

2    A.    Yes.

3    Q.    Do you have the same cell phone now?

4    A.    Same number. Not the same cell phone.

5    Q.    Right. Not the same device. But it's with the

6    same company?

7    A.    Unless they were bought out.

8    Q.    Who is it with? Who is your company?

9    A.    Cingular.

09:42:02 10    Q.    And they were AT&T?

11    A.    Yeah, I think it was AT&T.

12    Q.    Okay. Do you maintain records of your cell

13    phone records?

14    A.    Not other than a year. After a year, toss

15    them.

16    Q.    Okay. How can you get Mr. Fetner's cell phone

17    number? Do you still have it in your phone?

18    A.    I can get it. I have got it somewhere.

19    Q.    Do you have it in your phone?

09:42:28 20    A.    In my phone?

21    Q.    Yeah. Do you have it stored as one of the

22    numbers in your phone?

23    A.    No.

24    Q.    You just have it written down somewhere you

25    think?

165

1    Q.    So, if it becomes unwelcome, then it could

2    violate Jeld-Wen's policy in your opinion?

3    A.    Absolutely.

4    Q.    Okay.  And who makes the decision within

5    Jeld-Wen whether conduct rises to the level such that it

6    violates Jeld-Wen's sexual harassment policy?

7    A.    That would be our legal department.

8    Q.    You testified just before we took our last

9    break about a video that is shown to new employees.  Do

12:26:50  10    you remember that testimony?

11    A.    Yes.

12    Q.    Okay.  Is that a video that is currently shown

13    to new employees?

14    A.    Yes.

15    Q.    Okay.  Do you know how long it has been

16    available and shown to new employees?

17    A.    Not exactly.  But it seems like the last --

18    within the last year or last two years.

19    Q.    Okay.  And you don't know if that video was

12:27:14  20    ever shown to any new employees at the Roanoke facility?

21    A.    No.  I wasn't there.  I don't --

22    Q.    My other clarification.  You testified about

23    one employee who was -- one Jeld-Wen employee who was

24    employed at the Roanoke facility and then moved on and

25    continued to work for Jeld-Wen somewhere else?

166

1    A.    Bill Keller.

2    Q.    Okay.  Was there another one?

3    A.    Of management or total?

4    Q.    Just any employee?

5    A.    Yeah, Roxi.  She went to the Austell branch.

6         MR. THOMPSON:  That's all.

7

8              REDIRECT EXAMINATION

9

10    QUESTIONS BY MR. DOUGLAS:

11

12    Q.    BY MR. DOUGLAS:  What is the Austell branch?

13    A.    That's a Jeld-Wen distribution in Georgia.

14    Near Atlanta.  Austell, Georgia.

15    Q.    It's in Austell.  What job does she have there?

16    A.    She works with the education, training, working

17    with doors and window.

18    Q.    And what was her job at the Roanoke facility?

19    A.    She was the staff person.  And she now is staff

12:28:18  20    over at Austell, Georgia.

21    Q.    Is that a promotion for her?

22    A.    I think it was a lateral move.

23         MR. DOUGLAS:  Okay.

24

25              RECROSS EXAMINATION

167

1

2    QUESTIONS BY MR. THOMPSON:

3

4    Q.    BY MR. THOMPSON:  I do have one other question.

5    You testified that you were interviewed by the E.E.O.C.

6    Do you remember that testimony?

7    A.    Yes.

8    Q.    Did you actually just attend a mediation?

9    A.    It was a mediation.  Mediation was the word.

12:28:38  10    Q.    So, you were never interviewed by the E.E.O.C.?

11    A.    No.

12    Q.    Okay.  Let me just flip through here to make

13    sure.

14         MR. DOUGLAS:  Off the record.

15

16              (Off the Record Discussion)

17

18    Q.    BY MR. THOMPSON:  Mr. Hees, one other thing.

19    You also testified that you are not aware that Jeld-Wen

12:29:48  20    has a policy that the complainer in a harassment

21    situation be separated from the person about which he or

22    she is complaining.  Do you recall that testimony?

23    A.    Yes.

24    Q.    Okay.  Are you aware of instances where you

25    have separated the complaining party from the person

168

1    about whom the complaint is made?

2    A.    Am I aware of any?

3    Q.    Yes.

4    A.    That I was involved in?

5    Q.    Yes.

6    A.    Yes.

7         MR. THOMPSON:  Okay.  That's it.

8

9              FURTHER REDIRECT EXAMINATION

10

11    QUESTIONS BY MR. DOUGLAS:

12

13    Q.    BY MR. DOUGLAS:  Who was that?

14    A.    That was the issue that we had here that

15    happened in the last two or three months.

16    Q.    I thought that that guy was out on workers'

17    comp?

18    A.    Same person.  He was on workman's comp.  But

19    while he was here, I separated them to sort out the

12:30:42  20    issue.

21         MR. DOUGLAS:  Okay.  Mr. -- never mind.  That's

22    all.

23              FURTHER DEPONENT SAITH NOT

24

25

169

1   STATE OF TENNESSEE          )

2

3   COUNTY OF RUTHERFORD          )

4

5          I, ROBIN AVERY, a Notary Public at Large for

6   the State of Tennessee, do hereby certify:

7          THAT, prior to being examined, the witness

8   named in the foregoing deposition, DAN HEES, was by me

9   duly sworn to testify the truth, the whole truth, and

10  nothing but the truth;

11         THAT, the said deposition was taken down by me

12  at the time and place therein named and thereafter

13  reduced to typewriting by me or under my direction.

14         I further certify that I am not interested in

15  the events of the action.

16         WITNESS my hand and seal this 1st day of May,

17  2006.

18

19         _____

20         ROBIN AVERY

21         Notary Public at Large

           State of Tennessee

22

    My Commission Expires:  12/15/07

23

24

25

---

170

1              ERRATA SHEET

2          Please, read your deposition and on this Errata
    Sheet make any changes or corrections in form or
3   substance to your deposition that you feel should be
    made.  You may add additional sheets, if necessary.
4

5          You are to identify these changes/corrections
    by page and line number, give the correction or change
    desired, and state the reason therefor.  After
6   completing this, sign at the conclusion of such
    changes/corrections, if any.  Do not make any
7   corrections on the transcript itself.

8

9   Page/Line Correction/Change_____    Reason

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21

22      Signature: _____

23      Date: _____

24

25

---

171

1              CERTIFICATE

2

3      I, _____, declare under
    penalty of perjury, that the foregoing is true and
4   correct, including such changes as I have made on the
    Errata Sheet annexed hereto.

5

6   _____        _____
    Date            Signature

7

              ACKNOWLEDGEMENT

8

9   STATE OF TENNESSEE          )
    COUNTY OF _____          )

10

11      I, _____, A Notary Public
    Within and for the State of Tennessee, do hereby
    certify:

12      THAT on the _____ day of _____, 20_____,
    before me personally appeared_____,

13  the witness whose deposition appears herein;
        THAT the said witness stated to me that the

14  said deposition was read to or by said witness, who
    having made such changes and corrections as desired,

15  thereupon subscribed and swore to the said deposition in
    my presence.

16      IN WITNESS HEREON, I have hereunto subscribed
    my name and affixed my official seal, the day herein

17  above written.

18

19  _____
          Notary Public

20  My Commission Expires: _____.

21

22
23
24
25

---

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| LORENA MINIX, BRENDA SIMS, and LINDA SIMS, | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NUMBER: |
| v. | ) ) | 3:05-cv-00685-T |
| JELD-WEN, Inc. and RICHARD FETNER, | ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF DAN HEES

STATE OF TENNESSEE    )
COUNTY OF WHITE        )

My name is Dan Hees. I am a resident of the State of Tennessee, over twenty-one (21) years of age, and give this Declaration of my own free will. I have personal knowledge of the information contained in this Declaration.

1.      I am employed as a Coordinating General Manager for JELD-WEN, inc. and have personal knowledge of the information set forth in this declaration based on my JELD-WEN employment.

2. JELD-WEN is head-quartered in Klamath Falls, Oregon and manufactures building products including windows and doors.

3. The Roanoke facility produced wooden components (exterior jambs and brick mold) used in the construction of door frames. The components produced at the Roanoke facility – i.e., the door frame pieces - were then shipped to other locations for assembly.

4.    From 2002 until 2004, I was the Coordinating General Manager of JELD-WEN, inc. plants that were located in Quebec, Canada; Sparta, Tennessee; and Roanoke, Alabama. I was based out of the Sparta, Tennessee facility.

5.    Pat Galvez reported to me when he worked at the Quebec and Roanoke JELD-WEN facilities.

6.    Joe Mendoza was also transferred to the Roanoke facility and worked as a Group Manager from October 2002 until October 2003, when he transferred to Corsicana, Texas. Mendoza and Richard Fetner were equal in the plant hierarchy as both were Group Managers and both reported to Galvez.

7.    During 2002 until 2004, in addition to the Legal Department, Pat Galvez (as the Acting General Manager) and I (as the Coordinating General Manager), along with an employee's immediate supervisor, were appropriate persons to receive reports of harassment under the provisions of the JELD-WEN, inc.'s anti-harassment policy for JELD-WEN, inc.'s Roanoke, Alabama facility.

8.    The Roanoke facility was not profitable because foreign competition suppressed the price of the door components and because JELD-WEN's Sparta, Tennessee plant produced the same components on a much larger scale and served the same general geographic area.

9.    In September 2004, my boss (Don Schneider) instructed me not to complete a 2005 budget for Roanoke because the plant would close before the new year. He also told me that we would discuss severance packages and plant closure protocol at a meeting in Oregon that would occur in a couple of weeks. I was at this meeting when Brenda Sims attempted to contact me at the Sparta plant with her initial

report of Fetner's conduct.  I returned her call after I returned to Tennessee from the meeting.

10.    The report that I received from the five women at the Roanoke facility on October 13, 2004, was the first notice of any type that I had the Richard Fetner had engaged in any inappropriate conduct of a sexual nature.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 5th day of May 2006.

Dan Hees

155142

3