LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CASE NUMBER: 3:05-CV-00685-T
Lorena Minix, et al.,
    Plaintiffs,
vs.
JELD-WEN, inc., et al.,
    Defendants.

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel, that the deposition of Stacy Cook Overton may be taken before Sara Mahler, CSR, at the offices of McNeal & Douglas, at 1710 Catherine Court, Suite B, Auburn, Alabama 36831, on the 9th day of May, 2006.

DEPOSITION OF STACY COOK OVERTON
48318

Page 2

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that the notice of filing of the deposition by the Commissioner is waived.

* * * * * * * * * * * * *

Page 3

* * * * * * * * * * * * *
I N D E X
EXAMINATION
                                        PAGE
By Mr. Thompson .................... 7
By Mr. White ........................ 75
EXAMINATION CONTINUED
                                        PAGE
By Mr. Thompson .................... 97
By Mr. White ........................ 103
By Mr. Thompson .................... 104
DEFENDANT'S EXHIBITS
                                        PAGE
Ex. 1 - The subpoena ................ 13
* * * * * * * * * * * * *

Page 4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CASE NUMBER: 3:05-CV-00685-T
Lorena Minix, et al.,
    Plaintiffs,
vs.
JELD-WEN, inc., et al.,
    Defendants.

BEFORE:
    SARA MAHLER, Commissioner.
APPEARANCES:
    JAMES B. DOUGLAS, ESQUIRE, of McNeal & Douglas, 1710 Catherine Court, Suite B, Auburn, Alabama 36831, appearing on behalf of the Plaintiffs.
    MATTHEW W. WHITE, ESQUIRE, of Adams, Umbach, Davidson & White, 205 South Ninth Street, Opelika, Alabama 36803, appearing on behalf of the Plaintiffs.
    MICHAEL L. THOMPSON, ESQUIRE, of

1 (Pages 1 to 4)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO


EXHIBIT A

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 61

1  A. Yes.
2  Q. Were you kissing him back?
3  A. No.
4  Q. Were you fighting him off?
5  A. Like I say, no, I didn't,
6  because I told him I didn't want to. And he
7  knew I didn't want to, but he kept on. And
8  he held my job in his hands, so I didn't
9  have much choice. But I finally did talk
10 him into quitting, because I kept saying:
11 Is that them pulling up in the driveway?
12 Are they coming back?
13 Q. What was he doing when he
14 quit?
15 A. He was making me have sex with
16 him, and then he just quit.
17 Q. So, he just -- He stopped
18 before the act was over?
19 A. Yes. I think he got scared,
20 yes.
21 Q. Okay. And I know this is all
22 kind of sensitive.
23 A. It's sickening, is what it is.

Page 62

1  Q. So, you told him no?
2  A. Yes.
3  Q. Okay. And did he ever tell
4  you he had his job, or you just knew that?
5  A. I just knew that. I was
6  single and had two kids at the time. I
7  couldn't afford to find another job.
8  Q. Were your kids there that day?
9  A. No. They were at my -- either
10 at my mother's or at daycare, one.
11 Q. Okay. It was a Saturday or
12 during the week?
13 A. It was a Friday.
14 Q. Friday.
15 A. Because we had inventory that
16 morning, so we got off early. I think we
17 had inventory, yes.
18 Q. You had sex with him, but it
19 was not consensual sex?
20 A. Right.
21 Q. Did you report this to the
22 police?
23 A. No.

Page 63

1  Q. Why not?
2  A. Because he had -- I mean, that
3  was my job. And I'm not one to stir up
4  stuff. And as long as he left me alone and
5  didn't bother me no more, I would leave him
6  alone.
7  Q. Okay. Other than that -- He
8  got scared, stopped doing what he was doing
9  correct?
10 A. Correct.
11 Q. Was he partially undressed?
12 Were you partially undressed? What?
13 A. I don't really -- I know he
14 had his shirt on, but I really don't
15 remember, because I kept looking out the
16 window, hoping that they would drive back
17 up, and trying not to look at him.
18 Q. Okay. And then what happened
19 after that?
20 A. He got up, and I'm assuming
21 pulled his pants up. I don't think he had
22 them took all the way off. I think he just
23 pulled them up and walked back in the living

Page 64

1  room and sat down like nothing had ever
2  happened.
3  Q. Okay. And what did you do?
4  A. I went in the living room and
5  sat down across the room from him. And then
6  my sister-in-law and my roommate had stopped
7  and called on the phone, and I told them to
8  get home right then.
9  Q. Okay. Did you have a car
10 there?
11 A. Me?
12 Q. Yes.
13 A. No. They were in my car.
14 Q. Who all have you told about
15 this prior to today?
16 A. Prior to today, I've told Lisa
17 and then Heather, I believe. And now I've
18 had to tell my husband all the details
19 because of this, and I think that's just
20 about it. And then I'm sure it got told to
21 other people through the other people.
22 Q. When did you tell -- Did you
23 tell Lisa and Heather, when they got back

16 (Pages 61 to 64)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 65

1  that day?
2      A.   Yes.
3      Q.   Did Fetner eat the food they
4  brought back and then left?
5      A.   I'm pretty sure he finished
6  eating so he wouldn't look strange running
7  them out after he had paid for the food and
8  had them go get it.
9      Q.   Did you eat?
10     A.   I think I did. I'm not sure.
11     Q.   Was it Mexican?
12     A.   It was Mexican.
13     Q.   Were you ever alone with
14 Mr. Fetner at any other time?
15     A.   After that?
16     Q.   Yes.
17     A.   No.
18     Q.   Okay. And you continued to
19 work at Millwork Specialties after this, and
20 then later on worked at JELD-WEN for a
21 couple of months or so?
22     A.   Yes.
23     Q.   Did you ever report this to

Page 66

1  anyone at Millwork Specialties?
2      A.   No. It was him and Cathy, the
3  lady in the office, that was it. But I
4  probably wouldn't have anyway, because I'm
5  not like that.
6      Q.   You didn't want to tell on
7  him?
8      A.   Right. And I didn't -- I
9  mean, that's not something that I'd like to
10 have out in the open.
11     Q.   I understand. Did you ever
12 see him direct any -- him. Now I'm doing
13 it. Did you ever see Mr. Fetner direct any
14 inappropriate conduct of a sexual nature
15 toward any employee at the plant?
16     A.   No. Because before that I
17 paid no attention because I didn't know what
18 he was. And after that, I didn't even want
19 to look at him unless I just had to.
20     Q.   Okay. Did you ever talk to
21 this gentleman that you think his name was
22 Pat at any time?
23     A.   About the situation or just

Page 67

1  talked to him?
2      Q.   About anything.
3      A.   Maybe passing in the mill,
4  maybe said: Hey, or something like that,
5  but never sat down and had any conversations
6  with him.
7      Q.   Okay. Were you ever involved
8  in a relationship with anyone that worked at
9  JELD-WEN or worked at the plant?
10     A.   No.
11     Q.   You don't mix business with
12 personal life?
13     A.   No. They were nasty people.
14     Q.   Who were the nasty people?
15     A.   Just -- I mean, all the men
16 were old and nasty or toothless and nasty or
17 just nasty.
18     Q.   What about the women?
19     A.   As far as being friends with
20 them, is that what you're asking?
21     Q.   I'll withdraw that.
22     A.   As far as that, I'm not, no.
23     Q.   No, no, no. I wasn't

Page 68

1  suggesting that.
2      A.   I was fixing to say, no.
3      Q.   Do you know who Dan Hees is?
4      A.   Who?
5      Q.   Dan Hees.
6      A.   I do remember a man named Dan,
7  but I don't remember his last name.
8      Q.   Did you ever talk to him?
9      A.   If we're talking about the
10 same man, I spoke to him, but not any
11 lengthy conversation or anything.
12     Q.   Did you find him to be
13 approachable and friendly?
14     A.   If it's the same man, like I
15 say, I don't really know.
16     Q.   Someone named Dan that did not
17 regularly work in the Roanoke plant?
18     A.   Right. We had several men in
19 and out that were right after JELD-WEN took
20 over.
21     Q.   Okay.
22     A.   So I don't know all of them.
23     Q.   What about Mr. Galvez? What

17 (Pages 65 to 68)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 69

1  about the man named Pat, did you find him
2  friendly and approachable?
3      A.   Well, I never really
4  approached him. But sometimes he could be a
5  jerk, just watching him. Not like -- He
6  didn't have a positive personality, I guess
7  you would say.
8      Q.   Okay. Up tight about the
9  work?
10     A.   I guess so. Maybe he wanted
11 everybody to know he was in charge.
12     Q.   What about a fellow named Joe
13 Mendoza? Did you ever meet Joe?
14     A.   Joe Mendoza? Possibly,
15 because I wasn't there very long. I didn't
16 -- if they -- Like I say, there were
17 several folks come through.
18     Q.   Have you seen Richard Fetner
19 since you left the Roanoke plant?
20     A.   Yes. I did leave out a job
21 that I worked at two years. Ace Hardware.
22 You'd think I remember that. That was my
23 last job. Yes. I did see him there. He

Page 70

1  would come in and out, purchasing things for
2  JELD-WEN.
3      Q.   Did you ever speak to him?
4      A.   I had to when I was a cashier.
5  I would get in trouble if I didn't -- wasn't
6  courteous to my customers.
7      Q.   You never discussed what
8  happened at your house with him, though, did
9  you?
10     A.   No. I didn't -- As far as
11 anything outside of my job that I was doing
12 right then, what I was selling him or who I
13 was charging it to, I didn't talk to him
14 about anything.
15     Q.   Okay. Have you ever discussed
16 any aspect of Lorena Minix's sex life with
17 her?
18     A.   With her?
19     Q.   Right.
20     A.   No.
21     Q.   Do you know whether she and
22 Mr. Fetner had a relationship at any time?
23     A.   I had heard they were -- had

Page 71

1  been dating, but that's mill talk.
2      Q.   Mill talk?
3      A.   Yes. Talk goes around out
4  there faster than you can speak it.
5      Q.   Have you ever been to
6  Mr. Fetner's house?
7      A.   Me and somebody did go there
8  for something prior to everything happening.
9  I don't know if we went to pick something
10 up, but I do remember I walked -- we walked
11 through his front door and was then standing
12 in his living room. It seems like we had to
13 pick something up, but I don't remember what
14 and -- but I know somebody was with me.
15     Q.   Was it Lisa Cook that was with
16 you?
17     A.   It could have been.
18     Q.   Did you go trick-or-treating
19 at Mr. Fetner's house?
20     A.   No.
21     Q.   Not -- Did you take your kids
22 trick-or-treating at Mr. Fetner's house?
23     A.   Not that I'm aware of.

Page 72

1      Q.   Okay. And you say you went
2  inside his house, inside the living room?
3      A.   Yes. It was a summer
4  afternoon because it was warm. And I
5  remember pulling up in his driveway. For
6  some reason we knocked on the door and we
7  went inside his living room. And then -- We
8  wasn't there but for a few minutes and left.
9  But I don't really recall what for.
10     Q.   Now, you don't want to be
11 involved in this case at all?
12     A.   No.
13     Q.   You do want to be involved?
14     A.   No. This is causing trouble
15 in my marriage.
16     Q.   And the advance that
17 Mr. Fetner made on you the day that y'all
18 were eating Mexican, is that the only time
19 he made an advance at you?
20     A.   Yes.
21     Q.   And you say he was friends
22 with and went to school with your mom or
23 something like that?

18 (Pages 69 to 72)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 73

1  A.  Yes. That's the reason he
2  claims that he hired me is because him and
3  my mother had grew up together and went to
4  school together and he was going to do her a
5  favor.
6  Q.  Did you feel like you did a
7  good job out there?
8  A.  Yes. I didn't like work, but
9  I do work when I have to, you know.
10  Q.  You don't like work, period?
11  A.  Right. I mean, why work when
12  you can stay at home?
13  Q.  There was never a task at
14  Millwork Specialty or JELD-WEN that you
15  enjoyed, then?
16  A.  Oh, yeah. Now, the day before
17  they closed the cutting line down, I enjoyed
18  that. But they closed it down right before
19  JELD-WEN took over, I think, or maybe right
20  after JELD-WEN took over. But I enjoyed
21  that.
22  Q.  So that wouldn't have been a
23  JELD-WEN position, that would have been a

Page 74

1  Millwork position?
2  A.  I'm not sure. I know it was
3  -- I remember being back there when some of
4  the men that JELD-WEN sent were there, but I
5  don't really remember if they owned it or
6  not.
7  Q.  Okay. You never told your mom
8  about what happened with Mr. Fetner?
9  A.  No. She knows I'm down here
10  today, but she has no idea why. And I would
11  like to keep it that way.
12  Q.  Has anyone told you why you
13  might be a witness in this case?
14  A.  No.
15  Q.  Ms. Minix never told you why
16  she's listed you as a witness and got you
17  involved?
18  A.  No.
19  Q.  And you wouldn't know Brenda
20  or Linda Sims if you met them on the street
21  or they were sitting in the room with us?
22  A.  If I've ever seen them, I
23  don't know their names. Those names don't

Page 75

1  -- And I worked out there for over a year,
2  I'm pretty sure, so I would have known them.
3  Q.  You testified truthfully and
4  completely today?
5  A.  Yes.
6  MR. THOMPSON: Let's take
7  about five-minute break. I might be done.
8  These gentlemen may have some questions for
9  you.
10  THE WITNESS: Okay.
11  (Recess taken.)
12  MR. THOMPSON: I don't have
13  any other questions at this time. I think
14  these gentlemen have a few questions for
15  you.
16  THE WITNESS: Okay.
17  MR. WHITE: I'm sorry. I
18  didn't hear that. Are you finished?
19  MR. THOMPSON: Yes. For now.
20  EXAMINATION
21  BY MR. WHITE:
22  Q.  Stacy, you and I have talked
23  on the phone. I'm Matt White.

Page 76

1  A.  Right.
2  Q.  I represent the plaintiffs,
3  along with Jim Douglas, who is sitting here
4  beside me. I just have a few follow-up
5  questions for you.
6  A.  Okay.
7  Q.  What I'm trying to figure out
8  is, you've told us about this incident that
9  occurred with Fetner at your house.
10  A.  Right.
11  Q.  If I asked you to tell me when
12  that occurred --
13  A.  Could I?
14  Q.  Yes.
15  A.  No. I don't -- I done told
16  y'all several times I don't do dates in my
17  mind.
18  Q.  Okay. Let me ask you this
19  way. How long before you left JELD-WEN did
20  this occur?
21  A.  It was a while before I left.
22  Q.  A while meaning weeks or
23  months?

19 (Pages 73 to 76)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 105

1  BY MR. THOMPSON:
2      Q.   Could it have been a year?
3      A.   I -- If it -- I mean --
4      Q.   Could it have been nine
5  months?
6      A.   It could have been any. I
7  mean, anything over a month, it could have
8  been. I don't -- I mean, I'm going good to
9  remember Christmas. I just don't -- I'm not
10 good with dates.
11     Q.   Okay.
12     A.   Like I say, I don't even
13 remember no -- the year I got married to my
14 present husband, other than I've been
15 married four years and I count back,
16 so . . .
17         MR. THOMPSON: I think that's
18 all I have. Thank you so much for coming
19 down.
20 (The deposition was concluded at 4:30 p.m.,
21 May 9, 2006.)
22
23

Page 106

1       REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4      I, Sara Mahler, Certified Shorthand
5  Reporter and Commissioner for the State of
6  Alabama at Large, do hereby certify that the
7  above and foregoing proceeding was taken
8  down by me by stenographic means, and that
9  the content herein was produced in
10 transcript form by computer aid under my
11 supervision, and that the foregoing
12 represents, to the best of my ability, a
13 true and correct transcript of the
14 proceedings occurring on said date and at
15 said time.
16     I further certify that I am neither
17 of kin nor of counsel to the parties to the
18 action; nor in any manner interested in the
19 result of said case.
20
21         _____
22         Sara Mahler, CSR,
           for the State of
23         Alabama at Large.

27 (Pages 105 to 106)