IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

LORENA MINIX, BRENDA SIMS, )
and LINDA SIMS,            )
                           )
    Plaintiffs,            )
                           )        CIVIL ACTION NO.
    v.                     )        3:05cv685-MHT
                           )           (WO)
JELD-WEN, INC.,            )
                           )
    Defendant.             )

OPINION

Plaintiffs Lorena Minix, Brenda Sims, and Linda
Sims bring this lawsuit under Title VII of the Civil
Rights Act of 1965, as amended, 42 U.S.C. §§ 1981a,
2000e through 2000e-17, against their former employer,
defendant JELD-WEN, Inc., claiming that they were
sexually harassed by their supervisor, Richard Fetner.[1]
Jurisdiction is proper under 42 U.S.C. § 2000e-5(f).

---

1.  Minix and the Simses' state-law claims, along
with defendant Fetner, have been dismissed (Doc. No. 36).

This lawsuit is before the court on JELD-WEN's motion for summary judgment. As explained below, the motion will be granted.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion. The burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56). The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial

and may not rest upon the mere allegations or denials in the pleadings.  Fed. R. Civ. P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## II. BACKGROUND

Sometime between late 2001 and early 2002, JELD-WEN took over a facility, located in Roanoke, Alabama, that manufactured wooden components used in the construction of doorframes.

At various times, Lorena Minix worked for JELD-WEN from the time it took over the Roanoke facility until

3

November 2004; she had also worked for JELD-WEN's predecessor. Brenda Sims and Linda Sims (no relation to Brenda) also worked at the facility from June 2004 through November 2004.

Richard Fetner, the immediate supervisor of Minix and the Simses, sexually harassed them during their employment in 2004. Fetner touched their legs and breasts without their consent, and directed inappropriate comments, including the following, to each of them:[2]

(1) He offered to "fix" Minix's timecard if she would have sex with him;[3] told her that he'd "like to eat her from the top of [her] head to [her] toes"; and repeatedly asked her to have sex with him.[4]

_____

2.  Plf. Brief in Opp. Summ. J. (Doc. No. 37), 2-5.

3.  Id., Exhibit 1, Minix dep. (hereinafter Minix dep.), 284:2-14.

4.  Id., 279:2-3.

4

(2) He repeatedly propositioned Brenda Sims,[5] saying that, if she came home with him, she would not have to worry about missing work time. On one occasion, Brenda Sims was sent home from work, although there was work to do on her job, and, as a result, lost hours and wages.[6]

(3) He told Linda Sims that her "butt looked like two basketballs" and he "wanted to go dribbling."[7] On another occasion, he came up behind her and said that one of her "basketballs" looked "deflated" and he "had a needle that could pump [her] up."[8] He also mimicked dribbling a basketball when walking

---

5. Id., Exhibit 2, Brenda Sims dep. (hereafter B. Sims dep.), 150:2-5.

6. Id., 162:10.

7. Id., Exhibit 3, Linda Sims dep. (hereafter L. Sims dep.) 134-135:2, 11, 22, 31.

8. Id., 136:18-20.

5

past her.[9]  Linda Sims was also sent home when there was still work on her job.[10]

Fetner sexually harassed three other women at the facility.  Fetner touched and grabbed Kathy Thornton and stuck broom handles up her skirt while she was working;[11] he also grabbed his crotch in front of her. Thornton reported Fetner's conduct to a coordinating group manager at the plant, but the group manager and JELD-WEN never pursued the complaint.[12]  Fetner also sexually harassed Linda Cook while she was employed at the Roanoke facility.  He touched her between her legs in her "private" area;[13] his attempts to touch her were an "everyday thing."[14]  Fetner forced a third woman to have sex with him.

---

9.  Id., 135:10-13.

10.  Id., 153:14-154:2.

11.  Id., Exhibit 4, Thornton dep. (hereinafter Thornton dep.), 87:16-21.

12.  Id., 105:15-17.

13.  Id., Exhibit 5, Cook dep. 91:10-15.

14.  Id., 208:17-23.

Minix was also harassed at the JELD-WEN facility by a coworker named Ronald Bowen, who masturbated in front of her.[15]   She and another plant worker complained to a manager.   A week later, counsel for JELD-WEN visited the facility,[16] and anti-harassment training was given at the facility, including training on the company's sexual harassment policy.   Bowen quit his job.[17]

On October 13, 2004, Minix and the Simses reported Fetner's harassment to JELD-WEN.   That morning, after the company began an investigation into his behavior, Fetner resigned.   He was awarded severance.   JELD-WEN closed the Roanoke facility shortly thereafter, in late 2004.

In November and December of 2004, Minix and the Simses separately filed charges of sexual harassment with the Equal Employment Opportunity Commission (EEOC), and eventually received right-to-sue letters.

---

15. Minix dep., 219:5-11.

16. Id., 222:22-224:13.

17. Id., 229:10-12.

7

The Simses' EEOC charges indicated that the harassment stopped in August 2004. Minix's charge indicated that the harassment stopped in July 2004.[18]

Minix and the Simses brought this lawsuit in July 2005.

## III. DISCUSSION

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment violates Title VII's prohibition of discrimination based on sex. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57 (1986).

The only issue before the court is JELD-WEN's liability for Fetner's actions; JELD-WEN does not, at this point, dispute that unlawful harassment took

_____

18. Def. M. Summ. J. (Doc. No. 30), Exhibits 22, 31, 43, EEOC charges.

8

place.  Thus, the discussion that follows is confined to the issue of JELD-WEN's liability.

Where, as here, a supervisor has harassed an employee, the company is liable for the harassment where the plaintiff can prove that a tangible employment action was taken against her in connection with the harassment.  In the absence of a tangible employment action, the company is still liable unless it can prove that (1) it exercised reasonable care to prevent and correct the harassment and (2) the plaintiff failed to pursue reasonably corrective opportunities.  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998); <u>Johnson v. Booker T. Washington Broad. Service</u>, 234 F.3d 501, 508 (11th Cir. 2000).

Minix and the Simses contend that a tangible employment action was taken against each of them, and that the company is liable even in the absence of such an action because it did not exercise reasonable care to prevent or correct the harassment they suffered.

## A. Tangible Employment Action

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Where there has been a tangible employment action, no defenses are available to the company. Id. at 765. Minix and the Simses argue that they have suffered a tangible employment action.

To establish JELD-WEN'S liability for sexual harassment based on a tangible employment action, Minix and the Simses must demonstrate that "[their] reaction to the unwelcome behavior affected tangible aspects of [their] compensation, or terms, conditions or privileges of employment." Brown v. Snow, 440 F.3d 1259 (11th Cir. 2006) (internal quotations and citations omitted). Thus, the issue here is whether Minix's and the Simses' reactions to the sexual

10

harassment (not responding to Fetner's propositions) led Fetner to take a tangible employment action against them.

As this case is framed, there are two elements of a claim based on tangible employment action: first, whether the employment action was, in fact, tangible; and, second, whether there was, in fact, a connection between the harassment, including here the refusal, and the employment action. Cotton v. Cracker Barrel Old Country Store, 434 F.3d 1227, 1231 (11th Cir. 2006).

The Simses contend that two sorts of tangible actions were taken against them: lost hours and reassignment. Minix challenges only her reassignment.

## 1. The Simses' Lost Hours

The Simses maintain that they were sent home and lost hours (and, therefore, wages) as a result of rebuffing Fetner's advances. According to them, Fetner did not send them home himself, but rather instructed another employee to do so.

11

Employment decisions that alter compensation are obviously tangible employment decisions, and thus "a reduction in an employee's hours, which reduces the employee's take home pay, qualifies as a tangible employment decision." Cotton, 434 F.3d at 1231. Thus, the Simses' loss of hours satisfies the first requirement of the tangible employment action standard.

The Simses have not, however, adequately established a fact issue as to the necessary "causal link between the tangible employment action and the sexual harassment." Id. While "[t]emporal proximity between the harassment and a tangible employment action can give rise to a genuine issue of fact as to causation," id. at 1232, Linda Sims's loss of hours happened two months after she acknowledged that the harassment stopped; this period of time, without more (that is, standing alone), is too long for a factfinder to be able to conclude, other than by mere speculation, that there was a causal relationship between the

12

harassment and the loss of hours.[19]  Brenda Sims does

not remember when the harassment occurred,[20] and thus,

other through mere speculation, cannot create a fact

issue with respect to it.


### 2.  Minix's and the Simses' Reassignments

Minix's and the Simses' reassignments to different,

and less personally desirable, workstations do not

survive scrutiny either.  While an undesirable

reassignment can be a tangible employment action,

Ellerth, 524 U.S. at 765, the reassignments here cannot

be considered such.

In Davis v. Town of Lake Park Florida, 245 F.3d

1232 (11th Cir. 2001), after using standards for

tangible employment action to inform those for adverse

employment action, the Eleventh Circuit Court of

Appeals held that the plaintiff's removal as "Officer

---

19. L. Sims dep., 151:20.  The date of the end of the
harassment is set by the date in the plaintiff's EEOC
charge.

20. B. Sims dep., 162: 12.

in Charge," or OIC, of a police station was not an adverse employment action.    First, as the court explained, the reassignment did not bring with it any increase in salary or benefits, or unique opportunities for advancement.    Also, the OIC position was a temporary assignment in addition to his duties as an officer; it was "solely ... a stop-gap measure to ensure that certain duties are fulfilled in the event the officer normally responsible for those duties becomes unavailable" and was done as "a matter of course."    245 F.3d at 1244.    Therefore, removal from the position was not a diminution in prestige or a demotion.  Id.

Similarly, in Puckett v. Potter, 342 F.Supp.2d 1056 (M.D. Ala. 2004) (Thompson, J.), this court held that a one-hour change in an employee's hours was not an adverse employment action because the plaintiff lost no pay, and "[did] not allege that the one-hour change in her shift was accompanied by any loss of prestige, responsibility, or opportunity for advancement";

14

indeed, as the court said, the plaintiff was "doing the very same job as before."   342 F.Supp.2d at 1067.   In addition, because the plaintiff "had her hours changed not infrequently, ... a reasonable person would view [the] decision to change [her] hours as just a regular part of working for the [defendant] and not as an adverse tangible employment action."   Id.

The situation for Minix and the Simses is analogous to the situations in Davis and Puckett.   Minix's and the Simses' reassignments did not bring with them any increase or decrease in salary or benefits or in unique opportunities for advancement; employees were temporarily and frequently reassigned to make sure that the work got done.   Minix and the Simses introduced no evidence that there was anything adverse, tangible or intangible, incident to their reassignments. Therefore, a reasonable person would view their reassignments as "just a regular part of working for [JELD-WEN] and not as an adverse tangible employment action."   Puckett, 342 F.Supp.2d at 1067.

Moreover, to the degree that Minix and the Simses allege, as they must, that their reassignments were causally related to Fetner's sexual harassment by virtue of proximity in time, again this allegation must fail. Reassignments were so frequent and routine, and were so much an expected part of their job, that it would be purely speculative, on the current record, to assume that there was any causal relationship between their reassignments and Fetner's harassment.[21]   See Cotton, 434 F.3d at 1233 ("When an employer contemplates a given action before the harassment takes place, temporal proximity between the action and the incident of harassment alone will not suffice to show causation.").

Thus, neither Minix nor either of the Simses has raised an issue of fact that would preclude summary judgment in favor of JELD-WEN on whether they were subjected to a tangible employment action.

---

21. Minix dep., 72:13-73:7, 86:22-87:25; L. Sims dep. 99:1-102:2; B. Sims dep., 50:1-8.

## B. Non-Tangible Employment Injury

In the absence of a tangible employment action, a company may still be held liable for a supervisor's harassment. _Johnson v. Booker T. Washington Broad. Service_, 234 F.3d 501, 508 (11th Cir. 2000). However, where there is no tangible employment action, the company has a defense available to it. That defense was established by the Supreme Court in _Ellerth_ and _Faragher_.

Balancing the policies expressed in Title VII--avoidance of harm and compensation to victims--the Court in _Faragher_ and _Ellerth_ established a defense that put part of the responsibility for avoiding harm on the employer and part of the responsibility on the individual suffering the harassment. _Faragher_, 524 U.S. at 806. Thus, the defense relates both to the actions of the company and the actions of the complainant, even though the company bears the burden of proving it. First, the employer must prove that it

17

exercised reasonable care to prevent the harassment, or to correct it, for example, by creating and implementing a sexual harassment policy. Second, the employer must prove that plaintiff failed to pursue reasonable corrective opportunities. <u>Id</u>.

Minix and the Simses argue that JELD-WEN failed to exercise reasonable care in two ways. First, they argue that JELD-WEN is liable, even if it did not have any notice of Fetner's harassment, because the administration of its sexual harassment policy was inadequate. Second, they argue that the company had notice of the harassment and failed to correct it promptly.

## 1. The Employer's Duty

If JELD-WEN failed to exercise reasonable care to prevent and correct the harassment, it cannot establish the affirmative defense; if, on the other hand, it did exercise reasonable care, it must still prove that

18

Minix and the Simses failed to take advantage of corrective opportunities.

### a. Reasonable Care to Prevent the Harassment

An employer will generally satisfy the first prong of the test where it administers a sexual harassment policy that is, "comprehensive, well-known to employees, vigorously enforced, and provides alternate avenues of redress." <u>Farley v. American Cast Iron Pipe Co.</u>, 115 F.3d 1548 (11th Cir. 1997). The policy cannot be administered "in bad faith" or be "otherwise defective or dysfunctional." <u>Madray v. Publix Supermarkets</u>, 208 F.3d 1290, 1299 (11th Cir. 2000).

While the "wide variety of employment settings" makes it challenging to determine whether a harassment policy will fulfill this requirement, <u>id.</u>, <u>Faragher</u> suggests that the policy must be well-distributed and provide avenues for reporting the harassment to individuals other than the harasser. 542 U.S. at 808.

19

The policy here was well distributed, in that Minix and the Simses each acknowledge having received a copy, and the company conducted training on the policy, including after the incident in which Minix alleged that Bowen harassed her. The policy also provides adequate avenues for reporting other than to the harassing supervisor; the harassment is appropriately reported to the employee's supervisor, group manager, corporate manager, the vice president or subsidiary president or the legal department.[22]

However, Minix and the Simses argue that the policy was inadequately administered, and, in support of their contention, point to a disagreement between Dan Hees, a manager with ultimate responsibility for the Roanoke facility, and one of JELD-WEN's lawyers, over whether certain behaviors would violate JELD-WEN's policy.[23] Minix and the Simses argue that this dispute is proof

---

22. Def M. Summ. J. (Doc. No. 30), Def. Exhibit. A, sexual harassment policy.

23. Id., Exhibit K, Hees dep., 79:14-25, 80:1-4; id., Exhibit M, Strum dep. 118:20-25, 119:1-11.

that the policy was not comprehensive and known to the employees.

This dispute is not enough to raise an issue of fact on the administration of the policy. Although, as a logical matter, a policy must be reasonably comprehensible in order to be known to employees, there is no requirement that the policy be so clear that it can never be open to disagreement on interpretation. Indeed, common sense dictates that such a requirement would be impossible to meet. Even federal courts frequently disagree on matters of interpretation of Title VII. There is no evidence that, despite his interpretive disagreement with one of the company's lawyers, Hees was unaware of the policy or that he did not vigorously administer it in good faith.

On the other hand, there is ample evidence that the policy was administered in good faith. For example, in the wake of the incident where Bowen allegedly harassed

Minix, and before Fetner's harassment of Minix and the Simses, a training session was conducted at the plant.[24]

Minix and the Simses also argue that the decision to award Fetner severance pay is evidence of bad faith in the administration of the policy. While it is understandable that Minix and the Simses are outraged that the company paid severance to an individual who offended them so deeply, their argument that this is evidence a lack of reasonable care in preventing and correcting harassment is without merit. As a result of Fetner's resignation, of which his severance pay was incident, he would be prevented from harassing Minix and the Simses at work in the future. Far from showing a lack of seriousness about the policy, Fetner's severance in the face of investigation shows that the policy worked.

### b. Reasonable Care to Correct the Harassment

However, having a comprehensive, adequate sexual

---

24.    Minix dep., 227:19.

harassment policy that is adequately administered in good faith does not insulate the employer from liability if it had notice of the harassment and failed to correct it. "[T]he employer's notice of the harassment is of paramount importance because if the employer had notice of the harassment then it is liable unless it took prompt corrective action." <u>Madray</u>, 208 F 3.d at 1300.

Here, Minix and the Simses assert that JELD-WEN had actual knowledge of the harassment because another employee, Kathy Thornton, had reported similar harassment by Fetner to a Group Manager, Joe Mendoza.[25] Mendoza occupied the same level in the plant hierarchy that Fetner, Minix and the Simses' supervisor and harasser, did, albeit in another part of the plant.

Where a company employs a sexual harassment policy that lays out the steps an employee should take to report sexual harassment, it "itself answers the question of when it [is] deemed to have notice of the

---

25. Thornton dep., 208:17-23.

23

harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures." Madray, 208 F.3d at 1300; Coates v. Sundor Brands, 164 F.3d 1361, 1364 (11th Cir. 1999).   The question, when there is such a policy, is whether the employee made "reasonably sufficient use of the channels created by [the company's] policy to put [the company] on notice of the ongoing harassment." Id. (emphasis added).

JELD-WEN argues that Thornton's complaint to Mendoza about the harassment was not a reasonably sufficient use of its policy, such that the company could was on notice of the harassment.  The policy, of which both the plaintiff and non-plaintiff complainants were aware, advises employees to contact "their supervisor, their General or Corporate Manager, Vice President or Subsidiary President, or the Legal Department."[26]  Mendoza was not Thornton's supervisor, nor was he the supervisor of any of the plaintiffs in this action.

_____

26. Def M. Summ. J. (Doc. No. 30), Def. Exhibit. A.

24

Thornton's mere conversation with Mendoza was not sufficient to have put JELD-WEN on notice. "[I]nformal complaints to individuals not designated by [the company's policy] to receive or process sexual harassment complaints" do not normally put a company on notice. <u>Madray</u>, 208 F.3d at 1300. Although Mendoza was a manager, he was not a person designated by JELD-WEN's policy to receive complaints by those supervised by others. The reporting hierarchy set forth in JELD-WEN's policy clearly indicates that the appropriate individual to receive complaints is a supervising superior--that is, an individual with direct authority over the complainant in the plant hierarchy. The policy directs complainants to report complaints to "their" managers. Mendoza was not, in any sense, Thornton's manager.

While "an employer cannot use its own policies to insulate itself from liability by placing an increased burden on a complainant to provide notice beyond that required by law," <u>Madray</u>, 208 F.3d at 1302, JELD-WEN

25

did not impose unreasonable reporting requirements upon Thornton by requiring that she report to a supervising superior--someone with responsibility for her.  Rather, this requirement seems aimed at making sure that employees' complaints are dealt with responsibly and appropriately; a supervising superior, by contrast to someone without authority over a complainant, in theory has responsibility for the complainant and her work environment.  It is logical that such a person would be more likely to have both the authority and the responsibility to deal appropriately with the complaint.  Indeed, the company may be trying to avoid precisely what happened here:  Thornton complained to someone outside her reporting hierarchy, who had no responsibility for her area or her personally and who, as a result, did nothing about it.

This is not to say that a complainant may not put the company on notice by complaining to someone outside her hierarchy within a company; it is only to say that the structure of JELD-WEN's policy was reasonable and

26

that, under the law, that structure informs the court's view of whether it had notice.

Finally, Minix and the Simses do not dispute that JELD-WEN acted promptly to correct Fetner's harassment once they reported his harassment to the proper person. JELD-WEN therefore exercised reasonable care in preventing and correcting harassment.

## 2. The Employee's Duty

The second factor of the defense is the employee's failure to take advantage of corrective opportunities. "If the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so." <u>Faragher</u>, 524 U.S. at 807. It is undisputed that, for the time period before the plant's closure, Minix and the Simses failed to avail themselves of this policy, and that, when they did, Fetner resigned.

27

Minix and the Simses argue that this failure was reasonable, given that Minix had reported sexual harassment before, in the instance of Bowen's harassment, and was "dissatisfied" with the outcome of JELD-WEN's procedure.  However, the procedure in Bowen's case seems to have been fully adequate.  A week after Minix complained, a JELD-WEN lawyer came to investigate and do a sexual harassment training,[27] and, that day, Bowen quit his job.[28]  Minix complains that she was forced to work with Bowen for some portion of that week; however, Minix's working alongside Bowen for less than a week cannot render the failure of all three plaintiffs here to report the harassment reasonable.

In other words, Minix and the Simses cannot recover against JELD-WEN because it failed to act when the reason the company failed to act was that Minix and the Simses failed to give notice.  Put another way, because Minix and the Simses failed to inform JELD-WEN a

---

27. Id.

28. Id.

28

reasonable period of time before the facility closed that they were being harassed, the company could not have acted earlier (that is, months or weeks before it closed) to remedy the harassment. The evidence reflects that, in each instance when the company was informed of harassment pursuant to its policy, the offending employee left and thus there was a swift and effective end to the harassment.

Thus, JELD-WEN has proven that Minix and the Simses unreasonably failed to take advantage of the policy.

* * * *

In conclusion, the record reflects that, while there was impermissible sexual harassment of Minix and the Simses, JELD-WEN cannot be held accountable. An appropriate judgment will be entered.

DONE, this the 17th day of October, 2006.

                    /s/ Myron H. Thompson
                 UNITED STATES DISTRICT JUDGE